**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- X
BRIAN FLORES, as a Class Representative, on  :
behalf of himself and all others similarly situated, :    Civil Action No.
                                        :
                  Plaintiff,    :
                                          :
           v.                :    **CLASS ACTION COMPLAINT**
                                          :
THE NATIONAL FOOTBALL LEAGUE; NEW  :
YORK FOOTBALL GIANTS, INC.; MIAMI    :
DOLPHINS, LTD.; DENVER BRONCOS; and  :    **Jury Trial Demanded**
JOHN DOE TEAMS 1 through 29,         :
                                          :
                  Defendants.    :
------------------------------------------------------------- X

**"Sorry – I fucked this up.  I double checked and misread the text.  I think they are naming Brian Daboll.  I'm sorry about that.  BB."**

- Bill Belichick informing Plaintiff Brian Flores, three days *before* his interview with the New York Giants that Brian Daboll had *already* been selected for the job.

**"Morals cannot be legislated, but behavior can be regulated.  The law cannot make an employer love me, but it can keep him from refusing to hire me because of the color of my skin."**

- Dr. Martin Luther King, Jr.

## PRELIMINARY STATEMENT

1.     As this Class Action Complaint is filed on the first day of Black History Month, we honor the brave leaders that fought so hard to help break down racial barriers of injustice.  Martin Luther King Jr., Harriet Tubman, Rosa Parks, Frederick Douglass, Jackie Robinson and Mamie Till, to name only a few.

2.     Unfortunately, however, there is so much more to be done.  While racial barriers have been eroded in many areas, Defendant the National Football League ("NFL" or the "League") lives in a time of the past.  As described throughout this Class Action Complaint, the

NFL remains rife with racism, particularly when it comes to the hiring and retention of Black Head Coaches, Coordinators and General Managers.  Over the years, the NFL and its 32-member organizations (the "Teams") have been given every chance to do the right thing.  Rules have been implemented, promises made—but nothing has changed.  In fact, the racial discrimination has only been made worse by the NFL's disingenuous commitment to social equity.

3.      As such, in the face of the risks associated with combating racism and injustice, and in particular standing up to organizations as powerful as the NFL and its Teams, Mr. Flores has determined that the only way to effectuate real change is through the Courts, where the NFL's conduct can be judged by a jury of Mr. Flores' peers.  A judgment that is long overdue.

4.      In certain critical ways, the NFL is racially segregated and is managed much like a plantation.  Its 32 owners—none of whom are Black—profit substantially from the labor of NFL players, 70% of whom are Black.  The owners watch the games from atop NFL stadiums in their luxury boxes, while their majority-Black workforce put their bodies on the line every Sunday, taking vicious hits and suffering debilitating injuries to their bodies and their brains while the NFL and its owners reap billions of dollars.

5.      Many players desire to coach for their post-playing careers.  Others desire to work their way into management-level positions at one of the NFL's 32 Teams.  Unfortunately, for Black individuals, that is easier said than done.

- Only 1 of the NFL's 32 teams (3%) employs a Black Head Coach;

- Only 4 of the NFL's 32 teams (12%) employ a Black Offensive Coordinator;

- Only 11 of the NFL's 32 teams (34%) employ a Black Defensive Coordinator;

- Only 8 of the NFL's 32 teams (25%) employ a Black Special Teams Coordinator;

- Only 3 of the NFL's 32 teams (9%) employ a Black Quarterback Coach; and

- Only 6 of the NFL's 32 teams (19%) employ a Black General Manager.

6.     These numbers come from a pool of players that is approximately 70% Black. This is not by chance. Rather, the statistics above and those described throughout this Complaint are the result of race discrimination.

7.     The NFL has effectively conceded this point. Troy Vincent, the NFL Executive Vice President of Football Operations, recently stated with regard to Black Head Coaches:

> There is a double standard, and we've seen that . . . And you talk about the appetite for what's acceptable. Let's just go back to . . . Coach Dungy was let go in Tampa Bay after a winning season. . . Coach Wilks, just a few years prior, was let go after one year . . . Coach Caldwell was fired after a winning season in Detroit . . . It is part of the larger challenges that we have. But when you just look over time, it's over-indexing for men of color. These men have been fired after a winning season. How do you explain that? There is a double standard. I don't think that that is something that we should shy away from. But that is all part of some of the things that we need to fix in the system. We want to hold everyone to why does one, let's say, get the benefit of the doubt to be able to build or take bumps and bruises in this process of getting a franchise turned around when others are not afforded that latitude? . . . [W]e've seen that in history at the [professional] level.[1]

8.     Similarly, Jonathan Beane, the NFL's Senior Vice President and Chief Diversity & Inclusion Officer, stated:

> Any criticism we get for lack of representation at the GM and head coach positions, we deserve. We see that we're not where we want to be. We have to do much better. We're focusing on all roles at

---

[1]     See Maske, Mark, "Senior NFL Official: 'Double Standard for Black coaches when it comes to keeping jobs'", *The Washington Post*, (Jan. 11, 2022), available at: https://www.washingtonpost.com/sports/2022/01/11/black-nfl-coaches-firings-troy-vincent/.

the league, and all these roles are key roles . . . But certainly at the top of the house, general manager and head coach, that's the responsibility of the NFL to make sure that we are representing our current fan base and we're representing those that are in the league today. And if you look at it right now, we're grossly underrepresented.[2]

9.      Perhaps worst of all, in connection with its distribution of settlement monies to retirees who suffer from traumatic brain injury, the NFL insisted on applying so-called "race-norms."  Put simply, the NFL took the position that white people simply have better baseline cognitive function than Black people.  This is the very definition of racism—the assumption that someone is not as smart as another person because of the color of his or her skin.  It also perhaps explains why the NFL and its Teams are so loath to hire Black Head Coaches, Coordinators and General Managers ("GMs"), just as for years the League discriminated against Black quarterbacks.

10.      These are literal admissions of liability and fault on the part of the NFL and its owners, and yet no meaningful remedial action has been taken to remedy this recognized discrimination.

11.      Even when Black candidates get hired for Head Coaching positions, a rarity, they are discriminated against in connection with the terms and conditions of their employment and compensation and terminated even as far less successful white Head Coaches are retained. Moreover, Black Head Coaches are far less likely than white Head Coaches to receive second chances even as white Head Coaches are routinely hired by Teams even after they fail elsewhere.

12.      It has been nearly 20 years since the NFL implemented the Rooney Rule, purportedly to try to combat the utter lack of Black Head Coaches in the NFL.  As first

---

[2]      See "NFL Executives Want, Expect More Black Coaches To Be Hired", *The Associated Press*, (Jan. 15, 2022), available at: https://pittsburgh.cbslocal.com/2022/01/15/nfl-executives-want-expect-more-black-coaches-to-be-hired/.

implemented, the Rooney Rule required NFL Teams to interview at least one Black person in connection with any Head Coach vacancy. The Rooney Rule has since been expanded to cover General Manager and other front office positions, as well as Assistant Head Coach and Coordinator positions. Moreover, as it relates to Head Coach positions, teams are now required to interview two minority coaching candidates, at least one of whom must be interviewed in person.

13.     The Rooney Rule may have been well intentioned, although it is hard to attribute benevolence to the NFL given the complete lack of action that it has taken post-Rooney Rule to remedy discrimination that it admits exists. However, well intentioned or not, what is clear is that the Rooney Rule is not working. It is not working because the numbers of Black Head Coaches, Coordinators and Quarterback Coaches are not even close to being reflective of the number of Black athletes on the field. The Rooney Rule is also not working because management is not doing the interviews in good-faith, and it therefore creates a stigma that interviews of Black candidates are only being done to comply with the Rooney Rule rather than in recognition of the talents that the Black candidates possess.

14.     In January 2022, Mr. Flores, who spent three years as the Head Coach of Defendant Miami Dolphins, Ltd. (the "Dolphins" or "Miami"), found himself without a job. He was fired by the Dolphins after leading the team to its first back-to-back winning seasons since 2003. The purported basis for his termination was alleged poor collaboration. In reality, the writing had been on the wall since Mr. Flores' first season as Head Coach of the Dolphins, when he refused his owner's directive to "tank" for the first pick in the draft. Indeed, during the 2019 season, Miami's owner, Stephen Ross, told Mr. Flores that he would pay him $100,000 for every

loss, and the team's General Manager, Chris Grier, told Mr. Flores that "Steve" was "mad" that

Mr. Flores' success in winning games that year was "compromising [the team's] draft position."

15.     After the end of the 2019 season, Mr. Ross began to pressure Mr. Flores to recruit

a prominent quarterback in violation of League tampering rules.  Mr. Flores repeatedly refused to

comply with these improper directives.  Undeterred, in the winter of 2020, Mr. Ross invited Mr.

Flores onto a yacht for lunch.  Shortly after he arrived, Mr. Ross told Mr. Flores that the

prominent quarterback was "conveniently" arriving at the marina.  Obviously, Mr. Ross had

attempted to "set up" a purportedly impromptu meeting between Mr. Flores and the prominent

quarterback.  Mr. Flores refused the meeting and left the yacht immediately.  After the incident,

Mr. Flores was treated with disdain and held out as someone who was noncompliant and difficult

to work with.

16.     From that point forward, Mr. Flores was ostracized and ultimately he was fired.

He was subsequently defamed throughout the media and the League as he was labeled by the

Dolphins brass as someone who was difficult to work with.  This is reflective of an all too

familiar "angry black man" stigma that is often casted upon Black men who are strong in their

morals and convictions while white men are coined as passionate for those very same attributes.

17.     Thus, last week, Defendant New York Football Giants, Inc. (the "Giants" or

"New York Giants") had an opportunity to move a step in the right direction, if even only one.

The Giants had the chance to hire Mr. Flores, an eminently qualified Black man, to be the first

Black Head Coach in the Giants' nearly 100-year history.

18.     Instead, the New York Giants made the decision to hire Brian Daboll—and

disclosed that decision to third parties—during a time when the Giants were scheduled to still

interview Mr. Flores and when Mr. Flores was deceptively led to believe he actually had a chance at this job.

19.     Thus, on Wednesday, January 26, 2022, Mr. Flores was forced to sit through a dinner with Joe Schoen, the Giant's new General Manager, knowing that the Giants had already selected Mr. Daboll.  Much worse, on Thursday, January 27, 2022, Mr. Flores had to give an extensive interview for a job that he already knew he would not get—an interview that was held for no reason other than for the Giants to demonstrate falsely to the League Commissioner Roger Goodell and the public at large that it was in compliance with the Rooney Rule.

20.     The Giants would likely have gotten away with this most insidious form of discrimination if New England Patriots Coach Bill Belichick had not mistakenly disclosed it to Mr. Flores in the below text messages.




21.     Incredibly, this was not Mr. Flores' first sham interview that was held only in an effort to comply with the Rooney Rule.  Indeed, in 2019 Mr. Flores was scheduled to interview with the Denver Broncos.  However, the Broncos' then-General Manager, John Elway, President and Chief Executive Officer Joe Ellis and others, showed up an hour late to the interview.  They looked completely disheveled, and it was obvious that they had drinking heavily the night before.  It was clear from the substance of the interview that Mr. Flores was interviewed only because of the Rooney Rule, and that the Broncos never had any intention to consider him as a legitimate candidate for the job.  Shortly thereafter, Vic Fangio, a white man, was hired to be the Head Coach of the Broncos.

22.     Having discovered what the Giants and the rest of the NFL had hoped to keep in the dark, Mr. Flores now brings this Class Action Complaint to shine a light on the racial injustices that take place inside the NFL and to effectuate real change for the future.

23.     Among the other relief sought, Mr. Flores seeks the following injunctive relief:

i.      Increase the influence of Black individuals in hiring and termination decisions for General Manager, Head Coach and Offensive and Defensive Coordinator positions;

a.      Ensure diversity of ownership by creating and funding a committee dedicated to sourcing Black investors to take majority ownership stakes in NFL Teams;

b.      Ensure diversity of decision-making by permitting select Black players and coaches to participate in the interviewing process for General Manager, Head Coach and Offensive and Defensive Coordinator positions;

ii.     Increase the objectivity of hiring and termination decisions for General Manager, Head Coach and Offensive and Defensive Coordinator positions;

a. Require NFL Teams to reduce to writing the rationale for hiring and termination decisions, including a full explanation of the basis for any subjective influences (*e.g.*, trust, personality, interview performance, *etc.*);

b. Require NFL Teams to consider side-by-side comparisons of objective criteria, such as past performance, experience and objective qualifications;

iii. Increase the number of Black Offensive and Defensive Coordinators;

a. Create and fund a training program for lower-level Black coaches who demonstrate an aptitude for coaching and an interest in advancing to a Coordinator position;

iv. Incentivize the hiring and retention of Black General Managers, Head Coaches and Offensive and Defensive Coordinators through monetary, draft and/or other compensation such as additional salary cap space; and

v. Complete transparency with respect to pay for all General Managers, Head Coaches and Offensive and Defensive Coordinators.

24. Defendants' conduct has violated Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), the New Jersey Law Against Discrimination, ("NJLAD"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL") and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq*. ("NYCHRL").

## ADMINISTRATIVE PROCEDURES

25. Plaintiff will file a Charge of Discrimination with the Equal Employment Opportunity Commission, an administrative pre-requisite to filing an action under Title VII of the Civil Rights Act of 1964 ("Title VII") and will amend this action to include claims under Title VII at the appropriate time.

26. Pursuant to NYCHRL § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department,

Office of the Corporation Counsel within 10 days of its filing, thereby satisfying the notice requirements of this action.

27.     Plaintiff has complied with any and all other prerequisites to filing this action.

## JURISDICTION AND VENUE

28.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under § 1981.  The Court has supplemental jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

29.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including certain of the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

30.     Plaintiff Brian Flores is a Black man and the former Head Coach of the Miami Dolphins.  Mr. Flores was not only denied the Head Coach position of the New York Giants but was humiliated in the process as the New York Giants subjected him to a sham interview in an attempt to appear to provide a Black candidate with a legitimate chance at obtaining the job.

31.     Defendant the National Football League is a trade association made up of 32 professional football teams and with a principal place of business located at 345 Park Avenue, New York, NY 10154.

32.     Defendant New York Football Giants, Inc. is a corporation that owns and operates the New York Giants professional football team.  New York Football Giants, Inc. is headquartered at 1925 Giants Drive, East Rutherford, NJ 07073.

33.     Defendant Miami Dolphins, Ltd. is a corporation that owns and operates the Miami Dolphins professional football team.  Miami Dolphins, Ltd. is headquartered at 346 Don Shula Drive, Miami Gardens, FL 33056.

34.     Defendant Denver Broncos, former corporate name PDB Sports, Ltd., is a corporation that owns and operates the Denver Broncos professional football team.  The Denver Broncos are headquartered at 13655 Broncos Parkway, Englewood, Colorado 80112.

35.     Defendants John Doe Teams 1 through 29 are intended to identify NFL teams who have engaged in discriminatory conduct towards the Members of the Proposed Class, including potentially the Arizona Cardinals, Atlanta Falcons, Baltimore Ravens, Buffalo Bills, Carolina Panthers, Chicago Bears, Cincinnati Bengals, Cleveland Browns, Dallas Cowboys, Detroit Lions, Green Bay Packers, Houston Texans, Indianapolis Colts, Jacksonville Jaguars, Kansas City Chiefs, Las Vegas Raiders, Los Angeles Chargers, Los Angeles Rams, Minnesota Vikings, New England Patriots, New Orleans Saints, New York Jets, Philadelphia Eagles, Pittsburgh Steelers, San Francisco 49ers, Seattle Seahawks, Tampa Bay Buccaneers, Tennessee Titans and/or the Washington Football Team.

## FACTUAL ALLEGATIONS

## I.     HISTORY OF RACE DISCRIMINATION IN THE NFL

36.     The NFL has a tortured and unacceptable history with race relations that requires immediate focus in the first instance.  The League remains mired in a culture that lacks inclusivity and where a barrier to entry still exists today for Black professionals in leadership.

37.     The first iteration of the NFL[3] began in 1920, and it was rife with racism.

---

[3]     The NFL was originally known as the American Professional Football Conference, then the American Professional Football Association, before being renamed to the NFL in 1922.

38.     From 1920 through 1926, a total of only nine Black players were permitted into the League.  At that time, the only reason Black players were permitted at all was because the then-existing teams had difficulty filling out their rosters in the League's early days.

39.     Heading into the 1927 season, all five of the remaining Black players at the time left the League and, from 1927 to 1933, only a handful of Black players were permitted to participate.  Indeed, during that time frame there was no more than one Black player in the League per year.

40.     In 1933, the League had only two Black players, but they left at the end of the year, leaving the NFL with none.  At this point, the NFL was reportedly financially viable and no longer needed Black players to fill vacant positions.

41.     This led to one of the most despicable moments in the history of professional sports in the United States:  it is widely accepted that the NFL used the absence of Black players as an opportunity to impose a "gentleman's agreement" to ban Black players entirely.

42.     This initiative was led by the Washington Football Team's owner George Preston Marshall.[4]  The League's other founding owners—including but not limited to, Tim Mara of the New York Giants—appear to have colluded and cooperated in this widespread racial ban.

43.     It was not until 1946 that Black players re-entered professional football.

44.     However, the reentry of Black players into the League was not the result of introspection and a commitment to equality.  Rather, when the Cleveland Rams moved to Los Angeles, the publicly funded playing venue, the Los Angeles Coliseum, forced the Rams to integrate at least one Black player in order to comply with the Supreme Court's decision in *Plessy v. Ferguson* that banned segregation in places of public accommodation.

---

[4]     See Moore, Louis, "The NFL and a History of Black Protest", *African American Intellectual History Society*, (Sept. 12, 2018) (citing "Kenny to get Tryout with National League," *Los Angeles Tribune,* (Jan. 19, 1946)), available at: https://www.aaihs.org/the-nfl-and-a-history-of-black-protest/#fn-42670-3.

45.     In fact, it was reported that during a meeting between local officials, community activists and the Rams' General Manager Charles F. Walsh, Mr. Walsh admitted to the unwritten racist "gentlemen's agreement" of barring Black players.

46.     As it would happen, the Rams ultimately signed two Black players for the 1946 season, but two more years would go by before any other team would sign a Black player.

47.     As of 1950, fewer than half of the NFL's ten teams had signed a Black player and it was not until more than a decade later that the Washington Football Team signed its first Black player.

48.     In 1959, 13 years later after the start of integration, only 12 percent of the League's players were Black.

49.     Even as integration slowly progressed, the stain of racism persisted.  Teams reportedly put unwritten quotas on how many Black players could be signed, and often teams would stack Black players at the same position so that they would be eliminated as a matter of competition and roster cuts.  It was also reported that Black players received less compensation than their white counterparts.

50.      The NFL only engaged in genuine full-scale racial integration when it became economically necessary due to outrage and protests from writers and fans, the emergence of the rival and more racially progressive leagues (such as the All-America Football Conference ("AAFC") and American Football League ("AFL")) and the success of numerous minority athletes in college football.[5]

---

[5]     See "The Reintegration of the NFL." *NFL Football Operations*, accessed Feb. 1, 2022 available at: https://operations.nfl.com/inside-football-ops/players-legends/evolution-of-the-nfl-player/the-reintegration-of-the-nfl/.

51.     Of course, integration was hardly the end of Black struggle in the NFL—untold forms of discrimination still followed Black players from team-to-team, city-to-city, stadium-to-stadium and hotel-to-hotel.  In fact, though the NFL had integrated 23 years earlier, when Washington's owner, Mr. Marshall, died in 1969, he abhorrently stipulated that his estate be used to establish the Redskins Foundation, on the condition that it was barred from spending money for "any purpose which supports or employs the principle of racial integration in any form."[6]

52.     The NFL has profited immensely from the racial integration of its players. Initially considered a second-tier sport, the NFL has thrived as an integrated League over the last 75 years.

53.     While the NFL was forced to racially integrate its players to generate these immense profits, it was not forced to do so in other areas—so it did not.

54.     It took approximately **20 years** for the League to hire its first black official (Burl Toler).

55.     It is widely known by even casual NFL fans that it took until at least the 1980s—approximately **40 years** after integration—for teams to genuinely accept Black players at the quarterback position (*i.e.* Warren Moon and Randall Cunningham).[7]

56.     It took **43 years** for the first Black Head Coach to be hired (Art Shell).

---

[6]     See Coates, Ta-Nehisi, "A History of Segregation in the NFL", *The Atlantic*, (Nov. 17, 2011), available at: https://www.theatlantic.com/entertainment/archive/2011/11/a-history-of-segregation-in-the-nfl/248625/

[7]     The blatant racial stereotyping of Black quarterbacks in terms of the way they have been treated and described must be noted.  Empirical studies show that "Black quarterbacks tend to be praised for their athleticism and criticized for a lack of intelligence. Meanwhile, white quarterbacks are often praised for their intelligence and criticized for a lack of athleticism."  See Mercurio, Eugenio, and Filak, Vincent, "Roughing the Passer: The Framing of Black and White Quarterbacks Prior to the NFL Draft." *Howard Journal of Communications* 21, no. 1 (2010): 56–71. https://doi.org/10.1080/10646170903501328.  The Wonderlic test, used by NFL teams to gauge intelligence of pre-draft players has been harshly criticized for being discriminatory.  See *e.g.* Hazell, Ricardo A., "NFL Draft Wonderlic leaks Reek of Racism and Classism," *The Shadow League* (April 25, 2017); Stromberg, Joseph, "Reminder: The NFL's Wonderlic Aptitude Test is Totally Worthless," *Vox* (May 8, 2014).

57. It took **54 years** for an NFL team to hire a Black General Manager (Ozzie Newsome).

58. Now, **76 years** following integration, there has never been a Black Commissioner and there has never been a Black majority owner of an NFL team.

59. For a League and its team owners who have profited immensely off the talent of Black players, the NFL has never fully acknowledged its history of racism or taken appropriate steps to address its racial disparities. As a Black sportswriter once wrote:

> [P]ersons, corporations or business almost always forget the people or incidents that made them big . . . [the NFL] took all the aid the colored American could give and then as soon as it became 'big league,' promptly put a bar up against the very backbone of its existence."[8]

60. Case in point: Mr. Marshall, in many ways the personification of the NFL's deep-seeded institutional racism, is enshrined in the NFL Hall of Fame—and his contributions are lauded by the Hall of Fame's website, with only a passing reference to the fact that he "endured his share of criticism for not integrating his team until being forced to do so in 1962."[9] That is, the NFL does not even acknowledge, much less condemn, Mr. Marshall's role in the League's history with racism. Rather, it only notes that he received criticism from others.

## II.     THE NFL'S ONGOING PROBLEMS WITH RACE

61. History shows that the NFL is synonymous with ownership resistance to anti-racist protest—and that continues to the present day.

---

[8]     See Halley Harding, "So What?" *Los Angeles Tribune*, (Feb. 7, 1941) (as cited in Moore, "The NFL and a History of Black Protest").

[9]     See "George Preston Marshall: Pro Football Hall of Fame Official Site." *PFHOF* (Accessed January 27, 2022), available at: https://www.profootballhof.com/players/george-preston-marshall/. For his part, Tim Mara's Hall of Fame entry does not include any reference to New York's complicity with the NFL's racist segregationist policies. See Tim Mara: Pro Football Hall of Fame Official Site." *PFHOF* (Accessed January 27, 2022), available at: https://www.profootballhof.com/players/tim-mara/.

A.    **Discrimination Against Colin Kaepernick**

62.    As has been well documented, during the 2016 NFL season, Colin Kaepernick

protested societal racial injustice by kneeling during the national anthem.

63.    Following the 2016-17 season—a season in which over the course of 11 games

started he had 16 touchdowns against only four interceptions, 468 rushing yards and a passer

rating of 90.7—no NFL team would offer him a job, even as a backup.

64.    To even a casual observer it was clear that Mr. Kaepernick was more than

qualified for a roster spot in the NFL.

65.    Seahawks Head Coach Pete Carroll explained the Seahawks' rationale for not

bringing him in: "**He's a *starter* in this league**. And we have a starter. But **he's a *starter* in this**

**league,** and I can't imagine that someone won't give him a chance to play."[10]

66.    The New York Giants gave Mr. Kaepernick no consideration and suggested that it

was because the team feared backlash from the fans if it signed Mr. Kaepernick—a statement

that journalists understandably labeled "dangerous."[11]

67.    In an August 2017 article titled, "Colin Kaepernick is Not Supposed to Be

Unemployed," the statistics website FiveThirtyEight stated, "It's obvious Kaepernick is being

frozen out for his political opinions," that "[n]o above-average quarterback has been unemployed

---

[10]    See Kapadia, Sheil, "Pete Carroll on Colin Kaepernick: Not doing anything yet, but 'he's a starter in this league'", *ESPN.com*, (Jun. 2, 2017), available at: https://www.espn.com/nfl/story/_/id/19523162/pete-carroll-says-seattle-seahawks-not-signing-colin-kaepernick.

[11]    See Biderman, Chris, "Why Giants Owner John Mara's Statement on Colin Kaepernick is dangerous", *USA Today*, (May 29, 2017), available at: https://ninerswire.usatoday.com/2017/05/29/why-giants-owner-john-maras-statement-on-colin-kaepernick-is-dangerous/.  This was a particularly outrageous position to take given that the Giants had just signed a white Kicker, Josh Brown, after he was arrested for domestic violence and kept him off the team after he was suspended for the same misconduct.  It took the murder of George Floyd and the related nationwide protests for you to publicly convey your support for players who choose to kneel during the Anthem

nearly as long as Kaepernick" and "[i]t's easy to lose sight of the reality that good quarterbacks often never even reach free agency, let alone remain unsigned for so long."[12]

68.     Mr. Kaepernick's protests received a variety of reactions—both positive and negative—with then-President Donald J. Trump siding against him and calling on the nearly all-white NFL owners to "fire" players who protest during the national anthem.  President Trump referred a player who protested (clearly referring to Mr. Kaepernick) as "that Son of a Bitch."

69.     In an October 2017 meeting among owners, players and League executives to address racial injustice protests by players, NFL owners effectively endorsed President Trump's opinion that a player who protests racial injustice is a "Son of a Bitch" and a stated an unwillingness to act contrary to Trump's directives.[13]

70.     As time went on, still no team would sign Mr. Kaepernick for any role, starter or backup, despite the fact that he clearly deserved such a role based on merit, skill and experience. While some owners gave lip service to solidarity with Black players, NFL owners still collectively refused to employ Mr. Kaepernick following his racial justice protests.

71.     During these years, many teams—including the New York Giants—could have used his services as a clear roster upgrade.  But he remained blackballed.

72.     Against the backdrop of the League's history, this conduct remains an appalling example of the League's continued problems with race.

---

[12]     See Wagner, Kyle, "Colin Kaepernick is Not Supposed To Be Unemployed", *FiveThirtyEight*, (Aug. 9, 2017), available at: https://fivethirtyeight.com/features/colin-kaepernick-is-not-supposed-to-be-unemployed/.

[13]     See McCann, Michael, "The Leaked October Tapes and the Kaepernick Collusion Case", *Sports Illustrated*, (Apr. 25, 2018), available at: https://www.si.com/nfl/2018/04/25/leaked-tapes-nfl-owners-players-october-meeting-kaepernick-collusion-case-donald-trump.

**B.**      **Acquiescence to Discrimination by Head Coach John Gruden**

73.      John Gruden, the 30-year NFL insider and three-time Head Coach, is the embodiment of the NFL's acquiescence to racism.

74.      In October 2021, it was disclosed that between 2011 and 2018, Mr. Gruden exchanged a slew of emails containing racist, misogynistic and homophobic slurs to Washington Football Team's then-General Manager Bruce Allen.

75.      Mr. Gruden remarked that DeMaurice Smith, the NFL Players' Association Executive Director, had "lips the size of Michelin tires."

76.      Mr. Gruden also stated that players who protested the national anthem to protest racial inequality should be "fired."

77.      Mr. Smith responded to reports of these emails saying, "Racism like this comes from the fact that I'm at the same table as they are and they don't think someone who looks like me belongs."[14]

78.      As stated, Mr. Gruden's emails also contained a slew of additional offensive conduct.  The emails referred to Mr. Goodell as a "faggot" and a "clueless anti football pussy," and said Mr. Goodell should not have pressured the Rams to draft "queers" (referring to the drafting of Michael Sam, the first openly gay player drafted by an NFL team in 2014), something which the Rams coach has denied.  Mr. Gruden also called then United States Vice President Joe Biden a "nervous clueless pussy."[15]

---

[14]      See "Raiders, NFL condemn Jon Gruden for using racial trope in 2011 email to describe NFLPA Executive Director DeMaurice Smith", *NFL.com*, (Oct. 8, 2021), available at: https://www.nfl.com/news/raiders-nfl-condemn-jon-gruden-for-using-racial-trope-in-2011-email-to-describe-#:~:text=%22Racism%20like%20this%20comes%20from,not%20let%20it%20define%20me.%22.

[15]      See Belson, Ken and Rosman, Katherine, "Raiders Coach Resigns After Homophobic and Misogynistic Emails", *New York Times*, (Oct. 11, 2021), available at: https://www.nytimes.com/2021/10/11/sports/football/what-did-jon-gruden-say.html.

79.     Mr. Gruden and Mr. Allen also exchanged emails with other members of the Washington Football Team staff with photos of topless women, including two team cheerleaders.

80.     In one email from 2015 that includes several football insiders including Mr. Allen, Gruden asked Mr. Allen to tell Bryan Glazer (part of the family which owns the Tampa Bay Buccaneers) to perform oral sex on him.

81.     Mr. Gruden also mocked Caitlyn Jenner, a transgender former Olympic athlete.

82.     It simply cannot be a surprise to NFL executives, insiders and team owners—who have collectively spent the last three decades in the proximity of Mr. Gruden—that this is who Mr. Gruden is and that these are the beliefs he harbors.

83.     Nonetheless, Mr. Gruden remained an inner-circle candidate for virtually every Head Coach position over the 10-year period that followed his departure from the Tampa Bay Buccaneers in 2008.

84.     Ultimately, in 2018, Mr. Gruden received the largest contract in history for an NFL Head Coach, when the Las Vegas Raiders signed him to a 10-year, $100 million deal.

85.     The Raiders' hiring of Mr. Gruden occurred in close succession with the Raiders' firing of General Manager Reggie McKenzie, one of the few Black General Managers in the League.

86.     Under Mr. McKenzie, the Raiders had the highest percentage of Black players at 82.3%, and he won the NFL Executive of the Year Award in 2016 after compiling a 12-4 record.

87.     Only two years later, Mr. McKenzie was fired and replaced by Mike Mayock, a white candidate.  Under all-white leadership (Owner, General Manager and Head Coach), the

percentage of Black players on the Raiders decreased every year that followed. By 2021, the percentage of Black players on the Raiders roster dropped to 67.2%.

88. Though Mr. Gruden is no longer employed by the Raiders, it has been reported that the NFL was well aware of Mr. Gruden's offensive emails for several months and took no action.[16]

89. When the news of Mr. Gruden's racist emails finally surfaced, rather than an unequivocal rebuke and a for-cause termination, the Raiders allowed him to graciously resign and claim that it was due to his desire not to be a distraction.

90. Mr. Gruden even had the gall to blame the NFL and Mr. Goodell, claiming that they were responsible—not him for his own actions—for his termination.[17]

C. **The NFL's Concussion Settlement Discriminated Against Black Players**

91. In 2011, retired NFL players began filing personal injury actions in courts around the country seeking damages or relief in the form of medical monitoring. Some of these actions were filed on behalf of a class, some for small groups of former players and others for individuals (collectively, the "Concussion Lawsuits").

92. As alleged in the Concussion Lawsuits, the NFL for decades was aware of the evidence and the risks associated with repetitive traumatic brain injuries, but nevertheless "ignored, minimized, disputed, and actively suppressed broader awareness of the link between subconcussive and concussive injuries in football and the chronic neuro-cognitive damage, illnesses, and decline suffered by former players."

---

[16]　See Beaton, Andrew, "How the NFL Learned Months Ago of the Offensive Emails that Cost Jon Gruden His Job", *The Wall Street Journal*, (Oct. 12, 2021), available at: https://www.wsj.com/articles/jon-gruden-emails-investigation-washington-football-team-11634079234.

[17]　See Whelan, Catherine, "Jon Gruden Sues NFL for Allegedly Leaking Emails that Led to his Resignation", *NPR*, (Nov. 13, 2021), available at: https://www.npr.org/2021/11/13/1055574569/jon-gruden-sues-nfl-for-allegedly-leaking-emails-that-led-to-his-resignation.

93.     The NFL was also alleged to have "failed to warn [players] and/or impose safety regulations governing this health and safety problem" and "produced industry-funded, biased, and falsified research that claimed that concussive and sub-concussive head impacts in football do not present serious, life-altering risks."

94.     The Concussion Lawsuits identified a number of retired NFL players who were diagnosed with traumatic brain injury ("TBI") following their playing career, and sought money damages for injury and death, as well as medical treatment for retired players diagnosed with TBI.

95.     Ultimately, the claims were consolidated and settled in 2014.  Under the settlement agreement, a former player who has a "Qualifying Diagnosis" is eligible for monetary benefits.  A diagnosis is "Qualifying" primarily—but not exclusively—if rendered by physicians approved by the NFL or in conjunction with the NFL's Baseline Assessment Program ("BAP").  The BAP is intended both to identify symptoms of eligible conditions and to collect data for comparison to later testing, to establish any subsequent decline in a retired player's cognitive functioning.

96.     Claims for monetary awards are first reviewed by a Claims Administrator.  In the first instance, any appeals of the Claims Administrator's determinations are heard by an Appeals Advisory Panel.  Any appeals from the Appeals Advisory Panel are brought to the court that entered the settlement agreement.

97.     According to a lawsuit filed by former Black NFL players Kevin Henry and Najeh Davenport, as well as media reports, the NFL began regularly insisting that physicians use "race-norms" in determining whether a retiree had suffered cognitive impairment (the "Race-

Norming Lawsuit"). When Black retirees were deemed to be cognitively impaired, the NFL regularly appealed such determinations if race-norming was not used.

98.     As alleged in the Race-Norming Lawsuit, "the National Football League . . . [has] been avoiding paying head-injury claims under the Settlement Agreement based on a formula for identifying qualifying diagnoses that explicitly and deliberately discriminates on the basis of race. When being evaluated for the Qualifying Diagnoses of Neurocognitive Impairment, Black former players are automatically assumed (through a statistical manipulation called 'race-norming') to have started with worse cognitive functioning than white former players. As a result, if a Black former player and a white former player receive the exact same raw scores on a battery of tests designed to measure their current cognitive functioning, the Black player is presumed to have suffered less impairment, and he is therefore less likely to qualify for compensation."

99.     Put another way, the NFL insisted that white people simply have better cognitive function than Black people. Thus, if a Black person was found to be cognitively impaired, the NFL would often not accept that diagnosis unless the physician gave adequate consideration to the possibility that Black people simply do not function cognitively as well as white people. This is the very definition of racism—the assumption that someone is not as smart as another person because of the color of his or her skin.

D.     **The NFL's Attempt to Pander During Widespread, Societal Racial Protests**

100.     In June 2020, following protests over George Floyd's murder and other instances of racially charged violence, Roger Goodell publicly apologized for the League's previous response to player protests saying, "we were wrong for not listening to NFL players earlier."[18]

---

[18]     See "Roger Goodell: NFL 'wrong' for not listening to protesting players earlier", *NFL.com*, (Jun. 5, 2020), available at: https://www.nfl.com/news/roger-goodell-nfl-wrong-for-not-listening-to-protesting-players-earlier.

101.     Goodell further "encourage[d] all to speak out and peacefully protest" and said, "[w]ithout black players, there would be no National Football League and the protests around the country are emblematic of the centuries of silence, inequality and oppression of black players, coaches, fans and staff." Id.

102.     Despite the blatant collusion against him, Mr. Goodell declared in a publicly released video that "Black Lives Matter" and announced that the NFL desired to work with Mr. Kaepernick in the creation and distribution of a $250 million foundation for social justice initiative.[19]

103.     These remarks and actions—emblematic of the phrase "too little too late"—were largely ridiculed by the public as hypocritical and an obvious attempt to pander to growing public sentiment against racial injustice.  Racial discrimination requires real and meaningful attention—not mere soundbites when it is in the League's financial interest.

## III.     LACK OF BLACK COACHES AND THE FAILURE OF THE ROONEY RULE

104.     Troy Vincent, a Black, Hall of Fame former cornerback, and current NFL Executive Vice President of Football Operations, recently stated with regard to the treatment of Black Head Coaches in the NFL:

> There is a double standard, and we've seen that . . . And you talk about the appetite for what's acceptable.  Let's just go back to . . . Coach Dungy was let go in Tampa Bay after a winning season. . . Coach Wilks, just a few years prior, was let go after one year . . . Coach Caldwell was fired after a winning season in Detroit . . . It is part of the larger challenges that we have.  But when you just look over time, it's over-indexing for men of color.  These men have been fired after a winning season.  How do you explain that?  There is a double standard.  I don't think that that is something that

---

[19]     See Battista, Judy, "NFL commits $250M over 10-year period to combat systemic racism", *NFL.com*, (Jun. 11, 2020), available at: https://www.nfl.com/news/nfl-commits-250m-over-10-year-period-to-combat-systemic-racism.

we should shy away from.  But that is all part of some of the things that we need to fix in the system. We want to hold everyone to why does one, let's say, get the benefit of the doubt to be able to build or take bumps and bruises in this process of getting a franchise turned around when others are not afforded that latitude? . . . [W]e've seen that in history at the [professional] level.[20]

105.    Mr. Vincent's common-sense analysis of the NFL's predicament with respect to the lack of Black Head Coaches hits the nail on the head: "There is a double standard."  This double standard has led to a consistent dearth of Black Head Coaches despite an abundance of highly qualified candidates.  For Black Head Coaches who are hired, retention of the job is routinely more difficult than for white counterparts.

106.    Historically, Head Coach positions were closed to Black candidates until Art Shell broke this color barrier in 1989.  Still, Mr. Shell was only one of five Black Head coaches between then and 2003.  As one sportswriter noted, "In 2003, NFL franchise owners had to be prodded to seriously consider Black candidates to coach their teams. They were willing to sign Black players [to] make them money while risking their health. They were reluctant to let them lead their teams after they were done playing."[21]  This was a reference to what is commonly known as the "Rooney Rule."

107.    By way of brief background, in 2002, Johnnie L. Cochran Jr., civil rights attorney Cyrus Mehri and labor economist Dr. Janice Madden together produced a detailed report on the NFL's head-coaching hiring practices entitled "Black Coaches in the National Football League: Superior Performance, Inferior Opportunities."  The report analyzed the NFL's hiring and firing practices over the previous 15 seasons, and the statistics showed evidence of discrimination,

---

[20]    See Maske, Mark, "Senior NFL Official: 'Double Standard for Black coaches when it comes to keeping jobs", *The Washington Post*, (Jan. 11, 2022), available at: https://www.washingtonpost.com/sports/2022/01/11/black-nfl-coaches-firings-troy-vincent/.

[21]    See Cunningham, Michael, "Here we go again: NFL still has 'double standard' with Black coaches," *The Atlanta Journal Constitution*, (Jan. 14, 2022), available at: https://www.ajc.com/sports/mike-check-blog/here-we-go-again-nfl-still-has-double-standard-with-black-coaches/2L7DTCGPCFBIHBUVRGHDGPX2UA/.

including that Black Head Coach candidates were less likely to be hired and that Black Head

Coaches were more likely to be fired.

108.     Due to the public sentiment gathering to address this problem, on October 31,

2002, the NFL appointed a "Committee on Workplace Diversity," headed by Pittsburgh Steelers'

President Dan Rooney, to study the issue further.  On December 20, 2002, this committee issued

its recommendations, including that NFL teams make a commitment to interview minority

candidates for every Head Coach job opening (with limited exceptions).  In December 2002, the

owners approved this recommendation.

109.     Since its passage, the Rooney Rule has been amended several times in an effort to

strengthen its impact on diversity and inclusion, or to at least appear to do that.  It now applies to

General Manager and other front office positions, as well as Assistant Head Coach and

Coordinator positions.  Moreover, teams are now required to interview two minority Head Coach

candidates, and at least one in person.  However, the Rooney Rule has failed to yield any

meaningful change to an institution so fully steeped in discriminatory practices.

110.     In the 20 years since the Rooney Rule was passed, only 15 Head Coaching

positions have been filled by Black Candidates.  During that time, there have been approximately

129 Head Coaching vacancies.  Thus only 11% of Head Coach positions have been filled by

Black candidates—in a league where 70% of players are Black.  With few exceptions, the Black

candidates who have obtained Head Coach positions have been on a "short leash" and lasted for

extremely short periods, while white candidates have much lengthier opportunities to prove their

worth.  In addition, upon information and belief, in general Black coaches at all levels are paid

less than similarly qualified white coaches.

111.    Indeed, not a single one of the 10 Black Head Coaches hired since 2012 still holds his Head Coach job today.  In contrast, approximately 25% of white Head Coaches hired during the same time frame remain employed as a Head Coach.  Moreover, since 2012, Black Head Coaches have been fired in an average of 2.5 years, whereas (accounting for Head Coaches that are expected to return next year) white Head Coaches have averaged nearly 3.5 years on the job. Put another way, white Head Coaches are afforded an entire additional year to establish themselves relative to Black Head Coaches.

112.    Moreover, since 1978, only 16 winning teams have fired their head coach (3%). Even though Black men only held a small fraction of the Head Coach positions during that time, an astounding 25% (four of the 16) of the Head Coaches fired after a winning season were Black. This statistic is even more remarkable given that there have only ever been 17 Black Head Coaches who have coached a full season, and four of them (23.5%) were fired after a winning season.  In contrast, only 6.9% of white coaches were fired after a winning season (12 out of 174).  Thus, Black Head Coaches are 3.5 times more likely to be fired even when successful.

113.    Moreover, unsuccessful white Head Coaches routinely get second and third chances in critical positions, including as a Head Coach or Offensive or Defensive Coordinator. Indeed, according to a 2021 NFL Diversity and Inclusion report, since 1963, 116 white individuals have been hired as a Head Coach or Coordinator after an initial Head Coach opportunity, whereas only 21 individuals of color have received the same second chances.[22]  The same report noted that only one person of color has received three Head Coaching opportunities, whereas 15 white men have received three Head Coaching opportunities (two of the 15 received four opportunities).  Id.

---

[22]    See Harrison, C.K. and Bukstein, S., "Occupational Mobility Patterns in the National Football League" (Volume X), (2021), available at: https://operations.nfl.com/media/4989/nfl-occupational-mobility-report-volume-x-february-2021.pdf.

114.   Thus, while the Rooney Rule was and remains well-intentioned, its effectiveness requires NFL teams to take it seriously, and not treat it as a formality that must be endured simply to formalize the pre-determined hiring of a white coach.  Moreover, it requires that teams provide Black Head Coaches a fair and legitimate chance—a chance commensurate with the circumstances and comparable to the chances given to white Head Coaches—to thrive.

115.   But that has not happened.  As a result, following the recent terminations of Mr. Flores and David Culley, former Head Coach of the Houston Texans, there is currently only one Black Head Coach out of 32 NFL teams.  The following photo array speaks for itself.



116.    At the time the Rooney Rule was instituted, almost twenty years ago, there were three Black Head Coaches.  There is now only one.  That marks a complete lack of improvement, and in fact, a move backwards in the wrong direction.

117.    As was recently well-put by sportswriter Jemele Hill,

> [M]ost NFL owners have been white men, and they have seldom been willing to let African Americans or Latinos call plays—either on the field or from the sidelines. This is no different from when franchises presumed that black players weren't smart enough to play quarterback and lacked leadership skills to command men. The league's paltry record of hiring minority head coaches comes from the same mind-set. And its primary effort to address the problem has been a failure, because a policy can't compensate for ignorance . . . If the NFL wants to create an equitable system for minority head coaches, the owners can't rely on a rule to create institutional change.[23]

118.    Ms. Hill continued, "NFL owners must recognize that their lazy stereotypes of black male leadership have created this embarrassing problem.  In time, we'll see whether they have the courage to fix it."  As has been evidenced by The New York Giants' Head Coach search and treatment of Mr. Flores—the NFL and its teams clearly do not.

## IV.    RACIAL DISPARITIES EXTEND TO COORDINATOR AND GENERAL MANAGER POSITIONS

119.    Racial disparities also exist in the hiring and retention at Coordinator positions as well.  Offensive and Defensive Coordinators are significantly over-represented by white candidates and under-represented by Black candidates.  These positions are very often filled by a pool of former players, approximately 70% of whom are Black.

---

[23]    See Hill, Jemele, "NFL Owners Have a Problem With Coaches of Color," *The Atlantic* (Jan. 11, 2020), available at: https://www.theatlantic.com/ideas/archive/2020/01/nfl-owners-have-problem-coaches-color/604771/. Unfortunately, NFL owners have, by and large, failed to recognize even the existence of these stereotypes, much less found the courage to eradicate them.

120.    Currently, there are only four Black Offensive Coordinators in the 32-team

League (12.5 percent), and 11 Black Defensive Coordinators (34 percent).[24]

121.    This is significant given that, according to the NFL's Diversity & Inclusion

Report covering 2012 through 2021 (published in February 2021),[25] teams focus on

Coordinators, and in particular Offensive Coordinators, when it comes to considering candidates

for Head Coach positions.  During the period studied, approximately 80% of Head Coach hires

were previously Coordinators.

122.    According to the study, 31 out of 62 Head Coach positions were filled by

Offensive Coordinators (where Black professionals are the most under-represented) while 18

Head Coach positions were filled by Defensive Coordinators.  Moreover, only three out of 32

teams have a Black Quarterbacks Coach, which is the position that most often leads to an

Offensive Coordinator opportunity.  This figure is not entirely surprising given the NFL's history

of racism when it comes to the quarterback position.

123.    This shows that not only are the NFL's Head Coaches predominantly white, but

that the pipeline feeding this racial disparity is fraught with discrimination.  This is indicative of

the structural discrimination that pervades NFL teams and likely ensures that this problem will

remain.  In sum, NFL teams are more willing to hire Black professionals into positions they

deem to be less important and less likely to lead to Head Coach positions.

---

[24]      In addition, only eight of 32 Special Teams Coordinators are Black (25%).

[25]      See Harrison, C.K. and Bukstein, S., "Occupational Mobility Patterns in the National Football League" (Volume X), (2021), available at: https://operations.nfl.com/media/4989/nfl-occupational-mobility-report-volume-x-february-2021.pdf.

124.    The same discriminatory practices are apparent when it comes to the hiring of

General Managers.  Currently, out of 32 teams, there are only six Black General Managers

(18.75%) against 26 white General Managers.[26]  See below:



<hr />

[26]    These are as follows: Chris Grier, Miami Dolphins; Andrew Berry, Cleveland Browns; Martin Mayhew, Washington Football Team; Brad Holmes, Detroit Lions; Terry Fontenot, Atlanta Falcons and Kwesi Adofo Mensah, Minnesota Vikings.

125.    According to the NFL's Diversity & Inclusion Report, from 2012 through 2021 there were 37 General Managers vacancies and only six were filled by Black candidates (16 percent).  20 NFL teams have never had a Black General Manager.

126.    The NFL's inability to achieve racial diversity at the Head Coach positions stems from the both the pipeline flowing up as well as the decision makers at the top.  The lack of representation of Black General Managers doubtlessly leads to the lack of Black Head Coaches.

127.    It stands to reason that, whether explicit or implicit, white decisionmakers tend to favor white candidates for significant positions, as numerous studies suggest there is same-race bias in decision-making.  Organizational studies have shown that people are most likely to hire others of the same race and that bias among decision makers can affect the diversity of the entire organization.  This helps explain the structural problems that lead to a lack of Black professionals in both Head Coaching and in the pipeline at Coordinator positions.[27]

---

[27]    See, e.g., Goldberg, Caren B, "Relational Demography and Similarity-Attraction in Interview Assessments and Subsequent Offer Decisions: Are we Missing Something," *George Washington University* (Dec. 1, 2005); Bertrand, M., & Mullainathan, S., "Are Emily and Greg more employable than Lakisha and Jamal? A field experiment on labor market discrimination.", *The American Economic Review, 94*(4), 991-1013, (2004) Retrieved February 1, 2022 from https://proxy.library.upenn.edu/login?url=https://www.proquest.com/scholarly-journals/are-emily-greg-more-employable-than-lakisha-jamal/docview/233023724/se-2; Johnson, S. K., Hekman, D. R., & Chan, E. T., "If there's only one woman in your candidate pool, there's statistically no chance she'll be hired", *Harvard Business Review*, (Apr. 26, 2016), Retrieved February 1, 2022, from https://hbr.org/2016/04/if-theres-only-one-woman-in-your-candidate-pool-theres-statistically-no-chance-shell-be-hired.

128.   To that end, the NFL has no Black owners:





129.   Owners are ultimately responsible for leading the entire organization, establishing

an inclusive culture and deciding who to hire and retain in front office leadership positions such

General Managers.  The lack of any Black voices in ownership clearly has led to a dearth of

opportunities for Black General Managers, which has—in turn—undermined racial inclusion in

the NFL for more than 100 years.

## V.    NOTABLE RECENT EXAMPLES OF DISCRIMINATORY CONDUCT

### A.    Brian Flores

#### i.    Background on Brian Flores

130.    Mr. Flores, the son of Honduran immigrants, grew up in the housing projects in Brownsville, Brooklyn, New York.  Mr. Flores managed to navigate and avoid the perils of drugs, gangs and violence in one of the city's toughest neighborhoods and grew to love his home neighborhood and city.  As it was put by a childhood friend, "Brownsville is the trenches . . . and Brian was like a rose growing out of the concrete."[28]

131.    Mr. Flores excelled academically and began playing football.  After a successful high school and college playing career, Mr. Flores was hired as a scout by the New England Patriots and, in 2008, transitioned to a coaching position.  Mr. Flores received multiple promotions, and, during his tenure, the Patriots appeared in five Super Bowls, winning three of them.  In the last of these Super Bowls, when Mr. Flores called the Patriots' defensive plays, the Patriots held the Los Angeles Rams to three points, tied for the fewest ever in a Super Bowl.

132.    In 2019, on the heels of his outstanding performance with the Patriots, Mr. Flores was offered the Miami Dolphins Head Coach position.  By all accounts, Mr. Flores did a fantastic job in three seasons from 2019-2021.  In his first year, Miami's gutted roster won five games despite many experts predicting an 0-16 season and one of the worst teams in NFL history.

133.    The Dolphins owner, Stephen Ross, was unhappy with this performance not because it was under-performing.  To the contrary, Mr. Ross wanted the Mr. Flores to "tank" the season to put the team in position to secure the first pick in the draft.  Indeed, during the 2019

---

[28]    See O'Connor, Ian, "The Patriots' next coaching star? His odds were incredibly long", *ESPN.com*, (Mar. 7, 2018), available at: https://www.espn.com/nfl/story/_/id/22262842/brian-flores-new-england-patriots-next-coaching-star-emerge-bill-belichick-tree.

season, Mr. Ross told Mr. Flores that he would pay him $100,000 for each game lost that
year.  Then, when the Dolphins started winning games, due in no small part to Mr. Flores'
coaching, Mr. Flores was told by the team's General Manager, Chris Grier, that "Steve" was
"mad" that Mr. Flores' success in winning games that year was "compromising [the team's] draft
position."

134.    After the end of the 2019 season, Mr. Ross began to pressure Mr. Flores to recruit
a prominent quarterback in violation of League tampering rules.  Mr. Flores repeatedly refused to
comply with these improper directives.  Undeterred, in the winter of 2020, Mr. Ross invited Mr.
Flores onto a yacht for lunch.  Shortly after he arrived, Mr. Ross told Mr. Flores that the
prominent quarterback was "conveniently" arriving at the marina.  Obviously, Mr. Ross had
attempted to "set up" a purportedly impromptu meeting between Mr. Flores and the prominent
quarterback.  Mr. Flores refused the meeting and left the yacht immediately.  After the incident,
Mr. Flores was treated with disdain and held out as someone who was noncompliant and difficult
to work with.

135.    Over the remaining year and a half of Mr. Flores tenure at the helm of the Miami
Dolphins, he was routinely made to feel uncomfortable based upon his decision not tank in order
to secure the top pick in the 2019 draft.  Upon information and belief, no white Head Coach has
ever been subjected to such ridicule over winning and holding the spirt of the game in such high
regard.  In fact, Mr. Flores was ultimately terminated and subsequently defamed throughout the
media and the League as he was labeled by the Dolphins brass as someone who was difficult to
work with.  This is reflective of an all too familiar "angry black man" stigma that is often casted
upon Black men who are strong in their morals and convictions while white men are coined as
passionate.

136.    The following year, in 2020, despite this discriminatory treatment, the Dolphins improbably won 10 games, narrowly missing the playoffs, and Mr. Flores was mentioned as a potential coach of the year candidate.  In 2021, Miami again finished with a winning record, and fans, pundits and experts all agree the team played extraordinarily hard for Mr. Flores. Nonetheless, Mr. Flores was terminated just three years into his five-year contract with the Dolphins.  He was told that he was being terminated for "poor collaboration," which itself has discriminatory undertones.

137.    Mr. Flores' only failure to collaborate was his refusal to tank the 2019 season as had been requested by Mr. Ross.  When he refused, and then over-performed and led the team to winning records in two consecutive seasons with a roster few experts predicted could do so—he was fired.

138.    Mr. Flores was discharged from his duties as the Dolphins Head Coach on January 10, 2022.  Countless current and former players, executives and media analysts expressed their dismay at Mr. Flores' termination,[29] and he immediately became one of the top Head Coach candidates on the market.

### ii.    The New York Giants Subject Mr. Flores to a Sham Interview

139.    It is against this backdrop that the Giants should have considered Mr. Flores as a highly regarded candidate for the Head Coach position, and, for nearly two weeks, it at least publicly appeared that the Giants viewed Mr. Flores as a desirable option.

140.    Indeed, on January 11, 2022, the day that the Giants terminated Head Coach Joe Judge, Mr. Flores received a text message from Tim McDonnell, the Giants' Co-Director of Player Personnel.  The two spoke *via* telephone and, according to Mr. McDonnell, the Giants,

---

[29]    See Cwik, Chris, "Dolphins players, rest of NFL react to Brian Flores getting fired: ' I'm sick'", *Yahoo!* Sports, (Jan. 10, 2022), available at: https://sports.yahoo.com/dolphins-players-rest-of-nfl-react-to-brian-flores-getting-fired-im-sick-170451689.html.

and owner John Mara, were extremely interested in hiring him for the team's vacant Head Coach position.

141.    Later that day, after the two texted about potential General Manager and Assistant Coach/Coordinator candidates, Mr. McDonnell let Mr. Flores know that Mr. Mara would be reaching out directly to him to express his interest.  Mr. Flores let Mr. McDonnell know that the Giants Head Coach position would be his "dream job."[30]

142.    The following day, on January 12, 2022, Mr. Mara and Mr. Flores had a positive conversation about his candidacy for the Head Coach position.  This was followed up with a Zoom meeting on Tuesday, January 18, 2022.

143.    On the morning of Sunday, January 23, 2022, Mr. Schoen, who had recently been announced as the Giants' new General Manager (beating out multiple Black candidates for the job), began the process of scheduling an interview with Mr. Flores.

144.    The same day in the mid-afternoon, Mr. McDonnell told Mr. Flores that he hoped that Mr. Flores would "come in and win the fng job."

145.    On Monday, January 24, 2022, Mr. Schoen finalized Mr. Flores' interview date for January 27, 2022.

146.    Unfortunately, just hours later Mr. Flores learned that the Giants' continued courtship was nothing more than a discriminatory façade designed to show false compliance with the Rooney Rule.

147.    Indeed, on January 24, 2022, at 2:30 p.m., Mr. Flores received a text message from New England Patriots Head Coach, Bill Belichick—clearly an insider and privy to non-

---

[30]    Ironically, during their January 11, 2022 text exchange, Mr. McDonnell also suggested that if Mr. Flores were hired as the Giants Head Coach, Brian Daboll might be interested in leaving Buffalo to serve as his Offensive Coordinator ("Heard Daboll isn't happy with Sean [McDermott] in Buffalo . . . might be able to get out if he doesn't get a head job… thoughts?").

public information from direct sources.  The ensuing text messages from Mr. Belichick to Mr.

Flores speak for themselves:

 

148.    Clearly, by midday Monday, January 24, 2022, the Giants had already decided to

hire Mr. Daboll and communicated the decision to third-parties, including to Mr. Belichick.

149.    But for Mr. Belichick's error, Mr. Flores never would have known of this fact.[31]

This revelation not only impugns and viciously exposes the sham process to which Mr. Flores

was subjected but also stands to indict the Giants' organizational hiring practices in general.

---

[31]    Other third parties have also confirmed that the interview of Mr. Flores was a sham.  *See*, *e.g.*, Randazzo, Jimmy, "I Was Told on Monday Brian Daboll Will Get the Job.  I Don't Care Who Was Right or Who Was First I Just Want Him to Be the next Head Coach," *Twitter*, (Jan. 28, 2022), available at:

150.    It is impossible to put into words the emotions Mr. Flores felt upon learning that not only would he not be getting the Giants Head Coach job—the job of his dreams—but, more importantly, that he was not even being given serious consideration for the position but being treated as a box to "check off" due to his race.

151.    Mr. Flores spent Monday evening, Tuesday and Wednesday (including a dinner with Mr. Schoen) knowing that he was walking into Thursday's interview with no chance to become the Giants Head Coach.  While he would spend countless hours preparing to put his best step forward, the white men across the table from him saw and heard only one thing: a formality that had to be observed in order to name Mr. Daboll the Head Coach.

### iii.    The Giants' Treatment of Mr. Flores is Consistent with Its Past

152.    The Giants in particular have an ominous history when it comes to race relations, and, in particular, when it comes to hiring Black Head Coaches.

153.    The Giants have never hired a Black Head Coach—Mr. Flores would have been the Team's first.  This is a near unbelievable fact given that the Giants have been in existence for nearly 100 years and have now hired 22 Head Coaches.  It is made even worse given that approximately 70% of the players in the NFL are Black, and the Organization sits in the nexus of the New York/New Jersey community, which prides itself on diversity and inclusion.

154.    Year after year, the Giants have interviewed Black candidates for open Head Coach positions—likely due only to the requirements of the Rooney Rule—without ever hiring one.

155.    In 2004, the Giants hired Tom Coughlin after interviewing Romeo Crennel (who would go on to receive Head Coach positions with the Cleveland Browns, Kansas City Chiefs

---

https://twitter.com/JimmyRandazzo/status/1487168987725185025; Esiason, Boomer, "[Brian Daboll] was offered the job earlier in the week but had to wait for the Giants to complete the formal interviewing process," CBS Sports Minute, (Jan. 31, 2022), available at: https://www.audacy.com/podcasts/cbs-sports-minute-818.

and Houston Texans) and Lovie Smith (who would go on to receive a Head Coach position with the Chicago Bears, who he took to the Super Bowl in 2006, and Tampa Bay Buccaneers).

156.    After Tom Coughlin left the organization in 2016, the Giants hired Ben McAdoo after interviewing Teryl Austin, the highly qualified Black Defensive Coordinator of the Detroit Lions.

157.    When Mr. McAdoo was terminated after just two years, the Giants hired Pat Shurmur after interviewing Steve Wilks and Eric Studesville, two highly qualified Black candidates.

158.    After Mr. Shurmur was fired just two years later, the Giants passed over Eric Bieniemy, who many considered to be the best Head Coach prospect on the market, as well as Kris Richard, and instead hired Joe Judge,[32] who himself was fired after just two years.

159.    More to the point, only once since the passage of the Rooney Rule have the Giants even interviewed more than the minimum number of Black candidates for Head Coach, and it is not for a lack of qualified candidates.  This demonstrates that the Giants interview Black candidates because of the NFL's mandate and for no other reason.

### iv.    Prior Sham Interview With the Denver Broncos

160.    Incredibly, this was not Mr. Flores' first sham interview that was held only in an effort to comply with the Rooney Rule.  Indeed, in 2019 Mr. Flores was scheduled to interview with the Denver Broncos.  However, the Broncos' then-General Manager, John Elway, President and Chief Executive Officer, Mr. Ellis, and others, showed up an hour late to the interview. They looked completely disheveled, and it was obvious that they had drinking heavily the night

---

[32]    The Giants' willingness to hire Mr. Judge, but not Mr. Flores, is a particular affront to racial equality when comparing their relative qualifications.  See Hill, Jemele, "NFL Owners Have a Problem with Coaches of Color", *The Atlantic*, (Jan 11, 2020), available at: https://www.theatlantic.com/ideas/archive/2020/01/nfl-owners-have-problem-coaches-color/604771/ (explaining that Mr. Flores had to have far greater qualifications than Mr. Judge before finally receiving a Head Coach position with the Miami Dolphins).

before.  It was clear from the substance of the interview that Mr. Flores was interviewed only because of the Rooney Rule, and that the Bronco's never had any intention to consider him as a legitimate candidate for the job.  Shortly thereafter, Vic Fangio, a White man, was hired to be the Head Coach of the Broncos.

161.    Sadly, while the Rooney Rule was meant to lift the NFL from its history of insidious "gentlemen's agreements," segregation and racism, the Giants' actions towards Mr. Flores fit that history all too well.

**B.**    **The Hiring of Steve Mariucci**

162.    In 2003, soon after the Rooney Rule was adopted, the Detroit Lions were looking for a Head Coach, and team president Matt Millen made it clear that the team expected to hire Steve Mariucci.

163.    Likely because the Lions' intention to hire Mr. Mariucci was made so well known, five minority coaching candidates, including Dennis Green (who had a 97-62 record as the Head Coach of the Minnesota Vikings for 10 seasons), understandably turned down interviews.

164.    Similar to the Giants with Mr. Flores, the Lions were looking to interview Black candidates not because of any genuine intent to give any of them a fair shot at the job.  It was only an attempt to engage in false compliance with the Rooney Rule.

165.    The NFL determined that the Rooney Rule had been violated and fined the team a paltry $200,000.

**C.**    **Jim Caldwell Fired After Winning Seasons and Replaced by White Coaches**

166.    In 2009, Jim Caldwell was hired as the Indianapolis Colts Head Coach.

167.     The team went 14-2 in his first year and made it to the Super Bowl, followed by a 10-6 record and the AFC South division title for a second year in a row—a total record of 27-8 over his first two seasons.

168.     The following year Colts lost their starting quarterback—Peyton Manning, around whom the entire team had been built – and the team fell to 2-14.

169.     Despite his past success and the justifiable reasons for this poor record in one season out of three, Mr. Caldwell was fired.

170.     In 2014, the Detroit Lions hired Mr. Caldwell.

171.     In his first year the team went 11-5, a four-game improvement from the previous year.  The Lions fell to 7-9 in 2015 but rebounded to 9-7 in 2016 and made it to the playoffs. The Lions were 9-7 again in 2017 but missed the playoffs.  Thus, Mr. Caldwell had three winning seasons in four years—for one of the historically worst franchises in the NFL.

172.     He had an aggregate record of 36-28, a winning percentage of .563—the best winning percentage of any Lions Head Coach since the 1950s.  The Lions also had two playoff berths in four seasons, as compared to one playoff appearance in the previous 14 seasons.

173.     Nonetheless, Mr. Caldwell was fired the day after his fourth season.

174.     The Lions have gone 17-46 since his departure with only white Head Coaches, including no playoff appearances and no season with any greater than six wins.

175.     In the more than three years since losing the Lions job, Mr. Caldwell has not received any further opportunities as a Head Coach, despite numerous openings and interviewing no fewer than five times for different positions.

### D.     **"Double Standard" Treatment of Steve Wilks**

176.    In 2018, the Arizona Cardinals hired Steve Wilks, a longtime NFL coach for several franchises.  He led the team to a disappointing 3-13 record in his first season.

177.    However, it was his first season, and he was not given any time to develop the team or culture and he was stuck with numerous burdens not of his own making—he had a rookie quarterback in Josh Rosen (9th pick), the team GM (Steve Keim) was suspended for five weeks following a DUI during training camp and the Cardinals had numerous injuries to key players.  Mr. Keim, a white GM, kept his job, but Mr. Wilks was fired.

178.    The next Head Coach, Kliff Kingsbury, went 5-10 in his first year with Kyler Murray as a rookie quarterback (first pick), and he retained his job and was given time to improve.

### E.     **Discriminatory Treatment David Culley**

179.    David Culley has been a collegiate and NFL coach for more than 45 years, including 27 years in the NFL.

180.    Despite his reputation and success, Mr. Culley was never hired into an Offensive or Defensive Coordinator position.

181.    However, in January 2021, the Houston Texans hired Mr. Culley to be Head Coach, though it was widely considered to be one of the most difficult situations for a first year Head Coach in memory.

182.    The previous season, the Texans went 4-12 despite having Pro Bowl quarterback Deshaun Watson start every game, throw 33 touchdowns against only seven interceptions and end with a passer rating of 112.4.

183.     However, Mr. Watson was unavailable to play due to allegations of sexual misconduct and Mr. Culley was forced to start Davis Mills, a rookie third round draft pick at quarterback.  The team had also lost its top two players in recent years, J.J. Watt and DeAndre Hopkins.

184.     Mr. Culley's prospects for success were near impossible, but Mr. Culley managed to coach the team to the same record as the team had its previous season.

185.     Immediately after the season ended, the Texans fired Mr. Culley without explanation other than vague "philosophical differences"—which begs the question why he was hired just one year earlier in the first place.

186.     Even the Texans GM acknowledged that, "a change after one season is unusual."

**F.     No Opportunities Provided to Kris Richard**

187.     Kris Richard has been a collegiate and NFL coach for more than 10 years.

188.     He boasts an impressive resume, including being instrumental in the formation of the Seattle Seahawks "Legion of Boom," as both a Secondary Coach and Defensive Coordinator, in the mid-2010s.

189.     He was also very successful as a Defensive Assistant for the Dallas Cowboys and New Orleans Saints.

190.     Mr. Richard had five Head Coach interviews during the 2018 and 2019 hiring cycles and received no offers.

191.     Meanwhile, six white Head Coaches were hired in 2018 and another six were hired in 2019.

192.     Mr. Richard was reportedly not interviewed at all during the 2020 cycle, and it seems now that he is being considered only for Defensive Coordinator positions.

G.    **Teryl Austin Never Given a Chance**

193.    Teryl Austin has been a collegiate and NFL coach for more 30 years.

194.    After success with the Seahawks, Ravens and Lions, Mr. Austin was interviewed for no fewer than 10 open Head Coach positions.  He was rejected for each one.

195.    Following the 2016 hiring cycle, Mr. Austin stated that only two of the four interviews he engaged in that year felt like "legitimate interviews" where he had a "legitimate shot at the job."  He was asked in a follow-up question whether his saying two of the job interviews were "legitimate," meant he believed the other two were "Rooney Rule interviews." Austin said: "Take it however you want."

H.    **Eric Bieniemy Cannot Get a Head Coach Job**

196.    Eric Bieniemy has been a highly successful NFL coach for almost 12 years and has yet to be offered a Head Coach position despite more than 70 vacancies during that time.

197.    In high school, Mr. Bieniemy was a second team All-American and went on to play at the University of Colorado.  In 1990, his senior year, he was the nation's second leading rusher with 1,628 years and 17 touchdowns, and he finished third in Heisman Award voting.

198.    Mr. Bieniemy was drafted in the second round of the NFL draft and played in the League for nine seasons, until 1999.

199.    After going back to college to complete his degree, Mr. Bieniemy then took jobs as the Running Back Coach at Colorado for two years and at UCLA for three years.

200.    In 2005, following a 9-2 season concluding with a win in the Sun Bowl, Mr. Bieniemy accepted a position as Running Back Coach for the Minnesota Vikings.

201.    During his tenure, the team's lead back, Adrian Peterson, led the NFC in rushing in 2007 and 2008.

202.     In 2010, Mr. Bieniemy was named the Vikings' Assistant Head Coach for the offense.

203.     In 2011, Mr. Bieniemy returned to Colorado as Offensive Coordinator, only to return to the NFL two years later as the Running Back Coach for Kansas City Chiefs.

204.     In 2018, Mr. Bieniemy was promoted to Offensive Coordinator.  In Mr. Bieniemy's first season as Offensive Coordinator, the Chiefs were first in the NFL in yards per game and scored the third-most points in a season in NFL history.  Chiefs quarterback Patrick Mahomes became only the second quarterback in NFL history, along with Peyton Manning to throw for 5,000 yards and 50 touchdowns in a season.

205.     In 2018, the Chiefs advanced to the AFC Championship Game where they lost to the Tom Brady-led New England Patriots.

206.     In 2019, Mr. Bieniemy won his first Super Bowl when the Chiefs.  In 2020 and 2021, Mr. Bieniemy again helped lead the Chiefs to the AFC Championship Game and, in 2020, the Super Bowl.

207.     Without question, Mr. Bieniemy has the pedigree, track record and reputation to make him a sought-after Head Coach.  However, despite being interviewed for approximately 20 vacant positions over the last five years, no team has extended Mr. Bieniemy an offer.

208.     During this time, numerous white candidates who are clearly less qualified have taken over the Head Coach duties for numerous NFL teams.

## RULE 23 CLASS ACTION ALLEGATIONS

### I.   CLASS DEFINITION

209.    This is a class action pursuant to Federal Rule of Civil Procedure ("FRCP") 23,

brought by Plaintiff on behalf of a Proposed Class of similarly situated employees.  The

Proposed Class (subject to future revision as may be necessary), is defined as follows:

> **All Black Head Coach, Offensive and Defensive Coordinators and Quarterbacks Coaches, as well as General Managers, and Black candidates for those positions during the applicable statute of limitations period**

210.    The unlawful conduct suffered by Plaintiff and the members of the Proposed

Class, includes, but is not limited to:

- Members of the Proposed Class have been discriminatorily denied positions as Head Coaches, Offensive and Defensive Coordinators and Quarterbacks Coaches, as well as General Managers;

- Members of the Proposed Class have been discriminatorily subjected to sham and illegitimate interviews;

- Members of the Proposed Class have been subjected to discriminatory retention practices and/or termination decisions;

- Members of the Proposed Class have been subjected to disparate terms and conditions of employment, including but not limited to, lack of opportunity and harm to professional reputation; and

- Members of the Proposed Class have been subjected to unequal compensation relative to their white peers.

211.    Upon information and belief, the Proposed Class contains more than 40 members

during the applicable limitations period.

212.    Plaintiff and the Proposed Class have standing to seek such relief because of the adverse effects that Defendants' unlawful patterns, practices and/or policies have had on them individually and generally.

213.    The patterns, practices and/or policies described in this Complaint demonstrate that discrimination is not unusual at the NFL; rather, it is part and parcel to the League's standard operating patterns, practices and/or policies.

## II.    NUMEROSITY AND IMPRACTICALITY OF JOINDER

214.    The members of the Proposed Class are sufficiently numerous to make joinder of their claims impracticable.

215.    The exact number of Proposed Class members is unknown because such information is in the exclusive control of Defendants and requires discovery.

216.    Upon information and belief, there are more than 40 current, former and prospective members of the Proposed Class who have been subjected to the discriminatory conduct described herein.

217.    Although precise determination of the number of Proposed Class members is immeasurable at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

## III.    COMMON QUESTIONS OF LAW AND FACT

218.    The claims alleged on behalf of Plaintiff and the Proposed Class raise questions of law and fact common to all Plaintiff and Proposed Class members.  Among these questions are:

  a.    Whether members of the Proposed Class have been denied positions as Head Coaches, Offensive and Defensive Coordinators and Quarterbacks Coaches, as well as General Managers, and whether race and/or color played motivating factor in those decisions;

b.       Whether members of the Proposed Class have been discriminatorily subjected to sham and illegitimate interviews due in whole or part to their race and/or color;

c.       Whether members of the Proposed Class have been subjected to discriminatory retention practices and/or termination decisions in whole or part due to race and/or color;

d.       Whether members of the Proposed Class have been subjected to disparate terms and conditions of employment, including but not limited to, lack of opportunity and harm to professional reputation, due in whole or part to race and/or color;

e.       Whether members of the Proposed Class have been subjected to unequal compensation relative to their white peers, and whether this is due in whole or part to race and/or color;

f.       Whether the NFL is complicit, has participated in, and/or has aided and abetted the NFL teams in the discriminatory treatment of the members of the Proposed Class;

g.       Whether the NFL and/or the NFL teams collectively engage in discriminatory practices towards the members of the Proposed Class; and

h.       Whether the NFL and/or the NFL teams engage in conduct that has a discriminatory impact on the members of the Proposed Class.

219.    Thus, the common question requirement of FRCP 23(a) is satisfied.

## IV.    <u>TYPICALITY OF CLAIMS AND RELIEF SOUGHT</u>

220.    Plaintiff is a member of the Proposed Class he seeks to represent.

221.    The claims of Plaintiff are typical of the claims of the Proposed Class in that they all arise from the same unlawful patterns, practices and/or policies of Defendants, and are based on the legal theory that these patterns, practices and/or policies violate legal rights.

222.    Plaintiff and the members of the Proposed Class all allege that they each are the victims of unlawful adverse employment decisions and/or treatment based on race and/or color.

223.    The relief that Plaintiff seeks as a result Defendants' unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Proposed Class.

224.    Thus, the typicality requirement of FRCP 23(a) is satisfied.

## V.    ADEQUACY OF REPRESENTATION

225.    The interests of Plaintiff are co-extensive with those of the Proposed Class he seeks to represent in the instant case.

226.    Plaintiff is willing and able to represent the Proposed Class fairly and vigorously as they pursue their similar individual claims.

227.    Plaintiff has retained counsel who are qualified and experienced in employment class action litigation and who are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

228.    The combined interests, experience and resources of Plaintiff and his counsel to competently litigate the individual and class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

## VI.    REQUIREMENTS OF RULE 23(b)(1)

229.    Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

230.    Specifically, all evidence of Defendants' patterns, practices and/or policies and the issue of whether they are in violation of the law would be exchanged and litigated repeatedly.

231.    Accordingly, certification of the Proposed Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiff, the Proposed Class and Defendants.

232.    By filing this Complaint, Plaintiff is preserving the rights of Proposed Class members with respect to the statute of limitations on their claims.  Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

## VII.    REQUIREMENTS OF RULE 23(b)(2)

233.    Defendants have acted on grounds, described herein, generally applicable to Plaintiff and the members of the Proposed Class, by adopting and following systemic patterns, practices and/or policies that are discriminatory towards the Proposed Class.

234.    These discriminatory acts are fostered by Defendants' standard patterns, practices and/or policies, are not sporadic or isolated, and support the request for final injunctive and declaratory relief with respect to Plaintiff and the Proposed Class as a whole.

235.    Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic discrimination based on race and/or color committed against the Proposed Class.

236.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiff and the Class Members' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic discrimination.

237.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

## VIII.    REQUIREMENTS OF RULE 23(b)(3)

238.    The common issues of fact and law affecting Plaintiff's claims and those of the

Proposed Class, including, but not limited to, the common issues identified in the paragraphs

above, predominate over issues affecting only individual claims.

239.    A class action is superior to other available means for the fair and efficient

adjudication of Plaintiff's claims and the claims of the Proposed Class.

240.    The cost of proving Defendants' pattern and practice of discrimination makes it

impracticable for the members of the Proposed Class to pursue their claims individually.

241.    The class action will not be difficult to manage for reasons including, but not

limited to, the discrete organizational nature of the Proposed Class, as well as the common

questions of law and fact described above.

### FIRST CAUSE OF ACTION
**(Discrimination under Section 1981)**
***On Behalf of Plaintiff and the Proposed Class***
*As to all Defendants*

242.    Plaintiff, on behalf of himself and the Proposed Class, hereby repeats, reiterates

and re-alleges each and every previous allegation as if fully set forth herein.

243.    As described above, Defendants have discriminated against Plaintiff and the

Proposed Class on the basis of race and/or color in violation of Section 1981 by (i)

discriminatorily denying Proposed Class members positions as Head Coaches, Offensive and

Defensive Coordinators and Quarterbacks Coaches, as well as General Managers, (ii)

discriminatorily subjecting them to sham and illegitimate interviews, (iii) subjecting Proposed

Class members to discriminatory retention practices and/or termination decisions, (iv) subjecting

Proposed Class members to disparate terms and conditions of employment, including but not

limited to, lack of opportunity and harm to professional reputation and (v) subjecting Proposed

Class members to unequal compensation relative to their white peers.

244.    Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to

prevent or remedy discriminatory conduct due to race and/or color.  Each Defendant has actually

participated in and aided and abetted the discriminatory conduct of the other Defendants.

245.    As a direct and proximate result of Defendants' unlawful discriminatory conduct

in violation of Section 1981, Plaintiff and the Proposed Class have suffered, and continue to

suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which

they are entitled to an award of damages.

246.    Defendants' unlawful discriminatory actions constitute reckless, malicious,

willful and wanton violations of Section 1981 for which Plaintiff and the Proposed Class are

entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**(Discrimination under NYSHRL)**
***On Behalf of Plaintiff and the Proposed Class***
*As to all Defendants*

247.    Plaintiff, on behalf of himself and the Proposed Class, hereby repeats, reiterates

and re-alleges each and every previous allegation as if fully set forth herein.

248.    As described above, Defendants have discriminated against Plaintiff and the

Proposed Class on the basis of race and/or color in violation of the NYSHRL by (i)

discriminatorily denying Proposed Class members positions as Head Coaches, Offensive and

Defensive Coordinators and Quarterbacks Coaches, as well as General Managers, (ii)

discriminatorily subjecting them to sham and illegitimate interviews, (iii) subjecting Proposed

Class members to discriminatory retention practices and/or termination decisions, (iv) subjecting

Proposed Class members to disparate terms and conditions of employment, including but not

limited to, lack of opportunity and harm to professional reputation and (v) subjecting Proposed

Class members to unequal compensation relative to their white peers.

249.    Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to

prevent or remedy discriminatory conduct due to race and/or color.  Each Defendant has actually

participated in and aided and abetted the discriminatory conduct of the other Defendants.

250.    As a direct and proximate result of Defendants' unlawful discriminatory conduct

in violation of NYSHRL, Plaintiff and the Proposed Class have suffered, and continue to suffer,

economic damages, loss of opportunity, loss of reputation and mental anguish for which they are

entitled to an award of damages.

251.    Defendants' unlawful discriminatory actions constitute reckless, malicious,

willful and wanton violations of NYSHRL for which Plaintiff and the Proposed Class are entitled

to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Discrimination under NYCHRL)**
***On Behalf of Plaintiff and the Proposed Class***
*As to all Defendants*

252.    Plaintiff, on behalf of himself and the Proposed Class, hereby repeats, reiterates

and re-alleges each and every previous allegation as if fully set forth herein.

253.    As described above, Defendants have discriminated against Plaintiff and the

Proposed Class on the basis of race and/or color in violation of the NYCHRL by (i)

discriminatorily denying Proposed Class members positions as Head Coaches, Offensive and

Defensive Coordinators and Quarterbacks Coaches, as well as General Managers, (ii)

discriminatorily subjecting them to sham and illegitimate interviews, (iii) subjecting Proposed

Class members to discriminatory retention practices and/or termination decisions, (iv) subjecting

Proposed Class members to disparate terms and conditions of employment, including but not

limited to, lack of opportunity and harm to professional reputation and (v) subjecting Proposed

Class members to unequal compensation relative to their white peers.

254.    Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to

prevent or remedy discriminatory conduct due to race and/or color.  Each Defendant has actually

participated in and aided and abetted the discriminatory conduct of the other Defendants.

255.    As a direct and proximate result of Defendants' unlawful discriminatory conduct

in violation of NYCHRL, Plaintiff and the Proposed Class have suffered, and continue to suffer,

economic damages, loss of opportunity, loss of reputation and mental anguish for which they are

entitled to an award of damages.

256.    Defendants' unlawful discriminatory actions constitute reckless, malicious,

willful and wanton violations of NYCHRL for which Plaintiff and the Proposed Class are

entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**(Discrimination under NJLAD)**
***On Behalf of Plaintiff and the Proposed Class***
*As to Defendant The New York Giants*

257.    Plaintiff, on behalf of himself and the Proposed Class, hereby repeats, reiterates

and re-alleges each and every previous allegation as if fully set forth herein.

258.    As described above, Defendants have discriminated against Plaintiff and the

Proposed Class on the basis of race and/or color in violation of the NJLAD by (i)

discriminatorily denying Proposed Class members positions as Head Coaches, Offensive and

Defensive Coordinators and Quarterbacks Coaches, as well as General Managers, (ii)

discriminatorily subjecting them to sham and illegitimate interviews, (iii) subjecting Proposed

Class members to discriminatory retention practices and/or termination decisions, (iv) subjecting

Proposed Class members to disparate terms and conditions of employment, including but not

limited to, lack of opportunity and harm to professional reputation and (v) subjecting Proposed

Class members to unequal compensation relative to their white peers.

259.    Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to

prevent or remedy discriminatory conduct due to race and/or color.  Each Defendant has actually

participated in and aided and abetted the discriminatory conduct of the other Defendants.

260.    As a direct and proximate result of Defendants' unlawful discriminatory conduct

in violation of NJLAD, Plaintiff and the Proposed Class have suffered, and continue to suffer,

economic damages, loss of opportunity, loss of reputation and mental anguish for which they are

entitled to an award of damages.

261.    Defendants' unlawful discriminatory actions constitute reckless, malicious,

willful and wanton violations of NJLAD for which Plaintiff and the Proposed Class are entitled

to an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enters judgment in his favor and against the

Defendants for the following relief:

A.    A declaratory judgment that the actions, conduct and practices of the Defendants

complained of herein violate the laws of the United States and the State and City of New York,

and the State of New Jersey;

B.    An award of injunctive relief necessary to cure Defendants' discriminatory

policies and practices;

C.    Certification of this action as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure;

D.      An award of damages to Plaintiff and the Proposed Class and against the

Defendants, in an amount to be determined at trial, to compensate them for all monetary and/or

economic damages;

E.      An award of damages to Plaintiff and the Proposed Class and against the

Defendants, in an amount to be determined at trial, to compensate them for all non-monetary

and/or compensatory damages, including, but not limited to, loss of reputation, loss of

opportunity and mental anguish;

F.      An award of punitive damages to Plaintiff and the Proposed Class and against the

Defendants in an amount to be determined at trial;

G.      Pre- and post-judgment interest on all amounts due;

H.      An award of Plaintiff and the Proposed Class's reasonable attorneys' fees and

costs; and

I.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff and the Proposed Class hereby demand a trial by jury.

Dated: February 1, 2022
       New York, New York                    Respectfully submitted,

                                             **WIGDOR LLP**

                                             By: _____
                                                   Douglas H. Wigdor
                                                   Michael J. Willemin
                                                   David E. Gottlieb

                                             85 Fifth Avenue
                                             New York, NY 10003
                                             Telephone: (212) 257-6800
                                             Facsimile: (212) 257-6845
                                             dwigdor@wigdorlaw.com
                                             mwillemin@wigdorlaw.com
                                             dgottlieb@wigdorlaw.com

                                             *Counsel for Plaintiff and
                                             Putative Class Counsel*

                                                    - and -

                                             **ELEFTERAKIS, ELEFTERAKIS & PANEK**

                                             By: _____
                                                   John Elefterakis
                                                   Nicholas Elefterakis
                                                   Raymond Panek

                                             80 Pine Street, 38th Floor
                                             New York, New York 10005
                                             Telephone: 212-532-1116
                                             Facsimile: 212 532-1176