**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN FLORES, STEVE WILKS and RAY HORTON, as Class Representatives, on behalf of themselves and all others similarly situated, <br><br>       Plaintiffs, <br><br> v. <br><br> THE NATIONAL FOOTBALL LEAGUE; NEW YORK FOOTBALL GIANTS, INC. d/b/a NEW YORK GIANTS; MIAMI DOLPHINS, LTD. d/b/a MIAMI DOLPHINS; DENVER BRONCOS FOOTBALL CLUB d/b/a DENVER BRONCOS; HOUSTON NFL HOLDINGS, L.P. d/b/a HOUSTON TEXANS; ARIZONA CARDINALS FOOTBALL CLUB LLC d/b/a ARIZONA CARDINALS; TENNESSEE TITANS ENTERTAINMENT, INC. d/b/a TENNESSEE TITANS and JOHN DOE TEAMS 1 through 26, <br><br>       Defendants. | Civil Action No.: 22-cv-00871 (VEC) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO**
**COMPEL ARBITRATION AND STAY FURTHER PROCEEDINGS**

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ........................................................................................ 4

    A.    The NFL ..................................................................................... 4

    B.    Plaintiffs ..................................................................................... 5

    C.    Plaintiffs' Arbitration Agreements ........................................................ 6

    D.    The Amended Complaint ................................................................ 9

ARGUMENT ......................................................................................... 11

    A.    Plaintiffs Entered Into Multiple Arbitration Agreements ..................................... 12

    B.    Plaintiffs' Claims Fall Within the Scope of Their Enforceable Arbitration
        Agreements ................................................................................ 14

        1.    Brian Flores's Claims Against the Miami Dolphins ................................. 15

        2.    Brian Flores's Claims Against the Denver Broncos,
            New York Giants, and Houston Texans ............................................ 18

        3.    Steve Wilks's Claims Against the Arizona Cardinals ............................... 20

        4.    Ray Horton's Claims Against the Tennessee Titans ................................ 21

        5.    Plaintiffs' Claims Against the NFL ................................................ 21

    C.    Plaintiffs Must Arbitrate Their Claims on an Individual Basis ...............................24

CONCLUSION........................................................................................ 25

## TABLE OF AUTHORITIES

**CASES**

*ACE Cap. Re Overseas Ltd.* v. *Cent. United Life Ins. Co.*,
    307 F.3d 24 (2d Cir. 2002)........................................................................14

*Adams* v. *Suozzi*,
    433 F.3d 220 (2d Cir. 2005)......................................................................11

*Am. E Grp. LLC* v. *Livewire Ergogenics Inc.*,
    432 F. Supp. 3d 390 (S.D.N.Y. 2020).........................................................13

*Am. Needle, Inc.* v. *NFL*,
    560 U.S. 183 (2010) ............................................................................................................4

*AT&T Mobility LLC* v. *Concepcion*,
    563 U.S. 333 (2011) ..........................................................................................................17

*Brinkman* v. *Buffalo Bills Football Club*,
    433 F. Supp. 699 (W.D.N.Y. 1977) ..................................................................................15

*Charles O. Finley & Co.* v. *Kuhn*,
    569 F.2d 527 (7th Cir. 1978) ...........................................................................................17

*Choctaw Generation Ltd. P'ship* v. *Am. Home Assur. Co.*,
    271 F.3d 403 (2d Cir. 2001).............................................................................................22

*Citigroup Inc.* v. *Sayeg*,
    No. 21-cv-10413, 2022 WL 179203 (S.D.N.Y. Jan. 20, 2022) ........................................14

*Citigroup, Inc.* v. *Abu Dhabi Inv. Auth.*,
    776 F.3d 126 (2d Cir. 2015).............................................................................................12

*Convergen Energy LLC* v. *Brooks*,
    No. 20-cv-3746, 2020 WL 5549039 (S.D.N.Y. Sept. 16, 2020) ......................................14

*Cooper* v. *Ruane Cunniff & Goldfarb Inc.*,
    990 F.3d 173 (2d Cir. 2021).............................................................................................12

*CPR (USA) Inc.* v. *Spray*,
    187 F.3d 245 (2d Cir. 1999)..................................................................................18, 19, 20

*Crouch* v. *NASCAR, Inc.*,
    845 F.2d 397 (2d Cir. 1988).............................................................................................17

*In re Currency Conversion Fee Antitrust Litig.*,
    265 F. Supp. 2d 385 (S.D.N.Y. 2003)...............................................................................20

*Doe* v. *Trump Corp.*,
    6 F.4th 400 (2d Cir. 2021) ..........................................................................................21, 22

*Foran* v. *NFL*,
    No. 18-cv-10857, 2019 WL 2408030 (S.D.N.Y. June 7, 2019) .......................................15

*GateGuard, Inc.* v. *Goldenberg*,
    No. 20-cv-1609, 2022 WL 452637 (S.D.N.Y. Feb. 15, 2022) .........................................14

*Gaul* v. *Chrysler Fin. Servs. Am. LLC*,
    657 F. App'x 16 (2d Cir. 2016) ........................................................................................14

*Gold* v. *Deutsche Aktiengesellschaft*,
    365 F.3d 144 (2d Cir. 2004)................................................................................12, 14

*Hanson* v. *Cable*,
    No. A138208, 2015 WL 1739487 (Cal. Ct. App. Apr. 15, 2015) ...........................15

*Holick* v. *Cellular Sales of N.Y., LLC*,
    802 F.3d 391 (2d Cir. 2015)....................................................................................12

*Houston NFL Holding L.P.* v. *Ryans*,
    581 S.W.3d 900 (Tex. App. 2019).........................................................................15

*Lamps Plus, Inc.* v. *Varela*,
    139 S. Ct. 1407 (2019)......................................................................................24, 25

*Louis Dreyfus Negoce S.A.* v. *Blystad Shipping & Trading Inc.*,
    252 F.3d 218 (2d Cir. 2001)..............................................................................15, 21

*Meyer* v. *Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017)................................................................................11, 17

*Murray* v. *NFL*,
    No. 94-cv-5971, 1998 WL 205596 (E.D. Pa. Apr. 28, 1998)................................13

*NFL Mgmt. Council* v. *NFL Players Ass'n*,
    820 F.3d 527 (2d Cir. 2016)....................................................................................15

*NFL Players Ass'n* v. *NFL Mgmt. Council*,
    523 F. App'x 756 (2d Cir. 2013) .............................................................................11

*Oakland Raiders* v. *NFL*,
    131 Cal. App. 4th 621 (Cal. Ct. App. 2005) ..........................................................17

*Pagaduan* v. *Carnival Corp.*,
    709 F. App'x 713 (2d Cir. 2017) ............................................................................14

*Parisi* v. *Goldman, Sachs & Co.*,
    710 F.3d 483 (2d Cir. 2013)........................................................................11, 12, 25

*Radovich* v. *NFL*,
    352 U.S. 445 (1957)................................................................................................11

*Ragone* v. *Atl. Video at Manhattan Ctr.*,
    595 F.3d 115 (2d Cir. 2010)........................................................................12, 23, 24

*Robinson Brog Leinwand Greene Genovese & Gluck P.C.*
    v. *John M. O'Quinn & Assocs., L.L.P.*, 523 F. App'x 761 (2d Cir. 2013) .............14

*Rosenbloom* v. *Mecom*,
    478 So. 2d 1375 (La. Ct. App. 1985) ....................................................................14

*Ross* v. *Am. Exp. Co.*,
    547 F.3d 137 (2d Cir. 2008) ...............................................................................22

*Rothman* v. *Snyder*,
    No. 20-cv-3290, 2020 WL 7769928 (D. Md. Dec. 30, 2020) ................................13

*Schwartz* v. *Sterling Ent. Enters., LLC*,
    No. 21-cv-1084, 2021 WL 4321106 (S.D.N.Y. Sept. 23, 2021) .....................12, 14

*Smith/Enron Cogeneration Ltd. P'ship, Inc.* v. *Smith Cogeneration Int'l Inc.*,
    198 F.3d 88 (2d Cir. 1999) .............................................................................20, 21

*Sokol Holdings, Inc.* v. *BMB Munai, Inc.*,
    542 F.3d 354 (2d Cir. 2008) ...............................................................................22

*Spinelli* v. *NFL*,
    903 F.3d 185 (2d Cir. 2018) ...............................................................................11

*Stolt-Nielsen S.A.* v. *AnimalFeeds Int'l Corp.*,
    559 U.S. 662 (2010) ...........................................................................................24

*T. Park Cent., LLC* v. *Bluegreen Vacations Unlimited, Inc.*,
    No. 21-cv-4346, 2021 WL 5826296 (S.D.N.Y. Dec. 7, 2021) ..............................14

*TradeComet.com LLC* v. *Google, Inc.*,
    435 F. App'x 31 (2d Cir. 2011) ...........................................................................20

*Viking River Cruises, Inc.* v. *Moriana*,
    No. 20-1573, 2022 WL 2135491 (U.S. June 15, 2022) ........................................11

**STATUTES**

Federal Arbitration Act, 9 U.S.C. §§ 1–16 ...................................................2, 11, 12, 17

    9 U.S.C. § 2 ........................................................................................................11

    9 U.S.C. § 3 ........................................................................................................12

    9 U.S.C. § 4 ........................................................................................................12

**OTHER AUTHORITIES**

Michael Baca, *NFL Owners Approve Rooney Rule Applying to Vacant QB Coach
    Positions*, NFL (May 24, 2022, 3:45 PM), https:// www.nfl.com/news/nfl-
    owners-approve-rooney-rule-applying-to-vacant-qb-coach-positions .........................5

Andrew Mason, *Patriots Assistant Brian Flores Interviews with Broncos*, Denver Broncos News (Jan. 5, 2019, 10:03 AM), https://tinyurl.com/floresbroncos ..........................10

*NFL Makes Bold New Steps to Enhance Diversity*, NFL Football Operations (May 19, 2020), https://tinyurl.com/nflnewsteps ...................................................................5

*The Rooney Rule*, NFL Football Operations, https://tinyurl.com/nflrooneyrule (last visited May 27, 2022) ...............................................................................................5

Marc Sessler, *Browns Hire Ray Horton as New Defensive Coordinator*, NFL (Jan. 22, 2016, 1:26 AM), www.nfl.com/news/browns-hire-ray-horton-as-new-defensive-coordinator-0ap3000000626246 ...............................................................6

Ben Shpigel, *Terribly Good*, N.Y. Times, Feb. 4, 2019, at D1, *revised version available at* https://tinyurl.com/patriotsLIII ...........................................................5

Defendants National Football League ("NFL"); New York Football Giants, Inc.; Miami Dolphins, Ltd.; Denver Broncos Football Club; Houston NFL Holdings, L.P.; Arizona Cardinals Football Club LLC; and Tennessee Titans Entertainment, Inc. respectfully submit this memorandum of law in support of their motion to compel the arbitration of, and stay further proceedings on, all claims alleged in the Amended Complaint ("Complaint") (ECF No. 22).

## PRELIMINARY STATEMENT

The Complaint—founded on allegations of racial discrimination arising out of Plaintiffs' employment and applications for employment with NFL member clubs—belongs in arbitration because Plaintiffs contractually agreed to multiple arbitration provisions that squarely cover their claims.

Plaintiffs Brian Flores, Steve Wilks, and Ray Horton are three Black current or former NFL coaches who have had long coaching careers at several NFL member clubs.  During that time, each Plaintiff entered into several employment agreements with their member club employers, each of which contained broad arbitration provisions that require the arbitration of all disputes.  Mr. Flores's agreement with defendant Miami Dolphins, for example, states that "all matters in dispute between [Mr. Flores] and the Club, including, without limitation, any dispute arising from the terms of [the agreement], [his] employment with the Club, or otherwise, shall be referred to the Commissioner of the NFL for binding arbitration in accordance with the NFL's Dispute Resolution Procedural Guidelines."  It also states that the purpose of this provision "is to ensure that any and all disputes that may arise between the Club and [Mr. Flores] will be resolved through binding, conclusive arbitration as opposed to court or administrative litigation."  Mr. Wilks's and Mr. Horton's employment agreements contain similarly broad language, evidencing the parties' intent to arbitrate all disputes, including all "disputes relating to or arising out of discrimination."  In addition, each Plaintiff expressly agreed to be bound by the NFL Constitution and Bylaws, which

states that the "Commissioner shall have full, complete, and final jurisdiction and authority to arbitrate," among a broad litany of disputes, any dispute "between any . . . coach . . . and any member club or clubs" and any dispute involving two or more member clubs.

Notwithstanding Plaintiffs' multiple and clear contractual obligations to arbitrate their claims, Plaintiffs filed this federal-court action against the NFL and six of its member clubs, purporting to allege that the clubs discriminated against them on the basis of race when the clubs terminated them or failed to hire them (or both).  Specifically, Mr. Flores claims that his termination as the Dolphins head coach was discriminatory and that the club wrongfully withheld his severance compensation; that both the Dolphins and defendant Houston Texans retaliated against him for filing this lawsuit; and that defendants New York Giants and Denver Broncos subjected him to "sham" interviews for head-coaching vacancies to comply with the NFL's "Rooney Rule," a League rule designed to increase diversity in club leadership positions by requiring clubs to interview minority candidates for those positions.  Mr. Horton alleges that he was subject to a similar sham interview by defendant Tennessee Titans, and Mr. Wilks alleges that his termination as the head coach of defendant Arizona Cardinals was discriminatory.  More broadly, Plaintiffs assert based on the above allegations that the NFL and its member clubs are somehow engaged in racially discriminatory employment practices that result in a disparate impact on the hiring and retention of Black head coaches.

Issues of racial diversity in professional football have long been and still are the focus of numerous diversity, equity, and inclusion initiatives at the NFL and its member clubs.  But the substance of Plaintiffs' claims is not properly before the Court, and the facts and law on the question of whether Plaintiffs must arbitrate those claims are clear.  Plaintiffs' multiple arbitration agreements preclude them from pursuing their claims in this Court.  The Federal Arbitration Act

and settled precedent in this Circuit strongly favor the enforcement of arbitration agreements and require that courts compel arbitration if the agreement is even susceptible to an interpretation that requires arbitration of the alleged claims.  Defendants far surpass that standard here.

Plaintiffs' claims fall squarely within the scope of the broad arbitration agreements into which each Plaintiff entered.  Mr. Flores's claims against the Dolphins concern his termination and compensation, which are precisely the types of disputes that Mr. Flores indisputably agreed to submit to binding arbitration under his employment agreement with the Dolphins.  Mr. Flores's claims against the Broncos, Giants, and Texans also must be arbitrated under the NFL Constitution because they constitute disputes between a coach and a member club.  Mr. Wilks's claim that the Cardinals wrongfully terminated him likewise constitutes an arbitrable dispute with his club because it is founded on conduct occurring during his employment as a coach and thus falls under both the express arbitration provisions in his employment agreement and the NFL Constitution.  And Mr. Horton was already under contract with the Titans when he interviewed for the club's head-coach position and thus is required to arbitrate his claims under the clear terms of the arbitration agreements in his employment agreement and the NFL Constitution.

Plaintiffs' claims against the NFL also must be arbitrated under Plaintiffs' many arbitration agreements.  The NFL is entitled, both expressly and under settled principles of equitable estoppel, to enforce the arbitration provisions to which Plaintiffs agreed, for several reasons.  First, the NFL is no stranger to those agreements.  Rather, it is the membership association for the member clubs that hired Plaintiffs, and the NFL itself approved and signed those agreements—making arbitration of claims against the NFL fundamentally fair.  Second, Plaintiffs' claims against the NFL are wholly derivative of and factually intertwined with their claims against the member clubs whose employment practices and purported violations of NFL rules and policies are the foundation for

3

such claims.  Finally, the NFL Constitution's arbitration provisions to which Plaintiffs agreed expressly cover claims involving two or more member clubs and claims between any coach and any member club—precisely the case here.

In sum, Plaintiffs' multiple arbitration agreements plainly cover Plaintiffs' claims.  Indeed, courts have compelled many employment disputes—including claims of discrimination among the NFL, its member clubs, and their employees (including coaches)—to arbitration under arbitration agreements containing near identical language.  Accordingly, for the reasons set forth below, the motion to compel arbitration and stay further proceedings should be granted.

## **BACKGROUND**

### A.    **The NFL**

The NFL, the world's premier professional football league, is an unincorporated membership association consisting of 32 member clubs.  Am. Compl. ¶ 36; *see Am. Needle, Inc.* v. *NFL*, 560 U.S. 183, 187 (2010).  The operations and structure of the League, and the relationship between the League and the member clubs, their employees, and the players, are governed by the NFL Constitution and Bylaws.  *See* Constitution and Bylaws of the National Football League (rev. ed. 2016) (Ex. 1).  The NFL Constitution also sets forth certain rules governing the conduct of member clubs and their employees.  For example, the NFL Constitution prohibits a member club from "tamper[ing] with a player . . . under contract to . . . another member club" or attempting to "illegally influence the outcome" of the member club's games.  *Id.* art. 9.1(11)–(12).  Pursuant to the NFL Constitution, the Commissioner of the NFL is responsible for administering the day-to-day business affairs of the League and, as detailed below, for adjudicating a broad number of disputes involving the member clubs, their employees, and the League.  *Id*. art. 8.

Diversity, equity, and inclusion are core NFL values.  In furtherance of those values, the NFL has undertaken numerous deliberate initiatives to promote diversity in leadership positions in

the League, including in head-coach positions.  Among others, nearly two decades ago, the NFL implemented the "Rooney Rule" requiring teams to interview minority candidates for any vacant head-coach position.  Am. Compl. ¶ 118.  The NFL has since expanded the Rooney Rule to apply to other leadership positions, including assistant head coach, offensive coordinator, defensive coordinator, special teams coordinator, quarterback coach, general manager, and other front-office positions.  *Id.*  ¶¶ 118–19;  *see The Rooney Rule*, NFL Football Operations, https:// tinyurl.com/nflrooneyrule (last visited June 21, 2022); Michael Baca, *NFL Owners Approve Rooney Rule Applying to Vacant QB Coach Positions*, NFL (May 24, 2022, 3:45 PM), https:// www.nfl.com/news/nfl-owners-approve-rooney-rule-applying-to-vacant-qb-coach-positions.  The Rooney Rule now also requires teams to interview at least two minority candidates for any head-coach opening, and at least one such candidate in person.  Am. Compl. ¶ 119.

In recent years, the NFL has also undertaken other broad programs to increase employment and advancement opportunities for diverse candidates.  Those initiatives include a reward of additional draft picks to teams that develop minority coaches and executives; the modification of anti-tampering rules to allow assistant coaches and executives to interview for coordinator or general-manager positions with other member clubs; and the establishment of coaching fellowship programs across all 32 member clubs geared toward minority coaches.  In addition, the NFL maintains two longstanding fellowship programs focused on developing the pipeline for minority coaching and player personnel candidates. *See NFL Makes Bold New Steps to Enhance Diversity*, NFL Football Operations (May 19, 2020), https://tinyurl.com/nflnewsteps.

### B. <u>Plaintiffs</u>

Mr. Flores began his NFL coaching career with the New England Patriots in 2008 through February 3, 2019. *See* Am. Compl. ¶¶ 157–58; Ben Shpigel, *Terribly Good*, N.Y. Times, Feb. 4, 2019, at D1, *revised version available at* https://tinyurl.com/patriotsLIII.  Before Mr. Flores's

contract with the Patriots expired, the Miami Dolphins hired Mr. Flores as their head coach.  *See* Flores-Dolphins Agreement 1 (Ex. 2); Flores-Patriots Agreement ¶ 2 (Ex. 3).  Mr. Flores coached the Dolphins for three seasons and was discharged on January 10, 2022.  *See* Am. Compl. ¶¶ 159, 177.  He began his current position as the senior defensive assistant and linebackers coach of the Pittsburgh Steelers on February 18, 2022.  *See* Flores-Steelers Agreement 1 (Ex. 4).  His contract with the Steelers extends until 2024.  *Id.* ¶ 2.

Mr. Wilks began his NFL coaching career in 2006 and has worked for four different member clubs.  *See* Am. Compl. ¶¶ 229–31.  On January 20, 2018, Mr. Wilks was hired as the head coach of the Arizona Cardinals.  Wilks-Cardinals Agreement 1 (Ex. 5).  He was terminated after one season on December 31, 2018.  Am. Compl. ¶ 252.  Mr. Wilks began his current position as the defensive pass-game coordinator and secondary coach of the Carolina Panthers on February 16, 2022.  Wilks-Panthers Agreement ¶ 2 (Ex. 6).  His contract with the Panthers is still in force.

Mr. Horton had a successful career as an NFL player before transitioning to coaching in 1994.  *See* Am. Compl. ¶¶ 264–65.  He coached for six different NFL member clubs over 20 consecutive seasons before joining the Tennessee Titans as their defensive coordinator on January 20, 2014.  *See id.* ¶ 265; Horton-Titans Agreement 3 (Ex. 7).  Mr. Horton's employment with the Titans ended when he was hired by another NFL member club on January 22, 2016.  *See* Marc Sessler, *Browns Hire Ray Horton as New Defensive Coordinator*, NFL (Jan. 22, 2016, 1:26 AM), www.nfl.com/news/browns-hire-ray-horton-as-new-defensive-coordinator-0ap3000000626246. Mr. Horton is not currently coaching in the NFL.

### C.    <u>Plaintiffs' Arbitration Agreements</u>

Each time that each Plaintiff joined a member club, he entered into an employment agreement that governed his relationship with the club and the NFL and agreed to be bound by the NFL Constitution and to arbitrate a broad category of disputes.

For example, Mr. Flores's employment agreement with the Dolphins provides that "Employee and the Club agree that all matters in dispute between Employee and the Club, including, without limitation, any dispute arising from the terms of this Agreement, Employee's employment with the Club, or otherwise, shall be referred to the Commissioner of the NFL for binding arbitration in accordance with the NFL's Dispute Resolution Procedural Guidelines (attached to this Agreement as Exhibit A)."  Flores-Dolphins Agreement ¶ 12.2.  To eliminate all doubt, the agreement expressly provides that "Employee and the Club agree that the purpose of this Paragraph 12 and Exhibit A is to ensure that any and all disputes that may arise between the Club and Employee will be resolved through binding, conclusive arbitration as opposed to court or administrative litigation."  Flores-Dolphins Agreement ¶ 12.4.

Mr. Wilks's agreement with the Cardinals and Mr. Horton's agreement with the Titans contain similarly broad provisions requiring the "binding arbitration" of "all disputes . . . between" or "all matters in dispute between" Plaintiffs and their employer member club.  Wilks-Cardinals Agreement ¶ 10a; Horton-Titans Agreement ¶ 6(a); *see also* Wilks-Cardinals Agreement ¶ 10f (stating that the purpose of the arbitration provisions is to "ensure that any and all disputes that may arise between the [member club] and [the coach] will be resolved through binding, conclusive arbitration as opposed to court or administrative litigation").

All of Plaintiffs' employment agreements set forth procedures—either in the agreements themselves or through express incorporation of the NFL Dispute Resolution Procedural Guidelines—for determining who will arbitrate a dispute arising with the coach.  *See* Flores-Patriots Agreement ¶ 17 (incorporating the NFL Dispute Resolution Procedural Guidelines); Flores-Dolphins Agreement ¶ 12.2 & Ex. A (incorporating the Guidelines and attaching them as an exhibit); Flores-Steelers Agreement ¶ 14 (requiring arbitration under the "NFL's arbitration

guidelines"); Wilks-Cardinals Agreement ¶¶ 10b–10e & pp. 14–18 (incorporating provisions directly into the body of the contract and attaching additional procedural guidelines); Wilks-Panthers Agreement ¶ 18 (incorporating provisions directly into the body of the contract); Horton-Titans Agreement 2, 3 (requiring compliance with the "NFL Rules," defined to include "policies of the NFL" and "arbitration decisions and directives of the Commissioner").

Under those provisions, the process for the arbitration depends on whether the dispute is "football-oriented." *See, e.g.*, Flores-Dolphins Agreement, Ex. A, ¶¶ 1.5–1.8. A "football-oriented" dispute is one that "relat[es] to or aris[es] out of the Constitution and Bylaws of the National Football League, or any NFL or Club policies, rules or regulations." *Id.* ¶ 1.5. Every such dispute is "subject to arbitration under th[e] Guidelines" before the Commissioner. *Id.* ¶ 1.6.

Disputes that "could arise between any employer and employee, such as a dispute relating to or arising out of discrimination," are expressly defined by the Guidelines to be "not football oriented." *Id.* ¶ 1.5. Non-football-oriented disputes are still subject to mandatory arbitration, but the Commissioner may refer such disputes "for final, binding, and conclusive arbitration administered by the alternative dispute resolution provider agreed to by the parties, or in the absence of such agreement, by JAMS, Inc. pursuant to its Comprehensive Arbitration Rules and Procedures." *Id.* ¶ 1.7. Where a dispute "raises issues that are both football-oriented and not football-oriented," the dispute is also subject to mandatory arbitration—but in that case the Commissioner may decide all of the issues himself; refer all of the issues to an alternative dispute resolution provider; or bifurcate the proceedings. *Id.* ¶ 1.8. The NFL Commissioner is thus not required to preside over disputes that raise any non-football-related issues.

As the NFL Constitution requires, *see* art. 3.11(D), Plaintiffs also agreed in each of their employment agreements "to comply at all times with, and to be bound by, the NFL Constitution

and ByLaws," which were incorporated by reference into those agreements.   Flores-Patriots Agreement ¶ 15; *see* Flores-Dolphins Agreement ¶¶ 7.1, 12.1; Flores-Steelers Agreement ¶ 13; Wilks-Cardinals Agreement ¶ 9a; Wilks-Panthers Agreement ¶ 9g; Horton-Titans Agreement ¶ 6(a).   Under Article 8.3 of the NFL Constitution, the NFL Commissioner has "full, complete, and final jurisdiction and authority to arbitrate . . . [a]ny dispute between any . . . coach . . . and any member club or clubs," NFL Const. art. 8.3(B), as well as "[a]ny dispute involving two or more members of the League," *id.* art. 8.3(A).   Plaintiffs acknowledged in their agreements that they "read the NFL Constitution and Bylaws . . . and underst[ood] their meaning."   Flores-Patriots Agreement ¶ 15; *see* Flores-Dolphins Agreement ¶¶ 7.1, 12.1; Flores-Steelers Agreement ¶ 13; Wilks-Cardinals Agreement ¶ 9(a); Wilks-Panthers Agreement ¶ 9(g); Horton-Titans Agreement ¶ 6(c).   The Commissioner approved Plaintiffs' relevant employment agreements (except for Mr. Flores's current agreement with the Steelers, the approval for which is pending).   *See* Flores-Patriots Agreement 7; Flores-Dolphins Agreement 11; Flores-Steelers Agreement 7; Wilks-Cardinals Agreement 13; Wilks-Panthers Agreement 13; Horton-Titans Agreement 9.

### D.   **The Amended Complaint**

Notwithstanding Plaintiffs' contractual commitments to be bound by broad arbitration agreements, Plaintiffs filed suit in this Court, asserting various causes of action for employment discrimination under federal, state, and local law, alleging that one or more of the NFL and the member club defendants discriminated against them on the basis of race in their employment as a head coach, in applying for a head-coaching position, or both.   *See* Am. Compl. ¶¶ 391–413.[1]

---

[1] The Complaint pleads the first through fifth causes of action as asserted by all Plaintiffs against all Defendants. *See, e.g.*, Am. Compl. ¶¶ 392, 398, 402.  The Complaint, however, contains no factual allegations supporting claims by individual Plaintiffs against member clubs with whom they had no actual or prospective employment relationship.  Accordingly, Defendants construe the Complaint as asserting claims by each Plaintiff against only the NFL and the particular member

Specifically, Mr. Flores alleges that the Dolphins discriminated against him while he was employed as the club's head coach and when the club terminated him.  *See* Am. Compl. ¶¶ 158–77.  He also alleges that the Dolphins retaliated against him for filing this lawsuit by failing to pay him severance allegedly required under his employment agreement and by demanding the return of certain compensation.  *See id.* ¶¶ 219–26.  In February 2022, the Miami Dolphins invoked their contractual right to submit these disputes to the NFL for arbitration, pursuant to the Flores-Dolphins Agreement.  *See id.* ¶¶ 15, 226.

Mr. Flores further alleges that his interviews for head-coaching positions with the Giants on January 27, 2022, *see* Am. Compl. ¶¶ 178–99, and the Broncos on January 5, 2019, *see id.* ¶¶ 200–06; Andrew Mason, *Patriots Assistant Brian Flores Interviews with Broncos*, Denver Broncos News (Jan. 5, 2019, 10:03 AM), https://tinyurl.com/floresbroncos, were shams designed only so that those teams could formally comply with the Rooney Rule.  Regarding the Texans, Mr. Flores alleges that the club retaliated against him for filing this lawsuit by hiring another Black candidate to serve as their head coach on February 8, 2022, after Mr. Flores interviewed for the position.  *See* Am. Compl. ¶¶ 207–18.

Mr. Wilks alleges that the Cardinals discriminated against him when they discharged him as their head coach on or about December 31, 2018.  *See* Am. Compl. ¶¶ 231–63.  Mr. Horton alleges that his interview for the Titans head-coaching position on January 16, 2016, was a sham designed to demonstrate formal compliance with the Rooney Rule.  *See id.* ¶¶ 268–84.

More broadly, Plaintiffs allege that the "discretionary" and "subjective" employment practices used by 32 different NFL member clubs result in a disparate impact in the hiring and

---

clubs described in the relevant factual allegations.  *See id.* ¶¶ 156–206 (Mr. Flores); *id.* ¶¶ 227–63 (Mr. Wilks); *id.* ¶¶ 268–84 (Mr. Horton).

retention of Black head coaches. *See* Am. Compl. ¶¶ 120, 123. Plaintiffs seek class certification, proposing to proceed with a class consisting of every Black head coach, offensive or defensive coordinator, quarterback coach, and general manager, as well as every Black applicant for those positions, in the NFL during the applicable limitations period. *See id.* ¶ 358.

For the reasons below, Plaintiffs' claims are covered by their many arbitration agreements and should be compelled to arbitration under settled law.

## ARGUMENT

The Federal Arbitration Act provides that a written arbitration agreement involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.[2] The FAA thus creates an "enforcement mandate, which renders agreements to arbitrate enforceable as a matter of federal law." *Viking River Cruises, Inc.* v. *Moriana*, No. 20-1573, 2022 WL 2135491, at *6 (U.S. June 15, 2022). In that way, the FAA reflects "a liberal federal policy favoring arbitration agreements and places arbitration agreements on the same footing as other contracts." *Meyer* v. *Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (internal quotation marks and citations omitted). The FAA's "preference for enforcing arbitration agreements applies even when the claims at issue are federal statutory claims," including "claims arising under a statute designed to further important social policies." *Parisi* v. *Goldman, Sachs & Co.*, 710 F.3d 483, 486–87 (2d Cir. 2013). "[S]tatutory

---

[2]     Plaintiffs' employment and applications for employment with the member club defendants "involv[ed] interstate commerce" for purposes of the FAA. 9 U.S.C. § 2; *see Adams* v. *Suozzi*, 433 F.3d 220, 225 (2d Cir. 2005) (noting that the FAA extends to the "broadest permissible exercise of Congress' Commerce Clause power"); *Radovich* v. *NFL*, 352 U.S. 445, 452 (1957) (recognizing that the NFL engages in a significant "volume of interstate commerce"); *cf. Spinelli* v. *NFL*, 903 F.3d 185, 211 (2d Cir. 2018) (applying federal antitrust laws to the NFL); *NFL Players Ass'n* v. *NFL Mgmt. Council*, 523 F. App'x 756, 760 (2d Cir. 2013) (applying the Labor-Management Relations Act to the NFL).

claims of employment discrimination" can be and routinely are "subject to mandatory arbitration." *Gold* v. *Deutsche Aktiengesellschaft*, 365 F.3d 144, 147 (2d Cir. 2004); *see, e.g.*, *Parisi*, 710 F.3d at 488 (Title VII); *Ragone* v. *Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 117, 120 (2d Cir. 2010) (Title VII, New York State Human Rights Law, and New York City Human Rights Law); *Schwartz* v. *Sterling Ent. Enters., LLC*, No. 21-cv-1084, 2021 WL 4321106, at *1 (S.D.N.Y. Sept. 23, 2021) (42 U.S.C. § 1981, New York State Human Rights Law, and New York City Human Rights Law).

To determine whether a particular dispute is subject to arbitration, courts consider "whether the parties agreed to arbitrate" and "whether the scope of that agreement encompasses the claims at issue." *Cooper* v. *Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 179 (2d Cir. 2021). Once a court is satisfied that an arbitration agreement exists, "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Citigroup, Inc.* v. *Abu Dhabi Inv. Auth.*, 776 F.3d 126, 130 (2d Cir. 2015) (citation omitted). A court should thus compel arbitration and stay further proceedings unless "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Holick* v. *Cellular Sales of N.Y., LLC*, 802 F.3d 391, 395 (2d Cir. 2015); *see* 9 U.S.C. §§ 3–4.

Defendants easily meet the FAA's standards for compelling arbitration here.

### A.    Plaintiffs Entered Into Multiple Arbitration Agreements

Plaintiffs have entered into numerous arbitration agreements covering their claims. As discussed in detail above, *see* pp. 6–8, Mr. Flores, Mr. Wilks, and Mr. Horton agreed to express arbitration provisions in their employment contracts with the Dolphins, Cardinals, and Titans, respectively (and among other member clubs), each of which provides an independent basis to compel arbitration between each Plaintiff and his respective former club. Those agreements require the "binding arbitration" of "all disputes" or "all matters in dispute" between the coach and the member club. Flores-Dolphins Agreement ¶¶ 12.2, 12.4; *see* Wilks-Cardinals Agreement

¶ 10a; Horton-Titans Agreement ¶ 6(a).  Mr. Flores's agreement with the Dolphins and Mr. Wilks's agreement with the Cardinals confirm that the "purpose" of those arbitration provisions is to "ensure that any and all disputes that may arise between the [member club] and [the coach] will be resolved through binding, conclusive arbitration as opposed to court or administrative litigation."  Flores-Dolphins Agreement ¶ 12.4; Wilks-Cardinals Agreement ¶ 10f.  In light of those provisions, there is no question that Plaintiffs formed arbitration agreements in their contracts with the Dolphins, Cardinals, and Titans.  *See, e.g.*, *Am. E Grp. LLC* v. *Livewire Ergogenics Inc.*, 432 F. Supp. 3d 390, 398 (S.D.N.Y. 2020) (holding that an engagement letter requiring the arbitration of "any dispute" formed an arbitration agreement between the parties that executed the letter).

Plaintiffs also agreed to comply with the NFL Constitution and Bylaws, which, as noted above, *see* pp. 8–9, were expressly incorporated by reference and provide a basis for compelling arbitration of all claims against all Defendants.  *See* Flores-Patriots Agreement ¶ 15; Flores-Dolphins Agreement ¶¶ 7.1, 12.1; Flores-Steelers Agreement ¶ 13; Wilks-Panthers Agreement ¶ 9(g); Wilks-Cardinals Agreement ¶ 9(b); Horton-Titans Agreement ¶ 6(a).  And Plaintiffs acknowledged that they had read and understood the NFL Constitution.  *See* Flores-Patriots Agreement ¶ 15; Flores-Dolphins Agreement ¶¶ 7.1, 12.1; Flores-Steelers Agreement ¶ 13; Wilks-Cardinals Agreement ¶ 9(a); Wilks-Panthers Agreement ¶ 9(g); Horton-Titans Agreement ¶ 6(c). As set forth above, *see* p. 9, a key component of the NFL Constitution is its arbitration provisions vesting jurisdiction in the Commissioner over a broad list of potential disputes, and there is no viable claim that Plaintiffs did not agree to them.  *See Rothman* v. *Snyder*, No. 20-cv-3290, 2020 WL 7769928, at *3 (D. Md. Dec. 30, 2020) (compelling arbitration under NFL Const. art. 8.3(A)); *Murray* v. *NFL*, No. 94-cv-5971, 1998 WL 205596, at *3 & n.4 (E.D. Pa. Apr. 28, 1998)

(acknowledging arbitration under the same provision); *Rosenbloom* v. *Mecom*, 478 So. 2d 1375, 1376 (La. Ct. App. 1985) (confirming arbitration award under NFL Const. art. 8.3(B)); *see also Pagaduan* v. *Carnival Corp.*, 709 F. App'x 713, 717 (2d Cir. 2017) (compelling arbitration under a provision of a "set of industry-wide standard terms and conditions" incorporated by reference into a one-page employment contract); *Gold*, 365 F.3d at 149-150 (compelling arbitration under rules incorporated by reference into an employment agreement); *Schwartz*, 2021 WL 4321106, at *1 (S.D.N.Y. Sept. 23, 2021) (similar).

B. **Plaintiffs' Claims Fall Within the Scope of Their Enforceable Arbitration Agreements**

Here, Plaintiffs' multiple arbitration agreements speak in broad terms that easily encompass all of the claims alleged in the Complaint. Plaintiffs' employment contracts expressly require the arbitration of "all disputes" or "all matters in dispute" between coach and club, which "constitutes the paradigm of a broad arbitration agreement." *Convergen Energy LLC* v. *Brooks*, No. 20-cv-3746, 2020 WL 5549039, at *16 (S.D.N.Y. Sept. 16, 2020) (internal quotation marks and citation omitted); *see T. Park Cent., LLC* v. *Bluegreen Vacations Unlimited, Inc.*, No. 21-cv-4346, 2021 WL 5826296, at *5 (S.D.N.Y. Dec. 7, 2021) (collecting additional cases making the same point). In addition, the NFL Constitution requires the arbitration of "any dispute" between a coach and a member club or involving two or more member clubs and thus similarly constitutes a "broad" agreement to arbitrate. *ACE Cap. Re Overseas Ltd.* v. *Cent. United Life Ins. Co.*, 307 F.3d 24, 33 (2d Cir. 2002) (Sotomayor, J.); *see Gaul* v. *Chrysler Fin. Servs. Am. LLC*, 657 F. App'x 16, 17 (2d Cir. 2016); *Robinson Brog Leinwand Greene Genovese & Gluck P.C.* v. *John M. O'Quinn & Assocs., L.L.P.*, 523 F. App'x 761, 764 (2d Cir. 2013); *GateGuard, Inc.* v. *Goldenberg*, No. 20-cv-1609, 2022 WL 452637, at *7 (S.D.N.Y. Feb. 15, 2022); *Citigroup Inc.* v. *Sayeg*, No. 21-cv-10413, 2022 WL 179203, at *6 (S.D.N.Y. Jan. 20, 2022).

Where, as here, parties use such "expansive language in drafting an arbitration clause, presumably they intend all issues that touch matters within the main agreement to be arbitrated." *Louis Dreyfus Negoce S.A.* v. *Blystad Shipping & Trading Inc.*, 252 F.3d 218, 225 (2d Cir. 2001) (internal quotation marks and citation omitted). Unsurprisingly, courts have consistently affirmed the rights of the NFL and its member clubs to arbitrate under agreements containing similarly broad language. *See Foran* v. *NFL*, No. 18-cv-10857, 2019 WL 2408030, at *3 (S.D.N.Y. June 7, 2019) (granting the NFL's motion to compel Plaintiffs' employment-related claims to arbitration); *Hanson* v. *Cable*, No. A138208, 2015 WL 1739487, at *1 (Cal. Ct. App. Apr. 15, 2015) (affirming order compelling former employee of an NFL member club to arbitrate his claims against the club); *see also NFL Mgmt. Council* v. *NFL Players Ass'n*, 820 F.3d 527, 548 (2d Cir. 2016) (confirming arbitration award in a case involving an NFL player's game-related conduct); *Brinkman* v. *Buffalo Bills Football Club*, 433 F. Supp. 699, 703–04 (W.D.N.Y. 1977) (holding that former player's claim against a member team was barred by his failure to follow the arbitration procedure set out in his contract); *Houston NFL Holding L.P.* v. *Ryans*, 581 S.W.3d 900, 911 (Tex. App. 2019) (compelling a former NFL player to arbitrate his premises-liability claims against a member club). Arbitration is all the more warranted here because, as explained above, *see* p. 8, the arbitration procedures set forth or incorporated in Plaintiffs' employment agreements expressly contemplate the arbitration of claims "relating to or arising out of discrimination." *E.g.*, Flores-Dolphins Agreement, Ex. A, ¶ 1.5. Accordingly, each of Plaintiffs' claims is arbitrable, for the reasons below.

### 1.    Brian Flores's Claims Against the Miami Dolphins

As set forth above, *see* p. 7, the arbitration provisions in Mr. Flores's employment agreement with Dolphins agreement clearly cover his claims against the Dolphins, which are all directly related to his employment. Those arbitration provisions state that "all matters in dispute"

between Mr. Flores and the club—including "any dispute arising from the terms of th[e] Agreement" or Mr. Flores's "employment with the Club"—"shall" be submitted to the NFL Commissioner for binding arbitration.  Flores-Dolphins Agreement ¶ 12.2.  The purpose of that language is explicitly to "ensure that any and all disputes that may arise" between Mr. Flores and the Dolphins "will be resolved through binding, conclusive arbitration as opposed to court."  *Id.* ¶ 12.4.  As Mr. Flores's counsel previously acknowledged, Mr. Flores's arbitration agreement with the Dolphins "cover[s] the claims that are unrelated to the failure-to-hire claims" against other clubs, including "the termination claims by Mr. Flores when he was terminated by the Dolphins." Tr. of May 5, 2022 Conference 8:12–18.

The NFL Constitution also requires the arbitration of Mr. Flores's claims against the Dolphins.  Section 8.3(B) broadly requires the arbitration of "any dispute" between a coach and a member club—which this is.  *See* NFL Const. art. 8.3(B). And Section 8.3(A) requires the arbitration of "[a]ny dispute" involving two or more member clubs.  *See* NFL Const. art. 8.3(A). This action involves claims for employment discrimination by three current or former NFL coaches, including Mr. Flores, against the NFL and six member clubs.  Am. Compl. ¶¶ 391–434. Plaintiffs seek relief on a league-wide basis:  they demand (among other things) the "[a]ppointment of an Independent Monitor"; the "funding [of] a committee dedicated to sourcing Black investors to take majority ownership stakes in NFL Teams"; the "appointment of a special hiring committee, and requir[ing] teams to have a committee member present at all applicable interviews"; and "additional salary cap space for making diverse hires."  Am. Compl. pp. 97–98 (prayer for relief). Thus, this dispute plainly qualifies as a covered dispute under Section 8.3(A) of the Constitution.

In addition, Mr. Flores's claims relate to alleged violations of various internal NFL rules— namely, the Rooney Rule, anti-tampering rules, and rules against intentionally losing games.  *See*

Am. Compl. ¶¶ 161–72, 190, 199, 200–06.  Courts are particularly hesitant to interfere in such matters, because the internal standards of professional sports leagues "are not necessarily familiar to courts and obviously require some expertise in their application." *Charles O. Finley & Co.* v. *Kuhn*, 569 F.2d 527, 537 (7th Cir. 1978); *see Crouch* v. *NASCAR, Inc*., 845 F.2d 397, 403 (2d Cir. 1988).  In light of the breadth of Plaintiffs' arbitration agreements and the Complaint's spotlight on issues concerning internal NFL governance, the Court should decline to "descend into the dismal swamp of resolving complex matters involving professional football that are best left to the voluntary unincorporated association that is the NFL." *Oakland Raiders* v. *NFL*, 131 Cal. App. 4th 621, 646 (Cal. Ct. App. 2005) (internal quotation marks and citation omitted) (abstaining from exercising jurisdiction over dispute between the NFL and one of its member clubs).

Perhaps recognizing that his claims clearly are arbitrable, in his correspondence with the NFL concerning the Dolphins' demands for arbitration, Mr. Flores asked the NFL Commissioner only to voluntarily decline to enforce the arbitration agreement in Mr. Flores's employment contract—a plea reiterated in the Complaint.  *See* Am. Compl. ¶¶ 15, 226.  Mr. Flores did not advance any legal or contractual basis for the Commissioner to set aside the bargained-for provisions of an employment agreement between two sophisticated parties.  Nor could he, because there is no authority that would permit the Commissioner to do so.  To the contrary, an arbitrator who invalidated an arbitration agreement based on the supposed "ills" of arbitration would contravene the FAA's "liberal federal policy favoring arbitration agreements," *Meyer*, 868 F.3d at 73 (citation omitted), and replace it with the historical "hostility to arbitration" that Congress designed the FAA to overcome, *AT&T Mobility LLC* v. *Concepcion*, 563 U.S. 333, 339, 342 (2011) (noting that "[t]he FAA was enacted in 1925 in response to widespread judicial hostility to

arbitration agreements" that "manifested itself in a great variety of devices and formulas declaring arbitration against public policy" (internal quotation marks and citation omitted)).

> **2.    Brian Flores's Claims Against the Denver Broncos, New York Giants, and Houston Texans**

Mr. Flores alleges that the Broncos and Giants discriminated against him by subjecting him to a sham interview and that the Texans retaliated against him for filing this lawsuit.  *See* Am. Compl. ¶¶ 178–218.  Although Mr. Flores did not enter into an employment agreement with those clubs, his claims against them are arbitrable under the NFL Constitution's broad arbitration provisions.  Those provisions plainly encompass Mr. Flores's disputes with the Broncos, Giants, and Texans:  Mr. Flores agreed to arbitrate any dispute with "*any* member club," NFL Const. art 8.3(B) (emphasis added)—not merely his employer—and to arbitrate any dispute "involving two or more members of the League," *id.* art. 8.3(A).  The NFL Constitution thus requires the arbitration of *all* disputes between a coach and one or more member clubs.

Mr. Flores was bound to comply with those arbitration provisions at all times relevant to his claims against the Broncos, Giants, and Texans.  He was under contract with the Patriots when he interviewed with the Broncos on January 5, 2019.  *See* Flores-Patriots Agreement ¶ 2.  He again agreed to be bound by the NFL Constitution in his employment agreement with the Dolphins, which ended on January 10, 2022.  *See* Flores-Dolphins Agreement ¶¶ 7.1, 12.1; Am. Compl. ¶ 177.  And he is now bound to the NFL Constitution under his employment agreement with the Steelers, which entered into on February 18, 2022.  *See* Flores-Steelers Agreement ¶ 13.

Although Mr. Flores was not employed by an NFL member club when he interviewed for head-coaching positions with the Giants and the Texans, disputes arising after his termination by the Dolphins can still be subject to arbitration under his employment agreement with the club where the dispute "involves facts and occurrences that arose before" his termination.  *CPR (USA)*

*Inc.* v. *Spray*, 187 F.3d 245, 255 (2d Cir. 1999) (citing *Litton Fin. Printing Div.* v. *NLRB*, 501 U.S. 190, 206 (1991)).  That is the case here.

As for his claims against the Giants, Mr. Flores alleges (incorrectly) that "the Giants interview Black candidates because of the [Rooney Rule] and for no other reason."  Am. Compl. ¶ 199.  In support of that assertion, Mr. Flores cites the Giants' hiring of Ben McAdoo as their head coach in 2016 and Joe Judge in 2020.  *See id.* ¶¶ 196–98.  Mr. Flores also makes allegations regarding the Giants' interviewing practices "since the passage of the Rooney Rule" in 2003.  *Id.* ¶ 199; *see also id.* ¶ 192 (referring to the Giants' "history when it comes to race relations").  The Complaint thus makes clear that Mr. Flores's claims against the Giants involve conduct that predates the termination of his employment with the Patriots and Dolphins, rendering those claims arbitrable under the NFL Constitution, as incorporated into Mr. Flores's agreements with those clubs.  *See CPR*, 187 F.3d at 255.

As for his claims against the Texans, Mr. Flores alleges that the Texans failed to hire him "because he filed this lawsuit and opposed systemic racism in the NFL."  Am. Compl. ¶ 217.  According to Mr. Flores's own allegations, the systemic racism he purports to identify arose well before February 2022, when the Texans failed to select him to fill their head-coach vacancy.  *See id.* ¶¶ 207–16.  The Complaint contains numerous allegations regarding conduct that occurred while Mr. Flores was employed by the Patriots and Dolphins. *See, e.g.*, *id.* ¶¶ 64–74 (allegations beginning in 2016 regarding Colin Kaepernick); *id.* ¶¶ 293–99 (allegations beginning in 2014 regarding Jim Caldwell); *id.* ¶¶ 311–13 (allegations beginning in 2018 regarding Kris Richard). Indeed, Mr. Flores's claims against the Broncos and Dolphins, Mr. Wilks's claims against the Cardinals, and Mr. Horton's claims against the Titans all relate to conduct occurring during that timeframe.  *See id.* ¶¶ 177, 201, 252, 274.  Mr. Flores's retaliation claim against the Texans also

"involves facts and occurrences that arose before expiration" of his employment agreements, *CPR*, 187 F.3d at 255, rendering it arbitrable under the NFL Constitution.  Mr. Flores's claims against the Broncos, Giants, and Texans are all subject to arbitration.[3]

### 3.    Steve Wilks's Claims Against the Arizona Cardinals

Mr. Wilks alleges that he was discriminated against by the Cardinals when he was terminated after one season and not given a meaningful chance during his tenure to succeed as the club's head coach.  *See* Am. Compl. ¶¶ 231–62.  His claims are plainly arbitrable under his employment agreement with the Cardinals, because they arose "between" him and the Cardinals, concern his employment with the club, and thus clearly touch on issues under his agreement.

Mr. Wilks is also obligated to arbitrate his dispute with the Cardinals under the NFL Constitution, which he agreed to be bound by in connection with his previous employment by the Cardinals and his current employment by the Panthers.  *See* Wilks-Cardinals Agreement ¶ 9(a); Wilks-Panthers Agreement ¶ 9(g).  As already explained, *see* pp. 16–17, this multi-coach, multi-team dispute seeking league-wide relief clearly qualifies as "[a]ny dispute between any . . . coach . . . and any member club or clubs," NFL Const. art. 8.3(B), as well as "[a]ny dispute involving

---

[3]    Mr. Flores's current obligation to comply with the NFL Constitution in connection with his employment with the Steelers also requires him to arbitrate his claims against the Giants and Texans.  While the allegations supporting those claims arose before the Steelers agreement, the Second Circuit has repeatedly held that arbitration agreements that lack temporal limitations can apply to conduct that predates the agreement.  *See, e.g.*, *Smith/Enron Cogeneration Ltd. P'ship, Inc.* v. *Smith Cogeneration Int'l Inc.*, 198 F.3d 88, 99 (2d Cir. 1999); *TradeComet.com LLC* v. *Google, Inc.*, 435 F. App'x 31, 34–35 (2d Cir. 2011) (compiling additional cases from other courts).  If the arbitration agreement "does not contain any temporal limitation, the relevant inquiry is whether [the] claims" fall within the scope of the arbitration agreement, "not when they arose." *Smith/Enron Cogeneration*, 198 F.3d at 99; *see, e.g.*, *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 407 (S.D.N.Y. 2003).  Here, Mr. Flores's agreement with the Steelers requires him to comply with the NFL Constitution "at all times," including the present day as he pursues the claims alleged in this action.  Flores-Steelers Agreement ¶ 13.  The NFL Constitution's arbitration provisions themselves similarly lack any temporal limitations.

two or more members of the League," *id.* art. 8.3(A).  And while Mr. Wilks's claims predate his current employment agreement with the Panthers, his obligation to comply with the NFL Constitution under that agreement contains no temporal limitation and thus applies to earlier-arising claims.  *See Smith/Enron Cogeneration*, 198 F.3d at 99.

### 4.    Ray Horton's Claims Against the Tennessee Titans

Mr. Horton alleges that the Titans discriminated against him by subjecting him to a sham interview and failing to promote him to head coach on January 16, 2016.  *See* Am. Compl. ¶¶ 268–78.  His employment agreement with the Titans was in effect at that time, and it required him to arbitrate "all matters in dispute between [him] and Titans."  Horton-Titans Agreement ¶ 6(a).  That broad language easily covers his claims, which center on an alleged act of discrimination during his employment with the club.  *See Louis Dreyfus*, 252 F.3d at 225.  Mr. Horton's obligation to abide by the NFL Constitution in connection with his employment with the Titans also required him to arbitrate his claims here, for reasons previously explained.  *See* pp. 16–17, 20–21.

### 5.    Plaintiffs' Claims Against the NFL

Plaintiffs' claims against the NFL are also arbitrable under Plaintiffs' employment agreements and the NFL Constitution.

*First*, the NFL is entitled to rely on the arbitration provisions in Plaintiffs' employment agreements.  The NFL Commissioner signed and approved those contracts.  *See* NFL Const. art. 9.3(A)(1); Flores-Dolphins Agreement 11; Wilks-Cardinals Agreement 13; Horton-Titans Agreement 9.  And while the arbitration provisions in those agreements are facially limited to claims between the coach and the club, the Second Circuit has repeatedly held that, under the doctrine of equitable estoppel, a signatory to an arbitration agreement cannot avoid arbitration with a third party where there is a "close relationship" among the parties and the issues in dispute are "intertwined" with the contract containing the arbitration agreement.  *See Doe* v. *Trump Corp.*, 6

F.4th 400, 412 (2d Cir. 2021); *Ross* v. *Am. Exp. Co.*, 547 F.3d 137, 146 (2d Cir. 2008); *Choctaw Generation Ltd. P'ship* v. *Am. Home Assur. Co.*, 271 F.3d 403, 406 (2d Cir. 2001). The requisite close relationship is present where the "basis of the relationships among the parties" demonstrates that "the promise to arbitrate" by the party opposing arbitration is "reasonably seen . . . as extending not only to" the contractual counterparty but also to a third party that "was, or would predictably become . . . affiliated or associated with [the contractual counterparty] in such a manner as to make it unfair to allow [the party opposing arbitration] to avoid its commitment to arbitrate on the ground that [the third party] was not the very entity with which [the party opposing arbitration] had a contract." *Sokol Holdings, Inc.* v. *BMB Munai, Inc.*, 542 F.3d 354, 361 (2d Cir. 2008).

Under that standard, the NFL is entitled to enforce Plaintiffs' arbitration agreements with their former employers. By the very nature of the NFL as a voluntary membership association, all member clubs in the NFL are associated with one another and with the NFL—as Plaintiffs concede (although their assertion that the NFL acted as their joint employer is incorrect). *See, e.g.*, Am. Compl. ¶¶ 340, 342, 349. Indeed, far from not knowing the NFL "from Adam," *Ross*, 547 F.3d at 146, Plaintiffs were well aware of the associational relationship among member clubs and the NFL when they agreed to arbitrate claims related to their employment as NFL head coaches. After all, Plaintiffs are experienced NFL coaches, and they represented in their employment agreements that they had read the NFL Constitution, which sets forth the relationship between the NFL and its member clubs in detail. *See* Flores-Dolphins Agreement ¶¶ 7.1, 12.1; Wilks-Cardinals Agreement ¶ 9a; Horton-Titans Agreement ¶ 6(c). And as noted, the NFL expressly approved Plaintiffs' contracts.

Plaintiffs' claims against the NFL are also intertwined with, and derivative of, their disputes with the NFL's member clubs. The Complaint does not allege that Plaintiffs experienced

discrimination by the NFL *independent from* the alleged discriminatory employment actions taken by the clubs. *See* Am. Compl. ¶¶ 158–206, 231–63, 268–84. Plaintiffs' claims against the NFL are thus derivative of Plaintiffs' "disputes" with the member clubs, requiring the arbitration of claims related to the Dolphins, Cardinals, and Titans under Plaintiffs' employment agreements with those clubs.

The Second Circuit's decision in *Ragone* v. *Atlantic Video at Manhattan Center*, 595 F.3d 115 (2d Cir. 2010), confirms that conclusion. Plaintiff in *Ragone* was a makeup artist employed by Atlantic Video, a broadcast production company that provided services for ESPN, among other clients. *Id.* at 118. Alleging that certain ESPN employees sexually harassed her on set, plaintiff filed a lawsuit asserting employment-discrimination claims against both Atlantic Video and ESPN under Title VII and New York state and local law. *Id.* at 117, 119. Atlantic Video and ESPN both moved to compel arbitration under plaintiff's employment agreement with Atlantic Video, which required the arbitration of claims "arising out of [her] employment." *Id.* at 118. Plaintiff argued that her claims against ESPN were not arbitrable because ESPN was not a signatory to her employment agreement. *See id.* at 126.

The Second Circuit disagreed. *See Ragone*, 595 F.3d at 126–28. Even though ESPN was not "linked textually" to the arbitration agreement, the Second Circuit reasoned that "it [was] plain" that plaintiff was "hired to provide make-up artistry and other services to ESPN[]" and would "extensively treat with ESPN personnel," demonstrating "the existence of a relationship" that allowed ESPN "to avail itself of the arbitration agreement" between plaintiff and her employer. *Id.* at 127–28. There was also "no question that the subject matter of the dispute between [plaintiff] and [Atlantic Video]" was "factually intertwined with the dispute between [plaintiff] and ESPN," because it was "the same dispute." *Id.* at 128. Plaintiff was thus required to arbitrate her claims

23

against both the signatory (Atlantic Video) and the third party (ESPN).  *See id.*  So too here, given Plaintiffs' knowledge of the relationship between the NFL and the member clubs and the significant overlap of Plaintiffs' claims against the clubs and the NFL.

*Second*, the NFL Constitution requires the arbitration of all of Plaintiffs' claims against the NFL.  As already explained, *see* pp. 16–17, this case involves disputes between coaches and clubs, *see* NFL Const. art 8.3(B), and the entire dispute involves multiple members of the League, *see id.* art. 8.3(A).  In addition, Plaintiffs allege that Defendants all engaged in "the same unlawful patterns, practices and/or policies" and seek League-wide remedies that every member club and the NFL would be required to implement.  Am. Compl. ¶ 370 & pp. 97–98.  And as noted, *see* p. 17, this case involves allegations that member clubs violated internal NFL rules—matters best reserved for internal League resolution.

As was the case with Plaintiffs' employment agreements, the NFL is entitled to rely on Plaintiffs' obligation to abide by the NFL Constitution.  As already explained, *see* pp. 21–23, the requisite close relationship is present, and Plaintiffs' claims against the NFL are intertwined with— indeed, derivative of—Plaintiffs' claims against the member clubs.  *See id.*  Plaintiffs are thus required to arbitrate their claims against the NFL under the NFL Constitution in addition to their employment agreements with the Dolphins, Cardinals, and Titans.

### C.   Plaintiffs Must Arbitrate Their Claims on an Individual Basis

Not only are Plaintiffs required to proceed with their claims in mandatory arbitration, but they also must proceed on an individual, rather than classwide, basis.  Supreme Court precedent makes clear that, where an arbitration agreement is silent or ambiguous on the availability of class arbitration, "[c]ourts may not infer . . . that parties have consented to arbitrate on a classwide basis."  *Lamps Plus, Inc.* v. *Varela*, 139 S. Ct. 1407, 1419 (2019); *see Stolt-Nielsen S.A.* v. *AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010) ("An implicit agreement to authorize class-

action arbitration . . . is not a term that the arbitrator may infer solely from the fact of the parties'

agreement to arbitrate.").  Because the arbitration agreements at issue here do not authorize class

arbitration, Plaintiffs may only pursue their individual claims in bilateral arbitration.  *See, e.g.*,

*Lamps Plus*, 139 S. Ct. at 1419 (requiring plaintiffs in a putative class action to proceed with

bilateral arbitration); *Parisi*, 710 F.3d at 486–87 (requiring a plaintiff seeking to assert class claims

for employment discrimination to proceed in bilateral arbitration).  Accordingly, Plaintiffs' claims

should be compelled to arbitration, and Plaintiffs cannot proceed on a classwide basis.

## **CONCLUSION**

The motion to compel arbitration and stay further proceedings should be granted.

Dated: New York, New York
       June 21, 2022

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**

By:  /s/ Loretta E. Lynch
Loretta E. Lynch
Brad S. Karp
Lynn B. Bayard
Brette Tannenbaum
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3900
lelynch@paulweiss.com
bkarp@paulweiss.com
lbayard@paulweiss.com
btannenbaum@paulweiss.com

*Attorneys for the National Football League, New York
Giants, Miami Dolphins, Denver Broncos, Houston
Texans, Arizona Cardinals, and Tennessee Titans*