# EXHIBIT 1

# CONSTITUTION
# AND BYLAWS
## OF THE
# NATIONAL
# FOOTBALL LEAGUE



**Effective February 1, 1970**
**(Revised as of September 14, 2016)**

*Provisions of the Constitution relating to players (in particular, Articles XII, XIV, XV, XVI, XVII, and XVIII) remain subject to the provisions of the Collective Bargaining Agreement.

# Table of Contents

| **Article** | | **Page Number** |
|---|---|---|
| Article I | Name and Principal Office | 1 |
| Article II | Purposes and Objects | 2 |
| Article III | Membership | 3 |
| Article IV | Territorial Rights | 13 |
| Article V | Meetings of the League | 22 |
| Article VI | Executive and Other Committees | 25 |
| Article VII | Officers | 28 |
| Article VIII | Commissioner | 30 |
| Article IX | Prohibited Conduct | 40 |
| Article X | Broadcasting and Television | 48 |
| Article XI | Playing Rules | 51 |
| Article XII | Eligibility of Players | 52 |
| Article XIII | Schedule | 61 |
| Article XIV | Selection Meeting | 64 |
| Article XV | Player Contracts | 71 |
| Article XVI | Assignment of Player Contracts | 73 |
| Article XVII | Player Limits and Eligibility | 76 |
| Article XVIII | Waivers | 94 |
| Article XIX | Conduct of Regular Season Games | 100 |
| Article XX | Divisional Playoff Games | 110 |
| Article XXI | Conference Championship Games | 116 |
| Article XXII | Super Bowl Game | 119 |
| Article XXIII | Preseason and Postseason Games | 120 |
| Article XXIV | Notices | 122 |
| Article XXV | Amendment of Constitution and Bylaws | 123 |
| Appendix of Resolutions | | A-i |

# Article I

## Name and Principal Office

1.1    The name of this association shall be National Football League, hereinafter called "League."  The word "League" herein shall refer to the National Football League, unless otherwise specified.

1.2    The Commissioner shall select the location of the office of the League, which shall be located in or adjacent to a city in which a League franchise is operated.

# Article II

## Purposes and Objects

2.1   The purpose and objects for which the League is organized are:

    (A)   To promote and foster the primary business of League members, each member being an owner of a professional football club located in the United States.

    (B)   To do and perform such other functions as may be necessary to carry out the purpose and objects of the League.

2.2   The League is not organized nor to be operated for profit.

    *But see*    2015 Resolution FC-3 (approving conversion of the League from a non-profit to a for-profit entity) App., p. 2015-4

# Article III

## Membership

**Members**

3.1 (A) Membership in the League shall be limited to the thirty-two (32) member clubs specified in Section 4.5 hereof and such new members as may be thereafter duly elected.

(B) The admission of a new member club, either within or outside the home territory of an existing member club, shall require the affirmative vote of three-fourths of the existing member clubs of the League.

*See* 1995 Resolution G-4 (Los Angeles franchise opportunity), App., p. 1995-1
1999 Resolution EC-1 (Houston expansion), App., p. 1999-1

**Eligibility of New Members**

3.2 Any person, association, partnership, corporation, or other entity of good repute organized for the purpose of operating a professional football club shall be eligible for membership, except:

(A) No corporation, association, partnership, or other entity not operated for profit nor any charitable organization or entity not presently a member of the League shall be eligible for membership.

(B) If any privately held corporation, partnership, trust, or other entity owns or operates, directly or indirectly, any substantial non-football business or assets and owns, directly or indirectly, an interest in or otherwise operates a member club, then:

(1) The member club shall be held in a separate corporation, partnership, or trust (the "Football Company"), the primary purpose of which shall at all times be and remain the operation of a professional football team as a member club of the League, which such primary purpose shall not be changed, and the only material asset of which shall be the member club;

(2) The ownership interest in the Football Company shall be held directly by a holding company that shall have no operating business or material assets but only ownership interests in other entities, and the ownership interests in the holding company shall be owned directly by individuals (or certain

3                                                    Article III

trusts or partnerships approved by the Commissioner's office); and

(3) The Football Company and all individuals or entities holding a direct or indirect interest in the Football Company shall be subject to all of the League policies and requirements on ownership that the members may from time to time adopt or apply, including, without limitation, all reporting, audit, ownership, and debt limitation requirements.

*See* 1985 Resolution FC-7 (rules governing limited partnerships), App., p. 1985-2
1988 Resolution FC-3 (club debt limitation requirements), App., p. 1988-2
1990 Resolution FC-2 (financial reporting), App., p. 1990-1
1996 Resolution FC-5 (rules governing limited partnerships; attribution), App., p. 1996-2
1996 Resolution FC-6 (rules governing corporations; attribution), App., p. 1996-3
1997 Resolution FC-3 (cross-ownership), App., p. 1997-1
1998 Resolution FC-10 (rules governing limited liability companies; attribution), App., p. 1998-12
2001 Resolution FC-4 (debt ceiling), App., p. 2001-1
2004 Resolution FC-1A (rules governing aggregation of a Principal Owner's ownership interest with those of immediate family members for the purposes of determining whether such Principal Owner holds at least a 30% beneficial interest), App., p. 2004-11
2004 Resolution FC-2 (cross-ownership), App., p. 2004-13
2004 Resolution FC-7 (financial reporting), App., p. 2004-14
2005 Resolution FC-2 (debt ceiling), App., p. 2005-6
2008 Resolution FC-14 (debt ceiling waivers for estate planning purposes)
2009 Resolution FC-12 (rules governing aggregation of a Principal Owner's ownership interest with those of immediate family members for the purposes of determining whether such Principal Owner holds at least a 30% beneficial interest), App., p. 2009-9
2011 Resolution FC-3 (rules governing aggregation of a Principal Owner's ownership interest with those of immediate family members for the purposes of determining the membership interest required to become a Principal Owner), App., p. 2011-12
2012 Resolution FC-6 (increasing debt ceiling), App., p. 2012-3
2015 Resolution FC-4 (amending 2004 Resolution FC-1A regarding minimum equity requirements for a Principal Owner), App., p. 2015-7

2015 Resolution FC-5 (increasing debt ceiling), App., p. 2015-14

**Admission for Members**

3.3   (A)   Each applicant for membership shall make a written application to the Commissioner. Such application shall describe the type of organization and shall designate the city in which the franchise of the applicant shall be located. Such application shall further describe and contain the following information:

      (1)   The names and addresses of all persons who do or shall own any interest or stock in the applicant, together with a statement that such persons will not own or hold such interest or stock for the benefit of any undisclosed person or organization;

      (2)   A detailed balance sheet of such company as of the date of organization and a pro forma statement as of the time it shall commence actual operation. A written financial statement shall be required from the applicant and from anyone owning an interest in any applicant, including stockholders and partners;

      (3)   If applicant is a corporation, a certified copy of the Articles of Incorporation, Bylaws and share certificate shall accompany such application, provided, however, that if the organization of such corporation has not been commenced or completed, a detailed statement summarizing the proposed plan of operation and the capital structure thereof shall be furnished;

      (4)   If applicant is a partnership, unincorporated association, or other entity, a certified copy of the Articles of Co-Partnership or organization agreement shall accompany such application;

      (5)   The names and addresses of all officers and directors; and

      (6)   All applications shall contain a representation that upon acceptance, the applicant will subscribe to and agree to be bound by the Constitution and Bylaws, Rules and Regulations of the League and any amendments or modifications thereto.

  (B)   Each application for membership shall be accompanied by a certified check for twenty-five thousand dollars ($25,000). Upon approval of any application for membership, an additional twenty-five thousand dollars ($25,000) shall be paid to the League. If any application for admission is rejected, the League shall repay to the applicant the sum of twenty-five thousand dollars ($25,000) paid by the applicant at the time of such application, less all expenses

5            Article III

reasonably incurred in connection with the consideration and investigation of such application.

(C) Upon receipt of any application for membership in the League, the Commissioner shall conduct such investigation thereof as he deems appropriate. Following the completion of such investigation, the Commissioner shall submit the application to the members for approval, together with his recommendation thereon, and such information thereon that the Commissioner deems pertinent. Each proposed owner or holder of any interest in a membership, including stockholders in any corporation, members of a partnership, and all other persons holding any interest in the applicant, must be individually approved by the affirmative vote of not less than three-fourths or 20, whichever is greater, of the members of the League.

**Franchise Certificate of Membership**

3.4     Each member shall receive a Franchise Certificate of Membership signed by the Commissioner and Secretary of the League certifying that such member is a member of the League and holds a franchise from the League to operate a professional football club in a designated city. Such Franchise Certificate shall not be assignable nor transferable, except as provided in Section 3.5 hereof.

**Transfer of Membership**

3.5     No membership, or any interest therein, may be sold, assigned, or otherwise transferred in whole or in part except in accordance with and subject to the following provisions:

(A) Application for the sale, transfer, or assignment of a membership, or of any interest therein, must be made in writing to the Commissioner. Upon receipt of such application, the Commissioner is empowered to require from applicant and applicant shall furnish such information as the Commissioner deems appropriate, including:

  (1) The names and addresses of each of the buyers, transferees, or assignees thereof;

  (2) The price to be paid for such sale, transfer, or assignment, and the terms of payment, including a description of the security for the unpaid balance, if any;

  (3) A banking reference for each buyer, transferee, or assignee; and

(4) If the buyer, transferee, or assignee is a corporation, a copy of the Articles of Incorporation and Bylaws thereof, together with a copy of the share certificates of each class of stock to be outstanding, the names and addresses of the directors and officers thereof, the names and the addresses of the stockholders therein, and the price paid or to be paid and the time of payment for said stock, a copy of any proposed voting trust agreement and of any voting trust certificates.

(B) Upon receipt thereof, the Commissioner shall conduct such investigation as he deems appropriate. Upon completion thereof, the Commissioner shall submit the proposed transfer to the members or to the Finance Committee, as applicable, for approval, together with his recommendation thereon, and all information in respect thereto that the Commissioner deems pertinent. All sales, transfers, or assignments, except  transfers referred to in Sections 3.5(C) and 3.5(D) hereof, shall only become effective if approved by the affirmative vote of not less than three-fourths or 20, whichever is greater, of the members of the League.

(C) If any person owning or holding a membership, or an interest therein, by stock ownership or otherwise, dies, such membership or interest therein may be transferred to a member of the "immediate family" of the deceased without requiring the consent or approval of the members of the League or the Commissioner. Similarly, if any person owning or holding a membership or an interest therein, by stock ownership or otherwise, seeks to transfer such membership or any interest therein by gift, such membership or the interest therein may be transferred to the donee if the donee is a member of the "immediate family" of the donor. In such event, no consent or approval of the members of the League or the Commissioner shall be required to complete such transfer. The "immediate family" for the purpose of this paragraph shall mean the wife, child, mother, father, brothers and sisters, or any other lineal descendant of the deceased or donor. In all other cases involving death or transfers by gift, any person succeeding to a membership or an interest therein, whether by gift, will, intestacy, or otherwise, must be first investigated by the Commissioner in such manner as the Commissioner deems appropriate. Upon completion thereof, the Commissioner shall submit  the proposed transfer to the membership or to the Finance Committee, as applicable, for approval and shall accompany the same with his recommendation thereon. Unless such succession or transfer is approved by the Finance Committee and the Commissioner pursuant to Section 3.5(D) hereof, no such succession or transfer shall be effective unless first approved by the affirmative vote of not less than three-fourths or 20, whichever is greater, of the members of the League.

(D) Subject to the final sentence of this Section 3.5(D), a transfer of an interest in a Member Club may be approved by the Finance Committee and the Commissioner, without a vote of the membership, provided that the proposed transfer (1) involves an interest not to exceed five percent or, if in excess of five percent, only results in an increase in the controlling owner's stake and/or a member of the controlling owner's immediate family's stake in a member club; (2) is recommended by the Commissioner following his receipt of the information contemplated by Section 3.5(A) and completion of his investigation pursuant to Section 3.5(B) and is unanimously approved by the members of the Finance Committee. At least five days prior to a Finance Committee decision on any qualifying proposed transaction, the Commissioner shall advise the membership of the proposed transaction to allow the membership to provide comments to the Finance Committee prior to the Committee's decision.  Any transaction involving the acquisition of controlling interest in a member club or an acquisition by a person who owns an interest of at least five percent in a member club (other than a transaction involving the controlling owner or a member of his or her immediate family, as described above), or who would by virtue of the proposed transaction acquire an interest that would exceed five percent of a member club (other than a transaction involving the controlling owner or a member of his or her immediate family, as described above), may not be approved under this subsection and must be approved by the affirmative vote of not less than three-fourths or 20, whichever is greater, of the members of the League.

**Voluntary Withdrawal**

3.6 Any member of the League may withdraw from membership either:

(A) By selling, assigning, or transferring its membership upon the terms and conditions set out in Section 3.5 hereof; or

(B) A club may voluntarily withdraw from the League by tendering its written resignation to the Commissioner and simultaneously surrendering its Franchise Certificate of Membership, making full payment of any and all dues, assessments, or other debts owing to the League, and assigning to the League or its nominee all player contracts and the lease of its playing field, if and to the extent the lease is assignable; provided, however, that no voluntary withdrawal may be made in any year between March 1st and the date of the Super Bowl game of that year, except with the unanimous consent of all members.

**Involuntary Termination**

3.7    Membership in the League shall be automatically terminated whenever:

(A)    An individual or corporate member or a partnership member or any general partner therein makes an assignment for the benefit of his or its creditors or files a voluntary petition in bankruptcy or whenever a receiver or trustee in bankruptcy is appointed for the property and assets of the member or of any general partner of a partnership member or whenever reorganization proceedings in bankruptcy are instituted by or against the member or by or against any general partner possessing an interest in a partnership membership. In the event the partnership agreement of a partnership member provides for automatic termination of the interest of any general partner who makes an assignment for the benefit of his creditors or who becomes the subject of any such bankruptcy proceedings and also provides for the continuation of such partnership in any such event and the remaining partners satisfy the requirements of Sections 3.5(A) and (B) hereof, then this Section 3.7(A) shall be inoperative with respect to such partnership member; or

(B)    A member disbands its team during the regular season; or

(C)    A member permanently disbands its business organization or ceases its business.

**Effect of Termination**

3.8    (A)    Upon the expulsion of a member or upon any other involuntary termination of membership, the following shall occur:

(1)    The lease of its playing field or interest of the member therein, if and to the extent the lease or interest is assignable, shall, upon demand of the League, be assigned to the League or its nominee, provided, however, that the assignment of said lease to the League shall first be approved by the affirmative vote or written consent of no less than three-fourths or 20, whichever is greater, of the members of the League. Said lease shall therefore be handled or disposed of in such manner as the remaining League members, by the affirmative vote of not less than three-fourths or 20, whichever is greater, of the members shall decide.

(2)    Title to all player contracts of the terminated member and title to all players on the Reserve or Selection List of such terminated member and any interest or right to such players and contracts shall, if demanded by the League, be assigned to

9                                      Article III

the League or its nominee, provided that such assignments are first approved by the affirmative vote or written consent of not less than three-fourths or 20, whichever is greater, of the remaining League members. Said players and contracts so acquired shall thereafter be handled and disposed of within the League in such manner as the remaining member clubs by the affirmative vote of not less than three-fourths or 20, whichever is greater, members of the League shall decide.

(3) All interests of the terminated member in and to any funds or property of the League, or any right or interest therein, shall cease.

(B) Whenever any stockholder, partner, or holder of any interest in a member club is requested to sell or dispose of his stock or an interest in a membership in the League by reason of an expulsion or other involuntary termination, such sale or disposition must be completed within one hundred twenty (120) days after such action has been ordered. If such stock or interest is not sold or disposed of within one hundred twenty (120) days, then the price and other terms of the sale or disposition shall be fixed by mutual agreement between the person affected and the Commissioner; if such cannot be accomplished by mutual agreement, then the price and other terms shall be fixed by arbitration with one arbitrator to be selected by the Commissioner and the other by the affected holder of the stock or interest. If within five (5) days the two arbitrators cannot agree on the price and terms, then the two arbitrators shall select a third arbitrator and the decision of the majority of the arbitrators shall be binding on all parties. If any person required to name an arbitrator fails to do so, or if the two arbitrators cannot agree on a third arbitrator, then such arbitrator in either case shall be named by the Commissioner.

**Capital Contribution of Transferee**

3.9    A new member acquiring its membership by transfer from another member shall succeed to the interest of the transferor in and to the funds, property, rights, and interests of the League and shall not be obligated to make the capital contribution required under Section 3.3(B) hereof.

**Membership Fees and Assessments**

3.10    Whenever monies are required to meet the expenses of the League and
        League funds are not available for that purpose, then, upon demand by
        the Commissioner, each member shall be obligated to contribute equally
        its share of the required monies.

        *See* 1984 Resolution (Finance; interest charged on delinquent club
            payments), App., p. 1984-2

**Membership Covenants and Obligations**

3.11    Each member club, and each and all of the owners, officers, stockholders,
        directors, or partners therein, as well as any other person owning any
        interest in such member club, assumes and agrees to be bound by the
        following obligations of membership in the League:

        (A)    They, and each of them, shall be bound by and will observe all
               decisions of the Commissioner of the League in all matters within
               his jurisdiction.

        (B)    They, and each of them, shall be bound by and will observe all
               decisions, rulings, and action of the Executive Committee or the
               member clubs of the League in every matter within the jurisdiction
               of such Committee or such member clubs, as the case may be.

               *See*  2004 Resolution BV-4 (All agreements existing as of the date
               of, and relating to the matters covered by, 2004 Resolution BV-4
               remain in effect, with clubs to continue to participate and support
               implementation of such agreements), App., p. 2004-3

        (C)    They, and each of them, to the fullest extent permitted by law,
               release and indemnify the Commissioner, the League and every
               employee thereof, every member club and every officer, director,
               or employee thereof, and every holder of an interest therein, from
               and against any and all claims, demands, suits or other
               proceedings, whether for damages or otherwise, which they, or any
               of them, or any other party, may at any time have or assert in
               connection with or by reason of any action taken or not taken by
               the released/indemnified parties in their official capacities on
               behalf of the League or any committee thereof.

               *See* 1997 Resolution FC-6 (reimbursement of legal fees and
                   expenses), App., p. 1997-3

(D)   They, and each of them, shall include in every contract between any member club and its employees, including coaches and players, a clause wherein the parties to such contract agree to be bound by the Constitution and Bylaws of the League.

(E)   That after becoming a member of the League, the primary purpose of the corporation, partnership, or other entity operating the club shall at all times be and remain the operation of a professional football team as a member club of the League, and such primary purpose shall not be changed.

 *See* 1993 Resolution FC-5 (primary purpose requirement), App., p. 1993-6

 *See also* 2005 Resolution BC-1 (prohibition on member club ownership of a Club-dedicated Network), App., p. 2005-1

(F)   They, and each of them, consent to be bound by the provisions of the Final Judgment of the United States District Court for the Eastern District of Pennsylvania entered against the National Football League and certain of its member clubs on December 28, 1953, and as thereafter modified and for the purpose of said Judgment submit to the jurisdiction of said Court.

(G)   They, and each of them, agree to be bound by all of the terms and provisions of the Constitution and Bylaws of the League as now or hereafter in effect.

(H)   They, and each of them, agree to be represented at each and every meeting of the League and of the Executive Committee of the League by a representative duly authorized and empowered to cast a binding vote of the member club on all questions coming before such meeting.

 *See* 1984 Resolution (Long Range Planning Committee, League meetings), App., p. 1984-4

# Article IV

## Territorial Rights

### Home Territory Defined

4.1     "Home Territory" with respect to any club means the city in which such
        club is located and for which it holds a franchise and plays its home
        games and includes the surrounding territory to the extent of 75 miles in
        every direction from the exterior corporate limits of such city, except as
        follows:

    (A)     Whenever any two member clubs, other than the San Francisco
                49ers and the Oakland Raiders, are located and hold franchises for
                different cities within 100 miles of each other measured from the
                exterior corporate limits of such city, then the territorial rights of
                each of such clubs shall only extend to and include an area of one-
                half the distance between such cities.

    (B)     The "home territory" of the Green Bay Packers shall extend to and
                include all of Milwaukee County, Wisconsin, despite the fact that
                portions of such County are outside the 75 mile limits from the
                exterior corporate limits of the City of Green Bay.

### Rights Within Home Territory

4.2     Each member shall have the exclusive right within its home territory to
        exhibit professional football games played by teams of the League except
        that:

    (A)     Whenever two club franchises in the League are located in the
                same city, then the owners of each of such franchises shall have
                equal rights within the home territory of such city.

    (B)     In respect to the San Francisco and Oakland franchises the
                following provisions shall apply:

        (1)     The home club in each city shall have the exclusive right to
                        exhibit professional football games played by teams in the
                        League in its city, and neither the San Francisco nor the
                        Oakland club shall have any right to play professional football
                        in the city of the other without the consent of the other club.

        (2)     In respect to the area included in the home territory of both
                        clubs, but located outside the city limits of both cities, both
                        clubs shall have joint rights of exclusivity, and both of said
                        clubs may play games with other clubs in the League within

such area without the consent of the other club also operating in the same home territory or any part thereof.

(C)    Subject to the provisions of Sections 4.2(A) and (B) above, no club in the League shall be permitted to play games within the home territory of any other club unless a home club is a participant.

(D)    In the event the Baltimore franchise is forfeited or surrendered, or is transferred to a city other than Baltimore, all rights to the Baltimore territory shall revest in the Washington Redskins, and the area included in the Baltimore territory shall be reconstituted and become part of the Home Territory of the Washington Redskins pursuant to the Constitution and Bylaws of the League.

(E)    The Home Territory of the Washington Redskins and the Home Territory of the Baltimore Ravens, respectively, shall remain as defined in Article 4.1(A) above except that the Home Territory of the Redskins shall include all of Montgomery and Prince Georges Counties and no other part of the State of Maryland and the Home Territory of the Baltimore Ravens shall include all of Anne Arundel and Howard Counties in the State of Maryland.

**League Control of Games**

4.3    The League shall have exclusive control of the exhibition of football games by member clubs within the home territory of each member. No member club shall have the right to transfer its franchise or playing site to a different city, either within or outside its home territory, without prior approval by the affirmative vote of three-fourths of the existing member clubs of the League.

*See* 2002 Resolution G-7 (confirming League control of sidelines for marketing and broadcasting purposes), App., p. 2002-8

2008 Resolution JC-1 Net (approving a series of Buffalo Bills games to be played in Toronto), App., p. 2008-6

2011 Resolution IC-1 (authorizing UK International Game Series), App., p. 2011-22

2012 Resolution IC-1 (delegating authority to approve additional Buffalo Bills games to be played in Toronto to the International Committee), App., p. 2012-10

2014 Resolution IC-1 (establishing parameters for selection of member clubs to play in regular season United Kingdom games), App., p. 2014-11

2015 Resolution IC-1 (extending scheduling of regular season games in the United Kingdom and authorizing exploration of scheduling regular season games in other international territories), App., p. 2015-16

2016 Resolution IC-1 (facilitating the scheduling of regular season games in the United Kingdom by modifying the scheduling parameters applicable to such games), App., p. 2016-12

**Home Marketing Area**

4.4    Home Marketing Area Defined.

(A)    Each club shall have a Home Marketing Area in which it may engage in the commercial activities set forth in Section 4.4(B) below. The Home Marketing Area shall be defined as (i) the Home Territory (including the portion of any foreign country within a club's Home Territory, provided however, that activities within a foreign country are coordinated with and approved in advance by the League on behalf of NFL International) and (ii) the State within which the City for which the club holds a franchise is located (the "Home State"), and (iii) the entirety of any other State within which any portion of such Club's Home Territory is located ("Adjacent State"), but excluding any other Club's Home State.

Where two or more clubs share a Home Territory, each club shall have equal rights under Section 4.4(B) below with respect to the Home Territory and Home Marketing Area. Where two or more clubs share a Home State but do not share a Home Territory, each club shall have equal rights within the Home State, except for the Home Territory of another club. Where two or more Clubs share an Adjacent State but do not share a Home Territory, each Club shall have equal rights within the Adjacent State, except for the Home Territory of another Club.

The Home Marketing Area of any club shall also include the county in which the club's preseason training camp is located (if located within the United States) for the duration of such training camp only, unless the training camp is located within the Home Territory of another member club.

(B)    Club Rights Within Home Marketing Area; Exclusivity and Other Terms

(1)    Subject to the terms of Section 4.4(A), each club shall have exclusive rights vis-à-vis other clubs to use its trademarks, including without limitation, the names, nicknames, logos, colors, slogans, symbols, or any other identifying indicia in their present form or as may be adopted in the future (the "Club Marks") within its Home Marketing Area with respect to NFL football activities involving (i) local advertising, sponsorship, naming rights, and related promotional arrangements; (ii) retail stores and other club-identified physical structures and ventures; (iii) promotional and public

awareness campaigns, including "image" advertising; and (iv) club-sponsored events.

(2) A club's rights to use its Club Marks within its Home Marketing Area shall at all times be subject to: (i) League agreements, including with manufacturers of licensed products; (ii) the rights of League sponsors and business partners, including television partners and the NFL Network; (iii) the right of the League to promote League initiatives and events; and (iv) the rights of the League and individual clubs to reach fans outside of their Home Marketing Area through e-commerce and other Internet related activities, catalog sales and database marketing, in each case subject to applicable League policy. Except as otherwise set forth in this Section, no club shall have any rights to use or license its Club Marks in the Home Marketing Area of another club.

(C) A club may request a limited expansion of its Home Marketing Area into a border state. Such requests will be evaluated based on the effect of the proposed expansion on the interests of the League or another member club.

(D) Consistent with prior resolutions, the Los Angeles Home Territory shall remain owned and controlled by the League, and pending a decision by the League to place one or more franchises in the Los Angeles area, no club shall have rights to use Club Marks in the Los Angeles Home Territory for the purposes set forth in Section 4.4(B) above.

(E) The International Committee shall evaluate and make recommendations to the membership as to whether Clubs should have rights to use and license the use of their individual Club Marks for marketing and promotional activities in certain international territories outside of their respective Home Marketing Area, and if so, on what terms and conditions.

(F) The League directly and/or through one or more entities collectively owned by the clubs (e.g., NFL Ventures, NFL Enterprises, NFL Properties, NFL International, and NFL Productions) (the "League affiliates") shall retain exclusive control of all trademarks owned by the League entities (including, without limitation, NFL, the NFL Shield design, Super Bowl game, Pro Bowl game, NFL Kickoff, NFL Playoffs, in their present form or as may be adopted in the future; collectively the "League Marks") and the collective use of Club Marks (the use of all clubs' Club Marks with equal emphasis) in any context. No club may license or use League Marks or any other Club Marks, nor permit a third

party to use any of its Club Marks together with the Club Marks of another club absent prior League approval.

(G)   The League shall retain exclusive worldwide control to license and otherwise use League Marks and individual Club Marks during the term of 2004 Resolution BV-4, in respect of the following business operations:  (i) the promotion of the League; (ii) game presentation including presentation and promotion of NFL football through game telecasts and related programming in all forms of media; (iii) international operations; (iv) apparel, accessories (e.g., headwear), footwear and fitness products; (v) computer and video games (including, without limitation, games for mobile phones and other wireless devices); (vi) trading cards; (vii) game action photographs; (viii) footballs, helmets, and other equipment used on the playing field; (x) player-identified product; (ix) home videos (e.g., DVDs) and related NFL Films products; (xi) products including the marks of all clubs; (xii) any of the products enumerated in (iv) through (xi) above for use as premiums (i.e. any product sold or given away for the purpose of promoting the sale of any other product or service); and (xiii) licensing, advertising, product or service placement, sponsorships and promotional agreements relating to commercial identification on the sidelines or playing field or otherwise subject to television exposure during NFL games. With respect to any such operations, no club may "opt out" of any League arrangement in such business operations or "go dark" by refusing to cooperate with any such arrangement; provided, however, that Clubs may elect to control distribution of certain licensed apparel products bearing their individual Club Marks pursuant and subject to terms and conditions to be determined by the Commissioner in consultation with the Business Ventures Committee.

(H)   The League may enter into sponsorship and promotional agreements licensing the use of League Marks and collective use of Club Marks. Except as set forth in Section 4.4(F) above, each club shall retain the right to have a separate sponsorship and promotional arrangement for individual use of its Club Marks within its Home Marketing Area, subject to rules and policies established by the League and/or a League affiliate, including without limitation, regulations based on taste, image, health or safety, or integrity of the game considerations, and relating to premium products and branding. The clubs, by a three-fourths vote, may authorize a League affiliate to enter into a particular sponsorship agreement for a specific category licensing the use of League Marks and the individual use of all of the Club Marks.

(I)   Any club that licenses or authorizes use of its Club Marks in violation of this section 4.4 or related rules or policies, shall, in

addition to any other penalty that may be assessed, pay to the League or a League affiliate all proceeds and other consideration received for such license and not be entitled to share in any revenues generated by the use of League Marks and Club Marks under Resolution BV-4.

(J) Any disputes arising out of or relating to 2004 Resolution BV-4, any policies or rules developed to implement 2004 Resolution BV-4, the NFL trademark trust and any related agreements, or the rights and obligations of NFL Ventures and its affiliates, shall be resolved exclusively under the mechanism set forth in Article VIII hereof.

> *See* 2004 Resolution BV-4 (Rights of clubs in Home Marketing Area; NFL right to enter into license agreements to use League and club marks for non-apparel products to be distributed nationally; League responsibilities for trademark and related intellectual property activities of the NFL and the clubs; dispute resolution), App., p. 2004-3
> 2011 Resolution BV-1 (amending 2004 Resolution BV-4), App., p. 2011-4
> 2013 Resolution BV-1 (establishing NFL Ventures' right to enter into League-wide strategic sideline technology partnership), App., p. 2013-3
> 2016 BV-1 (renewal of retail and licensing agreement with Fanatics) App., p. 2016-4

**Conference Alignment**

4.5   The League shall be divided into two conferences called the National Football Conference and the American Football Conference. The National Football Conference shall consist of sixteen (16) teams, and the American Football Conference shall consist of sixteen (16) teams as follows:

**National Football Conference**

| | |
|---|---|
| Arizona Cardinals | New Orleans Saints |
| Atlanta Falcons | New York Giants |
| Carolina Panthers | Philadelphia Eagles |
| Chicago Bears | Los Angeles Rams |
| Dallas Cowboys | San Francisco 49ers |
| Detroit Lions | Seattle Seahawks |
| Green Bay Packers | Tampa Bay Buccaneers |
| Minnesota Vikings | Washington Redskins |

**American Football Conference**

| | |
|---|---|
| Baltimore Ravens | Kansas City Chiefs |
| Buffalo Bills | Miami Dolphins |
| Cincinnati Bengals | New England Patriots |
| Cleveland Browns | New York Jets |
| Denver Broncos | Oakland Raiders |
| Houston Texans | Pittsburgh Steelers |
| Indianapolis Colts | San Diego Chargers |
| Jacksonville Jaguars | Tennessee Titans |

Such Conferences shall be operated under the following terms and conditions:

(A)  Each conference shall be divided into four (4) divisions;

(B)  The divisions of the clubs in the American Football Conference are as follows:

**South:**

| | |
|---|---|
| Houston Texans | Jacksonville Jaguars |
| Indianapolis Colts | Tennessee Titans |

**North:**

| | |
|---|---|
| Baltimore Ravens | Cleveland Browns |
| Cincinnati Bengals | Pittsburgh Steelers |

**West:**

| | |
|---|---|
| Denver Broncos | Oakland Raiders |
| Kansas City Chiefs | San Diego Chargers |

**East:**

| | |
|---|---|
| Buffalo Bills | New England Patriots |
| Miami Dolphins | New York Jets |

(C)  The divisions of the clubs in the National Football Conference are as follows:

**South:**

| | |
|---|---|
| Atlanta Falcons | New Orleans Saints |
| Carolina Panthers | Tampa Bay Buccaneers |

**North:**

| | |
|---|---|
| Chicago Bears | Green Bay Packers |
| Detroit Lions | Minnesota Vikings |

**West:**

| | |
|---|---|
| Arizona Cardinals | San Francisco 49ers |
| Los Angeles Rams | Seattle Seahawks |

**East:**

| | |
|---|---|
| Dallas Cowboys | Philadelphia Eagles |
| New York Giants | Washington Redskins |

(D)   The scheduling of games within each conference and between the two conferences shall be governed by the provisions of Article XIII hereof.

(E)   The New York Giants and the New York Jets shall not be assigned to the same conference without the consent of both clubs.

(F)   The San Francisco 49ers and the Oakland Raiders shall not be assigned to the same conference without the prior consent of both clubs unless the conferences are divided into smaller numerical groupings, i.e., divisions; in such case, the 49ers and the Raiders may be assigned to the same conference, but may not be placed in the same division or other smallest numerical grouping of clubs within the same conference.

(G)   Any realignment of the League must be approved by the affirmative vote of three-fourths of the existing member clubs of the League, except that in the case of two-franchise areas (e.g., New York Giants/New York Jets), no realignment placing both franchises in the same conference can be approved without the consent of the two franchises.

(H)   Subject to the other provisions of this Section 4.5, whenever the League proposes or seeks to realign the clubs into conferences or other groups for scheduling or standing purposes, the following factors shall be considered in order not to unfairly prejudice the rights of any club in the League: geographical location, natural rivalries, stadium capacity, gate attendance, weather conditions, relative team strength, and baseball conflicts involving clubs playing home games in baseball stadiums.

*See* 1995 Resolution G-4 (giving Rams' realignment vote to Commissioner), App., p. 1995-1

1996 Resolution G-1 (giving Ravens' realignment vote to Commissioner via referenced settlement agreement), App., p. 1996-5

1996 Resolution G-4 (giving Oilers' realignment vote to Commissioner), App., p. 1996-6

1999 Resolution EC-1 (approving expansion to Houston and League realignment), App., p. 1999-1

2001 Resolution G-5 (realignment into two conferences, each with four divisions of four teams), App., p. 2001-7

2016 Resolution G-2A (approving relocation of the St. Louis Rams to Los Angeles), App., p. 2016-9

# Article V

## Meetings of the League

**Annual Meetings**

5.1    The Annual Meeting of the League shall be held not earlier than the second Monday in February of each year and not later than April 1 in such year; such meeting shall be held on such date and at such places and times as the Commissioner shall designate in the notices of the meeting.

**Special Meetings**

5.2    Special meetings of the League may be held at any place upon call by the Commissioner.

**Notice of Annual and Special Meetings**

5.3    (A)    Written notice of the time and place of holding any meeting shall be given to each member at least thirty (30) days in advance of the day fixed for the Annual Meeting or at least seven (7) days in advance of the day fixed for any special meetings.

       (B)    Notice of a special meeting shall state the time, place, and purpose of the meeting. The notice of the Annual Meeting must state the time and place of the meeting, but not the purpose. If any amendments to the Constitution and Bylaws are to be considered at the Annual Meeting, the submission of such proposals must be in accordance with Article XXV hereof, except that, any other provisions of this Constitution notwithstanding, the Commissioner may propose in his sole discretion amendments which he considers to be of an emergency nature, and such amendments at a special meeting will require an affirmative vote of three-quarters or 20, whichever is greater, of the member clubs for passage.

       (C)    Notices of any meeting may be waived by the unanimous consent of all member clubs.

**Quorum**

5.4    At all meetings of the League, whether Annual or Special, three-fourths or 20, whichever is greater, of the members of the League in good standing, present in person or by authorized representatives, shall constitute a quorum for the transaction of business and shall have the power to adjourn the meeting from time to time without notice other than announcement at the meeting until the requisite numbers of members shall be present.

**Voting and Representation**

5.5     (A)    At each meeting of the League, each member shall be limited to
               two (2) representatives. Each member shall be limited to only one
               (1) vote upon any matter presented to the meeting. Each member
               shall file with the League within the time designated by the
               Commissioner a written designation of the representative and
               alternate to vote and act for it. The Commissioner or presiding
               officer may require proof satisfactory to the Commissioner or
               presiding officer of the authority of any representative to represent
               a member. In all meetings, both Executive Session and general,
               proxy voting is prohibited. If a member is not represented at the
               time of a vote, the three-fourths requirement for a vote to carry will
               be based on the number of members present. This special voting
               procedure when a quorum but not all clubs are represented shall
               not apply whenever a unanimous vote is required by the
               Constitution and Bylaws.

        (B)    Any proposal introduced to the membership at a meeting of the
               League at which a quorum is present or otherwise properly before
               the membership, may be voted upon either during or following
               such meeting by NFLNet, e-mail or facsimile or by similar means
               of communication.

**Number of Votes**

5.6     Except as herein otherwise specifically provided, the affirmative vote of
        not less than three-fourths or 20, whichever is greater, of the members of
        the League at any Annual Meeting of the League shall be required for
        action.

**Order of Business at Annual Meeting**

5.7     The order of business for the Annual Meeting shall be as follows:

        Roll call
        Reading of minutes of the previous meeting
        Report of the Commissioner
        Report of the Chief Financial Officer
        Report of other League personnel
        Report of the Public Relations Department
        Report of other committees
        Unfinished business
        Nomination and election of officers
        Installation of officers
        New business
        Adjournment

**Executive Session**

5.8    Upon call of the Commissioner or by majority vote of the members of the
       League, the League may go into Executive Session. Each member shall
       designate its duly authorized representative to act for it in such Executive
       Session. In any Executive Session, unless otherwise designated by the
       Commissioner, two representatives of each member and the
       Commissioner shall be present together with such other persons as either
       the Commissioner or the members by majority vote shall invite; provided
       that when two representatives of a member club are present in Executive
       Session, one of them must own an equity interest in such club. The
       Commissioner shall be Chairman of the Executive Session and may
       appoint the Secretary of the Session. Action at any Executive Session
       shall constitute action of the League.

           *See also*  1984 Resolution (Long Range Planning Committee; League
                       meetings), App., p. 1984-4

**Conduct of Meeting**

5.9    Except in respect to matters covered specifically in the Constitution and
       Bylaws of the League, Roberts Rules of Order shall prevail in all
       meetings of the League; provided, however, that any action taken in any
       meeting of the League involving a matter not covered specifically in the
       Constitution and Bylaws of the League shall require the affirmative vote
       of not less than three-fourths or 20, whichever is greater, of the members
       of the League for approval.

**Action Without a Meeting**

5.10   Any action or resolution which may be taken or adopted at a League
       meeting may be taken or adopted by an instrument in writing signed by
       all members of the League.

# Article VI

## Executive and Other Committees

**Number**

6.1 The League shall have an Executive Committee composed of one (1) representative from each member club. Each representative shall be appointed by the member club by written notice to the Commissioner. Each club may name an alternate representative in the same manner. Said alternate shall have the same authority as the regular appointee in the absence of such appointee. Each appointee and alternate on the Executive Committee shall serve until his appointment is revoked in writing by the appointing member club.

> *See* 1997 Resolution FC-3 (permitting Commissioner to disapprove Executive Committee appointments), App., p. 1997-1
>
> 2004 Resolution FC-2 (permitting Commissioner to disapprove Executive Committee appointments), App., p. 2004-13

**Voting Qualifications**

6.2 At all meetings of the Executive Committee, each member of the Committee shall have one (1) vote.

6.3 All Executive Committee members must be either owners or holders of an interest or officers of member clubs in the League.

**Vacancies**

6.4 In case any vacancy occurs in the Executive Committee, a successor shall be appointed by the member affected by the vacancy.

**Powers and Duties**

6.5 The Executive Committee shall have the following powers and duties:

(A) It shall have the power, after notice and hearing, to impose fines upon any member or any owner, director, partner, officer, stockholder, player, or employee of a member of the League.

(B) It shall have the power, after notice and hearing, to increase or impose other or additional penalties after action of the Commissioner upon any matter submitted to it by the Commissioner for that purpose, pursuant to Section 8.13(B)

hereof; provided, however, that the Executive Committee shall have no power to modify, reduce, remit, or suspend any fine, penalty, or suspension imposed by the Commissioner under Section 8.13(A) hereof.

(C)     It shall have the power and duty to investigate and report its findings and recommendations to the League on any matter referred to it by the Commissioner or the members.

(D)     It shall have power to cause an audit of the books and records of the League and the Chief Financial Officer or his delegate thereof and shall report its findings to the members and the Commissioner promptly.

(E)     If the Commissioner dies, is unwilling, or is by reason of physical or mental disability unable to discharge his duties as Commissioner, the Executive Committee shall have the power to decide that an emergency exists in the League. It shall thereupon call a special meeting of the members at a time and place selected by the Committee. Such meeting shall be held within thirty (30) days after the declaration of such emergency, and notice of such meeting shall be given as in the case of any other special meeting. The purpose of such meeting shall be either to remove such Commissioner or to elect a new Commissioner or to appoint an acting Commissioner to serve until the next succeeding Annual Meeting.

(F)     It is empowered to borrow in the name of the League such sum or sums of money as it may from time to time deem necessary or appropriate and to authorize the Commissioner and Chief Financial Officer and other appropriate senior executives, individually or jointly, to make and deliver in the name of the League a promissory note or notes evidencing any such loan and to pledge as security therefor any stocks, bonds, or other securities owned by the League.

(G)     In the event that the Commissioner or any other officer of the League shall be convicted of a crime involving moral turpitude or be physically or mentally incapacitated to perform his duties or shall fail or refuse to abide by the Constitution and Bylaws of the League, and the Executive Committee finds that such action by such officer is detrimental to the best interests of the League, or in the event the Commissioner or any other officer of the League fails or is unwilling to perform his duties, then such Committee shall have the power after notice and hearing to suspend or remove said officer and to terminate any contract between such Commissioner or officer and the League.

**Approval**

6.6 All actions and decisions of the Executive Committee must be approved by the affirmative vote of not less than three-fourths or 20, whichever is greater, of the members of the Executive Committee provided, however, that:

   (A) Any decisions to proceed under Section 6.5(C), (D), or (E) hereof may be taken by majority vote of the Executive Committee; and

   (B) In any hearing involving charges against any club or whenever one club is making charges against another, the member club or clubs so involved shall not vote.

**Other Committees**

6.7 The Commissioner of the League may appoint such other committees as the League deems necessary and appropriate. All committees shall act under the direction and chairmanship of the Commissioner, who shall be a member "ex-officio" of each committee. The League shall pay each member of the committee the expenses of his attendance at committee meetings.

   *See* 2004 Resolution BV-4 (Formation of a special committee to evaluate key financial aspects of the operations of all member clubs in relation to all revenue sources and opportunities and to make recommendations on these matters, including revenue and cost sharing alternatives), App., p. 2004-3
   2011 Resolution G-2 (establishing a strategic investment fund), App., p. 2011-14
   2013 Resolution FC-3 (amending strategic investment fund resolution), App., p. 2013-5

**Vacancies**

6.8 Subject to the provisions of Section 8.1 hereof, the Executive Committee shall have the power to fill by appointment any and all vacancies in any elective offices of the League for the balance of the term of such office or until a successor is duly elected for such office in the prescribed manner.

**Meetings**

6.9 At each meeting of the Executive Committee, the Commissioner of the League shall preside.

# Article VII

## Officers

**Officers**

7.1   The officers of the League shall be the Commissioner, a Secretary, and a Chief Financial Officer. The Secretary and Chief Financial Officer shall be appointed by the Commissioner. The Commissioner shall have the right to appoint any other officers or assistants thereto as he, in his sole discretion, deems necessary. The duties and compensation thereof shall be fixed by the Commissioner.

**Voting**

7.2   The Commissioner shall be elected pursuant to and in accordance with the provisions of Section 8.1 hereof. Any other officer of the League shall be appointed by the Commissioner in accordance with the provisions of Section 7.1(A) hereof, provided, however, that if the Commissioner is unable so to do by reason of death or disability, then such officer shall be elected by the affirmative vote of not less than three-quarters or 20, whichever is greater, of the member clubs of the League.

**Commissioner**

7.3   The powers and duties of the Commissioner shall be such as are described in Article VIII hereof.

**Chief Financial Officer**

7.4   The Chief Financial Officer or his delegate shall have charge and custody of, and be responsible for, all funds and securities of the League, receive and give receipts for monies due and payable to the League from any source whatsoever, and deposit all such monies in the name of the League in such depositories as the Commissioner may determine, keep full and accurate accounts of the receipts and disbursements of the League, and in general perform all of the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to him by the Commissioner or the Executive Committee. In addition, the Chief Financial Officer or his delegate shall:

(A)   Pay all current bills and salaries after approval by the Commissioner;

(B)   Annually submit to the member clubs detailed financial statements;

(C)   He shall give a surety bond in the principal sum of not less than two hundred fifty thousand dollars ($250,000) for the faithful

discharge of his duties, with the League named as obligee thereon. The premium shall be paid by the League; and

(D) During the playing season, he shall report weekly to each member on attendance and receipts for all games played by member clubs during the preceding week. Such report shall also include any delinquency in any amounts owing to the League and such other information as the Chief Financial Officer or his delegate deems expedient.

> *See also* 1983 Resolution (Finance; clubs' share of coaches' pension plans), App., p. 1983-1
> 1990 Resolution FC-2 (club financial reporting), App., p. 1990-1
> 1993 Resolution FC-1 (Deferred Compensation Reserve Mechanism) App., p. 1993-3
> 2004 Resolution FC-7 (club financial reporting), App., p. 2004-14

**Secretary**

7.5 The Secretary shall keep records of all proceedings of the League and the minutes of the meetings of the members and of the Executive Committee in one or more books provided for that purpose, cause all notices to be duly given in accordance with the provisions of this Constitution, or as required by law, be custodian of the League records, keep a register of the Post Office addresses of each member, and in general perform all of the duties incident to the office of Secretary and such other duties as may from time to time be assigned to him by the Commissioner.

The Secretary will supply the member clubs with a record of the action taken at any meeting within twenty (20) days following the adjournment thereof and shall also furnish the member clubs formal minutes of each meeting within ninety (90) days following the adjournment of each meeting.

**Disability of Commissioner**

7.6 If, by reason of physical or mental disability, the Commissioner is unable to discharge or perform the duties of his office, or is unwilling so to do, then, during any such period, the Executive Committee may require any other member of the Commissioner's staff to perform such duties of the Commissioner.

# Article VIII

## Commissioner

**Employment**

8.1    The League shall select and employ a person of unquestioned integrity to serve as Commissioner of the League and shall determine the period and fix the compensation of his employment. All voting requirements and procedures for the selection of or successor to the office of Commissioner shall be determined by the affirmative vote of not less than two-thirds or 18, whichever is greater, of the members of the League.

**Independence**

8.2    The Commissioner shall have no financial interest, direct or indirect, in any professional sport.

**Jurisdiction to Resolve Disputes**

8.3    The Commissioner shall have full, complete, and final jurisdiction and authority to arbitrate:

   (A)    Any dispute involving two or more members of the League or involving two or more holders of an ownership interest in a member club of the League, certified to him by any of the disputants;

   (B)    Any dispute between any player, coach, and/or other employee of any member of the League (or any combination thereof) and any member club or clubs;

   (C)    Any dispute between or among players, coaches, and/or other employees of any member club or clubs of the League, other than disputes unrelated to and outside the course and scope of the employment of such disputants within the League;

   (D)    Any dispute between a player and any official of the League;

   (E)    Any dispute involving a member or members in the League or any players or employees of the members of the League or any combination thereof that in the opinion of the Commissioner constitutes conduct detrimental to the best interests of the League or professional football.

**Financial and Other Authority**

8.4     (A)     The Commissioner, on behalf of the League, may incur any expense which, in his sole discretion, is necessary to conduct and transact the ordinary business of the League, including but not limited to, the leasing of office space and the hiring of employees and other assistance or services; provided, however, that the Commissioner shall not have authority to incur any expense for any extraordinary obligations or make any capital investment on behalf of the League without prior approval by the Executive Committee.

          (B)     The Commissioner shall: (1) preside at all meetings of the League and the Executive Committee; (2) be the principal executive officer of the League and shall have general supervision of its business and affairs; and (3) approve for payment all proper charges.

**Policy and Procedure**

8.5     The Commissioner shall interpret and from time to time establish policy and procedure in respect to the provisions of the Constitution and Bylaws and any enforcement thereof.

**Detrimental Conduct**

8.6     The Commissioner is authorized, at the expense of the League, to hire legal counsel and take or adopt appropriate legal action or such other steps or procedures as he deems necessary and proper in the best interests of either the League or professional football, whenever any party or organization not a member of, employed by, or connected with the League or any member thereof is guilty of any conduct detrimental either to the League, its member clubs or employees, or to professional football.

      *See*     2014 Resolution G-2 (endorsing Commissioner's Personal Conduct Policy and related use of the Exempt List), App., p. 2014-10.

**Game Officials**

8.7     The Commissioner shall select and employ a Supervisor of League Game Officials and shall further select and approve all game officials for all preseason, regular season, and postseason games. All fees and traveling expenses of game officials shall be paid by the League after approval by the Commissioner. It shall be the duty of each member to accept as game officials for any game such game officials as the Commissioner shall assign to such game.

**Public Relations Department**

8.8     The Commissioner shall have authority to establish a Public Relations Department for the League, and such department shall be under his exclusive control and direction. He may employ persons to staff said department and shall fix and determine the compensation thereof.

**Broadcasts and Television**

8.9     Subject to the provisions of Article X hereof, the Commissioner shall have the exclusive authority to arrange for and sell all broadcasting and television rights to the Conference Championship games and the Super Bowl game.

**League Contracts**

8.10    The Commissioner shall have authority to arrange for and negotiate contracts on behalf of the League with other persons, firms, leagues, or associations; provided, however, that except in instances where the Commissioner is otherwise specifically authorized herein, any contract involving a substantial commitment by the League or its members shall not be binding unless first approved by the affirmative vote of not less than three-fourths or 20, whichever is greater, of the members of the League.

**Reports**

8.11    The Commissioner shall render an annual report to the League members at each Annual Meeting.

**Bond**

8.12    The Commissioner shall file and maintain in effect a surety bond with the League in the sum of fifty thousand dollars ($50,000). Said bond shall be conditioned upon faithful performance by the Commissioner of his duties and shall name the League as obligee. The expenses for such bond shall be paid by the League.

**Disciplinary Powers of Commissioner**

8.13 (A) Whenever the Commissioner, after notice and hearing, decides that an owner, shareholder, partner or holder of an interest in a member club, or any player, coach, officer, director, or employee thereof, or an officer, employee or official of the League has either violated the Constitution and Bylaws of the League or has been or is guilty of conduct detrimental to the welfare of the League or professional football, then the Commissioner shall have complete authority to:

(1) Suspend and/or fine such person in an amount not in excess of five hundred thousand dollars ($500,000), or in the case of an unrescinded unauthorized sale, transfer, or assignment of a membership or an interest therein to any person other than a member of the transferor's immediate family in violation of Section 3.5 hereof, the greater of (i) five hundred thousand dollars ($500,000), and (ii) an amount equal to 15% of the transaction value; and/or

(2) Cancel any contract or agreement of such person with the League or with any member thereof;

(3) In cases involving a violation of the prohibitions against tampering as set forth in Sections 9.1(C)(10) and (11), 9.2 and 12.1(B) hereof, award or transfer selection choices and/or deprive the offending club of a selection choice or choices; and

(4) In cases involving a violation affecting the competitive aspects of the game, award selection choices and/or deprive the offending club of a selection choice or choices and/or cancel any contract or agreement of such person with the League or with any member thereof and/or fine the offending club in an amount not in excess of five hundred thousand dollars ($500,000), or in the case of an unrescinded unauthorized sale, transfer, or assignment of a membership or an interest therein to any person other than a member of the transferor's immediate family in violation of Section 3.5 hereof, the greater of (i) five hundred thousand dollars ($500,000), and (ii) an amount equal to 15% of the transaction value.

(B) Whenever the Commissioner determines that any punishment that the Commissioner has the power to impose pursuant to Section 8.13(A), is not adequate or sufficient, considering the nature and gravity of the offense involved, he may refer the matter to the Executive Committee, with a recommendation that all or any part of the following additional or increased punishments or discipline be imposed:

33                                                          Article VIII

(1)  Cancellation or forfeiture of the franchise in the League of any member club involved or implicated. If such occurs, the affected franchise shall be sold and disposed of under the provisions of Section 3.8(B) hereof;

(2)  Cancellation or forfeiture of the interest in a member club or in the franchise thereof owned by a person involved or implicated therein. If such occurs, the interest held by any person so implicated shall be sold and disposed of under the provisions of Section 3.8(B) hereof;

(3)  Declare one or more players of the offending club to be a free agent or that one or more players, and the contracts thereon held by the offending club, be assigned to another club or clubs;

(4)  Assignment to another club or a nominee of the League of the lease on any stadium or playing field held for or owned by the defending club or any person owning any interest therein;

(5)  Assignment to one or more clubs of players on the Selection or Reserve Lists of the offending club;

(6)  Require the sale of any stock or interest in a member club of such offending person by the method and under the procedure specified in Section 3.8(B) hereof; and

(7)  Make any other recommendation he deems appropriate.

The Executive Committee may impose such other or additional discipline or punishment as it may decide.

Any such ruling or decision by the Commissioner under the circumstances referred to in this Section 8.13(B), after approval or ratification by the affirmative vote of no less than three-fourths or 20, whichever is greater, of the members of the League, as aforesaid, shall be final, conclusive, and unappealable. Any party involved in or affected by any such decision agrees to release and waive any and all claims that such party may now or hereafter have or possess arising out of or connected with such decision against the Commissioner, individually and in his official capacity, as well as against the League and any officer or employee thereof and every member club therein and against any director, officer, shareholder, or partner thereof or the holder of any interest therein, whether for damages or for any other remedy or relief.

The word "person," for the purposes of this subparagraph (B) of Article VIII, Section 8.13, shall mean and include a member club and any owner,

officer, stockholder, or partner thereof, or anyone holding any interest therein.

The membership of a member or the interest of any person owning a share or interest therein shall be suspended or terminated under this Section 8.13(B) only by resort to the following procedure:

(a) Any member of the Executive Committee or the Commissioner may prefer charges against a member or the holder of any interest therein on the ground that such a member or holder has violated the provisions of the Constitution and Bylaws or is or has been guilty of conduct detrimental to the League or to professional football. Said charges shall be in writing and filed with the Secretary of the League. The Commissioner shall first conduct such investigation as he deems appropriate. Upon the completion thereof, the Commissioner shall submit a copy of the charges by mail to each member club and to the member or person against whom such charges have been made and shall make his recommendation thereon to the member clubs.

(b) The member or person so charged may, within fifteen (15) days after receipt of the charges, file with the Commissioner its or his written answer thereto. The Commissioner shall thereupon deliver a copy of such answer to all members of the League.

(c) A special meeting of the League shall be called to hear charges; the time and place of such meeting shall be fixed by the Commissioner.

(d) At such hearing the Commissioner shall preside, unless he is the complainant. In such event, the presiding officer shall be elected by majority vote of the members attending the meeting.

(e) At the hearing the member or person so charged shall have the right to appear in person and by counsel. Strict rules of evidence shall not apply, and any testimony and documentary evidence submitted to the hearing shall be received and considered. Either the complainant or the member or person charged shall be entitled to an adjournment for a reasonable time to enable it or him to present rebuttal evidence.

(f) After considering all the evidence, the members shall vote upon the charges and fix the punishment. An

affirmative vote of not less than three-fourths or 20, whichever is greater, of the members shall be required to sustain the charges and fix the punishment, excluding the vote of any member in which the person charged has an interest.

(g) If the members vote to terminate the membership or the interest of any member in a club of the League, then the member club or person charged shall be required to dispose of such membership or interest in the affected club in accordance with the provisions of Section 3.8(B) hereof.

(C) Whenever the Commissioner, after notice and hearing, determines that a person employed by or connected with the League or any member club thereof has bet money or any other thing of value on the outcome or score of any game or games played in the League or has had knowledge of or has received an offer, directly or indirectly, to control, fix, or bet money or other consideration on the outcome or score of a professional football game and has failed to report the same in the manner hereinafter prescribed, then the Commissioner shall have complete and unrestricted authority to enforce any or all of the following penalties:

(1) Suspend such person indefinitely or for a prescribed period of time;

(2) Bar such person from the League for life;

(3) Cancel or terminate the contract of such person in the League or any member club thereof;

(4) Require the sale of any stock, or other interest of such offending person in any member club by the method and under the procedure specified in Section 3.8(B) hereof;

(5) Fine such person in an amount not in excess of five hundred thousand dollars ($500,000);

(6) Cancel or declare to be forfeited any interest in a member club, or in the franchise thereof, owned by any person so involved. In such event, any interest of the offending person so implicated in the club or any stock owned by such person in any member club shall be sold under the procedure provided in Section 3.8(B) hereof;

(7) Assign to another club or a member of the League the lease on any stadium or playing field held for or owned by the offending club or by any person owning any interest therein;

(8) Assign to one or more other clubs players on the Selection or Reserve Lists of the offending club;

(9) Impose such other or additional punishment or discipline as the Commissioner may decide.

If the person involved is a player in the League, such player is obligated to report immediately such incident to the head coach, owner, or managing officer of the club with which he is affiliated. If the person involved is either an owner, officer, director, stockholder, or a partner of a member club or owns or holds an interest therein, or is a coach or employee (other than a player) thereof, such report shall be made promptly to the Commissioner. Any decision by the Commissioner under the circumstances referred to in this Section 8.13(C) shall be final, conclusive, and unappealable. All persons involved in or affected by any such decision agree to release and waive any and all claims arising out of or connected with such decision that such person may now have or hereafter possess against the Commissioner, individually and in his official capacity, as well as against the League or any officer or employee thereof and against every member club therein and any director, officer, shareholder, or partner thereof or against the holder of any interest therein, either for damages or for any other remedy or relief. The word "person" wherever used in this subparagraph (C) of Article VIII, Section 8.13, shall mean and include a member club, or any club owner, official, officer, stockholder, partner thereof, or anyone holding any interest therein, as well as a coach, player, or other employee thereof; it shall also include an officer or employee of the League or any official employed by the League.

(D) Whenever the Commissioner finds, in his sole and exclusive discretion, that any person, whether or not connected or affiliated with the League or a member club therein, is guilty of conduct detrimental to the best interests of the League or professional football, then in addition to his other powers prescribed in the Constitution and Bylaws of the League, the Commissioner shall have the right to bar and prohibit such person from entry to any stadium or park used by the League or its member clubs or affiliates for the practice or exhibition of professional football.

(E) The Commissioner shall have authority to change, reduce, modify, remit, or suspend any fine, suspension, or other discipline imposed by the Commissioner and not requiring approval of the member clubs.

**Miscellaneous Powers of the Commissioner**

8.14    (A)    The Commissioner shall have the power, without a hearing, to disapprove contracts between a player and a club, if such contracts have been executed in violation of or contrary to the Constitution and Bylaws of the League, or, if either or both of the parties to such contracts have been or are guilty of an act or conduct which is or may be detrimental to the League or to the sport of professional football. Any such disapproval of a contract between a player and a club shall be exercised by the Commissioner upon written notice to the contracting parties within ten (10) days after such contracts are filed with the Commissioner. The Commissioner shall also have the power to disapprove any contract between any club and a player or any other person, at any time pursuant to and in accordance with the provisions of Section 8.13(A) of the Constitution and Bylaws.

        (B)    The Commissioner shall have the power to hear and determine disputes between clubs in respect to any matter certified to him by either or both of the clubs. He shall also have the power to settle and determine any controversy between two clubs which, in the opinion of the Commissioner, involves or affects League policy.

        (C)    The Commissioner shall have the right to propose amendments or modifications to the Constitution and Bylaws of the League by submitting such amendments or modifications in writing to the League no less than fifteen (15) days prior to the holding of any Annual Meeting of the League or recessed session thereof.

            *See* 1990 Resolution SM-1 (confirming Commissioner's supervisory authority over the operations of Management Council, NFL Properties, and NFL Films), App., p. 1990-3
            2004 Resolution BV-4 (appointment by the Commissioner of members of a special committee to evaluate key financial aspects of the operations of all member clubs in relation to all revenue sources and opportunities and to make recommendations on these matters, including revenue and cost sharing alternatives), App., p. 2004-3
            2007 Resolution MC-2 (authorizing Commissioner to appoint the Chairman of the Management Council Executive Committee), App., p. 2007-12
            2011 Resolution BV-1 (amending 2004 Resolution BV-4 to permit Commissioner to set terms and conditions for clubs to control distribution of certain licensed apparel products), App., p. 2011-4
            2011 Resolution G-2 (establishing an NFL strategic investment fund), App., p. 2011-14
            2013 Resolution FC-3 (amending strategic investment fund resolution), App., p. 2013-5

*See also*  NFL Collective Bargaining Agreement ("CBA"), including
Article 46 (Commissioner Discipline)

# Article IX

## Prohibited Conduct

**Conflicting Interests and Prohibited Conduct**

9.1     (A)    The violation of any of the provisions of this Article IX shall constitute conduct detrimental to the League and professional football.

        (B)    No member, or stockholder, officer, director, partner, or employee thereof, and no officer or employee of the League, including a game official, shall:

               (1)    Own or have any financial interest, directly or indirectly, in any other member club of the League;

               (2)    Directly or indirectly loan money to or become surety or guarantor for any other member club or any player, coach, or employee thereof, or holder of an interest therein;

               (3)    Directly or indirectly loan money or offer any gift or reward or become surety or guarantor for any game official or other official or employee of the League; or

               (4)    Act as the contracting agent or representative for any player or share or be financially interested in the compensation of any player in the League. Nothing herein shall prevent any player from negotiating on his own behalf or for his own account.

        (C)    No member, nor any stockholder, director, officer, partner, or employee thereof, or person holding an interest therein, nor any officer or employee of the League shall:

               (1)    Publicize or participate in the selection of any mythical All-League or All-Opponent team;

               (2)    Issue a free ticket of admission to a game to any visiting club or player thereof except pursuant to the Constitution and Bylaws of the League;

               (3)    Offer any gift or reward to a player, coach, or person connected with or employed by another member club for services promised, rendered, or to be rendered in defeating or attempting to defeat a competing club;

(4) Publicly criticize any member club or its management, personnel, employees, or coaches and/or any football official employed by the League. All complaints or criticism in respect to the foregoing shall be made to the Commissioner only and shall not be publicized directly or indirectly;

(5) Directly or indirectly pay a fine for a person who has been penalized;

(6) Permit or state in any game program, or by means of its public address system or otherwise, that it, he, or they, offer or agree, either directly or indirectly, to pay or give money or any other thing of value to any member of the public; neither shall any club or other person referred to in this Section 9.1 be permitted to participate at any time, directly or indirectly, in any lottery of any kind, except that no provision of the Constitution and Bylaws shall prohibit a member club or any broadcasting or other entity with which a club has a contractual relationship from accepting advertising on club radio broadcasts, preseason telecasts, highlight shows or in game programs or stadiums from any state or municipal lottery or off-track betting organization that does not offer any lottery or other betting scheme based on the outcome of or any performance in any NFL game or in any other actual sporting event; provided that such advertising shall not (a) in any way involve club, coach, player, or other club employee affiliation with or endorsement of such lottery or off-track betting, nor (b) include promotion of any lottery game or betting scheme having a sports theme;

*See* 1985 Resolution G-2 (In-Stadium Giveaways), App., p. 1985-3
1993 Resolution BC-2 (Lottery and Off-Track Betting Organization Advertising), App., p. 1993-1
2009 Resolution BV-1 (State and Municipal Lotteries), App., p. 2009-3

(7) Own, directly or indirectly, any interest whatsoever in a professional football organization, league, club, or team not a member of the League, except that these prohibitions shall not apply to the direct or indirect ownership by NFL owners of interests in clubs of the Arena Football League playing in the home territory of the owner's NFL club, provided that any players who have not executed an NFL Player Contract and who participate for such Arena League club shall be available to be signed by any National Football League club, subject to customary eligibility rules. Nor shall these prohibitions bar participation of NFL member clubs in an international Spring

Football League to commence play no later than the Spring of 1991;

*See* 2002 Bylaw Proposal No. 6 (Arena Football League players), App., p. 2002-1

(8) Offer or pay a player or coach, and no player or coach may receive any bonus, money, or thing of value, for winning any game played in the League.

No club or any representative thereof, shall offer to pay, directly or indirectly, to a player, and no player shall receive, any bonus of any kind unless such bonus provision is attached to and/or incorporated in the contract of such player;

(9) Fail to present its team at the time and place where it is scheduled to play in a preseason or regular season game, unless such failure is caused by any unavoidable accident in travel or by conditions beyond the control of the member;

(10) Tamper with players of college teams who are not eligible for play in the League under the eligibility rules thereof.

(11) Tamper with a player or coaches or other employee under contract to or the property of another member club;

(12) Offer, agree, conspire, or attempt to illegally influence the outcome of the member or fail to suspend immediately any officer or player or other employee of the member who shall be proven guilty of offering, agreeing, conspiring, or attempting to influence the outcome of any game or be interested in any pool or wager of any game in which a member club participates;

(13) Dispense beer or any other beverage in NFL stadia in glass containers;

(14) Use at any time, from the start to the finish of any game in which a club is a participant, any communications or information gathering equipment, other than Polaroid-type cameras or field telephones, including without limitation videotape machines, telephone tapping or bugging devices, or any other form of electronic device that might aid a team during the playing of a game;

(15) In respect to minor league clubs and the Canadian Football League, the following prohibitions shall apply to all clubs in the League:

(a) No club in the League shall own or have any financial interest, directly or indirectly, in any minor league club, except that these prohibitions shall not apply to the direct or indirect ownership by NFL owners of interests in clubs of the Arena Football League playing in the home territory of the owner's NFL club, provided that any players who have not executed an NFL Player Contract and who participate for such Arena League club shall be available to be signed by any National Football League club, subject to customary eligibility rules.

(b) No club in the League shall, directly or indirectly, loan money to, nor make a gift or contribution to, nor become a surety or guarantor for any minor league club or for any player, coach, employee, owner, stockholder, officer, director, or partner therein, or to any holder of any interest in any minor league club.

(c) The restrictions on the clubs in this League as set out in subparagraphs and (a) and (b) above, shall likewise apply to all owners, stockholders, officers, directors, partners, agents, representatives, or employees of clubs in the League, as well as to any other person owning any interest in any club in this League.

A "minor league club" shall include any professional football club not a member of this League, which has been designated by the Commissioner of this League as a minor league club.

Should any club in the League violate the provisions of this 9.1(C)(15), then, in addition to all other remedies available to the Commissioner under this Constitution and Bylaws, such club guilty of such violation shall not have the right to employ as a football player any player who was under contract to or played for such minor league club at the time of any such violation.

(D) No player, coach, or manager shall, directly or indirectly, own stock or have any financial interest in the ownership or earnings of any member club of the League, other than in the member club with whom he is employed, and then only under an agreement approved by the Executive Committee stipulating for the immediate sale (and the terms thereof) of such stock or financial interest therein in the event of his transfer to, employment by, or association with, another member club. A player, coach, or manager financially interested in another member club shall be ineligible to play for, coach, or manage the club of any other

member while, in the opinion of the Executive Committee, such interest is retained by or for him, directly or indirectly.

(E)   No player, coach, manager, or owner may remove his team, nor order his team removed, from the field during the playing of a game, regular or preseason, except at the direction of the referee. Should any club in this League violate the provisions of this subsection 9.1(E), then in addition to all other remedies available to the Commissioner under this Constitution and Bylaws, such club guilty of such violation shall face possible forfeiture of any victory or tie achieved in such game and in addition incur sole liability for financial losses suffered by the opposing team and any other member clubs so affected. All such determinations shall be made by the Commissioner.

(F)   No member shall permit access to the NFLNet, e-mail, facsimile or other similar means of communication by non-club personnel.

**Tampering**

9.2   If a member club or any officer, shareholder, director, partner, employee, agent, or representative thereof or any person holding an interest in said club shall tamper, negotiate with, or make an offer, directly or indirectly, to a player, or his representative, on the Active, Reserve, or Selection List of another member club, then unless the offending club shall clearly prove to the Commissioner that such action was unintentional, the offending club, in addition to being subject to all other penalties provided in the Constitution and Bylaws, shall lose its selection choice in the next succeeding Selection Meeting in the same round in which the affected player was originally selected in the Selection Meeting in which he was originally chosen. If such affected player was never selected in any Selection Meeting, the Commissioner shall determine the round in which the offending club shall lose its selection choice. Additionally, if the Commissioner decided such offense was intentional, the Commissioner shall have the power to fine the offending club and may award the offended club 50% of the amount of the fine imposed by the Commissioner. In all such cases the offended club must first certify to the Commissioner that such an offense has been committed.

*See* 1998 Resolution G-2 (tampering/non-player personnel), App., p. 1998-13
    2000 Resolution G-1B (tampering/non-player personnel), App., p. 2000-1
    2001 Resolution G-4 (tampering/non-player personnel), App., p. 2001-3
    2004 Resolution G-1 (tampering/non-player personnel), App., p. 2004-15
    2004 Resolution JC-1A (tampering/non-player personnel), App., p. 2004-16
    2007 Resolution G-4A (tampering/non-player personnel), App., p. 2007-8
    2007 Resolution G-5 (tampering/non-player personnel), App., p. 2007-9
    2007 Resolution G-6 (tampering/non-player personnel), App., p. 2007-10
    2008 Resolution G-8 (tampering/non-player personnel), App., p. 2008-5

2012 Resolution G-7 (tampering/non-player personnel), App., p. 2012-9
2015 Resolution G-3 (tampering/non-player personnel). App., p. 2015-15
2016 Competition Committee Position (Anti-Tampering Policy-
Commissioner Discipline), App., p. 2016-16

9.3    (A)    (1)   No coach or administrative or supervisory employee, as hereinafter defined, may be employed by any member club of the League without the prior approval of the Commissioner. All coaches must have a written contract. Such contract shall be filed in the League office promptly following execution, and the terms thereof must be approved by the Commissioner. An administrator or supervisory employee, for the purpose of this Section, shall mean a general manager or any assistant to the president or executive officer of the club.

          (2)   Every contract with any employee of the League or of a club therein shall contain a clause wherein the employee agrees to abide and be legally bound by the Constitution and Bylaws and the Rules and Regulations of the League, as well as by the decisions of the Commissioner, which decisions shall be final, conclusive, and unappealable. Such contract shall provide further that the contracting parties, if involved or affected in any manner by a decision of the Commissioner, agree to release the Commissioner and to waive every claim he, they, or it have against the Commissioner, individually and in his official capacity, as well as against the League, each and every member club thereof, and any and all directors, officers, stockholders, partners, or holders of an interest therein, for damages and for any other claims or demands arising out of or connected with any decision of the Commissioner. Every written employment contract with any non-player employee of a club shall be filed in the League office promptly following its execution and shall provide: that such contract sets forth the entire agreement between the parties; that no oral agreements, and no other written agreements, except as are attached to the contract or specifically incorporated by reference therein, exist between them; that such written contract (including agreements attached thereto or incorporated therein) sets forth the entire agreement with respect to the employee's services for the club; and that neither party will rely on any agreement or understanding not reduced to writing and specifically incorporated into such employment contract prior to its execution or when subsequently amended.

          (3)   Every coach and administrative or supervisory employee shall have an obligation to communicate openly and candidly with the principal owner and/or his designated representatives; to

ensure that club ownership is informed on a complete and timely basis of all matters affecting the club's operations; to respect the authority and responsibility of ownership to make decisions on behalf of the club; and to avoid actions that undermine or damage the club's reputation or operating success. These obligations shall be fully implied and incorporated into any contract.

(B)     No owner or person holding any interest in a member club, nor any officer, stockholder, director, or partner thereof, nor any officer or employee of the League or a member club thereof, shall enter the dressing room of a game official.

(C)     Subject to the provisions of Section 17.10 hereof for purposes of this subsection, a player shall be deemed to be an "active member of the Armed Forces" until he is discharged therefrom or listed as a reserve member of the Armed Forces. No active member of the Armed Forces may play or practice with a club in the League, subject to the following limitations:

(1)     In the event of a declaration of war, the Commissioner has the right to suspend this requirement for the duration thereof.

(2)     This provision shall not apply to participation in preseason games.

(3)     This provision shall not apply to any player who has been given a conditional release from the Armed Forces or is on terminal leave.

(4)     Active members of the Armed Forces may play or practice with a club provided:

(a)     The club, at the time the player is inducted into the Armed Forces of the United States, continues to carry such player as one of its active players and notifies the Commissioner to that effect at the time of said induction; and

(b)     Such player receives permission from his commanding officer in the military service to play or practice with such club.

(D)     No club, nor any coach, representative, or employee thereof, shall use or employ any mechanical or other equipment or device in connection with the staging or playing of any game, except such as has been normally and commonly used in games in former seasons in the League; no electronic magnifiers or loud speaker systems

may be used or employed either from the stands, bench or sidelines to impart any information or instructions to players engaged in play on the field, but such instruction or information shall only be given orally or through substitution or through coach-to-quarterback radio systems approved by the membership.

(E)     No films of prior games shall be shown or displayed on or by means of television other than complete game films. Such film shall not be stopped during any showing; provided, however, that in the staging of a regular quarterback show of a club, clips or portions of game films may be shown. In connection with the showing of films, no employee, officer, owner, or representative of a club shall make any comment or express any opinion, publicly or for publication, on the quality of the officiating or that any play shown was or was not illegal.

(F)     No bonus may be paid to a player or players for winning a particular game; neither may remuneration or gifts of any kind other than those listed in the contract of a player be announced, promised, or paid directly or indirectly by a member club or by any person connected with or employed by a club.

(G)     No blanket remuneration or bonuses shall be paid or given to players at any time.

(H)     There shall be no contact work prior to a club's official preseason camp. In any offseason camp, clubs may use helmets and protective pads for elbows and knees, but all other pads are prohibited. Blocking dummies, sleds, and similar apparatus may be used in offseason camps at club's option.

(I)     All clubs must pay the travel expenses of the players to training camp, and if a player thereafter is included on the Active List of the club for the first regular season game, travel expenses to training camp for that player, if previously paid, may be deducted from the salary of the player. If a player is waived out, then the waiving club shall pay the travel expenses of the player for the return trip to his house, provided, however, that if the player is claimed by another club under waivers, or is sold or traded, then the club acquiring the player shall pay the travel expenses of such player incurred in connection with reporting to the new club.

*See*  CBA, Article 23 (Preseason Training Camps)

# Article X

## Broadcasting and Television

**Contract Conditions**

10.1    Any contract entered into by any club for telecasting or broadcasting its games, and the sponsor or sponsors of each game telecast or broadcast pursuant to such a contract, must be approved in writing by the Commissioner in advance of such telecast or broadcast.

**Television Restrictions**

10.2    Subject to the limitations and exceptions set forth in this Article, member clubs participating in any game are authorized to telecast and broadcast such game anywhere except as follows:

(A)    No club shall cause or permit a game in which it is engaged to be telecast into any area included within the home territory of any other club on the day that such other club is engaged in playing a game at home;

(B)    No telecast of a home game within the home territory of a club shall be caused or permitted, except by agreement between the participating clubs;

(C)    Each home club grants to the visiting club the exclusive right to permit or license the telecast of the game being played between them back to the home territory of the visiting club.

The Commissioner will not approve any contracts that do not contain a provision stating that the contract is subject to Article X as now or hereafter in effect.

*See* 1984 Resolution BC-5 (preseason game telecast consent by visiting club), App., p. 1984-1

1984 Resolution (Broadcasting; preseason television rights contract requirements), App., p. 1984-3

**Television Income**

10.3 All regular season (and preseason network) television income will be divided equally among all member clubs of the League regardless of the source of such income, except that the member clubs may, by unanimous agreement, provide otherwise in a specific television contract or contracts.

> *See* 1998 Resolution BC-7 (payments to participants in nationally televised preseason games), App., p. 1998-8

**Network Provisions**

10.4 In any network television contract in effect in the League after 1970, the following provisions shall apply:

   (A) Each regular season road game of the New York Giants, New York Jets, Oakland Raiders, and San Francisco 49ers will be televised live back to the home territory of the club participating in the road game.

   (B) Without the prior consent of the home team, no road game of either the Oakland Raiders or the San Francisco 49ers respectively may be televised back to the home territory of the other club on any day when the other club is playing a game at home.

**Championship Games**

10.5 The sale of radio and television and film rights for the Super Bowl game and Conference Championship games shall be under the sole jurisdiction of the Commissioner and be subject to the provisions of Article X.

   In the Super Bowl game and Conference Championship games:

   (A) The participating clubs may broadcast by radio on a non-exclusive basis from a station located in its home territory; provided, (a) said club contributes to the gross receipts of the game (to be divided in the same manner as game receipts are distributed) a fair and equitable sum fixed by the Commissioner in his sole and absolute discretion; and (b) the Commissioner approves all sponsors and broadcasters involved in the game.

   (B) No television station may carry or broadcast the game if its signal is visible in the home territory (75 miles) of the home club in the city where the game is being played. The Commissioner's decision in this matter shall be final.

**Broadcast Facilities**

10.6    Each club when playing at home shall provide adequate space for use of the visiting club in telecasting and/or broadcasting each game.

**Player Depiction and Club Promotion**

10.7    The player grants to the club controlling his contract and to the League severally and jointly the privilege and authority to use his name and/or picture for publicity and/or advertising purposes in newspapers, magazines, motion pictures, game programs and annual roster manuals, radio material, television telecasts, and all other publicity and/or advertising media, provided such publicity and/or advertising does not in itself constitute an endorsement by that individual player of a commercial product.

**Judgment**

10.8    All provisions of Article X are intended to conform to and are subject to the Final Judgment of the United States District Court for the Eastern District of Pennsylvania, entered December 28, 1953, and as thereafter modified, against the National Football League and certain of its member clubs. In the event of any conflict between the Constitution and Bylaws and said judgment, the provisions of said Final Judgment, as modified, shall prevail.

**Replays in Stadiums**

10.9    In all NFL stadiums with the capability of displaying television replays on the scoreboard of action occurring on the field, such displays may be shown at any time during the game, provided, however, that the selection of material for the replays shall be at the home club's discretion.

*See also* CBA, including Article 51 Section 3 (Appearances)

# Article XI

## Playing Rules

**Official Rules**

11.1    The playing rules of the League shall be those set out in the Official Playing Rules of the National Football League.

**Amendment of Rules**

11.2    Playing rules may be amended or changed at any Annual Meeting by the affirmative vote of not less than three-fourths or 21, whichever is greater, of the members of the League, provided the proposed amendment or change has been presented to the League in writing fifteen (15) days prior to the Annual Meeting or a recessed session thereof, or provided the proposed amendment or change carries the unanimous approval of a duly appointed standing committee of the League vested with the authority to make a recommendation on proposed playing rules changes, in which case notice of at least 12 hours prior to the vote is required; and further provided that all playing rules proposals from clubs must be submitted in writing to the League office a minimum of thirty (30) days in advance of any Annual Meeting of the League. Otherwise unanimous consent is required for any amendment to the Playing Rules.

**Rules Committee**

11.3    Each member club of the League shall have one representative only on the Rules Committee.

# Article XII

## Eligibility of Players

**General Rules of Eligibility**

12.1 (A) No person shall be eligible to play or be selected as a player unless (1) all college football eligibility of such player has expired; or (2) at least five (5) years shall have elapsed since the player first entered or attended a recognized junior college, college, or university; or (3) such player receives a diploma from a recognized college or university prior to September 1st of the next football season of the League. The expression "recognized junior college, college, or university" shall be interpreted to mean any college listed in the Blue Book of College Athletics, published by the Athletic Publishing Company, P.O. Box 931, Montgomery, Alabama 36101-0931 and/or the Directory of Postsecondary Institutions, U.S. Dept. of Education, Washington, D.C.

The fact that a player has college eligibility remaining in another sport other than football shall not affect his eligibility under this Section, provided the player meets all other qualifications hereunder.

Despite the foregoing, if four college football seasons shall have elapsed since the player first entered or attended college and if such player did not at any time during such period participate in college football, such player shall be eligible for selection.

Special consideration shall be granted to those players whose colleges and/or conferences allow five years of football eligibility, during all of which the player may participate full-time, as distinguished from those who "red-shirt," i.e. do not participate during one particular year. If a player under the circumstances described above has completed four years of participating football eligibility and elects not to avail himself of his fifth year, such player shall be eligible for selection in this League.

Any player who does not attend college is automatically eligible for selection in the next principal draft that is conducted after four football seasons have elapsed since the player discontinued high school, and if not selected at that time, the player is eligible thereafter to be signed as a free agent, unless he subsequently attends college and participates in college football, in which case he shall be subject to Section 12.1(D) below. If four seasons have not elapsed since the player discontinued high school, he is ineligible for selection, but may apply to the Commissioner for special eligibility.

*See* NFLNet Memorandum, February 16, 1990 (establishing policy and procedure pursuant to Article VIII, Section 8.5, permitting college players to apply for special draft eligibility if at least three football seasons have elapsed since graduation from high school), App., p. 1990-4

(B)  No player may be signed to a contract or any other document (including a letter of intent), directly or indirectly, until completion of all football games, including postseason bowl games in which the team of the school or college of such player is to participate and in which the player is to participate; such provision shall also apply to college football players competing in football in any season ending after that date when the original class of such player shall have been graduated. If a club violates this Section, it shall be subject to punishment by the Commissioner. Such punishment shall provide for the loss of selection choices of the offending club in the next or in succeeding Selection Meetings up to and including the entire Selection List. All negotiating rights to the player or players so involved shall be awarded to the club lowest in the League standings, excluding the offending club, at the time of the last Selection Meeting.

(C)  A diploma of graduation issued by a recognized college or university to a student under an accelerated course or program shall be acceptable for eligibility purposes despite the fact that the student actually attended such institution for a period of less than four (4) years.

(D)  No person who has never been selected in a Selection Meeting and who has college athletic eligibility remaining and who registers at a college for the fall term or semester may be signed to a contract by a club in the League until the close of the next succeeding Selection Meeting of the League, at which meeting he would be eligible for selection regardless of how many seasons in excess of five have elapsed since he first registered at a college and regardless of how many Selection Meetings for which he was eligible have transpired.

(E)  No person who plays college football after the opening date of the training season in any year may play football in the League during the balance of the same calendar year.

(F)  No person eligible for the Selection Meeting in any calendar year may be signed to a contract with a club in the League until the Selection Meeting in that year.

(G)   A player, either under contract to or on the Reserve or Selection List of a League club, shall be a member of the team of the club until the Commissioner receives notice from such club that other League clubs are free to negotiate or contract with said player. Upon receipt of any such notice, the Commissioner shall promptly notify each other League club thereof. Until the notice is given by the Commissioner, no other club may sign a contract nor negotiate with such player unless prior written permission thereof has been given by the club owning rights to such player.

(H)   Any player who expects to graduate before his college football eligibility expires may become conditionally eligible for the League's principal Selection Meeting (i.e., the 12-round annual draft that includes approximately 373 choices) by declaring to the Commissioner in writing his intention to graduate before the League's next succeeding regular season, which declaration must be in the Commissioner's office no later than 15 days before the date of the opening of the principal Selection Meeting. The Commissioner has the authority to change the receipt date of the written declaration if he deems such change appropriate. If a player's written declaration is received in timely fashion and the League office determines that he has a reasonable opportunity to graduate before the next succeeding regular season of the League, all member clubs will be advised of his conditional eligibility for the principal Selection Meeting. Any player so designated cannot be signed to an NFL Player Contract, regardless of whether he is selected in the Selection Meeting, until the League office is advised by an appropriate authority at the player's college that he has graduated. Any player who makes such a declaration to graduate and who does not graduate before the next succeeding regular season of the League will be ineligible in the League for that season and postseason; and, if such player has been selected in the principal Selection Meeting, the selecting club will forfeit its selection choice. Any player who fails to make a timely written declaration of his intent to graduate but does graduate before his college football eligibility expires and before the beginning of the next succeeding regular season of the League will be eligible for a supplemental draft.

*But see* CBA, Article 6 (College Draft)

(I)   If a player who was not eligible for the principal Selection Meeting becomes eligible between the time of such principal Selection Meeting and the next succeeding regular season of the League, he will be eligible for a supplemental draft, subject to all provisions of subsection (J) below.

(J) Whenever a player or players become eligible for the League subsequent to the principal Selection Meeting, a supplemental draft will be conducted to admit such players. Supplemental draft procedures are as follows:

   (1) The League office will schedule a maximum of one supplemental draft in any year—to be conducted no later than the seventh calendar day prior to the opening of the first training camp. To be eligible for a supplemental draft, a player's petition for special eligibility must be approved by the League office and his name promulgated to clubs no later than 10 calendar days prior to the last day on which a supplemental draft can be conducted.

   (2) The League office will conduct each supplemental draft by electronic hookup with member clubs.

   (3) Immediately before each supplemental draft is to begin, the League office will conduct a lottery to determine the selection order of member clubs. Procedures of the lottery are:

      (a) A first step will be taken in which the order of the first round of the immediately prior principal draft, exclusive of any trades affecting that prior draft, will be weighted by assigning the weakest club the greatest number of lottery chances and the strongest club the fewest number (i.e., the weakest club will have its name in the drawing 32 times, the next weakest 31 times, etc., until the Super Bowl game winner will have its name in once.)

      (b) Lottery chances for the weakest teams, i.e., those which won no more than six games in the prior regular season, will be placed together in a container and drawn to determine a number of places in the selection order equal to the total number of those teams.

      (c) Lottery chances for the remaining teams, with the exception of the playoff teams, next will be placed together in a container and drawn to determine the places following those determined under (b) above.

      (d) Lottery chances for the playoff teams next will be placed together in a container and drawn to determine the remaining places in the selection order.

   (4) The Commissioner will determine an appropriate per-selection time limit for each supplemental draft.

(5) Trades involving draft choices may not be made after clubs have been informed of the priority of a supplemental draft until the conclusion of such draft.

(6) Each supplemental draft will proceed by rounds through 12 rounds.

(7) Any club that selects a player in a supplemental draft must forfeit a choice in the same round in the next succeeding principal draft.

(8) Any club that does not own a choice in a given round of the next succeeding principal draft may not select a player in that same round in a prior year's supplemental draft.

**Rules and Regulations**

12.2 (A) A club, at its option, may adopt individual club rules and regulations not inconsistent with or contrary to the Constitution and Bylaws of the League and/or the Rules and Regulations of the League. The club shall give players reasonable notice of all rules and regulations adopted by the club. Any club adopting rules and regulations may suspend and/or fine a player for violation thereof.

(B) The League may adopt League Rules and Regulations, and any Rules and Regulations so adopted must be printed on the reverse side of the standard form of player contract used by the League.

12.3 (A) No person employed by a club as a coach, trainer, or in any capacity other than as a player, may play for that club or any other club in that same year unless said employee is:

(1) Signed to a current year NFL Player Contract; and

(2) Counted within the first applicable player limit of the preseason and all subsequent player cut downs. If such person is released through waivers or placed on the Reserve List after the first applicable player limit is in effect, he cannot return to any club in the League in the same season as an active player.

(B) Whenever a player under contract or option to a member club in the League fails to report to that club prior to its first regular season game, then such player, without the prior consent of the Commissioner, may not play with any club in the League during that same season if said player played in any other league, or with any other team other than in or for the League during that same calendar year, unless such other league or other club in which or for whom such player played is designated by the Commissioner of

the League as a minor league; the decision of the Commissioner shall be final.

(C)     No club may sign any player who, in the same year, has been under contract to a Canadian Football League club at the end of the CFL club's season (regular season or postseason, whichever is applicable).

(D)     No player under contract to a club in the League shall be permitted to participate in any football game for or against any team, group, or organization outside the League, except in games officially approved and sanctioned by the League.

(E)     (1)   If a player reports to the club at its preseason training camp and is, in the opinion of the club physician, physically unable to perform his services as a player, the club will have the following options:

    (a)   Place the player on waivers with the designation "Failed Physical;" or

    (b)   Place him in the category of Active/Physically Unable to Perform. Players in this status count on the Active List and are allowed to attend meetings and undergo non-contact rehabilitative workouts up to the time of the second roster reduction in the preseason, at which time the club must either request waivers on the player as "Failed Physical," place him on Reserve/Physically Unable to Perform (see (c) below), trade the player, or continue to count him on the Active List. If the player continues to count on the Active List, he will be considered to have passed the club's physical examination. Any player in the status of Active/Physically Unable to Perform who appears in contact work during practice or any preseason game will be subject to all rules applicable to players who have passed the club's physical examination; or

    (c)   Place him in the category of Reserve/Physically Unable to Perform. The following rules apply:

        (i)   Upon receiving notification that the player has been placed on Reserve/Physically Unable to Perform, the League office will arrange to send the player to a neutral physician appointed by the Commissioner;

(ii) Players on Reserve/Physically Unable to Perform are ineligible for all games of the club and for all practice sessions, subject to the conditional practice described below. All players on Reserve/Physically Unable to Perform may attend meetings;

(iii) Commencing on the sixth calendar day prior to the club's seventh regular season game (including any bye week), and continuing through the day after the club's eleventh regular season game (including any bye week), clubs are permitted to begin practicing players on Reserve/Physically Unable to Perform for a period not to exceed 21 days. At any time during the 21-day practice period or not later than 4:00 p.m., New York time, on the day after the conclusion of the 21-day period, clubs are permitted to restore such players to their Active/Inactive list, provided that no player may be activated in a Week Six game. (Note: a club in the seventh week will be treated as having a Sunday game)

(iv) A club may at any time of the season request waivers on a player who is on Reserve/Physically Unable to Perform, provided, however, that if the player has not yet passed the club's physical examination, the waiver request will be marked "Failed Physical." Further, such player on waivers cannot return in the same season to the club which requested waivers;

(v) If the player is not restored to the Active/Inactive List by 4:00 p.m., New York time, on the day after the conclusion of the 21-day period and the club elects to continue to carry the player on Reserve/ Physically Unable to Perform, the player shall not be permitted to practice during the remainder of the season, including the postseason;

(vi) Players on Reserve/Physically Unable to Perform shall not be traded; and

(vii) Clubs are required to notify the League office on the first day of the 21-day practice period, which information shall be promulgated to clubs on that day's personnel notice.

(2) No club will be permitted to use any of the procedures of Physically Unable to Perform unless it reports to the League office

at the time physical examinations are given that the involved player has failed his physical.

(3)   If a player reports to a club at its preseason training camp and passes the club's physical, then later suffers an injury unrelated to football, the club may place him on Reserve as Non-Football Injury or Illness (N-F/I). Such a player may not play or practice with that club for the remainder of the season, including postseason, under any circumstances. Players on Reserve N-F/I shall not be traded. If suspended or placed on Reserve N-F/I, players shall not be entitled to compensation.

(4)   The club may also use the designation N-F/I for a player who fails the training camp physical, but said player will be governed by the provisions of 12.3(E)(1). Player shall not be entitled to compensation.

12.4   (A)   After the first mandatory roster reduction in the preseason and for the remainder of the season, a member club is permitted to transport a free agent player to its home city or any other site for two visits, one for the purpose of a tryout and/or physical examination, the other for a physical examination only. A visit for the purpose of a physical examination is limited to one day only, while a visit for a tryout and physical examination is limited to two days, but the tryout portion of the two-day visit must be completed in one day. The player's presence with the club must be reported to the League office prior to the completion of the visit. The League, in turn, shall promulgate all such visits to member clubs. Helmets and protective pads for elbows and knees are permitted for tryouts; all other pads are prohibited. The involved player or players shall not be on the club's practice field at the same time as regular practice is being conducted. The club shall be allowed a maximum of two players from its Active List to participate with the tryout player during his tryout. Multiple tryouts of the same player in the same session by a club are prohibited unless, following the most recent tryout, the player is placed under contract and released by another club in the League. Nothing in this subsection is to be interpreted in any way as a modification of Section 17.4(B) of this Constitution and Bylaws, and therefore such player may not participate in practice with the playing squad. No remuneration of any kind, except normal travel and lodging expenses, may be paid to such player while not under contract. Players tried out under this rule are not subject to the provisions of Section 17.4(C), which restrict the return to a former club.

The above restrictions also apply to any tryouts and/or physical examinations conducted for or administered to free agent players at

any location, even if the club does not transport the player to the site.

(B)  A player on the Reserve List of a member club may, with the permission of that member club, try out with another member club on one day only and only if the club granting permission notifies the Commissioner's office of such permission by NFLNet, e-mail, facsimile or other similar means of communication, and the Commissioner's office, in turn, notifies each member club in advance of such tryout through the daily notice that such permission has been granted. Subsequently, the club conducting the tryout must notify the Commissioner's office by NFLNet, e-mail, facsimile or other similar means of communication, of the date of the player's presence with that club prior to the completion of such tryout.

*See also*   CBA, including Article 6 (College Draft), Article 7 (Rookie Compensation and Rookie Compensation Pool), and Article 20 (Other Provisions)

# Article XIII

## Schedule

**Preparation**

13.1 The Commissioner shall draft a schedule and forward the same to the member clubs as soon as possible after the Super Bowl game. Such schedule shall constitute the official schedule for the regular season games of each member club of the League and shall not require any consent nor approval by the member clubs.

> *See* 1990 Resolution G-8 (League office control and coordination of international games), App., p. 1990-2
> 2006 Resolution BC-1 (Flexible Scheduling), App., p. 2006-1
> 2016 Resolution BC-1 (Flexible Scheduling), App. p. 2016-1

**Conditions**

13.2 The following conditions shall govern and apply in drafting of the schedule each year, namely,

(A) Whenever reference is made to a Green Bay home game, it is understood that such home game may be scheduled at either Green Bay or Milwaukee, subject to the approval of the Commissioner.

(B) Without the consent of the affected clubs, neither the New York Giants, the New York Jets, nor the San Francisco 49ers shall be required to play more regular season home games on the road than at home.

(C) The San Francisco 49ers and Oakland Raiders will not be required to play any regular season game at home on the same day without the consent of both clubs.

(D) The Commissioner will apply the following policies in preparing the official League regular season schedule beginning in 2002:

(1) Each team will play home and home with all division opponents (6 games).

(2) Each team in a division will play one other division within the conference based on annual rotation of divisions (4 games).

(3)  Each team will play one game against the team with the same standing from each of the two remaining divisions within its own conference, based upon previous season's results (i.e., 1 vs. 1&1; 2 vs. 2&2; 3 vs. 3&3; 4 vs. 4&4) (2 games).

(4)  Each team in a division will play the same entire division from the other conference on an annual rotating basis (4 games).

> *See* 2006 Resolution BV-1 (scheduling of international regular season games), App., p. 2006-6
> 2009 Resolution G-1 (scheduling of regular season games in the AFC West and NFC West), App., p. 2009-10
> 2011 Resolution IC-1 (authorizing UK International Game Series), App., p. 2011-22
> 2014 Resolution IC-1 (establishing parameters for selection of member clubs to play in regular season United Kingdom games), App., p. 2014-11
> 2015 Resolution IC-1 (extending scheduling of regular season games in the United Kingdom and authorizing exploration of scheduling regular season games in other international territories), App., p. 2015-16
> 2016 Resolution IC-1 (facilitating the scheduling of regular season games in the United Kingdom by modifying the scheduling parameters applicable to such games), App., p. 2016-12

**Schedule Adjustments**

13.3  (A)  In the event a member club ceases operating and a new franchise is then issued by the League to a new member club to replace such former member, the new member shall be obligated to perform under the same schedule in effect at the time the former club ceases operations, whether or not the franchise issued to the new member is to be operated in the same city as the former franchise holder.

(B)  In the event a member club shall cease operations and the League does not replace such franchise by issuing a new franchise or by the transfer of the former franchise, the Commissioner is empowered to make whatever adjustments in the schedule as he in his sole discretion decides are necessary, and all member clubs shall be bound thereby.

**Change in Site**

13.4  When a game is scheduled in a stadium used for baseball, the Commissioner shall have the right to change the site of the game

whenever he concludes such action is necessary by reason of the probable participation of the baseball club in the postseason playoffs and/or World Series. In such event, the visiting club will be reimbursed by the League for any extra travel expense incurred because of such change, and the home club will be compensated by the League for any loss of revenue suffered by it as a result of such change in the site of the game. The Commissioner's decision shall be final and binding upon both of the affected clubs in respect to the need for and amount of any such compensation or reimbursement.

# Article XIV

## Selection Meeting

14.1 A Selection Meeting of the League shall be held on the second Tuesday following the playing of the last postseason game; there shall be only one Selection Meeting each year. The Commissioner shall preside at the Selection Meeting and is empowered to settle any dispute or controversy involving or occurring in the Selection Meeting not otherwise covered by provisions of the Constitution and Bylaws of the League.

14.2 The only players eligible to be selected in any Selection Meeting shall be those players who fulfill the eligibility standards prescribed in Article XII, Section 12.1 of the Constitution and Bylaws of the League.

14.3 (A) At each Selection Meeting each club participating therein shall select players of its own choice. Selection shall be made by the clubs in each round in the reverse order of their standing.

(B) Reference in this Article to "standing" shall mean the standing of the clubs in the League in regular season games at the time of the Selection Meeting. In calculating the percentage, tie games shall be calculated as one-half game won and one-half game lost. To determine the percentage, the total number of winning games, including any fractions thereof to account for ties, shall be divided by the total number of games played in the regular season.

(1) The winner of the Super Bowl game shall select last and the loser of such game shall select next-to-last in all rounds, regardless of the record of such participating clubs in the regular season.

(2) The losers of the Conference championship games shall select 29th and 30th in all rounds, according to the reverse order of their standing.

(3) The losers of the Divisional playoff games shall select in the 25th through 28th positions in all rounds, according to the reverse order of their standing.

(4) The losers of the Wild Card games shall select in the 21st through 24th positions in all rounds, according to the reverse order of their standing.

(5) Clubs not participating in the playoffs shall select in the first through 20th positions in all rounds, according to the reverse order of their standing.

(6) If ties exist in any grouping except (1) above, such ties shall be broken by figuring the aggregate won-lost-tied percentage of each involved club's regular season opponents and awarding preferential selection order to the club which faced the schedule of teams with the lowest aggregate won-lost-tied percentage.

(7) If, after the procedures of (6) above have been applied, ties still exist, the divisional or conference tie-breaking method, whichever is applicable, shall be applied.

(8) If, after the procedures of (7) have been applied, ties still exist, they shall be broken by a coin flip conducted by the Commissioner.

(9) After the selection order for the first round of the college draft has been determined under this Section 14.3(B), the round-to-round rotation will be as follows:

(a) Clubs originally involved in two-club ties will alternate positions from round to round;

(b) In the cases of ties that originally involved three or more clubs, the club at the top of a tied segment in a given round will move to the bottom of the segment for the next round, while all other clubs in the segment move up one place. This rotation will continue throughout the draft.

(C) One player shall be selected in each round by each club participating in that round.

(D) There shall be twelve (12) selection rounds at each meeting.

*But see*   CBA, Article 6 (College Draft)

**Selecting Ineligible Player**

14.4    If any club selects an ineligible player, such club shall lose the right to that player and to the selection choice for that year.

**Reserve List—Selectees**

14.5    The selecting club shall have the exclusive right to negotiate for the services of each player selected by it in the Selection Meeting. Selected players shall be placed on the Reserve List of that club.

**Selectee Returning To College**

14.6    Any player eligible for selection at the Selection Meeting who is not selected, shall be eligible to sign with any club in the League, provided, however, that if any eligible selectee not chosen possesses additional college eligibility and thereafter attends college in the fall semester following the Selection Meeting, such player may not be signed by any club until after the close of the next succeeding Selection Meeting, at which time he is eligible for selection.

**League Policy On Playing With Another Club**

14.7    The League reaffirms the resolution passed unanimously in May 1935, and which has been in effect in the operations of the League since that time by adding the following action:

If for any valid reason it would be impossible for a player to play in the city by which he has been selected, or the player can show reasonable cause why he should be permitted to play in a city other than that designated for him, then through such arrangements as can be made by sale or trade with another club, he shall be permitted to play in the city he prefers if the Commissioner of the League approves his reasons as valid.

**Contact With Draft-Eligibles**

14.8    The following rules govern club contact with draft-eligible players:

(A)    Clubs may time, conduct on-field tests, interview, and administer written tests to draft-eligible players only at the following sites and subject to the following conditions (see (B)(3)(e) below for exceptions for interviews and written tests):

(1)    League-approved workouts administered by scouting organizations of which NFL clubs are members. A maximum of one such workout per year (preferably in late January or early February) will be held at a central location over several consecutive days, provided, however, that the scheduling for such workouts will, where possible, make full use of weekend days to minimize the participants' mid-week absence from their campuses, and further provided that best efforts will be made to limit each individual player's participation in the workouts to a three-day period that will allow him to attend classes the first day, travel to the workout site that afternoon or evening, participate in a full day of timing and testing (and/or medical examination) on the second day, and travel home on the third day after a half-day of participation at the workouts.

Players who have been invited to the League-approved session shall not be timed or tested at their residence or

66                                                          Article XIV

college campus until after the completion of the League-approved session.

(2) The metropolitan area of the city in which the player's college is located. (NFL clubs located in such areas may use their own facilities for the timing and testing if they wish.)

(a) Where possible, all in-season visits to campuses by NFL club representatives (including employees of scouting organizations of which NFL clubs are members) will be by appointment with advance notice to each college's designated professional football liaison. NFL representatives will adhere to the colleges' individual policies concerning open or closed practice sessions.

(b) Each NFL club and each NFL scouting organization will designate one person authorized to discuss injury or rehabilitation information with a college trainer during the season. College trainers will be asked to fill out a physical-status form on each of his team's draft-eligible players in late summer and an updated form, if warranted, after the college season is completed. These forms, developed by the Professional Football Athletic Trainers Society and approved by the member clubs and scouting organizations, constitute the only demands that representatives of the NFL clubs or scouting organizations will make on college trainers each year.

(c) For off-season visits to campuses, NFL representatives must make every effort to work out draft-eligible players only on days of the week designated by the college involved. NFL representatives would continue to be allowed to attend professional football timing days scheduled in the spring by colleges for all players, including non-draft-eligibles.

(d) If an NFL club is conducting on-field tests for five or more draft-eligible players at a single site outside of its home city on any day, notification of such tests must be provided to the Player Personnel Department of the League office and posted on the NFL website no later than three business days prior to the date of the tests, and all NFL clubs will be permitted to attend such on-field testing. This prohibition does not apply to interviews, electronic testing, or psychological testing.

(3) The campus of any college located in the same state as the player's college, provided that the player is attending a school

in NCAA Division I-AA, II, or III, an NAIA school, or a junior college. In such cases, the player is permitted to be timed, tested, and interviewed only on a school's Pro Day, and only if he has received permission from a school's Pro Liaison.

(4) The metropolitan area of the city in which the player lives. (NFL clubs located in such areas may use their own facilities for the timing and testing if they wish.) If a draft-eligible player establishes a residence in another city (e.g., lease on an apartment), NFL clubs will be permitted to send their scouts to such cities for purposes of timing and testing. If a draft-eligible player establishes a residence in another city and becomes part of a "camp," involving other players, NFL clubs are prohibited from timing and testing such players at a "camp," observing the sessions of the "camp," or otherwise participating in it.

(a) If an NFL club is conducting on-field tests for five or more draft-eligible players at a single site outside of its home city on any day, notification of such tests must be provided to the Player Personnel Department of the League office and posted on the NFL website no later than three business days prior to the date of the tests, and all NFL clubs will be permitted to attend such on-field testing. This prohibition does not apply to interviews, electronic testing, or psychological testing.

(5) College postseason all-star game practice sessions, provided that the players are participants in the all-star game. Players who are not participants are prohibited from such activities.

(B) Clubs may administer medical examinations to draft-eligible players under the following rules:

(1) At League-approved workouts administered by scouting organizations of which NFL clubs are members (see (A)(1) above);

(2) At a maximum of one League-wide follow-up session per year scheduled at a central location approximately two to three weeks before the annual college draft. This session would be for physical examinations only and would include no physical activity, such as on-field drills, weightlifting, and performance tests. Players invited to this follow-up session would be from the following categories:

(a) Those designated by team physicians at the earlier timing and testing session as requiring further physical examination closer to the draft;

(b) Those invited to the earlier workouts but who did not attend;

(c) Those subject to an occurrence that changes their physical or eligibility status;

(d) Others agreed upon by the scouting organizations;

(3) At the club's facilities or any other location, including the player's campus, provided that no draft-eligible player may be brought into a club's facilities or home-city area before the time of the initial League-wide session (see (A)(1) above); further provided that clubs will be limited to examining at the club's facilities or elsewhere in the club's home-city area, or at any other location, a maximum of thirty (30) players; and further provided that clubs located in the same franchise area are prohibited from combining their allotments of players under the permissible 30 per club to create a larger number for each. Despite the foregoing, a club may, after the initial League-wide session, administer physical examinations at its facilities or elsewhere in its home-city area to an unlimited number of draft-eligible players who reside or attend college in the metropolitan area of the club's facility. All medical examinations of draft-eligible players administered by individual clubs in their home-city areas must be administered under the following rules:

(a) Duration of each examination is limited to one day;

(b) Examination must not include physical activity of any kind. (A Cybex test is considered part of an orthopedic examination and is permitted);

(c) Examination must be after the completion of all football games, including postseason bowl games, in which the player is to participate as a player for his school;

(d) The League office must be notified of all such examinations before they are administered; and

(e) Interviews and written tests may be conducted during the visit for the physical examination.

(C)   A physical examination is the only permissible reason for a member club to bring a draft-eligible player into its city and/or training facilities before the draft of that year.

(D)   During the period from one week before the annual draft up to and including the final day of the draft, no club is permitted to transport or sponsor the transport of a draft-eligible player to its offices, workout facilities, home city, or other site without prior permission of the Commissioner, even if the player's campus or residence is located in the same metropolitan area as the club's facility; and no club is permitted during the same period to house a draft-eligible player at any site, including sites within his home city. Medical examinations may be administered by clubs during this one-week period at the player's home city or the city in which his college is located, whichever is applicable.

(E)   In no circumstances under (A) and (B) above is a club permitted to give or offer to give, directly or indirectly, a draft-eligible player anything of significant value beyond necessary transportation and lodging expenses. Club souvenirs and similar items are permissible. With respect to transportation paid for or arranged for free agents who are not selected in the draft, such payments or arrangements may not be made until the final round of the draft is completed.

(F)   If a player is draft-eligible for a given draft by not having signed with the club that selected him in the immediate prior draft, no club in the League except the original drafting club may time, test, examine, or otherwise contact such player without permission of the original drafting club up until the time he is selected by another club. Any such contact may subject the contacting club to League tampering prohibitions (see Section 9.2).

*See also* CBA, including Article 7 (College Draft)

# Article XV

## Player Contracts

**Player Contract**

15.1   All contracts between clubs and players shall be executed in triplicate and be in the form adopted by the member clubs of the League; such contract shall be known as the "NFL Player Contract." Subject to the provisions of Section 9.1(C)(8) hereof, a club may delete portions of or otherwise amend the NFL Player Contract subject to the right of the Commissioner to disapprove the same, as provided by Section 15.4 hereof.

**Amendment Of Player Contract**

15.2   The form of NFL Player Contract adopted by the League may be amended at any time by the affirmative vote or written consent of not less than three-fourths or 20, whichever is greater, of the member clubs of the League, provided, however, that in the event of an amendment to the NFL Player Contract, or should a new NFL Player Contract be adopted by the League, such action shall in no manner affect, change, modify, or terminate any of the terms or provisions of any unexpired NFL Player Contract then in effect between a player and a club in the League.

**Filing**

15.3   An executed copy of each player contract must be filed with the Commissioner within ten (10) days after the execution thereof. The Commissioner's office shall stamp the time of receipt upon all contracts immediately upon the filing with the Commissioner. All other documents required to be filed with the Commissioner shall likewise be stamped immediately upon receipt thereof. Contracts in effect at the date of the adoption of the Constitution and Bylaws shall not be affected by the foregoing provision if such contracts had been previously executed and filed in accordance with the Constitution and Bylaws of the League at the time of execution and filing.

**Disapproval**

15.4   The Commissioner shall have the power to disapprove any contract between a player and a club executed in violation of or contrary to the Constitution and Bylaws of the League or if either contracting party is or has been guilty of conduct detrimental to the League or to professional football. Any such disapproval of a player contract must be exercised by the Commissioner within ten (10) days after such contract is filed with the Commissioner.

**Promulgation**

15.5     The Commissioner shall notify all clubs of the execution of free agent player contracts on a weekly basis as part of the League personnel notice.

**Prerequisite To Play and Practice**

15.6     No club shall permit a player in any practice session or game, subject to the tryout provision of Sections 12.4(A) and (B), with its team unless:

         (A)     An NFL Player Contract has been executed between the player and a club or the player contract has been properly assigned to the club; and

         (B)     Such contract or assignment is on file in the League office or the League office has been notified by NFLNet, e-mail, facsimile or other similar means of communication, of the execution of a contract or assignment.

15.7     Any direct or indirect compensation or anything of value paid to a player who is not on the club's Active, Inactive, or Reserve Lists, regardless of whether the player participates in the club's practice sessions, shall constitute a competitive violation and the club and/or involved club employee shall be subject to disciplinary action under Section 8.13(A)(4) of this Constitution and Bylaws. Similarly, the tryout provisions of Section 12.4(A) shall be strictly enforced, and any violations of this rule shall fall within the provisions of Section 8.13(A)(4).

15.8     The minimum first-year income for a selected player shall be $12,000.

         *But see*   CBA, Article 26 Section 1 (Minimum Salaries)

15.9     In addition to the salary stipulated in Paragraph 5 of his contract, each player shall, during the training season, be paid an allowance for expenses to be determined by the club.

         *See also*   CBA including Article 4 (NFL Player Contract)

# Article XVI

## Assignment Of Player Contracts

**Assignment Notice**

16.1   All assignments of player contracts (through trade, waiver, or otherwise) shall be documented by the assignor club with execution of a notice to the player in a form prescribed by the Commissioner. Such form will be in quadruplicate, with appropriate copies delivered to the player, the Commissioner, and the assignee club, and a copy retained by the assignor club.

**Player Responsibility**

16.2   Immediately following any assignment, the player shall report to the assignee club as promptly as possible and shall perform services with the assignee club as prescribed in said contract.

**Salary Liability**

16.3   The assignor club shall be liable for such proportion of the player's salary for the season as the number of the applicable League games of the assignor club's regular season elapsed up to and including the date of assignment bears to the total number of games in the assignor club's regular season, provided, however that whenever such assignment involves a player claimed as a result of a waiver, then the allocation of salary shall be subject to the provisions of Section 18.8 hereof. The assignee club shall be liable for the balance of the player's salary subject also to the provisions of Section 18.8 in respect to players acquired through waiver. For the purposes of this Section, the date of assignment shall be deemed to be the date on which notice of assignment is delivered to the Commissioner as prescribed in Section 16.1 hereof, or the date when the player was notified orally of such assignment by an authorized member of the assignor club, whichever occurs first. In the event of a dispute as to whether or not oral notice of the assignment has been given by the assignor club, the burden of proving shall rest with the assignor club.

**Waivers**

16.4   (A)   If waivers are required for assignment of a player's contract, no assignment shall be effected and no notice of assignment shall be delivered to the player unless and until the club has been advised by the Commissioner that waivers have been granted by all clubs entitled to claim the player under the waiver rules.

(B)     Whenever a club has been awarded a player through waivers, such club acquires all rights to the player owned or possessed by the waiving club, including any rights to the player's services for a succeeding season or seasons and, subject to the provisions of Section 18.8 hereof, the claiming club likewise assumes all obligations under such contract or contracts.

### Promulgation

16.5     All assignments shall be promulgated by the Commissioner through bulletins sent to each club.

### Trading Deadline

16.6     By definition, a trade in the League is a transaction involving two or more clubs resulting in an outright or conditional assignment or exchange of player contracts, rights to players, selection choices, and/or cash, which transaction is not effected through the waiver system, the first-refusal/compensation system of an operative collective bargaining agreement, or other special assignment procedures of this Constitution and Bylaws. There shall be no trades for past, future or nominal consideration. Trades are permissible within the following period:

Trades involving selection choices, cash, player contracts and/or rights to players from club Reserve lists may be made only on days during which the League office is open to accept player-personnel transactions from the period beginning on the first such day after the expiration of NFL Player Contracts and continuing until 4:00 p.m., New York time, on the day after the date that the final game of the eighth regular season weekend begins (i.e., Tuesday if the final game of such weekend's schedule of games begins on Monday).

### Trade Conditions

16.7     (A)     No trade may be made between member clubs in any season wherein the player traded may revert to or be traded back to the original club, unless through the normal procedure of trading, waiving, etc., as otherwise specified in this Section and this Constitution and Bylaws.

(B)     All conditions affecting trades must be specified in the original notification to the Commissioner of the trade and in the trade agreement papers. If the written conditions do not cover subsequent events which result in the assignee club having use of the player on its Active List at some later time or in obtaining value for him through a subsequent trade, the original assignor club shall have no recourse.

**Approval by the Commissioner**

16.8    (A)    No sale or trade by a club shall be binding unless approved by the Commissioner. Immediately following such approval, the Commissioner shall notify all clubs of such trade or sale.

         (B)    All sale or trade agreements between clubs must be in writing and filed with the Commissioner within fifteen (15) days following completion of such sale or trade. The League office shall stamp the time of receipt on any sale or trade agreement immediately upon the filing thereof.

         *But see*    1982 Statement of Position on Trades for Cash (Statement by Commissioner Rozelle), App., p. 1982-2
                    2001    Competition Committee Position on Trades for Cash, App., p. 2001-15

16.9    When a player on the Active or Inactive List of a club is traded or acquired on waivers on or after 4:00 p.m., New York time, on the Thursday prior to the opening of the regular season, or at any time thereafter, such player must immediately be listed within the applicable player limit of the club to which he is traded or acquired, which includes both the team's Active and Inactive Lists.

# Article XVII

## Player Limits and Eligibility

**Cutdowns and Player Limits**

17.1    (A)    Subject to paragraphs (B) through (D) of this Section 17.1, clubs
                will be limited to a year-round roster limit of 90 players on the
                following combined lists: Active, Inactive, Practice Squad, and
                Exempt, and the following Reserve Lists: Injured, Physically
                Unable to Perform, Non-Football Illness, Non-Football Injury,
                Suspended (for less than one year), Future, Drafted-Unsigned,
                Exclusive Rights, First Refusal Rights, Unrestricted Free Agents
                with an individually negotiated right of first refusal, Franchise, and
                Transition.
                The 90-player limit will not include any players on the following
                lists:    Reserve/Retired, Reserve/Did Not Report, Reserve/Left
                Squad, Reserve/Military, Reserve/Unrestricted Free Agents,
                unsigned Veteran Free Agents, and players who have been
                declared ineligible to participate (suspended) by the Commissioner
                (for more than one year).

        (B)    Any players placed on Reserve/Injured prior to the roster reduction
                to 75 players on the Active List will not count on the club's overall
                roster limit of 90 players, provided that the club requested waivers
                on the player with the designation "injured" and placed the player
                on Reserve/Injured immediately after the expiration of the
                claiming period and provided that all such players will count on the
                club's overall 90-man roster limit after 4:00 p.m., New York time,
                on the day of the cutdown to 75 players.

        (C)    Any players placed on Reserve/Physically Unable to Perform or
                Reserve/Non-Football Injury/Illness prior to the roster reduction to
                75 players on the Active List will not count on the club's overall
                roster limit of 90 players, provided that the club requests waivers
                on the player with the designation "Failed Physical" immediately
                upon reporting to training camp and failing the club's physical
                examination and that the club places the player on Reserve/PUP or
                Reserve/NF/I immediately after the expiration of the claiming
                period. All such players will count on the club's overall roster limit
                after 4:00 p.m., New York time, on the day of the cutdown to 75
                players. All players so placed on Reserve/PUP or Reserve/NF/I
                shall not be eligible to play or practice for that club for the
                remainder of the regular season and postseason, notwithstanding
                other provisions in this Constitution and Bylaws. The same
                provisions shall apply to a Vested Veteran who is placed on
                Reserve/PUP or Reserve/NF/I immediately upon failing the
                training camp physical examination, provided that the club

                                        76                          Article XVII

declares to the League office at such time that the player shall be ineligible to practice or play for the remainder of the regular season and postseason.

(D) If a player has passed his club's training camp physical examination and is placed on Reserve/Non-Football Injury/Illness prior to the roster reduction to 75 players on the Active List, he will not count on the club's overall roster limit of 90 players, provided that the club requests waivers on the player with the designation "Non-Football Injury/Illness" and provided that the club places the player on Reserve/NFI immediately after the expiration of the claiming period. All such players will count on the club's overall roster limit of 90 players after 4:00 p.m., New York time, on the day of the cutdown to 75 players. All players so placed on Reserve/NFI shall not be eligible to play or practice for that club for the remainder of the regular season and postseason. The same provisions shall apply to a Vested Veteran who is placed on Reserve/NFI after passing his club's training camp physical examination.

(E) If a player, after reporting to training camp, leaves his club without permission, and the club is granted an exemption, such player will not count on the club's overall roster limit of 90 players until 4:00 p.m., New York time, on the day of the cutdown to 75 players on the Active List, or until the player returns to the club, whichever occurs first.

(F) Subject to the provisions of Section 17.3 of this Article, clubs will be required to reduce their Active Lists to 75 players by 4:00 p.m., New York time, on the Tuesday after the third preseason weekend and to 53 players by 6:00 p.m., New York time, on the Saturday of the fourth preseason weekend. (If there are no games scheduled on the Friday of the fourth preseason week, the roster reduction to 53 players will occur by 4:00 p.m., New York time, on that Saturday.) The claiming deadline for players on waivers at the final cutdown shall be 12 noon, New York time, on the following day (Sunday).

(G) No player may play with any team unless an executed contract with that team is on file in the office of the Commissioner, pursuant to the provisions of Section 15.6. This number shall include all veteran players upon whom options have been exercised for the applicable year, except a veteran player discharged for military service subsequent to June 1st in the applicable year.

(H)   Notwithstanding other provisions of this Constitution and Bylaws allowing recall of waiver requests under certain circumstance, the following rules are in effect with respect to waivers involving players who do not meet the physical standards of the club: Any waiver request on an injured player and any waiver request on a player who fails the club physical may not be recalled and no claim on any such player may be withdrawn.

**Active/Inactive Lists**

17.2   The Active List, for the purposes of this Article, shall consist of all players eligible to play in any preseason, regular season, playoff, championship, or postseason game then under contract to the club within the applicable player limit as set out in the preceding section. This Section 17.2, and succeeding Section 17.3 are in force only within the provisions of the applicable player limit in a given year.

17.3   One hour and 30 minutes prior to kickoff, each club is required to establish its 45-player Active List for the game by notifying the Referee of the players on its Inactive List for that game. Each club may also identify one player on its Inactive List who may dress for the game, provided that (1) such player is a quarterback; (2) the club has two quarterbacks on its 45-player Active List; (3) if the third quarterback enters the game during the first three periods, he must replace one of the club's other two quarterbacks, neither of whom may thereafter return to the game under any circumstances; and (4) if the third quarterback enters the game during the fourth period or any overtime period, he must replace one of the club's other two quarterbacks, either of whom is permitted to return to the game.

Players on the Inactive List, except for the Third Quarterback, are prohibited from participating in game day warm-ups with their teams for all preseason, regular season, and post-season games, except the Super Bowl game. Except for the Third Quarterback, they are also prohibited from dressing in game uniforms on game days, or representing their teams in pregame ceremonies. They may be in the bench area during the game provided they dress in clothing issued by the club to its game staff and display appropriate bench area credentials.

For the Super Bowl game only, Inactive List players may participate in game day warm-ups in their uniforms. During the game, they are permitted in the bench area, provided they dress in clothing issued by the club (which may include game jersey) to its game staff and display appropriate bench area credentials.

Any club that makes a roster change on game-day, subject to the provisions outlined above, also has the responsibility of confirming such change by NFLNet to the League office the following day.

*See also* CBA, including Article 25 (Squad Size)

**Future List**

17.4 (A)  The Future List, for the purpose of this Article, shall consist of all players under contract to a club for a succeeding year or years but not for the current year. Clubs may not sign free agent players to their Future List until the day after the last day of the final regular season weekend (Tuesday if the final regular season game begins on Monday). If the club of a Practice Squad player has completed its season (i.e., is not participating in the playoffs or has lost in the playoffs), such Practice Squad player may thereafter be signed as a free agent to any club's Future List. A free agent signed to a club's Future List is not eligible to be signed by any club for the current season. Contracts for players signed to a club's Future List will begin on February 1 of the subsequent year.

(B)  No player may practice with a club unless such player is signed to a contract with that club for the current or succeeding season or seasons. All contracts including contracts of players on the Future List must be filed with the Commissioner in accordance with the provisions of Section 15.3 hereof.

**Reacquisition of Players**

(C)  A player who has been traded or assigned via waivers cannot return to the club that took such action until two seasons, including the season of the year in which he left the club, have elapsed, unless one of the following exceptions applies:

**Reacquiring Traded Player**

(1)  Traded player must have been on the Active List of the assignee club, any club beyond the assignee club, or a combination thereof, for a minimum of four (4) regular season games, after which the original assignor club may reacquire the player by waiver assignment or free-agent signing. The four-game requirement specified herein may span two regular season if applicable; or

(2)  Traded player must have been on the Active List of the assignee club, any club beyond the assignee club, or a combination thereof, for less than four (4) regular season games and must have been placed on waivers and terminated

by the assignee club or any subsequent club, in which case the original assignor club may reacquire the player only by free-agent signing. The original assignor club under these circumstances must not reacquire such player by trade or assignment via waivers; or

(3) Traded player, before participating in any practice or game for the assignee club, must have reverted to the assignor club through conditions of a trade requiring his reporting to or passing the physical examination of the assignee club, or through a condition requiring him to execute a previously agreed-upon contract with the assignee club within a period of time agreed upon by the clubs, but in no event longer than three business days after the trade has been approved by the Commissioner.

**Reacquiring Player Assigned Via Waivers**

(4) Player assigned via waivers must have been on the Active List of the assignee club, any club beyond the assignee club, or a combination thereof, for a minimum of four (4) games while a player limit is in effect (preseason or regular season games, or a combination thereof), after which the original assignor club may reacquire the player by trade, waiver assignment, or free-agent signing. The four-game requirement specified herein may span two seasons if applicable; or

(5) Player assigned via waivers must have been on the Active List of the assignee club, any club beyond the assignee club, or a combination thereof, for less than four (4) games while a player limit is in effect (preseason or regular season games, or a combination thereof) and must have been placed on waivers and terminated by such assignee club or any subsequent club, in which case the original assignor club may reacquire the player only by free-agent signing. The original assignor club under these circumstances must not reacquire such player by trade or assignment via waivers.

**Reacquiring Terminated Player**

(6) There are no restrictions on reacquiring, in the same or a subsequent season, players who have been terminated via the waiver system, subject to restrictions that may appear in other parts of this Constitution and Bylaws.

**Evasion of Reacquisition Rules**

(7) Any evasion of the rules covering reacquisition of players, including but not limited to procedures by a club to place a player on another club's roster in order to evade the former club's player limit, will result in appropriate discipline by the Commissioner against all involved clubs that are proven to have taken part in such maneuvers with prior knowledge of the evasion.

(D) No player who opts for free agency under the waiver system section of the Collective Bargaining Agreement can re-sign with the same club in the same season or in the following season.

**Reserve List**

17.5 The Reserve List of each club may consist of players in the following categories:

(A) Retired
(B) Did not report
(C) Left squad (quit team)
(D) Injured
(E) Physically unable to perform (at the time of the training camp physical)
(F) N-F/I (Non-football injury or illness)
(G) In military
(H) Selected in Selection Meeting by the club, but never under contract
(I) Suspended or declared ineligible, or expelled from the League for violation of the contract between the player and the club or for other reasons permitted by this Constitution and Bylaws.

Players placed on Reserve in the manner prescribed in (A), (B), (G), and (I) may apply to the Commissioner for reinstatement. Players placed on Reserve under (C) shall be governed by the provisions of Article 17.15(C).

Players placed on Reserve under (D) shall not be eligible to play or practice with the club for the remainder of the regular season and postseason under any circumstances. Players placed on Reserve under (E) are subject to the provisions of Article 12.3(E). Players on Reserve under (H) may be activated upon signing.

A player on a club's Reserve List shall not be eligible to contract with any other club unless and until the player is released or his contract assigned as provided in this Constitution and Bylaws.

**Reserve List Limitations**

17.6    (A)    Unless this Constitution and Bylaws provides otherwise, any player on the Active List of the club who reports to the club and is thereafter placed on the Reserve List by reasons other than military service may not play with his club for the balance of that preseason or regular season unless waivers have been asked on such player, which waivers may not be recalled; provided, however, that if such player becomes an active player with another club and such other club thereafter asks waivers on him, and he is either claimed, released on waivers, or plays with another club in its league in that season, then the original club is entitled to restore such player to its Active List if it acquires him in a manner permitted by this Constitution and Bylaws or the rules of the League. If another club acquires such player from the Reserve List of another club by means of a trade following the establishment of 75 active players, such player cannot play for the acquiring club for the balance of that season unless the acquiring club waives such player without recall.

        (B)    Whenever a player is placed on the Reserve List of a club for any reason, the club must promptly submit a written report to the Commissioner stating the reason for such action. Upon receipt of such information, the Commissioner shall investigate the circumstances thereof in such manner as he deems appropriate. The Commissioner shall have the right to request further explanation or substantiation of the matter, and the club shall supply the same. In the event the Commissioner determines that placing such player on the Reserve List violated the provisions of Section 17.7 of the Constitution and Bylaws of the League, the Commissioner shall have the power to remove such player from the Reserve List and to take such other action against the club that he believes appropriate. Additionally, when such determination is made by the Commissioner, all expenses incurred by the Commissioner in any investigation thereof shall be charged against the involved club and such club shall be obligated to pay such expenses upon demand by the Commissioner.

**Evasion**

17.7    No club shall place any player on its Reserve List in order to evade the player limit.

**College All-Star Players**

17.8    Any player injured while a member of a preseason All-Star squad in connection with a game approved by the League may thereafter be carried without being counted as an Active Player for the determination of the

applicable player limit and without requiring the club to place such player on its Reserve List. Such privilege shall continue until such player is able to play football. If such player, after being listed and counted as one of the Active Players within the applicable player limit, has a reoccurrence of the same injury, then such player may again be carried as a player of the club without being counted as an Active Player or being placed on the Reserve List until he again recovers from such reinjury. A medical report of the All-Star participant's injury must be filed with the League office as soon as possible after the All-Star game.

### Retired Players

17.9    A Retired Player is defined as a player who discontinues professional football play in the League while under contract or option to a club. A Retired Player shall not be eligible to play football in the League until he shall have been reinstated by the Commissioner as provided in Section 17.13. Upon his reinstatement such player shall be eligible to play football only for the club entitled to his services at the time of his retirement or its assignee.

### Military Service List

17.10   Any player on the Active List for the first regular season game who is thereafter inducted into the Armed Forces of the United States shall automatically be placed on the Reserve List of his club and shall not count in the Active Player limit of said club nor be permitted to play or practice with the club until his reinstatement to the Active List, subject to the provisions of Section 17.13 and Section 9.3(C)(4).

The following additional rules shall apply in respect to the military service of a player:

(A)   No player who reports to his club after the commencement of training camp because of any reserve military obligations affecting such player need be counted on the Active Player roster of the club until he receives one (1) day's practice for every day missed because of his military obligation, but not to exceed four (4) weeks, provided, however, if such player plays in one or more preseason games, he must be counted on the Active List.

(B)   No player reporting to his club after October 15 in any year need be counted on the Active or Inactive List unless the club wishes to activate such player for a regular season game.

(C)   Whenever a player reports to his team and thereafter is placed on military reserve to permit such player to fulfill the required two weeks of active military duty, such player shall be allowed one week following his return to the club before such player must be

counted as an active player. However, if the club elects to play such player in any preseason or regular-season game, such player must be included on the Active List of such club.

(D)    None of the privileges accorded under the provisions of this Section 17.10 shall apply to players having military service obligations of less than a period embracing fourteen (14) days.

(E)    All clubs are obligated to notify the League office within forty-eight (48) hours of the time when any of its players are released from active military service and shall specify the date such player reported to the club. Failure of a club to comply with this provision will require the League office to treat the date such player was released from the service as the date when such player reported to the club.

(F)    Any player released from military service after October 15 and under contract to the club for such season may be placed on the Inactive List of that club and may be named to the Active List of the club and participate in any Divisional Playoff game, Conference Championship game, or Super Bowl game in accordance with the provisions of Section 20.6.

**Suspended Players**

17.11    A club or the Commissioner may suspend a player for violation of this Constitution and Bylaws, his NFL Player Contract, or the rules and regulations of the League or the club. During the period of suspension, a player shall not be entitled to compensation and shall be ineligible to play with any club. Any player suspended by a club shall have the right to appeal to the Commissioner, who shall have authority to order his reinstatement upon such terms as he deems proper. Players suspended by either the Commissioner or a club will be placed in the category of Reserve/Suspended. If the immediate former category of a player suspended by a club was the Active List and the club wishes to lift his suspension and return him to the Active List, it may do so without requesting procedural-recall waivers, despite the provisions of Section 17.6(A) of this Constitution and Bylaws. Any club that places a player on Reserve/Suspended to evade the Active List limit will be subject to appropriate disciplinary action by the Commissioner.

**Ineligible Players**

17.12    The Commissioner may, on application of a club or on his own motion, declare ineligible a player who violates his contract, is guilty of conduct detrimental to the best interests of professional football, or who violates this Constitution and Bylaws or the rules and regulations of his club. Any

ineligible player shall not be entitled to play for any club in the League until he shall have been reinstated by the Commissioner.

17.13   All players in the categories of Reserve/Retired, Reserve/Did Not Report, and Reserve/Veteran Free Agent Asked to Re-Sign will continue to be prohibited from being reinstated in the last 30 days of the regular season. Additionally, no player in such category will be reinstated between the trading deadline of the applicable season and the normal 30-day deadline unless the club initiates the reinstatement request and the Commissioner approves it.

**Listing of Players**

17.14   All players must be listed by the club on one of the following lists:

Active List
Reserve List
Exemption List

**Exemption List**

(A)   The Exemption List is a special player status available to clubs only in unusual circumstances. The List includes those players who have been declared by the Commissioner to be temporarily exempt from counting within the Active List limit. Any request for an Exemption must be sent to the Commissioner by NFLNet, e-mail, facsimile or other similar means of communication, and must include complete facts and reasons to support such request. Only the Commissioner has the authority to place a player on the Exemption List; clubs have no such authority. Except as provided in paragraph (1) of this subsection (A), no exemption, regardless of circumstances, is automatic. The Commissioner also has the authority to determine in advance whether a player's time on the Exemption List will be finite or will continue until the Commissioner deems the exemption should be lifted and the player returned to the Active List. The following additional provisions govern the Exemption List:

(1)   Clubs participating in the American Bowl games shall be granted roster exemptions for any international players signed for such game, provided that the exemption extends for no more than 10 days and expires at 4:00 p.m., New York time, on the first business day after the game.

(2)   In no event will the Commissioner grant an exemption of more than two games in cases where a player fails to report to his club at the prescribed time. Whenever an exemption is granted in a case of late-reporting, it will be rescinded and the

player added to the Active List as of 4:00 p.m., New York time, on the last League business day before he appears in playing uniform at a game of his club. A late-reporting player is defined as a player already under contract on his club's Active List or Reserve List or a player on his club's Reserve List as an unsigned draft choice or unsigned Veteran Free Agent who fails to report to his club at the prescribed time.

(3) If a player who is eligible for a two-game roster exemption reports to camp prior to the time that a roster limit is in effect, the two-game maximum will be reduced by the number of games that the club has played since the player reported, provided that the club notifies the League office as soon as the player reports that it desires a roster exemption and provided that the player does not dress for or participate in a game.

(4) If a player, after reporting, leaves his club without permission and the club is granted an exemption, such exemption will expire immediately upon the player's return to the club, unless the Commissioner deems it reasonable that the player is not in sufficient physical condition to return to regular participation.

(5) It is permissible for a club to trade or request waivers on a player who is on the Exemption List. If such player is assigned to another club and the involved exemption is for a finite period of time, the assignee club will have available to it only the portion of the exemption which has not expired. If such player is assigned to another club and the involved exemption is not for a finite period of time, the player will immediately count on the assignee club's Active List unless the Commissioner deems it reasonable that the player is not in sufficient physical condition to begin or return to regular participation.

(6) This is to confirm that the Commissioner may make use of the Exempt List in aid of his jurisdiction to address conduct detrimental, specifically violations of the Personal Conduct Policy that are under investigation. If a player is formally charged with a crime of violence or other conduct that poses a genuine danger to the safety or well-being of another person, or if a player is suspected on the basis of credible evidence of having committed such a crime but further investigation is required, then in such unusual circumstances, the Commissioner may place a player on the Exempt List until the matter is resolved under the Personal Conduct Policy.

*See* 2014 Resolution G-2 (authorizing Commissioner's use of the Exempt List under the Personal Conduct Policy), App., p. 2014-10.

**Player Leaving Camp**

17.15   If a player leaves the camp of his club during either the training season or the regular season without permission, the following provisions shall apply in respect to such player:

   (A)   If such player returns to his club within five (5) days from date of his departure, then the club shall be limited to the exercise of one of the following alternatives:

      (1)   The club may restore such player to its Active List, provided it either has maintained or immediately provides a place on its Active List within the applicable player limit; or

      (2)   The club may waive or trade such player.

   (B)   If such player does not return to his club until five (5) or more days shall have elapsed from the date of his departure and the club did not retain a place on its active roster for such player, then the club shall have the right to exercise any one of the following options:

      (1)   The club may place such player on its Reserve List as a Retired Player; or

      (2)   The club may reduce its active roster to provide a place thereon for such player; or

      (3)   The club may waive such player or another player from its Active List.

   (C)   Any player placed on the Reserve List as a Retired Player under the circumstances described in Section 17.15(B)(1) above shall remain on the Reserve List of the club for the balance of that season. In such event the obligation of the player to perform services as a professional football player for the club in that season shall be tolled. The term of such player's contract to his club for the balance of that season shall be extended and shall not commence until the player returns to professional football for such club. Additionally, any renewal option for such player's services shall be tolled and shall remain in effect until the end of such extended term of the contract. During any such retirement period, such player shall not be allowed to play football for any other club engaged in professional football; neither shall such player be entitled to any compensation, expenses, or other payments from his club under his contract.

(D) Any player placed on the Reserve List as a Retired Player under the provisions described in Section 17.15(B)(1) shall not be entitled to reinstatement as an Active Player for the balance of the season in which such retirement occurs.

(E) He cannot practice for the season.

(F) Any violation or attempt to evade the player limit is conduct detrimental to football.

**Reserve/Injured**

17.16 The following rules govern Reserve/Injured:

(A) **Purpose.** Reserve/Injured is a category of the Reserve List. A club may use this category for a player who is injured in a practice session or game of his club in any year after having passed the club's physical examination in that year. If a player fails the club's initial physical examination in any year, he is not eligible for Reserve/Injured; the club may instead use the procedures of Physically Unable to Perform or Non-Football Injury/Illness, whichever is applicable. A Non-Football Injury or Illness case may, in some circumstances, fall under the procedures of Reserve/Injured, but only if such injury or illness occurs after the player has passed the club's physical for that year.

(B) **Participation While on Reserve/Injured**. Unless designated as a free activation in accordance with 17.16 (C), players on Reserve/Injured at any time may not play or practice or engage in any drill or any physical activity other than that required as part of their rehabilitation with that club for the remainder of the season, including postseason, under any circumstances. Players on Reserve/Injured are prohibited from appearing in games, participating in game-day warm-ups with their teams, dressing in game uniforms on game days, or representing their teams in pregame ceremonies. However, a team captain on Reserve/Injured may participate in the coin toss. Reserve/Injured players may, however, attend team meetings, engage in rehabilitative work under the direction of the club's physician or trainer, observe practice, and serve their clubs on the sidelines, provided they perform a necessary function connected with the game, dress in clothing issued by the club to its game staff, and display appropriate credentials under the prevailing rules covering the bench areas.

(C) **Designated Free Activation from Reserved Injured**. During each season a team will be permitted to return one player from the Reserve/Injured List to its 53-player Active/Inactive List. Such

player must have suffered a major football-related injury or non-football-related injury (defined as an injury that renders the player physically unable to practice or play football for a period of at least six weeks [42 calendar days] from the date that the injury occurred) after reporting to training camp and must have been placed on Reserve/Injured after 4:00 p.m., New York time, on the day after the final roster reduction. A player who is eligible to return must be noted as "Designated for Return" on the first day that he returns to practice.

A player is ineligible to practice until six weeks have elapsed since the date he was placed on Reserve, and is not eligible to return to the Active/Inactive List until eight weeks have elapsed since the date he was placed on Reserve. The business day (prior to 4:00 p.m., New York time) that the player is placed on Reserve counts as the first day.

At any time after the conclusion of the sixth week that a player has been on Reserve/Injured, a club is permitted to return him to practice for a period not to exceed 21 calendar days, provided that the club has notified the Player Personnel department of the League office that the player has been Designated for Return, which information shall be promulgated to clubs on that day's Personnel Notice. Provided that the player has been on Reserve/Injured for at least eight weeks from the date he was placed on Reserve, a club is permitted to return him to its Active/Inactive List at any time during the 21-day practice period, or prior to 4:00 p.m., New York time, on the day after the conclusion of the 21-day period.  No other player on Reserve/Injured shall be permitted to practice or to return to the club's 53-player Active/Inactive List. If the player is not returned to the Active/Inactive List prior to 4:00 p.m., New York time, on the day after the conclusion of the 21-day period, he is not eligible to return to that club's Active/Inactive List for the remainder of the season and postseason. If the club elects to continue to carry the player on Reserve/Injured, the player shall not be permitted to practice or to participate in team or individual drills (contact or non-contact) during the remainder of the season, including postseason. Such players are limited to non-contact rehabilitative work under the supervision of the club's trainer or physician. Pads and helmets are prohibited during such rehabilitative work. Such players are permitted to attend team meetings, and may also attend practice sessions, provided they do not participate.

(D) **Compensation While on Reserve/Injured.** Players on Reserve/ Injured are compensated at the full rate of their NFL Player Contracts (Paragraph 5).

(E) **Injury Definition.** For purposes only of administering the procedures of Reserve/Injured, a minor injury is one which renders a player physically unable to play football for any period less than six weeks (42 calendar days) from the date of injury. Conversely, a major injury is one which renders a player physically unable to play football for a minimum of six weeks (42 calendar days) from the date of injury.

(F) **Documentation.** All determinations of recovery time for major and minor injuries must be by the club's medical staff and in accordance with the club's medical standards. Such prognosis must be documented on the form "Verification of Injury/Illness Report," which must be completed in full by the club physician and countersigned by a working club executive or the head coach. This form must be filed in the League office within 15 days after the date the player is officially added to Reserve/Injured; if not, the club forfeits a spot on its Active List until it complies. The prognosis of the player's recovery time should be as precise as possible. When the verification form is received by the League office, the case receives a major or minor injury classification, which remains fixed unless the Commissioner grants special permission to reclassify after considering a revised prognosis by the club.

The League's medical examination procedures shall include a network of qualified neutral physicians in each club's territory (including the training camp area). Such physicians shall be available to examine players within a short time (usually less than a week) after a player is injured.

(G) **Minor Injuries.** If a club places a player with a minor injury onto Reserve/Injured, such player must be placed on no-recall waivers (or terminated if he had four pension-credited seasons at the conclusion of the previous season) as soon as, in the judgment of the club, he is physically able to play football. Such players may not be reacquired by the club for the remainder of the season, including the postseason. This definition of a minor injury shall be applicable throughout the remainder of the season, including postseason, even if less than six weeks remain in a club's season. If, despite the original classification of minor injury, the player's recovery time continues into the following year, the waiver request must be before April 15.

(H) **Evasion.** The Commissioner is authorized to take whatever steps he deems necessary to investigate any Reserve/Injured case that he has reason to believe may not have been handled properly by the involved club. If he determines that a club has abused the

procedures of Reserve/Injured in order to evade the player limit or for any other reason, he may take appropriate disciplinary action.

(I) **Contract Restrictions.** Whenever a player becomes subject to waivers under the rules governing Reserve/Injured, there must be no subsequent renegotiations or modification of his contract that constitutes a deterrent to claims by other clubs.

(J) **N-F/I After Passing Physical.** Players who go onto the Reserve List under Non-Football Injury or Illness after passing the club's physical examination may not play or practice with the club for the remainder of the season, including postseason, under any circumstances, except for players placed on Reserve/NF/I pursuant to the terms of the NFL Drug Policy. Players on Reserve/Non-Football Illness/Injury shall not be traded.

(K) **Trading From Reserve/Injured.** Players on Reserve/Injured may not be traded.

(L) **Settlements.** Any financial settlement agreed to between a club and player concerning an injury shall cover a fixed period of time and shall be reported in detail to the League office. Such player then shall be carried on the club's Reserve/Injured list for the specified period covered by the settlement. Such listing must be for procedural purposes only, and the player must not practice with or be affiliated with the club in any way other than normal rehabilitation treatment. At the end of such specified period, the player must be placed on waivers.

Clubs also have the option of immediately requesting waivers on a player with whom they have negotiated a financial settlement. Any such waiver request shall carry the notation "Injury Settlement," and any such financial settlement must be reported in detail to the League office and must specify that the agreement does not obviate the League's waiver system. Players with whom a club has reached an injury settlement and for whom it has requested waivers (or terminated without waivers if the player had four or more pension-credited seasons) may not be reacquired by that club during the same season until a period of time has elapsed since the date of termination that is three regular or postseason games longer than the number of regular season games represented by the settlement (a bye week counts as a game). The above procedure shall also be applicable to a player who has been placed on Reserve/Injured or for whom a club has requested waivers with the designation "injured," provided that no later than 4:00 p.m., New York time, on the fifth business day after the date that the player was placed on Reserve/Injured or that waivers were requested, whichever occurs first, the club (1) executes and files an Injury Settlement

with the league office, and (2) requests waivers for the player with the designation "Injury Settlement" (or terminates him without waivers if the player has four or more pension-credited seasons). A player for whom waivers have been requested pursuant to an injury settlement is permitted to be claimed, and any player terminated pursuant to an injury settlement is permitted to sign with any other club, subject to customary rules. Clubs are permitted to pay the settlement amount in weekly installments or in other arrangements acceptable to player and club, provided that any amounts paid to the player are received no later than the last game represented by the settlement. Upon termination, such players are free agents and shall have no further contact with the club, other than a tryout and/or physical examination, until the date that they have become eligible to be re-signed by the club. The tryout and/or physical examination must be conducted within 14 days of the date that such players are eligible to be re-signed.

For purposes of this rule, Saturdays, Sundays, and holidays shall not be included in the five business days, even if the Player Personnel department is open for business and/or a Personnel Notice is transmitted on that day.

**Practice Squad**

17.17   After 12 noon, New York time, on the Monday prior to the first regular season game, clubs may establish a Practice Squad of five players, which is limited to players who are free agents and who do not have an accrued season of free agency credit, unless that season was achieved by spending an entire regular season on Reserve/Injured or Reserve/Physically Unable to Perform. A player who achieved his accrued season on Reserve/Injured or Reserve/Physically Unable to Perform may be signed to the Practice Squad of any club except the club that placed him in that category. Practice Squad players are eligible to be signed to the Active/Inactive List of other NFL clubs.

*See* 2004 Resolution MC-1 (providing that, subject to negotiation and agreement with the NFL Players Association, clubs may employ up to eight practice squad players for the 2004 season, and the League has the option to extend this arrangement for subsequent seasons), App., p. 2004-18

*See also* 2005 Resolution G-3 (extending 2004 Resolution MC-1, permitting clubs to employ practice squads not to exceed eight players for the 2005 season), App., p. 2005-7

*See also* 2006 Resolution G-3 (extending 2005 Resolution G-3), App., p. 2006-15

*See also* CBA, including Article 33 (Practice Squads)

**Players Waived Injured**

17.18 (A) Players waived injured will continue to be no-recall and count against the applicable player limit if they clear waivers.

(B) If a player is placed on injured waivers and the club remains below the applicable player limit at all times until such player clears waivers, the club may at that time return the player to its roster and use him in a game as soon as he is physically able.

(C) If a player is placed on injured waivers and the club reaches the applicable player limit before such player clears waivers, the club cannot return the player to its roster but must immediately place him on Reserve/Injured.

# Article XVIII

## Waivers

### When Required

18.1 (A)  Clubs desiring to release players must first give written notice to the Commissioner of such intention. At 4:00 p.m., New York time, during each day, exclusive of Sundays, the Commissioner shall notify each club of such waiver request and any club desiring the services of said player may claim him. Regardless of the time when the League receives a request for waivers, the Commissioner shall not give the notice thereof to the clubs until 4:00 p.m., New York time, on the same or succeeding day.

Clubs shall not have a right to withdraw any claims, and, except for waiver requests designated as Procedural Recall, clubs shall not have a right of recall for any waiver requests.

### Claiming Period

(B)  Clubs may claim a player placed on waivers by notifying the Commissioner within the claiming period. Clubs may file claims on players for whom waivers have been requested beginning at 4:01 p.m., New York time, on the day such waivers are requested and ending at 4:00 p.m., New York time, on a subsequent date, pursuant to the following:

(1)  For any waivers requested during the period commencing on the first business day after the Pro Bowl or the Super Bowl, whichever occurs later through 4:00 p.m., New York time, on the Friday prior to the final regular season weekend, a 24-hour claiming period shall be in effect, except for waiver requests on Friday and Saturday of each week, which shall expire at 4:00 p.m., New York time, on the following Monday. [Exception: During the two weekends preceding the first full weekend of preseason games, waivers requested on Friday will expire at 4:00 p.m., New York time, on Saturday; waivers requested on Saturday will expire at 4:00 p.m., New York time, on Sunday; and waivers requested on Sunday will expire at 4:00 p.m., New York time, on Monday.]

If the claiming period is scheduled to expire on a holiday, or such other day when the League office is not open for customary business, the claiming deadline shall be extended until 4:00 p.m., New York time, on the next League business day.

Waivers requested on the Friday preceding the final regular season weekend shall expire at 4:00 p.m., New York time, on Saturday.

If any waiver request has been designated as Procedural Recall, the club requesting such waivers shall thereafter have an additional 24 hours to recall such waiver request.

(2) A claiming period of 10 calendar days shall be in effect for any waivers requested during the period from the Saturday of the final regular season weekend through the conclusion of the final postseason game, but the assignment or termination of any players will be deferred until the first business day after the Super Bowl game. If the waiver request is within 10 calendar days of the first business day after the Super Bowl game, such claiming period will expire on the first business day after the Super Bowl game. A club that is not participating in the playoffs shall not request waivers on players after 4:00 p.m., New York time, on the Saturday of the final regular- season weekend, unless it is awarded a player via waivers on the Monday after its final regular season game and needs to create an opening on its roster for such player.

All waiver notices released by the Commissioner during the training or regular season shall be sent by NFLNet or facsimile.

The Commissioner shall notify each club in both conferences simultaneously of any waiver request in the manner prescribed above. Any club within the League may, upon request, secure from the Commissioner all available salary information on any player for whom waivers have been requested, which information shall be supplied prior to the time for the filing of any claim on such player.

**Awarding of Players**

(C) Whenever a club claims and is thereafter awarded a player, the following rules shall govern:

(1) The club to which the player is awarded is required to count the player on its Active List for at least two business days. The assignee club is prohibited from trading such player unless he has been a member of the club's Active/Inactive List for one preseason or regular season game or for seven calendar days, whichever occurs first.

95 Article XVIII

If a player limit is applicable at the time of the award, and the club has a full complement of Active Players within such limit, then following the award of such player the club must either:

(a) Waive another player from its Active List with no right of recall;

(b) Place another player from its Active List on its Reserve List, subject to all of the restrictions applicable to the Reserve List; or

(c) Trade another player on its Active List.

(2) If a club is awarded a player, is assigned a player in trade, or signs a free-agent player to a current-year contract at any time after Monday, 4:00 p.m., New York time, prior to the first regular season game and for the balance of the regular season, if the club at the time of such acquisition has a full complement of players under the applicable player limit, the club must either:

(a) Waive another player from its Active List with no right of recall (or designate a recallable player currently on waivers as nonrecallable);

(b) Place another player from its Active List on its Reserve List subject to all restrictions applicable to the Reserve List; or

(c) Trade another player from its Active List.

The exercise by the club of any of the foregoing alternatives must be taken by 4:00 p.m., New York time, on the day of the acquisition, with the exception that if the acquisition is an award via waivers, the club is allowed up to one hour after notification of the award to take appropriate action.

(3) "Time" referred to in subsection (2) above shall always be 4:00 p.m., New York time, unless superseded by other provisions of this Constitution and Bylaws.

(D) Whenever a claiming club is to be awarded a player on the day of a preseason or regular season game for which it is scheduled, the award shall not be made until 4:00 p.m., New York time, on the next day of business following the game.

**Recall of Waiver**

18.2   (A)   Subject to other provisions of this Constitution and Bylaws restricting the right of recall under various circumstances, a club which has requested waivers may recall the request by notifying the Commissioner of such recall by NFLNet, e-mail, facsimile or other similar means of communication, within twenty-four (24) hours after the expiration of the claiming period.

       (B)   Whenever the Commissioner notifies a club that a player placed on waiver has been claimed, the Commissioner shall do so by NFLNet, e-mail, facsimile or other similar means of communication.

**Free Agents**

18.3   Whenever a player has been placed on waivers and not designated injured and is not claimed by another club, such player shall then become a free agent upon expiration of the waiver recall period, if any, on such player.

**Players Waived While Injured**

18.4   Whenever a player has been placed on waivers and the waiving club designates such player to be injured and there is no award of the player made to another club, such injured player remains under contract to the waiving club until the expiration of such contract or until its termination by the club in accordance with the provisions thereof.

**Multiple Claims**

18.5   For any claims made by clubs beginning the day after the completion of the third regular-season weekend (i.e., Tuesday if the final game of such weekend's schedule begins on Monday), if two or more clubs claim a player's contract after a waiver, the contract shall be awarded to the club whose position in the League standing at that time is the lowest. In case of a tie in the standing, ties shall be broken by computing the aggregate won-lost-tied percentage of the opponents that an involved club has played at that point of the regular season and awarding the contract to the club which has faced the schedule of teams with the lowest aggregate won-lost-tied percentage. If a tie still exists, the Commissioner will award the contract by lot.   For any claims made prior to the day after the completion of the third-regular season weekend, if two or more clubs claim a player's contract after a waiver, the contract shall be awarded to the club which had priority in the most recent Selection Meeting, as provided for in Section 14.3(B).

**Waiver Requests**

18.6    If the request for waivers occurs either during the training season or the regular season, the waiver request must be by NFLNet, e-mail, facsimile or other similar means of communication. During the non-playing season, a waiver request may be by mail and the time stamped upon receipt of any such mailing by the Commissioner shall determine the date of the request. Despite the fact that such communication be delayed, misdirected or lost, the time of delivery to the Commissioner thereof shall fix the date of request. Clubs shall have the right to telephone the Commissioner's office and give oral notice that a written or NFLNet, e-mail, facsimile or similar request for waiver has been given. In such event, the time of the telephone call shall fix the date for the giving of notice of a waiver.

**Salary of Claimed Player**

18.7    (A)    Each player under contract to a club must be paid a full game salary by such club unless a request for waivers on such player is sent by such club and received by the League office prior to 4:00 p.m., New York time, on Tuesday prior to the first regular season game and/or before 4:00 p.m., New York time, on the Tuesday following the playing of a regular season game. If any other club claims such player and such player is thereafter awarded to such claiming club, such claiming club shall assume the player contract and be responsible for the balance of the salary of such player as prescribed therein.

        (B)    Despite anything in this Constitution and Bylaws to the contrary, whenever a player's contract or contracts are assigned through the waiver system, the assignee club's financial responsibility under such contract or contracts and any attachment thereto shall be limited to: (1) any unearned salary, as set forth in Paragraph 5 of the NFL Player Contract and (2) any unearned football-related performance bonuses. The original signing club shall retain responsibility for all other financial obligations to the player of any character arising as a result of the signing of such contract or contracts, including but not limited to any signing bonus.

**Notification**

18.8    If a player has an active contract and reports and then leaves the club, such fact must be reported to the League office within 48 hours after such player has left the club. If not reported, the Commissioner, after verifying such fact, shall request waivers on said player; such request for waivers may not be recalled. This provision shall not be applicable to any player inducted into military service.

18.9    Where any player contract awarded on waivers to another club contains a provision purporting to impose, or having the effect of imposing, financial obligations on the claiming club that were not imposed on the waiving club, the waiving club shall bear the ultimate financial responsibility for meeting such obligations.

18.10   Clubs are prohibited from renegotiating, revising, altering, or superseding any contract in a manner that would constitute a deterrent to claims of that contract by another club, e.g., "guaranteed" and "no trade" provisions. If such a contract is executed, the club may not subsequently waive the player in that season.

**Waiver System**

18.11   (A)   All claims filed by clubs shall be in priority order within groupings of one or more and the claiming club shall indicate the number of players within each grouping it wishes to be assigned. No player may be listed more than once.

        (B)   All players placed on waivers will be waived for all years of their contract.

        *See also*   CBA, including Article 29 (Waivers)

# Article XIX

## Conduct of Regular Season Games

**Game Receipts and Guarantee**

19.1    (A)    The home club shall deliver to the League office the greater of $30,000 for each regular season and preseason game, or 40% of the gross receipts after the following deductions:

(1)    All federal, state, and municipal taxes assessed on the sale of tickets, plus any other special charges approved in writing on an individual club basis by the Executive Committee.

(2)    A stadium rental allowance equal to fifteen (15%) percent of the gross receipts after deducting the taxes and any other approved special charges set out in (1) above.

(3)    "Gross Receipts," as used in this section, shall mean all receipts derived from the sale of tickets, including taxes and special charges but excluding ticket handling charges. Receipts of the home club from the sale of season tickets shall be included in the gross receipts from each game equally in proportion to the number of regular season games scheduled by the club after the adjustment of any preseason game monies included in the cost of the season ticket.

*See* 1987 Resolution FC-1 (authorizing Executive Committee to approve exclusion of seat premiums for stadium projects), App., p. 1987-1
1987 Resolution FC-7 (ticket handling and service charges), App., p. 1987-3
1994 Criteria for Approval of Premium Waivers, App., p. 1994-3
1995 Resolution G-6 (revenue sharing pool), App., p. 1995-4
1999 Resolution G-3 (restating and expanding League policy governing waivers of sharing obligations for stadium construction projects), App., p. 1999-2
2001 Resolution G-1 (revisions to definition and calculation of visiting team share for preseason games), App., p. 2001-2
2003 Resolution JC-1 (extending G-3 program), App., p. 2003-7
2006 Resolution BV-1 (scheduling of international regular season games), App., p. 2006-6
2006 Resolution G-1 (approval of CBA; revenue sharing pool), App., p. 2006-9

2006 Resolution MC-1 (approval of CBA; revenue sharing pool), App., p. 2006-9

2007 Resolution G-1 (governing implementation of the revenue sharing pool). App., p. 2007-5

2007 Resolution MC-1 (governing implementation of the revenue sharing pool). App., p. 2007-5

2008 Resolution FC-9 (modifying the definition of club seat premiums). App., p. 2008-1

2008 Resolution FC-10 (modifying the calculation of visiting team share for all-inclusive ticket packages). App., p. 2008-3

2011 Resolution G-1 (with Resolution MC-3) (approving new CBA and supplemental revenue sharing program), App., 2011-26

2011 Resolution G-4 (restating and expanding League policy governing waivers of sharing obligations for stadium construction projects), App., p. 2011-16

2012 Resolution G-2 (establishing NFL Ventures as league-level lender under G-4 program), App., p. 2012-4

2012 Resolution G-4 (modifying G-4 program terms), App., p. 2012-7

2014 Resolution JC-4 (modifying terms of G-3 VTS payment guarantees), App., p. 2014-13

(4) Each club shall provide the League office by July 15 of each year with ticket manifests for all games to be played in the club's home stadium. Ticket manifests shall list the number and price of all tickets printed to include standing room tickets, and shall include a breakout of the amount of each tax and any special charge included in the price of each category of ticket. In the event ticket manifests are subsequently changed (e.g., bleachers are added subsequent to baseball season at a date different from originally planned and submitted) it shall be the responsibility of each club to update the ticket manifests on file in the League office.

*See* 2012 Resolution JC-1 (authorizing ticket sales in excess of a "base" ticket manifest for the 2012 and 2013 seasons), App., p. 2012-11

2014 Resolution FC-4 (extending 2012 Resolution JC-1 through the 2018 season), App., p. 2014-8

2016 Resolution JC-1 (requiring clubs that sell less than 85% of their general admission tickets at a home game during the 2016 regular season to contribute Visiting Team Share for 85% of general admission tickets), App., p. 2016-14

(5) All clubs, on or before May 1, shall forward to the League office a certified report by an independent CPA of attendance and income for all home games (preseason, regular season,

and postseason) of the previous season to include a certified count of unsold tickets of all categories.

(B) Except as the Finance Committee may otherwise specify in policies and procedures adopted and amended from time to time, (i) final settlement of funds payable to the League office pursuant to Section 19.1(A) shall be made on the day of the game or no later than two business days subsequent to each regular season or preseason game, and (ii) the home club shall make settlement by wiring Federal funds to the League office.

(C) There shall be no charge imposed or percentage claimed against gate receipts of regular season games for or by the League office.

(D) The home team may deduct from the final settlement of visiting team shares amounts owed by the visiting team for the purchase of game tickets.

*See* 2001 Resolution G-1 (pooling of visiting team shares), App., p. 2001-2

**Conduct of Game**

19.2   Each club shall play all of its regular season games at the times and places provided for in the official schedule of the League. There shall be no postponement of regular season games unless said game cannot be played because of an Act of God or because of a state, federal or local prohibition. Neither the starting time of a regular season game nor the locale of the game shall be changed in any manner after the adoption of the schedule and the publication thereof, except with the written consent of both clubs and the prior approval of the Commissioner.

*But see* 2006 Resolution BC-1 (Flexible Scheduling), App., p. 2006-1
*But see* 2016 Resolution BC-1 (Flexible Scheduling), App., p. 2016-1

**Bench Personnel**

19.3    With the exception of uniformed players eligible to participate in the game, all persons in a team's bench area must wear a visible credential clearly marked "BENCH." For all NFL home games—preseason, regular season, and postseason—the home club will be issued a maximum of 27 credentials and the visiting club will be issued a maximum of 25 credentials for use in its bench area. Such credentials must be worn by coaches, players under contract to the applicable club but ineligible to participate in the game, and team support personnel (trainers, doctors, equipment men). From time to time, persons with game-services credentials (e.g., oxygen technicians, ball boys) and authorized club personnel not regularly assigned to the bench area may be in a team's bench area for a brief period without bench credentials.

Clubs are prohibited from allowing into their bench area any persons who are not officially affiliated with the club or otherwise serving a necessary game-day function. Clubs also are prohibited from allowing into the nonbench areas of field level any persons who have not been accredited to those locations by the home club's public relations office for purposes related to news-media coverage, stadium operations, or pre-game and halftime entertainment.

**Field Credentials**

19.4    Persons permitted on the field level during a game, other than those described in Section 19.3, shall be limited to photographers, stadium employees, utility maintenance personnel, and police. Such persons must remain behind the playing field's standard six-foot border and are not permitted within bench areas. Clubs which seat pre-game and halftime personnel on the field level must keep them well behind the six-foot border. All such persons not in uniform covered in this subsection must be issued and display appropriate credentials issued by the home club only.

**Medical Facilities**

19.5    The home team shall provide a physician and an ambulance at each game available to both teams. Said ambulance facilities shall be located at or adjacent to the stadium, with the driver in attendance in the ambulance for the use of both competing teams.

**Player Attire**

19.6     All players of a team shall be uniformly and neatly attired for all games. All players on the same team must wear the same color jersey, head guards, and stockings, except that a club, at its option, may permit all eligible pass receivers to wear a different color head gear than the rest of the team. If a different color is worn by any eligible pass receiver of a club, all of the eligible receivers must wear the same color. Players must wear stockings in all games. The Commissioner must approve in advance any changes in the colors of the club. Every player appearing on the field during the game or in any pregame workout must wear his complete game outfit exclusive of pads and helmet.

**Player Identification**

19.7     Players must wear on the back and front of their jerseys identification numbers that shall be at least eight (8) inches long and four (4) inches wide. Names of players shall be placed on uniforms directly above the numbers on the back in a size lettering no less than two and one-half ($2^1/_2$) inches. The name and number of each player of the visiting team must be furnished to the home team by the visiting club at least six (6) days prior to the scheduled game with the visiting team. Any change in the numbering of a player shall be forthwith communicated to the opposing club.

**Choice of Game Uniforms**

19.8     (A)     Subject to the provisions of subsection (B) hereof and at the option of the home club, the visiting team in all preseason and regular season games shall wear the colors awarded to such team under Section 19.9, and the home team shall wear white. In the event that the colors of the visiting team conflict with the white worn by the home team, the visiting team shall wear other colors approved by the Commissioner. The provisions of this Section shall also apply to the Divisional Playoff games, Conference Championship games, and to the Super Bowl game.

          (B)     Provided written approval is obtained from the applicable television network of the home club prior to September 1st in any year, neither club in any preseason or regular season game shall be required to wear white jerseys, but shall be permitted to wear the colors awarded to their respective clubs. The same provisions shall likewise apply to the Divisional Playoff games, Conference Championship games, and to the Super Bowl game, provided such permission is received from the applicable television network before 5:00 p.m., New York time on the Tuesday preceding the playing of such game.

**Club Colors**

19.9   (A)   The colors of the respective clubs are as follows:

| | |
|---|---|
| Arizona Cardinals | Cardinal red, black and white |
| Atlanta Falcons | Red, black, silver and white |
| Baltimore Ravens | Purple, black and old gold |
| Buffalo Bills | Royal, red, navy, and grey |
| Carolina Panthers | Process blue, black and silver |
| Chicago Bears | Navy, orange and white |
| Cincinnati Bengals | Black, orange and white |
| Cleveland Browns | Dark brown, orange and white |
| Dallas Cowboys | Royal, silver, white and navy |
| Denver Broncos | Navy and orange |
| Detroit Lions | Light blue, silver and black |
| Green Bay Packers | Dark green, yellow-gold and white |
| Houston Texans | Navy, white and red |
| Indianapolis Colts | Royal and white |
| Jacksonville Jaguars | Teal, black and old gold |
| Kansas City Chiefs | Red, yellow-gold and white |
| Miami Dolphins | Aqua, coral, white and navy |
| Minnesota Vikings | Purple, yellow-gold and white |
| New England Patriots | Red, white, navy and silver |
| New Orleans Saints | Metallic gold, black and white |
| New York Giants | Red, white, dark royal and silver |
| New York Jets | Dark green and white |
| Oakland Raiders | Silver and black |
| Philadelphia Eagles | Midnight green, silver, black and white |
| Pittsburgh Steelers | Yellow-gold and black |
| Los Angeles Rams | Navy, metallic gold and white |
| San Diego Chargers | Navy, yellow-gold, white and light blue |
| San Francisco 49ers | Red, metallic gold and black |
| Seattle Seahawks | Storm blue, bright green and navy |
| Tampa Bay Buccaneers | Red, pewter and black |
| Tennessee Titans | Light blue, navy and red |
| Washington Redskins | Burgundy and yellow-gold |

The Commissioner must approve, in advance, any changes in the foregoing colors of the clubs.

*See* 2004 Resolution BV-4 (Prohibiting club marks and logos from being used in connection with the presentation of other sports without prior League approval by three-fourths of the member clubs; prohibiting assignment, sublicenses, mortgages, pledges, hypothecations and other transfers or encumbrances of League and club marks without prior League approval), App., p. 2004-3
2011 Resolution BV-1 (amending and restating 2004 Resolution BV-4), App., p. 2011-4

**Conflicting Club Colors**

(B)    The home club shall have the option of deciding whether the visiting club shall wear white jerseys or shall wear the colors awarded to the visiting team in any League game, regular season or preseason. The home club is obligated to give written notice to the visiting club and to the Commissioner of its decision on the colors of the jerseys to be worn by the visiting club, which notification must be given by July 1st of the year in which the game is scheduled to be played. If either participating club fails to conform to the jersey colors designated for such game, then there shall be an automatic fine against the offending club of $5,000, which sum shall be payable to the League office. Despite the foregoing, in the event that the colors of the participating teams as so designated are in conflict for a League game, regular season or preseason, the Commissioner shall have the right to designate the colors to be used by the competing teams in such game.

(C)    Anything in Section 19.9(B) to the contrary notwithstanding, if any game, including the Super Bowl game, is played in a city other than in a city of the competing clubs, then the colors awarded to such teams by the League may be worn by the competing teams unless such colors are, in the opinion of the Commissioner, conflicting. In such event, if competing teams are unable to agree upon the colors to be worn by each team in such game, the Commissioner shall have the right to designate the colors to be used by the competing teams in such game.

(D)    No club shall have the right to make changes in its club colors and/or in the designs of its team helmets or uniforms except in accordance with the following provisions:

(1)    Absent specific extenuating circumstances as determined by the Commissioner, if a club desires to make any changes in club colors, uniform appearance, designs of team helmets, designs of team uniforms, trademarks, or trade names, it must give written notice and details thereof to the League on or before March 1 of the year prior to the year in which it wishes to change; must comply with the uniform change notification and approval timeline as established by the League office and amended from time to time; and further must obtain approval from the League pursuant to Section 19.9(D)(2) by December 1 of the year prior to the year in which it wishes to change; otherwise it shall have no right to make any change for the succeeding season.

> *See* 2002 Resolution G-3 (uniform design changes and notification timeline), App., p. 2002-3
> 2003 Resolution G-1 (third uniform design), App., p. 2003-5
> 2014 Resolution BV-2 (uniform design for Thursday Night Football), App., p. 2014-6

> (2) Despite the provisions of the foregoing sub-paragraph (1) of this Section 19.9(D) and despite the fact that notice was given of the proposed change in the colors and/or designs of team helmet and uniforms as above set out, should such change, in the opinion of the Commissioner, result in any conflict with the club colors and/or helmet and uniform designs of any other club, and the clubs involved are unable to agree upon a method of solving such conflict, the Commissioner shall have the right to designate the club colors and/or the designs of the team helmet or uniforms to be used by the affected clubs in such season.

> *See* 2004 Resolution BV-4 (Resolution of disputes relating to 2004 Resolution BV-4, any policies or rules developed to implement 2004 Resolution BV-4, the NFL trademark trust and any related agreements, or the rights and obligations of NFL Ventures and its affiliates), App., p. 2004-3
> 2011 Resolution BV-1 (amending and restating 2004 Resolution BV-4), App., p. 2011-4

**Seats for Visiting Club**

19.10   The home club must reserve a total of twenty-five (25) seats for the visiting club located within the 40 yard lines.

**Game Postponed or Rescheduled**

19.11   (A)   After the first two weekends of the regular season, all games shall be played on Sunday unless both competing clubs agree to a change in the day of the game or unless such date is affected by World Series play. In such event the day of the game may be changed from Sunday.

(B)   If a scheduled game cannot be played on the designated day, it will be rescheduled by the Commissioner.

(C)   Whenever a postponement is attributable to negligence by a club, the negligent club shall be responsible for all home club costs and expenses, including gate receipts and television contract income, subject to approval by the Commissioner.

(D)     All teams traveling by air to play a regular season game must be scheduled to arrive in the game city or vicinity before eighteen (18) hours prior to the scheduled kickoff, unless adequate protection is provided for the squad to make the trip by other means of transportation.

**Starting Times**

19.12   The starting time for all regular season games shall be 1:00 p.m., at the site at which they are played, unless prohibited by local or state statute or authorized otherwise by the Commissioner.

*But see* 2006 Resolution BC-1 (Flexible Scheduling), App., p. 2006-1
*But see* 2016 Resolution BC-1 (Flexible Scheduling), App., p. 2016-1

**Introduction of Players**

19.13   Prior to the game, each club is required to introduce (i) its Head Coach, and (ii) its full squad as a unit, or 11 members of its offensive team, defensive team, or special teams, either as individuals or as a unit, unless inclement weather prevents or interferes with such introduction. A representative sampling of the photos of the visiting players and the photo of the visiting head coach must appear in all game programs.

**Complimentary Tickets**

19.14   The following rules govern the complimentary ticket policy for preseason, regular season, wildcard and division playoff games:

(A)     A "complimentary ticket" is any ticket which is issued free as a courtesy by the home club for a seat or location reflected on the club's ticket manifest and which otherwise would be salable.

(B)     The home club may deduct up to 1,000 tickets of any price category listed on its ticket manifest, provided, however, that the club itemizes the number of complimentary tickets issued by category of recipient. Categories of recipients may include, but are not limited to, players, coaches, other club personnel, officials, other League employees, media, media guests, local dignitaries, lease requirements, bus drivers, etc. If a home club issues more than 1,000 complimentary tickets of the type contemplated above without the prior permission of the visiting club, the home club must pay the full price for all such tickets exceeding 1,000, and such income must be reflected in the game's gross receipts. Separate and apart from the above complimentary tickets and the limits placed thereon, the home club may issue without limitation such additional complimentary tickets as may be required to seat pregame and halftime entertainment personnel. The number and

price of complimentary tickets issued to such pregame and halftime entertainment personnel shall be listed separately in the space provided on the League game statement.

**Tickets for Players**

19.15   Each player of the home club is entitled to receive one complimentary ticket for each home game. The home club shall not issue any tickets to the visiting club, directly or indirectly, except when full payment is made for such tickets.

*But see*   CBA Article 51, Section 9 (Player Tickets)

**Playing Surface**

19.16   All clubs must provide and have available a tarpaulin adequate to cover the entire playing area of the field and must exercise reasonable care and diligence in arranging for the use thereof whenever the weather is apt to render unfit or endanger the playing condition of the home field.

19.17   Teams playing in parks with baseball facilities should sod or seed the infield after the baseball season.

**Restrictions**

19.18   Bull horns, klaxons, megaphones and other noisemaking devices are banned from parks in the NFL.

19.19   No person except authorized club and League personnel and accredited members of the media shall be permitted to enter a dressing room of any participating club on the day of a game.

**Game Films**

19.20   The home club shall provide the visiting club facilities and vantage points equal to its own for the filming of the game for coaching purposes.

19.21   A club that films its home games from more than one sideline vantage point shall inform future opponents, with whom films are to be exchanged, of that fact and must provide each opponent true copies of films taken from the vantage point preferred by the opponent.

# Article XX

## Divisional Playoff Games

**Pairings and Priority**

20.1  The four division champions and two Wild Card clubs (the two clubs with the best records other than the division champions) from each conference will participate in the postseason. Tie games are calculated as one-half game won and one-half game lost. Both Wild Cards may come from the same division. Clubs eliminated in Divisional Championship tie-breakers are eligible to be Wild Cards if their records qualify them.

20.2  Pairings for the playoffs will be as follows:

The six postseason participants from each conference will be seeded as follows:

1. The division champion with the best record.
2. The division champion or Wild Card with the second-best record.
3. The division champion or Wild Card with the third-best record.
4. The division champion or Wild Card with the fourth-best record.
5. The division champion or Wild Card with the fifth-best record.
6. The division champion or Wild Card with the sixth-best record.

If two or more division champions finish with the best won-lost-tied percentage at the end of the regular season, ties will be broken pursuant to Section 20.4(B).

After the above procedure has been applied to determine the #1 seed, if two or more teams finish with the same won-lost-tied percentage at the end of the regular season, priority shall be given to a team or teams that are division champions. Ties that involve division champions with the same won-lost-tied percentage shall be broken pursuant to 20.4(B). Ties that involve Wild Card teams from the same division shall be broken pursuant to 20.4(A). Ties that involve Wild Card teams from different divisions shall be broken pursuant to 20.4(B).

In the first round, the #3 seed will play the #6 seed, and the #4 seed will play the #5 seed. The two highest seeded teams will host the games.

In the second round, the #1 seed will play the winner of the game between the #4 seed and the #5 seed, unless the #6 seed wins its First Round game, in which case the #1 seed will play the #6 seed. In either case, the #2 seed will play the winner of the other First Round game. The two highest seeded teams will host the games.

None of the above will be affected by the fact that a Wild Card and division champion are from the same division.

**Division Ties**

20.3   If, at the end of the regular season, two or more clubs in the same division finish with the best won-lost-tied percentage, the following steps will be taken until a champion is determined:

TWO CLUBS

1. Head-to-head (best won-lost-tied percentage in games between the clubs.)

2. Best won-lost-tied percentage in games played within the division.

3. Best won-lost-tied percentage in common games.

4. Best won-lost-tied percentage in games played within the conference.

5. Strength of victory in all games.

6. Strength of schedule in all games.

**   Best combined ranking among conference teams in points scored and points allowed in all games.

**   Best combined ranking among all teams in points scored and points allowed in all games.

9. Best net points in common games.

10. Best net points in all games.

11. Best net touchdowns in all games.

THREE OR MORE CLUBS*

1. Head-to-head (best won-lost-tied percentage in games among the clubs.)

2. Best won-lost-tied percentage in games played within the division.

3. Best won-lost-tied percentage in common games.

4. Best won-lost-tied percentage in games played within the conference.

5. Strength of victory in all games.

6. Strength of schedule in all games.

**   Best combined ranking among conference teams in points scored and points allowed in all games.

**   Best combined ranking among all teams in points scored and points allowed in all games.

9. Best net points in common games.

10. Best net points in all games.

11. Best net touchdowns in all games.

12. Coin toss.                        12. Coin toss.

                                               \*Note 1: If two clubs remain tied after one or more clubs are eliminated during any step, tie-breaker re-starts at Step One of two-club format.

                                               \* Note 2: If three clubs remain tied after a fourth club is eliminated during any step, tie-breaker re-starts at Step One of three-club format.

\*\* The combined ranking is derived by adding a club's position in the two categories, and the lowest score wins.  If Club A is first in points scored and second in points allowed, its combined ranking is "three," and if Club B is third in points scored and first in points allowed, its combined ranking is "four," and Club A wins the tie-breaker.  If two clubs are tied for a position, both clubs are awarded the ranking as if they held it solely.  For example, if Club A and Club B are tied for first in points scored, each club is assigned a ranking of "1" in the category, and if Club C is third, its ranking will still be "3."

**Wild Card Ties**

20.4    If necessary to break ties to determine the two Wild Card clubs from each conference, the following steps will be taken:

    (A)    If all the tied clubs are from the same division, apply division tie-breaker.

    (B)    If the tied clubs are from different divisions, apply the following steps:

TWO CLUBS

        1.    Head-to-head, if applicable.

        2.    Best won-lost-tied percentage in the games played within the conference.

        3.    Best won-lost-tied percentage in common games, minimum of four.

        4.    Strength of victory in all games.

        5.    Strength of schedule in all games.

      \*\*    Best combined ranking among conference teams in points scored and points allowed in all games.

       ∗∗    Best combined ranking among all teams in points scored and points allowed in all games.

     8. Best net points in conference games.

     9. Best net points in all games.

    10. Best net touchdowns in all games.

    11. Coin toss.

## THREE OR MORE CLUBS

1. Apply division tie-breaker to eliminate all but highest ranked club in each division prior to proceeding to step two. The original seeding within a division upon application of the division tie-breaker remains the same for all subsequent applications of the procedure that are necessary to identify the two Wild Card participants.

2. Head-to-Head Sweep (apply only if one has defeated each of the others or one club has lost to each of the others.)

3. Best won-lost-tied percentage in games played within the conference.

4. Best won-lost-tied percentage in common games, minimum of four.

5. Strength of victory in all games.

6. Strength of schedule in all games.

  ∗∗    Best combined ranking among conference teams in points scored and points allowed in all games.

  ∗∗    Best combined ranking among all teams in points scored and points allowed in all games.

    9. Best net points in conference games.

   10 Best net points in all games.

  11. Best net touchdowns in all games.

  12. Coin toss.

> > \*Note 1: If two clubs remain tied after one or more clubs are eliminated during any step, tie-breaker re-starts at Step One of the two-club format.
> >
> > \* Note 2: If three clubs remain tied after a fourth club is eliminated during any step, tie-breaker re-starts at Step Two of three-club format.

\*\* The combined ranking is derived by adding a club's position in the two categories, and the lowest score wins. If Club A is first in points scored and second in points allowed, its combined ranking is "three," and if Club B is third in points scored and first in points allowed, its combined ranking is "four," and Club A wins the tie-breaker. If two clubs are tied for a position, both clubs are awarded the ranking as if they held it solely. For example, if Club A and Club B are tied for first in points scored, each club is assigned a ranking of "1" in the category, and if Club C is third, its ranking will still be "3."

> (C) When the first Wild Card Team has been identified, the procedure is repeated to name the second Wild Card (i.e., eliminate all but the highest ranked club in each division prior to proceeding to step two). In situations where three teams from the same division are involved in the procedure, the original seeding of the teams remains the same for subsequent applications of the tie-breaker if the top-ranked team in that division qualifies for a Wild Card berth.

**Sudden Death**

20.5    The sudden-death system to determine the winner shall prevail when the score is tied at the end of the regulation playing time of a Division Playoff game.

Under this system the team scoring first during over-time play herein provided for, shall be the winner of the game, and the game is automatically ended on any score (including a safety) or when a score is awarded by the referee for a palpably unfair act. Other provisions in respect to the sudden death system shall be as provided in the Rule Book of the League.

**Playoff Rosters**

20.6    Rosters for clubs participating in the playoffs will be frozen after the final regular season game, with the following exceptions:

> > 1. Clubs will be permitted to claim and be awarded players for whom waivers have been requested prior to 4:00 p.m., New York time, on the Friday preceding the final regular season weekend.

2. Clubs will be permitted to sign free agents throughout the postseason, but are limited to a total of four free agent signings, including players on other clubs' Practice Squads, during the period that begins at 4:00 p.m., New York time, on the Wednesday after the final regular season weekend. Clubs cannot sign more than two such players during any week of the postseason. Players who were on a club's Practice Squad at the conclusion of the regular season and who are signed to that club's Active/Inactive List during the postseason shall not count against the limit of two free agent signings in a week or the overall limit of four signings.

3. Clubs will be permitted to restore to their Active Lists players who have been placed on Reserve/Non-Football Illness for the purpose of drug rehabilitation.

4. Clubs may remove players from their Active Lists by requesting waivers or by any other method possible in this Constitution and Bylaws. If waivers are requested on a player, such requests will be No Recall/No Withdrawal, a 10-day claiming period will be in effect, and any assignment or termination will be deferred until the first business day after the Super Bowl game.

# Article XXI

## Conference Championship Games

**Supervision**

21.1 The American Football Conference and National Football Conference Championship games shall be under the supervision, control, and direction of the Commissioner, and the Commissioner shall establish the date, starting time, and the ticket price of the games.

Nevertheless, all provisions relating to the site of the games and to the division or distribution of the proceeds of said games shall require approval of the affirmative vote of not less than three-fourths or 20, whichever is greater, of the member clubs of the League.

All questions arising in connection with said games not specifically provided for herein or covered in the playing rules of the League shall be decided by the Commissioner.

**Tickets**

21.2 Tickets shall be printed under the Commissioner's direction, and the cost thereof shall be charged as an expense of the game. Tickets shall be made available as promptly as possible following the determination of the teams to participate therein. There shall be no complimentary tickets for the game.

21.3 The Commissioner shall have the authority to order the home club to honor reserved seat requests in the following priority:

(A) One hundred (100) tickets for the Conference office.

(B) Up to one hundred (100) tickets for the televising network and twenty (20) for the national radio network.

(C) Tickets for the visiting clubs in such quantity as the Commissioner deems necessary, providing that such quantity does not exceed 20% of the available tickets after provision for season-ticket holders or other obligations under this Section 21.3.

The home club is entitled to permit the season-ticket holders to purchase for the Conference Championship games the same number of seats at the same locations as such season-ticket holders held throughout the regular season.

All unsold tickets in possession of the visiting club, together with funds covering any tickets sold by the visiting club, must be returned postage prepaid, by the fastest means possible, to the home club not later than 72 hours prior to the scheduled starting time of said game.

*See*   2014 Resolution FC-5 (approves postseason ticket sales policy for season ticket holders), App., p. 2014-9, 2015 Resolution FC-2, App., p. 2015-3

**Schedule and Site**

21.4   Each season the pairings and sites of the Conference Championship games will be determined as follows: winners of the Divisional Playoff games (second round) under the formula provided for in Section 20.2 will be the four participants; the home team in a Conference Championship game will be the team that was seeded highest in the playoffs.

**Officials**

21.5   The Commissioner shall select all persons to officiate at the Conference Championship games, and in making such selection shall not invite nor be required to observe any recommendations or objections from member clubs, coaches, or employees in respect to the officials therein.

**Game Receipts and Expenses**

21.6   The game receipts shall include all receipts from the sale of tickets, whether presented for admission or not, and any additional amounts received for radio, television, and motion pictures. Such receipts shall be deposited in the League Treasury.

The program receipts, including sums for advertising or sale thereof, shall belong to the home club, and any profit or loss thereon shall be for the account of the home club. Neither the League nor the visiting club shall share in the program or be responsible therefor.

21.7   After all income from the game from whatever sources has been computed, the Chief Financial Officer or his delegate, after approval by the Commissioner, shall first pay the following amounts therefrom:

(A)   All federal admission and other taxes, state, federal, or local;

(B)   Stadium rental and all other expenses involved in the staging of the game, including the authorized halftime entertainment, visiting team travel expenses, and game officials' expenses.

Balance of the income, if any, shall be distributed by the formula as fixed by resolution of the member clubs of the League.

**Halftime Entertainment**

21.8    Halftime entertainment shall be provided by the home club under the supervision of the Commissioner, and the cost of the same shall be charged to and paid as an expense of the game.

**Visiting Club Travel**

21.9    The visiting club shall be allowed transportation and hotel expenses for fifty-five (55) persons.

**Sudden Death**

21.10   If a Conference Championship game results in a tie score at the end of regulation play, the sudden-death system of determining the winner shall prevail as described in Section 20.5 hereof, and the game will thereafter proceed by quarters with no halftime intermission. Rules for time-outs will be the same as in a regulation game, including rules governing the last two minutes of the second and fourth quarters in any sudden-death period.

# Article XXII

## Super Bowl Game

**Supervision**

22.1   The Super Bowl game shall be played under the supervision, control, and direction of the Commissioner, except that the site of the game and all provisions relating to the division or distribution of the proceeds of said game shall require approval of the affirmative vote of not less than three-fourths or 20, whichever is greater, of the member clubs of the League.

**Tickets**

22.2   The Commissioner shall establish the date, starting time, and the ticket price of the game. Tickets shall be printed under the Commissioner's direction, and the cost thereof shall be charged as an expense of the game. There shall be no complimentary tickets for the game.

**Sudden Death**

22.3   If the game results in a tie score at the end of regulation play, the sudden-death system of determining the winner shall prevail as described in Section 20.5, and the game will thereafter proceed by quarters with no halftime intermission. Rules for time outs will be the same as in a regulation game, including rules governing the last two minutes of the second and fourth quarters in any sudden-death period.

**Decisions of Commissioner**

22.4   All questions arising in connection with said game not expressly provided for by the provisions hereof or by agreement of the League shall be decided by the Commissioner.

   *See*   1989 Resolution G-3 (Reporting of Super Bowl game ticket distribution to League office; allocation for season ticket holders), App., p. 1989-1
      1991 Resolution SB-2 (Super Bowl game site selection voting procedures), App., p. 1991-3
      1998 Resolution SB-5 (Super Bowl game ticket allocation formula for Super Bowl game XXXVI and beyond), App., p. 1998-14
      2016 Resolution BV-2 (modifying the annual allocation of Super Bowl game tickets), App., p. 2016-6

# Article XXIII

## Preseason and Postseason Games

**Preseason Games**

23.1   No member club shall schedule a preseason game without the approval of the Commissioner. The preseason schedule shall be completed and the dates and participants named at the Annual Meeting of the League. Should a conflict exist at the time of the October League Meeting, the Commissioner will be empowered to make any changes necessary to complete the preseason schedule so it can be presented to the membership for approval.

    (A)   Any preseason game which is required to be played between the Oakland Raiders and San Francisco 49ers shall be counted as a preseason game between teams of opposite conferences for the purpose of conforming to any provision hereof requiring any of such participating teams to play a prescribed number of preseason games with teams in the opposite conference before it can play a preseason game within its own conference. Such provision shall apply despite the fact that such clubs may be members of the same conference.

    (B)   All restrictions upon the right of clubs to participate in preseason games may be imposed by the affirmative vote of not less than three-fourths or 20, whichever is greater, of the member clubs of the League.

    (C)   Each preseason game contract shall be approved by the Commissioner and the rules and procedures for sharing gross gate receipts shall be the same as those applicable to regular season games, as set forth in Section 19.1 and League resolutions referred to therein.

    (D)   All clubs shall schedule four (4) preseason games each season, to be scheduled on the four consecutive weekends prior to the first regular season weekend, excluding the Professional Football Hall of Fame game participants and participants in American Bowl games, who will each play five games. Each NFL club will be required to play two (2) preseason games at its home stadium. Any exception to this rule must be approved by the Commissioner.

       *See*  2001 Resolution G-1 (pooling of visiting team shares), App., p. 2001-2
          2001 Resolution G-5 (realignment; scheduling of preseason games), App., p. 2001-7

2006 Resolution BC-4 (extending 2001 Resolution G-5),
App., p. 2006-5

**Postseason Games**

23.2   No club shall participate in any non-League game after the Super Bowl
game shall have been played, except that the club winning the Super
Bowl game must play any non-League game contracted for by the
League.

**Prohibited Games**

23.3   No club may play a non-League game of any kind after such club has
played its first regular season game.

**Player Participation**

23.4   Except for games sanctioned and approved by the League, no player may
participate in any game between the time of the completion of the last
regular season game of his club and July 1st of the following year.

> *See* 1990 Resolution G-8 (League office control and coordination
> of international games), App., p. 1990-2
> 1991 Resolution G-10 (authorizing Commissioner to select
> American Bowl participants), App., p. 1991-2
> 1998 Resolution BC-5 (preseason games/network package),
> App., p. 1998-6
> 1998 Resolution BC-6 (authorizing Commissioner to select
> Hall of Fame game participants), App., p. 1998-7

> *See also*   CBA, including Article 23 (Number of Preseason Games)

# **Article XXIV**

## **Notices**

**Type of Notice**

Unless the Constitution and Bylaws specify a different form or method of notice, all notices required to be given under any provision of the Constitution and Bylaws shall be in writing or by NFLNet, e-mail, facsimile or other similar means of communication, addressed to the last known address of the addressee; all notices by mail shall be deposited in the U.S. Mail, postage thereon prepaid.

# Article XXV

## Amendment of Constitution and Bylaws

**Amendment After Notice**

25.1 (A) Subject to the provisions of Section 25.3 herein, the Constitution and Bylaws of the League may be altered or amended by the affirmative vote of not less than three-fourths or 21, whichever is greater, of the member clubs of the League at any Annual Meeting of the League, provided fifteen (15) days written notice of the proposed amendment is given to the member clubs in advance of such meeting or any recessed session thereof; further provided that if any club introduces an amendment proposal which involves the competitive aspects of the game, such proposal must be submitted in writing to the League office a minimum of thirty (30) days in advance of any Annual Meeting of the League. If notice of at least 12 hours prior to the vote is given and such alteration or amendment carries the unanimous approval (in the case of an alteration or amendment which involves the competitive aspects of the game; majority approval in all other cases) of a duly appointed standing committee of the League vested with the authority to make a recommendation on the subject matter of such amendment, such alteration or amendment may be approved by three-fourths or 21, whichever is greater, of the member clubs of the League convened at any Annual Meeting or recessed session thereof. In all other cases involving an alteration or amendment to the Constitution and Bylaws, the provisions of Section 25.2 shall apply.

(B) If any amendment or alteration of the Constitution and Bylaws is adopted or fails of adoption at an Annual Meeting of the League under circumstances wherein such proposal required a vote of three-fourths or 20, whichever is greater, of the member clubs of the League, the action on the proposed alteration or amendment cannot be changed at any recessed session of such Annual Meeting except by the unanimous vote of all of the member clubs of the League.

**Amendment Without Notice**

25.2 This Constitution and Bylaws may also be altered or amended by a unanimous vote of all the member clubs at any meeting, special, annual, or otherwise.

**Special Provisions for Amendment of Constitution and Bylaws**

25.3  (A)  No change or amendment to any section of the Constitution and Bylaws involving or relating to the arrangement under which the Baltimore and Washington franchises are to be operated and handled shall be effective unless approved by the unanimous vote of all member clubs of the League. Such arrangement is contained in the provisions of Section 4.2(D) of the Constitution and Bylaws.

(B)  No change or amendment to any section of the Constitution and Bylaws involving or relating to the arrangements and conditions under which the New York Giants and the New York Jets franchises are to be operated and handled shall be effective unless approved by the unanimous vote of all member clubs of the League. Such arrangements and conditions are contained in the following sections of the Constitution and Bylaws: 4.2(A), 4.5(B), 4.5(D), 10.4, and 13.2.

(C)  No change or amendment to any section of the Constitution and Bylaws involving or relating to the arrangements and conditions under which the Oakland Raiders and the San Francisco 49ers franchises are to be operated and handled shall be effective unless approved by the unanimous vote of all member clubs of the League. Such arrangements and conditions are contained in the following sections of the Constitution and Bylaws: 4.2(B), 4.2(C), 4.5(C), 4.5(F), 4.5(G), 4.5(H), 10.4, 13.2, and 23.1.

(D)  Anything in this Constitution and Bylaws to the contrary not withstanding, the provisions of Section 3.1(B), 4.2(C), 6.1, 6.2, 10.3, and of this Section 25.3 may not be altered or amended without the unanimous consent of all members of the League.

**Name of Proposer**

25.4  Whenever an amendment or alteration to the Constitution and Bylaws is submitted for approval, such must indicate the author of the proposal.

**TABLE OF CONTENTS**

**Page Number**

**TAB 1977**
1977 RESOLUTION (Finance) (October 13, 1977)                          1977-1

**TAB 1978**
1978 RESOLUTION (Finance) (January 23, 1978)                          1978-1

**TAB 1982**
1982 RESOLUTION (Finance) (December 15, 1982)                         1982-1
1982 STATEMENT OF POSITION ON TRADES FOR CASH
   (STATEMENT BY COMMISSIONER ROZELLE)                   1982-2

**TAB 1983**
1983 RESOLUTION (Finance) (May 25, 1983)                              1983-1
1983 RESOLUTION (Finance) (May 25, 1983)                              1983-2

**TAB 1984**
1984 RESOLUTION BC-5                                                  1984-1
1984 RESOLUTION (Finance) (March 19, 1984)                           1984-2
1984 RESOLUTION (Broadcasting) (March 23, 1984)                      1984-3
1984 RESOLUTION (Long Range Planning Committee) (May 23, 1984)       1984-4

**TAB 1985**
1985 RESOLUTION FC-7                                                  1985-1
1985 RESOLUTION FC-7 (Duplicate number)                              1985-2
1985 RESOLUTION G-2                                                   1985-3

**TAB 1987**
1987 RESOLUTION FC-1 (As Amended)                                    1987-1
1987 RESOLUTION FC-3                                                  1987-2
1987 RESOLUTION FC-7                                                  1987-3

**TAB 1988**
1988 RESOLUTION FC-2                                                  1988-1
1988 RESOLUTION FC-3 (As Amended)                                    1988-2
1988 RESOLUTION FC-5 (As Amended)                                    1988-3

**TAB 1989**
1989 RESOLUTION G-3                                                   1989-1

**TAB 1990**
1990 RESOLUTION FC-2                                                  1990-1
1990 RESOLUTION G-8                                                   1990-2
1990 RESOLUTION SM-1                                                  1990-3
1990 NFLNET MEMORANDUM, FEBRUARY 16, 1990
   (Special Draft Eligibility)                          1990-4

**TAB 1991**
1991 RESOLUTION G-1                                                   1991-1
1991 RESOLUTION G-10                                                  1991-2

| | |
|---|---|
| 1991 RESOLUTION SB-2 | 1991-3 |

**TAB 1993**

| | |
|---|---|
| 1993 RESOLUTION BC-2 | 1993-1 |
| 1993 RESOLUTION CEC-1 | 1993-2 |
| 1993 RESOLUTION FC-1 | 1993-3 |
| 1993 RESOLUTION FC-5 | 1993-6 |
| 1993 RESOLUTION IC-1 (As Amended) | 1993-7 |

**TAB 1994**

| | |
|---|---|
| 1994 RESOLUTION BC-4 | 1994-1 |
| 1994 RESOLUTION BC-6 (As Amended) | 1994-2 |
| 1994 CRITERIA FOR APPROVAL OF PREMIUM WAIVER | 1994-3 |

**TAB 1995**

| | |
|---|---|
| 1995 RESOLUTION G-4 | 1995-1 |
| 1995 RESOLUTION G-6 | 1995-4 |

**TAB 1996**

| | |
|---|---|
| 1996 RESOLUTION FC-1 | 1996-1 |
| 1996 RESOLUTION FC-5 | 1996-2 |
| 1996 RESOLUTION FC-6 | 1996-3 |
| 1996 RESOLUTION G-1 | 1996-5 |
| 1996 RESOLUTION G-4 | 1996-6 |

**TAB 1997**

| | |
|---|---|
| 1997 RESOLUTION FC-3 | 1997-1 |
| 1997 RESOLUTION FC-6 (As Amended) | 1997-3 |
| 1997 RESOLUTION JC-1 | 1997-4 |
| 1997 RESOLUTION NFLP-3 (As Amended) | 1997-5 |

**TAB 1998**

| | |
|---|---|
| 1998 RESOLUTION BC-1 | 1998-1 |
| 1998 RESOLUTION BC-2 | 1998-2 |
| 1998 RESOLUTION BC-4 | 1998-5 |
| 1998 RESOLUTION BC-5 | 1998-6 |
| 1998 RESOLUTION BC-6 (As Amended) | 1998-7 |
| 1998 RESOLUTION BC-7 | 1998-8 |
| 1998 RESOLUTION FC-2 | 1998-9 |
| 1998 RESOLUTION FC-3 | 1998-10 |
| 1998 RESOLUTION FC-9 | 1998-11 |
| 1998 RESOLUTION FC-10 | 1998-12 |
| 1998 RESOLUTION G-2 | 1998-13 |
| 1998 RESOLUTION SB-5 (As Amended) | 1998-14 |

**TAB 1999**

| | |
|---|---|
| 1999 RESOLUTION EC-1 (As Amended) | 1999-1 |
| 1999 RESOLUTION G-3 (As Amended) | 1999-2 |

**TAB 2000**
2000 RESOLUTION G1-B*                                       2000-1
2000 RESOLUTION G-3A                                        2000-3
2000 RESOLUTION G-8                                         2000-4
2000 RESOLUTION G-10                                        2000-5

**TAB 2001**
2001 RESOLUTION FC-4 (As Amended)                          2001-1
2001 RESOLUTION G-1 (As Amended)                           2001-2
2001 RESOLUTION G-4 (As Amended)                           2001-3
2001 RESOLUTION G-5 (As Amended)                           2001-7
2001 RESOLUTION JC-1 (As Amended)                          2001-8
2001 RESOLUTION JC-3 (As Amended)                          2001-14
2001 COMPETITION COMMITTEE POSITION ON
    TRADES FOR CASH                                        2001-15

**TAB 2002**
2002 BYLAW PROPOSAL NO. 6                                   2002-1
2002 RESOLUTION FC-12                                       2002-2
2002 RESOLUTION G-3 (As Amended)                           2002-3
2002 RESOLUTION G-6                                         2002-6
2002 RESOLUTION G-7                                         2002-8
2002 RESOLUTION MC-1                                        2002-10

**TAB 2003**
2003 RESOLUTION BC-1 (As Amended)                          2003-1
2003 RESOLUTION BC-2                                        2003-4
2003 RESOLUTION G-1                                         2003-5
2003 RESOLUTION IC-1 (As Amended)                          2003-6
2003 RESOLUTION JC-1 (As Amended)                          2003-7

**TAB 2004**
2004 RESOLUTION BC-3                                        2004-1
2004 RESOLUTION BC-4                                        2004-2
2004 RESOLUTION BV-4 (As Amended)                          2004-3
2004 RESOLUTION FC-1A (As Amended)                         2004-11
2004 RESOLUTION FC-2 (As Amended)                          2004-13
2004 RESOLUTION FC-7 (As Amended)                          2004-14
2004 RESOLUTION G-1 (As Amended)                           2004-15
2004 RESOLUTION JC-1A                                       2004-16
2004 RESOLUTION MC-1                                        2004-18

\* Presented in the Competition Committee report as Resolution G-IA; renamed
G-IB to reflect amendments by the Competition Committee before the start of the
Annual Meetings.

**TAB 2005**
| | |
|---|---|
| 2005 RESOLUTION BC-1 | 2005-1 |
| 2005 RESOLUTION BC-2 | 2005-2 |
| 2005 RESOLUTION BC-3 | 2005-3 |
| 2005 RESOLUTION BV-1 | 2005-4 |
| 2005 RESOLUTION FC-2 (As Amended) | 2005-6 |
| 2005 RESOLUTION G-3 | 2005-7 |
| 2005 RESOLUTION G-4 (As Amended) | 2005-8 |
| 2005 RESOLUTION MC-1 | 2005-10 |
| 2005 RESOLUTION MC-2 | 2005-11 |

**TAB 2006**
| | |
|---|---|
| 2006 RESOLUTION BC-1 | 2006-1 |
| 2006 RESOLUTION BC-3 | 2006-3 |
| 2006 RESOLUTION BC-4 | 2006-5 |
| 2006 RESOLUTION BV-1 | 2006-6 |
| 2006 RESOLUTION BV-2 | 2006-8 |
| 2006 RESOLUTION G-1 | 2006-9 |
| 2006 RESOLUTION MC-1 | 2006-9 |
| 2006 RESOLUTION G-3 | 2006-15 |

**TAB 2007**
| | |
|---|---|
| 2007 RESOLUTION BV-1 | 2007-1 |
| 2007 RESOLUTION BV-2 (As Amended) | 2007-2 |
| 2007 RESOLUTION DM-1 | 2007-3 |
| 2007 RESOLUTION FC-3 | 2007-4 |
| 2007 RESOLUTION G-1 | 2007-5 |
| 2007 RESOLUTION MC-1 | 2007-5 |
| 2007 RESOLUTION G-4A | 2007-8 |
| 2007 RESOLUTION G-5 | 2007-9 |
| 2007 RESOLUTION G-6 | 2007-10 |
| 2007 RESOLUTION G-9 | 2007-11 |
| 2007 RESOLUTION MC-2 | 2007-12 |

**TAB 2008**
| | |
|---|---|
| 2008 RESOLUTION FC-9 | 2008-1 |
| 2008 RESOLUTION FC-10 | 2008-3 |
| 2008 RESOLUTION G-8 | 2008-5 |
| 2008 RESOLUTION JC-1 Net | 2008-6 |
| 2008 RESOLUTION JC-1 | 2008-7 |
| 2008 RESOLUTION MC-3 | 2008-9 |
| 2008 RESOLUTION MC-4 | 2008-10 |

**TAB 2009**
| | |
|---|---|
| 2009 RESOLUTION BC-1 | 2009-1 |
| 2009 RESOLUTION BC-1A | 2009-2 |

| | |
|---|---|
| 2009 RESOLUTION BV-1 | 2009-3 |
| 2009 RESOLUTION FC-4 | 2009-7 |
| 2009 RESOLUTION FC-12 | 2009-9 |
| 2009 RESOLUTION G-1 | 2009-10 |

**TAB 2010**

| | |
|---|---|
| 2010 RESOLUTION DM-1 | 2010-1 |
| 2010 RESOLUTION FC-1 | 2010-2 |
| 2010 RESOLUTION JC-1 | 2010-4 |
| 2010 RESOLUTION BC-1 | 2010-5 |
| 2010 RESOLUTION BC-2 | 2010-6 |

**TAB 2011**

| | |
|---|---|
| 2011 RESOLUTION BC-1 | 2011-1 |
| 2011 RESOLUTION BC-2 | 2011-2 |
| 2011 RESOLUTION BC-3 | 2011-3 |
| 2011 RESOLUTION BV-1 | 2011-4 |
| 2011 RESOLUTION FC-3 | 2011-12 |
| 2011 RESOLUTION G-2 | 2011-14 |
| 2011 RESOLUTION G-4 | 2011-16 |
| 2011 RESOLUTION IC-1 | 2011-22 |
| 2011 RESOLUTION MC-1 | 2011-24 |
| 2011 RESOLUTION MC-2 | 2011-25 |
| 2011 RESOLUTION MC-3 & 2011 RESOLUTION G-1 | 2011-26 |

**TAB 2012**

| | |
|---|---|
| 2012 RESOLUTION BV-1 | 2012-1 |
| 2012 RESOLUTION DM-1 | 2012-2 |
| 2012 RESOLUTION FC-6 | 2012-3 |
| 2012 RESOLUTION G-2 | 2012-4 |
| 2012 RESOLUTION G-4 | 2012-7 |
| 2012 RESOLUTION G-6 | 2012-8 |
| 2012 RESOLUTION G-7 | 2012-9 |
| 2012 RESOLUTION IC-1 | 2012-10 |
| 2012 RESOLUTION JC-1 | 2012-11 |
| 2012 RESOLUTION MC-1 | 2012-13 |
| 2012 RESOLUTION MC-2 | 2012-14 |

**TAB 2013**

| | |
|---|---|
| 2013 RESOLUTION BC-1 | 2013-1 |
| 2013 RESOLUTION BV-1 | 2013-3 |
| 2013 RESOLUTION FC-3 | 2013-5 |
| 2013 RESOLUTION FC-7 | 2013-6 |
| 2013 RESOLUTION FC-9 | 2013-8 |

**TAB 2014**

| | |
|---|---|
| 2014 RESOLUTION BC-1 | 2014-1 |
| 2014 RESOLUTION BC-2 | 2014-3 |
| 2014 RESOLUTION BV-1 | 2014-4 |

| | |
|---|---|
| 2014 RESOLUTION BV-2 (As Amended) | 2014-6 |
| 2014 RESOLUTION DM-1 | 2014-7 |
| 2014 RESOLUTION FC-4 | 2014-8 |
| 2014 RESOLUTION FC-5 | 2014-9 |
| 2014 RESOLUTION G-2 | 2014-10 |
| 2014 RESOLUTION IC-1 | 2014-11 |
| 2014 RESOLUTION JC-4 | 2014-13 |
| 2014 RESOLUTION MC-3 | 2014-16 |

**TAB 2015**

| | |
|---|---|
| 2015 RESOLTUION BC-1 | 2015-1 |
| 2015 RESOLUTION BC-2 | 2015-2 |
| 2015 RESOLUTION FC-2 | 2015-3 |
| 2015 RESOLUTION FC-3 | 2015-4 |
| 2015 RESOLUTION FC-4 (As Amended) | 2015-7 |
| 2015 RESOLUTION FC-5 | 2015-14 |
| 2015 RESOLUTION G-3 | 2015-15 |
| 2015 RESOLUTION IC-1 | 2015-16 |
| 2015 RESOLUTION JC-1 | 2015-18 |
| 2015 RESOLUTION JC-4 | 2015-19 |
| 2015 RESOLUTION JC-5 | 2015-20 |
| 2015 RESOLUTION MC-1 | 2015-21 |
| 2015 RESOLUTION MC-2 | 2015-22 |

**TAB 2016**

| | |
|---|---|
| 2016 RESOLUTION BC-1 | 2016-1 |
| 2016 RESOLUTION BV-1 | 2016-4 |
| 2016 RESOLUTION BV-2 | 2016-6 |
| 2016 RESOLUTION FC-2 | 2016-7 |
| 2016 RESOLUTION G-2A | 2016-9 |
| 2016 RESOLUTION IC-1 | 2016-12 |
| 2016 RESOLUTION JC-1 | 2016-14 |
| 2016 RESOLUTION JC-5 | 2016-15 |
| 2016 COMPETITION COMMITTEE POSITION PAPER ON ANTI-TAMPERING | 2016-17 |

| | |
|---|---|
| **INDEX** | I-1 |

**1977 RESOLUTION (FINANCE)**
**(OCTOBER 13, 1977)**

*Resolved*, that the National Football League be hereby authorized to continue to receive network television revenues and postseason game proceeds as agent for and on behalf of the member clubs of the League and to disburse such funds on their behalf, without further action on their part, for the following purposes:

1. To pay on behalf of each of the member clubs to the Management Council from time to time those amounts necessary to satisfy the obligations of the clubs under the Stipulation and Settlement Agreement;

2. To make payments on behalf of each of the member clubs to the Player Insurance Trust and the Player Retirement Plan at such times and in such amounts as are necessary to satisfy the obligations of each member club as established in the 1977 Collective Bargaining Agreement and any future collective bargaining agreements. The clubs intend that, consistent with past practice, there shall be allocated to each club postseason game income in an amount equal to such club's share of the contribution to the Player Benefit Plan, so that the cost of the plans will be borne equally by each club (except that proper credit shall be given to Tampa Bay and Seattle for the pension contribution allocable to the 1974 and 1975 seasons); and

3. To meet expenses of postseason games.

All network television revenues and postseason game proceeds received hereunder by (the League treasurer) as agent for the member clubs which are not required for the foregoing purposes shall be promptly disbursed to the member clubs. This resolution shall remain in effect until amended or revoked by the member clubs of the National Football League.

**1978 RESOLUTION (FINANCE)**
**(JANUARY 23, 1978)**

*Resolved,* that commencing with the 1976 season:

(1) All postseason game revenues, from whatever source derived (including interest), shall be divided equally among the member clubs, and

(2) Each club shall be charged with its allocable share of contributions to the Player Retirement Plan and Player Insurance Trust, such allocable share to be determined in a manner consistent with past practice.

Further *Resolved,* that the October 13, 1977 resolutions regarding postseason game income are hereby superseded to the extent inconsistent with the foregoing resolution, and are otherwise reaffirmed.

**1982 RESOLUTION (FINANCE)**
**(DECEMBER 15, 1982)**

*Resolved,* that whenever a member club is delinquent with respect to one or more League or Management Council assessments and the League office, as agent for the clubs, is in receipt of funds attributable to the delinquent club's account, the Commissioner may authorize the Treasurer to apply such funds to eliminate or reduce the delinquent club's assessment liability.

**1982 STATEMENT OF POSITION ON TRADES FOR CASH**
**(STATEMENT BY COMMISSIONER ROZELLE)**

Commissioner Rozelle presented the following position on trades for cash, as
recorded in the meeting minutes of the March 1982 Annual Meeting of the
League:

-- Under his [Commissioner Rozelle's] responsibility to the Constitution,  all
member clubs should know that he would consider the sale of a draft choice or
draft choices for any amount of money as conduct detrimental to the League.  He
would void any such sale and disciplinary action could result.  The Commissioner
said he would view similarly sale of player contract rights for any significant sum.
He cited past approval of cash trades in the $100 to $5,000 range but cautioned
that larger cash transactions would not be accepted.

## 1983 RESOLUTION (FINANCE)
### (MAY 25, 1983)

*Resolved*, that the Treasurer of the National Football League be, and hereby is, authorized to deduct from postseason game revenues and the regular season network television advance rights payments each club's allocable share of payments to the Coaches' Pension Plan.

**1983 RESOLUTION (FINANCE)**
**(MAY 25, 1983)**

*Resolved,* that each club submit to the League office by June 15 of each year commencing with the year 1983 a current list of that club's ownership to include percent of ownership, and that such information be available to the League office for inspection by any person having an ownership interest in a National Football League club, <u>provided however that any application to inspect such information must be submitted by the club's representative on the Executive Committee to the Commissioner and must be approved by the Commissioner. Approval by the Commissioner shall not be unreasonably withheld.</u>

Green Bay, as a publicly-held corporation having in excess of 10 stockholders, is exempt from compliance with this resolution.

## 1984 RESOLUTION BC-5

*Resolved,* that it shall be League policy that, when preseason games are sold out 72 hours before kickoff and the home team wishes to offer a home telecast of the game, the consent of the visiting team for such home telecasts shall be considered automatically effective.

## 1984 RESOLUTION (FINANCE)
## (MARCH 19, 1984)

*Resolved,* that the Treasurer of the National Football League shall be and hereby is authorized and directed to charge interest at the then prevailing prime rate plus four percent to any club which is delinquent in any amount due and payable by such club to the League office and that such interest shall be charged to the delinquent club from the date the payment was due until the payment is made.

## 1984 RESOLUTION (BROADCASTING)
### (MARCH 23, 1984)

*Resolved,* that every club contract for the sale or transfer of its preseason game television rights shall include among its provisions the following:

Telecasting rights transferred pursuant to this contract are subject to the following limitations:

1.  No game shall be telecast into any area within the home territory of any other NFL club on a day when such other club is playing a game at home;

2.  No home game may be telecast or carried on tape delay on the day of the game within the home territory of the home club except with express written consent of the visiting club; and

3.  Each visiting club shall have the exclusive right to permit or license a telecast of the game being played back to the home territory of the visiting club.

No contract for the sale or transfer of preseason game telecasting rights shall be approved by the Commissioner unless the above provision is specifically included.

### 1984 RESOLUTION (LONG RANGE PLANNING COMMITTEE)
### (MAY 23, 1984)

*Resolved,* that from time to time the League shall have confidential Executive Session meetings. Club representatives in attendance at such sessions shall be a maximum of two per club, who shall be limited to (a) the principal owner of the club and (b) a key day-to-day business operating executive of the club; provided that the principal owner may designate, in place of either (a) or (b), a member of (a)'s immediate family.

Up to three such representatives shall be designated on an annual basis, in writing ten days in advance of the annual meeting, and these representatives shall not be altered for 12 months except in case of death or disability of any representative, change of club ownership or, in the case of a club employee, disassociation from the club involved.

In order to encourage involvement of principal owners, every effort will be made to schedule such meetings at predetermined times within the allocated meeting schedules.

**1985 RESOLUTION FC-7**

*Resolved,* that each club shall submit a certified audit report, together with such additional information necessary to complete the League-wide financial report, to the Treasurer of the NFL within one hundred twenty (120) days of that club's fiscal year end, and that failure to do so shall result in a League office imposed club fine of $5,000 for the first 10 days, and $1,000 per day for each day thereafter, and

Further *Resolved,* that the Treasurer will not disclose individual club data to other League or club personnel, or to the Management Council.

## 1985 RESOLUTION FC-7*

*Resolved,* that in considering proposed admission for or transfer of membership under Article III of the Constitution and Bylaws, the members shall not approve any admission of or transfer to any corporation or partnership unless a majority of the beneficial interest and voting rights in such corporation or partnership is vested in one individual, except as set forth below; and

Further *Resolved,* that a limited partnership may be approved for admission as a member or for transfer of membership provided that the controlling partnership agreements meet all of the following conditions.

a) there is one general partner who has at least 30% of the beneficial interest in the capital of the limited partnership;

b) there are no more than 15 limited partners or individuals with interests in limited partners;

c) complete management control is vested in the general partner, and no management rights may be exercised by any limited partner except matters required by law, such as limitations on the general partner's right to change the ownership interests of the limited partners, the right of the limited partners to have access to the books and records of the partnership, etc.;

d) the financial resources of the partners, to the extent available for partnership purposes, are adequate in the business judgment of the Executive Committee to meet all foreseeable debts and liabilities of the partnership;

e) any change in the general partner, admission or withdrawal of a limited partner, or transfer or redemption of a limited partnership interest is subject to the approval of the members of the League; and

Further *Resolved,* that nothing in this resolution in any way negates or supersedes any other policies on ownership that the membership may from time to time adopt or apply.

*Duplicate number

**1985 RESOLUTION G-2**

*Resolved,* that the Resolution and Guidelines for In-Stadium Giveaways that was adopted for 1984 only at the Recessed Session of the 1984 annual meeting be extended indefinitely.

_____

**REVISED GUIDELINES PROPOSED BY NFL PROPERTIES STAFF AND APPROVED BY THE NFL PROPERTIES EXECUTIVE COMMITTEE, MAY 25, 1984:**

A. Giveaway items must be fan-related, with souvenir take-home value; e.g., pom-pom, team photo, team poster, calendars, etc. Artificial noise-makers are prohibited.

B. Clubs may use any item on the Approved List issued by NFL Properties Executive Committee. The Club must clear in advance with NFL Properties any item not on the Approved List before it can be used as an in-stadium giveaway.

C. Clubs may not use any item on Prohibited List issued by NFL Properties Executive Committee.

D. Clubs must exercise quality control over giveaway items.

E. Corporate sponsorship of giveaways is encouraged, but any involvement must be controlled by the Club and licensed with Local Trademark Rights Agreement by NFL Properties (fee waived).

F. Advertising and promotional artwork and copy must be approved in advance by the Club and NFL Properties.

G. Six samples of each giveaway item used must be sent to NFL Properties within one week of the giveaway program.

Giveaways should be planned on a select basis, not every home game.

**1987 RESOLUTION FC-1**

**(AS AMENDED)**

*Resolved,* that any income in excess of the stated ticket price from the sale, leasing or licensing of seats or admission to any game, including club seats or other premium pricing but excluding box suites, is to be included in gross receipts of the game as defined in Article XIX, Section 19.1 of the Constitution and Bylaws; and

Further *Resolved,* that the Executive Committee, on recommendation by the Finance Committee, may approve the exclusion of any excess income described above by any individual club, to the extent and during the time that the excess income is dedicated to and used for financing construction, expansion or major refurbishing of a stadium; and

Further *Resolved,* that for purposes of the League's television blackout policy, unsold club seats or other premium seats will not be included in the manifest.

**1987 RESOLUTION FC-3**

*Resolved,* that for purposes of calculating gross gate receipts from postseason games, participating clubs must include 50% of all revenues above the stated ticket price from the licensing or rental of suites or other premium pricing (such as club seats) charged specifically for that game.

**1987 RESOLUTION FC-7**

*Resolved,* that any ticket handling or ticket service charge in excess of $4.00 per regular season ticket account or order constitutes gross receipts and is to be shared with the visiting team in accordance with established procedures.

**1988 RESOLUTION FC-2**

*Resolved,* that no club be permitted to withdraw amounts required to be on deposit in the deferred compensation fund except with the permission of the Executive Committee.

**1988 RESOLUTION FC-3**

**(AS AMENDED)**

*Resolved,* that effective March 31, 1988, each member club is prohibited from incurring more than $35 million of debt related to such club;

Further *Resolved,* that for purposes of this Resolution, debt includes any short term or long term liabilities of the club other than (a) accounts payable, accruals, and taxes which are incurred in the ordinary course of business and are not overdue or in default, and (b) liabilities for current or deferred compensation;

Further *Resolved,* that for purposes of this Resolution, debt includes any amounts similar to the above, and not already included above, incurred by the principal and/or controlling owner of the club, for which the assets, stock or ownership interest of the club is pledged or hypothecated;

Further *Resolved,* that any club in violation of this provision on March 31, 1988 shall be given five years to reach compliance, provided that the amount by which the club is in default declines in each year;

Further *Resolved,* that each club and each principal and/or controlling owner of the club shall report to the Treasurer of the NFL no later than July 31, 1988, the amount of its debt covered by this Resolution, and report annually thereafter within 120 days of the club's fiscal year end;

Further *Resolved,* that the Executive Committee, after consideration by the Finance Committee, be authorized to waive these restrictions to the extent necessary in appropriate circumstances; and

Further *Resolved,* that the Finance Committee will annually consider whether, in light of inflation and franchise values, this debt limitation should be increased, and will report to the Executive Committee.

**1988 RESOLUTION FC-5**

**(AS AMENDED)**

*Resolved,* that all financial terms of stadium leases or amendments thereto executed after this date must be reviewed by the Finance Committee and recommended to the Executive Committee for approval prior to execution by the club; and

Further *Resolved,* that for this purpose each club must submit copies of such leases or amendments to the League office at least thirty days prior to anticipated execution.

+ + + + +

**ADDENDUM TO FC-5:**

**FINANCE COMMITTEE
REPORT TO THE MEMBERSHIP
STADIUM LEASE ISSUES**

At last year's meeting, the membership approved a resolution which provides that clubs must share proceeds of club seats or other premium pricing with the visiting team, unless an exemption from sharing is approved by the Executive Committee upon recommendation of the Finance Committee. Exemptions may only be requested to the extent that the funds generated are used to service the financing for a new stadium or substantial rebuilding or remodeling.

In order to reach a recommendation on any requested exemption, the Finance Committee will consider a number of factors having to do with the overall balance of shared versus unshared revenue generated by football activities. In order to avoid situations in which commitments have been made which are later found unacceptable, the Committee recommends most strongly that clubs involved in leases for new or renovated stadiums contact the Committee well before the negotiations are completed.

Examples of lease or financing provisions which the Committee would expect to question closely are the following:

- An imbalance among the proportion of various categories of revenues (percentage rent, premium seating, suites, etc.) which are dedicated to repayment of the stadium financing.

- Surcharges. The Committee does not believe that any further surcharges are likely to be justifiable as deductions in computing visitors' share.

- Any provisions which have the effect of diverting funds from sales of tickets to booster groups, civic groups, etc.

- Attendance guarantees, except to the extent that any proceeds from such guarantees are committed to be shared with visiting teams.

- Provisions which provide for the club or a related entity to obtain equity in the stadium for little or no capital cost.

- Lease provisions applicable to postseason games which are more onerous than the provisions applicable to preseason or regular season games.

**1989 RESOLUTION G-3**

*Resolved,* that beginning with Super Bowl XXIV and forward, all NFL teams will report to the League office immediately before or immediately after the playing of the Super Bowl game their distribution of tickets to the game. The report is to take a form prescribed by the League office, but will include individuals, corporate affiliation and number of tickets issued; and

Further *Resolved,* that beginning with Super Bowl XXIV and forward the League office will prescribe a formula for the ticket distribution of the Super Bowl game host team(s) and participating teams. Under the current distribution formula, it will generally call for (based on 70,000 capacity):

— A minimum of 4,500 of the 7,000 tickets for the host team will go to season ticket holders. All other local needs will be the responsibility of the host team(s).

— A minimum of 10,500 of the 14,000 tickets for the participating teams will go to season ticket holders. All other local needs will be the responsibility of the participating teams.

— It is recommended that all other teams set aside a portion of no less than 10% of their Super Bowl game tickets to season ticket holders.

**1990 RESOLUTION FC-2**

*Resolved,* that each member club shall submit no later than May 31st of each year the results for its fiscal year covering the previous season and operating budgets for its next three fiscal years in a format to be prescribed by the Treasurer, and that the Treasurer aggregate these budgets and distribute them to the clubs in a format reflecting averages and groups of clubs;

Further *Resolved,* that the Treasurer shall not disclose individual club data to other NFL or club personnel; and

Further *Resolved,* that failure of a club to submit this data on a timely basis subjects the club to the same fines as failure to submit timely annual reports.

**1990 RESOLUTION G-8**

Amend existing three International Resolutions to read:

*Resolved,* that any international games—preseason, regular season or postseason—will be scheduled by and administered through the League office;

*Resolved,* that no member club will enter into negotiations for an international game without advance approval by the Commissioner. To insure proper promotion and staging of the games(s), no other NFL games will be played in the country or market of the American Bowl site(s); and

*Resolved,* that club selection and game arrangements, including game telecasting, will be under the control of the Commissioner. Club selection will be based on those clubs willing to participate.

**1990 RESOLUTION SM-1**

*Resolved,* that the following principles of operation are hereby approved and are to be implemented by the Commissioner:

1. That the labor-management relations function of the Management Council be brought under the direction of the Commissioner on the terms set forth in the accompanying Resolution unanimously recommended by the CEC.

2. That the Commissioner chair the boards of directors of NFL Films and NFL Properties in order to ensure consistency on policy matters and coordination among League organizations with respect to the implementation of such policies.

3. That the NFL's business operations and business development activities, including NFL Films and NFL Properties, be conducted on a coordinated and properly unified basis under the direction of the Commissioner.

**SPECIAL DRAFT ELIGIBILITY**
**POLICY AND PROCEDURE ANNOUNCED FEBRUARY 16, 1990**

1. Applications for special eligibility for the 1990 draft will be accepted only from college players as to whom three full college seasons have elapsed since their high school graduations.

2. Such applications must be filed with the League office prior to March 22, 1990, one month before the 1990 draft.

3. To be declared eligible for the 1990 draft, a player filing for special eligibility must include in his application an irrevocable renunciation of any further college football eligibility.

4. Players will not be permitted to elect to bypass the March 22 application date in order to seek eligibility for a later supplemental draft and no supplemental draft will be held to accommodate such an election.

**1991 RESOLUTION G-1**

   *Resolved,* that beginning with the 1992 preseason schedule and thereafter, each NFL club will be required to play two (2) preseason games at its home stadium. Any exception to this rule must be approved by the Commissioner; and

   Further *Resolved,* that while responsibility for scheduling preseason games will remain a club function, should a conflict still exist at the time of the October League Meeting, the Commissioner will be empowered to make any changes necessary to complete the preseason schedule so it can be presented to the membership for approval.

**1991 RESOLUTION G-10**

*Resolved,* that the teams participating in the annual preseason American Bowl series will be selected by the Commissioner by February 15 of the year in which the games will be played; and

Further *Resolved,* that each member club is obligated to participate in the series unless it can demonstrate a valid reason to the Commissioner why it should not participate.

**1991 RESOLUTION SB-2**

*Resolved,* that the voting procedures for selecting Super Bowl game sites be as follows:

1. All voting will be by secret ballot, the votes to be counted by Lamar Hunt and Wellington Mara, Conference Presidents.

2. All cities bidding will be eligible for the first vote.

3. If one city does not receive the necessary 21 or more affirmative votes on the first vote, the list of eligible cities will be reduced to the top three plus ties for third, or if there are not ties for third, all cities within one vote of third.

4. If after the second vote no city has received the necessary 21 or more votes, the list of eligible cities will be reduced to the top two and any ties.

5. There will be a maximum of one vote to achieve the necessary 21 or more votes for an award when the list is reduced to the top two and ties. If after one vote no award has been made, the requirement to be selected will be reduced to simple majority vote. Voting continues until an award is made.

6. At no time will actual numerical vote be revealed by the Conference Presidents unless directed to do so by the Commissioner.

7. Each award will be decided individually, except that the Commissioner may propose a multiple award if circumstances so dictate.

**1993 RESOLUTION BC-2**

*Resolved,* that neither Section 9.1(C)(6) nor any other provision of the Constitution and Bylaws prohibits a member club, or any broadcasting or other entity with which a club has a contractual relationship, from accepting advertising on club radio broadcasts, preseason telecasts, highlight shows or in game programs or stadiums, from any state or municipal lottery or off-track betting organization that does not offer any lottery or other betting scheme based on the outcome of or any performance in any NFL game or in any other actual sporting event; provided that such advertising shall not (a) in any way involve club, coach, player or other club employee affiliation with or endorsement of such lottery or off-track betting, nor (b) include promotion of any lottery game or betting scheme having a sports theme.

**1993 RESOLUTION CEC-1**

*Whereas,* by resolution dated September 10, 1987 (as modified by resolutions dated May 23, 1990, May 22, 1991, and November 5, 1992), the NFL Management Council established a contingency fund (the "Strike Fund") to provide loans to its member clubs in the event of a player strike; and

*Whereas,* the Management Council wishes, in light of the Stipulation and Settlement Agreement dated February 26, 1993, which significantly reduces the prospect of a player strike, to apply amounts in the Strike Fund to satisfy in part the clubs' payment obligations under Article XII of the Stipulation and Settlement Agreement, it is hereby

*Resolved,* that if the District Court approves the Stipulation and Settlement Agreement, and if such approval has not at that time been invalidated by the Court of Appeals, the Executive Director be, and he hereby is, authorized to take all necessary and appropriate actions, including the execution of documents and certification of instruments, to transfer from the Strike Fund to the "qualified settlement fund" to be created pursuant to Article XII of the Stipulation and Settlement Agreement the following amounts on the following dates:

a) $70,000,000 on April 26, 1993 or ten days after District Court approval of the Stipulation and Settlement Agreement, whichever is later, and

b) the balance remaining in the Strike Fund on October 15, 1993.

## 1993 RESOLUTION FC-1

*Resolved,* that the Finance Committee resolution dated March 22, 1982, amended October 23, 1984, and amended October 21, 1992, be further amended in the manner set forth below (new language underlined; deleted language struck over).

| | |
|---|---|
| Subject: | Finance (Deferred compensation reserve mechanism) |
| Date of Adoption: | March 22, 1982; amended October 23, 1984; amended October 21, 1992 |

*Resolved,* that the clubs establish a Deferred Compensation Reserve Mechanism in the form set forth in Exhibit A attached hereto (below);

Further *Resolved,* that each club prepare annually and submit to the League office the report and calculation described in Exhibit A;

Further *Resolved,* that the Treasurer of the League report at least annually to the Finance Committee the status of compliance by the member clubs with the provisions of Exhibit A;

Further *Resolved,* that the League, acting on behalf of the member clubs, establish a trust for the purpose of holding the funds deposited under the terms described in Exhibit A (with any officer of the League authorized to establish such trust);

Further *Resolved,* that the trustee described in Exhibit A be designated as Mercantile-Safe Deposit and Trust Company or such other trustee as the Finance Committee shall from time to time designate by instruction to the Treasurer;

Further *Resolved,* that the trustee, acting in consultation with or subject to an investment agent initially designated as Merrill Lynch Private Capital, Inc. or such other or additional investment agents as the Finance Committee shall from time to time designate by instruction to the Treasurer, be directed to invest the funds (or portions of the funds) in a manner consistent with the interest of the member clubs and subject to such limitations or restrictions as the Finance Committee shall from time to time determine as appropriate; and

Further *Resolved,* that the Finance Committee shall require the trustee to provide reports quarterly to the concerned clubs and the Finance Committee containing such information as the Finance Committee believes appropriate.

+ + + + +

**EXHIBIT A**

**DEFERRED COMPENSATION RESERVE MECHANISM**

1. Within 60 days of the measurement date (January 31 of each year), each club is to deposit with the trustee sufficient funds to bring its account with the trust to the balance calculated under paragraph (4) below.

2. In the transition years, the club will deposit no later than March 31, 1983, one-third of the amount calculated as of January 31, 1983, and at March 31, 1984. In subsequent years, the club will deposit 100% of the amount required.

3. Annual calculations required herein will be accompanied by a letter from the clubs' independent public accountants attesting to the accuracy of the calculation.

4. Calculation of the amount to be deposited shall be made as follows, and shall be set forth in reasonable detail in the report submitted:

   a) The club shall set forth the gross amount of deferred compensation payable at the measurement date, together with the amounts payable in each subsequent fiscal year ended January 31.

   b) The club shall deduct $1,000,000 from such gross amount of deferred compensation. The deduction shall be made from the earliest maturity first, and from successive years until the full deduction is claimed.

   c) The club shall calculate the present values, at the measurement date, of the remaining amounts payable, using ~~as~~ a discount rate ~~of 12%~~ the one year Treasury Bill rate as published in the Wall Street Journal on March 1st of each Year.

   d) The resultant sum of the present values is the amount that must be deposited with the trustee.

5. Each year, as soon as possible, the trustee shall advise each club of the total funds (at market value) standing to the club's credit, including accumulated fund earnings.

6. If a club reasonably anticipates that its funds on deposit are in excess of the amounts which will be required at the next measurement date, the club may upon certification to the League by a responsible officer of the club obtain refund of such excess.

7. In the event any club fails to make required deposits, the League may make the deposit on behalf of the club from any club funds to which the League has access.

8. Funds held on deposit will remain part of each club's general assets and will be subject to the claims of creditors.

9. Deferred compensation includes (a) any compensation unpaid as of March 31 following the measurement date, earned and vested for services already performed by any club employee, and (b) any unpaid compensation to players for past or future services under signed contracts, the liability for which cannot be terminated by action of the contracting club or its assignee (such as termination via waivers). Any deferred compensation payable at an indefinite date (e.g., commencing one year after retirement) is to be included in the calculation as though the employee retired at the end of the existing contract with options.

10. Deferred compensation to any employee may be reduced by the amounts of any loans to that same employee, to the extent that such loans are reasonably available to be offset against payment of the deferred compensation.

### 1993 RESOLUTION FC-5
### Primary Purpose Requirement

*Resolved,* that if any privately-held corporation, partnership, trust or other entity owns or operates, directly or indirectly, any substantial non-football business or assets and owns, directly or indirectly, an interest in or otherwise operates a member club, then:

(i) the member club shall be held in a separate corporation, partnership or trust (the "Football Company") the primary purpose of which shall at all times be and remain the operation of a professional football team as a member club of the League, which such primary purpose shall not be changed, and the only material asset of which shall be the member club;

(ii) the ownership interest in the Football Company shall be held directly by a holding company that shall have no operating business or material assets but only ownership interests in other entities, and the ownership interests in the holding company shall be owned directly by individuals (or certain trusts or partnerships approved by the Commissioner's Office); and

(iii) the Football Company and all individuals or entities holding a direct or indirect interest in the Football Company shall be subject to all of the League policies and requirements on ownership that the members may from time to time adopt or apply, including, without limitation, all reporting, audit, ownership and debt limitation requirements.

## 1993 RESOLUTION IC-1
## (AS AMENDED)

*Resolved,*

1. International Business Objectives

   A. That the League will continue to expand interest in the game, as appropriate, and coordinate programs to develop support for NFL football in international markets, including Canada, Mexico, Asia, and Europe;

   B. To accomplish the above, an NFL International Division will be established under a senior executive and with a business plan that integrates all existing and future elements that produce revenue and promote NFL football;

   C. This integrated business plan will include, but not be limited to, television, American Bowl series, licensing, a European-based league, sponsorships and grass roots development; and

   D. The International Division will form a joint venture with outside investors and committed sponsorship support to operate the European-based league, which is currently expected to commence its first season of play in 1995, subject to postponement by decision of the NFL or its representatives if economic conditions so dictate.

2. Termination of Existing WLAF

   A. The existing concept of a World League with a majority of teams in the United States and dependent on substantial North American television revenues will be discontinued in favor of a European-based league.

3. Business Plan and League Operations

   A. The International Division will develop a comprehensive business plan with full implementing documentation, including signed sponsorship, joint venture, investment and other agreements, all of which shall be reviewed and approved by both the Finance Committee and the International Committee;

   B. The business plan and implementing documentation will contain performance benchmarks and funding levels and timetables consistent with those presented to the membership at the 1993 Fall Recessed Meeting; and

C. Such plan, and a schedule for implementation of the plan, shall be delivered to the membership no later than the Spring Recessed Meeting in 1994.

## 1994 RESOLUTION BC-4

*Resolved,* that preseason contracts will be forwarded to the League office for Commissioner approval as follows:

Preseason game contracts by April 15. Any agreement between clubs for the home telecast (live or delayed) of a game must be in writing and forwarded to the League with the preseason game contract in question by the April 15 date.

Preseason television contracts by June 1. A copy of proposed preseason television contracts must be directed to the League office for initial review prior to the signing by the member club involved. Final, signed preseason television contracts will be forwarded to the League office for approval by the June 1 date.

Further *Resolved,* that club radio contracts will be forwarded to the League office for Commissioner approval as follows:

Radio contracts by June 1. A copy of proposed club radio contracts must be directed to the League office for initial review prior to the signing by the member club involved. Final, signed club radio contracts will be forwarded to the League office for approval by the June 1 date.

Further *Resolved,* that clubs will use standard preseason game, preseason television and club radio contracts provided by the League office when negotiating new or renewed contracts.

**1994 RESOLUTION BC-6**
**(AS AMENDED)**

*Resolved,*

1. that the Commissioner cause NFL Enterprises L.P. ("Enterprises") to be formed as a Delaware limited partnership, to be owned by each of the member clubs equally;

2. that the Commissioner will cause the formation of a Delaware corporation, to be owned by each of the member clubs equally, to act as general partner of Enterprises;

3. that the Commissioner be, and hereby is, authorized to cause direct or indirect equity interests in Enterprises to be issued to each of the member clubs for such consideration as he shall deem appropriate; and

4. that the Executive Committee of the NFL Enterprises partnership shall at all times consist of the same club representatives who comprise the League's Broadcasting Committee.

## 1994 CRITERIA FOR APPROVAL OF PREMIUM WAIVER

If a waiver of the requirement that the club seating premium be shared with the visiting team is requested under a stadium renovation plan, the following points must be met:

1. Each request for an exemption will be submitted to and must be approved by the membership, after review and consideration by the Finance Committee.

2. The maximum length of time for the exemption cannot exceed 12 years.

3. The total premium on the club seating, not just the visiting team share, must be used to finance renovation and/or amortize debt.

4. The percentage of club seats "waived" cannot exceed 20% of the total seating manifest.

5. The ticket price for a club seat must be as high as any other seat in the stadium. Further, VTS shall be calculated as if the average percentage price differential between the highest priced seats and the balance of the seats in the stadium that existed for the three years prior to the application's approval continues to exist.

6. For purposes of calculating VTS, any "premiums" that, in the period beginning five years after the project is commenced, are less than $250 per seat per season will be treated as ticket price increases subject to sharing.

7. VTS must increase in the first year of the project. In addition, once the waiver is granted, and so long as it is in effect, VTS attributable to the remaining seats in the stadium cannot be decreased.

8. Only projects that are directly related to stadium renovation and upgrading and that the requesting club can demonstrate will result in shamble revenue or other benefits to the visiting team will qualify for funding under the waiver. If non-qualifying projects such as practice facilities, team offices, luxury boxes, stadium clubs whose revenue is not shared with the visiting team, etc., are undertaken as part of a larger project that includes qualifying stadium renovation projects, the incremental cost of the non-qualifying projects must be borne by the team, whether or not any public funding is available for the project, with no VTS contribution.

9. The Finance Committee and the membership will consider plans that reflect departures from the above terms, but only if, during the waiver period, VTS is calculated as if those terms are in effect.

**1995 RESOLUTION G-4**

*Whereas,* the Los Angeles Rams have requested that they be allowed to relocate their home territory from Los Angeles to St. Louis and have submitted a Statement of Reasons in support of their request pursuant to the League's Procedures for Proposed Franchise Relocation (the "Procedures");

*Whereas,* the Executive Committee rejected the Rams' request on March 15, 1995, in light of the Commissioner's report that, on the terms presented, the Rams' proposed relocation was not justified by the specifically identified factors set forth in the League's Procedures;

*Whereas,* notwithstanding its earlier rejection of the proposed Rams relocation, the Executive Committee has determined that in light of all circumstances and factors relevant to the proposed relocation, it is in the best interests of the League, as a collective whole, for the Rams' proposed relocation to St. Louis to proceed immediately;

*Whereas,* the Executive Committee further believes that St. Louis is a strong venue for NFL football and will suitably serve as a League home city;

*Whereas,* the Executive Committee further believes that it must be an important objective of the League to reconstitute a strong NFC presence in the greater Los Angeles area as soon as possible; and

*Whereas,* the Executive Committee also wishes to establish the terms applicable to the Rams' relocation, including, without limitation, the amount and disposition of the franchise relocation fee payable by the Rams.

Therefore, Be It *Resolved,* that the proposed relocation of the Rams' home territory from Los Angeles to St. Louis be approved on the terms set forth in this Resolution, which terms require:

- The Rams to share, as "gross receipts" sharable under Article XIX of the League Constitution and Bylaws, revenues, as provided below, from the sale of certain Personal Seat Licenses that are required for the purchase of season tickets to Rams' home games in St. Louis. Of such PSL proceeds, $50.0 million have been determined to be sharable as "gross receipts," and the 34% portion of such funds to be shared is equal to $17.0 million. Such $17.0 million shall be paid to the League and distributed pro rata to the other 29 member clubs of the League or pooled, as the Executive Committee shall later determine. Such funds shall be paid in equal annual installments over the next fifteen years, with the first such installment to be paid within thirty days from the closing (the "Closing") of the transaction contemplated by that certain NFL Franchise Relocation Agreement dated as of January 17, 1995 (the "Relocation Agreement") and any subsequent installments to be paid annually on or before the anniversary date of the initial installment payment;

- The Rams to indemnify the other member clubs of the League for any rebate in the rights fees paid, or diminution in the rights fees to be paid, to the League in respect of any of the League's current television arrangements (for the years 1995-1997) caused by substitution of St. Louis for Los Angeles, subject to a "cap" on the aggregate amount payable by the Rams pursuant to this paragraph of $12.5 million, and further provided that such payment, in all events, shall not exceed 50% of the total rebate made or diminution suffered by the League. The Rams shall have the right to arbitrate, under procedures to be determined by agreement between the Rams and the League, whether any such rebate should have been made or diminution should have been agreed to and, if so, the appropriate amount of such rebate or diminution;

- Subject to and conditioned on the Closing, the Rams to pay to the League, for stadium trust fund purposes, for payment of NFL Charities, Inc., or for such other purposes as the Finance Committee may determine, a franchise relocation fee in an aggregate amount of $29 million to reflect the enhancement of the value of the Rams franchise resulting from the club's relocation to St. Louis, with an initial installment of $20 million to be paid in respect of such fee on or before November 15, 1995, and the balance of $9 million to be paid in equal installments over a 15-year period, with each installment to be paid on or before November 16 of the year due;

- The Rams to forgo their right to receive any portion of the fees or other consideration ("Fee") received by the League from the award of the next two clubs added to the League by expansion if such teams are added at any time within the next ten years; provided, however, the Rams shall fully participate in a Fee attributable to the award of an expansion club in the greater Los Angeles area if one of the next two expansion clubs is located within said area; and

- The Rams to recognize the League's right (a) to determine the start time of all St. Louis home games and (b) to determine the club's conference and divisional alignment, and in furtherance of such right to grant to the Commissioner an irrevocable proxy to vote on behalf of the Rams in connection with any realignment proposal;

Further *Resolved,* that the Executive Committee hereby reaffirms that, in light of the importance of a second greater Los Angeles area team to the League's television packages and to other interests of the League, after the Rams' relocation to St. Louis the League, as a collective whole, will own and control the second franchise opportunity in the greater Los Angeles area; that no club may appropriate such opportunity for itself without the consent of the Executive Committee, as required by Section 4.3 of the League Constitution and Bylaws; and that any further relocation of a member club to the greater Los Angeles area shall be conditioned upon the payment of an appropriate franchise enhancement fee and satisfaction of other terms (including terms consistent with those set forth

above) to be determined pursuant to procedures and/or criteria to be promulgated by the Commissioner; and

Further *Resolved,* that the visiting team share of all premiums charged by the Rams with respect to club seats in the new St. Louis domed stadium (which are sharable with visiting teams playing in the stadium pursuant to 1987 Resolution FC-1) shall be pooled in a League account for distribution in such manner as the Executive Committee may direct.

## 1995 RESOLUTION G-6

*Whereas,* the Executive Committee wishes to create a pool consisting of (1) the amount visiting teams would have received, absent this resolution, in respect of monies received, directly or indirectly, by any party, including any member club (a) in excess of the stated ticket price for any "club" or "premium" seat (other than seats in luxury suites) attributable to the sale, lease, or licensing for use of such seat, or (b) from any party's sale or issuance of any "permanent seat licenses" or other similar instruments that give purchasers the right to acquire tickets to NFL games (other than the Super Bowl game), and (2) any franchise enhancement, transfer, relocation, or similar fees or payments made by or in respect of any member club in connection with any geographic relocation of any NFL franchise (all such revenues, the "Pooled Revenues");

Be it *Resolved,* that all Pooled Revenues shall, from and after the adoption of this resolution, be required to be paid to an administered fund, which fund shall be distributed currently according to distribution standards to be adopted by the NFL Management Council Executive Committee, to member clubs with adjusted revenues (defined as gross revenues less aggregate amounts paid for stadium rent [not to exceed 15% of net gate receipts] and for locally-required player benefits) that are less than the League average (any such clubs, "Receiving Clubs");

Further *Resolved,* that the CEC shall consult with the Finance Committee of the League and shall annually circulate to the member clubs for comment its proposed distribution standards for each season before making any distribution from Pooled Revenues to any Receiving Clubs; and

Further *Resolved,* that the arrangements set forth herein for distribution of Pooled Revenues to Receiving Clubs are conclusively deemed by the membership to satisfy in full the requirement, set forth in Resolution MC-92-2 and CEC Resolution 93-1, that a revenue sharing plan be adopted as an interdependent component of the Management Council's adoption of the 1993 Collective Bargaining Agreement.

**1996 RESOLUTION FC-1**

*Whereas,* the Finance Committee has reviewed the League's current debt limit in light of numerous current economic factors and conditions, including recent changes in franchise values and current and foreseeable club revenue levels;

*Resolved,* that effective March 31, 1996, the amount of debt which each member club may incur, as described in 1988 Resolution FC-3 (which set the debt ceiling at $35 million and took effect on March 31, 1988), be raised from the current $40 million (at which the debt ceiling has been set since March 23, 1994) to $55 million; and

Further *Resolved,* that without limitation of the foregoing, the authorization for an incremental $10 million of debt in excess of club debt to be secured by the principal and/or controlling owner's interest in the franchise (as described in 1992 Resolution FC-1 and extended by 1994 Resolution FC-3) be repealed effective March 31, 1996;

Further *Resolved,* that effective March 31, 1996, no debt beyond the foregoing $55 million may be secured by any principal and/or controlling owner's interest in a franchise, but that both the assets of the member club and the principal and/or controlling owner's interest therein may be used as security for the foregoing $55 million in debt, in such proportions as the club and its principal and/or controlling owner may determine;

Further *Resolved,* that any debt of any principal and/or controlling owner of a club secured by such owner's interest in the club shall count towards such club's $55 million debt ceiling on a dollar-for-dollar basis;

Further *Resolved,* that each club shall be required annually to submit to the Treasurer an auditor's letter certifying that it is, and at all times during the previous year has been, in compliance with the debt ceiling at all levels; and

Further *Resolved,* that the Finance Committee will annually consider whether, in light of inflation, projected revenues, and franchise values, the overall club and/or controlling owner debt limitation should be further increased, and will report to the Executive Committee.

**1996 RESOLUTION FC-5**

*Whereas,* the Finance Committee has determined, in light of estate planning and similar issues, to relax to a limited extent the provisions of 1985 Resolution FC-7 that (1) restrict member clubs organized as limited partnerships to 15 limited partners and (2) require each person who holds a direct or indirect beneficial interest in the club to be counted as a limited partner for purpose of the restriction;

Be It *Resolved,* that member clubs organized as limited partnerships will continue to be required to have a single general partner controlled by an individual who has at least a 30% equity interest and total voting control of the general partner's and limited partnership's affairs (except for voting rights of limited partners required by law);

Further *Resolved,* that from the date of this resolution, up to a total of 25 persons may own direct or indirect interests in such clubs (including interests in the general partner of such a club); and

Further *Resolved,* that with respect to *family companies* and *family trusts* owning limited partnership interests in a member club, the following ownership attribution rules will apply for purposes of these ownership limitations:

> Family companies and family trusts shall count as a single "person" if:
>
> (1) members of a single family (a) own substantially all equity interests in the company, or (b) constitute substantially all of the trust beneficiaries, and
>
> (2) the only assets owned by the particular company or trust in addition to the NFL club interest are passive investment assets that are not used in an active trade or business (although a family company owning an interest in an NFL club may be a member of a group of companies structured in accordance with 1993 Resolution FC-5), and
>
> (3) in the case of a company, a single individual has voting control of such company (whether as general partner, equity holder, voting trustee under a trust containing provisions with respect to control, continuation, primacy of League policies, and trustee succession that are acceptable to the League, or proxy holder under irrevocable proxies in form and substance acceptable to the League), and in the case of a trust, a single individual acts as trustee under a trust agreement containing provisions with respect to control, trustee succession, primacy of League policies, and investment restrictions that are acceptable to the League.

## 1996 RESOLUTION FC-6

*Whereas,* the Finance Committee has determined that restrictions on the number of owners of NFL clubs that are organized as corporations should be adopted; and

*Whereas,* the Committee further believes that those restrictions should be comparable to those set forth in 1985 Resolution FC-7, as amended by 1996 Resolution FC-5, and that certain benefits afforded to the principal and/or controlling owner of a club organized as a limited partnership under 1985 Resolution FC-7 should also be extended to principal and/or controlling owners of clubs organized as corporations;

Be It *Resolved,* that from the date of this resolution, no more than a total of 25 persons may own direct or indirect interests in member clubs organized as corporations;

Further *Resolved,* that with respect to *family companies* and *family trusts* owning interests in a member club organized as a corporation, the following ownership attribution rules will apply for purposes of these ownership limitations:

> Family companies and family trusts shall count as a single "person" if:
>
> (1) members, of a single family (a) own substantially all equity interests in the company, or (b) constitute substantially all of the trust beneficiaries,
>
> (2) the only assets owned by the particular company or trust in addition to the NFL club interest are passive investment assets that are not used in an active trade or business (although a family company owning an interest in an NFL club may be a member of a group of companies structured in accordance with 1993 Resolution FC-5), and
>
> (3) in the case of a company, a single individual has voting control of such company (whether as general partner, equity holder, voting trustee under a trust containing provisions with respect to control, continuation, primacy of League policies, and trustee succession that are acceptable to the League, or proxy holder under irrevocable proxies in form and substance acceptable to the League), and in the case of a trust, a single individual acts as trustee under a trust agreement containing provisions with respect to control, trustee succession, primacy of League policies, and investment restrictions that are acceptable to the League;

Further *Resolved,* that if an NFL club is owned by a privately held corporation that has multiple classes of stock, one of which possesses full voting power and the others of which possess voting power only to the extent required by applicable corporate law, the principal and/or controlling owner shall only be required to

have a 30% equity interest in the corporation if such principal and/or controlling owner owns all of the voting stock of the corporation and is not subject to contractual or other restrictions on his ability to vote such stock;

Further *Resolved,* that if an NFL club is owned by a privately held corporation other than one described above, there shall be a single individual (or League-approved voting trust or family holding company) who owns at least 51% of the stock and controls at least 51% of the voting power of such corporation; and

Further *Resolved,* that any NFL club owned by any corporation that is not in compliance with this resolution as of the date of its passage shall come into compliance with this resolution no later than December 31, 1997.

**1996 RESOLUTION G-1**

*Resolved,* that the recommended settlement among the Cleveland Browns franchise, the City of Cleveland, the Maryland Stadium Authority, Art Modell, and the League described to the membership and reflected in binding letter agreements dated February 8, 1996 between the League, Cleveland, Art Modell, and the MSA, is hereby approved;

Further *Resolved,* that pursuant to the settlement Art Modell (or a franchise entity controlled by Art Modell) will become the operator of an NFL franchise in Baltimore effective in the 1996 NFL season (to operate with current Browns personnel under a new name approved by the League); will make a $29 million payment to the League (with an initial payment of $20 million and the balance in 10 equal annual installments); will pay 34% of all Baltimore PSL revenues into the League revenue sharing pool in equal payments over a 15-year period; and will transfer the Cleveland Browns name, logo, trademarks, heritage, history and memorabilia to the Commissioner in trust, for assignment to an NFL franchise designated by decision of the League's membership to begin play in Cleveland in the 1999 League season;

Further *Resolved,* that pursuant to the settlement the League will commit that a franchise (either an existing or expansion franchise, to be determined in 1998 or 1999) will resume play in Cleveland as the Browns upon completion to the League's satisfaction of a new stadium in 1999; and the League will advance up to $48 million in construction funds to Cleveland for the new stadium (promised upon satisfactory premium seat sales, execution by the City of a lease on the terms of its November 8, 1995 proposal to the Browns, and public and business community commitment of at least $192 million in construction funds for the stadium), to be repaid to the League by the club beginning play in Cleveland in 1999; and

Further *Resolved,* that the settlement shall be embodied in documents satisfactory to the Commissioner and the Stadium and Finance Committees, and shall be conditioned upon mutual general releases and waivers of all litigation claims by all involved parties.

### 1996 RESOLUTION G-4

*Whereas,* on February 7, 1996, the Houston Oilers formally advised the Commissioner of their desire to relocate their home territory from Houston, Texas, to Nashville, Tennessee, and made a submission in support of the proposed relocation, as contemplated by the League's Procedures for Proposed Franchise Relocations (the "Procedures"); and

*Whereas,* the Executive Committee has determined that in light of all circumstances and factors relevant to the permanent relocation of the Oilers' home territory to Nashville, it is in the best interests of the League, as a collective whole, for such relocation to be approved, notwithstanding that it may be necessary for the Oilers to play in Houston and/or Memphis during the 1996 and 1997 seasons (and possibly the 1998 season) in light of the terms of the Oilers' lease for the Houston Astrodome and the construction schedule for the proposed new stadium to be built for the Oilers in Nashville; and

*Whereas,* the Executive Committee now wishes to establish the terms applicable to the permanent relocation of the Oilers' home territory to Nashville;

Be It *Resolved,* that the permanent relocation of the Oilers' home territory from Houston to Nashville (the "Relocation") be approved on the terms and subject to the conditions set forth in this Resolution;

Further *Resolved,* that in connection with the Relocation, the Oilers shall pay a franchise relocation fee in an aggregate amount of $20 million to reflect the enhancement in value of the Oilers franchise resulting from the club's relocation to Nashville, to be paid on or before October 1, 1998. In addition, the Oilers shall pay, at such times and in such manner as directed by the Commissioner, up to $5 million to visiting teams which played in Houston in 1995 and which play in Houston or Memphis at any time before the club's new stadium in Nashville is completed, in such amount(s) as may be necessary in order to ensure that the visiting clubs receive visiting team shares in respect of their games at Houston or Memphis that, on average, are at least equal to $542,000 (the average visiting team share paid by the Oilers over the 1992 through 1994 seasons);

Further *Resolved,* that consistent with established League practice, any revenues received from the sale of Permanent Seat Licenses or club seats that are invested in construction of the new Nashville stadium shall not be subject to sharing in accordance with established criteria and upon final approval by the Finance Committee;

Further *Resolved,* that in connection with the Relocation, the Oilers shall grant to the Commissioner an irrevocable proxy to vote on behalf of the Oilers in connection with any realignment proposal;

Further *Resolved,* that the approval granted hereby shall be automatically voided, and of no force and effect, if either:

• Davidson County voters fail to approve the proposed Oilers relocation in the referendum to be held on May 7, 1996; or

• Federal legislation applicable to the Relocation shall be enacted during the 104th Congress, which legislation would require the League to grant an expansion franchise to any investor on any basis that is "forced" or that involves any term, including a requirement to expand the League, that is not willingly agreed to by the League and its member clubs. The Commissioner shall have the authority to deem this condition satisfied upon the adjournment of the 104th Congress; and

Further *Resolved,* that the approval granted hereby shall be embodied in documents satisfactory to the Commissioner and to the Finance Committee, which shall include general litigation releases from the Oilers and all of their affiliates and from the Nashville parties.

## 1997 RESOLUTION FC-3

*Whereas,* the membership desires to strengthen and improve the League's existing ownership policies;

*Whereas,* the membership desires to retain and reaffirm the traditional role of individual locally-based ownership; and

*Whereas,* the membership also desires to reaffirm and strengthen the right and duty of the membership carefully to review and approve proposed changes in club ownership;

Be it *Resolved,* as follows:

1. That the controlling owner of an NFL club may acquire an interest in a major league baseball, basketball or hockey ("other major sports league") franchise (subject to prior notice to the Commissioner and to such covenants and safeguards as the Commissioner and Finance Committee may determine are appropriate to address actual or perceived conflicts of interest that may arise in the particular situation), but only if such other franchise is located (1) within the home territory of the owner's NFL club, or (2) within a neutral area, i.e., any area that is not within the home territory of any NFL club;

2. That the controlling owner of an NFL club may propose to sell his NFL ownership interest to an individual owner of a franchise in another major sports league, but only if (a) the other major sports league franchise is located within the home territory of the owner's NFL club or within a neutral territory, (b) the NFL owner has given advance notice to the Commissioner of his consideration of such a sale and has advised the Commissioner of his reasons for believing the proposed cross-ownership to be appropriate, and (c) the Commissioner and the Finance Committee have investigated the situation in accordance with criteria and procedures to be established by them to address actual or perceived conflicts of interest or other circumstances relevant to the particular situation, and have determined that the relative balance of the asserted benefits and disadvantages of cross-ownership in the particular situation (including the existence or absence of other possible purchasers of the controlling NFL interest) make it appropriate for the NFL owner to proceed to negotiate the proposed sale and to submit it for Executive Committee approval;

3. That any sale of a controlling interest in an NFL club to an owner of another major league sports franchise shall, after negotiation of a sale agreement, be submitted for consideration to the Executive Committee as required by the League's standard procedures, and shall require the approval of three-quarters of the membership;

4. That any cross-owner of an NFL club shall own and operate such NFL club in compliance with the terms of all NFL ownership, debt ceiling, and other policies applicable to the ownership or operation of an NFL club, and such safeguards or covenants as the Commissioner and Finance Committee may determine are appropriate to the particular situation;

5. That in order to ensure compliance with the NFL Constitution and Bylaws, the Collective Bargaining Agreement, and other NFL policies and agreements and to avoid potential conflicts of interest and the appearance thereof, the Commissioner will annually conduct audits, as appropriate, of any cross-owned NFL club and/or affiliated entities of such NFL club, and will have the authority to review, as appropriate, any contracts of any cross-owned NFL club or affiliated entity based upon the Commissioner's determination that reasonable cause exists to review such contracts for the reasons set forth above, and may impose sanctions pursuant to his authority under the Constitution and Bylaws; and

6. That for purposes of this resolution the "home territories" described above shall include each home territory in which a club is currently playing (which, as of the date of this resolution, includes Houston) as well as the areas that would constitute the home territories of clubs playing in Cleveland, greater Los Angeles (including Orange County), Nashville, and Memphis.

Further *Resolved,* that any person designated as an appointee or alternate under Article VI of the Constitution and Bylaws may not serve in that capacity if disapproved by the Commissioner and Finance Committee for any reason. This paragraph shall not apply to any current owner of an interest of an NFL club unless that club is or becomes commonly owned with another major sports league franchise.

## 1997 RESOLUTION FC-6
### (AS AMENDED)

*Resolved,* that if any member club or any entity controlled by any direct or indirect owner of an interest in a member club (a "Claiming Party"), initiates, joins, has a direct, football-related financial interest in, or offers substantial assistance to any lawsuit or other legal, regulatory, or administrative proceeding ("Claim") against the League, any affiliated League entity (including, without limitation, NFL Enterprises, NFL Films, or NFL Properties), a majority of the other member clubs, or any other member club(s) on a basis that the Commissioner determines is generally applicable to a majority of clubs, or any director, officer, or employee of any such entity (a "League Affiliate") (including any suit purportedly filed on behalf of the League or any League Affiliate), each Claiming Party shall be obligated jointly and severally to reimburse the League and/or each such League Affiliate for all of such party's legal fees, litigation expenses, and costs incurred in such Claim if the Claiming Party (or the third party that received substantial assistance from the Claiming Party, or in whose Claim the Claiming Party has a direct, football-related financial Interest) does not obtain a judgment on the merits which substantially achieves, in substance and amount, the remedy sought;

Further *Resolved,* that the Commissioner or his designee, following notice and an opportunity for the Claiming Party to be heard, shall determine the amount of said legal fees, litigation expenses, and costs, and such determination shall be final and binding;

Further *Resolved,* that the Commissioner shall have authority to make a special League assessment equal to said amount against the Claiming Party and to make payments from said assessments to each League Affiliate entitled to receive them;

Further *Resolved,* that this resolution shall apply to all future claims, but shall not require payment to the League or any League Affiliate of its legal fees, litigation expenses, or costs in the event of (i) a negotiated settlement of any such Claim; or (ii) in any case brought under Section 8.3 of the Constitution and Bylaws or any similar method of internal dispute resolution; or (iii) in any claim brought by a non-football entity controlled by a direct or indirect owner where the Claim does not address business practices of the League or of a League Affiliate in a way generally applicable to all clubs; and

Further *Resolved,* that the other powers of the Commissioner and/or Executive Committee that may be applicable to such a Claim under the NFL Constitution and Bylaws (e.g., the power to make a determination as to conduct detrimental and to impose penalties for such conduct) are not affected by this Resolution.

### 1997 RESOLUTION JC-1

*Whereas,* the NFL Employee Benefit Committee and the NFL Finance Committee have considered certain issues concerning club policy to provide employee group medical benefits;

*Resolved,* that effective April 1, 1997, the NFL clubs' group medical plans will provide coverage for new employees transferring from other NFL clubs and League entities, as of the date of hire, and will further provide that no limitations for pre-existing conditions for the new employee and his dependents may be applied; and

Further *Resolved,* that medical insurance be extended until age 65 for employees (and for their dependents) who have 15 years of pension credited service and who are eligible for early retirement (age 55) when they leave NFL football, subject to the following conditions:

- The employee must have a Credited Season for the 1996 or later NFL season.

- The employee will participate in the plan of the club from which he retires, under the same terms, including any required employee contribution, as active employees.

- The employee must make a contribution at least equal to 20 percent of the cost of coverage.

- The net cost after employee contributions will be paid by the club from which the employee retires.

- The club's obligation ends when the employee becomes eligible for Medicare or another employer group medical plan, or attains age 65.

## 1997 RESOLUTION NFLP-3
## (AS AMENDED)

*Whereas,* the member clubs of the NFL have determined that, in order to promote the primary business of the member clubs (professional football), it is necessary and appropriate to form, on a League-wide coordinated basis, a venture to create and operate location-based entertainment ("LBE") venues with an NFL theme (the "Venture");

*Whereas,* the LBE venues will include interactive entertainment, other entertainment, retail, NFL memorabilia, and food service, and will both foster fan interest in the NFL and create a new and separate source of revenues not derived from NFL games; and

*Whereas,* the member clubs now wish to authorize and direct the formation of one or more entities to engage in this new Venture;

Be it *Resolved,* that the Commissioner, with the concurrence of the NFLP Executive Committee and the Finance Committee, is hereby authorized and directed to cause the formation of a limited partnership, to be named NFL Attractions, L.P. or such other name as he may determine (the "Partnership"), to be owned in equal shares by all NFL member clubs, with a sole general partner owned in equal shares by each of the member clubs (the "General Partner");

Further *Resolved,* that the initial board of directors shall be Roger Headrick, Wayne Weaver, Robert Tisch, Jerry Richardson and Pat Bowlen, as representatives of the NFL Properties Executive Committee, the Finance Committee, the Stadium Committee, and the Broadcasting Committee respectively;

Further *Resolved,* that the General Partner shall, under the control of its Board of Directors, negotiate and enter into a joint venture agreement with St. Joe Corporation on the terms generally presented to the member clubs on December 9, 1997 with such changes therein as the Board of Directors and the officers of the General Partner negotiating the same shall deem reasonable or appropriate (with the General Partner's execution of the same to be conclusive proof of the acceptability of the same);

Further *Resolved,* that the Board of Directors of the General Partner shall have full authority to approve any and all joint venture agreements and to designate the Partnership's representatives on the joint venture board;

Further *Resolved,* that if the Board of Directors of the General Partner elects not to proceed with a joint venture with St. Joe Corporation, it may cause the Partnership to pursue the Venture with another joint venture partner on such terms and conditions as the Board may deem reasonable or appropriate;

Further *Resolved,* that the member clubs hereby acknowledge that proper implementation of the Venture will require long-term licenses for NFL and club marks, logos, film, and other rights, in order to assure that this new business venture can operate successfully for a long period of time, and accordingly the member clubs recognize the importance to the Venture, and approve the grant, of appropriate long-term licenses for such marks, logos, film and other rights by NFL Properties, Inc., NFL Films, Inc., and NFL Enterprises L.P. to be used solely in connection with this Venture; and

Further *Resolved,* that each member club will cooperate as reasonably requested with the Partnership and the joint venture in implementing and carrying out the business plan related to the Venture.

**1998 RESOLUTION BC-1**

*Resolved,* that the membership hereby approves the eight-year television contracts with ABC, ESPN, CBS, and FOX, covering all NFL regular season and postseason games, the Hall of Fame game, and no less than 10 other preseason games each year, for the 1998 through 2005 seasons;

Further *Resolved,* that the League will implement the television agreements with these organizations through scheduling, game length, overall cooperation, and preseason policies described to the membership and comparable to those in effect from 1994-97, with 16 games played over 17 weeks each season, with one bye week for each team each season; and

Further *Resolved,* that each team participating in a nationally-televised preseason game (other than the Hall of Fame game) will receive $400,000 for its participation in such game, and that all other television income will be divided equally pursuant to the Constitution and Bylaws.

## 1998 RESOLUTION BC-2

*Resolved,* that member clubs will cooperate fully with the television networks (ABC, CBS, ESPN and FOX) in order to present NFL football on television in the most professional manner. Such cooperation will include, but not be limited to, the following areas:

1. GAME PREPARATION

   • Making previous game tapes available to TV announcers for viewing.

   • Allowing network personnel (defined as the producer, director and game announcers) reasonable access at practice one or two days before a game, at the network's option.

   • Making players/coaches available, either the day before a game, or on game day, for interviews or other pre-taping when it does not interfere with standard club operations or practices.

   • Supplying a fresh set of head shots including all players, the head coach, general manager and principal owner(s) by July 15 of each season to NFL Films for distribution to the networks.

2. GAME COVERAGE

   • Making available, if asked, a key player from the winning team for a brief interview with the telecasting network immediately following the game.

   • Strictly adhering to League policy regarding the six-foot white border and the yellow restraining line, and agreeing to an expanded secondary border area that will allow special access for network television.

   • Making available accurate injury information as quickly as possible to the network during a game.

   • Strictly adhering to game time schedules.

   • Properly maintaining and operating referee wireless equipment (which includes a complete back-up set).

   • Allowing the use of a sideline camera cart or carts on both sides at the field.

   • Providing acceptable low end zone camera locations.

- Allowing hand-held crews to shoot from approved locations outside of the yellow restraining line, including behind team bench areas.

- Providing two individuals on the sidelines whose primary assignment will be TV liaison. One person, which both the home team (every home game) and visiting team (optional) should supply, will assure that the network's field camera crews and field reporter(s) have access to primary allowable areas from which to shoot and/or report. The second individual (the NFL Sideline Coordinator), approved by the League office, will wear a Green Hat and will serve as direct liaison with the network's sideline coordinator (Orange Sleeves). These two individuals will serve as representatives of each club's P.R. Director and the League on applicable matters. They must be present at the pre-game officials meeting 1:30 before kickoff.

3. SCHEDULING

- Making every effort to maximize stadium availability for scheduling purposes.

- Agreeing, with proper notice, to switch regular season games from 1:00 to 4:00 p.m. (Eastern Time) to accommodate television broadcasting patterns.

- Agreeing to cooperate fully with League office on finalization of the network preseason game packages.

4. NEW/RENOVATED STADIUMS

- Providing minimum broadcasting requirements in new or remodeled stadiums, including

  - Locating the TV booth at 50-yard line between 40 and 80 feet above field with minimum width of 20 feet.

  - Positioning primary elevated coverage cameras on TV booth side between 19 and 27 degrees (to near sideline) with standing positions and unobstructed views.

  - Locating high end zone camera positions between 24 degrees and 36 degrees to back of each end zone.

  - Having available at least five radio/preseason TV booths.

  - Guaranteeing NFL Films two elevated camera locations at approximately the 50-yard line.

5. NETWORK ADVERTISER/SPONSOR SUPPORT

- Making a reasonable number of game tickets available to the networks. If requested, the minimum number for FOX and CBS will be 10 season tickets, or 24 tickets to any specific game telecast by either network. If requested, each club should also make 50 tickets available to FOX and CBS for at least one game per season (game or games selected by the network). If requested, the minimum for ABC will be 175 tickets per each game telecast. If requested, the minimum for ESPN will be 100 tickets per each game telecast. Regarding individual game ticket allocations other than season tickets, at least 20 tickets, in groups of two or more, will be located between the 30-yard lines and with elevation. If requested, up to 24 tickets per game will be provided to our national radio partner—currently CBS Radio—for games it broadcasts.

- Allowing the applicable television network to place appropriate signs/banners on end zone walls or on field level walls across the field from camera locations so that they may be shown on the telecast that has been purchased by the network. Conversely, clubs will not allow local radio/television stations or any other commercial identifications via signs/banners on end zone walls or on field level walls across from network camera locations or on the field surface, including sideline areas, so that television networks will be forced to show such commercial signage as part of their telecasts and therefore provide free television time. Stadium names with commercial tie-ins also are prohibited from being placed in these restricted areas.

- Agreeing not to cooperate in any way with local television shows that would air at the same time as FOX and CBS pregame shows, or against any network game telecast.

**1998 RESOLUTION BC-4**

*Resolved,* that the Commissioner will apply the following policies in preparing the official League regular season schedule:

1. The scheduling of all Sunday games and late season Saturday games remains at the discretion of the League office.

2. The following scheduling provisions will apply to the Monday Night Football Package:

   a) Maximum of three appearances per club.

   b) If a club is scheduled three times, two of the three games will be scheduled home or away, unless prior permission is received from the club.

   c) If a club is scheduled twice, both games may be scheduled at home, both games may be scheduled away, or one game may be scheduled at home and one away.

   d) If a club is scheduled once, the game may be scheduled home or away.

3. No club will be asked to make more than one appearance per season in games scheduled on dates other than Saturday, Sunday or Monday, i.e. Thanksgiving Day games or other Thursday games that would result in a team having less than a full week of preparation time both before and after the game.

## 1998 RESOLUTION BC-5

*Resolved,* that teams will cooperate fully with the League office on the finalization of the network preseason game package (11 game minimum, HOF game included);

Further *Resolved,* that teams are obligated to play a minimum of two network preseason games, if asked (HOF game and other international "extra" games not included) and understand that there may be specific instances when additional games are required;

Further *Resolved,* that teams will agree to play preseason games on nights other than Saturday (two Monday night games, and one or more Thursday, Friday and Sunday night games will be required at minimum);

Further *Resolved,* that teams will agree to play daytime preseason games as required by our network agreements;

Further *Resolved,* that teams understand that their local stations give up all rights, including tape delay to games selected for the network preseason game package. (Television patterns will be the same as in the regular season); and

Further *Resolved,* that League office decisions on the preseason schedule will be final and binding on the member clubs with such decisions to be made in the collective best interest of the teams and the League.

## 1998 RESOLUTION BC-6
## (AS AMENDED)

*Resolved,* insofar as the annual AFC/NFC Hall of Fame game will be moved to Prime Time in order to secure better television exposure of the game, the Commissioner shall have the authority to designate the participants on an annual basis, beginning in 1999. One participating team shall be selected from the American Football Conference, and the other participating team shall be selected from the National Football Conference, provided that no team shall be required to play more than once in any seven year period.

**1998 RESOLUTION BC-7**

*Resolved,* that beginning with the 1998 season, the League shall pay $500,000 per game to each team participating in a nationally televised preseason game (other than the Hall of Fame game).

## 1998 RESOLUTION FC-2

*Whereas,* the Finance Committee has reviewed the League's current debt limit in light of numerous economic factors and conditions, including franchise values and current and foreseeable club revenue levels;

Be it *Resolved,* that effective April 1, 1998:

1.  The amount of debt which each member club may incur (as defined and described in 1988 Resolution FC-3) shall be raised from the current $55 million to $75 million;

2.  Subject to Paragraph 3 below, such debt may be secured by or a liability of either the member club or its principal or controlling owner, as permitted under 1996 Resolution FC-1; and

3.  If more than $20 million of such $75 million in debt is secured by any direct or indirect interest of the principal or controlling owner of a club or a liability of such principal or controlling owner (whether directly or by way of guaranty or other surety), then all amounts of such debt in excess of such $20 million shall be secured by a pledge of substantially all of the member club's assets in addition to any pledges or other security given by the principal or controlling owner in respect of such amounts; and

Further *Resolved,* that the Finance Committee will annually consider whether, in light of inflation, projected revenues, and franchise values, the overall debt limitation should be further increased beyond the aggregate $75 million allowed under this resolution, and will report to the Executive Committee.

**1998 RESOLUTION FC-3**

*Whereas,* the League has undertaken a coordinated international development effort through NFL International, which is operated as a part of NFL Enterprises L.P.; and

*Whereas,* the Finance Committee, in consultation with the International Committee, has determined that it is appropriate and in the League's long-term interest to dedicate on an ongoing basis an amount equal to the League's international television revenues to the funding of NFL International's business operations;

Be it *Resolved,* that in the current League fiscal year and in all League fiscal years until this resolution is repealed, the Treasurer is authorized and directed to pay from the Agency Account to NFL Enterprises L.P. an amount equal to the League's international television revenues for such League fiscal year;

Further *Resolved,* that such payment shall be deemed an additional capital contribution made equally by all member clubs to NFL Enterprises L.P.; and

Further *Resolved,* that such additional capital contribution shall be used exclusively to fund the international development effort to be conducted by NFL International.

## 1998 RESOLUTION FC-9

*Whereas,* the Finance Committee has reviewed the League's current debt limit in light of numerous economic factors and conditions, including franchise values and current and foreseeable club revenue levels;

Be it *Resolved,* that effective August 1, 1998:

1. The amount of debt which each member club may incur (as defined and described in 1988 Resolution FC-3) shall be raised from the current $75 million to $100 million;

2. Subject to Paragraph 3 below, such debt may be secured by or a liability of either the member club or its principal or controlling owner, as permitted under 1996 Resolution FC-1;

3. The level at which 1998 Resolution FC-2 requires club-related liabilities of the principal or controlling owner (including obligations secured by his interest in his club) also to be secured by a pledge of club assets shall be increased from $20 million to $25 million; and

4. In connection with any acquisition of a member club or any controlling interest therein, the principal and/or controlling owner shall be required to invest equity (cash on hand or funds borrowed against other current or determinable future assets of such owner) in a minimum amount to be determined by the Finance Committee, and no acquisition transaction that the Finance Committee finds to be excessively leveraged shall be recommended by the Finance Committee for membership approval; and

Further *Resolved,* that the Finance Committee will consider at the March 1999 League meeting, and annually thereafter, whether, in light of inflation, projected revenues, and franchise values, the overall debt limitation should be further increased beyond the aggregate $100 million allowed under this resolution, and will report to the Executive Committee.

## 1998 RESOLUTION FC-10

*Whereas,* several owners have sought to utilize limited liability companies ("LLCs") in their club ownership structures in order to take advantage of LLCs' favorable tax characteristics and flexible structure; and

*Whereas,* the membership has determined that, in certain circumstances, the League's ownership policies may be adequately served and protected through the use of LLCs;

Be it *Resolved,* that a member club may be organized as an LLC, provided that it has a single controlling member (which may be an individual, or an entity that is wholly owned by a single individual with complete voting control thereof) with at least a 30% equity interest in, and total voting control of the affairs of, the LLC (except for voting rights of non-controlling members of the LLC that are mandatory under applicable law);

Further *Resolved,* that up to a total of 25 persons may own direct or indirect interests in such a club (or in members of the LLC that owns such a club); and

Further *Resolved,* that with respect to family companies and family trusts owning non-voting, non-controlling membership interests in a club organized as an LLC (or in non-voting, non-controlling members of such an LLC), the following ownership attribution rules shall apply for purposes of these ownership limitations:

Family companies and family trusts shall count as a single "person" if:

(1) members of a single family (a) own substantially all equity interests in the company or (b) constitute substantially all of the trust beneficiaries, and

(2) the only assets owned by the company or trust in addition to the NFL club are passive investment assets that are not used in an active trade or business (although a family company owning an interest in an NFL club may be a member of a group of companies structured in accordance with 1993 Resolution FC-5), and

(3) in the case of a company, a single individual has voting control of such company (whether as proxy holder under irrevocable proxies in form and substance acceptable to the League, or as managing member, general partner, equity holder, or voting trustee under a trust containing provisions with respect to control, continuation, primacy of League policies, and control succession that are acceptable to the League), and in the case of a trust, a single individual acts as trustee under a trust agreement containing provisions with respect to control, trustee succession, primacy of League policies, and investment restrictions that are acceptable to the League.

**1998 RESOLUTION G-2**

*Resolved,* that the NFL Anti-Tampering Policy will be amended to reflect the following:

1. If a club (the inquiring club) is interested in interviewing for a head coaching position an assistant coach who is a member of the staff of a club participating in the playoffs, the chief operating officer of the inquiring club will be permitted to contact the chief operating officer of the assistant coach's club to advise him of its interest. The chief operating officer of the club participating in the playoffs will then advise the assistant coach of the expression of interest, and the assistant coach will advise his chief operating officer if he is interested in interviewing with the inquiring club after the conclusion of the season. This information will then be conveyed to the chief operating officer of the inquiring club.

2. There shall be no other direct or indirect contact between any member of the inquiring club and the assistant coach that it desires to interview for its head coaching position.

## 1998 RESOLUTION SB-5
### (AS AMENDED)

*Resolved,* that for Super Bowl XXXVI and beyond, tickets will be distributed according to the following formula:

Accommodations for box suites will be taken off the top of the allocable seating, as will 2,500 tickets, which will be set aside for the League-run fan drawing, international travel programs and other international needs. From the remaining, these percentages will be allocated:

| | |
|---|---|
| League office | 25.28% |
| AFC Team | 17.50% |
| NFC Team | 17.50% |
| Host Team | 5.00% * |
| Other 28 Member Clubs | 34.72% (1.24% each ) |

\* If the Host Team is one of the participants, each participating team will share tickets equally, receiving 19.46%. If two teams share the host market, they will each receive 3.12%; and

Further *Resolved,* that the Super Bowl Advisory Committee, in consultation with Atlanta and Tampa Bay, is authorized to decide upon ticket allocations of between 5% and 10% for Atlanta and Tampa Bay for Super Bowls XXXIV and XXXV, respectively. The balance will be equally divided among the 28 non-involved teams.

## 1999 RESOLUTION EC-1

### (AS AMENDED)

*Resolved,* that a National Football League expansion franchise is hereby granted to Houston, to begin play in the 2002 season as a member club of the American Football Conference in a new state-of-the-art, retractable roof stadium in that community;

Further *Resolved,* that such expansion franchise is awarded to Houston NFL Holdings, L.P. (the "Franchisee") on the terms and conditions reflected in the Expansion Franchise Agreement executed by the Franchisee and Robert C. McNair, as its controlling owner (the "Controlling Owner"), with such award conditioned on completion of appropriate documentation and legal matters in form and substance acceptable to the Commissioner;

Further *Resolved,* that the procedure pursuant to which the Franchisee has been admitted is hereby deemed to satisfy all applicable procedural requirements under the NFL Constitution and Bylaws;

Further *Resolved,* that a waiver of the Franchisee's obligation, under Article XIX, Section 19.1, of the Constitution and Bylaws, to pay a Visiting Team Share of gross receipts derived from the sale of Permanent Seat Licenses is hereby granted, as and to the extent that the revenues from such Permanent Seat License are dedicated to funding construction and related costs of the new Houston Stadium;

Further *Resolved,* that the Franchisee is hereby granted a temporary and decreasing waiver of the League's debt ceiling, for the term of and to accommodate the installment purchase price payment schedule specified in the Expansion Franchise Agreement, with the Franchisee and the Controlling Owner to be in full compliance with all then-applicable debt ceiling limitations from and after the payment of the final purchase price installment on January 15, 2004;

Further *Resolved,* that the Franchisee will obtain players through the same player stocking plan used for the Cleveland Browns;

Further *Resolved,* that a Super Bowl game will be played in the new Houston stadium at the first opportunity, subject to team and community agreements comparable to those obtained with respect to the last five Super Bowl games; and

Further *Resolved,* that no later than June 1, 2001, the member clubs will adopt a realignment plan that will ensure that each conference has an equal number of member clubs, aligned in four divisions of four teams each.

## 1999 RESOLUTION G-3
### (AS AMENDED)

*Whereas,* it is appropriate to improve the League's current policies to support new stadium construction through club seat sharing exemptions, as reflected in the club seat sharing exemption guidelines adopted by the League in 1994 (the "Guidelines"), and through PSL sharing exemptions;

*Whereas,* a revised policy can facilitate new stadium construction projects by (1) making upfront League loans in support of Clubs' private contributions to such projects (rather than annually exempting from sharing the visiting team share ("VTS") of club seat premiums over a period up to 15 years), and (2) assuring that League loans will amount to at least 34% of an affected Club's private contribution to a project;

*Whereas,* such League loans should be subject to member club approval on a case-by-case basis;

Be it *Resolved:*

(1) That for any stadium construction project involving a private investment for which an affected Club makes a binding commitment from now through the 2002 NFL season (through March 31, 2003), the League shall make a loan to the affected Club to support such project based on the amount that the affected Club has committed to such project as a private contribution (the "Private Contribution");

(2) That the amount of such League loan shall range from 34% to 50% of the Private Contribution, determined on a case-by-case basis based on the size of the Private Contribution, with incremental League loans in excess of 34% generally to be made available to facilitate stadium construction projects in the largest markets that are home to an NFL Club, and with the League loans in smaller markets generally limited to 34% of the Private Contribution;

(3) That the Commissioner is authorized to make arrangements for the League to borrow from commercial or institutional lenders funds to make such League loans, with the funds to be repaid to such lenders over an appropriate time period (10 years or such other period as may be determined by the Finance Committee); and

(4) That the specific borrowings from commercial or institutional lenders related to any stadium construction project must be approved as part of the League's approval of a League loan to such project, with the borrowings to be repaid principally from the VTS of club seat premiums generated by such project, and, to the extent that the VTS of club seat premiums is insufficient to repay such loans, with any incremental funds needed for repayment to be assessed against the League's network television revenues;

Further *Resolved:*

(1) That if PSLs are sold with respect to a particular stadium construction project, such PSLs shall be eligible for an exemption from sharing in accordance with current policies;

(2) That the amount of VTS exempted in respect of PSLs sold shall be offset against the principal amount of League loans available for the project; and

(3) That for purposes of determining whether a project is eligible for incremental League loans, only the first $75 million of PSL proceeds shall be treated as a portion of the Private Contribution;

Further *Resolved:*

(1) That any League loan under the League policy adopted by this resolution, as between an affected Club and the League, shall be forgiven over the term of the aforementioned League borrowing on an equal annual basis; and

(2) That, if an affected Club that receives a League loan under the League policy adopted by this resolution (or a controlling interest therein) is subsequently sold other than to a member or members of an owner's immediate family (as defined in the NFL Constitution and Bylaws) before the final maturity date of the League loan, then the selling party shall repay to the League from the sale proceeds at closing an amount equal to the outstanding principal balance on the League loan; and

Further *Resolved,* that in order for a stadium construction project involving a Private Contribution to qualify for a League loan, the conditions set forth in Attachment A to this resolution must be satisfied.

+ + + + +

## ATTACHMENT A

(a) The League must approve a resolution specifically directing the making of a loan in respect of a particular stadium construction project, following an evaluation of (1) the necessity of a new or renovated stadium in a market in terms of the suitability, economic competitiveness, and physical condition of the existing facility, the stadium's importance to League franchise stability, the League's concerns regarding its national image and presence, the importance of an affected market to the League's national television ratings, and other League business priorities, and (2) the specific attributes of the project, including the scope and cost of the project relative to the economics in a market and the League as a whole, the balance of projected shareable and non-sharable revenue streams and the construction costs

associated with each, whether a renovation project is a "qualifying" project (as defined in the Guidelines), and similar factors;

(b) Such resolution must be adopted and the stadium construction project must be committed to by both public and private parties, from now through the 2002 NFL season (through March 31, 2003);

(c) The stadium construction project must be a "public-private partnership" to which public authorities and an affected Club each have committed funds;

(d) The project must not involve any relocation of or change in an affected Club's "home territory" (as defined in the Constitution and Bylaws);

(e) Increases in the visiting team share generated by the new or renovated stadium must meet the standards set forth in the Guidelines; and

(f) The NFL Players Association must agree to exclude from DGR, over a reasonable period of time on a straight-line amortization basis, the entire amount of the Private Contribution, together with an amount equal to the imputed interest on the Private Contribution at a commercially reasonable interest rate.

### 2000 RESOLUTION G1-B[*]

Amend the Anti-Tampering Policy of the League to reflect the following:

1. (a) Prior to March 2, if a club is interested in discussing its head coaching position with an assistant coach whose playing season (excluding the Pro Bowl game) is over, and who is contractually obligated to another club, the assistant coach's employer club may not deny the coach the opportunity to discuss, and possibly accept, such employment. Except for the post-season procedure applicable to coaches whose clubs are participating in the playoffs, no club, directly or through an intermediary, may seek permission to discuss its head coaching position with an assistant coach of another club until the playing season of that coach's employer club is completed. Similarly, no employer club may grant permission of the kind described in the immediate prior sentence until that club's playing season is completed, including post-season if applicable.

   (b) After March 1 of any year, if a club seeks permission to discuss employment with an assistant coach who is under contract to another club at any time prior to the opening of the employer club's training camp, it will be considered a lateral move, and the employer club is under no obligation to grant the coach the opportunity to discuss the position with the interested club. At the discretion of the employer club, however, such permission may be voluntarily granted.

2. (a) All moves of assistant coaches to any position other than head coach are lateral moves.

   (b) If a club is interested in discussing an assistant coaching position with an assistant coach who is under contract to another club at any time prior to the opening of the employer club's training camp, it will be considered a lateral move, and the employer club is under no obligation to grant the coach the opportunity to discuss the position with the interested club. At the discretion of the employer club, however, such permission may be voluntarily granted.

---

[*] Presented in the Competition Committee report as Resolution G-IA; renamed G-IB to reflect amendments by the Competition Committee before the start of the Annual Meetings.

3.  Any contacts by a club seeking to employ an assistant coach -- either with the employer club of the person sought, or directly with the club employee sought (or his representative) -- are subject to the provisions of the section on "Protocol." Similarly, contacts by club employees seeking assistant coaching jobs with other clubs are subject to the provisions of the section on "Protocol." Despite provisions of the "Protocol" section, all in-season discussions, requests for permission, or contacts of any kind concerning the future employment of an assistant coach with a club other than his employer club are prohibited.

### 2000 RESOLUTION G-3A

*Whereas,* the Competition Committee is concerned about overall onfield player conduct including (1) celebratory acts taking place on the playing field that go beyond the natural, spontaneous expressions of exuberance that add to the excitement and enjoyment of NFL games, (2) actions that are sexually suggestive or can otherwise be construed as being in poor taste, and (3) actions that are unsportsmanlike toward officials;

Be it *Resolved,* therefore, that it is Unsportsmanlike Conduct if two or more players engage in prolonged, excessive or premeditated celebrations, particularly after scoring plays; if a player engages in actions that are sexually suggestive or that can otherwise be construed as being in poor taste; and if a player engages in actions that are unsportsmanlike and/or offensive toward officials. Such unsportsmanlike conduct will subject the player(s) to significant fines.

**2000 RESOLUTION G-8**

*Resolved,* that the Commissioner will apply the following policies in preparing the official League regular season schedule beginning in 2002:

A. Each team will play home and home with all division opponents (6 games).

B. Each team in a division will play one other division within the conference based on annual rotation of divisions (4 games).

C. Each team will play one game against the team with the same standing from each of the two remaining divisions within its own conference, based upon previous season's results (i.e., 1 vs. 1&1; 2 vs. 2&2; 3 vs. 3&3; 4 vs. 4&4) (2 games).

D. Each team in a division will play the same entire division from the other conference on an annual rotating basis (4 games).

## 2000 RESOLUTION G-10

*Whereas,* the membership has received several presentations by the Executive Committee of NFL Properties and the Board of Directors of NFL Enterprises ("the Committees") regarding their review of the business conditions and the need for a restructuring of the League's consumer products and apparel business;

*Whereas,* the Committees have unanimously recommended that the member clubs enter into the two-stage arrangement with Reebok described in the accompanying Resolution; and

*Whereas,* the membership concurs in the judgment and recommendation of the Committees that the agreement described in the accompanied Resolution will enhance the quality, attractiveness, and image of the League and its member clubs, and will improve the League's consumer products business.

Be it *Resolved* that:

1. The member clubs hereby approve, adopt and concur in the attached Resolution of the Committees;

2. That the member clubs approve the acquisition of an option to acquire an equity position of 49% in a joint venture with Reebok (referred to as "Newco") on the terms described in the Resolution;

3. That the member clubs hereby approve the necessary grant of rights and marks, logos, other intellectual property and marketing assets pursuant to the license agreement between NFL Properties and Reebok on the terms described in the Resolution; and

4. That the member clubs agree to give their full cooperation as necessary to implement and further the agreement between NFL Properties and Reebok.

## ATTACHMENT TO 2000 RESOLUTION G-10

### RESOLUTION

*Whereas,* over the past six (6) months, the NFL Properties and Broadcasting Committees (the "Committees") have met in joint session and received several extensive presentations, and engaged in lengthy analysis and discussion concerning the state of the consumer products and apparel business and the need to develop new models to improve the business;

*Whereas,* the Committees have received a proposal from Reebok International, Ltd. ("Reebok") to enhance the product design, quality, attractiveness to consumers and marketing of NFL apparel products and extensively discussed an appropriate deal structure to accomplish these business goals, pursuant to which

Reebok would receive long term exclusive rights for uniforms and sideline apparel, certain other apparel product categories and fitness products; and

*Whereas,* the Committees believe that the proposed business arrangement ("Venture") with Reebok (the key terms of which are described below) is essential to improving the quality, image, attractiveness to consumers and profitability of the NFL consumer products and apparel business:

1. Ten year exclusive license agreement, including the NFL and all club marks and logos, for uniforms, sideline apparel, headwear and fitness equipment commencing in the 2002 season and ending March 31, 2012.

2. An interim license for the 2001 season to outfit 21 Clubs for uniforms and sideline apparel along with non-exclusive rights for those and other apparel products.

3. The option to convert the rights under the exclusive license into a joint venture ("Newco") after Year 3, 4, or 5 (2003, 2004 or 2005) by foregoing royalty payments. If the option is exercised, the NFL will hold 49% ownership, split profits equally and have equal representation on the Newco Board of Directors.

4. The ability for either the NFL or Reebok to terminate the Venture for any reason after Year 6 (2006).

5. Consideration in the form of minimum annual royalty guarantees commencing in Year 2 at $15 million and increasing to $22.5 million during the term of the Agreement along with the potential to receive 1.6 million stock warrants from Reebok priced at 20% above the average closing market price of the stock for the fifteen (15) days prior to the execution of the documentation implementing the Venture (projected to be December 12, 2000).

It is hereby *Resolved,* that the Commissioner, or such other officer(s) as he may designate (on behalf of the National Football League, its Member Clubs and NFL Properties), with the concurrence of the Committees, shall be authorized to enter into agreements implementing the Venture with Reebok on the above terms, with such changes therein as the two Committees shall deem reasonable or appropriate (with the two Committees' approval of the same to be conclusive proof of the acceptability of the same);

Further *Resolved,* that the Commissioner, with the concurrence of the two Committees, be and hereby is authorized to cause the League or its affiliates to enter into one or more agreements with Reebok, as he and such Committees may deem necessary or appropriate, to implement the Venture and to create or pursue the Venture, all on the terms referenced to in the recitals above and previously described to the member clubs or such other terms as he with the concurrence of such two Committees may deem necessary or proper (with the acceptability and

propriety of any such terms to be conclusively indicated by the League's entry into such agreements); and

Further *Resolved,* that each member club will cooperate as reasonably requested in implementing and carrying out the business plan related to the Venture.

## 2001 RESOLUTION FC-4
### (AS AMENDED)

*Whereas,* the Finance Committee has reviewed the League's current debt limit in light of numerous economic factors and conditions, including franchise values and current and foreseeable club revenue levels;

Be it *Resolved,* that effective immediately:

1. The amount of debt which each member club may incur (as defined and described in 1988 Resolution FC-3) shall be raised from the current $100 million to $125 million;

2. Subject to Paragraph 3 below, such debt may be secured by or a liability of either the member club or its principal or controlling owner, as permitted under 1996 Resolution FC-1;

3. The level at which 1998 Resolution FC-9 requires club-related liabilities of the principal or controlling owner (including obligations secured by his interest in his club) also to be secured by a pledge of club assets shall remain at $25 million; and

4. In connection with any acquisition of a member club or any controlling interest therein, the principal and/or controlling owner shall be required to invest equity (cash on hand or funds borrowed against other current or determinable future assets of such owner) in a minimum amount to be determined by the Finance Committee, and no acquisition transaction that the Finance Committee finds to be excessively leveraged shall be recommended by the Finance Committee for membership approval; and

Further *Resolved,* that the Finance Committee will consider at the March, 2002, League Meeting, and annually thereafter, whether, in light of inflation, projected revenues, and franchise values, the overall debt limitation should be further increased beyond the aggregate $125 million allowed under this resolution, and will report to the Executive Committee.

**2001 RESOLUTION G-1**
**(AS AMENDED)**

*Whereas,* pursuant to 1999 Resolution EC-1, the Member Clubs resolved to expand by adding a 32nd member club, to be located in Houston, Texas;

*Whereas,* pursuant to that same Resolution, the Member Clubs resolved to realign the League into two 16-team Conferences, with each Conference to consist of four divisions of four teams each; and

*Whereas,* as part of accomplishing this desired realignment, the Member Clubs have determined to address certain related financial consideration;

Be it *Resolved:*

1. that beginning with the 2002 NFL season, all regular season and preseason game visiting team shares shall be pooled and shared equally among the 32 Member Clubs;

2. that the term "visiting team share" shall mean the portion of gross receipts currently required (in the absence of a waiver) to be paid to visiting clubs under Article 19.1(A) of the NFL Constitution and Bylaws in respect of regular season games;

3. that the separate rules for sharing "gross gate receipts" in respect of preseason games under Article 23.1(C) shall be eliminated;

4. that for purposes of calculating such visiting team shares, the term "gross receipts" shall have the meaning given to it in Article 19.1(A)(3) as supplemented by 1987 Resolution FC-1, and the exclusions permitted in calculating visiting team shares shall be those exclusions currently allowed under Article 19.1(A), as supplemented by 1995 Resolution G-6 and 1999 Resolution G-3;

5. that the current preseason scheduling system and contract approval process set forth in Article 23.1 shall not be affected by this resolution; and

Further *Resolved,* that the Finance Committee is authorized to establish policies relating to complimentary seats, "unsaleable" seats, preparation of ticket manifests, audit procedures, and related administrative matters for the purpose of implementing this Resolution, which it shall periodically present to the membership for discussion; and

Further *Resolved,* that Articles 19.1 and 23.1 of the NFL Constitution and Bylaws shall be deemed amended as necessary to accomplish this Resolution.

**2001 RESOLUTION G-4**
**(AS AMENDED)**

Amend the Anti-Tampering Policy to reflect the following:

1. If a club is interested in discussing a position with a non-player, non-coach employee who is under contract to another club, the employer club is under no obligation to grant the employee the opportunity to discuss the position with the interested club. At the discretion of the employer club, however, such permission may be voluntarily granted.

2. If a club is interested in discussing a position as club president or general manager, or a position with equivalent responsibilities and authority, with an individual who is contractually obligated to another club after the conclusion of that club's playing season, the employer club may not deny the employee the opportunity to discuss and accept such employment, unless the individual is already employed as a club president or general manager, or is employed in a position with equivalent responsibilities and authority. A club president is defined as an individual who shall have authority and responsibility for the organization, direction, and management of day-to-day operations of the club and who reports directly to the controlling owner. A general manager is defined as an individual who has (1) the authority over all personnel decisions related to the signing of free agents, the selection of players in the College Draft, trades, terminations, and related decisions, and (2) the responsibility for coordinating other football activities with the Head Coach.

**ATTACHMENT TO 2001 RESOLUTION G-4 (AS AMENDED)**

Amend the Anti-Tampering Policy as follows (old language struck over, new language underlined):

- **High-Level Club Employees (Non-Player, Non-Coach)**. The following provisions govern in cases of high-level club employees (non-player, non-coach), defined for purposes of this Policy as club president, general manager, and persons with equivalent responsibilities and authority. A club president is defined as an individual who shall have authority and responsibility for the organization, direction, and management of day-to-day operations of the club and who reports directly to the controlling owner. A general manager is defined as an individual who has (1) the authority over all personnel decisions related to the signing of free agents, the selection of players in the College Draft, trades, terminations, and related decisions, and (2) the responsibility for coordinating other football activities with the Head Coach (see "Test of Reasonableness," "Administrative Review," page 10, for disputes concerning this definition):

- *Under Contract.* Except as may be otherwise provided in such contract, a club is not obligated to grant another club permission to discuss employment with a high-level employee if he or she is under contract, even if the second club is prepared to offer him or her a position of greater responsibility within the category of High-Level Club Employees. Clubs may negotiate a right of first refusal.

- *Expired Contract.* If the contract of a high-level employee has expired or he or she is a non-contract employee, any attempt by the employer club to deny the employee an opportunity to discuss or accept employment with another club will be considered improper ~~unreasonable~~ under "Administrative Review," ~~the "Test of Reasonableness,"~~ page 10.

*Other Club Employees (Non-Player, Non-Coach).* The following provisions govern in cases of club employees who do not fall into the categories of player, coach, or high-level employee (see definition above):

- *Under Contract.* If a club employee (other than player, coach, or high-level-employee) is under contract for the succeeding season or seasons at the time an off-season expression of interest in him or her is made to the employer club by another club,~~ the employer club may not unreasonably deny permission for the employee to discuss and accept employment with the inquiring club, except that where the employee's primary responsibilities extend to recurring events beyond the playing season (principally the college draft or the free agency period), the employer club may suspend permission until after occurrence of such event. This applies but is not limited to contract employees of a club's player personnel department who are responsible for gathering information on and evaluating draft eligible players or veteran free agent players (scouts, directors of player personnel, directors of pro and college personnel, etc.). The above restriction regarding recurring events beyond the playing season will not apply if another club is prepared to offer a general manager's position or its equivalent, to a non-player, non-coach employee who is under contract for the succeeding season or seasons. If an employer club has an employee under contract for a future season, it has no obligation to grant permission to another club to contact its employee to offer him a position that is a lateral move (See "Test of Reasonableness," page 10.)~~ the employer club is under no obligation to grant the employee the opportunity to discuss the position with the interested club. At the discretion of the employer club, however, such permission may be voluntarily granted. If, however, the inquiring club is prepared to offer a position as a high-level employee, as defined above, the employer club may not deny the employee the opportunity to discuss and accept such employment.

- *Contract Due to Expire.* If a club employee (other than player, coach, or high-level employee) has completed the regular season covered by the final year of his or her contract, any attempt to deny permission for the employee to discuss and accept employment with another club will be

2001-4

considered improper ~~unreasonable~~ under "Administrative Review" ~~the "Test of Reasonableness"~~ (page 10), except that where the employee's primary responsibilities extend to recurring events beyond the playing season (principally the college draft or the free-agency period), the employer club may suspend permission until after occurrence of such event. This applies but is not limited to contract employees of club's player-personnel department who are responsible for gathering information on and evaluating draft-eligible players or veteran free agent players (scouts, directors of player personnel, directors of pro and college personnel, etc.). The above restriction regarding recurring events beyond the playing season will not apply if another club is prepared to offer a position as a high level employee, as defined above, to a non-player, non-coach employee whose contract is expiring, nor will it apply to employees who do not have contracts or whose contracts are expiring prior to the recurring off-season event such as the draft or the free-agency period.

•   *Permission to Discuss/Sign.* Permission granted by a club to an employee to discuss employment is also permission to accept employment with another club, provided, however, that an employer club may limit the duration of its permission. Any permission granted by an employer club to discuss employment with another club must be documented in writing and provided to the employee in advance of any such discussions.

**~~Test of Reasonableness~~ Administrative Review**

~~Subject to the specific provisions of this Policy that allow a club to withhold permission for an employee to discuss or accept employment with another club, an employee must not be unjustifiably prevented from significantly bettering himself or herself within the League.~~

If a disagreement arises over whether an employer club has improperly ~~unreasonably~~ withheld permission or whether a club has incorrectly designated the category of an employee (see section on high-level employees), the involved club or clubs may certify a dispute with the Commissioner. The Commissioner will then promptly gather all pertinent facts, including but not limited to the ~~relative compensation levels, length of term of current and~~ proposed contracts, authority, and responsibilities~~, opportunities for advancement, and inter-club competitive ramifications~~ of ~~a~~ the proposed job change. In rendering his final, expedited decision, the Commissioner will not be disposed to approve a job change that in name is a promotion but is in fact a lateral move involving little or no greater responsibility than the prior job.

As provided for above under "Non-Players," no club, nor any person employed by or otherwise affiliated with a club, is permitted to discuss employment with an employee of another club during the employer club's playing season, regardless of the contractual status of the employee. Conversely, it will be considered unreasonable under this test for any employer, during the off-season, to deny permission to another club to discuss or offer employment to a non-

contract employee or to deny permission to a non-contract employee to seek other employment on his own.

**Protocol**

As a common courtesy and to avoid inter-club disputes, whenever a club wishes to contact a non-player employee of another club about possible employment, such inquiring club must first notify the owner or operating head of the employer club to express its interest. This requirement prevails even if the employee in question does not have an active contract and even if other provisions of this Policy prohibit the employer club from denying permission to discuss employment with the employee. (See the sections under "NFL Players" above for rules governing contacts of or by players.)

Whenever a non-player employee of a club initiates contact with another club about possible employment, the contacted club must immediately notify the owner or operating head of the employer club about the contact, after which all other applicable provisions of this Policy will apply.

Despite the other requirements of this section on protocol, if a public announcement has been made by an employer club that it has dismissed or will not be retaining an employee, such employee and any clubs interested in him or her are under no obligation to observe the club-to-club courtesies of this section.

**Discipline**

Any violation of this Anti-Tampering Policy will subject the involved club and/or person to severe disciplinary action by the Commissioner. The League office will promulgate to all clubs the details of any penalties imposed for tampering.

## 2001 RESOLUTION G-5
### (AS AMENDED)

*Whereas,* the League is required under 1999 Resolution EC-1 to adopt by no later than June 1, 2001, a realignment plan that will result in two conferences each containing four divisions of four teams; and

*Whereas,* such realignment will take effect commencing with the 2002 NFL season;

Be it *Resolved,* that the National Football League is hereby realigned in accordance with the attached realignment plan;

Further *Resolved,* that the NFL Constitution and Bylaws shall be deemed amended as necessary to accomplish this Resolution; and

Further *Resolved,* that beginning with the 2002 NFL season, the League office will undertake to schedule preseason games for five years (i.e., through the 2006 season), provided that (a) such scheduling authority will be exercised pursuant to a plan developed by the Commissioner and submitted to the membership for review; (b) clubs realigned from otherwise intact divisions will receive preference in scheduling home games with former division rivals and other attractive opponents; (c) such scheduling authority will not extend to the final weekend of the preseason; and (d) unless otherwise agreed to by the membership, such scheduling authority will expire following the 2006 preseason.

**AFC**

| EAST | NORTH | SOUTH | WEST |
|------|-------|-------|------|
| Buffalo | Baltimore | Houston | Denver |
| Miami | Cincinnati | Indianapolis | Kansas City |
| New England | Cleveland | Jacksonville | Oakland |
| N.Y. Jets | Pittsburgh | Tennessee | San Diego |

**NFC**

| EAST | NORTH | SOUTH | WEST |
|------|-------|-------|------|
| Dallas | Chicago | Atlanta | Arizona |
| N.Y. Giants | Detroit | Carolina | St. Louis |
| Philadelphia | Green Bay | New Orleans | San Francisco |
| Washington | Minnesota | Tampa Bay | Seattle |

**2001 RESOLUTION JC-1**
**(AS AMENDED)**

*Whereas,* pursuant to 2000 Resolution JC-1 (as amended), the Member Clubs established the NFL Internet Network to promote their joint entertainment product and to enhance their ability to compete with other entertainment providers;

*Whereas,* the NFL Internet Network has increased the overall quality of the Internet presence of the NFL and the Member Clubs, and has also increased the popularity and usage of the Network's member sites; and

*Whereas,* in order to facilitate and accommodate new third-party arrangements with respect to NFL.com (the anchor site of the NFL Internet Network) and other Network member sites, the Member Clubs wish to extend the term of the NFL Internet Network;

Be it *Resolved,* that the term of the NFL Internet Network shall be extended through the 2005 NFL season, with operations of such Network to be conducted in accordance with the Fundamental Principles and Operating Guidelines attached to this Resolution, as such Fundamental Principles and Operating Guidelines may be modified from time to time by the Member Clubs.

#### ATTACHMENT TO 2001 RESOLUTION JC-1

#### (AS AMENDED)

#### NFL INTERNET NETWORK

#### FUNDAMENTAL PRINCIPLES AND OPERATING GUIDELINES

The following principles and operating guidelines have been carefully developed to foster the growth of NFL.com and Club sites in an exclusive network framework.

A. Fundamental Principles

1. Network Concept

• All Clubs participate in the NFL network; all Club site traffic count will be aggregated only with NFL.com traffic count for Media Matrix (or other Internet measurement service) reporting.

• NFL.com will link directly to Official Club Sites (No NFL.com club pages); Clubs must include key content formerly on NFL.com (rosters, etc.) and standardized promotion/links to NFL.com and approved League Internet partners. For 2001 and future years, such promotion shall include promotional (i.e., logo) links from each

Official Club Site's home page to the NFL Internet Network's development and portal partners, who shall also provide links from their respective sites to each Club's Official Club Site.

- League and Clubs will work together to implement technology, design, and content integration plan.

2. NFL Game Action Video

- All NFL game video is a collective League asset and will be managed and distributed by the NFL Network. Video will be available on Club sites as described below.

- Full-length NFL football games (live or archived) will be distributed only on NFL.com (or successor League new media outlet).

3. Intellectual Property Matters

- To ensure compliance with non-Internet agreements negotiated and approved by the League, new media applications affecting or governed by such contracts (which include the CBA, network TV contracts) will be administered at the NFL Network level.

- To ensure protection of NFL intellectual property, all NFL media content (such as video and photos) will be licensed to third parties only at the NFL Network level.

4. Privacy Policies and Compliance with Laws

- The League will compile for the Clubs a list of "best practices" in respect of privacy policies, changes in the legal environment with respect to online issues (such as the Children's Online Privacy Protection Act), data usage, and similar matters.

- Each Club will be responsible for ensuring that its Official Club Site complies with all applicable laws and follows "best practices" online.

In order to further the development of a strong and viable Internet network, the NFL and the Clubs will proceed on the following basis for the 2001-2005 seasons.

B. 2001 Operating Guidelines

   1. Web Agreements

- Clubs must file all web hosting, commerce, and related agreements with the League office.

- Club web site agreements will have a term of 2 years or less; Club (but not developer) renewal options allowed.

- Club site agreements are subject to League approval in only those respects that affect NFL.com or other Club sites; League will provide approval or responses within 10 days.

- League will provide Clubs with a list of suggested web site developers. Clubs may select their own developer, subject to these Principles and Guidelines.

   2. Game-Action Video on Club Sites

- NFL Films will provide video highlights programming for use on Club sites.

- Clubs may offer their coaches' shows and other local TV shows on Club sites.

- NFL Films will provide footage for Club site archival features (i.e., top 10 Club plays of all time.)

- NFL Films will also produce other custom programming for Club sites. (Similar quantities of footage as licensed for local broadcast programming.)

- Clubs may not sell sponsorships or advertising in conjunction with game video programming. (i.e., Club secured advertisers may not receive exposure in the video or on the web page(s) associated with the video programming.)

- Video may not appear on Club sites during network broadcast windows or otherwise violate network broadcast agreements.

   3. Links/Third Party Networks/Content Licensing

- Clubs may link to local media, local sponsors, etc., without NFL Network approval, but may not link to sports site and/or sports content aggregators or major portals without NFL Network approval. Clubs shall (1) use the NFL Internet Network navigation bar (which

will contain links to each other NFL Internet Network site and to the NFL Internet Network's production and portal partners) on the home pages of their Official Club Sites, and (2) provide promotional (i.e., logo) links on the home page of their official sites to the NFL's production and portal partners, who shall also provide links from their respective sites to each Club's Official Club Site.

- Clubs may not participate in third party networks involving the aggregation of audience, ad sales, or commerce.

- Networking and sale or licensing of content to third parties are solely the prerogative of the NFL Network.

- Clubs may not sell or license promotional rights to any Internet Service Provider, or substantive ISP rights (e.g., the right to provide vanity e-mail services), for any season after the 2001 season, as sale or licensing of such rights would conflict with rights licensed and/or granted to NFL Internet Network portal partners.

- The NFL Internet Network's portal partner shall be entitled to allow its subscribers to customize their personal home pages with the marks and logos of a subscriber's favorite Club along with a package of links and content focused on such Club (including a link to the Club's Official Web Site).

4. Game Day Applications

- Real-time statistics and "game-day live" applications will reside only on NFL.com. or "co-branded" NFL.com sites produced in conjunction with the NFL Internet Network's production partner.

- Clubs will link to such central game day applications.

5. Games

- All action-simulation and other types of games produced by League level game developer(s) will reside on NFL.com or an NFL "game channel."

- Clubs may produce and develop their own trivia games consistent with the terms of the League level agreement.

- Availability of action-simulation, trivia, and mini-games on Club sites will be subject to the proposed NFL relationship with EA/AOL.

- All fantasy games will reside on NFL.com only; Clubs will link to NFL.com fantasy games. Customized Club prizes and incentives can be created in coordination with NFL.com.

6. Radio

- Any radio broadcasts of NFL games on the Internet will be available via NFL.com (all games) and Club sites (Club's broadcast).

- The League and Clubs will collaborate to create additional radio programming (i.e., greatest moments, archived games), available via Club sites and NFL.com.

- The party arranging to make such broadcasts available on a particular site will bear responsibility for talent and guild clearances and residuals for broadcasts on the site.

7. Club Site Advertising

- Club sites to include Club-sold and League-sold advertising.

- Clubs to sell all site ad inventory except advertising associated with NFL Films video programming, which will be sold by the League to a national sponsor(s). Revenues from League-sold advertising will be divided equally. Clubs to retain 100% of revenues from Club-sold advertising.

- NFL production and portal partners will sell Club-controlled inventory if and only if requested to do so by a Club.

- Official Club sponsors will receive category protection on Club sites.

8. Commerce

- Clubs may link directly from their Club site to a team-specific e-commerce "Shop" administered by Venator or a successor NFL Internet Network e-commerce partner. Clubs will receive the full retail royalty (15%) based on the traffic they deliver to their "Shop".

- Clubs may choose other e-commerce providers/partners, but such deals will have a term of 2 years or less with Club (not developer) renewal options allowed.

9. Auctions

- A single central auction engine has been created and will continue to be hosted on eBay, pursuant to an agreement with NFL.com.

2001-12

- The central auction engine will continue to include customized auction "store fronts" for Clubs.

- Should a Club provide "inventory" for an auction, that Club will receive all revenues generated, less an industry-standard listing/transaction fee (7%).

- All net proceeds received from merchandise or experiences sold through Internet auctions will be paid to charity, with the party receiving such proceeds to designate the recipient charity.

10. Photos

- Clubs and League will work to develop a common credentialing policy to protect against "bootlegged" photos.

- NFL Properties will continue to license stock photo houses to sell NFL photos, and will arrange for Club and League access to such photos for web site use.

- Clubs should include photos on their sites.

11. Compliance

Non-compliance will subject violators to fines, etc., for conduct detrimental.

## 2001 RESOLUTION JC-3
### (AS AMENDED)

*Whereas,* 2000 Resolution G-10 concerning the agreement between NFL Properties and Reebok (copy attached) was approved on December 12, 2000 subject to a further ratification vote after the completion of the terms of definitive documents and club distribution arrangements with Reebok; and

*Whereas,* (1) the terms of the definitive documents negotiated with Reebok are consistent with those set forth in 2000 Resolution G-10 and (2) arrangements providing Clubs greater flexibility in the distribution of the products covered by the Reebok agreement have been established;

It is hereby *Resolved,* that notwithstanding anything set forth in 2000 Resolution G-10, the affirmative vote of not less than three quarters of the members of the League present and voting shall be required for the following matters related to the Reebok agreements:

1. termination of the Reebok agreements;

2. exercise of the first option (to acquire 49% of Newco and form a joint venture) or the second option (buyout of Reebok's equity interest in Newco after exercise of the first option);

3. permitting the name or logo of a third party sponsor to appear on game uniforms or sideline apparel products (and promotional/sponsorship agreement related thereto);

4. exercise of the Reebok warrants;

5. "roll in" of substantial volume of new products into the Omnibus License Agreement that are designated to achieve the Roll-in Objective; and

6. take any action under the Reebok agreements that would have the effect, directly or indirectly, of extending the term of the Reebok agreements; and

Further *Resolved,* that 2000 Resolution G-10 is ratified and approved, including the terms set forth in paragraphs 1-6 above.

**2001 COMPETITION COMMITTEE POSITION ON TRADES FOR CASH**

The Competition Committee presented the following position on trading for cash at the March 2001 Annual Meeting of the League:

**Trades for Cash**

The Committee reviewed and re-affirmed a long-standing League policy that prohibits "any sale of a draft choice or draft choices for any amount of money" or the "sale of player contract rights for any significant sum." Since Article XVI, Section 16.6 of the Constitution and Bylaws prohibits trades for past, future, or nominal consideration, the Committee agreed that any trades for, or involving, any amount of cash are prohibited.

**2002 BYLAW PROPOSAL NO. 6**

*Whereas,* a number of NFL owners have purchased interests in teams in the Arena Football League; and

*Whereas,* the membership wishes to define certain principles involving players who are employed by Arena League and NFL teams with common ownership;

Be it *Resolved,* that if an NFL club drafts a player under contract to an Arena League club with which it shares common ownership, the NFL club must, upon signing the player to an NFL Player Contact, offer that contract to all other NFL clubs via procedural recall waivers. This requirement will also apply to undrafted rookie free agents and veterans subject to waivers who formerly played for an Arena League team that shares common ownership with the NFL club that has signed him to a contract; and

Further *Resolved*, that a player not subject to waivers in the NFL may not play back-to-back seasons for commonly owned NFL and Arena League teams.

**2002 RESOLUTION FC-12**

*Whereas,* the NFL credit facility arranged by the League office serves important League interests by establishing a benchmark borrowing and collateral framework for NFL lending, and a benchmark credit rating for lending to NFL clubs;

*Whereas,* such facility has substantially grown in size and club participation since its inception in 1991, necessitating that the syndicate of banks providing liquidity for the facility be expanded;

*Whereas,* the continued ready availability of the facility to all non-participating clubs will also serve important League interests;

*Whereas,* further expansion of the syndicate, to keep the facility readily available to all NFL clubs, will require the establishment of an interest reserve in the form of a $15 million standby letter of credit to mitigate any possible risk of an interruption in interest payments in the event of a club default on its credit facility loan; and

*Whereas,* the posting by the League (or an affiliated NFL entity) of the necessary standby letter of credit (with the costs thereof to be reimbursed to the League by clubs participating in the credit facility) will facilitate the current and potential future expansion of the credit facility;

Be it *Resolved,* that the League's (or an affiliate's) posting of the proposed standby letter of credit as an interest reserve mechanism for the League-wide credit facility be, and hereby is, approved on the terms described to the membership; and

Further *Resolved,* that the terms and conditions of the League's posting of the letter of credit shall be reflected in reimbursement and other appropriate agreements with participating clubs, credit facility syndicate banks, and other parties to the credit facility transactions, which shall be in form and substance acceptable to the Commissioner, with the Commissioner or his designee to execute and deliver such agreements on behalf of the League parties thereto.

## 2002 RESOLUTION G-3
### (AS AMENDED)

*Whereas,* pursuant to Article 19 of the NFL Constitution and Bylaws, the League has the authority to approve changes in uniform appearance, including logos, colors and design;

*Whereas,* changes in uniform appearance that are proposed by Member Clubs are subject to, among other things, the notification requirements set forth in Article 19.9(D)(1) and in 1997 Resolution NFLP-1;

*Whereas,* consistent with the NFL Uniform Code, and unless expressly provided otherwise, the term "uniform" as used herein applies to every piece of equipment worn by a player, including but not limited to helmet, pants, jerseys, wristbands, gloves, stockings, shoes, visible undergarments, and accessories such as headwear, coverings worn under helmets, and hand towels;

*Whereas,* pursuant to Article 19 and interpretations thereunder, each Member Club is permitted to have one home uniform design and one away uniform design for use during NFL games;

*Whereas,* the marketing benefits to the NFL and its Member Clubs, and developments in the NFL's consumer products business make it beneficial to revise the notice requirements for uniform changes and permit the Member Clubs to create a third uniform design for use at regular season NFL games subject to certain conditions.

First, be it *Resolved,* to supersede 1997 Resolution NFLP-1 and to amend Article 19.9(D)(1) to read as follows (deleted language struck over, new language underlined):

(D) No club shall have the right to make changes in its club colors and/or in the designs of its team helmets or uniforms except in accordance with the following provisions:

  (1) Absent specific extenuating circumstances as determined by the Commissioner, if a club desires to make any changes in club colors, uniform appearance, designs of team helmets, designs of team uniforms, trademarks, or trade names, it must give written notice and details thereof to the League on or before September March 1 of the year prior to the year in which it wishes to change; must comply with the uniform change notification and approval timeline as established by the League office and amended from time to time, the current timeline being attached hereto; and further must obtain approval from the League pursuant to the Section 19.9(D)(2) herein by October December 1 of the year prior to the year in which it wishes to change; otherwise it shall have no right to make any change for the succeeding season.

Second, be it Further *Resolved,* that beginning with the second half of the 2002 season, the Member Clubs may use a third uniform design subject to the conditions set forth below:

   (1) The third uniform design may be one of two options: (a) an alternate color scheme, using the colors that are part of the club's existing color palette (as set forth in Article 19.9 and any Appendix to the NFL Constitution and Bylaws), and using the same design and logo as either the existing home or away uniform, or (b) a previously approved "classic" uniform from the Club's history.

   (2) The helmet to be used with the third uniform design is limited to the following: If the third uniform design incorporates an alternate color scheme, a second helmet may not be used and the Club must use an existing helmet. If the third uniform design is a "classic" uniform, the helmet may be the existing helmet or a previously approved "classic" helmet.

   (3) The creation of a third uniform design is subject to the notice and approval procedures set forth in Section 19.9(D) of the NFL Constitution and Bylaws, as amended; provided, however, that for the 2002 season only, the deadline for obtaining League approval for a third uniform design is May 1, 2002.

   (4) A Club may wear an approved third uniform design at one home game each season in connection with a special event, occasion or anniversary, provided that the Club gives notice to the League office by July 1 of the year in which the selected game is scheduled to be played, the selected game does not conflict with a League event or initiative, and the event being commemorated is approved by the Commissioner.

Third, be it Further *Resolved,* that a Club may not change its regular home and away uniforms more than once every five NFL seasons, and may not change its third uniform design more than once every five NFL seasons, absent specific extenuating circumstances (e.g., Club ownership change or relocation) as determined by the Commissioner.

Fourth, be it Further *Resolved,* that the Commissioner, in consultation with the NFL Business Ventures Committee, is authorized to establish policies and procedures relating to the subject matter of this resolution, including but not limited to uniform changes, third uniform design, the use of special event uniforms in connection with League initiatives, and related administrative matters, which they shall periodically present to the membership for discussion.

Fifth, be it Further *Resolved,* that the NFL Constitution and Bylaws shall be deemed further amended as necessary to accomplish this Resolution.

**ATTACHMENT TO 2002 RESOLUTION G-3**

**UNIFORM CHANGE NOTIFICATION AND APPROVAL TIMELINE**

| DEADLINE | REQUIREMENT |
|---|---|
| March 1 of year prior to the year in which uniform change will take place | Written notice and details of any changes in uniform provided to the League office |
| July 1 of the year prior | Uniform color selection and logo design completed, with club owner and chief executive approval |
| August 1 of the year prior | First uniform samples created -- Club owner, equipment manager and chief executive should have approved designs for first samples |
| November 1 of the year prior | Final uniform samples provided to League office for approval-final TV test and approvals from Club owner, equipment manager and chief executive should also be forwarded by this date |
| December 1 of the year prior | League office final approval |

If final samples do not arrive in the League offices by November 1 of the year preceding the season in which the change is occurring the uniform will not be approved.

**2002 RESOLUTION G-6**

Amend the NFL's Crowd Noise Policy to read as follows (deleted language struck over, new language underlined):

N. Crowd Noise

While the League does not wish to place restrictions on spontaneous crowd noise or to diminish fan enjoyment in our sport, it is each club's responsibility to exert proper control over cheerleaders and mascots (including noise-making specialists hired exclusively for that purpose), use of scoreboards, message boards, etc. Artificial or manufactured crowd noise in NFL stadiums has increased to the extent that teams have notified the League office that they have experienced difficulty communicating within their bench area as well as on the field.

1. Club-Controlled Sound—The home club does not have the prerogative to decide if sound hampers signal calling. While spontaneous crowd noises may be beyond immediate control, noise of any kind (music, horns, gongs, drums, etc.) that is under club control must cease when the play clock (40-25) is running and the visiting team is in possession of the ball. This includes kickoffs. Conversely, this restriction does not apply when the home team is in possession of the ball. Flagrant attempts by cheerleaders, mascots or the public address system to encourage crowd noise for the purpose of disrupting the visiting team's offense while the play clock is running is prohibited. The use of noise meters or such messages as "Noise!," "Let's hear it," "Raise the Roof," "Let's go Crazy," "Pump it Up," "12th Man" or any video to incite crowd noise are prohibited at any time during the game. These examples are not limited to the foregoing, but also would include similar messages that encourage crowds to make random noise in order to disrupt the opposition. The prohibitions specified in this section also apply during kicking plays.

Exception: Any conventional cheerleader or mascot actions or the use of the scoreboard or message board for acceptable cheers such as "Defense!" and "Push 'em back!" must be stopped when the huddle breaks and/or the offensive team moves to the line of scrimmage.

2. "Wave"—Club-controlled efforts to start the "Wave" cheer through the use of cheerleaders or message boards—even if the actions are stopped when the visiting team breaks the huddle—are a violation of the crowd noise policy.

3. Noise-Making Devices—Bullhorns, megaphones, Klaxons, whistles and other noisemakers of any kind are not permitted in the stadium.

4. Field-Level Speakers—The number of field-level speakers must be limited to a maximum of four. They must be placed between the goal lines and the 20-yard lines, and be pointed away from the bench area and the playing field.

5. Mascots—Team mascots must stay behind the six-foot white border at all times during the game (they may be on the field at appropriate times during the pregame and at halftime when players are not on the field), and they are prohibited from engaging in any acts of taunting opposing players, coaches, and game officials. In the event of violations, teams employing the mascots will be subject to significant fines.

Clubs should be aware of the playing rule adopted at the 1989 Annual Meeting which establishes a set of procedures, including loss of time-outs or five-yard penalty on the defense, to handle the problem of crowd noise which prevents the offense from hearing its signals.

## 2002 RESOLUTION G-7

*Whereas,* Article 4.3 of the Constitution and Bylaws provides, and has long provided, that "[t]he League shall have exclusive control of the exhibition of football games by member clubs";

*Whereas,* pursuant to that exclusive control, and consistent with the provisions of Article 10 of the Constitution and Bylaws, the League has for decades entered into contracts for the exhibition of NFL games by national broadcast networks and, more recently, by cable and by satellite;

*Whereas,* the stadium interior regularly within the frame of the television broadcast, including but not limited to the field, as well as the benches and surrounding areas ("the sidelines"), has long been considered to be the equivalent of the "stage" for purposes of the exhibition of NFL games and therefore within the League's exclusive control;

*Whereas,* the League's control has been exercised, for example, through restrictions on signs and banners "on end zone walls or on field level walls across from network camera locations or on the field, including sideline areas" (1994 Resolution BC-3) and through control of game-day marketing opportunities, such as branded apparel, on the sidelines (see 2001 Resolution JC-3);

*Whereas,* the League and its affiliates have, and expect to have in the future, strategic relationships with sponsors (e.g., Motorola, Gatorade) and others (e.g., Reebok) that represent collective assets and opportunities of all of the member clubs;

*Whereas,* the maintenance and enhancement of both those strategic relationships and the League's broadcast relationship could be jeopardized in the absence of collective League control over marketing and sponsorship opportunities presented by sideline exposure during NFL games;

*Whereas,* the membership generally, and the Business Ventures and Broadcasting Committees, will continue to explore alternatives for promoting the value of the broadcasting, marketing and sponsorship relationships of the League and its member clubs; and

*Whereas,* the Executive Committee wishes to reaffirm and confirm that Article 4.3's provision for exclusive League control over the exhibition of football games by member clubs includes all marketing and sponsorship opportunities on the sidelines of all NFL games;

It is Hereby *Resolved,* that Article 4.3's provision for exclusive control over the exhibition of football games includes all marketing and sponsorship opportunities on the sidelines of all NFL games; and that prior exercise by the League and its affiliated entities of such control be, and is, hereby ratified and affirmed.

## 2002 RESOLUTION MC-1

*Whereas,* certain NFL players have experienced both on-field and off-field injuries resulting in total and permanent disability;

*Whereas,* worker's compensation coverage may be unavailable or inadequate to offset the costs associated with such total and permanent disabilities;

*Whereas,* many NFL clubs have purchased insurance to cover costs associated with such injuries;

*Whereas*, NFL clubs may wish to supplement such insurance coverage at favorable rates;

*Whereas,* a League-wide catastrophic loss program would result in coverage for all NFL players at all times for both on-field and off-field injuries and result in lower premium costs for Member Clubs; and

*Whereas,* the NFL Management Council Executive Committee recommends that all Member Clubs should be provided with more cost-effective and comprehensive catastrophic loss protection; it is therefore

*Resolved,* that the Management Council Executive Committee unanimously moves approval of the NFL Catastrophic Loss Program, on such terms and conditions as are attached hereto.

## ATTACHMENT TO 2002 RESOLUTION MC-1

## PRO FINANCIAL SERVICES, INC., LLOYD'S, LONDON INDICATION

## FOR THE NATIONAL FOOTBALL LEAGUE (NFL) FOR AND ON

## BEHALF OF ALL MEMBER TEAMS

## 2002 CATASTROPHIC LOSS PROGRAM

Type:...........................................Catastrophic Injury Insurance-Accidental Bodily Injury Only-24 hour.

Form: .........................................Lloyd's, London wording to be advised.

Holder:.......................................The National Football League (NFL) for and on behalf of all thirty-two (32) Member Teams.

Insureds:.....................................The National Football League contracted football players.

2002-10

Territorial Limit: ........................Worldwide.

Interest: ......................................Accidental Bodily Injury causing catastrophic injury defined as: paraplegia, quadriplegia, hemiplegia, monoplegia, total severance of limb(s) or total loss of sight

Term: .........................................Thirty-Six (36) months from the Time of Binding.

Sum Insured: ..............................On and Off Field Coverage - $1,000,000 Maximum Sum Insured Any One Player.

Limit Any One Occurrence: ........$10,000,000

Premium:

Year 1) $640,000.00 ..............Due at Inception

Year 1) $160,000.00 ..............Due in the event of a claim within the first 12 months

Year 2) $640,000.00 ..............Due at First Anniversary

Year 2) $160,000.00 ..............Due in the event of a claim within the first 24 months

Year 3) $640,000.00 ..............Due at Second Anniversary

Year 3) $160,000.00 ..............Due in the event of a claim at any time within the policy term

**Conditions:**

1. Mandatory that all Players contracted to National Football League Clubs be covered, not to exceed ninety (90) players per NFL team.

2. All players to be covered under this policy must pass their team's official entrance examination and be warranted fit and healthy at the date the player is added to the coverage.

3. Receipt of premium.

4. Catastrophic Injury defined as paraplegia, quadriplegia, hemiplegia, monoplegia, total severance of limb(s) or total loss of sight.

5. All Catastrophic coverages purchased by individual NFL teams will cancel if the above League Plan is purchased.

2002-11

## 2003 RESOLUTION BC-1
## (AS AMENDED)

*Whereas,* the League's Broadcasting Committee has reviewed and approved the terms of the proposed NFL Sunday Ticket rights agreement between NFL Enterprises and DirecTV for the 2003-08 NFL seasons (the "DirecTV Agreement");

*Whereas,* the Board of Directors of NFL Enterprises has approved the terms of the DirecTV Agreement;

*Whereas,* the DirecTV Agreement creates a distribution opportunity for an NFL television channel (the "NFL Network");

*Whereas,* it is anticipated that the NFL Network will, under the DirecTV Agreement, produce as much as $100 million in subscriber fees from DirecTV to be invested in the development and distribution of the NFL Network;

*Whereas,* the NFL Network creates long-term strategic value and opportunity for the League as a whole, and could reach many more NFL fans and generate substantially more in revenue if it is broadly distributed via cable television systems and potentially via satellite television carriers in addition to DirecTV; and

*Whereas,* the Executive Committee of the League now also wishes to confirm its interest in facilitating the broad distribution of the NFL Network via cable television and satellite television systems in order to reach more NFL fans and to maximize the NFL Network's long-term monetary and strategic value, and associated collective benefits for the League and the member Clubs;

It is hereby *Resolved* that the League concurs in the Broadcasting Committee's approval of the DirecTV Agreement, with the Broadcasting Committee to ensure that, during the term of the DirecTV Agreement, no network television agreement containing provisions that would interfere with or preclude NFL Enterprises' performance of the DirecTV Agreement will be executed;

Further *Resolved,* that the Executive Committee confirms its intent to secure the monetary and strategic value of the NFL Network for the benefit of the League as a whole by obtaining broad distribution for the NFL Network on cable television systems and potentially satellite television carriers in addition to DirecTV;

Further *Resolved,* that in order to secure such broad distribution of the NFL Network on cable television systems and additional satellite television carriers, each member club shall cooperate with NFL Enterprises in the conduct of the NFL Network business and in such club's exploitation of its local media opportunities, in order to permit the financial and strategic value of the collective NFL Network opportunity to be secured and enhanced;

Further *Resolved,* that, to ensure that the NFL Network has attractive programming to help it secure broad distribution and without limiting the manner in which Clubs cooperate in the NFL Network's business, clubs shall make the following programming available to the NFL Network:

1. Beginning with the later of the 2004 NFL preseason and the first NFL preseason following the expiration of such club's current preseason television contract, each club shall

   a. make available to NFL Enterprises the right to reair its preseason game telecasts (i) live outside of such club's home market and (ii) on a non-exclusive, time-delayed basis within and outside such club's home market as part of the programming mix for the NFL Network (the airing of which shall not give rise to any preseason networking charges under then-current League policies on networking of preseason games); and

   b. make available to NFL Enterprises the right to reair such preseason game telecasts on a "video on demand" basis (the airing of which shall not give rise to any preseason networking charges under then-current League policies on networking of preseason games);

2. Beginning with the 2004 NFL season, each club shall make available to NFL Enterprises its season preview shows (if any), to air on the NFL Network and/or on a "video on demand" basis; and

3. Beginning with the 2003 NFL season, each club shall cooperate with NFL Enterprises by producing, at Enterprises' cost and expense, customized shoulder programming related to such club to be aired by the NFL Network on a "video on demand" basis.

Further *Resolved,* that the programming described in the previous section of this resolution, and other "video on demand" programming made available by the NFL Network to subscribers to the various cable television and satellite television services carrying the NFL Channel, shall be the only NFL programming made available on a "video on demand" basis by the League or the member clubs;

Further *Resolved,* that club promotional advertising in any such telecasts will be included in any reairs and current club exclusive advertising relationships will be respected in any reairs within the club's home marketing area, and that a full report on proposed NFL Network advertising patterns and relationships will be presented to the Board of NFL Business Ventures prior to the Fall 2003 Annual Meeting and to the full membership at that Meeting;

Further *Resolved,* that each club shall require that any regional sports network carrying its preseason games limit its distribution of such games to those areas within the club's home territory (i.e., primary and secondary television markets) in which such regional sports network is distributed via cable television systems, and "black out" such games outside the club's home territory if the regional sports

network is distributed to wider areas by cable systems or satellite television distribution; and

Further *Resolved,* that member clubs are encouraged, in their distribution of local preseason game and shoulder programming, to promote the NFL Network through advertisements and promotional mentions for the NFL Network.

### 2003 RESOLUTION BC-2

*Whereas*, satellite radio is a new nationwide distribution platform that offers the NFL an opportunity -- previously unavailable to it -- to provide out-of-market audiocasts to fans of NFL clubs;

*Whereas*, satellite radio also offers the League the opportunity for substantial promotional exposure and (potentially) to create simulcast programming that can also air on the NFL Network;

*Whereas*, the NFL and its member clubs can realize the full potential of the nationwide satellite radio platform and minimize adverse impact on the League's and the member clubs' respective terrestrial radio and Internet audio streaming businesses only through a coordinated approach to satellite radio development pursued at a national level by the League;

*Whereas*, in order to begin such coordinated development of the satellite radio platform, NFL Enterprises has negotiated a seven-year nationwide satellite radio agreement with Sirius Satellite Radio, which includes game broadcasts, other programming, and equity grants to NFL Enterprises for the benefit of its partners (the member clubs), all as described to the membership; and

*Whereas*, the Broadcasting Committee has recommended that the member clubs approve the Sirius agreement, and that the directors of NFL Ventures, Inc. approve such agreement as well;

Be it *Resolved*, that the nationwide satellite radio agreement between NFL Enterprises and Sirius Satellite Radio be, and hereby is, approved on the terms presented to the membership; and

Further *Resolved*, that the Commissioner (as Chairman of NFL Ventures) and each officer of NFL Enterprises be, and hereby is, authorized and directed to negotiate and execute definitive agreements with Sirius implementing the transaction described to the membership, with such officer's execution of those agreements being conclusively deemed to evidence the acceptability thereof.

**2003 RESOLUTION G-1**

*Whereas,* pursuant to 2002 Resolution G-3, the Member Clubs may wear an approved third uniform design at one home game each season in connection with a special event, occasion or anniversary, provided that the Club gives notice to the League office by July 1 of the year in which the selected game is scheduled to be played, the selected game does not conflict with a League event or initiative, and the event being commemorated is approved by the Commissioner ("the Third Uniform Design Program");

*Whereas,* pursuant to Article 19.9 of the NFL Constitution and Bylaws, the home team has the option of deciding whether the visiting club shall wear white jerseys or the colors awarded to the visiting team under Section 19.9, and the Commissioner has authority to resolve any conflict or asserted conflict between the colors of the two clubs;

*Whereas,* the Member Clubs believe that it would be beneficial to authorize the Business Ventures Committee to oversee implementation of the Third Uniform Design Program; and

*Whereas,* developments in the NFL's consumer products business make it desirable to expand the Third Uniform Design Program to allow a third uniform design at two regular season games, home or away.

Be it *Resolved,* that, subject to the conditions prescribed by 2002 Resolution G-3, a Club may wear an approved third uniform design at two regular season games, home or away; and

Further *Resolved,* that the Business Ventures Committee shall be authorized to oversee implementation of the Third Uniform Design Program.

## 2003 RESOLUTION IC-1
### (AS AMENDED)

*Whereas*, the member clubs committed to operate the NFL Europe League through the 2003 NFL Europe League season pursuant to 1999 Resolution IC-1 and 2000 Resolution JC-5;

*Whereas*, the NFL Europe League serves important League objectives by, among other things, providing development opportunities for potential NFL players (U.S. and foreign players), coaches (including former players and minorities), officials, and staff, increasing international awareness of American football, and providing programming for the NFL Network;

*Whereas*, the NFL Players Association has expressed a continuing commitment to share the cost of the NFL Europe League (including, but not limited to, annual DGR deductions and Salary Cap credits); and

*Whereas*, the member clubs believe that continued investment in NFL Europe is in the best interests of the League and wish to extend their commitment to the NFL Europe League;

Be it *Resolved*:

1. That the NFL Europe League shall be operated through the 2005 NFL Europe League season on the basis presented to the Executive Committee.

2. In operating for the term set forth in the preceding paragraph, NFL Europe shall emphasize the following goals:

   a. Identify and develop foreign national players to expand the talent pool on an international basis and elevate the presence of NFL Europe.

   b. Emphasize operations in priority markets where individual Europe League teams have the greatest prospect for successful operation.

   c. Explore joint ventures and Europe-based partnerships that will enhance the prospect for improved financial performance and public awareness and acceptance in Europe.

   d. That the budget for NFL Europe League operations shall be approved annually by the Business Ventures Committee, which shall report to the League membership on such approved budgets.

## 2003 RESOLUTION JC-1
## (AS AMENDED)

*Whereas,* the stadium construction support program established by 1999 Resolution G-3 (the "G-3 Program") has been successful in improving the League's ability to secure the construction of new stadiums through public-private partnerships;

*Whereas,* extension of the G-3 Program can facilitate public-private efforts in support of new stadium construction projects in the remaining markets where such projects are needed by (1) continuing to make upfront League loans available to support Clubs' private contributions to such projects (rather than annually exempting from sharing the visiting team share ("VTS") of club seat premiums over a period up to 15 years), and (2) continuing to ensure that League loans will amount to at least 34% of an affected Club's private contribution to a project;

*Whereas,* the Finance and Stadium Committees have determined that any extension of the G-3 Program should reaffirm the principal parameters of the current G-3 Program, including but not limited to (1) the target maximum annual assessment level presented to the membership in connection with the G-3 Program ($1 million per club), (2) the requirement that, upon the sale (other than an intra-family sale) of any Club that receives League stadium construction support under the G-3 Program during the first fifteen seasons after a G-3 stadium is opened, the selling party shall repay the unamortized portion of such League support from the sale proceeds, (3) the maximum amortization period for League borrowings to fund G-3 Program stadium support (determined by the Finance Committee to be 25 years after the inception of the G-3 Program unless the Finance Committee shall subsequently determine to the contrary), and (4) the amortization period for League G-3 Program support to a Club (15 years from the opening of the Club's stadium); and

*Whereas,* the membership desires to clarify and strengthen certain aspects of the G-3 Program while retaining substantially all of the principal parameters described above;

Be it *Resolved:*

1. That for any stadium construction project (new stadium or substantial renovation) involving a private investment for which an affected Club makes a binding commitment, the League shall make a loan to the affected Club to support such project based on the amount that the affected Club has committed to such project as a private contribution (the "Private Contribution"), provided, that no such loan shall be made if the result would be that the projected television assessments arising out of the G-3 Program (defined as the portion of the League's total G-3 borrowings that are projected not to be amortized through application of club seat premium VTS and PSL VTS generated from G-3-funded stadiums during their first 15 years of operations, based on projections provided to the membership in

connection with a request for G-3 approval and (where applicable) club guarantees of such projected club seat premium and PSL VTS levels) exceed the target maximum annual assessment level of $1 million per Club per year for a 25 year period ending on March 31, 2024;

2. That the amount of such League loan shall be either 34% or 50% of the Private Contribution, determined by the size of the television market in which the stadium involved is being constructed, with League loans at the 50% level to be made available to facilitate stadium construction projects for NFL clubs currently operating in the six largest national television markets, and with the League loans in all other television markets limited to 34% of the Private Contribution;

3. That each League loan in support of a stadium construction project shall be subject to membership approval on a case-by-case basis, and that, in addition to the restriction on the availability of such loans based on the target maximum annual assessment level set forth in paragraph (1) above, no League committee shall recommend any such loan for membership approval unless:

   a. the club seeking such support shall have provided, at least six weeks in advance of the League meeting at which such support is to be considered:

      i. detailed information on the sources and uses of construction funds (for review by NFL staff and consultants as to the adequacy and appropriateness of the proposed construction budget);

      ii. detailed projections of the revenues to be generated from the new stadium during its first fifteen seasons of operations (for review by NFL staff and consultants to permit them to calculate the amount of revenue available to defray League support for the project and the funds needed to amortize over a reasonable period the club's stadium construction debt (if any)); and

      iii. detailed information on the scope of the project (to permit review by NFL consultants as to the matters addressed in paragraph 1 of Attachment A);

   b. the club seeking such support shall have guaranteed the amount of revenues from Club Seat Premium and PSL VTS that it projects will be generated by its stadium to defray G-3 Program support for such stadium, at levels consistent with recent precedents (90% of the club-generated funds to be used for such purposes that are reflected in the club projections presented to the membership, with funds from both Club Seat Premium and PSL VTS counted towards satisfaction of such guarantee), and shall have projected that Club-generated funds equal to no less than 80% of G-3 Program support in the case of a 34% loan, and

2003-8

> no less than 50% of G-3 Program support in the case of a 50% loan, will
> be generated by the project to defray G-3 Program support; and

> c. the club shall have accepted all overrun risk, as between itself and the
> League, by accepting a "hard cap" on the amount of G-3 Program
> support it will receive, which may be varied or increased only through a
> subsequent membership vote;

4. That the Commissioner is authorized to make arrangements for the League
to borrow from commercial or institutional lenders funds to make such
League loans, with the funds to be repaid to such lenders over an
appropriate time period (25 years after the inception of the G-3 Program, or
such other period as may be determined by the Finance Committee);

5. That a specific authorization to borrow the necessary funds to provide
support for each project from commercial or institutional lenders will be
included as part of the League's approval of a League loan to such project,
with the borrowings to be repaid principally from the VTS of club seat
premiums generated by such project and other G-3 projects, and, to the
extent that the VTS of club seat premiums generated during the first 15
seasons of G-3 stadium operation (all of which shall be applied to amortize
League debt incurred to fund the G-3 Program, even if the support provided
under the G-3 Program to a particular project is nominally amortized in
fewer than 15 seasons) is insufficient to repay such loans, with any
incremental funds needed for repayment to be assessed against the
League's network television revenues;

Further *Resolved:*

1. That if PSLs are sold with respect to, and entirely dedicated to, a particular
stadium construction project, such PSLs shall be eligible for an exemption
from sharing in accordance with current policies;

2. That the amount of VTS exempted in respect of PSLs sold shall constitute a
League contribution and thus shall reduce the principal amount of League
loans available for the project by such exempted amount; and

3. That for purposes of determining whether a project is eligible for
incremental League loans, only the first $75 million of PSL proceeds shall
be treated as a portion of the Private Contribution;

Further *Resolved:*

1. That, as between an affected Club and the League, any League loan under
the League policy extended by this resolution shall be forgiven over the
term of such League loan, on an equal annual basis; and

2. That, if a Club that receives a League loan under the League policy extended by this resolution and such Club (or a controlling interest therein) is thereafter sold other than to a member or members of an owner's immediate family (as defined in the NFL Constitution and Bylaws) before the final maturity date of the League loan, then the selling party shall repay to the League from the sale proceeds at closing an amount equal to the outstanding principal balance of the League loan, and shall further pay to the League the shortfall (if any) of its guarantee of Club Seat Premium and PSL VTS to be generated by the stadium, with such shortfall to be determined by pro-rating such guarantee over the first fifteen seasons of stadium operations, and calculating the shortfall (if any) against the guarantee for that portion of such fifteen seasons that has then elapsed; and

Further *Resolved,* that in order for a stadium construction project involving a Private Contribution to qualify for a League loan, the conditions set forth in Attachment A to this resolution must be satisfied.

**ATTACHMENT A TO 2003 RESOLUTION JC-1 (As Amended)**

a. The League must approve a resolution specifically directing the making of a loan in respect of a particular stadium construction project, following an evaluation of (1) the necessity of a new or renovated stadium in a market in terms of the suitability, economic competitiveness, and physical condition of the existing facility, the stadium's importance to League franchise stability, the League's concerns regarding its national image and presence, the importance of an affected market to the League's national television ratings, and other League business priorities, and (2) the specific attributes of the project, including the scope and cost of the project relative to the economics in a market and the League as a whole, the balance of projected shareable and non-sharable revenue streams and the construction costs associated with each, whether a renovation project is a "qualifying" project (as defined in the 1994 Club Seat Sharing Exemption Guidelines), and similar factors;

b. Such resolution must be adopted and the stadium construction project must be committed to by both public and private parties before the maximum annual assessment target of $1 million per club is reached;

c. The stadium construction project must be a "public-private partnership" to which public authorities and an affected Club each have committed funds;

d. The project must not involve any relocation of or change in an affected Club's "home territory" (as defined in the Constitution and Bylaws);

e. No project proposal may be accepted from any club that, within the year prior to its submission of such proposal, has had pending or has supported a lawsuit against the League or any of its member Clubs;

f. Increases in the visiting team share generated by the new or renovated stadium must meet the standards set forth in the 1994 Club Seat Sharing Exemption Guidelines; and

g. The NFL Players Association must agree to exclude from DGR, over a reasonable period of time on a straight-line amortization basis, the entire amount of the Private Contribution (except for any deemed contribution made by a club in the form of rent in excess of a $2 million per year deductible, which may be reconsidered and modified by the Finance Committee from time to time), together with an amount equal to the imputed interest on the Private Contribution at a commercially reasonable interest rate.

## 2004 RESOLUTION BC-3

*Whereas,* the League's Broadcasting Committee has reviewed and unanimously approved the terms of the proposed NFL Sunday Ticket rights agreement between NFL Enterprises LLC and DirecTV for the 2006-2010 NFL seasons (the "DirecTV Agreement");

*Whereas,* this extended agreement continues the League's satellite television service in the same format as has been successfully presented during the seasons 1994-2004; and

*Whereas,* the DirecTV Agreement will continue to provide a distribution opportunity for the NFL Network consistent with the DirecTV arrangements currently in effect;

Be it *Resolved* that the League concurs in the Broadcasting Committee's approval of the DirecTV Agreement and directs the Broadcasting Committee to ensure that, during the term of the DirecTV Agreement, no network television agreement containing provisions that would interfere with or preclude NFL Enterprises' performance of its obligations under the DirecTV Agreement.

## 2004 RESOLUTION BC-4

*Whereas*, the League has negotiated new television contracts for its Sunday afternoon television packages with CBS and FOX, covering all NFL preseason, regular season and postseason Sunday afternoon games, and no less than 2 Super Bowl games each, for the 2006 through 2011 seasons;

*Whereas*, ratification of those contracts by the membership has been unanimously recommended by the Broadcasting Committee; and

*Whereas*, the membership now desires to ratify and approve such contracts, with specific administrative and cooperation policies with respect to such television contracts to be adopted by membership resolution at a later date following the League's negotiation of television contracts for its prime time television packages;

Be it *Resolved*, that the League's 2006-2011 television contracts with CBS and FOX each are hereby ratified and approved; and

Further *Resolved*, that pending membership adoption of resolutions governing scheduling, game length, overall cooperation, and preseason policies for the new contract term (and in any case, for the 2004 and 2005 seasons, which continue to be subject to the current network television contracts), the member clubs will continue to cooperate fully with the television networks pursuant to and as required by 1998 Resolution BC-2.

## 2004 RESOLUTION BV-4
## (AS AMENDED)

*Whereas*, the NFL has for decades operated a successful and highly respected business involving the collective licensing and protection of League Marks[1] and Club Marks[2], and has entered into successful business relationships with producers of a wide range of consumer products and with major corporate sponsors in a variety of fields;

*Whereas*, the licensing of League Marks and Club Marks has become an integral and important part of the collective efforts of the League and the Member Clubs to promote and foster the primary business of League Members, the creation of a football entertainment product, NFL football;

*Whereas*, since 1982 such activities have been implemented by NFL Properties on a collective basis through the mechanism of an NFL Trust and related exclusive license agreements;

*Whereas*, the League's business models for licensing, sponsorships and promotion have evolved and been modified by League Committees and membership decisions to allow the League and Member Clubs to compete more effectively with other trademark holders in view of changes in business conditions within the NFL as well as in the broader competitive marketplace;

*Whereas*, the NFL Trust and related exclusive license agreements are scheduled to expire on March 31, 2004;

*Whereas*, a trust structure is no longer necessary to achieve the purposes for which it was intended based on changes in the NFL's business structure and operations including the formation of NFL Ventures, L.P.;

*Whereas*, the development and use of League Marks and Club Marks, for both commercial and promotional purposes, should continue to be managed through a membership-owned common enterprise and on a coordinated basis under the terms set forth below and consistent with settled League governance principles;

---

[1] League Marks shall mean all trademarks owned by the League entities, including without limitation, NFL, the NFL Shield design, Super Bowl game, Pro Bowl game, NFL Kickoff, NFL Playoffs in their present form or as may be adopted in the future.

[2] Club Marks shall mean all trademarks owned by a Member Club, including without limitation, the names, nicknames, logos, colors, slogans, symbols, or any other identifying indicia in their present form or as may be adopted in the future.

*Whereas*, League and Member Club trademark licensing and related activities constitute a shared opportunity created by the joint presentation of NFL football games among all Member Clubs and a collective means of promoting NFL football, and are most appropriately pursued on terms established by the vote of three-fourths of Member Clubs as provided in the Constitution and Bylaws; and

*Whereas*, the Member Clubs deem it necessary and advisable to amend certain provisions of the Constitution and Bylaws to implement the successor arrangements to the NFL Trust and to ensure that League Marks and Club Marks can continue to be effectively used to promote and foster NFL football;

Be it *Resolved* that the Constitution and Bylaws are amended as follows:

1. Expiration of Trust and New Agreement: The NFL Trust and related exclusive license agreements will expire by their terms on March 31, 2004. Subject to existing agreements, the terms of this Resolution, and other applicable provisions of the NFL Constitution and Bylaws and League rules and policies, each Club will have the right to use its Club Marks within its Home Territory and Home Marketing Area, as defined below.

2. Continuation of Existing Agreements: All existing agreements entered into by the League or a League affiliate[3] with third parties on matters covered by this Resolution shall remain in effect according to their terms, including any extension or renewal rights. All Clubs shall continue to participate in and support implementation of all such agreements. This Resolution shall not affect any existing agreements between the League (and/or a League affiliate) and the NFL Players Association (and/or an affiliate).

3. Definition of Home Territory: The definition of "Home Territory" as set forth in Article 4.1 of the Constitution and Bylaws remains unchanged, and the definition of club "rights within home territory" as set forth in Article 4.2 of the Constitution and Bylaws remains unchanged except that this Article is amended to add the following subsection (E).

> The Home Territory of the Washington Redskins and the Home Territory of the Baltimore Ravens, respectively, shall remain as defined in Article 4.1 (A) above except that the Home Territory of the Redskins shall include all of Montgomery and Prince Georges Counties and no other part of the State of Maryland and the Home Territory of the Baltimore Ravens shall include all of Anne Arundel and Howard Counties in the State of Maryland.

---

[3] League affiliate shall mean entities collectively owned by the Member Clubs of the NFL (e.g., NFL Ventures, NFL Enterprises, NFL Properties, NFL International, and NFL Productions).

4. <u>Definition of Home Marketing Area</u>: Article 4 of the Constitution and Bylaws is hereby amended to add the following Article 4.4, and existing Article 4.4 ("Conference Alignment") shall be renumbered as Article 4.5:

(4.4)  Home Marketing Area Defined

(A)  Each Club shall have a Home Marketing Area in which it may engage in the commercial activities set forth in Section 4.4(B) below. The Home Marketing Area shall be defined as (i) the Home Territory (including the portion of any foreign country within a Club's Home Territory, provided however, that activities within a foreign country are coordinated with and approved in advance by the League on behalf of NFL International) and (ii) the State within which the City for which the Club holds a franchise is located.

Where two or more Clubs share a Home Territory, each Club shall have equal rights under Section 4.4(B) below with respect to the Home Territory and Home Marketing Area. Where two or more Clubs hold franchises within the same state but do not share a Home Territory, each Club shall have equal rights within the Home Marketing Area, except for the Home Territory of another Club.

The Home Marketing Area of any Club shall also include the County in which the Club's preseason training camp is located (if located within the United States) for the duration of such training camp only, unless the training camp is located within the Home Territory of another Member Club.

(B)  Club Rights Within Home Marketing Area; Exclusivity and Other Terms

1.  Subject to the terms of Section 4.4(A), each Club shall have exclusive rights vis-à-vis other Clubs to use its Club Marks within its Home Marketing Area with respect to NFL football activities involving (i) local advertising, sponsorship, naming rights, and related promotional arrangements; (ii) retail stores and other Club-identified physical structures and ventures; (iii) promotional and public awareness campaigns, including "image" advertising; and (iv) Club-sponsored events.

2.  A Club's rights to use its Club Marks within its Home Marketing Area shall at all times be subject to: (i) League agreements, including with manufacturers of licensed products; (ii) the rights of League sponsors and business partners, including television partners and the NFL Network; (iii) the right of the League to promote League

2004-5

initiatives and events; and (iv) the rights of the League and individual Clubs to reach fans outside of their Home Marketing Area through e-commerce and other Internet related activities, catalog sales and database marketing. Except as otherwise set forth in this Section, no Club shall have any rights to use or license its Club Marks in the Home Marketing Area of another Club.

(C) A Club may request a limited expansion of its Home Marketing Area into a border state. Such requests will be evaluated based on the effect of the proposed expansion on the interests of the League or another Member Club.

(D) Consistent with prior resolutions, the Los Angeles home territory shall remain owned and controlled by the League, and pending a decision by the League to place one or more franchises in the Los Angeles area, no Club shall have rights to use Club Marks in the Los Angeles Home Territory for the purposes set forth in Section 4.4(B) above.

5. <u>Revenue and Cost Sharing Study</u>: The Commissioner will appoint a Special Committee of at least nine owners to evaluate in depth the key financial aspects of the operations of all member clubs in relation to all revenue sources and revenue opportunities, all club operating costs (including team and owner stadium construction costs), and the impact of these matters on the competitive football opportunities of all clubs as well as the terms of any current or proposed Collective Bargaining Agreement with the NFL Players Association. The Committee will make recommendations on these matters, including on revenue and cost sharing alternatives, to the thirty-two (32) owners for their consideration in further League decision-making. The members of this Committee will include three of the current members of the Management Council Executive Committee; three of the current members of the Finance Committee; and three owners not currently a member of either of these committees.

6. <u>League Policies</u>: This Resolution shall not affect any existing policies regarding the League's image, health and safety issues, or the integrity of the game. To further the commitment of all Clubs to promote NFL football, Club Marks can be used in connection with the presentation and promotion only of (a) NFL football as conducted by the League and its Member Clubs or (b) football presented by NFL-owned entities approved by the League's membership, such as the NFL Europe League (see Section 9.1(C)(7)). Club marks and logos may not be used in connection with the presentation or promotion of other sports, amateur or professional, except with the prior approval of the League's membership based upon a three-fourths vote.

7. <u>League Control of League Marks and Collective Use of Club Marks</u>: The League directly and/or through one or more League affiliates shall retain

exclusive control of all League Marks and the collective use of Club Marks (the use of all Clubs' marks with equal emphasis) in any context. No Club may license or use League Marks or any other Club Marks, nor permit a third party to use any of its Club Marks together with the Club Marks of another Club absent prior League approval.

8. <u>League Control of League Marks and Individual Club Marks in Certain Contexts</u>: The League shall retain exclusive worldwide control to license and otherwise use League Marks and individual Club Marks during the Term of this Resolution, in respect of the following business operations: (i) the promotion of the League; (ii) game presentation including presentation and promotion of NFL football through game telecasts and related programming in all forms of media; (iii) international operations; (iv) apparel, accessories, footwear and fitness products; (v) computer and video games; (vi) trading cards; (vii) footballs, helmets, and other equipment used on the playing field; (viii) player-identified product; (ix) home videos and related NFL Films products; (x) products including the marks of all Clubs; and (xi) licensing, advertising, product or service placement, sponsorships and promotional agreements relating to commercial identification on the sidelines or playing field or otherwise subject to television exposure during NFL games. With respect to any such operations, no Club may "opt out" of any League arrangement in such business operations or "go dark" by refusing to cooperate with any such arrangement.

9. <u>League and Club Publishing</u>: The League shall continue to be responsible for publishing products (books, magazines, etc.) that feature the marks, logos and intellectual property of the League and Member Clubs, with each Club retaining the right to produce and license Club-related publications using its Club Marks within its Home Marketing Area.

10. <u>League Sponsorship and Promotional Arrangements</u>:

    (a) The League may enter into sponsorship and promotional agreements licensing the use of League Marks and collective use of Club Marks. Except as set forth in paragraph 8 above, each Club shall retain the right to have a separate sponsorship and promotional arrangement for individual use of its Club Marks within its Home Marketing Area, subject to rules and policies established by the League and/or a League affiliate, including without limitation, regulations based on taste, image, health or safety, or integrity of the game considerations, and relating to premium products and branding.

    (b) The Member Clubs, by a three-fourths vote, may authorize a League affiliate to enter into a particular sponsorship agreement for a specific category licensing the use of League Marks and the individual use of all of the Club Marks.

11. <u>Hardline Products</u>: The League has the exclusive right to enter into license agreements to use League Marks and Club Marks for non-apparel ("hardline") products to be distributed nationally. Except for those hardline products identified in paragraph 8 above, Clubs shall have the rights set forth below:

    (a) Clubs may opt independently to obtain certain hardline products bearing their respective Club Marks from League licensees for distribution in the Club's Home Marketing Area in non-traditional retail outlets operated by Club sponsors (e.g., automobile dealerships). League licensees will be required to offer a favorable price to such Clubs. Clubs may purchase the product from a non-licensee if the price is at least 10% below the NFL licensee's price provided the quality of the product is comparable to that offered by the NFL licensee. Clubs electing this option will be required to ensure that a customary royalty is paid to a League affiliate.

    (b) Clubs may "opt out" of League licensing arrangements for certain products bearing their Club Marks for taste, image or other legitimate reasons but may not license their Club Marks for use on the identical or substantially similar hardline products independently. Clubs opting out of a product will not share in any revenue derived from the sale of that product.

    (c) Clubs may enter into license agreements for use of their Club Marks on up to five products which are not part of the NFL's national licensing program for distribution within the Club's Home Marketing Area, subject to appropriate quality control provisions and receipt of customary royalty payments by a League affiliate.

12. <u>Extension of NFL Internet Network</u>: The NFL Internet Network as currently structured and operated by the League and the member clubs, under 2000 Resolution JC-1 and 2001 Resolution JC-1, shall be extended to operate beyond the end of the 2005 NFL season through and including March 31, 2019. During this Term, the membership may periodically review the operations and elements of the Network to take account of changing technology, business models and other considerations and to determine whether modifications (by three-fourths membership vote) should be made to aspects of the Network's operations.

13. <u>Violations; Sanctions and Penalties</u>: Any Club that licenses or authorizes use of its Club Marks in violation of this Resolution, or related rules or policies, shall, in addition to any other penalty that may be assessed, pay to the League or a League affiliate all proceeds and other consideration received for such license and not be entitled to share in any revenues generated by the use of League Marks and Clubs Marks hereunder.

14. <u>Finance/Tax Matters</u>: NFL Properties' net income and expenses shall be taken into account for purposes of determining the License Fee to be paid by NFL Ventures to the Clubs.

15. <u>Effective Term of Resolution</u>: This Resolution shall be effective as of April 1, 2004, and shall remain in effect through and including March 31, 2019 or expiration of any then-existing agreements beyond the Term as approved by three-fourths of the Member Clubs.

16. <u>Three-Fourths Voting Standard; Constitution and Bylaws Governs</u>: This Resolution may be amended and further membership decisions on these matters will be made by a three-fourths vote of the Member Clubs.

17. <u>League Responsibilities for Trademark Protection</u>: All trademark and related intellectual property protection activities for the League and the Member Clubs, including without limitation, registration activities and the prosecution or defense of litigation, will be handled on a worldwide basis exclusively by a League affiliate, as will all agreements with the NFL Players Association or its affiliates relating to the subject matter of this Resolution.

18. <u>Disputes Resolution; Constitution and Bylaws Governs</u>: Any disputes arising out of or relating to this Resolution, any policies or rules developed to implement this Resolution, the Trust and any related agreements, or the rights and obligations of NFL Ventures and its affiliates, shall be resolved exclusively under the mechanism set forth in Article VIII of the Constitution and Bylaws.

19. <u>Policies and Compliance Matters</u>:

    (a) Any policies or rules developed to implement this Resolution shall be established by the Commissioner in consultation with the Business Ventures Committee.

    (b) All licenses granted by the League and any Member Club or any affiliate of such entity shall include appropriate provisions relating to audit, insurance and indemnification, quality control, prohibitions on assignment, sublicensing, or otherwise encumbering League Marks or Club Marks, prohibitions on third party licensing of League Marks or Club Marks, and other contractual provisions that may be from time to time required to protect the League and the Member Clubs.

    (c) Clubs shall not mortgage, pledge, hypothecate or otherwise encumber rights in Club Marks without prior approval of the League.

20. <u>Club Cooperation and Support of Joint Activities</u>: The Clubs shall cooperate with the League and League affiliates as may be reasonably necessary to carry out the terms of this Resolution including the licensing

and protection of League Marks and Club Marks rights and in that respect shall execute documents as may be reasonably requested by the League or a League affiliate to carry out the purposes of this Resolution.

## 2004 RESOLUTION FC-1A
### (AS AMENDED)

Whereas, 1985 Resolution FC-7, as amended by 1996 Resolutions FC-5 and FC-6, requires that a single individual (the "Principal Owner", also referred to as the "Controlling Owner") must hold at least a 30% beneficial interest in a Member Club, and that such individual also have total voting control of the Member Club through a voting trust, general partner or managing member interest, shareholders agreement, or similar arrangement;

*Whereas*, the Finance Committee recognizes the importance of permitting Principal Owners to engage in responsible succession planning and to provide for the orderly transfer of ownership to the next generation without the disruption of forced sales to pay estate taxes; and

*Whereas*, to facilitate such intergenerational transfers the Finance Committee has determined that it is in the best interest of the League to allow Principal Owners, in certain circumstances and subject to certain conditions, to reduce potential estate tax liability by holding individually less than a 30% beneficial interest, and aggregating the Principal Owner's individual interest with those of immediate family members to reach the required 30% stake;

Be it *Resolved*, that a Principal Owner will be deemed to own a 30% beneficial interest in his club if all of the following conditions are met:

1.  The Principal Owner has owned the club for at least ten years, except that this provision shall not apply to any person who is a Principal Owner as of April 15, 2004, or his designated beneficiary;

2.  The Principal Owner individually owns a beneficial interest in the Member Club of at least twenty percent (20%);

3.  The Principal Owner and members of the Principal Owner's immediate family hold, through a family-owned entity in which the Principal Owner is the sole general partner, manager, voting stockholder, or trustee (as the case may be) an aggregate beneficial interest in the Member Club of at least thirty percent (30%) (such entity, the "GP Entity");

4.  The Principal Owner has total voting control of the Member Club through the GP Entity as managing member of a limited liability company, or general partner of a limited partnership, that owns the Member Club, or as the owner of all voting stock of a Member Club, in each case as documented to and approved by the Commissioner;

5.  The Principal Owner provides verification in form and substance satisfactory to the Commissioner that he has made arrangements to pass total voting control of the Member Club upon his death to a designated beneficiary who is a member of his immediate family, that upon the

2004-11

Principal Owner's death such designated beneficiary will succeed to the Principal Owner's position and will own at least a 20% beneficial interest in the Member Club, that following the Principal Owner's death members of the Principal Owner's immediate family will continue to hold at least a 30% beneficial interest in the Member Club, and that these arrangements will stay in effect until the Principal Owner's death or disposition of the Member Club, whichever occurs first;

6. No change may be made in the individual exercising total voting control of the Member Club except (a) with prior consent of the League's Executive Committee by a three-fourths vote, and (b) where the successor to the control position holds at least a 20% beneficial interest in the Club;

7. A member of the Principal Owner's immediate family may sell or transfer his interest in the Member Club, subject to the terms of any partnership, shareholder, or other contractual agreement and League policies regarding the transfer of ownership in Member Clubs;

8. In any case where a member of the Principal Owner's immediate family wishes to sell an interest that has been aggregated with the Principal Owner's interest to satisfy the 30% beneficial ownership requirement, such person must be required by the governing internal agreement of the GP Entity to sell such interest to the GP Entity (or to individuals owning interests therein), and the organizational documents of the GP Entity must provide that if the price cannot be agreed upon, the arbitration mechanism as set forth in Article III, Section 3.8(B) of the Constitution and Bylaws will be used to determine the price of the interest being sold; and

9. In any case not involving a transfer from a Principal Owner to a successor group of his immediate family, the requirement that the Principal Owner hold at least a 30% beneficial interest in the Member Club shall remain in full force and effect;

Be it Further *Resolved*, that except as specifically amended hereby, all policies relating to ownership or transfers of ownership in Member Clubs, including applicable debt ceiling rules, shall remain in full force and effect and shall be fully applicable to the GP Entity and to all members of the Principal Owner's immediate family owning interests therein; and

Be it Further *Resolved*, that nothing in this Resolution shall affect the validity of any existing and approved ownership arrangement at a Member Club.

### 2004 RESOLUTION FC-2

### (AS AMENDED)

*Whereas*, pursuant to 1997 Resolution FC-3, the membership provided for cross-ownership by controlling NFL owners in certain limited circumstances;

*Whereas*, the membership desires to clarify and strengthen ownership policy as it related to cross-ownership; and

*Whereas*, the membership wishes to avoid conflicts of interest, protect confidential information, and encourage owners to promote and develop NFL and club business;

Be it *Resolved* that:

1. The terms of 1997 Resolution FC-3 shall be deemed fully applicable to any member of a controlling owner's immediate family who either (a) holds an interest in the franchise, (b) is an officer, director or executive of the club or a club affiliate, or (c) is designated by the club as a representative to the Executive Committee pursuant to Article VI of the Constitution and Bylaws.

2. The provision of 1997 Resolution FC-3 shall be deemed fully applicable to any non-controlling owner who acquires his interest in an NFL franchise after May 25, 2004, and either (a) has an option, right of first refusal, or other contractual provision pursuant to which he may become the controlling owner of the club or (b) is designated by the club as a representative to the Executive Committee pursuant to Article VI of the Constitution and Bylaws.

3. Any person found by the Commissioner and the Finance Committee not to be in compliance with 1997 Resolution FC-3 or this Resolution shall be ineligible to attend meetings of the Executive Committee, and may not be appointed a member of the Broadcasting, Business Ventures, Finance, Stadium or Management Council Executive Committees.

4. For purposes of the Resolution, the term "club affiliate" shall have the meaning set forth in the Collective Bargaining Agreement. The term "immediate family" shall have the meaning set forth in Article 3.5 of the Constitution and Bylaws.

### 2004 RESOLUTION FC-7

### (AS AMENDED)

*Whereas*, all NFL member clubs are required annually to furnish audited financial statements to the League office,

*Whereas*, all NFL member clubs are required annually to furnish financial information sufficient to allow the preparation of the annual conforming statements;

*Whereas*, these financial reports are relied upon by the membership to formulate and implement important League policies; and

*Whereas*, the Committees wish to enhance the reliability, thoroughness and accuracy of these reports;

Be it *Resolved*, that

1. All club audited financial statements and all club conforming statements must include a specific certification that the financial results of all football-related affiliated entities have been included in the club's report;

2. All club audited financial statements and all club conforming statements must include a representation, signed by the principal owner and Chief Financial Officer, that the reports are complete and accurate, and contain all necessary disclosures, to the best of the signing party or parties' knowledge;

3. All club conforming statements must be audited by the club's independent auditors and include an audit opinion covering all schedules thereto in accordance with the conforming statement instructions prepared in accordance with a standardized chart of accounts as promulgated by the Finance Committee;

4. Each club shall submit the certified audit report and conforming statement to the Treasurer of the NFL by the earlier of June 30 or within 150 days after that club's fiscal year end; and

5. Each club will grant full cooperation to League auditors for the purpose of reviewing and confirming compliance with this Resolution and related instructions for preparing the conforming statements.

**2004 RESOLUTION G-1**

**(AS AMENDED)**

Amend the Anti-Tampering Policy to reflect the following:

After February 15 of any year and through the conclusion of the annual Selection Meeting, if a club seeks permission to discuss employment with an individual who is under contract for the succeeding season or seasons to another club to offer him a position as a high-level club employee, the employer club is under no obligation to grant the individual the opportunity to discuss the position with the interested club, provided that his current responsibilities do not include gathering information on and evaluating draft-eligible players or veteran free agent players. At the discretion of the employer club, however, such permission may be voluntarily granted.

## 2004 RESOLUTION JC-1A

<u>Renew and amend for the 2004, 2005 and 2006 seasons</u>, the amendments made to the Anti-Tampering Policy by 2002 Resolution JC-1 which was for the 2003 season only, as follows (new language underlined):

The following post-season procedure applies if a club (the inquiring club) is interested in discussing its vacant head coaching position with an assistant coach whose employer club is participating in the playoffs:

1.     The owner or operating head of the inquiring club may contact the owner or operating head of the employer club to request written permission to discuss its head coaching position with an assistant coach.

2.  If the employer club elects to grant permission to the inquiring club, the one (1) interview between the inquiring club and the assistant coach must be conducted in the home city of the employer's club at a time that is convenient for the employer club. For clubs that have byes in the Wild Card weekend, interviews of its coaches must be conducted prior to the <u>conclusion of</u> Wild Card games. For assistant coaches of clubs that participate in a Wild Card game and advance to the Divisional Playoffs, interviews must be conducted after the Wild Card games and prior to the Divisional Playoff games. An inquiring club is permitted only one interview with an assistant coach while his team is competing in the post-season, and there shall be no other direct or indirect contact between any employee or agent of the inquiring club and the assistant coach or any representative or agent of the assistant coach. No interviews may be requested nor granted after the Divisional Playoff weekend for any assistant coach whose team is still participating in the post-season.

3.  No contract shall be executed, and no agreement to execute a contract, or an announcement of a contract or of an agreement for employment, shall be permitted until after the conclusion of the employer club's playing season.

4.  If a club elects to grant permission for one of its assistant coaches to interview for a head coaching position, it must grant permission to all inquiring clubs that seek to interview him. Permission cannot be granted selectively.

5.  If a club elects to grant permission for one of its assistant coaches to interview with an inquiring club or clubs, it may deny permission for another member of its staff, provided that the denial is applicable to all inquiring clubs.

6. <u>The procedures described above will also apply if a club wishes to discuss a vacant high-level non-player, non-coach position (defined as club president, general manager, or a position with equivalent responsibilities and authority) with an individual who is not a high-level club employee and whose employer club is participating in the playoffs</u>.

## 2004 RESOLUTION MC-1

*Whereas*, the existence of Practice Squads has been authorized and regulated since 1993 by Article XXXIV of the Collective Bargaining Agreement ("CBA");

*Whereas*, NFL Clubs have benefited from the ability to employ practice squad players;

*Whereas*, numerous NFL Clubs have expressed the desire to employ additional practice squad players beyond the five (5) authorized by Article XXXIV, Section 1 of the CBA;

*Whereas*, the Competition Committee has unanimously recommended that Practice Squad rosters be increased by up to (3) players per Club;

*Whereas*, such additional practice squad players would be subject to all the restrictions and provisions of Article XXXIV; and

*Whereas*, the Management Council Executive Committee recommends that for the 2004 League Year only, and perhaps for subsequent League Years depending upon further review at the conclusion of the 2004 season, Clubs should have the opportunity to employ additional practice squad players; it is therefore

*Resolved,* that the Management Council, subject to negotiation and agreement with the NFL Players Association, modify Article XXXIV to provide for Practice Squads not to exceed eight (8) players per Club for the 2004 League Year only and to provide for an NFL option for subsequent League Years to set Practice Squad levels not to exceed (8) players per Club.

## 2005 RESOLUTION BC-1

It is hereby *Resolved* that, to protect and enhance the ability of the League to compete effectively with other entertainment providers and to protect the interests of the League as a whole (and specific initiatives thereof, including but not limited to the NFL Network), no member club may launch, operate, or participate in the launch or operation of, a Club-dedicated Network (as defined in the attached Report of the Broadcasting Committee);

*Further Resolved,* that, to avoid any conflicts of interests (including the appearance thereof) and to ensure compliance with the "primary purpose" rule set forth in the NFL Constitution, no member club may acquire or hold an equity or quasi-equity interest in a Club-equity Network (as defined in the attached Report of the Broadcasting Committee) unless prior approval of the terms of such equity interest shall have been obtained from the Commissioner after consultation with the Broadcasting Committee;

*Further Resolved*, that to preserve and enhance the ability of the League and the NFL Network to compete with other entertainment providers on a national basis, clubs may license programming to third-party-owned Regional Sports Networks only if carriage of such programming is expressly limited to the Club's home television market; and

*Further Resolved,* that with respect to an existing Club-equity Network in Dallas and existing and planned Club-dedicated Networks in Atlanta and Tampa Bay, the NFL Network and the involved Clubs will cooperate in good faith in promptly transitioning such existing operations into virtual Club networks as contemplated by, and within the framework of, the NFL Network.

## 2005 RESOLUTION BC-2

*Whereas,* the League has negotiated new television contracts for its prime time television packages with NBC and ESPN, covering all NFL prime time regular season games, certain preseason games, and in the case of NBC, certain postseason games including the Super Bowl games to be played in February 2009 and February 2012; and

*Whereas,* ratification of the NBC contract (covering the 2006-2011 seasons) at this time by the membership has been unanimously recommended by the Broadcasting Committee; and

*Whereas,* ratification of the ESPN contract (covering the 2006-2013 NFL seasons) by the membership has been unanimously recommended at such time as a definitive long-form agreement has been completed, reflecting in a manner satisfactory to the NFL all of the terms and conditions of the Memorandum of Agreement with ESPN dated April 15, 2005; and

*Whereas,* the membership now desires to ratify and approve such NBC contract, with specific administrative and cooperation policies with respect to such television contracts to be adopted by membership resolution at a later date following the League's ratification of the ESPN contract;

*Be it Resolved,* that the League's 2006-2011 television contract with NBC is hereby ratified and approved; and

*Further*, *Resolved,* that pending membership adoption of resolutions governing scheduling, game length, overall cooperation, and preseason policies for the new contract term (and in any case, for the 2005 season, which continues to be subject to the current network television contracts), the member clubs will continue to cooperate fully with the television networks pursuant to and as required by 1998 Resolution BC-2.

## 2005 RESOLUTION BC-3

*Whereas*, the League has negotiated new television contracts for its prime time television packages with NBC and ESPN, covering all NFL prime time regular season windows that have existed under previous NFL television contracts, certain preseason games, and in the case of NBC, certain postseason games including the Super Bowl games to be played in February 2009 and February 2012; and

*Whereas*, the membership has previously ratified the NBC contract (covering the 2006-2011 seasons); and

*Whereas*, the Broadcast Committee has unanimously recommended ratification of the ESPN contract (covering 2006-2013 NFL seasons) at this time, given that definitive long-form documentation with ESPN has been completed, reflecting in a manner satisfactory to the NFL all of the terms and conditions of the Memorandum of Agreement with ESPN dated April 15, 2005; and

*Whereas*, the membership now desires to ratify and approve such ESPN contract, with specific administrative and cooperation policies with respect to all of the League's television contracts to be adopted by membership resolution at a later date following the League's decision on creation and/or license of a possible Thursday/Saturday prime time television package;

Be it *Resolved*, that the League's 2006-2013 television contract with ESPN is hereby ratified and approved and subject to completion on terms satisfactory to the Commissioner of certain ancillary agreements with ESPN's sister network ABC, the league office is director to take steps to implement such agreement; and

Further, *Resolved*, that pending membership adoption of resolutions governing scheduling, game length, overall cooperation, and preseason policies for the new contract term (and in any case, for the 2005 season, which continues to be subject to the current network television contracts), the member clubs will continue to cooperate fully with the television networks pursuant to and as required by 1998 Resolution BC-2.

## 2005 RESOLUTION BV-1

*Whereas***,** the wireless distribution of NFL and Member Club related content (e.g.,  game video highlights, live game statistics, score updates, screen savers, ring tones, wallpaper, text based news services/updates, polls, contests/ sweepstakes) for use on handheld devices such as cellular telephones represents a significant emerging business opportunity for the NFL, to serve its fans, offering long-term strategic value to the NFL and Member Clubs by providing an opportunity to reach fans who are unable otherwise to access NFL and Member Club content;

*Whereas,* the NFL Business Ventures Committee has concluded that certain wireless content distribution of NFL and Member Club related content on a national level could most effectively serve NFL fans and enable the Member Clubs to compete effectively with other content providers if it were administered solely by the League Office on a collective basis; and

*Whereas,* the Committee has concluded that, in order to provide all Member Clubs with incremental assets to sell to third parties and service their fans, certain Member Club related content should be available for wireless distribution by the Member Clubs as set forth herein;

It is hereby *Resolved,* that NFL Ventures, L.P. or an appropriate affiliate shall attempt to enter into a wireless distribution agreement with a third party wireless network operator or other third party wireless content distributor in order to facilitate the broad distribution of NFL and Member Club related content, to best serve NFL fans, and to maximize the associated revenue to the entire NFL, provided that the entry into such agreement, shall be subject to the prior approval of the NFL Business Ventures Committee in its capacity as the NFL Ventures Board of Directors. Such agreement may include game video highlights, NFL Films video, NFL Network video, fantasy football, promotional content (e.g., screen savers, ringtones and wallpaper), video games, game radio highlights, segments and alerts, but may not include Member Club live full game radio rights;

*Further Resolved,* that subject to the terms of any national wireless content distribution agreement between NFL Ventures, L.P. or an appropriate affiliate and a third party wireless network operator or other third party wireless content distributor, and also pending the approval of such agreement by the NFL Business Ventures Committee, each Member Club shall then have the right to authorize third party wireless network operators and/or other third party wireless content distributors to distribute on a wireless basis, only the following content:

a) Non-game "shoulder" audio/visual programming not including any game video footage, such as coaches' shows and press conferences produced by or on behalf of such Member Club (excluding VOD and NFL Films produced programming), the availability of which shall be subject to all applicable NFL rules.

b) Screen savers, ring tones, wallpaper, text based news services/updates, polls, contest/sweepstakes and, subject to the approval of the NFL, other non-game promotional content related to such Member Club and to no other Member Club.

*Further Resolved***,** that all content distributed wirelessly pursuant to a Member Club agreement with third party wireless network operators and/or other third party wireless content distributors may be distributed only to consumers who reside, have billing addresses, and wireless devices registered, in the Member Club's Home Television Territory, and may be made available to such consumers for reception, viewing and use only on wireless devices registered in the Member Club's Home Television Territory.

*Further Resolved,* that any wireless content distribution agreement entered into by any Member Club as permitted hereunder shall expressly provide that it is subject to all applicable NFL rules and the prior approval of the League Office.

*Further Resolved,* that any marketing rights associated with NFL and Member Club wireless content shall be governed by the applicable provisions of the NFL Master Agreement as set forth in 2004 Resolution BV-4 (As Amended) regarding the execution of such rights in the Member Club's Home Marketing Area.

## 2005 RESOLUTION FC-2
### (As Amended)

*Whereas*, the Finance Committee has reviewed the League's current debt limit in light of numerous economic factors and conditions;

Be it *Resolved*, that effective immediately:

1. The amount of debt which each member club may incur (as defined and described in 1988 Resolution FC-3) shall be raised from the current $125 million to $150 million;

2. Subject to Paragraph 3 below, such debt may be secured by or a liability of either the member club or its principal or controlling owner, as permitted under 1996 Resolution FC-1;

3. The level at which 1998 Resolution FC-9 requires club-related liabilities of the principal or controlling owner (including obligations secured by his interest in his club) also to be secured by a pledge of club assets shall remain at $25 million; and

4. Consistent with 2001 Resolution FC-4, in connection with any acquisition of a member club or any controlling interest therein, the principal and/or controlling owner shall be required to invest equity (cash on hand or funds borrowed against other current or determinable future assets of such owner) in a minimum amount to be determined by the Finance Committee, and no acquisition transaction that the Finance Committee finds to be excessively leveraged shall be recommended by the Finance Committee for membership approval.

*Further Resolved*, that the Finance Committee may consider annually, whether, in light of economic factors and projected revenues, the overall debt limitation should be further increased beyond the aggregate $150 million allowed under this resolution, and will report to the Executive Committee.

**2005 RESOLUTION G-3**

*Whereas*, numerous NFL clubs have expressed the desire to extend 2004 Resolution MC-1 for another year; and

*Whereas*, NFL Clubs benefited from the ability to employ three additional practice squad players during the 2004 season, and a total of eight (8) such players; and

*Whereas*, the Competition Committee unanimously recommends that for the 2005 League Year only, Practice Squad rosters be maintained at eight (8) players per club; it is therefore

*Resolved*, that clubs be permitted Practice Squads not to exceed eight (8) players per Club for the 2005 League Year.

## 2005 RESOLUTION G-4
### (As Amended)

*Whereas,* the NFL is competing in an increasingly global professional sports marketplace fueled by worldwide media and communications, an emerging global consumer culture, and the exceptional performance of individual athletes who become national "heroes" in their countries;

*Whereas*, in this global marketplace, a strong presence beyond the United States, or any other single country, may be necessary to position a sports property as a business partner of choice for broadcasters, sponsors, and licensees;

*Whereas*, current NFL business partners are already making significant sports-related investments in foreign markets, and are seeking NFL leadership in growing football abroad;

*Whereas*, the NFL has engaged in almost twenty years of international activity with exhibition games, grass roots programs, and customized television programming, and NFL Europe League ("NFLEL");

*Whereas*, since 2003, when the member clubs committed to operate NFLEL through the 2005 NFLEL season (pursuant to 2003 Resolution IC-1), NFLEL has continued to serve important NFL objectives by, among other things, continuing to develop and evaluate U.S. and foreign players and coaches, and has also positioned itself well for the future by strategically concentrating in Germany, and by establishing the NFL Europe Advisory Board;

*Whereas,* the NFL Players Association continues to regard NFLEL as an important element of our relationship and has committed to increase its share of the cost of NFLEL through the 2006 NFLEL season;

*Whereas*, the NFL has launched NFL Network and has also created the contractual predicates for a new Thursday-Saturday cable television package, both of which increase demand for live football game programming and related television content, and NFLEL is an important source of such content;

*Whereas,* the member clubs believe that continued investment in NFLEL is in the best interests of the League, provided that such investment can be effectively controlled and that the volatility of such investment can be minimized, and wish to extend their commitment to NFLEL on such a basis;

Be it *Resolved*:

1. That NFLEL shall be operated for five additional seasons, through the 2010 NFLEL season, pursuant to annual business plans and budgets that shall be reviewed and endorsed by the Commissioner, and approved by the Business Ventures Committee as part of the League's annual international business plan.

2. That the NFLEL operating authorization under this Resolution is conditioned a) on the continued financial support of NFLEL by the NFL Players Association at the minimum net level of \$21 million for the 2006 NFLEL season, as provided for under the September 30, 2005 amendment to the Collective Bargaining Agreement executed by the NFLPA and NFL Management Council; and b) on an extension of the Collective Bargaining Agreement before the beginning of any Uncapped Year that includes a continuing commitment of financial support by the NFL Players Association at minimum annual net levels of \$25 million for each of the 2007-2010 NFLEL seasons, or such lesser amount as may be agreed by the League's membership in any extension of the Collective Bargaining Agreement.

3. That NFLEL shall place highest priority on securing third-party investment (at the team and/or league levels), and shall structure and operate in such a manner as to make the league optimally attractive to such potential investors, provided that such structure and operations shall not materially degrade the quality of the league's development of U.S. players.

4. That the NFLEL operating authorization under this Resolution may, at the discretion of the Business Ventures Committee, be revoked or modified if: a) the NFL Europe Advisory Board ceases to exist or changes in character from its current CEO-driven structure; b) third-party investment in at least two NFLEL teams has not been secured and activated by the beginning of the 2008 NFLEL season; or c) the league's actual Operating Income (in constant exchange rate terms) for both the 2006 and 2007 seasons is lower by 20% or more than the approved budgeted levels.

**2005 RESOLUTION MC-1**

*Whereas*, certain NFL players have experienced both on-field and off-field injuries resulting in total and permanent disability; and

*Whereas*, workers' compensation coverage may be unavailable or inadequate to offset the costs associated with such total and permanent disabilities; and

*Whereas*, the NFL has purchased a League-wide catastrophic loss program to cover all NFL players at all times for both on-field and off-field injuries thereby resulting in lower premium costs for Member Clubs; and

*Whereas*, the insurance policy purchased in 2001 will expire in August, 2005; and

*Whereas*, the Management Council Executive Committee recommends the continuation of the insurance coverage for a three year term;  it is therefore

*Resolved*, that the Management Council authorizes that the NFL Catastrophic Loss Program be retained for another three-year period on such terms and conditions as are attached hereto.

**2005 RESOLUTION MC-2**

*Whereas*, certain drafted players have suffered career ending injuries or accidental death prior to reporting to their initial training camp; and

*Whereas*, the loss of the drafted player and draft choice is an insurable interest of the club; and

*Whereas*, certain first and second round drafted players have suffered temporary total disabilities which has caused them to miss all or part of their first regular season; and

*Whereas*, the Management Council Executive Committee recommends that insurance coverage be acquired to cover the loss of services of such players due to permanent or total disability or accidental death; it is therefore

*Resolved*, that the membership authorize the acquisition of a draft choice asset value policy for a three year term on such terms and conditions as are attached hereto.

## 2006 RESOLUTION BC-1

*Resolved*, that in the preparation of the official NFL regular season schedule and administration of the new "flexible scheduling" system that will be implemented beginning with the 2006 NFL season for Sunday games to be telecast on CBS, FOX and NBC, the Commissioner and League Office will apply the following policies:

1. Each club will, with proper notice, switch Sunday regular season games between 1:00 and 4:15 P.M. (Eastern Time), and in flexible scheduling weeks (generally weeks 11-17 of each season) to approximately 8:15 P.M. (Eastern Time), to accommodate television broadcasting patterns;

2. The following scheduling provisions will apply to the scheduling of the League's Sunday Night primetime broadcast television package:

    a. Maximum of three scheduled (i.e., Week 1-10) appearances per club, inclusive of the Thursday night opener;

    b. With respect to such scheduled appearances:

        i. If a club is scheduled three times, such club may not be scheduled with all of those games at home, or all such games away, without its prior permission;

        ii. If a club is scheduled twice, both games may be scheduled away, or one may be scheduled at home and one away; and

        iii. If a club is scheduled once, such game may be home or away.

3. In addition to such scheduled Sunday night broadcast appearance, all clubs may have games "flexed" into the Sunday night broadcast package and scheduled in other prime time television packages subject to the following:

        i. No club may, as a result of such "flexing" and scheduling in other prime time television packages, appear more than six times in prime time television packages;

        ii. No more than three clubs may appear six times in prime time television packages;

        iii. No club may appear in the Sunday night broadcast package more than four times, and only three clubs may appear in such package four times);

4. No club will be required to make more than one appearance per season in games scheduled on dates other than Saturday, Sunday or Monday if,

as a result of such scheduled appearance, such club will have fewer than five days available for preparation time prior to such games.

### 2006 RESOLUTION BC-3

*Whereas,* it is in the best interests of the member clubs to cooperate fully with their broadcast partners to ensure the presentation of NFL football in the most professional and high quality manner, be it

*Resolved,* that the provisions of 1998 Resolution BC-2 shall remain in full force and effect throughout the term of the current contracts with CBS, ESPN, Fox and NBC, and shall extend to NFL Films, the NFL Network and Westwood One; and further

*Resolved,* that the clubs shall also cooperate with the television networks as follows:

1. By making available key players, the head coach and, if requested, the offensive/defensive coordinators to the telecasting network at the weekly production meeting (to be scheduled for a minimum of 60 minutes).

2. By allowing the telecasting network unobstructed access to players on the field pregame (provided there is no interruption of pregame drills) and, at the club's option, to the team locker room for a taped piece to be used only until the game has concluded.

3. At the club's option, by making available to the telecasting network the head coach and/or a "star" player for an on-camera interview at halftime, as well as any inactive (but not suspended) player at any time during the game.

4. By giving priority for post-game on-field interviews to the telecasting network first, followed by Westwood One (if applicable), the NFL Network and other national television partners.

5. By ensuring unobstructed views and access to team bench areas and bench activity, with TV crews using hand-held equipment from approved locations behind the yellow restraining line; by limiting sideline boom microphones to one each for NFL Films and the two participating teams; and by exercising necessary crowd control to ensure clear shots of out of bounds lines.

6. By allowing NFL Films (or a club film crew in lieu of NFL Films) into the winning locker room; and by allowing network camera and reporter access outside team locker rooms (excluding training and X-ray areas).

7. For games broadcast by Westwood One, providing it with priority in selecting a radio booth behind only the home and visiting team primary booths, and 2 close-in parking spaces.

8. Providing all network partners access to a live feed of any club preseason telecast within the broadcast window of a live network preseason game for purposes of limited in-progress taped highlights.

9. Providing necessary stadium services (as defined by the network agreements and the Broadcasting Committee) at club expense; and further

*Resolved,* that beginning two hours before the scheduled start of a game until the game's conclusion, clubs shall not permit any media entity other than the telecasting entity to televise live from a set located at any place with a field view in the stadium, except that the NFL and home club may permit (a) reporters from other NFL network partners and the participating clubs' local station partners to do live or taped stand-ups (without a set) until one hour before the scheduled start of the game; (b) reporters from local stations broadcasting in the local markets of the participating teams to do live or taped reports for regularly-scheduled local news programs (without a set) until 20 minutes before the scheduled start of the game; and (c) the NFL Network to have reporters providing live or taped reports (without a set) until kick off; and shall remove all other television and other video media personnel from the field during the game; and further

*Resolved,* that clubs shall (and shall require their local broadcasters to) honor provisions in national television contracts on scheduling local post-game shows and to comply with League policies implemented to enhance the value of telecasts to the League and NFL broadcast partners; and further

*Resolved*, that the Commissioner and Broadcasting Committee may develop other guidelines to implement the broadcasting agreements, which shall be binding on the member clubs.

## 2006 RESOLUTION BC-4

*Whereas*, the League adopted under 2001 Resolution G-5 a realignment plan and provided the League Office with scheduling authority for the preseason games (not including the final weekend of the preseason);

*Whereas*, such scheduling authority expired with the conclusion of the 2006 preseason;

Be it *Resolved,* that beginning with the 2007 NFL season, the League Office will schedule preseason games (not including the final week of the preseason), provided that (a) such scheduling authority will be exercised in accordance with the plan developed by the Commissioner in 2002 and submitted to the membership for review, (b) clubs realigned from otherwise intact divisions will receive preference in scheduling home games with former division rivals and other attractive opponents; (c) such scheduling authority will continue to honor traditional rivalries (e.g. Jets-Giants) as requested by the clubs; and (d) unless otherwise agreed to by the membership.

Be it *Further Resolved,* that as stated in the 1998 Resolution BC-5:

Teams will cooperate fully with the League Office on the finalization of the network preseason game package (15 games, HOF game included).

Teams are obligated to play a minimum of two network preseason games, if asked (HOF game and other international "extra" games not included) and understand that there may be specific instances when additional games are required.

Teams will agree to play preseason games on nights other than Saturday if requested to do so to satisfy network partner commitments.

Teams will agree to play daytime preseason games when required to satisfy network partner commitments.

Teams understand that their local stations give up all rights, including tape delay to games selected for the network preseason game package.

League Office decisions on the preseason schedule will be final and binding on the member clubs with such decisions to be made in the collective best interest of the teams and the League.

## 2006 RESOLUTION BV-1

*Whereas,* the NFL has demonstrated its commitment to competing in a global professional sports marketplace and to developing a greater presence beyond the United States;

*Whereas*, current NFL business partners have made significant sports-related investments in foreign markets and are seeking NFL leadership in growing football abroad;

*Whereas*, the NFL has engaged in almost twenty years of international activity including exhibition games, grass roots programs, customized television programming, and investment in the NFL Europe League;

*Whereas*, the NFL live game experience is one of the most compelling assets available to the League in building its fan base and business opportunities globally;

*Whereas,* during the 2005 season, the NFL held its first-ever regular season game outside the United States in Mexico City, successfully demonstrating the potential for global demand at both the fan and sponsor level;

*Whereas*, the member clubs believe that hosting additional NFL regular season games outside the United States is in the best interests of the League, and will contribute to the strength and development of the NFL's brand and presence outside the United States.

Be it *Resolved,* that the League is authorized to schedule up to two (2) regular-season games per season outside the United States beginning with the 2007 season and continuing through at least the 2011 season (the "International Games");

Be it *Further Resolved*, that the operating budget for the International Games will be reviewed and endorsed by the Commissioner and approved by the Business Ventures Committee as part of the League's international business plan;

Be it *Further Resolved*, that all competitive aspects of the International games will be considered and, if necessary, approved by the Competition Committee;

Be it *Further Resolved*, that the "home" team will have the option of designating one regularly scheduled home game that will not be eligible as an International Game;

Be it *Further Resolved*, that divisional match-ups will not be eligible as International Games, without the consent of both clubs;

Be it *Further Resolved*, that the visiting team will be required to participate in accordance with the NFL schedule;

Be it *Further Resolved,* that clubs who participate in International Games outside North America will have a bye week scheduled the week following the International Game. In addition, each participating team will have a "home" market game scheduled for the week prior to the International Game.

Be it *Further Resolved*, that for International Games, the "home" team will be paid a game fee equal to the average net revenue of the team's seven other regular season home games, less actual VTS. "Home" team travel and local costs, including transportation, practice facilities and security will be the responsibility of the League office. For games played outside North America, the differential between the "visiting" team travel costs and the average travel costs for the season's other away games and all local costs will also be the responsibility of the League office.

**2006 RESOLUTION BV-2**

*Whereas,* NFL Enterprises' agreement with CBS Sportsline and AOL with respect to production and operation of the NFL.com Internet site and the NFL Internet Network has recently expired;

*Whereas,* NFL Enterprises' management has concluded, after extensive exploratory discussions with a number of potential Internet partners, that a new arrangement for third-party production and operation of NFL.com and the NFL Internet Network would not produce the strategic, financial and other benefits that it believes should be attained from the operation of NFL.com and the NFL Internet Network over the next five years and beyond;

*Whereas,* NFL Enterprises LLC believes that in-house operation of NFL.com and the NFL Internet Network would be a better strategic and financial alternative than a new third-party arrangement; and

*Whereas,* the Broadcasting Committee, as part of its strategic oversight of NFL media operations and plans, has unanimously concurred in the judgment of NFL Enterprises' management;

*Be It Resolved,* that NFL Enterprises will operate NFL.com and the NFL Internet Network on an in-house basis going forward, subject to oversight and budgetary approval by the NFL Ventures L.P. Executive Committee.

*Further Resolved,* that no change in the allocation of the Clubs' and NFL Enterprises' respective rights, opportunities and obligations in the Internet and related digital media spaces will occur as a result of (or is requested or contemplated in connection with), the in-house operation of NFL.com and the NFL Internet Network, which will continue to be operated through the 2019 season in accordance with the allocation of rights, opportunities, and obligations set forth in 2001 Resolution JC-1, as contemplated by and mandated pursuant to 2004 Resolution BV-4.

**2006 RESOLUTION G-1**
**2006 RESOLUTION MC-1**

**March 15, 2006**

**Resolution Adopted at Special Management Council/**
**League Meeting, March 8, 2006, Dallas, Texas**

**(Moved by Baltimore, Carolina, Dallas, Denver, New England, New York**
**Giants, New York Jets, Pittsburgh; seconded by Atlanta)**

1. Accept the Union's offer.

2. SRS funded at the following levels:

    a. 2006 -- $100 million

    b. 2007-11 – 65% of **a club's own revenue at the** "midpoint" **between**
       **the Salary Cap and the "trigger"** (58.5% level), **projected at**
       **approximately**

        i. 2007 -- $105 million
        ii. 2008 -- $120 million
        iii. 2009 -- $140 million
        iv. 2010 -- $210 million
        v. 2011 -- $220 million

       **[Note: The current projections of committed finding levels,**
       **distributed at the meeting during the discussion of the proposed**
       **resolution, is at Attachment A.]**

3. Funding Mix:

    a. Current **SRS Funding Sources** (now pooled; approximately $27
       million annually)

    b. **Annual** commitments from High Revenue Clubs, at
        i. $3 million from each of the top five Clubs
        ii. $2 million from each of the next five Clubs
        iii. $1 million from each of the next five Clubs

    c. Balance from High Revenue Clubs' **(as identified on an annual**
       **basis)** share of incremental League revenue streams in excess of
       current projections (other than television); e.g., new business
       categories, new technologies, new revenue streams from existing
       business categories.

2006-9

   **d.  [Deleted due to overlap with paragraph 4.]**

4.  **The League will have the** authority to borrow against High Revenue
    Clubs' **(as identified on an annual basis)** share of digital and internet
    revenue **streams** pooled at League level to fund shortfalls. **Such funding
    may** be called to the actual extent earned by qualifying Clubs in the given
    year. To the extent earned, the League will borrow these monies against a
    pledge of the High Revenue Clubs' distribution of **future New Media
    revenues. For the first four years of the extended CBA (2006-09), the
    annual financial responsibility of the top 15 clubs for funding
    shortfalls of up to $105 million (average of $26 million/year)** will be as
    follows:
    a.  **Clubs** 1-5 = $2.6 million
    b.  **Clubs** 6-10 = $2.08 million
    c.  **Clubs** 11-15 = $520 thousand

    To the extent less **than the $26 million annual average is needed,** it
    will be taken pro rata on the above formula. **Money will not be borrowed
    unless necessary.**

    **For the duration of this CBA, including the uncapped year,** all
    revenues generated by the NFL or any member club from the distribution
    of audio, video, animated, live statistical, or textual content via any
    subscription, non-broadcast digital, or other technology for distributing
    media now in existence or hereafter developed, including without limitation
    subscription television or radio (other than existing DirecTV and Sirius
    agreements), video-on-demand, internet (including advertising or pay-per-
    view or related services), broadband, IPTV, or digital download or
    streaming devices (e.g., iPods, cell phones, PDAs or similar devices) shall
    be committed as equally-shared revenues (hereafter referred to as "New
    Media Revenues"). Beginning with the 2006 League Year, the amount of
    equally-shared New Media Revenues that would otherwise be distributed to
    the High Revenue Clubs (as that term is defined by the membership) shall
    instead be used **to the extent necessary to** fund the supplemental revenue
    sharing pool created under the extended CBA. **Any** New Media Revenues
    not devoted to the supplemental revenue sharing pool **shall be** distributed
    equally to clubs that are not "High Revenue Clubs" **and to High Revenue
    Clubs insofar as the New Media Revenues of those clubs are not
    required to fund the supplemental revenue sharing pool.**

5.  **To the extent excess funding arising from Paragraph 3 exists in any
    year, such excess will be retained ("Banked") for future obligations
    through four years or six years, as the case may be. At the end of the
    term provided for under this document any remaining banked funds
    will be returned to the contributing clubs. [This section may drop out;
    committed to discuss further with the clubs.** *(See Note 3 at Attachment
    C.)***]**

6. Qualifiers per current system/Commissioner recommendations (See Attachment B; "Funds Distribution Standards"). **The final system will include qualifiers. The Commissioner will appoint and chair a Special Committee, to be composed of eight owners (2 from each "quartile" in the League), which will review the issue of qualifiers and make a report and recommendations to the membership. Any qualifiers will be approved by a vote of three-fourths of the membership. If, in the judgment of the Commissioner, the membership is unable to resolve the issue of qualifiers on a three-fourths vote, the Commissioner shall have the authority to determine those qualifiers that will apply to distributions from the supplemental revenue sharing pool. [*See Notes 1 and 2 (at Attachment C) for Commissioner's comments on the subject of qualifiers.*]**

7. If at end of term, there is a debt balance, debt will be repaid in same proportion as High Revenue Clubs' contributions to pool. **[This section needs further consideration in light of paragraph 4. *(See Note 3 at Attachment C) for Commissioner's comments on this subject.*]**

8. Any decision **to be made as per the Players Association's term sheet in November 2008 or 2009** to extend the CBA to include a 2010 and/or 2011 capped year shall require the affirmative vote of three-fourths of the Member Clubs.

**Player Cost as % of Revenue Test - 65%**

|  |  | Seasons Projected | | | | | |
|---|---|---|---|---|---|---|---|
|  |  | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** |
| 6-Year Deal Average | | | | | | | |
| 58.5% | # Clubs Above 65% | 18 | 16 | 16 | 17 | 17 | 17 |
|  | $ Required | $100 | $111 | $115 | $132 | $207 | $219 |

## FUNDS DISTRIBUTION STANDARDS

New Stadium - no distribution for specified period of years

Purchase of team - no distributions for specified period of years, on standards provided in advance of purchase

Distributions tied to improved team performance on objective standards (home sellouts, gross ticket receipts to VTS pool, etc.)

## NOTES

1. In response to questions from Mike Bidwell, John Shaw and others, the Commissioner explained that the Resolution would state that he would appoint a Special Committee to study the issue of qualifiers and to report to the membership. He further explained that the qualifiers to be evaluated by the Committee would include those in the current SRS system (such as the imputation of ticket receipts for each club as a percentage of average receipts) and that the three items identified in the attachments to the 8 Club Proposal reflected for Commissioner's recommendations as to the key elements of a framework for establishing qualifiers.

2. In response to suggestions from Mike Bidwill and others, the Commissioner stated that the Resolution would state that any qualifiers would be subject to approval by a vote of the League's membership under the three-fourths voting standard. At the suggestion of Dan Snyder and others (and with the concurrence of Mike Bidwill), the Commissioner stated that the Resolution would provide that, in the event of a membership deadlock on qualifiers, the Commissioner would have the delegated authority to determine qualifiers that will apply as a condition of receiving a distribution from the Revenue Sharing Pool. The Commissioner also noted Jeff Lurie's suggestion that the qualifiers should be determined within the next six months.

3. In response to a question from Jeff Lurie, the Commissioner stated that this paragraph was a direct carryover from the Jets-Patriots concept summary and that the paragraph might prove to be unnecessary in light of the new and broader funding arrangements reflected in the 8 Club Proposal; that in developing the 8 Club Proposal, we had not had time to address this issue; and that the issue would be addressed in a definitive way after the 8 Club Proposal was adopted (assuming it would be adopted).

**2006 RESOLUTION G-3**

*Whereas*, numerous NFL clubs have expressed the desire to extend 2005 Resolution G-3 for four additional years; and

*Whereas*, NFL Clubs benefited from the ability to employ three additional practice squad players during the 2004 and 2005 seasons, and a total of eight (8) such players; it is therefore

*Resolved*, that clubs be permitted Practice Squads not to exceed eight (8) players per Club for the 2006, 2007, 2008 and 2009 League Years.

## **2007 RESOLUTION BV-1**

*Whereas*, the League Office, under the direction of the Business Ventures Committee, has been evaluating opportunities within the expanding and rapidly changing online ticket exchange business; and

*Whereas*, the due diligence work conducted thus far indicates that online ticket exchanges may represent an opportunity to provide additional service to NFL fans, increased competition between the NFL and other entertainment providers, access for Clubs to better marketing information, and a new and/or increasing revenue source for the League and Clubs; and

*Whereas*, the League anticipates issuing a Request for Proposal ("RFP") to online ticket exchange vendors after the Spring League Meeting, which RFP would invite proposals for two possible structures (1) a League level-only deal (using only League marks and inventory); and (2) a League-wide deal that would involve all 32 Clubs; and

*Whereas*, a League-wide deal may result in the most fan friendly user experience across the League, in addition to the most attractive economic terms.

*Resolved*, that to facilitate evaluation of a possible League-wide deal in the future, the Clubs (i) shall submit to the League Office by June 1, 2007 all current contracts with online ticket exchange vendors (e.g., StubHub, RazorGator, Ticketmaster) and (ii) shall not make any new contractual commitments relating to an online ticket exchange beyond the 2009 season.

## 2007 RESOLUTION BV-2
### (As Amended)

*Whereas*, to provide a more fan-friendly ticketing experience, to provide additional fan service, and to enhance the League's ability to compete with other entertainment providers, the League Office, under the direction of the Business Ventures Committee, has evaluated the possibility of creating an online exchange for tickets to NFL games;

*Whereas*, after receiving a report on the initial due diligence conducted by the League Office, the Business Ventures Committee directed the League Office to negotiate alternative potential deal terms with various online ticket exchange vendors with respect to the creation of an NFL online ticket exchange, including a League-wide deal that would require participation by all 32 Clubs upon expiration or earlier satisfaction of their existing contractual obligations in the area of online ticket exchange;

*Whereas*, the Business Ventures Committee has determined that an online ticket exchange, made available to fans on a League-wide basis, would best serve the interests of a fan-friendly ticketing experience and enhanced fan service; would best enhance the League's ability to compete with other entertainment providers; and would also generate enhanced marketing information and a new and/or increasing source of revenues;

*It is hereby resolved*, that the League Office, under the direction and subject to the approval of the Business Ventures Committee, is authorized to conclude negotiations and enter into a League-wide agreement with an online ticket vendor providing for the development and implementation of an NFL online ticket exchange and requiring, upon the expiration or earlier satisfaction of their existing relevant contractual obligations, participation by all 32 Clubs on terms generally consistent with those described in the presentation to membership, including a Club's ability to determine ticket resale restrictions and to offer inventory unrelated to the NFL (e.g., concerts held at Club stadiums) on other websites.

## 2007 RESOLUTION DM-1

*Whereas*, the NFL Internet Network established by 2000 Resolution JC-1 and extended by 2001 Resolution JC-1 and 2004 Resolution BV-4 created an operating framework for NFL and Club websites to promote the member Clubs' collective product, NFL football, and to develop a valuable media asset;

*Whereas*, such operating framework, while successful in most respects, has (1) resulted in duplicative and unnecessary investment by providing for separate development of Club web sites and League web sites, and (2) created inefficiencies and other limitations of scale that limit the Clubs' ability to achieve optimal economics;

*Whereas*, the membership desires to modify such operating framework (1) to enhance the Clubs' ability to innovate and compete with other multimedia sports and entertainment properties; (2) to achieve greater economies of scale and eliminate duplicative and unnecessary costs through greater operational integration; and (3) to supplement the existing advertising inventory with national advertising units on all Club sites that can be sold on an integrated basis with NFL.com and other League-level units;

*Be it resolved*, that the NFL Internet Network operating framework shall be modified to reflect the operational and advertising integration elements set forth in Exhibit CoA hereto, and that except as specifically modified by Exhibit A hereto, the NFL Internet Network operating framework will remain in full force and effect.

*Further resolved*, that the Digital Media Committee may periodically review the modified NFL Internet Network operating framework (including but not limited to the sponsorship exclusivities) to assess whether or not it has achieved the desired objectives and to determine whether changes should be made by applicable membership vote.

**2007 RESOLUTION FC-3**

*Whereas*, 1998 Resolution FC-3 directed that the Treasurer pay from the Agency Account to NFL Ventures, L.P., f/k/a NFL Enterprises L.P., an amount equal to the League's international television revenues for such League fiscal year to fund NFL International's business operations;

*Whereas*, the Finance Committee considers it in the best interests of the League to repeal 1998 Resolution FC-3 and to direct and authorize the Treasurer to pay annual net League international television revenues from the Agency Account directly to the member clubs;

*Be it Resolved*, 1998 Resolution FC-3 is repealed effective as of the end of the 2006 season (March 31, 2007), and that commencing with the 2007 season, the Treasurer is directed and authorized to pay annual net League international television revenues from the Agency Account directly to the member clubs.

**2007 RESOLUTION G-1**
**2007 RESOLUTION MC-1**

*Whereas*, the Member Clubs adopted 2006 Resolution G-1 and MC-1 by a vote of 30-2 at a Special League Meeting on March 7-8, 2006; and

*Whereas*, 2006 Resolution G-1 and MC-1 extended the Collective Bargaining Agreement with the NFL Players Association and established an expanded program of revenue sharing among the Member Clubs, which program has been submitted to and approved by the NFLPA as required by the Collective Bargaining Agreement; and

*Whereas*, 2006 Resolution G-1 and MC-1 contained "Fund Distribution Standards" or qualifiers to govern the distribution of funds from the revenue sharing pool; and

*Whereas*, 2006 Resolution G-1 and MC-1 required the Commissioner to appoint a Special Committee to consider the issue of qualifiers, and further required the Committee to recommend a set of qualifiers for consideration by the full membership; and

*Whereas*, the Special Committee on Qualifiers has met and unanimously recommended a set of qualifiers to implement 2006 Resolution G-1 and MC-1 for the 2006 through 2009 seasons;

Be it *Resolved* that the following provisions shall govern the implementation of the revenue sharing program, including the Fund Distribution Standards ("Qualifiers"), approved by the membership in 2006 Resolution G-1 and MC-1 for the 2006 through 2009 seasons only.

Program for the 2006 through 2009 seasons

1. "Need" calculation based on 65% formula as outlined in 2006 Resolution G-1 and MC-1.

2. Apply agreed-upon qualifiers

3. The pool for the 2006 through 2009 seasons is as follows; funded as set forth in the 2006 Resolution:

   a. 2006 - $100MM
   b. 2007 - $110MM
   c. 2008 - $110MM
   d. 2009 - $110MM

4. If post-qualifier need is:
   a. ≤ Pool: distribute based on post-qualifier need and bank excess funds.
   b. > Pool, distribute $100MM for 2006 or $110MM (in 2007-09) and any previously banked funds up to the calculated post-qualifier need for the season. If post-qualifier need > pool and any available banked funds, apply pro-rata deductible to recipient Clubs.

5. Unused banked funds available (if any) after distributions for 2009 season to be returned to payors on a pro-rata basis, commensurate with their contributions.

Qualifiers for the 2006 through 2009 seasons:

Stadium Qualifier

1. Applies to New or Substantially Renovated Stadiums.

   a. "Substantially Renovated" defined as a stadium project with an expenditure of at least $150mm, and that uses the same building foundation and that consists principally of revenue-generating improvements (e.g., new seating, club seats, suites, concession facilities, fan entertainment areas, structured parking, and the like; as distinct from replacement, renovation, or upgrade of HVAC systems, team facilities, roofs, walls, facades, or the playing field, none of which projects have the principal effect of enhancing revenue). For projects with an expenditure of less than $150mm, yet exhibiting all or most of the other aforementioned attributes, determination to be made by Finance and Stadium Committees. For the avoidance of doubt, project descriptions and revenue sharing impacts should be submitted in advance.

2. No Revenue Sharing Distribution for 5 Seasons beginning with Season in which stadium opens (each Season is defined as a Season to which the Revenue Sharing payment was attributable), not the Season during which the payment was made.

3. Eligibility increases ratably in Season 6 – 10 such that 20% of the calculated Revenue Sharing Distribution would be available in year 6, 100% in year 10.

4. For Seasons 6-10, any reduction applied will be the greater of the G-3 deductible method or the ratably reduced percentage.

Club Sale

1. Applies to the sale of a Controlling Interest ("Club Sale")

2. No Revenue Sharing Distributions after a Club Sale for the seasons covered by these terms.

Performance

Revenue sharing calculation based on revenue after imputation of:

Gate Revenue to % below of League Average (Defined as including club seat premiums for non-G3 and non-waiver stadiums).

a. 2006 – 90%
b. 2007 – 90%
c. 2008 – 90%
d. 2009 – 90%

2007-6

Player Spending

Revenue Sharing Distributions to a club will be reduced for a specific season if such otherwise eligible club's Final Team Salary (as defined for these purposes) plus Player Benefits (National and Local) is less than 65% of its Revenue (defined as Conforming Revenue used for the Revenue Sharing calculation before imputation and not including Supplemental Revenue Sharing receipts). The reduction will be 50% of the underage.

Other Provisions

If the Membership does not adopt a resolution at the 2007 Annual Meeting to address the specific qualifiers applicable to League Resolution G-1 and MC-1, approved on March 8, 2006, the matter will be deemed deadlocked, and will be referred to the Commissioner for final determination.

G-3 terms for existing stadiums would remain intact, including but not limited to the provision requiring any unamortized portion of a G-3 loan to be repaid upon Club Sale.

With respect to any litigation filed on a prospective basis, clubs will be ineligible to receive Revenue Sharing distributions if, for either the Season to which the distribution is attributable, or at the time the distribution is made, they have a pending lawsuit against the NFL, any NFL member club, or any NFL affiliate.

Except as specifically set forth in this Resolution, nothing herein shall be deemed to amend or otherwise modify the terms of 2006 Resolution G-1 and MC-1.

## 2007 RESOLUTION G-4A

Be It *Resolved*, that the NFL Anti-Tampering Policy be amended as follows (deleted language struck over, new language underlined):

      b) If the employer club elects to grant permission to the inquiring club, the one (1) interview between the inquiring club and the assistant coach must be conducted in the home city of the employer's club at a time that is convenient for the employer club. For clubs that have byes in the Wild Card weekend, interviews of its coaches must be conducted prior to the conclusion of Wild Card games. For assistant coaches of clubs that participate in a Wild Card game and advance to the Divisional Playoffs, interviews must be conducted after the Wild Card games and prior to the <u>conclusion of</u> Divisional Playoff games. An inquiring club is permitted only one interview with an assistant coach while his team is competing in the postseason, and there shall be no other direct or indirect contact between any employee or agent of the inquiring club and the assistant coach or any representative or agent of the assistant coach. No <u>initial</u> interviews may be requested nor granted after the Divisional Playoff weekend for any assistant coach whose team is still participating in the playoffs. <u>However, in any year in which there is at least a two-week break between the conference championship games and the Super Bowl, an assistant coach who (i) has previously interviewed for another club's head coaching job and (ii) whose current employer-club is participating in the Super Bowl may have a second interview with a club with which he has previously interviewed for an open head coach position provided that (a) the current employer-club elects to grant permission for a second interview, and (b) the interview will take place at a time and location that is acceptable for the current employer-club, but no later than the Sunday preceding the Super Bowl.</u>

**2007 RESOLUTION G-5**

Be it *Resolved*, that the NFL Anti-Tampering Policy be amended as follows (deleted language struck over; new language underlined):

*Contract Due to Expire.* The employer club retains the exclusive right to an assistant coach's contract during the period after the conclusion of the last NFL season covered by such contract and the applicable deadline specified on the schedule below.

- o *Clubs Not in Playoffs.* 12:01 A.M. on the ~~third~~ second Tuesday after the club's final game of the regular season.

- o *Clubs in Playoff.* 12:01 A.M. on the ~~third~~ second Tuesday after the club's final playoff game, including Super Bowl if applicable, but in no event after the expiration date specified in the coach's contract.

**2007 RESOLUTION G-6**

Be it *Resolved*, that the NFL Anti-Tampering Policy be amended as follows (deleted language struck over, new language underlined):

- *Protocol*

As a common courtesy and to avoid inter-club disputes, whenever a club wishes to contact a non-player employee of another club about possible employment, such inquiring club must first notify the owner or operating head of the employer club to express interest. This requirement prevails even if the employee in question does not have an active contract and even if other provisions of this Policy prohibit the employer club from denying permission to discuss employment with the employee. If the inquiring club has confirmed with the League office that the employee in question does not have an active contract, or if the employer club does not otherwise have the right to deny permission, the inquiring club may immediately initiate contact with the employee after notification has been sent to the employer club. No response is required after notification has been sent. (See the section under "NFL Player" above for rules governing contacts of or by players.)

Whenever a non-player employee of a club initiates contact with another club about possible employment, the contacted club must immediately notify the owner or operating head of the employer club about the contact, after which all other applicable provisions of this Policy will apply. Despite the other requirements of this section on protocol, if a public announcement has been made by an employer club that it has dismissed or will not be retaining an employee, such employee and any clubs interested in him or her are under no obligation to observe the club-to-club courtesies of this section.

**2007 RESOLUTION G-9**

*Whereas*, the NFL has joined with the NFL Players Association, NFL Alumni Association, NFL Charities, and the Pro Football Hall of Fame to form an "Alliance" to assist retired players; and

*Whereas*, the Alliance has identified several specific programs to address particular needs of retired players and their family; and

*Whereas*, the formation of the Alliance has resulted in positive recognition for the League both publicly and among retired players; and

*Whereas*, the parties have agreed to provide $7 million in currently-available funds as "seed" money to fund the initiatives of the Alliance; and have agreed to provide additional needed funds, Be It *Resolved*

That the member clubs shall collectively contribute up to $10 million to support the current and future initiatives of the Alliance; that the Commissioner may contribute up to this amount on an as-needed basis and assess the clubs as required; and that the contribution shall be closely coordinated with additional amounts contributed by other members of the Alliance and retiree groups.

### 2007 RESOLUTION MC-2

*Whereas*, the Management Council Articles of Association and By-Laws state that the NFL Vice President – Labor Relations is the Chairman and a voting member of the Management Council Executive Committee; and

*Whereas*, Chairmen of all other League Standing Committees are appointed by the Commissioner; and

*Whereas*, the Management Council believes that this practice should be followed with respect to the CEC; it is therefore

*Resolved*, that Article IV of the Management Council Articles of Association and Article II of the Management Council By-Laws be amended to provide that the Commissioner shall appoint the Chairman of the Management Council Executive Committee.

## 2008 RESOLUTION FC-9

*Whereas,* for purposes of determining (a) gross receipts (as defined in Article XIX, Section 19.1(A) of the NFL Constitution and Bylaws)*,* as supplemented by 1987 Resolution FC-1 (as amended), and (b) the corresponding visiting team share, the ticket price attributable to the ticket portion of club seats and seats in a box suite is deemed to be equal to the ticket price charged for the highest priced general admission ticket in the relevant stadium; and

*Whereas,* pursuant to League rules, club seat premiums (which are also considered gross receipts, pursuant to 1987 Resolution FC-1 (as amended)) are currently defined as the amount by which the price for a club seat ticket price exceeds the price for the highest priced general admission ticket in the relevant stadium; and

*Whereas,* the membership believes that a redefinition of the term "highest priced general admission ticket" may encourage greater flexibility in club decisions regarding ticket prices and generate increased visiting team shares for all Member Clubs;

Be it *Resolved:*

1. that commencing with the 2009 season, the definition of club seat premium shall be modified such that the "highest price" general admission ticket for purposes of the club seat premium calculation shall be determined without regard to the price(s) charged on up to the 2,500 of the highest priced general admission seats in high premium areas (e.g., 50-yard line, immediately adjacent to tunnel where players emerge onto field), and shall instead be determined by reference to the next highest priced general admission seats in the relevant stadium after such exclusion;

2. that this Resolution shall not modify any obligations of any Club with a G-3 loan (including club seat premium guarantees) or club seat premium waiver other than changing the definition of club seat premium com-mencing with the 2009 season, as expressly set forth herein;

3. that commencing with the 2009 season, the ticket price attributable to tickets to a box suite shall be determined without regard to the price(s) charged on the same 2,500 highest priced general admission seats as referenced above, and shall instead be determined by reference to the next highest priced general admission seats in the relevant stadium after such exclusion (e.g., the price of the 2,501st general admission seat);

4. that notwithstanding the exclusions afforded by the foregoing resolutions, the highest price general admission ticket for purposes of determining club seat and box suite seat ticket prices shall be not less than the highest priced general admission seats in the relevant stadium for the 2008 season

> (determined without regard to the exclusions permitted under this resolution);

5. that for the avoidance of doubt, for purposes of calculating the "visiting team share" portion of gross receipts currently required (in the absence of a waiver) to be paid to the visiting team share pool pursuant to Article 19.1(A) of the NFL Constitution and Bylaws in respect of the general admission seats excluded from the calculation of club seat premium and box suite seat tickets as provided herein, the full price actually charged for such up to 2,500 seats shall be included;

6. that the modifications described herein shall only be permitted for a Member Club with respect to a particular season whose visiting team share attributable to the ticket portion of box suites and the club seats and paid to the visiting team share pool for such season is equal to or greater than the visiting team share attributable to the ticket portion of box suites and the club seats and paid to the visiting team share pool for the previous season;

that the Finance Committee is authorized to establish policies relating to administrative matters (e.g., what are considered "high premium areas") for the purpose of implementing this Resolution, which it shall periodically present to the membership for discussion.

## 2008 RESOLUTION FC-10

*Whereas,* certain Member Clubs believe that creating an all-inclusive ticket offering that includes a game ticket and certain other amenities for a limited number of tickets may enhance their ability to sell tickets in certain stadium locations that have traditionally been less attractive to buyers (e.g., upper deck end zone seats); and

*Whereas,* other sports leagues and entertainment companies have had success selling similarly integrated seat and amenity products; and

*Whereas,* enhancing the ability of Member Clubs to sell tickets can be expected to increase the visiting team share within the League; and

*Whereas,* the membership has determined that it is appropriate to recognize certain costs in connection with offering all-inclusive ticket packages; and

*Whereas,* in order to determine the effectiveness of such packages, both with respect to encouraging additional tickets sales, and to assess the other effects of such offerings, the membership desires to amend, for a limited period of time, the rules applicable to the calculation of the visiting team share with respect to such all-inclusive offerings by allowing certain costs to be recognized and excluded from the calculation of "gross receipts" (for purposes of Article 19.1A of the NFL Constitution and Bylaws, as supplemented by 1987 Resolution FC-1, as supplemented and amended to date) relating to such all-inclusive offerings;

Be it *Resolved:*

that the term "visiting team share" shall mean the portion of gross receipts currently required (in the absence of a waiver) to be paid to visiting clubs under Article 19.1(A) of the NFL Constitution and Bylaws;

that the term "all-inclusive ticket packages" shall mean ticket offerings (whether all-inclusives, services, or discounts) by a Member Club that entitles the customer to a game ticket and any or all of: food, soft drinks offerings, and/or parking; provided that other hospitality offerings or amenities (e.g., merchandise or special club or area access) offered in such all-inclusive ticket package shall not be eligible for cost recognition;

that for purposes of calculating the visiting team share from all-inclusive ticket packages, the term "gross receipts" shall have the meaning given to it in Article 19.1(A)(3)*,* as supplemented by 1987 Resolution FC-1, subject to the following exclusions only: (a) those exclusions currently allowed under Article 19.1(A), as supplemented and amended to date, and, (b) with respect to all-inclusive ticket packages eligible for such treatment pursuant to this Resolution only, an exclusion for certain costs related to the offering of such all-inclusive elements in addition to the seat, the exact method-ology for determining such costs (e.g., a certain fixed dollar amount per

ticket or a percentage of the price per ticket) to be determined by the
Finance Committee;

that the all-inclusive ticket packages eligible for such treatment may be offered
for up to 2,500 seats per game;

that the visiting team share paid into the visiting team share pool by a Member
Club with respect to any seat offered as part of an all-inclusive ticket
package for a particular season must be no less than the amount of the
visiting team share paid by the Member Club with respect to such seat for
the season prior to the offering;

that the treatment described herein shall be applicable for the 2009 through
2011 seasons only.

Further *Resolved*, that Article 19.1 of the NFL Constitution and Bylaws
shall be deemed amended as necessary to accomplish this Resolution.

**2008 RESOLUTION G-8**

Be it *Resolved*, that the NFL Anti-Tampering Policy be amended as follows (deleted language struck over, new language underlined):

• Postseason Procedures. If a club wishes to discuss a vacant high-level non-player, non-coach position (defined as club president, general manager, or a position with equivalent responsibilities and authority) with an individual who is not a high-level employee, and whose employer club is participating in the playoffs, ~~the same procedure shall be applicable as in effect for an assistant coach whose employer club is participating in the playoffs (see pages 7-8).~~ the following procedure shall apply:

    a) The owner or operating head of the inquiring club may contact the owner or operating head of the employer club to request written permission to discuss its high-level position with an individual who is not a high-level employee.

    b) If the employer club elects to grant permission to the inquiring club, any interview or interviews may be conducted at a time and place that is convenient for the employer club. There is no limitation on the number of times that an individual may be interviewed by the same club, provided that, in each instance, permission has been received from the employer club.

    c) No contract shall be executed, and no agreement to execute a contract, or an announcement of a contract or of an agreement for employment, shall be permitted until after the conclusion of the employer club's playing season, unless the employer club has specifically granted written permission for its employee to accept a position with the new club prior to the conclusion of its participation in the postseason.

    d) If a club elects to grant permission for one of its employees to interview for a high-level position, or to accept employment, it must grant permission to all inquiring clubs that seek to interview him. Permission cannot be granted selectively.

    e) If a club elects to grant permission for one of its employees to interview with an inquiring club or clubs, or to accept employment, it may deny permission for another member of its organization, provided that the denial is applicable to all inquiring clubs.

### 2008 RESOLUTION JC-1 Net

*Whereas*, the Buffalo Bills have proposed to play a series of games in Toronto over the next five years consisting of one regular season game in each year and one pre-season game in each of the 2008, 2010 and 2012 seasons (the "Toronto Games");

*Whereas*, the Toronto Games proposal was described by the Bills in a presentation to the membership during the 2007 Fall League Meeting and in a more detailed presentation to the Business Ventures and International Committees on December 11, 2007;

*Whereas*, the Bills have reached a definitive agreement (the "Agreement") with Rogers Stadium Limited Partnership to conduct the Toronto Games in the Rogers Centre, and presented this agreement, which is contingent upon membership approval, to the League Office;

*Whereas*, the Bills have coordinated with the League Office to ensure that the Toronto Games and related commercial opportunities (stadium presentation and operation, ticket sales, broadcast, security, etc.) will be in compliance with League rules and will advance the interests of NFL Canada;

*Whereas*, the Toronto Games offer the prospect of strengthening the Bills' franchise by increasing the Club's local revenues, growing its fan base, and reducing blackout exposure, all of which would in turn strengthen the NFL and enable it to compete more effectively with other entertainment providers;

*Whereas*, the Agreement does not limit the NFL's ability to establish an expansion or relocated team in the Toronto market and would terminate upon the occurrence of such event;

*Whereas*, the Agreement does not grant any current or future ownership or operating rights for the Buffalo Bills or an NFL franchise in Toronto;

*It Is Hereby Resolved*, that the Toronto Games proposal, as presented to the Business Ventures and International Committees on December 11, 2007 and subsequently documented in the Agreement, is hereby approved.

## 2008 RESOLUTION JC-1

*Whereas*, pursuant to 2005 Resolution BV-1, NFL Properties LLC and NFL Enterprises LLC entered into a multi-year marketing and wireless content distribution agreement with the Sprint Communications Company L.P. ("Sprint"), which granted Sprint certain exclusive rights to distribute NFL and Member Club related content (e.g., game video highlights, live game statistics, score updates, screen savers, ring tones, wallpaper, text based news services/updates, polls, contests/sweepstakes) via a restricted access wireless telecommunications network for use on handheld devices such as cellular telephones ("Wireless Distribution"); and

*Whereas,* in addition to authorizing national and local Wireless Distribution of certain League and Club generated content, 2005 Resolution BV-1 prohibited the Wireless Distribution of live game audio on both a national and a local level through League or Club arrangements; and

*Whereas,* the Sprint Agreement expires on March 31, 2008 and the NFL staff, in consultation with the NFL Digital Media Committee and the NFL Business Ventures Committee, has been pursuing negotiations with a wide range of potential partners for a replacement wireless content distribution and marketing agreement; and

*Whereas,* in addition to the content allocated for Wireless Distribution on a national basis by the League Office pursuant to 2005 Resolution BV-1, future potential national wireless content distribution partners are consistently demanding the inclusion of additional live NFL game content in any future League-level agreement; and

*Whereas,* to provide all Member Clubs with incremental assets to sell to third parties and further service their fans in such Member Clubs' home markets, certain additional Member Club-generated live game content should be available for wireless distribution by the Member Clubs as set forth herein; and

*Whereas,* to maximize the value of the marketing and content rights available for sale by the Member Clubs in the wireless telecommunications category, the Clubs have concluded the local territory for wireless content distribution should coincide with each Member Club's Home Marketing Area.

It is hereby *Resolved,* that NFL Ventures, L.P. or an appropriate affiliate may include live full and/or partial game audio rights to all NFL games (i.e., wireless streaming of all home and away radio broadcasts) in any future Wireless Distribution agreement with a third party wireless network operator or other third party wireless content distributor to facilitate the broad distribution of NFL and Member Club related content, provided that the entry into such agreement shall be subject to the prior approval of the NFL Digital Media Committee and the NFL Business Ventures Committee. Such agreement may include all of the content previously authorized for inclusion in such an agreement pursuant to 2005

Resolution BV-1 in addition to Member Club live full and partial game audio rights;

Further *Resolved,* that subject to the terms of any national wireless content distribution agreement approved by the NFL Digital Media Committee and the NFL Business Ventures Committee between NFL Ventures, L.P. or an appropriate affiliate and a third party wireless network operator or other third party wireless content distributor, each Member Club shall have the right to authorize third party wireless network operators and/or other third party wireless content distributors to distribute via Wireless Distribution, in addition to the content authorized for Wireless Distribution by the Member Clubs pursuant to 2005 Resolution BV-1, live game audio rights only for such Member Club's preseason and regular season home games (i.e., wireless streaming of such Member Club's local market preseason and regular season home game radio broadcasts).

Further *Resolved*, that all content distributed wirelessly pursuant to a Member Club agreement with third party wireless network operators and/or other third party wireless content distributors may be distributed only to consumers who reside, have billing addresses, and wireless devices registered, in the Member Club's Home Marketing Area, and may be made available to such consumers for reception, viewing and use only on wireless devices registered in the Member Club's Home Marketing Area.

Further *Resolved,* that any wireless content distribution agreement entered into by any Member Club as permitted hereunder shall expressly provide that it is subject to all applicable NFL rules and the prior approval of the League Office.

Further *Resolved,* that any marketing rights associated with NFL and Member Club wireless content shall be governed by the applicable provisions of the NFL Master Agreement as set forth in 2004 Resolution BV-4 (As Amended) regarding the execution of such rights in the Member Club's Home Marketing Area.

## 2008 RESOLUTION MC-3

*Whereas*, certain NFL players have experienced both on-field and off-field catastrophic injury, defined as: paraplegia, quadriplegia, hemiplegia, monoplegia, total severance of limb(s) or total loss of sight; and

*Whereas*, workers' compensation coverage may be unavailable or inadequate to offset the costs associated with such catastrophic injury; and

*Whereas*, the NFL has purchased a League-wide catastrophic loss program to cover all NFL players at all times for both on-field and off-field catastrophic injury, thereby resulting in lower premium costs for Member Clubs; and

*Whereas*, the insurance policy purchased in 2005 will expire in June, 2008; it is therefore

*Resolved*, that the Membership authorize the renewal of the NFL Catastrophic Loss Program for a three-year term.

**2008 RESOLUTION MC-4**

*Whereas*, by 2006 Resolution G-1 and 2006 Resolution MC-1 ("the 2006 Resolution"), the Member Clubs approved the terms of an extended Collective Bargaining Agreement between the NFL Management Council and the NFL Players Association, as well as an extension of the Stipulation and Settlement Agreement in the White litigation (collectively, lithe CBA");

*Whereas*, the CBA provides that either party may terminate the final two Capped Years (2010 and 2011) by giving written notice to the other on or before November 8, 2008;

*Whereas*, the 2006 Resolution provides that a decision not to terminate the final two Capped Years shall require the affirmative vote of three-fourths of the Member Clubs;

*Whereas*, the Management Council Executive Committee has unanimously recommended that notice of termination of the final two Capped Years be promptly communicated to the NFL Players Association and to Class Counsel;

*Whereas*, more than three-fourths of the Member Clubs have indicated their support of the Management Councils recommendation;

Be it *Resolved* that the final two Capped Years (2010 and 2011) of the CBA shall be terminated, with the result that the 2010 League Year shall be the Final League Year of the CBA; and

Be it *further Resolved* that the Commissioner is directed to provide notice to the NFL Players Association and to Class Counsel that, as of 4:00 P.M. ET of this day, the final two Capped Years are terminated.

**2009 RESOLUTION BC-1**

(Meeting of the Board of Directors of NFL Ventures, Inc.)

*Whereas*, the League's Broadcasting Committee has reviewed and unanimously approved the terms of the proposed NFL Sunday Ticket rights agreement between NFL Enterprises LLC ("Enterprises") and DIRECTV for the 2011-2014 NFL seasons (the "DIRECTV Agreement");

*Resolved*, that the Board hereby authorizes the Company, in the Company's capacity as sole general partner of the NFL Ventures, L.P., the sole managing member of Enterprises, to execute and deliver: (1) the DIRECTV Agreement and (2) such ancillary agreements related to the DIRECTV Agreement as may be necessary or desirable in the judgment of the duly authorized officer executing and delivering the same on behalf of the Company, in the Company's capacity as sole general partner of the NFL Ventures, L.P., the sole managing member of Enterprises (any and all such agreements, the "Ancillary Agreements"), all on the terms heretofore presented to the Broadcasting Committee; and

Further *Resolved*, that any of the officers of the Company, be, and hereby are, authorized to execute and deliver the DIRECTV Agreement and the Ancillary Agreements, with any changes or modifications to the DIRECTV Agreement and/or the Ancillary Agreements that the executing officer deems acceptable, with the acceptability thereof to be conclusively evidenced by such officer's execution and delivery of the same.

**2009 RESOLUTION BC-1A**

*Whereas*, the current Sunday afternoon network television agreements with CBS and FOX are scheduled to expire following the 2011 season; and

*Whereas*, the membership has been presented with the opportunity to extend the CBS and FOX contracts for two additional years, i.e., through the 2013 season; and

*Whereas*, the Broadcasting Committee has reviewed the terms of the proposed extensions and believes they are advantageous and will advance the long-term strategic interests of the Member Clubs; be it

*Resolved*, that the proposed extensions of the CBS and FOX network television agreements through the 2013 season are ratified and approved on the terms recommended by the Broadcasting Committee; and be it further

*Resolved*, that the Member Clubs will continue to cooperate fully with CBS and FOX, as required by 1998 Resolution BC-2 and 2004 Resolution BC-4.

## 2009 RESOLUTION BV-1

*Whereas,* Article IX (Prohibited Conduct), Section 9.1(C)(6) of the Constitution and Bylaws of the National Football League governs commercial relationships between Clubs and state and municipal lotteries; and

*Whereas,* Clubs are permitted under certain circumstances to accept general advertising for state and municipal lotteries including, without limitation, stadium signage and advertising within all Club-controlled media, and many Clubs have done so; and

*Whereas,* Clubs are prohibited from commercial involvement with a state or municipal lottery that (a) in any way involves a Club affiliation with or endorsement of the lottery, or (b) includes promotion of any lottery game having a sports theme; and

*Whereas,* scratch-off lottery tickets bearing third party brands and sold at retail locations throughout the state are a growing and important source of revenue for many states; and

*Whereas,* other major professional sports leagues, teams and entertainment entities have successfully licensed the use of their marks and logos on various state-issued scratch-off lottery tickets on a state-wide basis; and

*Whereas,* the NFL Business Ventures Committee has determined that permitting Clubs to enter into sponsorship agreements with state and municipal lottery organizations and to otherwise authorize the use of Club marks and logos in connection with the creation and marketing of scratch-off lottery tickets could provide additional funding for state and municipal initiatives such as education and infrastructure development (potentially including stadium development), as well as result in incremental revenue for the participating Clubs; and

*Whereas,* to ensure that any such activities remain consistent with long-standing League policy against advertising or promotional activities by Clubs that can reasonably be perceived as constituting affiliation with or endorsement of gambling or gambling-related activities, it is appropriate to set forth specific parameters within which Clubs may affiliate themselves with state and municipal lottery games and organizations, and to provide for certain continued oversight by the League Office;

Be it *Resolved*, that effective immediately,

1. Any provision of the Constitution and Bylaws of the National Football League notwithstanding, the Commissioner in consultation with the Business Ventures Committee shall determine whether and under what parameters Clubs may enter into commercial relationships involving state and municipal lottery games and organizations.

2. The term "performance in" as used in Article IX, Section 9.1(C)(6) of the Constitution and Bylaws of the National Football League and in this Resolution shall be defined to include, without limitation, points scored, margins of victory, timing of scores, yards gained, or any other current or future recognized measure of team or individual performance in any NFL game or other actual sporting event.

3. Through June 1, 2011 only, any other provision of the Constitution and Bylaws of the National Football League notwithstanding, Clubs shall be permitted to engage in commercial arrangements with state and municipal lotteries provided that the lottery organization does not offer any lottery game (with or without Club Marks) or betting scheme based on the outcome of or any performance in any NFL game or in any other actual sporting event, as follows:

    (i) Each Club may authorize the use within such Club's Lottery Marketing Area (as defined below) of its trademarks and logos ("Club Marks") in connection with the marketing and promotion of any state or municipal lottery game distributed within its Lottery Marketing Area, provided that Clubs shall not authorize the use of their respective Club Marks in connection with any advertising or promotional materials that, in the Commissioner's judgment, could reasonably create the impression of a Club affiliation with or endorsement of gambling or gambling-related activities (e.g., a lottery game based on the outcome of or performance in any NFL game); and

    (ii) Each Club may provide experiential and other prizing for use in connection with any state or municipal lottery game distributed within its Lottery Marketing Area, provided that such experiential and other prizing is not used, marketed, or promoted in any manner that, in the Commissioner's judgment, might reasonably be perceived as constituting an affiliation with or endorsement of any state or municipal lottery game by any coach, player or other Club employee (and such individuals continue to be prohibited from participating in any advertising or promotion of any lottery game or organization); and

    (iii) Each Club may authorize the use of its Club Marks on scratch-off game tickets for any state or municipal lottery game distributed within such Club's Lottery Marketing Area, provided that (a) all such game tickets are submitted to and approved in advance in writing by the League Office, and (b) such game tickets are not designed, marketed or promoted in such a way that, in the Commissioner's judgment, they could reasonably be perceived as being based on the outcome of or performance in any NFL game or in any other actual sporting event; and

(iv) The foregoing notwithstanding, all marketing and promotional activities within a Club's Lottery Marketing Area shall be subject to the provisions of 2004 Resolution BV-4, provided that, for the avoidance of doubt, Clubs shall not be prohibited from authorizing the sale at retail of their Club-themed scratch-off lottery tickets within any other Club's Home Territory within such Club's Lottery Marketing Area.

4. For purposes of this Resolution, each Club's Lottery Marketing Area shall include:

   (i) The entire State in which the city for which the Club holds a franchise is located (the "Home State"), provided that where two or more Clubs share a Home State, each Club shall have equal rights under this Resolution within such State; and

   (ii) The entirety of any other States within which any portion of such Club's Home Territory is located ("Adjacent States"), but excluding any other Club's Home State and provided that where two or more Clubs share any Adjacent States, each Club shall have equal rights under this Resolution within such Adjacent States; and

   (iii) The foregoing notwithstanding, the Baltimore Ravens and the Washington Redskins shall have equal rights under this Resolution within the entire state of Maryland, excluding the District of Columbia which shall be exclusively within the Lottery Marketing Area of the Washington Redskins.

5. Any agreement that a Club desires to enter into with a state or municipal lottery organization or any other third party in connection with the rights addressed in this Resolution must (i) be submitted to the League Office for prior written approval, (ii) incorporate a provision expressly providing that the agreement is subject to the rules and policies of the National Football League, as such may be amended from time to time, including, without limitation, the terms of this Resolution, (iii) not prohibit or in any way limit the state or municipal lottery organization from conducting a scratch-off lottery game in conjunction with any other Club in such Home State, and (iv) expire by its terms no later than June 1, 2011.

6. The League, directly and/or through one or more entities collectively owned by the Clubs (e.g., NFL Ventures, NFL Enterprises, NFL Properties, NFL International, and NFL Productions) (the "League Affiliates"), shall retain exclusive control over (i) the use of any trademarks owned by the League (e.g., NFL Shield, "Super Bowl") or any League Affiliate ("League Marks"), in connection with any state, municipal, or regional lottery game or organization, (ii) collective use of Club Marks, in connection with any state, municipal, or regional lottery game or organization, (iii) the use of two or more Club's Club Marks in

connection with any lottery game or organization within the United States and either (a) outside of all Clubs' Lottery Marketing Areas, or (b) in any regional lottery involving multiple Lottery Marketing Areas, and (iv) the use of Club Marks in connection with any lottery game or organization in all locations outside of the United States. No Club may license or use League Marks or any other Club's Club Marks, nor permit a third party to use any of its Club Marks together with the Club Marks of any other Club, in connection with any state or municipal lottery game or organization, except that where two or more Clubs have equal rights within any portion of their respective Lottery Marketing Area under this Resolution, such Clubs may mutually authorize the use of their respective Club Marks together within such joint marketing area in connection with the activities contemplated under this Resolution.

7. Any modifications to or extensions of this Resolution, as well as any additional policies or rules developed to implement this Resolution shall be established by the Commissioner in consultation with the Business Ventures Committee.

8. Clubs shall cooperate with the League Office and League Affiliates as may be reasonably necessary to carry out the terms of this Resolution including the protection of the League and Club brands and the provision of all information requested for the League Office to properly evaluate the lottery business during the term of this Resolution. Without limitation, all Clubs shall provide to the League Office upon request (i) complete copies of any and all agreements entered into by such Club with any state or municipal lottery organization or any other third party in connection with any of the activities contemplated under this Resolution (e.g., advertising agreements, sponsorship agreements, agreements for the use of Club Marks on scratch-off lottery tickets), (ii) samples of all marketing and promotional materials created in connection with the activities contemplated under this Resolution, and (iii) all requested financial information regarding rights fees and other revenue generated by such Club in connection with the activities contemplated under this Resolution.

9. Failure to comply with the terms of this Resolution or any related policies or rules shall subject the offending Club to the penalties set forth in Section 13 (Violations; Sanctions and Penalties) of 2004 Resolution BV-4.

10. Absent further action by the Commissioner in consultation with the Business Ventures Committee, the additional rights granted to the Clubs pursuant to Sections 3 and 4 of this Resolution shall expire on June 1, 2011. The League Office will monitor and report on the implementation of this Resolution no later than the Annual League Meeting in 2011.

## 2009 RESOLUTION FC-4

*Whereas*, non-player employees of the Member Clubs currently receive retirement benefits through the NFL Club Employees Pension Plan (the "Club Employees Pension Plan") and the NFL Supplemental Employee Retirement Plan (the "SERP"); and

*Whereas*, non-player employees of the Member Clubs currently may participate in the NFL Capital Accumulation Plan (the "401(k) Plan"); and

*Whereas*, the Membership wishes to afford to each Member Club greater flexibility and a wider range of alternatives in providing retirement benefits to Its non-player employees; Be It

*Resolved* that effective April 1, 2009

1. No Member Club shall be required to participate in the Club Employees Pension Plan.

2. No Member Club shall be required to participate in the 401(k) Plan, or to make employer matching contributions or other employer contributions to the 401(k) Plan.

3. No Member Club shall be required to participate in the SERP.

4. Nothing in this Resolution shall be deemed to preclude any Member Club, after March 31, 2009, from electing any one or any combination of the following options:

   a. Continuing to participate in the Club Employees Pension Plan, under either the current benefit formula or a different permitted benefit formula of the Member Club's choosing;

   b. Continuing to offer its employees the opportunity to contribute to the 401(k) Plan, and choosing to make employer matching contributions or other employer contributions on any permitted basis.

   c. Establishing and maintaining a separate defined benefit, defined contribution, or other tax-qualified retirement plan or admitting non-player employees to a separate plan maintained by a Member Club; and

   d. Offering supplemental retirement benefits either through the SERP or through a separate non-qualified arrangement maintained by the Member Club.

5. The Commissioner shall have full authority and discretion to establish, in consultation with the Finance and Employee Benefit Committees, appropriate rules relating to the reporting of tax-qualified and nonqualified retirement assets and liabilities, reporting of plan information, and compliance with governing law and regulations.

6. The Commissioner shall continue to take reasonable steps to ensure that each Member Club satisfies its obligation to ensure that the Club Employees Pension Plan maintains adequate funded status as required by federal law and regulations.

7. Plan assets of the Club Employees Pension Plan and the 401(k) Plan shall continue to be invested in the NFL Reciprocal Trust or such successor Trust as designated by the appropriate NFL Committee.

8. SERP assets shall continue to be invested in the current Trust or such successor Trust as designated by the appropriate NFL Committee.

### 2009 RESOLUTION FC-12

*Whereas*, 1985 Resolution FC-7, as amended by 1996 Resolutions FC-5 and FC-6 and as supplemented by 1998 Resolution FC-10, requires that a single individual (the "Principal Owner", also referred to as the "Controlling Owner") must hold at least a 30% equity interest in, and must possess total voting control over, a Member Club;

*Whereas*, the Finance Committee continues to recognize the importance of permitting Principal Owners to engage in responsible succession planning and to provide for the orderly transfer of ownership to the next generation without the disruption of forced sales to pay estate taxes;

*Whereas*, in 2004, in order to facilitate such intergenerational transfers, the membership approved 2004 Resolution FC-1A to allow Principal Owners, in certain circumstances and subject to certain conditions, to reduce potential estate tax liability by holding individually a minimum of a 20% beneficial interest, and aggregating the Principal Owner's individual interest with those of immediate family members to reach the required 30% stake;

*Whereas*, in light of the foregoing and for other reasons discussed with the membership, the Finance Committee believes it appropriate to reduce the minimum equity that a Principal Owner who meets all of the requirements set forth in 2004 Resolution FC-1A (including the possession of total voting control over the Member Club) is required to own, from 20% to 10%; and

*Whereas*, the Finance Committee reaffirms its belief in current ownership policies such as the requirement that the Principal Owner have full operating control over the Member Club and full authority to act on behalf of the Member Club as a member of the League.

*Be it Resolved*, that a Principal Owner will continue to be deemed to own a 30% beneficial interest in his club if all of the conditions of 2004 Resolution FC-1A are met, underlined provided that the references to twenty percent (20%) in Paragraph 2 and Paragraph 5 of 2004 Resolution FC-1A shall be modified to refer instead to ten percent (10%);

*Be it Further Resolved*, that all of the other terms and conditions of 2004 Resolution FC-1A shall remain unchanged;

*Be it Further Resolved*, that all provisions of the NFL Constitution and, except as specifically amended hereby, all currently effective NFL resolutions and policies relating to ownership (and to transfers of ownership) in Member Clubs shall remain in full force and effect; and

*Be it Further Resolved*, that nothing in this Resolution shall affect the validity of any existing and approved ownership arrangement at a Member Club.

## 2009 RESOLUTION G-1

*Whereas*, the League wishes to realign the team pairings of the NFC West and AFC West for the purpose of scheduling home and away games;

*Whereas*, currently when all the teams within a division are scheduled to play games against teams within the AFC West (Oakland, San Diego, Denver and Kansas City), two of those teams in such division will have road games against Oakland and San Diego and home games against Denver and Kansas City, while the other two teams will have road games against Denver and Kansas City and home games against Oakland and San Diego;

*Whereas*, currently when all the teams within a division are scheduled to play games against teams within the NFC West (San Francisco, Seattle, St. Louis and Arizona), two of those teams in such division will have road games against San Francisco and Seattle and home games against St. Louis and Arizona, while the other two teams in such division will have road games against St. Louis and Arizona and home games against San Francisco and Seattle;

Be it *Resolved*, that commencing with the 2010 NFL season, the League Office will realign the pairings of teams within the AFC West and NFC West as follows:

AFC West – Denver and Oakland will be paired together and Kansas City and San Diego will be paired together so that teams within a division playing games against the AFC West will have either:

(a) road games against Denver and Oakland and home games against Kansas City and San Diego, or

(b) road games against Kansas City and San Diego and home games against Denver and Oakland.

NFC West – Arizona and San Francisco will be paired together and St. Louis and Seattle will be paired together so that teams within a division playing games against the NFC West will have either:

(a) road games against Arizona and San Francisco and home games against St. Louis and Seattle, or

(b) road games against St. Louis and Seattle and home games against Arizona and San Francisco.

## 2010 RESOLUTION DM-1

*Whereas*, each Member Club has the right to televise its own NFL preseason games that are not televised by a national network television partner in accordance with Article X of the Constitution and Bylaws and the League's preseason networking policy;

*Whereas*, pursuant to 2003 Resolution BC-1, the Member Clubs authorized the re-airing of local preseason game telecasts on the NFL Network, both on a live basis outside of the participating Member Clubs' home television markets and on a time-delayed basis within and outside the participating Member Clubs' home television markets;

*Whereas*, since the passage of the 2003 Resolution BC-1, Internet distribution of content has become an increasingly important and many sports and entertainment properties are now delivering packages of local content on a national and international basis through the Internet;

*Whereas*, offering a package of NFL preseason games available through NFL.com would broaden the distribution of the NFL's media offerings, further promote NFL football, and allow the NFL to compete effectively with the Internet offerings of other sports and entertainment properties; and

*Whereas*, the Digital Media Committee has reviewed a proposal from League staff to make NFL preseason games available through NFL.com in a manner designed to protect the local market telecasts and has determined that such flexibility furthers the membership's desire to promote NFL football and to build a valuable media asset in a cost-effective manner.

It is hereby *Resolved* that, beginning with the 2010 NFL preseason, each Member Club shall make available to NFL Ventures, L.P. and its subsidiaries the right to distribute the Member Club's preseason game telecasts as part of a League-wide offering available through NFL.com (i) live outside of such Member Club's home television market and outside of any other markets that the Member Club has notified the League it is televising the game on a live basis and (ii) on a time-delayed basis within and outside such Member Club's home television market.

It is hereby further *Resolved* that (i) at each Member Club's election, when its preseason game telecasts are distributed live via the Internet, such simulcasts shall include all advertisements contained within the local over-the-air telecast of such games (provided such advertisements do not promote products or services precluded by the League's then-current prohibited advertising categories) and (ii) each Member Club shall be responsible for securing all necessary consents to enable NFL Ventures, L.P. or one of its subsidiaries to make such game telecasts available via the Internet.

## 2010 RESOLUTION FC-1

*Whereas,* non-player employees of the Member Clubs currently may participate in the NFL Capital Accumulation Plan (the "NFL 401(k) Plan"); and

*Whereas,* the 2009 Resolution FC-4 allows Member Clubs to establish separate 401(k) plans, but requires that plan assets of the NFL 401(k) plan continue to be invested in the NFL Reciprocal Trust or such successor trust as established by the appropriate NFL Committee (the "NFL Trust"); and

*Whereas,* the Membership wishes to have greater flexibility in providing retirement benefits to non-player employees; Be it

*Resolved,* that effective April 1, 2010

1.  Member Clubs that have established a tax-qualified defined contribution plan separate from the NFL 401(k) Plan, and a tax-exempt trust to hold the assets of the replacement plan, are permitted to transfer the accounts and assets attributable to the Member Clubs' employees from the NFL 401(k) Plan and the NFL Trust to the replacement plan and replacement trust.

2.  Any assets of the NFL 401(k) Plan attributable to the Member Clubs' employees (other than promissory notes reflecting outstanding participant loans) shall be converted to cash before the transfer, and the cash and promissory notes shall be transferred to the replacement trust. The NFL Employee Benefit Committee may determine, in its sole discretion, that the transfer should occur in two stages in order to ensure that the amount transferred does not exceed the value of the assets attributable to the Member Clubs' employees.

3.  A Member Club that wishes to transfer the accounts and assets attributable to its employees from the NFL 401(k) Plan and NFL Trust to a replacement plan and replacement trust must:

    a.  Agree to implement an administrative blackout period at least 30 days before the intended transfer date, during which all transactions affecting the accounts of the Member Club's employees will be suspended;

    b.  Certify that the transfer will comply in all respects with any applicable laws and tax qualification requirements;

    c.  Certify that the Member Club will bear all costs arising from or incidental to the transfer and will take all steps necessary to implement the transfer;

      d.  Agree that the Member Club will fully indemnify the League; the other Member Clubs; the NFL 401(k) Plan and NFL Trust; any participant in or fiduciary of the NFL 401(k) Plan, the NFL Trust, or another plan participating in the NFL Trust; any NFL Committee; and any member, officer, director, employee, agent, representative, delegate, or appointee of any of the foregoing, against any and all liability, cost, or expense arising from or in any way attributable to the transfer; and

      e.  Execute a withdrawal and indemnification certificate at least 90 days before the intended transfer date, in a form approved by the NFL Employee Benefit Committee, attesting that the Member Club has accepted and agreed to each of the conditions of the transfer.

4.  The Finance Committee may, from time to time, revise the conditions applicable to Member Clubs that wish to withdraw from the NFL 401(k) Plan and NFL Trust.

5.  The NFL Employee Benefit Committee shall have the authority and discretion to develop any procedures, create any documents, and take any and all other steps it deems necessary or advisable to ensure that the withdrawal of a Member Club from the NFL 401(k) Plan and NFL Trust is implemented in an appropriate manner and in accordance with these procedures.

## **2010 RESOLUTION JC-1**

*Whereas*, pursuant to 2005 Resolution BV-1 and 2008 Resolution JC-1, NFL Properties LLC and NFL Enterprises LLC ("NFL") granted Sprint certain exclusive rights to wirelessly distribute NFL and Member Club related content (e.g., NFL Network programming including live game content, live game audio of regular season games, game video highlights, live game statistics, score updates, screen savers, ring tones, wallpaper, text based news services/updates, polls, contests/sweepstakes) for use on handheld devices such as cellular telephones (the "Sprint Agreement");

*Whereas***,** the Sprint Agreement expires on March 31, 2010;

*Whereas*, the NFL staff has been pursuing negotiations with a wide range of potential partners for a replacement wireless content distribution and marketing agreement to include the rights set forth in the Sprint Agreement and certain new content rights including, without limitation, NFL Red Zone, Sunday Night Football and potentially Monday Night Football;

*Whereas*, the NFL has reached an agreement in principle with Cellco Partnership d/b/a Verizon Wireless for the above content and marketing rights ("Verizon");

It is hereby *Resolved,* that NFL Ventures, L.P. or an appropriate affiliate may include live full and/or partial game video rights to all NFL games (e.g., wireless streaming of all live game television broadcasts) in a future wireless distribution agreement(s) with Verizon on terms generally consistent with those described in the presentation to membership, in order to facilitate the broad distribution of NFL and Member Club related content, provided that the entry into such agreement(s) shall be subject to the prior approval of the NFL Digital Media Committee and the NFL Business Ventures Committee. Such agreement(s) may also include all of the content previously authorized for inclusion in such an agreement(s) pursuant to 2005 Resolution BV-1 and 2008 Resolution JC-1;

Further *Resolved,* each Member Club shall continue to have the right to authorize third party wireless network operators and/or other third party wireless content distributors to distribute on a wireless basis, all of the content authorized for wireless distribution by the Member Clubs pursuant to 2005 Resolution BV-1 and 2008 Resolution JC-1, subject to the territory, marketing, distribution, approval and other limitations and requirements set forth in such Resolutions.

**2010 RESOLUTION BC-1**

*Whereas*, the League, through NFL Enterprises LLC, has had a long-term agreement in place with Sirius Satellite Radio (now Sirius XM Radio) to make club radio broadcasts of all NFL games as well as other NFL-related audiocasts available to subscribers of Sirius XM satellite radio service; and

*Whereas*, the agreement with Sirius XM Radio is set to expire after the end of the 2010-11 NFL season; and

*Whereas*, there is now only one satellite radio company operating in the United States; and

*Whereas*, the League has entered into renewal discussions with Sirius XM Radio to extend Sirius XM's rights for an additional five NFL seasons on the terms presented to the membership.

*It Is Hereby Resolved*, that NFL Enterprises be, and hereby is, authorized and directed to enter into definitive agreements with Sirius XM implementing the transaction on the terms presented to the membership.

## 2010 RESOLUTION BC-2

*Whereas*, since 2006, the NFL Network has carried eight (8) live NFL regular season games; and

*Whereas*, the eight (8) live NFL regular season games are a valuable programming asset of the NFL Network; and

*Whereas*, the current authorization to provide such games to the NFL Network runs through the 2011 season; and

*Whereas*, the ability to negotiate favorable distribution arrangements with cable, satellite, and other distributors will be significantly enhanced by the NFL Network's ability to offer to provide continuing live NFL regular season games; and

*Whereas*, the current television packages with CBS, FOX, NBC and ESPN extend through the 2013 season.

*It Is Hereby Resolved*, that the Commissioner in consultation with the Broadcast Committee, shall be authorized to commit as part of a new or extended distribution agreement up to eight (8) live NFL regular season games to the NFL Network through the 2017 season.

**2011 RESOLUTION BC-1**

*Whereas*, the League's current agreement with ESPN is scheduled to expire following the 2013 season;

*Whereas*, the League has negotiated an eight-year extension with ESPN(i.e., covering the 2014-2021 seasons) in which ESPN would be granted, among other things, the right and obligation to telecast Monday night regular season games, the Pro Bowl, certain pre-season games, and, if the League so elects, a Wild Card Weekend game; and

*Whereas*, the Broadcast Committee has reviewed the terms of the proposed extension with ESPN and unanimously recommended ratification of this contract; and

*Whereas*, the membership now desires to ratify and approve this ESPN contract;

*Be it Resolved*, that the League's 2014-2021 television contract with ESPN is hereby ratified and approved; and

*Further*, *Resolved*, that pending membership adoption of resolutions governing scheduling, game length, overall cooperation, and preseason policies for the new contract term (and in any case, for the 2012 and 2013 seasons, which continues to be subject to the current network television contracts), the member clubs will continue to cooperate fully with the television networks pursuant to and as required by 1998 Resolution BC-2, and 2006 Resolution BC-3.

**2011 RESOLUTION BC-2**

*Whereas*, the current Sunday afternoon and evening network television agreements with CBS, FOX and NBC are scheduled to expire following the 2013 season;

*Whereas*, the League has negotiated nine year extensions of such agreements (covering the 2014-2022 seasons) with CBS, FOX and NBC; and

*Whereas*, the Broadcasting Committee has reviewed the terms of the proposed extensions with CBS, FOX and NBC and recommended ratification of these agreements; and

*Whereas*, the membership now desires to ratify and approve the CBS, FOX and NBC agreements;

*Be it Resolved*, that the proposed extension of the CBS, FOX and NBC television agreements through the 2022 season are ratified and approved on terms recommended by the Broadcasting Committee; and

*Further*, *Resolved*, that pending membership adoption of resolutions governing scheduling, game length, overall cooperation, and preseason policies for the new contract term (and in any case, for the 2012 and 2013 seasons, which continue to be subject to the current network television contracts), the member clubs will continue to cooperate fully with the television networks pursuant to and as required by 1998 Resolution BC-2, and 2006 Resolution BC-3.

## 2011 RESOLUTION BC-3

*Whereas*, since 2006, NFL Network has carried eight (8) live NFL regular season games; and

*Whereas*, live NFL regular season games are a valuable programming asset of NFL Network; and

*Whereas*, 2010 Resolution BC-2 authorized the Commissioner in consultation with the Broadcasting Committee to commit up to 8 games to the NFL Network through the 2017 season as part of a new or extended distribution agreement; and

*Whereas*, the NFL has entered into long term extensions of its telecast agreements with ESPN, CBS, FOX and NBC and such agreements provide flexibility to commit additional games to other telecasters; and

*Whereas*, the ability to negotiate favorable distribution arrangements with cable, satellite, and other distributors will be significantly enhanced by the NFL Network's ability to offer additional live NFL regular season games;

*It Is Hereby Resolved*, that the Commissioner, in consultation with the Broadcasting Committee, shall be authorized to commit up to thirteen (13) live NFL regular season games to NFL Network through the 2022 season as part of a new or extended distribution agreement.

## 2011 RESOLUTION BV-1

Amend and restate 2004 Resolution BV-4 to extend the effective term, modify the definition of each Club's "Home Marketing Area" and to make other changes as indicated in the below (deleted language struck over, new language underlined):

2004 Resolution BV-4
(~~As~~ Amended and Restated)

*Whereas,* the NFL has for decades operated a successful and highly respected business involving the collective licensing and protection of League Marks[1] and Club Marks[2], and has entered into successful business relationships with producers of a wide range of consumer products and with major corporate sponsors in a variety of fields; and

*Whereas,* the licensing of League Marks and Club Marks has become an integral and important part of the collective efforts of the League and the Member Clubs to promote and foster the primary business of League Members, the creation of a football entertainment product, NFL football; and

*Whereas,* ~~since~~ from 1982 through March 31, 2004, such activities ~~have been~~ were implemented by NFL Properties on a collective basis through the mechanism of an NFL Trust and related exclusive license agreements; and

*Whereas,* the League's business models for licensing, sponsorships and promotion have evolved and been modified by League Committees and membership decisions to allow the League and Member Clubs to compete more effectively with other trademark holders in view of changes in business conditions within the NFL as well as in the broader competitive marketplace; and

*Whereas,* the NFL Trust and related exclusive license agreements ~~are scheduled to expire~~ expired on March 31, 2004; and

*Whereas,* the membership has determined that a trust structure is no longer necessary to achieve the purposes for which it was intended based on changes in the NFL's business structure and operations including the formation of NFL Ventures L.P.; and

*Whereas,* the development and use of League Marks and Club Marks, for both commercial and promotional purposes, should continue to be managed through a membership-owned common enterprise and on a coordinated basis under the terms set forth below and consistent with settled League governance principles; and

*Whereas,* League and Member Club trademark licensing and related activities constitute a shared opportunity created by the joint presentation of NFL

---

[1] **League Marks** shall mean all trademarks owned by the League entities, including without limitation, NFL, the NFL Shield design, Super Bowl, Pro Bowl, NFL Kickoff, NFL Playoffs in their present form or as may be adopted in the future.

[2] **Club Marks** shall mean all trademarks owned by a Member Club, including without limitation, the names, nicknames, logos, colors, slogans, symbols, or any other identifying indicia in their present form or as may be adopted in the future.

football games among all Member Clubs and a collective means of promoting NFL football, and are most appropriately pursued on terms established by the vote of three-fourths of Member Clubs as provided in the Constitution and Bylaws; and

*Whereas,* the Member Clubs ~~deem~~ deemed it necessary and advisable to amend certain provisions of the Constitution and Bylaws to implement the successor arrangements to the NFL Trust and to ensure that League Marks and Club Marks can continue to be effectively used to promote and foster NFL football~~.~~; and

*Whereas.* the Member Clubs have operated under a new structure, as set forth in 2004 Resolution BV-4, to manage the common interests of the Member Clubs in promoting, protecting, and commercializing League and Club Marks.

*Be It Resolved* that the Constitution and Bylaws are amended as follows:

1.      Expiration of Trust and New Agreement: The NFL Trust and related exclusive license agreement~~s will~~ expired by their terms on March 31, 2004. Subject to existing agreements, the terms of this Resolution, and other applicable provisions of the NFL Constitution and Bylaws and League rules and policies, each Club will have the right to use its Club Marks within its Home Territory and Home Marketing Area, as defined below.

2.      Continuation of Existing Agreements: All existing agreements entered into by the League or a League-affiliate[3] with third parties on matters covered by this Resolution shall remain in effect according to their terms, Including any extension or renewal rights. All Clubs shall continue to participate in and support implementation of all such agreements. This Resolution shall not affect any existing agreements between the League (and/or a League affiliate) and the NFL Players Association (and/or an affiliate).

3.      Definition of Home Territory: The definition of "Home Territory" as set forth in Article 4.1 of the Constitution and Bylaws remains unchanged, and the definition of club "rights within home territory" as set forth in Article 4.2 of the Constitution and Bylaws remains unchanged except that this Article is amended to add the following subsection (E).

> The Home Territory of the Washington Redskins and the Home Territory of the Baltimore Ravens, respectively, shall remain as defined in Article 4.1(A) above except that the Home Territory of the Redskins shall include all of Montgomery and Prince Georges Counties and no other part of the State of Maryland and the Home Territory of the Baltimore Ravens shall include all of Anne Arundel and Howard Counties in the State of Maryland.

---

[3] **League affiliate** shall mean entities collectively owned by the Member Clubs of the NFL (e.g., NFL Ventures, NFL Enterprises, NFL Properties, NFL International, and NFL Productions).

4. <u>Definition of Home Marketing Area</u>: Article 4 of the Constitution and Bylaws is hereby amended to add the following Article 4.4, and existing Article 4.4 ("Conference Alignment") shall be renumbered as Article 4.5:

(4.4) Home Marketing Area Defined

(A) Each Club shall have a Home Marketing Area in which it may engage in the commercial activities set forth in Article 4.4 (B) below. The Home Marketing Area shall be defined as (i) the Home Territory (including the portion of any foreign country within a Club's Home Territory, provided however, that activities within a foreign country are coordinated with and approved in advance by the League on behalf of NFL International and (ii) the State within which the City for which the Club holds a franchise is located (the "Home State"), and (iii) the entirety of any other State within which any portion of such Club's Home Territory is located ("Adjacent State"), but excluding any other Club's Home State.

Where two or more Clubs share a Home Territory, each Club shall have equal rights under Section 4(B) below with respect to the Home Territory and Home Marketing Area. Where two or more Clubs hold franchises within the same state share a Home State but do not share a Home Territory, each Club shall have equal rights within the Home Marketing Area State, except for the Home Territory of another Club. Where two or more Clubs share an Adjacent State but do not share a Home Territory, each Club shall have equal rights within the Adjacent State, except for the Home Territory of another Club.

The Home Marketing Area of any Club shall also include the County in which the Club's preseason training camp is located (if located within the United States) for the duration of such training camp only, unless the training camp is located within the Home Territory of another Member Club.

(B) Club Rights Within Home Marketing Area; Exclusivity and Other Terms

1. Subject to the terms of Article 4.4(A), each Club shall have exclusive rights vis-a-vis other Clubs to use its Club Marks within its Home Marketing Area with respect to NFL football activities involving (i) local advertising, sponsorship, naming rights, and related promotional arrangements; (ii) retail stores and other Club-identified physical structures and ventures; (iii) promotional and public awareness campaigns, including "image" advertising; and (iv) Club-sponsored events.

2.      A Club's rights to use its Club Marks within its Home Marketing Area shall at all times be subject to: (i) League agreements, including with manufacturers of licensed products; (ii) the rights of League sponsors and business partners, including television partners and the NFL Network; (iii) the right of the League to promote League initiatives and events; and (iv) the rights of the League and individual Clubs to reach fans outside of their Home Marketing Area through e-commerce and other Internet related activities, catalog sales and database marketing~~.~~ , in each case subject to applicable League policy. Except as otherwise set forth in this section, no Club shall have any rights to use or license its Club Marks in the Home Marketing Area of another Club.

(C)      A Club may request a limited expansion of its Home Marketing Area into a border state. Such requests will be evaluated based on the effect of the proposed expansion on the interests of the League or another Member Club.

(D)      Consistent with prior resolutions, the Los Angeles ~~home territory~~ Home Territory shall remain owned and controlled by the League, and pending a decision by the League to place one or more franchises in the Los Angeles area, no Club shall have rights to use Club Marks in the Los Angeles Home Territory for the purposes set forth in paragraph 4(B) above.

(E)      The International Committee shall evaluate and make recommendations to the membership as to whether Clubs should have rights to use and license the use of their individual Club Marks for marketing and promotional activities in certain international territories outside of their respective Home Marketing Area, and if so, on what terms and conditions.

5.      ~~Revenue and Cost Sharing Study: The Commissioner will appoint a Special Committee of at least nine owners to evaluate in depth the key financial aspects of the operations of all member clubs in relation to all revenue sources and revenue opportunities, all club operating costs (including team and owner stadium construction costs), and the impact of these matters on the competitive football opportunities of all clubs as well as the terms of any current or proposed Collective Bargaining Agreement with the NFL Players Association. The Committee will make recommendations on these matters, including on revenue and cost sharing alternatives, to the thirty two (32) owners for their consideration in further League decision making. The members of this Committee will include three of the current members of the Management Council Executive Committee; three of the current members of the Finance Committee; and three owners not currently a member of either of these committees.~~
[INTENTIONALLY DELETED]

2011-7

6.    League Policies: This Resolution shall not affect any existing policies regarding the League's image, health and safety issues, or the integrity of the game. To further the commitment of all Clubs to promote NFL football, Club Marks can be used in connection with the presentation and promotion only of (a) NFL football as conducted by the League and its Member Clubs or (b) football presented by NFL--owned entities approved by the League's membership, such as the NFL Europe league (see Article 9.1(C)(7)). Club marks and logos may not be used in connection with the presentation or promotion of other sports, amateur or professional, except with the prior approval of the League's membership based upon a three-fourths vote or the approval of the Business Ventures Committee, which will make a report to the membership on this subject by no later than the 2011 Spring League Meeting.

7.    League Control of League Marks and Collective Use of Club Marks: The League directly and/or through one or more League affiliates shall retain exclusive control of all League Marks and the collective use of Club Marks (the use of all Clubs' marks with equal emphasis) in any context.  No Club may license or use League Marks or any other Club Marks, nor permit a third party to use any of its Club Marks together with the Club Marks of another Club absent prior League approval.

8.    League Control of League Marks and Individual Club Marks in Certain Contexts: The League shall retain exclusive worldwide control to license and otherwise use League Marks and individual Club Marks during the Term of this Resolution, in respect of the following business operations:  (i) the promotion of the League; (ii) game presentation including presentation and promotion of NFL football through game telecasts and related programming in all forms of media; (iii) international operations; (iv) apparel, accessories (e.g., headwear), footwear and fitness products; (v) computer and video games (including. without limitation, games for mobile phones and other wireless devices); (vi) trading cards; (vii) game action photographs; (viii) footballs, helmets, and other equipment used on the playing field; (viiix) player-identified product; (ix) home videos (e.g., DVDs) and related NFL Films products; (xi) products including the marks of all Clubs; and (xii) any of the products enumerated in (iv) through (xi) above for use as premiums (i.e., any product sold or given away for the purpose of promoting the sale of any other product or service); and (xiii) licensing, advertising, product or service placement, sponsorships and promotional agreements relating to commercial identification on the sidelines or playing field or otherwise subject to television exposure during NFL games. With respect to any such operations, no Club may "opt out" of any League arrangement in such business operations or "go dark" by refusing to cooperate with any such arrangement; provided, however, that, Clubs may elect to control distribution of certain licensed apparel products bearing their individual Club Marks pursuant and subject to terms and conditions to be determined by the Commissioner in consultation with the Business Ventures Committee.

9.    League and Club Publishing; Entertainment Programming:

(a)    The League shall continue to be responsible for publishing products (books, magazines, etc.) that feature the marks, logos and intellectual property of the League and Member Clubs, with each Club retaining the right to

produce and license Club-related publications using its Club Marks <u>for distribution</u> within its Home Marketing Area <u>only</u>.

(b)   The League shall continue to be responsible for producing and licensing to third parties the right to use the marks, logos and intellectual property of the League and Member Clubs in various entertainment programming, including, but not limited to, theatrical productions, films, television programs (e.g., sitcoms, game shows, "reality" programs), web-based programs, and musical compositions, with each Club retaining the right to produce and license Club-related entertainment programming using its Club Marks for distribution within its Home Marketing Area only.

10.   League Sponsorship and Promotional Arrangements:

(a)   The League may enter into sponsorship and promotional agreements licensing the use of League Marks and collective use of Club Marks. Except as set forth in paragraph 8 above, each Club shall retain the right to have a separate sponsorship and promotional arrangement for individual use of its Club Marks within its Home Marketing Area, subject to rules and policies established by the League and/or a League affiliate, including without limitation, regulations based on taste, image, health or safety, or integrity of the game considerations, and relating to premium products and branding.

(b)   The Member Clubs, by a three-fourths vote, may authorize a League affiliate to enter into a particular sponsorship agreement for a specific category licensing the use of League Marks and the individual use of all of the Club Marks.

11.   Hardline Products: The League has the exclusive right to enter into license agreements to use League Marks and Club Marks for non-apparel ("hardline") products to be distributed nationally. Except for those hardline products identified in paragraph 8 above, Clubs shall have the rights set forth below:

(a)   Clubs may opt independently to obtain certain hardline products bearing their respective Club Marks from League licensees for distribution in the Club's Home Marketing Area in non-traditional retail outlets operated by Club sponsors (e.g., automobile dealerships).  League licensees will be required to offer a favorable price to such Clubs. Clubs may purchase the product from a non-licensee if the price is at least 10% below the NFL licensee's price provided the quality of the product is comparable to that offered by the NFL licensee. Clubs electing this option will be required to ensure that a customary royalty is paid to a League affiliate.

(b)   Clubs may "opt out" of League licensing arrangements for certain products bearing their Club Marks for taste, image or other legitimate reasons but may not license their Club Marks for use on the identical or substantially similar hardline products independently. Clubs opting out of a product will not share in any revenue derived from the sale of that product.

(c)      Clubs may enter into license agreements for use of their Club Marks on up to five products which are not part of the NFL's national licensing program for distribution within the Club's Home Marketing Area, subject to appropriate quality control provisions and receipt of customary royalty payments by a League affiliate.

(d)      Clubs may license directly the use of their individual Club Marks on motor vehicle license plates issued by states within the respective Club's Home Marketing Area.

(e)      Clubs may opt independently to obtain certain hardline products bearing their respective Club Marks from League licensees for use as premium products (i.e., any product sold or given away for the purpose of promoting the sale of any other product or service) in the Club's Home Marketing Area by Club sponsors. Clubs may purchase the product from a third party other than a League licensee if (i) there is no League licensee for the type of product the Club desires to use, or (ii) the price is at least 10% below the League licensee's price, provided that in either case (1) the quality of the product is comparable to that offered by the League licensee (if any), and (2) such third party first enters into a standard NFL premium license agreement for such products. Clubs electing this option will be required to ensure that a customary premium royalty is paid to a League affiliate, provided that no royalty shall be payable on such premiums distributed within a Club's stadium, training camp or Club facilities.

12.      Extension of NFL Internet Network: The NFL Internet Network as currently structured and operated by the League and the member clubs, under 2000 Resolution JC-1 and 2001 Resolution JC-1, shall be extended to operate beyond the end of the 2005 NFL season through and including March 31, 2019 2026. During this Term, the membership Digital Media Committee may periodically review the operations and elements of the Network to take account of changing technology, business models and other considerations and to determine whether modifications (by three fourths membership vote) should be made to aspects of the Network's operations.

13.      Violations; Sanctions and Penalties: Any Club that licenses or authorizes use of its Club Marks in violation of this Resolution, or related rules or policies, shall, in addition to any other penalty that may be assessed, pay to the League or a League affiliate all proceeds and other consideration received for such license and not be entitled to share in any revenues generated by the use of League Marks and Clubs Marks hereunder.

14.      Finance/Tax Matters: NFL Properties' net income and expenses shall be taken into account for purposes of determining the License Fee to be paid by NFL Ventures to the Clubs.

15.      Effective Term of Resolution: This Resolution shall be effective as of April 1, 2004, and shall remain in effect through and including March 31, 2019 2026 or expiration of any then-existing agreements beyond the Term as approved by three-fourths of the Member Clubs. The Business Ventures Committee shall review this Resolution and its related policies on a periodic basis

2011-10

no less than once every three (3) years. in light of changes in League and Club business practices and the broader commercial marketplace, and make appropriate recommendations to the membership.

16.     Three-Fourths Voting Standard; Constitution and Bylaws Governs: This Resolution may be amended and further membership decisions on these matters will be made by a three-fourths vote of the Member Clubs.

17.     League Responsibilities for Trademark Protection: All trademark and related intellectual property protection activities for the League and the Member Clubs, including without limitation, registration activities and the prosecution or defense of litigation, will be handled on a worldwide basis exclusively by a League affiliate, as will all agreements with the NFL Players Association or its affiliates relating to the subject matter of this Resolution.

18.     Disputes Resolution; Constitution and Bylaws Governs: Any disputes arising out of or relating to this Resolution, any policies or rules developed to implement this Resolution, the Trust and any related agreements, or the rights and obligations of NFL Ventures and its affiliates, shall be resolved exclusively under the mechanism set forth in Article VIII of the Constitution and Bylaws.

19.     Policies and Compliance Matters:

(a)    Any policies or rules developed to implement this Resolution shall be established by the Commissioner in consultation with the Business Ventures Committee.

(b)    All licenses granted by the League and any Member Club or any affiliate of such entity shall include appropriate provisions relating to audit, insurance and indemnification, quality control, prohibitions on assignment, sublicensing, or otherwise encumbering League Marks or Club Marks, prohibitions on third party licensing of League Marks or Club Marks, and other contractual provisions that may be from time to time required to protect the League and the Member Clubs.

(c)    Clubs shall not mortgage, pledge, hypothecate or otherwise encumber rights in Club Marks without prior approval of the League.

20.     Club Cooperation and Support of Joint Activities: The Clubs shall cooperate with the League and League affiliates as may be reasonably necessary to carry out the terms of this Resolution including the licensing and protection of League Marks and Club Marks rights and in that respect shall execute documents as may be reasonably requested by the League or a League affiliate to carry out the purposes of this Resolution.

## 2011 RESOLUTION FC-3

*Whereas*, 1985 Resolution FC-7, as amended by 1996 Resolutions FC-5 and FC-6 and as supplemented by 1998 Resolution FC-10, requires that a single individual (the "Principal Owner", also referred to as the "Controlling Owner") must hold at least a 30% equity interest in, and must possess total voting control over, a Member Club;

*Whereas*, the Finance Committee continues to recognize the importance of permitting Principal Owners to engage in responsible succession planning and to provide for the orderly transfer of ownership to the next generation without the disruption of forced sales to pay estate taxes;

*Whereas*, in 2004 and 2009, in order to facilitate such intergenerational transfers, the membership approved 2004 Resolution FC-1A and 2009 Resolution FC-12, respectively, which allow Principal Owners, in certain circumstances and subject to certain conditions, to reduce potential estate tax liability by holding individually a minimum of a 10% interest, and aggregating the Principal Owner's individual interest with those of immediate family members to reach the required 30% stake;

*Whereas*, in light of the foregoing and for other reasons discussed with the membership, the Finance Committee believes it appropriate to establish an alternative succession planning option pursuant to which the minimum equity that a single immediate family member heir to a Principal Owner (regardless of how many potential heirs such Principal Owner may have) must own could be reduced to 20% of a Member Club, subject to certain conditions (including the possession of total voting control over the Member Club); and

*Whereas*, the Finance Committee reaffirms its belief in current ownership policies such as the requirement that the Principal Owner have full operating control over the Member Club and full authority to act on behalf of the Member Club as a member of the League.

*Be it Resolved*, that, as part of a Principal Owner's estate plan or otherwise, a single immediate family member (as defined in Article 3.5(C) of the NFL Constitution and Bylaws) in the Principal Owner's next (or, in appropriate circumstances, subsequent) familial generation (the "20% Successor Principal Owner") may, upon or after the date on which such 20% Successor Principal Owner becomes the principal owner of the Member Club, own a minimum of 20% of the Member Club and, in such circumstances, ownership of such a 20% or greater interest (including for the avoidance of doubt, ownership of an equal percentage interest in any affiliated stadium company or other entity that holds football-related assets) shall be considered sufficient minimum equity in the Member Club for purposes of satisfying the League's minimum equity ownership requirements if all of the following conditions are met:

> 1. The transferring Principal Owner has (or had) owned the Member Club for at least 10 years prior to the 20% Successor Principal Owner first availing himself or herself of this policy, except that

2011-12

this holding period requirement shall not apply to any person who is a Principal Owner as of May 31, 2011.

2.  The 20% Successor Principal Owner has and maintains "drag along," "call" or similar rights, options, and other rights, as necessary (and in each case, satisfactory to the Commissioner) with respect to other persons' equity interests in the Member Club, such that (i) a minimum of a 30% equity interest in, and total voting control of, the Member Club can be transferred simultaneously to a single, subsequent controlling owner, and (ii) the subsequent controlling owner and the Member Club can be in compliance with all applicable League rules (such as the then-applicable debt limit, etc.) following such transfer.

3.  The 20% Successor Principal Owner has and maintains total voting control of the Member Club (as contemplated by 1985 Resolution FC-7, as amended by 1996 Resolutions FC-5 and FC-6 and as supplemented by 1998 Resolution FC-10, as the same may hereafter be revised, amended and/or supplemented), in each case as documented in form and substance satisfactory to, and approved in advance by the Commissioner.

4.  The 20% Successor Principal Owner obtains any approvals required by the NFL Constitution and Bylaws, including all NFL resolutions and policies relating to ownership (and to transfers of ownership) in Member Clubs, prior to becoming the Member Club's Principal Owner.

5.  The 20% Successor Principal Owner may, in turn, transfer control of the Member Club to a single immediate family member (as defined in Article 3.5(C) of the NFL Constitution and Bylaws) pursuant to, and subject to the terms of, this Resolution and without regard to the holding period described in (1) above.

*Be it Further Resolved*, that except as and to the extent permitted by 2004 Resolution FC-1A, 2009 Resolution FC-12, and as otherwise provided by this Resolution, the requirement that the Principal Owner own at least a 30% beneficial interest in the Member Club shall remain in full force and effect;

*Be it Further Resolved*, that all provisions of the NFL Constitution and Bylaws and, except as specifically amended hereby, all currently effective NFL resolutions and policies relating to ownership (and to transfers of ownership) in Member Clubs, shall remain in full force and effect (and, for the avoidance of doubt, all other provisions of the NFL Constitution and Bylaws and other NFL resolutions and policies applicable to a Principal Owner shall apply to any 20% Successor Principal Owner); and

Be it Further *Resolved*, that nothing in this Resolution shall affect the validity of any existing and approved ownership arrangement at a Member Club.

**2011 RESOLUTION G-2**

*Whereas*, the membership believes it is advisable to create a strategic investment fund (the "Fund"), through the formation of a new entity (or entities) funded by the owners, to make strategic investments in sports, entertainment, media, enabling technologies, or other areas of strategic importance to the League and the member clubs, as described in more detail in presentations to the membership; and

*Whereas*, the Fund's investments would be designed to, among other things, support strategic, operational and financial goals; and

*Whereas*, the membership recognizes that while the financial goal of the Fund is to generate positive returns on its investments in the aggregate, strategic investing involves substantial risk and investment funds typically expect that a substantial number of the individual investments they make ultimately may not result in positive returns, and that positive returns typically are not realized for a period of at least several years; and

*Whereas*, the membership believes that it will serve the interests of both the NFL and the NFLPA and NFL players if the NFLPA and/or its members are offered the opportunity to co-invest in investments made by the Fund, in a form and on terms to be determined.

Be it *Resolved*:

1.  That the Commissioner is authorized to make all necessary and advisable arrangements to launch the Fund, which may include but are not limited to (i) forming legal entities, (ii) forming a Committee to govern the operations of the Fund and make investment decisions (the "Fund Investment Committee"), (iii) forming an investment advisory board consisting of members of established venture capital firms, private equity firms, entrepreneurs, and/or business executives, and (iv) discussing potential co-investment terms with the NFLPA;

2.  That all clubs will be required to commit to invest $1 million, such amounts currently expected to be invested within 5 years from the launch of the Fund, the payment of the committed amount, and the timing and amount of such investments to be determined by the Fund Investment Committee;

3.  That any individual investment by the Fund of less than $5 million may be made by the Fund Investment Committee; individual investments in greater amounts will require membership approval through a ¾ affirmative vote;

4.  That the clubs will be responsible for funding all amounts necessary to cover expenses of operating and administering the Fund, in accordance with budgets approved by the Fund

Investment Committee, through the annual League assessment or otherwise as determined by the Commissioner;

5.  That the Commissioner, in consultation with the Finance Committee and/or the Fund Investment Committee to the extent he deems necessary, shall be authorized to implement additional policies necessary or advisable to operate and administer the Fund including policies relating to, among other things, methods for resolving any real or perceived conflicts of interests (e.g., investing in businesses owned by NFL owners, perceived conflicts with existing business partners), monetizing Fund investments, and the distribution and/or reinvestment of proceeds from Fund investments; and

6.  That the foregoing approvals are subject to acceptable salary cap treatment relating to the Fund as determined by the Commissioner, in consultation with the Finance Committee, the CEC, and/or any other League Committee, to the extent he deems necessary.

**2011 RESOLUTION G-4**

*Whereas*, the stadium construction support program established by 1999 Resolution G-3, as extended by 2003 Resolution JC-1 (the "G-3 Program"), contributed to the completion of 12 stadium projects benefitting 13 clubs; and

*Whereas*, the G-3 Program reached its pre-established funding capacity in 2006, and since such time no new major stadium projects have been approved; and

*Whereas*, a new stadium construction support program (the "G-4 Program") would assist in building new stadiums that would provide many benefits to the League and clubs, including potentially (a) supporting franchise stability and national television contracts, (b) enhancing the in-stadium fan experience, and (c) allowing the League and clubs to remain competitive with other sports and entertainment offerings; and

*Whereas*, the G-4 Program should take into account certain developments since the institution of the G-4 Program, such as (a) the substantial increase in private contributions to stadium construction costs, (b) the League's institution of certain stadium financing guidelines, and (c) stadium credits available under the League's new collective bargaining agreement with the NFLPA; and

*Whereas*, any amounts made available to a club or its related stadium affiliate under the G-4 Program should require separate member club approval on a case-by-case basis;

Be it *Resolved*:

1.  That for any stadium construction project (new stadium or stadium renovation the costs of which will exceed $50 million) involving a private investment for which an affected club or its affiliated stadium entity ("Developing Club") makes a binding commitment, either NFL Ventures, an affiliate of NFL Ventures or another entity designated by the Finance Committee (the "League-Level Lender") shall provide funding ("League-Level Funding") of up to $200 million in the aggregate to the Developing Club to support such project based on the amount that the Developing Club has committed or that will be applied to such project (either through the issuance of equity or the application of PSL proceeds or, except as otherwise provided below in respect of the Second Tranche, through debt incurred by the applicable entity) as a private contribution (the "Private Contribution") as follows:

    a.  For up to $200 million of project costs for a new stadium and up to $250 million of project costs for a stadium renovation, the League-Level Lender will advance a loan equal to the lesser of the amount of the Private Contribution to such costs and $100 million (i.e., stadium renovations shall be subject to a $50 million deductible to be funded by a Private

2011-16

Contribution) (the "First Tranche"), with such loan to be repaid through waived club seat premium VTS and "Incremental Gate VTS" (defined below) during the first 15 seasons of operations in the new stadium and to otherwise include such terms, including with respect to maturity, interest, repayment and subordination, as the League-Level Lender may determine, provided that the controlling owner of the club will be required to guarantee and pay on a current basis any shortfalls in scheduled repayments due to club seat premium VTS and Incremental Gate VTS falling below the amounts necessary for such repayments;

b.   If there has been a Private Contribution of $100 million ($150 million in the case of a stadium renovation) towards the costs referenced in subsection (a) above, then for project costs between $200 million and $350 million for a new stadium, and for project costs between $250 million and $400 million for a stadium renovation, the League-Level Lender shall provide, in a manner determined by the Finance Committee on a case-by-case basis, an amount equal to 50% of the Private Contribution towards such costs (i.e., the League-Level Lender will provide up to $50 million of such costs) (the "Second Tranche"), provided that for purposes of such funding, only Private Contributions in the form of proceeds from the issuance of equity or the sale of PSLs shall be counted; and

c.   If there has been a Private Contribution of $200 million ($250 million in the case of a stadium renovation) towards the costs referenced in subsections (a) and (b) above, then the League-Level Lender will advance a loan to the Developing Club of up to $50 million to cover the project costs between $350 million and $400 million for a new stadium, and for the project costs between $400 million and $450 million for a stadium renovation (the "Third Tranche"), with such loan to be made on such terms, including with respect to maturity, interest rate, repayment and subordination, as the League-Level Lender may determine, provided that any such loan shall be guaranteed by the controlling owner of the club.

For purposes of this resolution, Incremental Gate VTS means the amount by which gate VTS in the new or renovated stadium exceeds the greater of (i) the average of the final three years of gate VTS in the old or pre-renovated stadium and (ii) the gate VTS in the final year of operations in the old or pre-renovated stadium, in each case with the gate VTS in the old or pre-renovated stadium being increased on a cumulative annual basis at a percentage for any year equal to the League-wide year-over-year percentage increase in gate VTS for the then current season compared to the prior year, excluding for purposes of such percentage calculation gate VTS from new or substantially renovated stadiums that are not operational for the full two seasons. Notwithstanding the foregoing, in the event

that the final year in the old or pre-renovated stadium is 2010, then for 2011 only, the increase in the actual gate VTS shall be deemed to be 2%.

2. That any stadium renovations less than $50 million and more than $10 million shall be eligible for a club seat premium waiver, debt ceiling waiver and/or PSL waiver (in each case subject to separate approval from the membership).

3. That League-Level Funding to a project will, unless the Finance Committee otherwise determines on a case-by-case basis, be made in conjunction with other funding sources on a pro rata basis (e.g., unless the Finance Committee otherwise determines, if the project is estimated to cost $1 billion and the League-Level Funding will total $200 million, then for every $4 of funding from other sources put into the project, $1 of League-Level Funding will be put into the project).

4. That League-Level Funding in support of a stadium construction project shall be subject to membership approval on a case-by-case basis following an evaluation of the criteria specified on Attachment A to this Resolution; provided, that no League-Level Funding shall be made to any stadium project if the impact to the member clubs as a result of the Second Tranche League-Level Funding for all projects under the G-4 Program would exceed $1 million per club per year for a 25-year period ending on March 31, 2037 (such projection to be determined by the Commissioner, in his sole discretion); and provided further, that the Stadium and Finance Committees shall not recommend any League-Level Funding for membership approval unless:

   a. The club seeking such support shall have provided the relevant League committees with such information as they shall have requested in respect of the project, including without limitation detailed information regarding sources and uses of funds, projections, project scope, compliance with League policies, etc.;

   b. The controlling owner of the club seeking such support shall have provided guarantees of First Tranche and Third Tranche League-Level Funding (and other affiliated entities shall have provided any additional adjacency or other guarantees required by the Finance Committee on a case-by-case basis);

   c. The club shall be in compliance, to the Finance and Stadium Committees' satisfaction, with the League's then applicable stadium financing debt guidelines, including, to the extent the Finance Committee deems necessary or appropriate, that the club's owners shall have committed to fund additional equity contributions to the extent necessary to maintain compliance with such guidelines;

d. The stadium construction project must be a "public-private partnership";

e. The project must not involve any relocation of or change in an affected club's "home territory" (as defined in the Constitution and Bylaws);

f. No project proposal may be accepted from any club that, within the year prior to its submission of such proposal, had pending or had supported litigation against the League or any of its clubs or affiliated entities (other than in the context of a proceeding brought before the Commissioner under Article VIII of the Constitution and Bylaws); and

g. Increases in the visiting team share generated by the new or renovated stadium must meet the standards set forth in the 1994 Club Seat Sharing Exemption Guidelines.

5. That the Commissioner is authorized to make arrangements for the League-Level Lender to borrow from commercial or institutional lenders funds to make League-Level Funding available under the G-4 Program, with the funds to be repaid to such lenders over an appropriate time period (25 years after the inception of the G-4 Program, or such other period as may be determined by the Finance Committee), on such terms as the Commissioner may deem appropriate and as may be approved by the Finance Committee.

6. That the League-Level Lender is authorized to withhold, or the member clubs shall otherwise pay, any amounts from time to time due and owing under the loans referenced in paragraph 5 above and which are not fully covered with respect to the clubs participating in the G-4 Program through application of the amounts referenced in paragraph 1 hereof.

7. That if PSLs are sold (whether by the applicable club, its affiliated stadium entity, a municipal authority or otherwise) with respect to a particular stadium construction project, such PSLs shall be entirely dedicated to the project costs in respect of such project and shall be eligible for an exemption from sharing in accordance with current policies.

8. That any club debt ceiling waiver associated with a stadium construction project (and separately approved by a membership vote) must expire in either (a) no more than 15 years, if such debt is amortized over such time mortgage-style or (b) no more than 25 years, provided that for a 25-year waiver, the Finance Committee shall in its discretion require "step-down" payments providing for amortization that is more rapid than mortgage-style amortization.

9.   That if a club (or its affiliated stadium entity) receives League-Level Funding under the G-4 Program and either such club or its affiliated stadium entity (or a controlling interest therein) is thereafter sold other than to a member of the controlling owner's immediate family (as defined in the NFL Constitution and Bylaws) before the final maturity date of the League-Level Funding or the franchise is relocated from such club's "home territory" before such final maturity date, then the selling or relocating party shall repay the League-Level Lender (in the case of a sale, from the sale proceeds at closing) an amount equal to the outstanding principal balance of the League-Level Funding.

10.  That definitions and policies with respect to what constitutes project costs and allowable annual consideration (e.g., rent) shall remain consistent with the definitions and policies under the G-3 Program, subject to such modifications, if any, as may be determined by the Finance Committee.

11.  That the membership delegates to either of the Finance and Stadium Committees the authorization to: (a) evaluate club projections for stadium projects (e.g., revenues, construction costs and operating expenses); (b) require adjacency or other guarantees; (c) authorize League-Level Lender staff to review and/or to engage third party experts (e.g., investment banks) to review club, affiliate entity and controlling owner financial statements and condition for purposes of evaluating the ability of such parties to meet their guarantee and other obligations under the G-4 Program, which reviews may occur both as part of the approval process for an applicable club's stadium project and at any time thereafter as deemed appropriate by the Finance or Stadium Committees; (d) require owner equity funding obligations to maintain compliance with stadium debt financing guidelines; (e) establish rules relating to funding priority for teams that have previously received stadium construction support from the League-Level Lender or an affiliate; (f) approve step paydown requirements for 25-year debt waivers; (g) establish the identity of the League-Level Lender and the structure of Second Tranche League-Level Funding; (h) establish the timing for funding of League-Level Funding, if other than pro rata as referenced in paragraph 3; (i) determine definitions and policies with respect to what constitutes project costs and allowable annual consideration; and (j) approve the terms of any debt referenced in paragraph 5 herein, and the terms of transactional documentation implementing repayment obligations with respect to League-Level Funding.

12.  Notwithstanding the foregoing, the foregoing matters shall also be subject to any requisite approvals of the League-Level Lender, to the extent the League-Level Lender is not the League.

Attachment A

The criteria to be examined in connection with a club's request that the membership approve the provision of League-Level Funding in respect of a stadium construction project include:

> (1) the necessity of a new or renovated stadium in the market in terms of the suitability, economic competitiveness, and physical condition of the existing facility, the stadium's importance to League franchise stability, the League's concerns regarding its national image and presence, the importance of the affected market to the League's national television ratings, and other League business priorities;

> (2) the specific attributes of the project, including the scope and cost of the project relative to the economics in the market and the League as a whole, the balance of projected shareable and non-sharable revenue streams and the construction costs associated with each;

> (3) the projected impact of the project on player costs under the Collective Bargaining Agreement;

> (4) whether a renovation project is a "qualifying" project (as defined in the 1994 Club Seat Sharing Exemption Guidelines);

> (5) compliance with stadium financing guidelines; and

> (6) such other factors as the Stadium and Finance Committees may deem appropriate.

## 2011 RESOLUTION IC-1

*Whereas*, 2006 Resolution BV-1 authorized the League Office (the "League") to schedule up to two (2) regular-season games per season outside the United States beginning with the 2007 season and continuing through the 2011 season;

*Whereas*, since the 2007 season the NFL has played one (1) regular season game each year in London which has generated a significant increase in avid fans, television ratings and revenue;

*Whereas*, the member clubs believe that hosting additional NFL regular season games in the U.K. and continuity of a particular team(s) participating is in the best interest of the NFL, and will further contribute to the strength and development of the NFL's brand and popularity outside the United States and could lead to London becoming a viable franchise location;

*Whereas*, the League is authorized to allow home teams (the "Home Team") to volunteer to play at least one (1) regular season game a year up to a period of five (5) years as a home team in the U.K.;

*It is Hereby Resolved*, that based on the number of member clubs that volunteer to play as a Home Team in the U.K. ("U.K. Games"), the League is authorized to schedule regular season games in the U.K. as well as determine the number of games and identity of the teams participating in the U.K. beginning with the 2012 season and continuing through the 2016 season;

*Be it Further Resolved*, that the operating budget and operating rules and guidelines (the "Operating Rules and Guidelines") for the U.K. Games will be reviewed and endorsed by the Commissioner and approved by the International Committee as part of the League's international business plan;

*Be it Further Resolved*, that the Home Team will participate in defined revenues from the U.K. Games and certain non-game opportunities as well as bear certain costs from the U.K. Games and such revenue opportunities as set forth in the Operating Rules and Guidelines as approved by the International Committee. The Home Team will still be responsible paying the Visiting Team Share (V.T.S.) payment into the V.T.S. pool based on average gate revenues of the Home Team's other seven (7) games;

*Be It Further Resolved*, that as an incentive to volunteer and invest in the development of the U.K. market, a Home Team which volunteers and plays a minimum of three (3) consecutive U.K. Games, will be eligible to receive an incentive up to a maximum of $1 million for each year a volunteer club participates as the Home Team in a U.K. Game based on the NFL achieving specified growth in non-game revenue as well as key fan metrics as set forth in the Operating Rules and Guidelines;

*Be it Further Resolved*, that nothing herein shall grant any Home Team any future ownership or operating rights for an NFL franchise in the U.K.;

*Be it Further Resolved*, that the following schedule parameters shall apply:

- The Home Team will have the option of designating one (1) regularly scheduled home game that will not be eligible as a U.K. Game;

- divisional match-ups will not be eligible as U.K. Games, without the consent of both teams;

- the member clubs who participate in the U.K. Games will have a bye week scheduled the week following the U.K. Game as well as a choice of a home or away market game scheduled for the week prior to the U.K. Game;

- the Visiting Team will be required to participate in accordance with the NFL schedule; provided that a member club will only be required to participate once between the 2012 and 2016 seasons, unless otherwise agreed by the member club; and

- For each U.K. Game that a member club is a Visiting Team, the League will cover certain costs as set forth in the Operating Rules and Guidelines; provided that the member club will be required to reimburse the League for an amount equal to the average travel costs of such member club's other away regular season games for such year (currently seven (7));

*Be it Further Resolved*, that the following operational and financial considerations shall apply:

- The Home Team will be responsible for all expenses related to playing a home game outside of their stadium and, as such, the League shall not supplement or off-set such expenses, including, but not limited to, lease obligations and sponsorship obligations;

- The League will operate and manage the U.K. Games and be responsible for all marketing, operations and event promotional activity, including, but not limited to setting ticket prices, negotiating stadium leases, negotiating all media contracts; and

- The League will determine the stadium for each game played in the U.K. Territory. All promotional or media team activity in the U.K. will be coordinated with the League.

## **2011 RESOLUTION MC-1**

*Whereas*, certain drafted players have suffered injuries resulting in their permanent total disability or accidental death prior to reporting to their initial pre-season training camp; and

*Whereas*, certain drafted players selected in rounds one through three of the draft have suffered injuries resulting in their temporary total disability prior to reporting to their initial pre-season training camp, which have caused them to miss all or part of their first regular season; and

*Whereas*, the loss of the drafted player and draft choice is an insurable interest of the Club; and

*Whereas*, the NFL has purchased a League-wide off-season draft choice asset value policy to cover the loss of services of: (i) all drafted players, including compensatory draft selections, due to permanent total disability or accidental death; and (ii) players selected in rounds one through three of the draft, including compensatory draft selections, due to temporary total disability; and

*Whereas*, the NFL's purchase of such policy results in lower premium costs for Member Clubs, and

*Whereas*, the insurance policy purchased in 2008 will expire in April, 2011; it is therefore

*Resolved*, that the Membership authorize the renewal of the NFL Offseason Draft Choice Asset Value Policy for a three-year term.

## **2011 RESOLUTION MC-2**

*Whereas*, certain NFL players have experienced both on-field and off-field catastrophic injury, defined as: paraplegia, quadriplegia, hemiplegia, monoplegia, total severance of limb(s) or total loss of sight in one eye or total loss of sight in both eyes; and

*Whereas*, the NFL has purchased a League-wide catastrophic loss insurance policy to cover NFL players at all times for both on-field and off-field catastrophic injury, thereby resulting in lower premium costs for Member Clubs; and

*Whereas*, recoveries under the policy enable Member Clubs to provide discretionary financial assistance to such players; and

*Whereas*, the insurance policy purchased in 2008 will expire in June, 2011 ; it is therefore

*Resolved*, that the Membership authorize the renewal of the NFL Catastrophic Loss Policy for a three-year term.

## 2011 RESOLUTION MC-3 and G-1

*Whereas*, the Member Clubs agreed to an extension of the then-existing Collective Bargaining Agreement and the corresponding Stipulation and Settlement Agreement in the White litigation in March of 2006; and

*Whereas*, the 2006 extension included a provision that gave either party the right to terminate the Collective Bargaining Agreement as soon as the conclusion of the 2010 League Year; and

*Whereas*, the Member Clubs voted to exercise their right of early termination in May 2008, and both the Collective Bargaining Agreement and the Stipulation and Settlement Agreement expired at midnight on March 11, 2011; and

*Whereas*, upon expiration of the CBA, after negotiations with the NFL Players Association were unsuccessful, the clubs exercised their right under labor law to lock out the players; the NFLPA purported to terminate its status as a labor union; and various litigation ensued, and

*Whereas*, resumed negotiations have resulted in a proposed agreement that will preserve competitive balance within the league, satisfactorily achieve the clubs' goals in collective bargaining, resolve pending litigation and permit the playing of a full 2011 season; and

*Whereas*, the Member Clubs believe it is appropriate further to support competitive balance by continuing a program of Supplemental Revenue Sharing;

*Be It Resolved* that

1.  The Member Clubs ratify and approve the proposed Collective Bargaining Agreement and litigation settlement as recommended by the Commissioner and the Management Council Executive Committee, and the Commissioner and CEC are authorized to execute all documents necessary to conclude the labor agreement.

2.  The Commissioner, in consultation with the CEC, is authorized to terminate the current work stoppage and direct the clubs to resume all normal operations, upon receiving satisfactory confirmation of the following:

    a.  That the NFLPA has resumed its status as the collective bargaining representative of all NFL players in an appropriate bargaining unit; and

    b.  That the NFLPA has advised the league that the proposed agreement has been approved by the NFLPA and ratified by its membership; and

    c.  That appropriate releases and other agreements are in place satisfactorily to resolve pending litigation and other

claims arising under, or in the immediate wake of the expiration of, the 2006 CBA and the Stipulation and Settlement Agreement in the <u>White</u> case.

3. The ratification and approval shall expire on [date] unless the NFLPA has previously communicated its acceptance of the agreement.

4. That, beginning with the 2011 League Year through no later than the expiration of the Collective Bargaining Agreement, a new program of Supplemental Revenue Sharing shall be in place, and shall consist of the following elements:

   a. A club will be eligible for a distribution under the SRS program if the greater of (i) the club's adjusted team salary after the year-end reconciliation (e.g., netting of incentives) plus the club's actual player benefit costs or (ii) the league average adjusted team salary plus average club benefit costs (the "Player Cost") in a particular League Year exceeds 65 percent of the club's revenue (the "cure rate"), defined in a manner consistent with the term "Conforming Revenue." The distribution shall be in an amount sufficient to bring the club's Player Cost equal to 65 percent of the club's revenue, subject to application of any qualifiers. Beginning with the 2013 League Year, the cure rate shall be set at 63 percent.

   b. For the 2011 and 2012 League Years only, if a club that otherwise qualifies for a distribution under the SRS program experiences a net operating loss as calculated per the accompanying Addendum during the League Year in question, it shall be eligible for a further distribution in an amount sufficient to bring the club's Player Cost equal to 62 percent of the club's revenue, but in no event shall the distribution exceed the amount of the club's net operating loss subject to application of any qualifiers.

   c. The Finance Committee shall have the authority to interpret the rules consistent with the accompanying Addendum pursuant to which the calculation of operating loss under the SRS program shall operate, and no distribution shall be made without the underlying financial metrics being verified by an independent major accounting firm retained by the league office.

   d. Funding for the program shall be provided as follows:

      i. Funds shall first be provided from the SRS Pool (visiting team share attributable to club seat

2011-27

premiums and PSLs), and any relocation fees paid by Member Clubs.

ii. An assessment shall be imposed on any club that both (a) has local non-gate revenue, less stadium interest expense, in excess of the league average, and (b) shares local revenue at a rate below the average rate of sharing for local revenue within the league (currently 19.8 percent of the club's total local revenue). The assessment of ten percent will be applied to the variance of local non-gate revenue (less stadium interest expense) versus the league average for this amount. No club shall be required to contribute more than $3.5 million in any one year under this provision.

iii. Any funds raised from the sources identified in paragraphs i and ii above that are not spent in the League Year in respect of which they are raised shall be retained by the league for purposes of the SRS program and shall be separately accounted for and invested as directed by the Finance Committee. Insofar as the funds raised from the sources identified in paragraphs i and ii are insufficient fully to fund the post-qualifier need in any League year, the additional funds required shall be drawn from the retained amounts.

iv. When the bank of retained funds equals at least $100 million, no further collection of funds from sources identified in paragraphs i and ii shall be required beyond the amount needed to fund post-qualifier SRS need for the League Year in question. When the bank of retained funds equals at least $100 million, but in any case no later than 2016, the Finance Committee and CEC shall jointly review policies relating to this pool, including projected collections, SRS need and alternative uses of these funds.

e. Distribution Standards

i. The qualifiers established in 2007 Resolution G-1 and MC-1 with respect to new or renovated stadiums, club sales, and litigation shall remain in full force effective as of this date, except that the club sale qualifier shall not apply in any case where the selling owner was the club's principal owner for at least 20 years as of the date of such sale.

    ii. Once a club has received SRS distributions for five years, any distribution for which it qualifies shall be reduced ratably in each succeeding year by 20 percent. The five year test is not consecutive and a club that rejects a distribution for which it otherwise qualifies shall not have that year count toward its five year eligibility period.

  f. The membership shall determine the disposition of any retained funds at the expiration of the Collective Bargaining Agreement.

  g. The Finance Committee shall have the authority to determine any other operating rules relating to the SRS program.

**2012 RESOLUTION BV- 1**

WHEREAS, to provide a more fan-friendly ticketing experience, to provide additional fan service, and to enhance the League's ability to compete with other entertainment providers, the League Office, under the direction of the Business Ventures Committee, entered into a multi-year agreement with Ticketmaster beginning on January 1, 2008 (the "Ticketmaster Agreement"), that required Ticketmaster to develop and manage on behalf of the NFL an online marketplace for the exchange of tickets to NFL games (the "NFL Ticket Exchange");

WHEREAS, the NFL Ticket Exchange has successfully provided a fan-friendly ticketing experience and enhanced fan service; has enhanced the League's ability to compete with other entertainment providers; and has generated enhanced marketing information and a new source of revenues;

WHEREAS, the Ticketmaster Agreement required participation in the NFL Ticket Exchange by all 32 Clubs upon expiration or earlier satisfaction of their existing contractual obligations in the area of online ticket exchange;

WHEREAS, the League Office has been negotiating with Ticketmaster for a follow-on agreement to begin upon the expiration of the Ticketmaster Agreement on March 31, 2013, as well as exploring alternative potential deals with various online ticket exchange vendors;

WHEREAS, after evaluating potential deals, including the proposed follow-on agreement with Ticketmaster, the Business Ventures Committee directed the League Office to conclude its negotiations for a follow-on, League-wide agreement with Ticketmaster, subject to the approval of membership;

IT IS HEREBY RESOLVED, that the League Office is authorized to enter into a League-wide follow-on agreement with Ticketmaster providing for the ongoing operation and continued development of the NFL Ticket Exchange and requiring, upon the expiration or earlier satisfaction of their existing relevant contractual obligations, participation by all 32 Clubs on terms generally consistent with those described in the presentation to membership.

IT IS HEREBY FURTHER RESOLVED that all Clubs shall provide cooperation and support to the League Office and Ticketmaster for the further development and operation of the NFL Ticket Exchange including, without limitation, by complying with the limitations on marketing alternate ticket exchange services as set forth in the presentation to membership.

**2012 RESOLUTION DM-1**

*Whereas*, fantasy football is an important and rapidly growing fan development and engagement initiative for the National Football League and its Member Clubs; and

*Whereas*, additional and standardized Club marketing and promotional support for fantasy football is in the best interests of the NFL and its Member Clubs; and

*Whereas*, the Digital Committee has received a presentation from League staff regarding this initiative and recommends the adoption of certain minimum fantasy football marketing requirements for Clubs.

*It Is Hereby Resolved*, that:

1. By June 2012, all Member Clubs will be required to add "Fantasy" to the top level main navigation of its website and to its mobile products navigation as more specifically described in Exhibit A attached hereto.

2. The Member Clubs will comply with the Fantasy Football Marketing Requirements as approved by the Digital Media Committee. The requirements will include using all available marketing platforms to encourage visitors to their websites to play fantasy football and displaying the team specific fantasy page(s) provided by the League, including all league advertising inventory and sponsorship placements.

3. The Digital Media Committee is delegated the authority to establish policies and procedures relating to the subject matter of this Resolution including but not limited to making changes to the Fantasy Football Club Minimum Marketing Requirements, compliance therewith and related administrative matters, which shall periodically be presented to the membership for discussion.

EXHIBIT A

The "FANTASY" navigation item should take the user to DOMAIN.fantasy.nfl.com <http://DOMAIN.fantasy.nfl.com> <http://DOMAIN.fantasy.nfl.com> <http://DOMAIN.fantasy.nfl.com <http://DOMAIN.fantasy.nfl.com> > when clicked. DOMAIN should equal the domain name for the NFL team. Example domain values are –patriots, chargers, etc. For example, the main navigation click for the patriots should be patriots.fantasy.nfl.com <http://patriots.fantasy.nfl.com> <http://patriots.fantasy.nfl.com> <http://patriots.fantasy.nfl.com <http://patriots.fantasy.nfl.com> > .

**2012 RESOLUTION FC-6**

*Whereas*, the Finance Committee has reviewed the League's current debt limit in light of numerous economic factors and conditions;

Be it *Resolved*, that effective immediately:

1. The amount of debt which each member club may incur (as defined and described in 1988 Resolution FC-3) shall be raised from the current $150 million to $200 million;

2. Subject to Paragraph 3 below, such debt may be secured by or a liability of either the member club or its principal or controlling owner, as permitted under 1996 Resolution FC-1;

3. The level at which 1998 Resolution FC-9 requires club-related liabilities of the principal or controlling owner (including obligations secured by his interest in his club) also to be secured by a pledge of club assets shall remain at $25 million; and

4. Consistent with 2001 Resolution FC-4, in connection with any acquisition of a member club or any controlling interest therein, the principal and/or controlling owner shall be required to invest equity (cash on hand or funds borrowed against other current or determinable future assets of such owner) in a minimum amount to be determined by the Finance Committee, and no acquisition transaction that the Finance Committee finds to be excessively leveraged shall be recommended by the Finance Committee for membership approval.

Further *Resolved*, that the Finance Committee may consider annually, whether, in light of economic factors and projected revenues, the overall debt limitation should be modified, and will report to the Executive Committee.

**2012 RESOLUTION G-2 &**
**MARCH 2012 ACTION OF DIRECTORS OF NFL VENTURES, INC.**

*Whereas*, 2011 Resolution G-4 established a new League-level program to facilitate stadium construction projects (the "G-4 Program"; capitalized terms used and not defined herein have the meaning set forth in 2011 Resolution G-4);

*Whereas*, certain elements of the G-4 Program were expressly reserved for future determination, among them establishing the identity of the League-Level Lender and determining the structure of the Second Tranche League-Level Funding;

*Whereas*, because, among other reasons, new and renovated stadiums provide benefits to businesses and initiatives of NFL Ventures, L.P. ("NFL Ventures"), NFL Ventures should be the League-Level Lender;

*Whereas*, it has been determined that each Developing Club's repayment of the Second Tranche should be funded through a gate VTS waiver for the Developing Club; and

*Whereas*, (a) forming a Finance Committee of NFL Ventures, Inc.; (b) forming a Stadium Committee of NFL Ventures, Inc.; and (c) appointing the Commissioner as an officer of NFL Ventures, Inc. will, among other things, assist in the administration of the G-4 Program.

Be it *Resolved*:

1.  That NFL Ventures shall be the League-Level Lender for all purposes Program.

2.  That NFL Ventures, Inc., in its capacity as the general partner of NFL Ventures, is hereby authorized to direct NFL Ventures as the League Level Lender for all purposes related to the G-4 Program.

3.  That Ventures is hereby authorized and directed to, as set forth in 2011 Resolution G-4, among other things:

    a.  Make loans to Developing Clubs in order to provide League-Level Funding in amounts determined in accordance with 2011 Resolution G-4; and

    b.  Require controlling owner guarantees and repayment obligations in the event of the sale or relocation of the club and otherwise determine the terms of such loans to Developing Clubs, including with respect to maturity, interest, repayment, and subordination, in each case in accordance with 2011 Resolution G-4 and as may otherwise be determined by the Finance Committee of NFL Ventures, Inc.

4. That:

    a. Each of the Commissioner (in his role as an officer of NFL Ventures, Inc.), the President, and Treasurer of NFL Ventures, Inc. (the "Authorized Officers") is hereby authorized to make and enter into arrangements for NFL Ventures to borrow funds from commercial or institutional lenders to make League-Level Funding available under the G-4 Program and, if deemed appropriate by such Authorized Officers (or any of them), to cause NFL Ventures to provide collateral and other security therefor with the loans to be repaid to such lenders over an appropriate time period (25 years after the inception of the G-4 Program, or such other period as may be determined by the Finance Committee of NFL Ventures, Inc.), on such terms as the Authorized Officers may deem appropriate and as may be approved by the Finance Committee of NFL Ventures, Inc.; and

    b. League membership authorizes the Commissioner to make the League a guarantor of any such loans, on such terms as the Commissioner may deem appropriate.

5. With respect to the Second Tranche League-Level Funding, NFL Ventures shall advance a loan of up to $50 million (the amount to be determined in accordance with 2011 Resolution G-4) to any Developing Club, with such loan to be repaid through, among other sources, waived gate VTS for the Developing Club (in addition to any waivers of club seat premium VTS and Incremental Gate VTS related to the First Tranche as contemplated by 2011 Resolution G-4) during the first 25 seasons of operations in the new stadium on terms, including with respect to maturity, interest, repayment, and subordination, as the Finance Committee of NFL Ventures, Inc. may determine.

6. The determination as to when no additional stadium projects will be eligible for League-Level Funding under the G-4 Program as set forth in Paragraph 4 of 2011 Resolution G-4 is amended so that no such League-Level Funding shall be made to any stadium project if the projected gate VTS waived in connection with Second Tranche League-Level Funding for all projects under the G-4 Program would exceed $1 million per club in a particular year (such projection to be determined by the Commissioner, in his role as an officer of Ventures, in his sole discretion), and no such gate VTS waiver shall extend beyond 25 years after operations commence at the last stadium project approved pursuant to the G-4 Program.

7. The Board of Directors of NFL Ventures, Inc. hereby creates (a) a G-4 Finance Committee to be comprised of each of the members of the Board of Directors who is a member of the

League's Finance Committee from time to time, and (b) a G-4 Stadium Committee to be comprised of each of the members of the Board of Directors who is a member of the League's Stadium Committee from time to time, and, subject to the authority granted to such G-4 Stadium Committee pursuant to the following Paragraph 8, hereby delegates authority to such G-4 Finance Committee to exert all powers of the Board of Directors with respect to the G-4 Program and the administration thereof.

8. Any authority granted to the League's Finance Committee and/or the League's Stadium Committee pursuant to 2011 Resolution G-4 shall hereafter be deemed granted to the G-4 Finance Committee of NFL Ventures, Inc. and/or the G-4 Stadium Committee of NFL Ventures, Inc., respectively.

9. The Board of Directors of NFL Ventures, Inc. hereby creates the following new officer positions for NFL Ventures, Inc.:

   a. the office of Chief Executive Officer ("CEO"), which officer shall, together with the President and subject to the direction of the Board of Directors, have general charge and supervision of the business of the corporation and shall perform such duties and have such other powers as may from time to time be assigned to him by the Board of Directors; and

   b. the office of Chief Financial Officer, which officer shall perform such duties and have such powers as are incident to the office of Chief Financial Officer and which officer shall perform such other duties and have such other powers as may from time to time be assigned to him by the Board of Directors, the CEO or the President.

10. The Board of Directors hereby elects (a) the NFL Commissioner (currently, Roger Goodell) to serve as the CEO of NFL Ventures, Inc. for so long as he retains his position as Commissioner of the NFL and (b) the NFL's Chief Financial Officer (currently, Joe Siclare) to serve as the Chief Financial Officer of NFL Ventures, Inc. for so long as he retains his position as Chief Financial Officer of the NFL.

11. Except as expressly set forth herein, nothing in 2011 Resolution G-4 shall be deemed to be modified or amended by virtue of this Resolution.

**2012 RESOLUTION G-4 &**
**MARCH 2012 ACTION OF DIRECTORS OF NFL VENTURES, INC.**

*Whereas*, 2011 Resolution G-4 established a new League-level program to facilitate stadium construction projects (the "G-4 Program"; capitalized terms used and not defined herein have the meaning set forth in 2011 Resolution G-4);

*Whereas*, at the time 2011 Resolution G-4 was approved, the League membership contemplated that the treatment of stadium renovations under the G-4 Program would be subject to further deliberation; and

*Whereas*, following such deliberation, the League membership and the League-Level Lender have determined that certain elements of 2011 Resolution G-4 relating to stadium renovations should be modified and additional policies shall be instituted.

Be it *Resolved*:

1. That Paragraphs 1 (a), (b), and (c) of 2011 Resolution G-4 are amended to eliminate the $50 million deductible relating to the costs of a stadium renovation so that the calculation of the amount of G-4 League-Level Funding available for a stadium renovation shall be determined in the same manner for both a new stadium and a stadium renovation of at least $50 million that meets the stadium financing guidelines.

2. That Paragraph 2 of 2011 Resolution G-4 is hereby amended so that (a) any stadium renovations more than $10 million and less than $50 million, and (b) any stadium renovations greater than $50 million that do not meet the League stadium financing guidelines, shall not be eligible for G-4 Program support but shall be eligible for a club seat premium VTS waiver, an Incremental Gate VTS waiver, a debt ceiling waiver and/or a PSL waiver (in each case subject to separate approval from the membership).

3. Except as expressly set forth herein, nothing in 2011 Resolution G-4 shall be deemed to be modified or amended by virtue of this Resolution.

**2012 RESOLUTION G-6**

*Whereas*, the Constitution and Bylaws authorize the Commissioner to employ game officials for all NFL games, and

*Whereas*, the collective bargaining agreement between the NFL and the union representing NFL game officials is scheduled to expire on May 31, 2012; and

*Whereas*, the membership wishes to express its support for the Commissioner's effort to negotiate a new agreement with the game officials; Be it

*Resolved*, that the member clubs hereby authorize the Commissioner, in consultation with a special committee of owners to include the Chairmen of the Compensation, Finance, and Management Council Executive Committees, to take such steps as he may deem necessary and appropriate, including hiring and using replacement game officials, to ensure that there will be no disruption of the 2012 NFL season, and to reach a successful conclusion to the current labor negotiations between the game officials and the NFL.

**2012 RESOLUTION G-7**

Amend the Anti-Tampering Policy to reflect the following (new language underlined):

*NFL Players*. No club, nor any person employed by or otherwise affiliated with a club, is permitted to tamper with a player who is under contract to or whose exclusive negotiating rights are held by another club. Notwithstanding the foregoing, during the period that begins three calendar days prior to the expiration of NFL Player Contracts, clubs are permitted to contact the certified agents of players who will be Unrestricted Free Agents at the end of the current League Year and enter into contract negotiations with them. A contract, however. cannot be executed with a new club, or submitted to the League office, until after the beginning of the new League Year. During this three-day period. a prospective Unrestricted Free Agent cannot visit a club (other than his current club) at its permanent facility or at any other location, and no direct contact is permitted between the player and any employee or representative of a club (other than his current club).

**2012 RESOLUTION IC-1**

*Whereas*, 2008 Resolution JC-1 approved the terms by which the Buffalo Bills were authorized to play pre-season and regular season games in Toronto during the 2008-2012 NFL seasons; and

*Whereas*, the International Committee has received a presentation from the Buffalo Bills about modifying and extending its agreement with Rogers Stadium Limited Partnership ("Rogers") to play additional games in Toronto at the Rogers Centre; and

*Whereas*, the playing of such games and related game presentation, marketing and promotion impacts the NFL brand and overall business of NFL Canada.

*It is Resolved*, that the membership shall delegate authority to the International Committee to review and, if appropriate, approve the terms of a follow-on agreement with Rogers for the Buffalo Bills to play additional games in Canada and such approval will require that the revenue generated from such games will be at least equal to that of a sell-out at Ralph Wilson Stadium; and

*It is further Resolved*, that consistent with 2008 Resolution JC-1, the terms of any new agreement with Rogers will not: i) limit the NFL's ability to establish an expansion or relocated team in the Toronto market and would terminate upon the occurrence of such event; ii) grant any current or future ownership rights for the Buffalo Bills and NFL franchise in Toronto; and iii) grant exclusivity to other NFL games that may be played in Toronto.

## 2012 RESOLUTION JC-1

*Whereas*, the Finance and Stadium Committees recommend modifications to certain policies, for a two season period, that relate to the ticket manifest that lists all tickets available for sale at a member club's stadium for the upcoming season, which League policy currently requires each member club to submit to the League office prior to each July 15th;

*Whereas*, the ticket manifest is used to, among other things, determine whether a game is sold out for purposes of the League's blackout policies and under current League policy, the same ticket manifest capacity must apply to all games played during such season (both preseason and regular season) and may not "float" based on opponent or for any other reason;

*Whereas*, as more fully described in presentations to the membership, the Finance and Stadium Committees recommend allowing, for the 2012 and 2013 seasons, member clubs to (a) submit a "base" ticket manifest for purposes of determining whether a game is sold out pursuant to the blackout policy; and (b) at the same time, submit a list of additional general admission tickets not included in the "base" seating manifest that may be sold for some or all games that season (the "Incremental GA Tickets"), subject to certain conditions, including an increase in the amount of visiting team share ("VTS") owed for sales of Incremental GA Tickets;

*Whereas*, such modifications to the VTS policy require membership approval because such modifications would amend Article XIX, Section 19.1(A) of the NFL Constitution and Bylaws; and

*Whereas*, the membership believes such approvals should be granted.

Be it *Resolved*:

1.  That the sale of Incremental GA Tickets in excess of those listed on the member club-submitted base ticket manifest for such season pursuant to the policy implemented by the Finance and Stadium Committees for the 2012 and 2013 seasons, shall require the home member club to deliver to the League office 50% of the gross receipts in respect of such Incremental GA Tickets as the VTS attributable to such Incremental GA Tickets (for purposes of this policy, "gross receipts" shall be defined as set forth in Article XIX, Section 19.1 (A) of the NFL Constitution and Bylaws after the deduction of taxes and charges described in Article XIX, Section 19.1(A)(1) of the NFL Constitution and Bylaws, but with no deduction for the stadium rental allowance otherwise permitted by Article XIX, Section 19.1 (A)(2) of the NFL Constitution and Bylaws);

2.  That this resolution would not modify any other ticket-related policies, including the treatment of obstructed view seats, standing room tickets, timing for submissions of manifests, club seats or suite seats identified in a Club manifest, determinations

regarding whether a game is "sold out" (such determinations to be based on the base ticket manifest), etc.; and

3.  That the Finance Committee is and remains authorized to establish policies relating to administrative and other matters in respect of such ticket policies (and similar ticket policies), including for purposes of implementing this Resolution (e.g., institution of a minimum percentage of stadium capacity that must be used for purposes of the ticket manifest capacity (the Finance Committee has currently determined that 85% shall be the appropriate threshold), determination of the permitted quantity of Incremental GA Tickets, etc.), which it shall periodically present to the membership for discussion.

4.  That a ¾ vote of the membership shall be required to extend the approvals hereunder beyond the 2012 and 2013 seasons.

## 2012 RESOLUTION MC-1

*Whereas*, certain drafted players have suffered injuries resulting in their permanent total disability or accidental death prior to reporting to their initial pre-season training camp; and

*Whereas*, certain drafted players selected in rounds one through three of the draft have suffered injuries resulting in their temporary total disability prior to reporting to their initial pre-season training camp, which have caused them to miss all or part of their first regular season; and

*Whereas*, the loss of the drafted player and draft choice is an insurable interest of the Club; and

*Whereas*, the NFL has purchased a League-wide Offseason Draft Choice Asset Value Policy to cover the loss of services of: (i) all drafted players, including compensatory draft selections, due to permanent total disability or accidental death; and (ii) players selected in rounds one through three of the draft, including compensatory draft selections, due to temporary total disability; and

*Whereas*, the NFL's purchase of such policy results in lower premium costs for Member Clubs, and

*Whereas*, the insurance policy purchased was renewed in 2011 for a three-year term and is scheduled to expire April 1, 2014; however, the NFL has procured the same coverage at a lesser premium, requiring the purchase of a new, three-year term; it is therefore

*Resolved*, that the Membership authorize the existing NFL Offseason Draft Choice Asset Value Policy to be superseded and extended for a three-year term, with coverage beginning March 31, 2012 and expiring March 31, 2015.

**2012 RESOLUTION MC-2**

*Whereas*, certain NFL players have experienced both on-field and off-field catastrophic injury, defined as: paraplegia, quadriplegia, hemiplegia, monoplegia, total severance of limb(s) or total loss of sight in one eye or total loss of sight in both eyes; and

*Whereas*, the NFL has purchased a League-wide catastrophic loss insurance policy to cover NFL players at all times for both on-field and off-field catastrophic injury, thereby resulting in lower costs for Member Clubs; and

*Whereas*, recoveries under the policy enable Member Clubs to provide discretionary financial assistance to such players; and

*Whereas*, the insurance policy purchased was renewed in 2011 for a three-year term and is scheduled to expire on June 1, 2014; however, the NFL has procured the same coverage at a lesser premium, requiring the purchase of a new, three-year term; it is therefore

*Resolved*, that the Membership authorize the existing NFL Catastrophic Loss Policy to be superseded and extended for a three-year term, with coverage beginning March 31, 2012 and expiring on March 31, 2015.

## **2013 RESOLUTION BC-1**

*Whereas*, Hard Knocks is a critically acclaimed and award winning reality sports documentary television series produced by NFL Productions LLC (d/b/a NFL Films) and broadcast by Home Box Office Inc., which features a Club through its training camp and covers the Club's preparation for the upcoming NFL season;

*Whereas*, Hard Knocks is an important pre-season League initiative that creates a meaningful bond between the featured Club and NFL fans and gives NFL fans unique access and appreciation of the work involved in preparing for the NFL season;

*Whereas*, Hard Knocks provides a meaningful opportunity for the featured Club to expand its national fan base, which, in turn, expands the national interest in the League and its national game broadcast packages and other media assets; and

*Whereas*, since inception in 2001, seven Clubs have participated in Hard Knocks.

It is hereby *Resolved*, that

1.  Each May prior to the start of training camp, NFL Films or an appropriate affiliate shall seek voluntary participation from a Club to be featured in the upcoming season of Hard Knocks;

2.  In the event NFL Films is unable to secure, on a voluntary basis, a Club to be featured in the upcoming season of Hard Knocks , NFL Films shall have the right to select the Club to be featured; provided that the selected Club has (i) not participated in Hard Knocks in the past 10 years (whether on a voluntary or selected basis), (ii) not appeared in the playoffs in the previous two seasons, and (iii) does not have a first year head coach;

3.  Each selected Club shall have the opportunity to meet with NFL Films personnel to have all aspects of Hard Knocks production and approval procedures explained, it being understood that Club approvals are generally exercisable only in the areas of: (i) technical football terminology, (ii) sensitive personal conversations related to family or private matters, (iii) details of contracts that could impact negotiations or trades, and (iv) scenes likely to be viewed as overly embarrassing to a player, the Club or the League;

4.  Each selected Club shall be required to provide NFL Films with the same level of access and cooperation as NFL Films has received from Clubs in prior seasons of Hard Knocks; and

5.  The Broadcasting Committee is delegated the authority to establish policies and procedures relating to the subject matter of this

Resolution including, but not limited to, making changes to the process for selecting Clubs to be featured in Hard Knocks.

## 2013 RESOLUTION BV-1

*Whereas*, pursuant to 2011 Resolution BV-1, the League retains exclusive worldwide control to license and otherwise use League Marks and individual Club Marks in respect of licensing, advertising, product or service placement, sponsorships and promotional agreements relating to commercial identification on the sidelines or playing field or otherwise subject to television exposure during NFL games;

*Whereas*, the League's sponsorship and sideline exposure agreement with Motorola for the telecommunications hardware category expired in March of 2012, which agreement (i) required Motorola to provide coaches' headsets and various other game day communication equipment to the Clubs, (ii) provided Motorola the exclusive right in its category to expose its brand on the sidelines of all NFL games (e.g., on the coaches' headsets, sideline communications carts and various related equipment), and (iii) granted to Motorola the right to use League Marks[1] and individual Club Marks[2] to promote telecommunications hardware, including both mobile phones and tablets;

*Whereas*, since early 2011, the League Office has been exploring a more strategic technology partnership model with a broad array of potential sponsors in the telecommunications hardware and related technology categories, that would better position the League to address important initiatives, including in-game technology opportunities and improving the game day experience in the stadium;

*Whereas*, the League Office has regularly briefed the Business Ventures Committee on the status of these efforts and the likely timing for securing a new sideline technology partner, and anticipates that a new agreement likely will be concluded in the coming weeks; and

*Whereas*, in order to maintain maximum leverage in this important sponsorship category while League staff works to conclude a new agreement, clubs should refrain from entering into any new sponsorship agreements with third parties regarding the use of Club Marks in connection with the marketing or promotion of telecommunications hardware products (including, without limitation, mobile phones and tablet computing devices).

It is hereby *Resolved*, that NFL Ventures, L.P. or an appropriate affiliate may conclude an agreement for a new League-wide strategic sideline technology partnership, provided that the entry into such agreement shall be subject to the prior approval of the Business Ventures Committee in its capacity as the NFL Ventures Board of Directors. Such agreement may include sideline exposure and sponsorship rights, including exclusive rights to individual Club Marks within the telecommunications hardware and related categories (including, without limitation, mobile phones and tablet computing devices);

Further *Resolved*, that clubs may not enter into any new sponsorship agreements with third parties regarding the use of Club Marks in connection with the marketing or promotion of telecommunications hardware products (including,

without limitation, mobile phones and tablet computing devices) absent further action by the Business Ventures Committee.

## 2013 RESOLUTION FC-3

*Whereas*, the membership approved 2011 Resolution G-2 to allow for the creation of a strategic investment fund (the "Fund") to make investments in sports, entertainment, media, enabling technologies, or other areas of strategic importance to the League and the member clubs; and

*Whereas*, 2011 Resolution G-2 authorized the Commissioner to make all necessary and advisable arrangements to launch the Fund; and

*Whereas*, the Commissioner, following consultation with the Finance Committee, has determined that the League will work and co-invest in the Fund with a partner, a leading private equity firm ("Partner Firm"); and

*Whereas*, the Partner Firm will bring to the Fund capital, substantial deal flow, infrastructure, and experience in deal execution and portfolio company management; and

*Whereas*, all portfolio investments and material operational decisions relating to the Fund will be governed jointly by the Partner Firm and League office representatives appointed by the Commissioner ("League Representatives"); and

*Whereas*, the Fund is expected to focus primarily on investments in traditional and digital media business with a target size significantly larger than the typical expected investment size contemplated when 2011 Resolution G-2 was approved by the membership, and the Fund will often need to make investment decisions on an expedited basis;

*Whereas*, the membership believes that in order to maximize opportunities in the most effective and efficient way under the Fund, the requirement under 2011 Resolution G-2 that investments over $5 million be approved by the membership should be eliminated.

*Be it Resolved*, that 2011 Resolution G-2 be hereby amended by deleting the third numbered paragraph in its entirety and that the remainder of 2011 Resolution G-2 shall remain in full force and effect; and

*Further Resolved*, that the League Representatives shall have the authority to approve any investment in the Fund, in accordance with the procedures more fully described in the presentations to the membership.

## 2013 RESOLUTION FC-7

*Whereas*, in connection with the funding of stadium construction projects from the late 1990s through the late-2000s, the membership approved debt ceiling waivers that generally extended fifteen years from the opening of the applicable club's new or renovated stadium; and

*Whereas*, the membership recognizes (1) the need for many of these clubs that received such fifteen-year debt ceiling waivers to fund additional stadium investments and the increasing costs associated with such investments; (2) that more recent debt ceiling waivers have typically been approved for twenty-five seasons from the opening of a new or renovated stadium; and (3) debt market conditions which would likely allow for favorable long-term re-financings.

*Whereas*, many clubs that received such debt ceiling waivers (a) will have a significant "bullet" payment due at the expiration of the debt waiver because the waivers were not tied to a specific amortization schedule and/or the underlying loans had a maturity date extending beyond the expiration of the applicable debt ceiling waiver; and (b) were required to enter into floating-to-fixed rate swaps in connection with their stadium borrowings, some of which are now "out of the money", and would likely require a significant payment to terminate if the club were to repay or re-finance the debt in advance of the expiration of such swap; and

*Whereas*, permitting (i) a limited extension of such stadium debt ceiling waivers and (ii) the financing of swap termination payments resulting from a re-financing related to such an extension, in conjunction with the concurrent imposition of an approved amortization schedule, would benefit both the affected clubs and the League by stabilizing club economics through the avoidance of large bullet repayment obligations and/or large swap termination payments while providing for increased certainty with respect to the mandatory repayment of debt in excess of the debt ceiling.

Be it *Resolved*, that each club that was granted a stadium debt waiver between 1997 and 2007 that extended for fifteen years from the opening of the club's new or renovated stadium be, and hereby is, subject to meeting the conditions of this resolution, granted a temporary and limited debt ceiling waiver extension for up to ten additional seasons beyond the currently scheduled expiration of each such club's current debt ceiling waiver such that such club, its affiliated stadium company and any of its affiliates holding football-related assets shall come into compliance with the generally applicable League debt ceiling no later than the end of the twenty- fifth season of operations at the applicable stadium (such compliance (and such club's compliance with other League rules) to be determined on a consolidated basis for such club, its affiliated stadium company and all its affiliates that hold football-related assets); and

Further *Resolved*, that the principal amount that may be re-financed by any such club can be no more than the sum of the then current principal amount of the applicable stadium loan outstanding as of the date of such refinancing (and in any event no more than the current outstanding principal amount of such stadium

loan as of the date hereof) plus an amount equal to the amount of any swap termination fee incurred as a result of the re-financing; and

Further *Resolved*, the maturity date of, and the amortization schedule (which shall be mortgage-style or straight line unless another schedule is approved by the Finance Committee) for, any debt being re-financed in connection with the extension of such a debt waiver shall be approved by the Commissioner, who may consult with the Finance Committee in his discretion; and

Further *Resolved*, that any clubs to which the foregoing extension applies may only enter into interest rate swaps in connection with any re-financings if such interest rate swaps are approved by the Finance Committee; and

Further *Resolved*, that the membership does not contemplate any further extensions of the debt ceiling waivers that are permitted to be extended as a result of this resolution; and

Further *Resolved*, that the approvals granted hereby shall be conditioned upon (1) any such re-financing of a loan that is not in compliance with the League's stadium financing guidelines shall be subject to monitoring on a periodic basis by the Finance Committee and the club shall provide information reasonably requested by the Commissioner or Finance Committee to permit such monitoring (provided that nothing herein shall be deemed to modify requirements relating to any financings entered into pursuant to a new debt ceiling waiver, all of which shall be subject to the League's stadium financing guidelines); (2) any such re-financing being in compliance with all other League policies; (3) delivery to the Commissioner of any documents the Commissioner and/or the Finance Committee deems necessary or advisable to substantiate the terms, conditions and arrangements of any proposed debt re-financings otherwise permitted by this resolution, in form and substance acceptable to the Commissioner; and (4) entry by the club, lenders, and any other parties deemed necessary or advisable by the Commissioner and/or the Finance Committee into any required consent letters in connection with a re-financing, in form and substance acceptable to the Commissioner and/or the Finance Committee evidencing the terms and conditions on which such approvals have been granted, with the Commissioner to execute and deliver such consent letters on behalf of the League.

**2013 RESOLUTION FC-9**

WHEREAS, Clubs have generally been unable in recent months to secure reasonable choices in coverage options and reasonable premiums for workers' compensation insurance;

WHEREAS, working with the Management Council and the League office, The Sports and Entertainment Practice of Willis, a prominent workers' compensation broker and consultant for many Clubs, has negotiated with Berkley Specialty Underwriting ("Berkley") a proposed five-year group workers' compensation program (the "Program");

WHEREAS, the Program would provide more favorable premiums and stable coverage than Clubs have been able to achieve in individual negotiations and include defined coverage for head trauma-related workers' compensation claims;

WHEREAS, Berkley has insisted, as a condition of offering the Program, that (a) participation be mandatory for all Clubs except the Bengals, Browns, Lions and Seahawks, who are insured through their respective state insurance programs; (b) that the League provide assurance that it will, if necessary, arrange to pay (through funds withheld from any late paying Club's national revenues or otherwise) any past due premiums or other workers' compensation bills relating to properly administered claims that arise after the commencement of this Program and within its duration; (c) that Clubs implement certain best practices in claims handling and risk management;

WHEREAS, the Program provides for a League deductible reimbursement for claims directly related to head trauma that will be assessed equally on participating Clubs, beginning when and if such claims are filed and;

WHEREAS, ratification of the Program would be beneficial to all Clubs that participate in the Program; it is hereby

RESOLVED, participation in the Program shall be mandatory for all Clubs that are not legally required to purchase insurance from their states and that do not have similar favorable state insurance arrangement (currently all Clubs other than the Bengals, Browns, Lions and Seahawks) and the League office is authorized to and shall take all appropriate steps to implement the Program.

## 2014 RESOLUTION BC-1

*Whereas*, since 2012, NFL Enterprises LLC d/b/a NFL Network has carried thirteen (13) live NFL regular season games; and

*Whereas*, live NFL regular season games are a valuable programming asset of NFL Network;

*Whereas*, 2011 Resolution BC-3 authorized the Commissioner, in consultation with the Broadcasting Committee, to commit up to thirteen (13) live NFL regular season games to NFL Network through the 2022 season as part of a new or extended distribution agreement;

*Whereas*, the League has entered into long term extensions of its telecast agreements with ESPN, CBS, FOX and NBC and such agreements provide flexibility to commit additional games to other telecasters;

*Whereas*, the ability to negotiate favorable distribution arrangements with cable, satellite, and other distributors will be significantly enhanced by NFL Network's ability to offer additional live NFL regular season games and an increasing viewership base for the NFL Network;

*Whereas*, the NFL and the NFL Network, for itself and as agent for the member clubs, have negotiated a two-year agreement with CBS (covering the 2014-2015 season and, at NFL Network's option, the 2015-2016 season) pursuant to which NFL Network would grant CBS, among other things, each of (i) the right and obligation to produce, for distribution on NFL Network, fourteen (14) Thursday night live regular season game telecasts and two (2) Saturday live regular season game telecasts and (ii) a sublicense to distribute on CBS, alongside NFL Network, the eight (8) Thursday night games in Weeks 2 through 9 (or, at NFL Network's option, the seven (7) Thursday games in Weeks 2 through 8 along with one (1) Saturday game);

*Whereas*, this agreement will increase the revenues, the viewership base, and the profile of NFL Network;

*Whereas*, the Broadcasting Committee and the Chairman of the Business Ventures Committee have recommended commitment of an additional three (3) live NFL regular season games to NFL Network through the 2022 season;

*Whereas*, the Broadcasting Committee and the Chairman of the Business Ventures Committee have reviewed the terms of the proposed agreement between NFL Network and CBS and have unanimously recommended ratification thereof;

*Whereas*, the membership now desires to (i) increase the number of live NFL regular season games that the Commissioner, in consultation with the Broadcasting Committee and as agent of the member clubs, may commit to NFL Network and (ii) ratify and approve the proposed agreement with CBS.

*It Is Hereby Resolved*, that the Commissioner, in consultation with the Broadcasting Committee and as agent of the member clubs, shall be authorized to commit up to sixteen (16) live NFL regular season games to NFL Network through the 2022 season as part of a new or extended distribution agreement; and

*Further Resolved*, that NFL Network's agreement with CBS relating to Thursday and Saturday games in the 2014 and 2015 seasons is hereby ratified and approved.

## **2014 RESOLUTION BC-2**

*Whereas*, certain agreements between NFL Enterprises and DirecTV, including those for carriage of NFL Network and NFL Sunday Ticket by DirecTV, are scheduled to expire following the 2014 season; and

*Whereas*, the Commissioner and the Broadcasting Committee have engaged in a diligent and thorough study of the marketplace and consideration of alternatives that would best serve the interests of clubs and fans; and

*Whereas*, the Broadcasting Committee and staff have reported to the membership on their assessment of the marketplace, the attractiveness of NFL Sunday Ticket and NFL Network, and the carriage opportunities and alternatives available for both; and

*Whereas*, there is a substantial prospect that developments in the next several months, including activity relating to possible mergers, acquisitions or restructurings, may present additional opportunities for the Member Clubs with respect to NFL Sunday Ticket and NFL Network; be it

*Resolved*, that the Member Clubs hereby delegate to the Commissioner and the Broadcasting Committee authority to negotiate and conclude binding agreements on behalf of NFL Ventures, L.P. or an appropriate affiliate for the carriage of NFL Network and NFL Sunday Ticket and related matters, and be it further

*Resolved*, that nothing in this resolution shall require the Commissioner and the Broadcasting Committee to conclude such agreements pursuant to this delegation of authority, and they shall do so only if they determine, in the exercise of their business judgment, that the conclusion of one or more such agreements is in the best interest of the league; and be it further

*Resolved*, that this delegation of authority shall expire at the date and time on which the Fall League Meeting is called to order unless otherwise extended or modified by action of the Member Clubs.

## 2014 RESOLUTION BV-1

WHEREAS, pursuant to 2011 Resolution BV-1, the League retains exclusive worldwide control to license and otherwise use League Marks and individual Club Marks in respect of licensing, advertising, product or service placement, sponsorships and promotional agreements relating to commercial identification on the sidelines or playing field or otherwise subject to television exposure during NFL games;

WHEREAS, the League's sponsorship and sideline exposure agreement with Motorola for the telecommunications hardware category expired in March of 2012, which agreement (i) required Motorola to provide coaches' headsets and various other game day communication equipment to the clubs, (ii) provided Motorola the exclusive right in its category to expose its brand on the sidelines of all NFL games (e.g., on the coaches' headsets, sideline communications carts and various related equipment), and (iii) granted to Motorola the right to use League Marks and individual Club Marks to promote telecommunications hardware, including both mobile phones and tablets;

WHEREAS, since early 2011, the League Office has been exploring a more strategic technology partnership model with a broad array of potential sponsors in the telecommunications hardware and related technology categories, that would better position the League to address important initiatives, including in-game technology opportunities and improving the game day experience in the stadium;

WHEREAS, pursuant to 2013 Resolution BV-1 the League was authorized to enter into a sponsorship and sideline exposure agreement with sideline technology partner Microsoft for telecommunications hardware consisting of tablets and operating systems and clubs were precluded from entering into any new sponsorship agreements with third parties regarding the use of Club Marks in connection with the marketing or promotion of telecommunications hardware products (including, without limitation, mobile phones) absent further action by the Business Ventures Committee;

WHEREAS, the League Office has regularly briefed the Business Ventures Committee on the status of its on-going efforts to secure additional sideline technology sponsors in the telecommunications hardware and related technology categories;

WHEREAS, the League Office has been negotiating a sponsorship and sideline exposure agreement with Bose for professional and consumer audio components including headsets and headphones (collectively, "Headsets") to begin April 1, 2014 which agreement (i) requires Bose to provide Headsets for use by the NFL in connection with the playing of NFL games (including, without limitation, on-field coaching headsets, coaching booth headsets, and instant replay headsets), (ii) provides Bose the exclusive right in its category to expose its brand on the sidelines of all NFL games (e.g., on the coaches' Headsets and various

related equipment), and (iii) grants to Bose the right to use League Marks[1] and individual Club Marks[2] to promote Headsets;

WHEREAS, the Business Ventures Committee directed the League Office to finalize the sponsorship and sideline exposure agreement with Bose, subject to the approval of membership;

IT IS HEREBY RESOLVED, that NFL Ventures, L.P. or an appropriate affiliate may conclude an agreement with Bose for sideline exposure and sponsorship rights, including exclusive rights to individual Club Marks within the Headset category and related categories on terms generally consistent with those described in the presentation to membership.

---

[1] **League Marks** shall mean all trademarks owned by the League entities, including without limitation, NFL, the NFL Shield design, Super Bowl, Pro Bowl, NFL Kickoff, NFL Playoffs in their present form or as may be adopted in the future.

[2] **Club Marks** shall mean all trademarks owned by a Member Club, including without limitation, the names, nicknames, logos, colors, slogans, symbols, or any other identifying indicia in their present form or as may be adopted in the future, subject to certain limitations in Home Marketing Areas where the applicable Member Club has an existing sponsorship agreement in the headphone category.

## 2014 RESOLUTION BV-2
(As Amended)

*Whereas*, pursuant to 2014 Resolution BC-1, the League recently launched the new Thursday Night Football live game broadcast package on CBS;

*Whereas*, Thursday Night Football continues to be one of the League's key strategic initiatives for the 2014 season and beyond;

*Whereas*, League staff have engaged a large cross-section of the League's business partners to help build excitement around and value in the Thursday Night Football franchise;

*Whereas*, League staff and NIKE have jointly developed an opportunity to create for each club, in collaboration with and subject to the approval of the clubs and the League Office, at no cost to the clubs, an innovative uniform design (potentially utilizing existing uniform elements) to be worn during participation in Thursday Night Football games (the "Thursday Night Football Uniform") and intended to promote the Thursday Night Football franchise in a consistent manner across all clubs and also to provide incremental opportunity for the clubs and their fans;

*Whereas*, the Business Ventures Committee has reviewed and unanimously approved the Thursday Night Football Uniform program;

*Whereas*, League membership has been presented with an overview of the Thursday Night Football Uniform program including sample illustrations of preliminary uniform design options;

*Resolved* that beginning with the 2016 season and continuing until otherwise determined by the Commissioner in consultation with the Business Ventures Committee, each club shall be required to exclusively utilize its respective Thursday Night Football Uniform when participating in Thursday Night Football games, subject to Article XIX, Section 19.9(B) of the Constitution and Bylaws of the National Football League in the event that the colors of the participating clubs' Thursday Night Football Uniforms for any Thursday Night Football games conflict; and

*Further Resolved* that each club will have the opportunity to consult with Nike and the League Office in the development of and approve the design of its respective Thursday Night Football Uniform, provided that, in order to ensure a consistent and cohesive program, the final design must remain generally consistent with design options included in the presentation to membership, and shall be subject to the final approval of the Commissioner in consultation with the Competition Committee.

## 2014 RESOLUTION DM-1

*Whereas*, pursuant to 2007 Resolution DM-1, the Member Clubs modified the operating framework of the NFL Internet Network as established by 2000 Resolution JC-1 and extended by 2001 Resolution JC-1 and 2004 Resolution BV-4; and

*Whereas*, distribution and consumption of content via the Internet has become increasingly popular among fans and consumers of sports-related content; and

*Whereas*, numerous sports and entertainment properties have expanded the types and amounts of content that they make available via the Internet; and

*Whereas*, as part of its efforts to reach and engage fans through new delivery platforms and to enhance the value of its media assets, the League intends to launch NFL Now, a new all-digital video network complimentary to the NFL Internet Network and consisting of NFL and Member Club content; and

*Whereas*, it is expected that NFL Now will serve as a vehicle for both Member Clubs and the League to reach and engage fans globally by offering their content as part of a deeper, richer and more robust experience; and

*Whereas*, 2007 Resolution DM-1 established that the Member Clubs would be required to produce certain minimum levels (including quantity and quality) of content and the League, after consultation with the Digital Media Committee, has previously communicated such minimum levels of video content production to the Member Clubs (the "Club Content Requirements").

*It Is Hereby Resolved*, that, beginning no later than July 1, 2014, (i) each Club shall make available to NFL Ventures, L.P. ("Ventures"), for additional distribution by Ventures or one or more of its subsidiaries as part of NFL Now and related or successor products, the level of Club-produced video content required to meet the Club Content Requirements and any additional Club video content as elected to be provided by the Club, and (ii) each Club shall be responsible for securing all consents, if any, that are necessary to enable Ventures or one or more of its subsidiaries to effectuate such additional distribution; and

Further Resolved, that, in consideration for the content made available by the Clubs to NFL Now pursuant hereto, each Club will receive and be permitted to sell certain NFL Now advertising inventory associated with its Club Content, under terms as determined by the League in consultation with the Digital Media Committee, which may be revised from time to time.

**2014 RESOLUTION FC-4**

*Whereas*, 2012 Resolution JC-1 authorized, for the 2012 and 2013 seasons, modifications to certain policies that relate to the ticket manifest that lists all tickets available for sale at a member club's stadium for the upcoming season;

*Whereas*, these modifications permitted, for the 2012 and 2013 seasons, member clubs to (a) submit a "base" ticket manifest for purposes of determining whether a game is sold out pursuant to the blackout policy; and (b) at the same time, submit a list of additional general admission tickets not included in the "base" ticket manifest that may be sold for some or all games that season (the "Incremental GA Tickets"), subject to certain conditions, including an increase in the amount of visiting team share ("VTS") owed for sales of Incremental GA Tickets; and

*Whereas*, the membership believes that these modifications have produced beneficial results for the League and for fans interested in attending regular season NFL games, and that an extension of the modifications for an additional five-season period would advance League and fan interests.

Be it *Resolved*, that the modifications to certain policies reflected in 2012 Resolution JC-1, as well as the other provisions of that Resolution, shall be continued for a period of five additional years, *i.e.*, through the 2018 season.

**2014 RESOLUTION FC-5**

*Whereas*, League policies emphasize the importance of maximizing home attendance for all games, including postseason games;

*Whereas*, full stadiums for postseason games enhance the value of the League's entertainment product and enable participating clubs to mitigate their postseason expenses; and

*Whereas*, clubs often do not know until very late in the regular season or thereafter whether they will host any postseason games; Be it

*Resolved*, that every club shall offer its season ticket members the opportunity to reserve tickets for any postseason game that it may host;

*Further Resolved*, that season ticket members shall not be charged for the cost of postseason home game tickets until the club is certain to host the associated postseason game, unless the season ticket member elects to be charged sooner; and

*Further Resolved*, that the Commissioner's office shall collect and communicate best practices and other recommendations to implement this Resolution to maximize efficiency and convenience for fans.

## 2014 RESOLUTION G-2

Whereas*,* the Commissioner is charged with responsibility under the Constitution and Bylaws to address conduct detrimental to the integrity of and public confidence in the National Football League and to impose discipline, if such a violation is proved, to address and deter such violations;

Whereas, the Commissioner has promulgated a Personal Conduct Policy, which applies to all employees of the League and its members clubs, to address certain categories of prohibited conduct;

Whereas, the integrity of and public confidence in the NFL may be undermined by permitting a player charged with, or faced with credible evidence of having committed, acts of violence or abuse to represent the league and his club on the field prior to the resolution of that charge under the Personal Conduct Policy;

Whereas, in such unusual circumstances, a period of paid administrative leave would afford the league an opportunity to investigate such charges, enable the player to focus on defending such charges, and obviate the adverse impact to the league, the club, and other players of permitting the charged player to represent the league and the club on the field until the matter is resolved;

Whereas, Article 17.14(A) of the Constitution and Bylaws creates the Exemption List;

It is hereby RESOLVED that the membership endorses the Personal Conduct Policy that the Commissioner has developed and implemented pursuant to his "conduct detrimental" authority under the Constitution and Bylaws;

It is hereby RESOLVED that Article 17.14(A) of the Constitution and Bylaws is hereby amended to add the following as subparagraph 6:

This is to confirm that the Commissioner may make use of the Exempt List in aid of his jurisdiction to address conduct detrimental, specifically violations of the Personal Conduct Policy that are under investigation. If a player is formally charged with a crime of violence or other conduct that poses a genuine danger to the safety or well-being of another person, or if a player is suspected on the basis of credible evidence of having committed such a crime but further investigation is required, then in such unusual circumstances, the Commissioner may place a player on the Exempt List until the matter is resolved under the Personal Conduct Policy.

It is further RESOLVED that the Commissioner and League staff are directed to take steps, including discussions with the Players Association if such discussions are necessary, to implement the foregoing amendment to the Constitution and Bylaws in a manner consistent with the Collective Bargaining Agreement.

## **2014 RESOLUTION IC-1**

*Whereas*, 2011 Resolution IC-1 authorized the League Office (the "League") to schedule regular season games in the United Kingdom (the "U.K. Games") beginning with the 2012 season and continuing through the 2016 season;

*Whereas*, pursuant to 2011 Resolution IC-1, the Jacksonville Jaguars volunteered to play one (1) home game in the U.K. in each of the 2013, 2014, 2015 and 2016 seasons, and no other member clubs volunteered to participate as a home team under the "club opportunity" revenue model described in 2011 Resolution IC-1;

*Whereas*, the member clubs believe that increasing the number of U.K. Games played each season has, and will continue to, contribute to the strength and development of the NFL's brand and popularity outside the United States; and

*Whereas*, in order for the League to schedule and execute the number of U.K. Games that are contemplated for the 2015 and 2016 seasons, and any subsequent seasons for which the League may be authorized to schedule U.K. Games, it is necessary to establish criteria by which the home teams will be selected for the U.K. Games to be played in such seasons.

*It is Hereby Resolved*, that the League shall continue to request member clubs to volunteer to play as a home team in the U.K. Games and the League will select the home teams for the U.K. Games from member clubs volunteering, subject to scheduling availability and other criteria the League may deem in the NFL's best interest. Any member clubs that volunteer and are selected as the home team for a U.K. Game will receive a One Million Dollar ($1,000,000) incentive bonus, in addition to the game fee described in the last paragraph of 2006 Resolution BV-1.

*Be It Further Resolved*, that, in the event that an insufficient number of member clubs volunteer and are scheduled to play as the home team in the U.K. Games, the League may select member clubs to play as the home team in the U.K. Games based on the following order of selection (provided that no member club may be selected to play as a home team in a U.K. Game pursuant to the following criteria during the club's first two seasons playing in a new or substantially renovated (total renovation costs in excess of $200,000,000) home stadium):

1.  Any member club that will be playing its regular season home games in a temporary facility (which, for the avoidance of doubt, shall mean a facility other than its home stadium), excluding any member club occupying a temporary facility as of the adoption of this resolution solely for the length of such occupancy, and excluding any occupancy of a temporary facility occurring as a result of a force majeure event or similar circumstance, may be selected to play one (1) home game in the U.K. in each of the regular seasons during which it is scheduled to play in such temporary facility. Any member club selected to play as a home team in a U.K. Game under this criteria will receive a One Million Dollar ($1,000,000) incentive bonus, in

addition to the game fee described in the last paragraph of 2006
Resolution BV-1.

2. Beginning with the bid process for Super Bowl LIII (to be
played in 2019), if a member club's (or member clubs') home
stadium and/or home market is awarded a Super Bowl, the
League may select such member club(s) to play as a home team
in a U.K. Game once within five years of the award; provided
that no member club will be selected more than once every five
years on the basis of this criterion. Any member club selected to
play as the home team in a U.K. Game under this criterion will
receive a One Million Dollar ($1,000,000) incentive bonus, in
addition to the game fee described in the last paragraph of 2006
Resolution BV-1. Beginning with the bid process for Super
Bowl LIII (to be played in 2019), member clubs wishing to
submit a bid to host a Super Bowl game will be required, as a
condition to being permitted to submit a bid, to secure the right
to play a home game outside their home stadium under their
applicable stadium lease agreements (or otherwise) if awarded a
Super Bowl.

*Be It Further Resolved*, that the scheduling parameters set forth in 2011
Resolution IC-1 will apply to any member clubs selected to play as a home team
in a U.K. Game pursuant to this Resolution.

*Be It Further Resolved*, that member clubs selected to play as a home
team in the U.K. Games pursuant to this Resolution will receive the game fee
described in the last paragraph of 2006 Resolution BV-1 and will not, for the
avoidance of doubt, be participating pursuant to the "club opportunity" revenue
model described in 2011 Resolution IC-1.

*Be It Further Resolved*, that the International Committee is delegated
the authority to establish policies and procedures relating to the subject matter of
this Resolution including, but not limited to, the parameters of the participation of
the home teams in U.K Games.

## 2014 RESOLUTION JC-4

*Whereas,* the loans made by the League to certain clubs in connection with the stadium construction support program established by 1999 Resolution G-3, as extended by 2003 Resolution JC-1 (the "G-3 Program"), generally required each G-3 Program participating club (collectively, the "G-3 Clubs") to guaranty some portion of its projected club seat premium VTS during the first fifteen seasons of operations in the G-3 Club's new or renovated stadium (collectively, the "G-3 Guarantees"), and to pay any shortfall in such G-3 Guaranty following such 15th season;

*Whereas*, seven G-3 Clubs currently project shortfalls in their G-3 Guarantees following the 15th season of operations in their new or renovated stadium (each a "G-3 Guaranty Shortfall") in the amounts set forth in the presentations to the Finance and Stadium Committees and to membership;

*Whereas*, certain G-3 Clubs had opt-in rights to a successor stadium program, subject to certain conditions, but for numerous reasons, a successor stadium funding program (established pursuant to 2011 Resolution G-4 (the "G-4 Program")) was not approved by the membership until after the opt-in rights expired;

*Whereas*, the G-4 Program, among other things, allows recipient clubs to receive a waiver for Incremental Gate VTS (as defined in 2011 Resolution G-4), in addition to club seat premium VTS, and to apply the waived funds during the first fifteen seasons of operations in the new or renovated stadium, towards repayment of "First Tranche" G-4 loans; and

*Whereas*, given numerous factors, including the ones cited above, the membership believes it would be equitable to allow Incremental Gate VTS amounts to be utilized as a funding source (on the terms set forth below, and as more specifically described in the presentations to the Finance and Stadium Committees in advance of, and to membership at, the December 2014 League meeting) by all of the G-3 Clubs projecting a G-3 Guaranty Shortfall other than the Dallas Cowboys (the remaining six G-3 Clubs, the "Shortfall G-3 Clubs"), including those Shortfall G-3 Clubs that did not have the benefit of an opt-in clause, with such amounts to be paid to the League and applied to repay the League's G-3 debt (which would effectively reduce the amount of the Shortfall G-3 Clubs' potential G-3 Guaranty Shortfall payments due).

Be it *Resolved that*:

1. Each Shortfall G-3 Club shall be permitted to include the following revenues, in addition to club seat premium VTS revenues, as sources to be applied against its G-3 Guaranty, and such amounts shall be paid to the League and applied to repay the League's G-3 debt:
   a. Commencing in 2014, gate VTS in an amount equal to actual Incremental Gate VTS (measured retroactively, season-by-season) during the seasons that the Shortfall G-3 Club's new or renovated stadium has been in operation prior to 2014. Such amounts will be applied in equal amounts on a straight-

line basis for the lesser of five seasons or the number of remaining seasons until its G-3 Guaranty Shortfall payment is due (through the 15th season in its new or renovated stadium) (e.g., the New York Giants and Jets would each be permitted to apply gate VTS for each of the 2014 through 2018 seasons in an amount equal to 20% of the nominal sum of Incremental Gate VTS of the Giants or Jets (as applicable) for the 2010, the 2011, the 2012 and the 2013 seasons); and

b. Commencing in 2014, for each season through the season its G-3 Guaranty Shortfall payment is due, Incremental Gate VTS for such season.

2. Each Shortfall G-3 Club's gate VTS and Incremental Gate VTS shall be paid to the League and applied to repay the League's G-3 debt in accordance with paragraph 1 above only to the extent required to reduce such Shortfall G-3 Club's projected G-3 Guaranty Shortfall to zero.

3. During each season commencing in 2014 and through the season in which a G-3 Guaranty Shortfall payment is due from a Shortfall G-3 Club, such Shortfall G-3 Club's total amount of actual Incremental Gate VTS and club seat premium VTS for such season will be measured against the total projection of those amounts for such season pursuant to the projections previously submitted by the Shortfall G-3 Club to the League office in 2014. To the extent there is a shortfall in any such season (a "Season Shortfall") and the Shortfall G-3 Club is projected to have a G-3 Guaranty Shortfall payment due at the end of its G-3 Guaranty term, then the Shortfall G-3 Club shall pay the amount of the Season Shortfall at the end of the season in which the Season Shortfall occurs.

4. If a Shortfall G-3 Club has a G-3 Guaranty Shortfall payment due at the end of the term of its G-3 Guaranty (after the application of the gate VTS and Incremental Gate VTS as contemplated by paragraphs 1 and 2 above and any Season Shortfall payments as contemplated by paragraph 3 above), then the Shortfall G-3 Club shall pay to the League the amount of its G-3 Guaranty Shortfall at such time (a Shortfall G-3 Club may request a debt ceiling waiver at such time, but approval of any such debt waiver will be in the membership's sole discretion).

5. No Shortfall G-3 Club shall be permitted to voluntarily prepay any projected G-3 Guaranty Shortfall resulting from a shortfall in actual club seat premium VTS and Incremental Gate VTS results compared to projections relating to the 2014 or later seasons, except as contemplated in paragraph 3 above.

6. The forward rate used to calculate the amount of the G-3 Guaranty Shortfall for each Shortfall G-3 Club shall be adjusted from 7% or 8%, as applicable, to the League's actual cost of borrowings related

to the G-3 Program as determined by the League at the time the G-3 Guaranty Shortfall payment is due from the Shortfall G-3 Club. For the avoidance of doubt, the discount rate applied to each Shortfall G-3 Club's actual and projected annual club seat premium VTS, Incremental Gate VTS, and gate VTS amounts which are applied against its G-3 Guaranty shall remain unchanged (7% or 8%, as applicable).

7. Other than any surplus or deficit of the G-3 Program relating to the League's actual cost of borrowings and reconciled pursuant to paragraph 6 above, any surplus or deficit in the G-3 Program existing following the 2024 season shall continue to be shared equally by all NFL clubs.

8. Consistent with general treatment under the G-4 Program, the sharing waiver on PSL VTS approved by the membership in connection with the Dallas Cowboys' stadium project shall no longer be limited to the maximum amount of PSLs that the NFLPA agreed would be eligible for salary cap credits and exclusions attributable to such project, but such waiver shall continue to be subject to all other requirements applicable to PSL waivers (e.g., all PSL proceeds must be used solely and entirely to fund the original stadium construction (including through retirement of stadium debt)).

9. The terms and conditions of the approvals hereunder with respect to each Shortfall G-3 Club, shall be evidenced by an agreement or agreements with such Club, its controlling owner, and other relevant parties, in form and substance acceptable to the Commissioner and with such additional specific terms and conditions as the Commissioner may deem necessary or appropriate, and the Commissioner shall execute and deliver such agreements on behalf of the League.

## 2014 RESOLUTION MC-3

*Whereas*, some Member Clubs have purchased insurance coverage for the accidental death of one or more of their Players;

*Whereas*, the terms of such policies vary with respect to covered individuals, the definition of "accident events," sums insured, maximum benefits, deductibles, exclusions and premiums;

*Whereas*, other Member Clubs currently have no insurance of any kind in this category of risk;

*Whereas*, the loss of contracted NFL Players, Principal Owners and Head Coaches, as well as those Club Executives, Assistant Coaches and NFL League Executives who earn in excess of $1.0 million in annual compensation is an insurable interest of all Member Clubs and the NFL;

*Whereas*, the purchase of a League-wide policy insuring against such risks will result in substantial savings to Member Clubs and the NFL;

*Whereas*, the purchase of such League-wide policy would serve to supplement existing Club policies and would provide accidental death insurance to the remainder of the League's currently uninsured Member Clubs;

*Resolved*, that the Membership authorizes the League to purchase a League-wide policy insuring all Member Clubs and the NFL against the accidental death of the Covered Individuals described above on a 24-hour, worldwide basis;

*Further Resolved*, that the term of such policy shall be thirty-nine months consisting of an initial fifteen-month policy period and two subsequent twelve-month policy periods, with coverage commencing on January 1, 2015 and expiring on March 31, 2018;

*Further Resolved*, that the Sum Insured and the Deductible under such policy shall be as follows:

*In the event five (5) or more Covered Individuals perish in a single occurrence a Lump Sum Benefit is payable based on a $10,000,000 sub-limit per Player; $10,000,000 sub-limit per Principal Owner and Head Coach; $5,000,000 sub-limit per NFL Team Executive, Assistant Coach and NFL League Executive earning in excess of $1,000,000 in annual compensation.*

*If ten (10) or more Covered Individuals perish in a single occurrence, a Lump Sum Benefit of $150,000,000 is payable. The Maximum Benefit Payable is $150,000,000 per Policy Period.*

## 2015 RESOLUTION BC-1

*Whereas*, 2014 Resolution BC-1 authorized the Commissioner, in consultation with the Broadcasting Committee and as agent of the member clubs, to commit up to sixteen (16) live NFL regular season games to NFL Enterprises LLC d/b/a NFL Network through the 2022 season as part of a new or extended distribution agreement;

*Whereas*, 2014 Resolution BC-1 also ratified and approved an agreement between NFL Network and CBS relating to a package of Thursday and Saturday regular season games during the 2014 season and, at NFL Network's option, the 2015 season;

*Whereas*, during the 2014 season and pursuant to such agreement between NFL Network and CBS, NFL Network carried sixteen (16) live NFL regular season games produced by CBS of which eight (8) such games were sublicensed to CBS to be distributed on CBS alongside NFL Network;

*Whereas*, in lieu of exercising the option for the 2015 season, the NFL and NFL Network, on their own behalf and as agents for the member clubs, have negotiated a new two- year agreement with CBS (covering the 2015 season and, at NFL Network's option, the 2016 season) pursuant to which NFL Network would, among other things, grant CBS each of (i) the right and obligation to produce, for distribution on NFL Network, fourteen (14) Thursday night live regular season game telecasts and two (2) Saturday live regular season game telecasts and (ii) a sublicense to distribute on CBS, alongside NFL Network, the eight (8) Thursday night games in Weeks 2 through 9;

*Whereas*, the proposed agreement is expected to have a positive impact on the revenues, viewership base and overall profile of NFL Network;

*Whereas*, the Broadcasting Committee has reviewed the terms of the proposed agreement between NFL Network and CBS and has unanimously recommended ratification thereof; and

*Whereas*, the membership now desires to ratify and approve the proposed agreement with CBS.

*It Is Hereby Resolved*, that NFL Network's agreement with CBS relating to Thursday and Saturday games in the 2015 and 2016 seasons is hereby ratified and approved.

## 2015 RESOLUTION BC-2

*Whereas*, the League has announced that each of the three International Series regular season games to be played in London during the 2015 season will kick off at approximately 9:30 a.m. New York time;

*Whereas*, the League's existing Sunday afternoon television agreements with CBS and FOX afford the League flexibility to distribute one or more of such International Series games through an alternate partner and/or delivery platform;

*Whereas*, the media landscape continues to shift toward digital platforms and consumption of content via the Internet has become increasingly popular among fans and consumers of sports;

*Whereas*, the League and its Member Clubs have recognized an ongoing need to reach and engage fans through new delivery platforms in order to enhance the long-term value of the live distribution rights for NFL games and other League media assets; and

*Whereas*, the League and its Member Clubs have further agreed that beginning to test the viability of the Internet as a high-quality distribution platform for live NFL games will provide valuable strategic benefits and learnings;

*It Is Hereby Resolved*, that the Commissioner, in consultation with the Broadcasting Committee, shall be authorized to negotiate and execute an agreement contemplating Internet distribution of one International Series game to be played in London during the 2015 season.

**2015 RESOLUTION FC-2**

*Whereas*, League policies emphasize the importance of maximizing home attendance for all games, including postseason games;

*Whereas*, full stadiums for postseason games enhance the value of the League's entertainment product and enable participating clubs to mitigate their postseason expenses;

*Whereas*, the membership approved 2014 Resolution FC-5 to require, among other things, that every club offer its season ticket members the opportunity to reserve tickets for any postseason game that it may host; and

*Whereas*, this requirement would best serve the aforementioned League interests as well as the convenience of clubs and fans if fulfilled prior to the start of the regular season;

Be it *Resolved*, that 2014 Resolution FC-5 be, and hereby is, amended by replacing the fourth paragraph in its entirety with the following paragraph:

Be it *Resolved*, that every club shall, prior to its first game of each regular season, offer its season ticket members the opportunity to reserve tickets for any postseason game that it may host in that season;

*Further Resolved*, that the remainder of 2014 Resolution FC-5 shall remain unchanged and in full force and effect;

*Further Resolved*, that a club may not charge any season ticket member who reserved postseason tickets prior to the club's first game of the regular season in excess of its season ticket member, regular season ticket prices for any Wild Card game that the club hosts that season; and

Further *Resolved*, that the Finance Committee is and remains authorized to establish policies relating to administrative and other matters in respect of such ticket policies (and similar ticket policies), including for purposes of implementing this Resolution, which it shall periodically present to the membership for discussion.

**2015 RESOLUTION FC-3 &**
**MARCH 2015 ACTION OF THE DIRECTORS OF NFL VENTURES, INC.**
**AND CONSENT OF THE PARTNERS OF NFL VENTURES, L.P.**

*Whereas*, the clubs desire to delegate to the Finance Committee and to the NFL Management Council's Executive Committee (the "CEC") the authority to convert each of the League and the NFL Management Council, respectively, from a tax-exempt, not-for-profit entity to a taxable, for-profit entity, and to take such actions incidental thereto as the Finance Committee or the CEC, as applicable, deems appropriate;

*Whereas*, the loans advanced by the League to clubs participating in the stadium construction support program (the "G-3 Clubs") established by 1999 Resolution G-3, as extended by 2003 Resolution JC-1 (the "G-3 Program") are currently forgiven, if certain conditions are met, on a straight-line annual basis over 15 years following the completion of the applicable stadium project;

*Whereas*, as a result of, among other things, differences between the amortization schedules of the League's G-3 Program debt and the loans advanced by the League to the G-3 Clubs, the forgiveness feature included in the loans advanced by the League to the G-3 Clubs, and the timing of payments that will be made under the club seat premium visiting team share ("VTS") guarantees of the G-3 Clubs, the outstanding principal balance of the debt incurred by the League to fund the G-3 Program exceeds the sum of the outstanding principal balance of the loans advanced by the League to the G-3 Clubs and the cash held in League reserves for repayment of the League's G-3 debt; and

*Whereas*, in order to balance the League's assets and liabilities relating to the G-3 Program and to maintain that balance going forward, the League desires to approve certain of the resolutions set forth herein.

Be it *Resolved*:

1. That the League and each club hereby delegates to the Finance Committee and to the CEC the authority, in its discretion, to convert each of the League and the NFL Management Council, respectively, from a tax-exempt, not-for-profit entity to a taxable, for-profit entity at any time after March 31, 2015, and to take (and authorize the Commissioner to take) any such actions on behalf of the League and/or NFL Management Council, as applicable, and to enter into (and authorize the Commissioner to enter into) any such documents or agreements (including, without limitation, amendments to the League's Constitution and Bylaws and/or to the NFL Management Council's Articles of Association and By-Laws, with each club hereby consenting to any such amendment as so approved by the Finance Committee and/or the CEC, and waiving any requirement for any further vote, consent or approval of the clubs in respect thereof, whether under the League's Constitution and Bylaws or the NFL Management Council's Articles of Association and Bylaws or otherwise), as the Finance Committee or the CEC, as applicable, deems necessary or appropriate in furtherance of such conversion;

2.   That NFL Ventures, L.P. ("NFL Ventures") is hereby authorized and directed to draw up to $300 million under its existing debt facilities (the "Draw Amount"), with such draw to be made on or prior to March 31, 2015 and with the final Draw Amount to be determined by the Commissioner;

3.   That NFL Ventures is hereby authorized and directed to make a distribution on or prior to March 31, 2015, in an aggregate amount equal to the Draw Amount, to the limited partners of record of NFL Ventures as of such date, with such distribution to be made pro rata to each such limited partner;

4.   That each club shall pay to the League, with such funds to be received by the League on or prior to March 31, 2015, a League assessment in an amount up to $9.375 million per club, with the amount of such assessment to be determined by the Commissioner (and with the aggregate amount of such assessments not to exceed the Draw Amount);

5.   That the League shall use the funds so received to prepay, on or prior to March 31, 2015, such amount of the League's G-3 debt (and to pay any related swap termination costs and prepayment penalties) so that, following such prepayment, the outstanding principal amount of the League's G-3 debt shall equal the outstanding principal amount of the G-3 Program debt advanced by the League to the G-3 Clubs after taking into account forgiveness granted on March 31, 2015, with the specific tranches of the League's G-3 debt to be so prepaid to be determined by the Commissioner;

6.   That the Board of Directors of NFL Ventures, Inc. hereby delegates to the G-4 Finance Committee of NFL Ventures the authority, in its discretion, to authorize NFL Ventures to incur additional indebtedness which will be used to refinance the draws made on the existing NFL Ventures credit lines pursuant to the resolutions contained in Paragraph 2 above, and to authorize the officers of NFL Ventures to enter into such documents and agreements as may be necessary or appropriate in connection therewith (and the clubs hereby authorize the Commissioner to provide League guarantees of any such indebtedness so incurred by NFL Ventures, on such terms as the Commissioner may deem appropriate); and

7.   In order to implement the foregoing resolutions, the G-3 Program will be revised, and related matters are approved, all as set forth on Exhibit A attached hereto.

EXHIBIT A

G-3 Program and Other Approvals

1. The loans advanced by the League to the G-3 Clubs under the G-3 Program shall, effective as of April 1, 2015, no longer be eligible for forgiveness, and each G-3 Club shall, on or prior to March 31, 2015, enter into an amendment to its G-3 credit agreement and related agreements acceptable to the Commissioner evidencing its obligation to repay principal and interest on its remaining G-3 debt commencing April 1, 2015, with the amount to be repaid each year to be equal to the amount that would otherwise have been forgiven in such year under the G-3 Program prior to such amendment; and, furthermore, the interest rate on each such loan will be restated to provide for interest to accrue annually at the Applicable Federal Rate in effect on the accrual date plus 50 basis points;

2. Subject to each G-3 Club entering into such agreements, each such G-3 Club shall have a waiver from its obligation to share club seat premium VTS and, only to the extent required, gate VTS in an aggregate amount each year (commencing April 1, 2015) equal to the principal and interest owing on its G-3 debt for such year (for clarity, a G-3 Club shall be required to pay club seat premium VTS and gate VTS in excess of the amount of such principal and interest to an NFL agency account as designated by the Commissioner or his designee);

4. The Finance Committee shall have the authority, on a G-3 Club-by-G-3 Club basis, and with the agreement of the relevant G-3 Club, to implement more limited or otherwise modified waivers and other amendments to the relevant G-3 Club's G-3 credit agreement and related guarantees and other agreements, and to approve modifications to VTS obligations and/or the allocation of club versus stadium company revenue streams for a G-3 Club and any related lease amendments, in each case if determined by the Finance Committee to be necessary or appropriate to implement the intent of the these resolutions and with the goal of providing the clubs with overall economics with respect to the G-3 Program that are equivalent to those in effect prior to the implementation of these resolutions, on a tax-efficient basis;

5. Except as contemplated by the foregoing resolutions, the other obligations of the G-3 Clubs shall be unaffected by the foregoing resolutions and amendments and, accordingly, all adjacency guarantees and VTS payment guarantees shall remain in full force and effect (subject, in the case of the VTS payment guarantees, to the terms of 2014 Resolution JC-4); and

6. Each G-3 Club is hereby granted a debt ceiling waiver in the amount of the G-3 Program debt owing from such club.

## 2015 RESOLUTION FC-4
### (As Amended)

*Whereas*, the League has maintained policies regarding ownership of member clubs, which rules are designed to foster a range of important League interests;

*Whereas*, 1985 Resolution FC-7, as amended by 1996 Resolutions FC-5 and FC-6 and as supplemented by 1998 Resolution FC-10, (a) requires that a single Principal Owner hold at least a 30% equity interest in, and possess total voting control over, a member club, and (b) limits the total number of individual owners of a member club and governs when a family trust or family company can count as a single "person" for such purposes;

*Whereas*, 2004 Resolution FC-1A, as modified by 2009 Resolution FC-12, allows Principal Owners, in certain circumstances and subject to certain conditions, to hold individually a minimum of a 10% beneficial interest, and to aggregate the Principal Owner's individual interest with those of immediate family members to reach the required 30% equity interest in the member club;

*Whereas*, League ownership policies have been designed to support orderly inter-generational succession planning, as evidenced by the above Resolutions and 2011 Resolution FC-3, among others;

*Whereas*, the membership believes that it is advisable to take further steps to facilitate responsible succession planning and inter-generational transfers by (a) reducing from 10% to 5% the minimum interest that must be held by a Principal Owner who otherwise satisfies the League rules relating to minimum equity ownership, including as further described in this Resolution, (b) permitting a controlling interest in a member club to be owned by an irrevocable family trust ("IFT") subject to certain conditions, and (c) making certain other changes to ownership policies as provided in this Resolution;

*Whereas*, in light of the succession planning policies which have been adopted by the membership with respect to Principal Owners, the membership believes it is advisable to provide more flexibility to count multiple immediate family members of the Principal Owner as a single "person" for purposes of determining the number of owners of a member club;

*Whereas*, because a member club's succession plan affects both the interests of the individual member club and the League, the membership believes it advisable to add further requirements to the succession planning process to ensure that (a) member clubs have given adequate consideration to this important matter and have formulated succession plans that comport with League rules; (b) member clubs have identified plans designed to avoid conflict and uncertainty that can be detrimental to the League and potentially disruptive to a member club's operations; and (c) member clubs communicate these plans to the League; and

*Whereas*, the membership reaffirms its belief in current ownership policies such as the requirement that, other than with respect to the changes

expressly contained in this Resolution, the Principal Owner have full operating control over the member club and full authority to act on behalf of the member club as a member of the League.

Be it *Resolved*, that:

1.  A Principal Owner will continue to be deemed to meet minimum equity requirements in a member club if all of the conditions of 2004 Resolution FC-1A, as modified by 2009 Resolution FC-12, are met, provided that:

    a.  The references to ten percent (10%) in Paragraphs 2, 5 and 6 of 2004 Resolution FC-1A, as modified by 2009 Resolution FC-12, shall be further modified to refer instead to five percent (5%);

    b.  The references to "immediate family members" in 2004 Resolution FC-1A and 2009 Resolution FC-12 (but, for clarity, except as expressly provided below in this Resolution, in no other provisions of the Constitution or other League Resolutions) shall be modified to include the "immediate family members" (as defined in Article 3.5(C) of the Constitution) of the Principal Owner who first implements the succession planning transaction that reduces his or her interest in the member club to a lower percentage pursuant to this Resolution in order to enable the successor Principal Owners to meet the requirement that such Principal Owner and his or her immediate family have an aggregate beneficial interest in the equity of the member club of at least 30% which is held through the applicable family company or family trust; and

    c.  All other terms and conditions of 2004 Resolution FC-1A, as modified by 2009 Resolution FC-12, shall remain unchanged.

2.  Principal Owners who have owned a club for at least ten years may, subject to the terms of this Resolution, transfer the controlling interest in the club to an IFT for the benefit of his or her family members and through which the Principal Owner shall continue to be required to maintain total voting control of the member club (as contemplated by 1985 Resolution FC-7, as amended by 1996 Resolutions FC-5 and FC-6 and as supplemented by 1998 Resolution FC-10, as the same may hereafter be revised, amended and/or supplemented) and the requisite minimum equity in the member club, in each case as documented in form and substance satisfactory to, and approved in advance by, the Commissioner, except that:

    a.  If a Principal Owner owns and controls a member club through an IFT, then distributions from the IFT to its beneficiaries may be controlled by an independent person or persons so long as the Principal Owner has the sole power to appoint and remove the independent person(s).

    b.  The appointment and removal of a Principal Owner may be determined collectively by multiple family members, provided that (i) all other requirements of this Resolution and League policies are met, (ii) the

2015-8

member club and its owners have agreements, satisfactory to, and approved in advance by, the Commissioner, intended to avoid deadlocks and disputes, and (iii) no such appointment and no such removal may occur without the prior approval of not less than three-fourths of the member clubs.

3. Any IFT to which a Principal Owner wishes to transfer a members club's controlling interest shall also be subject to the conditions and requirements set forth in Exhibit A, which conditions and requirements must be satisfied (as evidenced by a League consent letter) prior to any such transfer taking place.

4. For purposes of determining the total number of persons who own a direct or indirect interest in a member club, the following shall count as a single "person":

    a. An IFT that owns a controlling interest in a member club if such IFT (a) meets the requirements of this Resolution and all other League policies and (b) has beneficiaries that consist solely of immediate family members (as defined in Article 3.5(C) of the Constitution) of the Principal Owner who initially created such IFT in accordance with this Resolution and other League rules; and

    b. Immediate family members (as defined in Article 3.5(C) of the Constitution without taking into account the modifications referenced in Paragraph 1.b. above) of the then-current Principal Owner of a member club together with such then-current Principal Owner, even if such immediate family members own equity interests in the member club through different entities.

5. Each member club shall be required to submit an ownership succession plan certified by the member club and its Principal Owner by June 30, 2015 and must re-certify its plan annually by each June 30 thereafter, in accordance with the requirements set forth in Exhibit B.

6. All provisions of the NFL Constitution and, except as specifically amended hereby, all currently effective NFL Resolutions and policies relating to ownership, shall remain in full force and effect.

7. Nothing in this Resolution shall affect the validity of any existing Resolution approving the ownership arrangement of a member club.

EXHIBIT A
IFT Requirements

1. Trust/other agreements:

   a. All agreements and amendments are subject to prior League review and approval; agreements and amendments must be submitted sufficiently in advance to provide ample time for review and comment.

   b. Trust must be formed in an appropriate jurisdiction, in the Commissioner's discretion.

   c. Trust/other agreements must include:

      i. Appropriate waivers of heightened trustee duties (e.g., fiduciary, income production, diversification of assets, conflicts of interests).

      ii. Strong dispute resolution mechanism, such as final, binding, exclusive waivers of conflict and penalties for frivolous or unsuccessful challenges.

      iii. Rights designed to give the Principal Owner the maximum amount of control possible, consistent with League rules, including the power to transfer a minimum 30% equity interest in the member club and control to a new owner if the Principal Owner desires to transfer control.

      iv. Appropriate restrictions to limit dissemination of confidential and otherwise sensitive member club and League information.

      v. Other provisions as the Commissioner or Finance Committee deems necessary or advisable on a case-by-case basis.

2. League consent letter:

   a. In addition to terms customarily included in the League consent letter (e.g., owners/beneficiaries acknowledge that they are bound by the terms of the Constitution and Bylaws and other League agreements), the consent letter must include the following provisions:

      i. All owners agree/acknowledge the Principal Owner's rights and powers, and the Commissioner's dispute resolution authority.

      ii. Without limitation of existing consent letter requirements and provisions, waivers, releases, indemnities and covenants not to sue in favor of League which are designed to address issues relating to such IFT and/or its beneficiaries.

      b.  In the Commissioner's discretion, some or all beneficiaries of the IFT may be required to execute the consent letter.

      c.  Member club/owners must acknowledge that the League is not providing legal or tax advice on particular ownership structures, etc.

3.  Other:

      a.  IFT may be required to act as a guarantor, in addition to the Principal Owner, if the League requires a Principal Owner guarantee (e.g., G-4).

      b.  The Principal Owner/member club may be required to provide assurances that future capital needs of the member club can be met.

      c.  In the Commissioner's sole discretion, the Commissioner may exercise the exclusive authority to resolve any intra-club ownership dispute, and the Commissioner's decision shall be final, binding and non-appealable.

EXHIBIT B
Succession Plan Requirements

1.  Each member club/Principal Owner must submit a succession plan to the League office by June 30, 2015 and must re-certify its plan annually by each June 30 thereafter.

    a.  If a member club proposes changes to its plan, then the new proposal must be submitted promptly for review.

2.  Each succession plan must name a specific individual as the planned successor Principal Owner of the member club. The plan should confirm that the Principal Owner's succession arrangements and that the resulting ownership structure would meet all League rules, including Principal Owner minimum equity and control requirements. Therefore, submissions should contain, at a minimum, the following information, as applicable:

    a.  A representation from the member club and Principal Owner that there are no known impediments (whether relating to the member club's ownership structure, potential estate or other transfer taxes, issues relating to the successor's background or otherwise) to such successor meeting all League rules.

    b.  If such proposed successor is currently a minor or younger than the threshold age at which the succession plan would vest the proposed successor with control, a detailed description of an interim plan, compliant with League rules, that would be implemented if the proposed successor Principal Owner is still a minor or below such threshold age at the time that control passes.

    c.  If the current Principal Owner's succession plan is to sell the member club, the submission should provide a description of who would control the sales process, its expected timing, and how the sales process would work, together with a description of how the member club would be managed and a certification from the member club and its Principal Owner that the ownership structure would comply with League rules during the sales process.

3.  A Committee (either the Finance Committee or another newly-formed Committee) will review and provide feedback to each member club regarding the member club's succession plan.

    a.  The League will perform due diligence on any proposed named successor if such person has not previously been subject to a League background check.

    b.  The feedback from the Committee is intended to identify any apparent deficiencies in the member club's plan (structural or with the proposed successor owner) and will provide an opportunity for the member club to address the Committee's concerns.

2015-12

      c.    The review of a plan and feedback by the Committee, however, does not constitute approval of such plan or indicate that the proposed successor Principal Owner and related ownership structure comply with League policies or can or will ultimately be approved. A successor Principal Owner, and any resulting new ownership structure, will need to obtain the Commissioner, Committee and/or membership approvals required by League rules at the time of such transfer of control.

      d.    Such succession plan will be maintained in confidence by the League office and its advisors and any Committee that reviews the plans.

4.    The Commissioner shall have the authority to impose penalties for non-compliance with this policy (e.g., for failure to submit a plan, or for plans that lack all necessary information satisfactory to the Commissioner and the Committee).

## 2015 RESOLUTION FC-5

*Whereas*, the Finance Committee has reviewed the League's current debt limit in light of numerous economic factors and conditions;

Be it *Resolved*, that effective immediately, the amount of debt which each member club may incur (as defined and described in 1988 Resolution FC-3) shall be raised from the current $200 million to $250 million;

Further *Resolved*, that all provisions of the NFL Constitution and all other rules and policies regarding member club debt (including without limitation debt of the principal or controlling owner (or secured by his interest in his club) and all indebtedness incurred in connection with an acquisition of a member club or controlling interest therein) shall, except as specifically amended hereby, remain in full force and effect.

**2015 RESOLUTION G-3**

Amend the Anti-Tampering Policy to reflect the following (new language underlined):

*NFL Players*. No club, nor any person employed by or otherwise affiliated with a club, is permitted to tamper with a player who is under contract to or whose exclusive negotiating rights are held by another club.

Notwithstanding the foregoing, during the period that begins three two calendar days prior to the expiration of NFL Player Contracts, clubs are permitted to contact the certified agents of players who will be Unrestricted Free Agents at the end of the current League Year and enter into contract negotiations with them. A contract, however, cannot be executed with a new club, or submitted to the League office, until after the beginning of the new League Year. During this three two-day period, a prospective Unrestricted Free Agent cannot visit a club (other than his current club) at its permanent facility or at any other location, and no direct contact is permitted between the player and any employee or representative of a club (other than his current club).

## 2015 RESOLUTION IC-1

*Whereas*, 2006 Resolution BV-1 authorized the League Office (the "League") to schedule regular season games in the United Kingdom (the "International Games") beginning with the 2007 season and continuing through the 2011 season pursuant to the financial model described therein (the "2006 Model");

*Whereas*, 2011 Resolution IC-1 extended the ability for the League to schedule International Games through the 2016 season on terms to be endorsed by the Commissioner and approved by the International Committee as part of the League's international business plan, and also established an additional model to provide incentives for clubs that volunteer to be the home team for an International Game in multiple consecutive seasons (the "2011 Model");

*Whereas*, 2014 Resolution IC-1 established criteria pursuant to which the League may select member clubs to participate as the home team in each of the International Games in the event a sufficient number of member clubs do not volunteer to participate as a home team, and clarified the parameters under which clubs shall participate in the International Games;

*Whereas*, the member clubs believe that increasing the number of International Games played each season has, and will continue to, contribute to the strength and development of the NFL's brand and popularity outside the United States;

*Whereas*, in order for the League to effectively plan and develop infrastructure in the United Kingdom to support an expanded number of International Games, the ability of the League to schedule International Games should be extended significantly beyond the 2016 season; and

*Whereas*, the member clubs believe that expanding the territories in which the League is able to schedule NFL regular season games beyond the United Kingdom will further contribute to the strength and development of the NFL's brand and popularity outside the United States.

Be it *Resolved*, that the League may continue to schedule International Games through the 2025 season pursuant to the parameters set forth in 2006 Resolution BV-1, 2011 Resolution IC-1 and 2014 Resolution IC-1 (collectively, the "International Games Resolutions"), provided that a member club will not be obligated to participate in an International Game as a visiting team more than once in a season.

Be it *Further Resolved*, that the number of International Games to be scheduled each season and the member clubs selected to participate in the International Games shall continue to be determined by the League in consultation with the International Committee pursuant to the parameters set forth in the International Games Resolutions.

Be it *Further Resolved*, that the League may schedule one or more International Games each season in international territories other than the United

Kingdom subject to the approval of both the Competition Committee and the International Committee.

## 2015 RESOLUTION JC-1

*Whereas*, the Broadcast and Finance Committees recommend the suspension of the blackout policy for the 2015 season in order to study the impact of such a suspension on ticket sales and other League interests; and

*Whereas*, 2014 Resolution FC-4 extended, through the 2018 season, the provisions of 2012 Resolution JC-1, which modified certain policies related to the ticket manifest used to determine whether a game is sold out for purposes of the blackout policy;

Be it *Resolved*, that the blackout policy and 2014 Resolution FC-4 be, and hereby are, suspended for the 2015 season;

Further *Resolved*, that for the 2015 regular season, (a) all member clubs must contribute for each home game a 34% visiting team share ("VTS", which shall be calculated in accordance with existing League policies, including the discounted ticket policy, using prices in the club's 2015 ticket manifest as of July 15) equal to at least 85% of the general admission tickets (with no exclusion for Incremental GA Tickets) ("General Admission Tickets"); and (b) any member club that sells 85% or more of the General Admission Tickets for any game must contribute for that game a 34% VTS for those tickets;

Further *Resolved*, that for purposes of this Resolution, complimentary General Admission Tickets provided by a member club in a manner consistent with existing League policy shall be considered "sold" General Admission Tickets;

Further *Resolved*, that for the 2015 regular season, any member club selling less than 85% of the General Admission Tickets for any game may determine at its discretion for such game which unsold General Admission Tickets it will contribute VTS for to reach the 85% threshold;

Further *Resolved*, that this Resolution does not modify any other ticket-related policies, including the treatment of obstructed view seats, standing room tickets, club seats, and suite seats identified in a club manifest;

Further *Resolved*, that the Finance Committee is and remains authorized to establish policies relating to administrative and other matters in respect of such ticket policies (and similar ticket policies); and

Further *Resolved*, that a three-fourths vote of the membership shall be required to extend beyond the 2015 season the suspension of the blackout policy and/or 2014 Resolution FC-4 approved hereunder.

## 2015 RESOLUTION JC-4

*Whereas*, the media landscape continues to shift toward digital platforms and consumption of content on such platforms has become increasingly popular among consumers and NFL fans;

*Whereas*, the League and its Member Clubs have recognized an ongoing need to effectively reach and engage fans – including younger fans – through the digital platforms such fans are using to regularly consume content;

*Whereas*, the League and its Member Clubs can best realize the full potential of such platforms with respect to audio content, including audio broadcasts of NFL games, by structuring and entering into an effective partnership in connection with the licensing and distribution of such audio content;

*Whereas*, in furtherance of such objectives NFL Enterprises on behalf of the League has negotiated an agreement with TuneIn, Inc. for the distribution of game audio broadcasts and other NFL-themed audio programming as part of the TuneIn digital audio service for the 2015, 2016 and 2017 NFL seasons, with an option for NFL Enterprises to extend for an additional three (3) NFL seasons thereafter, in exchange for a cash rights fee and equity grants from TuneIn to NFL Enterprises for the benefit of the Member Clubs;

*Whereas*, the Broadcasting and Digital Media Committees have reviewed the terms of the proposed agreement with TuneIn and unanimously recommended ratification thereof; and

*Whereas*, the membership now desires to ratify and approve the proposed agreement with TuneIn.

*It is Hereby Resolved*, that the League's proposed agreement with TuneIn is hereby approved on the terms presented to membership and that, following the initial term of such agreement, the Broadcast and Digital Media Committees shall be delegated authority to approve the exercise of NFL Enterprises' above-referenced extension option.

**2015 RESOLUTION JC-5**

Whereas, the League, through NFL Enterprises LLC, has had a long-term agreement in place with Sirius XM Satellite Radio to make club radio broadcasts of all NFL games as well as other NFL-related audio content available to subscribers of Sirius XM satellite radio service; and

Whereas, the League's current agreement with Sirius XM is scheduled to expire after the end of the 2015-16 NFL season; and

Whereas, the League has entered into discussions with Sirius XM and negotiated a proposed renewal agreement pursuant to which Sirius XM's satellite radio and other rights would be extended for an additional six (6) NFL seasons (*i.e.*, through the 2021-22 NFL season); and

Whereas, the Broadcasting and Digital Media Committees have reviewed the terms of such proposed agreement and unanimously recommended ratification thereof; and

Whereas, the membership now desires to ratify and approve the proposed agreement with Sirius XM.

It is hereby resolved, that the League's new agreement with Sirius XM with respect to the 2016-2021 NFL seasons is ratified and approved.

## 2015 RESOLUTION MC-1

*Whereas*, certain drafted players have suffered injuries resulting in their permanent total disability or accidental death prior to reporting to their initial pre-season training camp; and

*Whereas*, certain drafted players selected in rounds one through three of the draft have suffered injuries resulting in their temporary total disability prior to reporting to their initial preseason training camp, which have caused them to miss all or part of their first regular season; and

*Whereas*, the loss of the drafted player and draft choice is an insurable interest of the Club; and

*Whereas*, the NFL has purchased a League-wide Offseason Draft Choice Asset Value Policy to cover the loss of services of: (i) all drafted players, including compensatory draft selections, due to permanent total disability or accidental death; and (ii) players selected in rounds one through three of the draft, including compensatory draft selections, due to temporary total disability; and

*Whereas*, the NFL's purchase of such policy results in lower premium costs for Member Clubs, and

*Whereas*, the insurance policy purchased was renewed in 2011 for a three-year term and extended for an additional year in 2012, such that the policy is scheduled to expire April 1, 2015; it is therefore

*Resolved*, that the Membership authorize the existing NFL Offseason Draft Choice Asset Value Policy to be renewed for a three-year term, with coverage beginning from the time of binding.

## 2015 RESOLUTION MC-2

*Whereas*, certain NFL players have experienced both on-field and off-field catastrophic injury, defined as: paraplegia, quadriplegia, hemiplegia, monoplegia, total severance of limb(s) or total loss of sight in one eye or total loss of sight in both eyes; and

*Whereas*, the NFL has purchased a League-wide catastrophic loss insurance policy to cover NFL players at all times for both on-field and off-field catastrophic injury, thereby resulting in lower costs for Member Clubs; and

*Whereas*, recoveries under the policy enable Member Clubs to provide discretionary financial assistance to such players; and

*Whereas*, the insurance policy purchased was renewed in 2011 for a three-year term and extended for an additional year in 2012, such that the policy is scheduled to expire on April 1, 2015; it is therefore

*Resolved*, that the Membership authorize the existing NFL Catastrophic Loss Policy to be renewed for a three-year term, with coverage beginning from the time of binding.

**2016 RESOLUTION BC-1**

*Whereas*, 2006 Resolution BC-1 established certain policies in connection with "flexible scheduling" and prime time appearances; and

*Whereas*, the Broadcasting Committee has reviewed such policies and unanimously recommended that 2006 Resolution BC-1 be modified such that the Commissioner and League Office may elect to "flex" any game into the Sunday night broadcast package during the final week of the regular season for the purposes of maximizing viewership and fan engagement.

*It Is Hereby Resolved,* that 2006 Resolution BC-1 (regarding Prime Time appearance limits) shall be amended and restated and attached hereto.

## 2006 RESOLUTION BC-1
### (Amended and Restated)

*Resolved,* that in the preparation of the official NFL regular season schedule and administration of the "flexible scheduling" system for Sunday games to be telecast on CBS, Fox and NBC, the Commissioner and League Office will apply the following policies:

1.  Each club will, with proper notice, switch Sunday regular season games between 1:00 P.M. and approximately 4:25 P.M. (Eastern Time), and in flexible scheduling weeks (generally weeks 11-17 of each season) to approximately 8:30 P.M. (Eastern Time), to accommodate television broadcasting patterns;

2.  The following scheduling provisions will apply to the scheduling of the League's Sunday Night Prime Time broadcast television package:

    a.  Maximum of three *scheduled* (i.e., Week 1-10) appearances per club, inclusive of the Thursday night opener;

    b.  With respect to such *scheduled* appearances:

        i.   If a club is scheduled three times, such club may not be scheduled with all of those games at home, or all such games away, without its prior permission.

        ii.  If a club is scheduled twice, both games may be scheduled away, or one may be scheduled at home and one away; and

        iii. If a club is scheduled once, such game may be home or away;

3.  In addition to such *scheduled* Sunday night broadcast appearances, all clubs may have games "flexed" into the Sunday night broadcast package and scheduled in other prime time television packages, subject to the following:

        i.   Prior to the final week of the applicable NFL regular season, no club may, as a result of such "flexing" and scheduling in other prime time television packages, appear more than six times in Prime Time television packages;

        ii.  Prior to the final week of the applicable NFL regular season, no more than three clubs may appear six times in prime time television packages;

        iii. Prior to the final week of the applicable NFL regular season, no club may appear in the Sunday night broadcast

package more than four times, and only three clubs may
appear in such package four times;

4. No club will be required to make more than one appearance per season in
games scheduled on dates other than Saturday, Sunday or Monday if, as a
result of such scheduled appearance, such club will have fewer than five
days available for preparation time prior to such games.

## 2016 RESOLUTION BV- 1

*Whereas,* ecommerce has evolved into an increasingly important channel for the sale of NFL licensed products to NFL fans, who seek efficient, convenient and timely access to a broad selection of authentic NFL licensed products across a range of metrics, including style, price and quality;

*Whereas*, Fanatics, Inc. has operated the League's official ecommerce site, NFLShop.com, since April 1, 2006 under an existing agreement that will expire on March 31, 2017;

*Whereas,* over the last two years, in close consultation with the Ecommerce Sub-Committee of the Business Ventures Committee (the "Sub-Committee"), the League Office has conducted a comprehensive analysis of the League's ecommerce business and numerous alternative business models, including through the use of a third-party consultant and discussions with full-service ecommerce providers as well as various financial, technology, and logistics providers;

*Whereas,* the League Office and the Sub-Committee concluded from this analysis that continuing to outsource the operation of NFLShop.com to a top-tier, full-service ecommerce provider on appropriate terms designed to enhance the availability, variety and quality of authentic NFL licensed products, optimize service and convenience for NFL fans, provide innovative consumer products in a timely way in response to consumer demand, protect the NFL brand, and support the League's efforts to combat unauthorized use of its intellectual property, represents the most attractive business model;

*Whereas,* the League Office identified Fanatics, Inc. and one other retailer as the two best potential partners to operate NFLShop.com after the expiration of NFL Properties' current agreement with Fanatics, Inc. and fully negotiated comprehensive agreements with both;

*Whereas,* both potential deals were presented to the Business Ventures Committee, which unanimously selected and approved the deal with Fanatics, Inc.;

*Whereas,* the proposed deal with Fanatics, Inc. will potentially extend beyond the current effective term of 2011 Resolution BV-1 (Commercial Master Agreement) and is therefore subject to the approval of membership;

*Whereas*, the membership now desires to ratify and approve the proposed agreement between NFL Properties LLC and Fanatics, Inc.

*It is Hereby Resolved*, that the proposed agreement between NFL Properties LLC and Fanatics, Inc. is hereby approved on the terms presented to membership.

## 2016 RESOLUTION BV-2

*Whereas*, 1998 Resolution SB-5 established the allocation of game tickets for each Super Bowl game beginning with Super Bowl XXXVI;

*Whereas*, the two participating clubs each year have limited time to prepare for their participation in the Super Bowl game and to address the significant travel, player and fan support, and other logistical issues associated with such participation;

*Whereas*, to help address many of these fan-related needs, as well as to offset the incremental expenses associated with Super Bowl participation, the participating clubs typically enter into short-term travel sponsorship deals with ticket travel package re-sellers during the two-week period between the AFC and NFC Championship games and the Super Bowl game;

*Whereas*, such deals risk damage to the NFL brand by providing fans who purchase the resulting Super Bowl travel packages with an experience that is inconsistent with the quality and expectations associated with the NFL;

*Whereas*, the League Office has developed an opportunity pursuant to which a greater number of tickets can be made available for purchase by fans on a year-round basis within high-quality and unique Super Bowl travel packages that will result in more positive and consistent fan experiences and interactions with the Super Bowl game and the NFL brand, as well as greater efficiencies due the multi-year nature of the arrangement and resulting opportunity for fans to purchase Super Bowl travel packages much further in advance of the Super Bowl game;

It is hereby *Resolved* that, for Super Bowl LI and beyond, (i) the allocation of Super Bowl game tickets to each of the two participating clubs shall be reduced by 3,000 tickets, (ii) the Super Bowl reimbursement amount paid by the League Office to each of the two participating clubs shall be increased by $5.5MM for Super Bowl LI, with such incremental reimbursement amount increasing by 3% for each subsequent Super Bowl game, (iii) the allocation of Super Bowl game tickets to each member club other than the two participating clubs and the host club shall be increased by 33, and (iv) the allocation of Super Bowl game tickets to the League Office shall be reduced by 957.

## 2016 RESOLUTION FC-2

*Whereas*, the Rams franchise (the "Club") received approval to relocate its home territory from St. Louis to Los Angeles and construct a new stadium at Hollywood Park in Inglewood, California pursuant to 2016 Resolutions G-1 and G-2A (the "Relocation Resolutions");

*Whereas*, the Relocation Resolutions require, among other terms and conditions, that the Club must obtain membership approval of (i) a lease for the stadium in which the team will play in any season before its permanent stadium facility is available and (ii) any other lease agreements and intra-company agreements, in each case no later than the conclusion of the 2016 Annual Meeting;

*Whereas*, prior to the opening of the new stadium, the Club is expected to play the 2016-2018 seasons at the Los Angeles Coliseum pursuant to a venue agreement between the Club and the University of Southern California (the "Venue Agreement");

*Whereas,* the financial terms of the Venue Agreement have been submitted for Executive Committee approval, as required by 1988 Resolution FC-5 and the Relocation Resolutions; and

*Whereas,* the Finance Committee recommends revising the requirement in the Relocation Resolutions to allow the Club to submit lease agreements, other than the Venue Agreement, and intra-company agreements at a later date as reasonably determined by the Commissioner.

Be it *Resolved*, that the financial terms of the Venue Agreement, be, and hereby are, approved subject to the following: (1) nothing in this Resolution shall be interpreted as, and such approval does not constitute, a waiver or otherwise supersede the Club's obligation to comply with the NFL Constitution and Bylaws and all NFL rules, and (2) the Club must submit to the League office final, executed documentation substantiating the terms, conditions, and arrangements presented to the Finance Committee and satisfactory to the Commissioner;

Further *Resolved,* that the requirement in the Relocation Resolutions that the Club obtain approval of any lease agreements and intra-company agreements no later than the conclusion of the 2016 Annual Meeting be, and hereby is, revised to allow the Club to obtain approval of such agreements, other than the Venue Agreement, at a later date to be reasonably determined by the Commissioner;

Further *Resolved*, that the terms and conditions of the approvals granted hereby may, in the Commissioner's discretion, be evidenced by agreements with all relevant parties acceptable in form and substance to the Commissioner, and that the Commissioner shall execute and deliver such agreements on behalf of the League, which shall contain such additional specific terms and conditions as the Commissioner may deem necessary or appropriate.

## 2016 RESOLUTION G-2A

*Whereas,* the Oakland Raiders seek approval pursuant to Section 4.3 of the NFL Constitution and Bylaws to relocate the club's home territory from Oakland to Los Angeles, beginning with the 2016 season; and

*Whereas,* the San Diego Chargers seek approval pursuant to Section 4.3 of the NFL Constitution and Bylaws to relocate the club's home territory from San Diego to Los Angeles, beginning with the 2016 season; and

*Whereas,* the Raiders and Chargers propose jointly to construct a new, state-of-the-art stadium in Carson, California, which would be shared by the two clubs; and

*Whereas,* the St. Louis Rams seek approval pursuant to Section 4.3 of the NFL Constitution and Bylaws to relocate the club's home territory from St. Louis to Los Angeles, beginning with the 2016 season; and

*Whereas,* the Rams propose to construct a new, state-of-the-art stadium in Inglewood, California, at a site known as Hollywood Park, which stadium would be suitable for use by two NFL clubs; and

*Whereas,* the relocation proposals have been evaluated by the Commissioner per the Policy and Procedures on Proposed Franchise Relocations, and the Commissioner has submitted a report to the membership as contemplated by the Procedures; and

*Whereas,* multiple league committees have undertaken a comprehensive evaluation of the possible relocation of one or more teams to Los Angeles and the membership has approved terms and conditions that apply to any approved relocation; and

*Whereas,* the resumption of NFL operations in Los Angeles would serve a wide range of important league interests if done successfully and in accordance with the approved terms and conditions; and

*Whereas,* given the unique and special circumstances presented, the membership believes that it is appropriate to provide, on a non-precedential basis, additional league financial support for stadium projects in the current home market of any club that sought permission, but was not approved to relocate for the 2016 season.

*Be It Resolved* that the member clubs hereby approve, subject to the terms and conditions set forth in 2016 Resolution G-1, the following relocation proposal, effective for the 2016 NFL season.

1.  That the proposed relocation of the Rams' home territory from St. Louis to

Los Angeles and the proposed construction of a new stadium at Hollywood Park are approved, with the new stadium at Hollywood Park to be constructed on a basis that permits two NFL teams to operate on an equal basis with respect to scheduling, access to facilities, and agreed-upon and approved financial terms generally consistent with the options presented to the member clubs on January 12, 2016, and with the member clubs having the right to determine the identity of the second team that will play in the stadium and the time at which it will begin play in the stadium;

2.  That the Chargers are approved to relocate the club's home territory from San Diego to Los Angeles and granted an option to accept the second team opportunity at Hollywood Park subject to the following terms:

   (A) The option shall expire on January 15, 2017, unless a referendum to approve public financing for a new stadium in San Diego is approved prior to November 15, 2016, in which case the Los Angeles Opportunities Committee may, at the Chargers' request, extend the option up to January 15, 2018.  In any year in which the Chargers have the option to relocate and accept the second team opportunity at Hollywood Park, the club must exercise those options no later than the conclusion of the Annual Meeting in that year, or when the option to accept the second team opportunity expires.

   (B) If the Chargers unequivocally reject the option or enter into a binding and approved stadium agreement in San Diego or another community prior to the date on which the option would otherwise expire, the option shall expire as of the date that the option is rejected or that the binding agreement is approved by the membership;

3.  That the Raiders are granted a conditional option to accept the second team opportunity at Hollywood Park, effective on the day that the option granted to the Chargers expires, and extending for a period of one year or sooner if the Raiders unequivocally reject the option or enter into a binding and approved stadium agreement in Oakland or another community at an earlier date.  This option must be exercised no later than the conclusion of the Annual Meeting in any year in which the Raiders have the option to accept the second team opportunity at Hollywood Park.

4.  The membership will make available, in addition to any other stadium financing support provided under the G-4 program, an additional $100 million in league financial support to each of the Raiders and Chargers for a new stadium in each of their respective current home markets, provided that a binding stadium agreement is made and approved by the member clubs no later than January 15, 2017, subject to being extended by the Finance and Stadium Committees.

5. The Rams will not engage in the sale of PSLs, premium seats (including luxury suites), stadium naming or cornerstone rights, or the equivalent of any of these products, prior to February 15, 2017, unless (a) a binding and approved agreement has been reached with a second team; or (b) the Finance, Stadium and Los Angeles Opportunities committees have jointly determined to extend the period past February 15, 2017 for up to 90 days; or (c) all options granted by this Resolution shall have expired prior to that date.

6. The Commissioner, in consultation with the Finance and Stadium Committees, shall have authority to interpret and implement this resolution.

**2016 RESOLUTION IC-1**

*Whereas***,** 2015 Resolution IC-1 authorized the League Office (the "League") to schedule regular season games in the United Kingdom ("UK Games") through the 2025 season pursuant to the parameters set forth in 2006 Resolution BV-1, 2011 Resolution IC-1 and 2014 Resolution IC-1, including the scheduling parameters set forth in 2011 Resolution IC-1;

*Whereas,* the member clubs believe that increasing the number of UK Games played each season has, and will continue to, contribute to the strength and development of the NFL's brand and popularity outside the United States; and

*Whereas,* in order to facilitate scheduling multiple UK Games each season, and based on the experience of the member clubs that have participated in UK Games, the member clubs believe that modifying the scheduling parameters applicable to UK Games as currently set forth in 2011 Resolution IC-1 is necessary and desirable.

Be it *Resolved,* that the following scheduling parameters shall apply to UK Games commencing with the 2016 season:

**Scheduling Parameters Applicable to Participating Member Clubs in the AFC West and NFC West Divisions:**

- Participating teams will have a choice of a home or away market game the week before the UK Game. Teams must notify the League of their choice no later than February 1st.
- Unless a participating team requests otherwise, participating teams will have a bye week scheduled the week immediately following the UK Game. Requests to not have a bye week scheduled the week immediately following a UK Game must be made no later than February 1st and will not entitle the requesting team to any preferential treatment in the scheduling of that team's bye week.

**Scheduling Parameters Applicable to Participating Member Clubs in the AFC East, AFC North, AFC South, NFC East, NFC North, or NFC South Divisions:**

- Participating teams may be scheduled to play home or away the week prior to the UK Game at the discretion of the League.
- If a participating team is scheduled to play away the week prior to the UK Game, then:
  - o Such away game will not be a Sunday evening or Monday evening game;
  - o Such away game will not be in a city located more than a 2-hour flight from the team's home city; and
  - o Such away game will not be in Florida during the month of September, or in Denver, Colorado.

2016-12

- Unless a participating team requests otherwise, participating teams will have a bye week scheduled the week immediately following the UK Game. Requests to not have a bye week scheduled the week immediately following a UK Game must be made no later than February 1st and will not entitle the requesting team to any preferential treatment in the scheduling of that team's bye week.

**Scheduling Parameters Applicable to All Participating Member Clubs:**

- Member clubs participating as a home team in a UK Game will have the option of designating one (1) regularly scheduled home game that will not be eligible as a UK Game.
- Divisional match-ups will not be eligible as a UK Game without the consent of both participating teams.
- Visiting teams will be required to participate in UK Games in accordance with the NFL schedule, provided that, as set forth in 2015 Resolution IC-1, a member club will not be obligated to participate in a UK Game as a visiting team more than once in a season.

## 2016 RESOLUTION JC-1

*Whereas,* 2015 Resolution JC-1 suspended the blackout policy and 2014 Resolution FC-4 for the 2015 season in order to study the impact of such a suspension on ticket sales and other League interests;

*Whereas*, the Broadcasting Committee and Finance Committee recommend the extension of 2015 Resolution JC-1 in order to further study the impact of such suspension; and

*Whereas,* 2015 Resolution JC-1 requires a three-fourths vote of the membership to extend the suspension of the blackout policy and/or 2014 Resolution FC-4 approved thereunder beyond the 2015 season;

Be it *Resolved*, that the suspension of the blackout policy and 2014 Resolution FC-4 reflected in 2015 Resolution JC-1, as well as the other provisions of 2015 Resolution JC-1 (including the supplemental VTS requirement for regular season games) be, and hereby are, continued for the 2016 season.

## 2016 RESOLUTION JC-5

*Whereas*, 2015 Resolution BC-1 ratified and approved an agreement between the League and CBS relating to a package of Thursday and Saturday regular season games during the 2015-16 season and, at the League's option, the 2016-17 season;

*Whereas,* in lieu of exercising such option for the 2016 season, the League, as agent for the member clubs, has negotiated new two-year agreements (covering the 2016 season and the 2017 season) with each of CBS and NBC, pursuant to which the League respectively would grant to CBS and NBC, among other things, the right and obligation (i) to produce, for distribution on CBS or NBC (as applicable), five (5) Thursday night live regular season game telecasts (subject to a League option to "put" an additional live regular season game telecast to NBC) and (ii) to collectively produce, for national distribution exclusively on NFL Network, an aggregate of eight (8) live regular season game telecasts (or, in the event that League exercises its above-referenced "put" option, seven (7) live regular season game telecasts);

*Whereas,* in each of such agreements with CBS and NBC, the League also has retained the right to simulcast on NFL Network and via digital distributor(s) each live regular season game telecast distributed on CBS or NBC (as applicable) pursuant to such agreements;

*Whereas*, the proposed agreements with CBS and NBC, and any such related agreement(s) with digital distributor(s), will increase the revenues, viewership base, and profile of the League's *Thursday Night Football* franchise and of NFL Network;

*Whereas*, the Broadcasting Committee and Digital Media Committee have reviewed the terms of the proposed agreements between the League and each of CBS and NBC and have unanimously recommended ratification thereof, and also have reviewed and endorsed the status of ongoing negotiations between the League and various digital distributors; and

*Whereas,* the membership now desires to ratify and approve the proposed agreements with CBS and NBC and to approve the completion by the Commissioner and the League Office of related agreement(s) with one or more such digital distributor(s).

*It Is Hereby Resolved,* that the League's new agreements with CBS and NBC relating to certain games in the 2016 and 2017 seasons are hereby ratified and approved; and

*Further Resolved*, that the Commissioner and League Office are hereby authorized to complete and execute agreement(s) relating to such games with one or more digital distributor(s).

## 2016 COMPETITION COMMITTEE POSITION PAPER
## ON ANTI-TAMPERING POLICY

Below is the Competition Committee's position paper on the Anti-Tampering Policy, presented at the March 2016 Annual meeting of the League:

### Anti-Tampering Policy – Commissioner Discipline

At the Commissioner's request, the Competition Committee discussed the types and levels of discipline that should be assessed by the Commissioner for violations of the Anti-Tampering Policy. The Committee reviewed the relevant provisions of the Constitution and Bylaws concerning tampering violations to determine if those provisions should be incorporated into the Anti-Tampering Policy for clarity and consistency. The Anti-Tampering Policy is consistently updated with respect to player and non-player personnel, and the Committee believes it should be the prevailing policy document for all matters relating to tampering. The Committee also reviewed the general guidance that it has provided regarding discipline for violations of competitive rules. It regards tampering as a serious competitive violation and therefore believes that discipline should be sufficient to deter future violations, and in appropriate cases, compensate the offended club.

After careful consideration, the Committee recommends the following, with the understanding that the Commissioner is granted broad authority under Section 8.13 of the Constitution and Bylaws and nothing in this position is meant to limit that authority in any way:

1. The disciplinary section of the Anti-Tampering Policy will be revised as follows to include language from Section 8.13 (A)(3) of the Constitution and Bylaws that refers to the broad disciplinary powers of the Commissioner.

> **Discipline.** Any violation of this Anti-Tampering Policy will subject the involved club and/or person to severe disciplinary action by the Commissioner. In such cases, the Commissioner may award or transfer selection choices and/or deprive the offending club of a selection choice or choices, and/or

2016-16

may fine or suspend with or without pay the offending club and/or any involved individuals as appropriate. The League office will promulgate to all clubs the details of any penalties imposed for tampering.

2. In assessing discipline, the Commissioner may consider as relevant factors whether the club that committed the violation did or did not secure the services of the player or other employee. If a club is found to be in violation of the Anti-Tampering Policy and that club acquires the player (or non-player employee), the Commissioner should consider in imposing discipline on the offending club the fact that the club is receiving the services of that individual for multiple years.

3. The Commissioner may award compensation to the offended club if it certifies a complaint that initiates an investigation against the offending club(s).

4. If the offending club can clearly prove to the Commissioner that the act constituting the violation of the Policy was unintentional, the Commissioner may consider that as a mitigating factor with respect to any discipline imposed on the club or individuals.

5. Clubs are reminded of the following provision in the Policy on Integrity of the Game & Enforcement of League Rules:

> Duty to Investigate and Cooperate - Actual or suspected violations will be thoroughly and promptly investigated.   Any club identifying a violation is required promptly to report the violation, and give its full support and cooperation in any investigation.   Failure to cooperate in an investigation   shall   be   considered   conduct detrimental to the League and will subject the offending club and responsible individual(s) to appropriate discipline.

The fact that a club self-reports a violation of the Anti-Tampering Policy should be considered a mitigating factor with respect to any discipline imposed on the club or individuals.   Conversely, if a club fails to cooperate and give its full support to an investigation, that should be considered an aggravating factor.

— A —

ADVERTISING
  Lottery and off-track betting, 1993-1

AMERICAN BOWL, 1990-2, 1991-2

ANTI-TAMPERING POLICY, 1998-13, 2000-1, 2001-3, 2004-15, 2004-16,
  2007-8, 2007-9, 2007-10, 2008-5, 2012-9, 2015-15, 2016-16

ARENA FOOTBALL LEAGUE, 2002-1

ASSESSMENTS, 1982-1

AUDIT REPORT, 1985-1


— B —

BLACKOUT POLICY, 2015-18, 2016-14


BROADCASTING
  Advertising/sponsorships, 1993-1, 1998-2, 2003-1
  Club cooperation, 1998-2, 2006-3, 2006-8, 2014-7
  DIRECTV Contract, see DIRECTV CONTRACT
  Flex Scheduling, 2006-1, 2016-1
  *Hard Knocks*/HBO, 2013-1
  Internet Distribution, 2015-2
  Network contracts, 1998-1, 2004-2, 2005-2, 2005-3, 2009-2, 2011-1
    2011-2, 2011-3, 2014-1, 2014- 2, 2015-1, 2016-15
  NFL Network, 2003-1, 2010-6, 2011-3, 2014-1,
    2014-3, 2015-1, 2016-15
  NFL Now, 2014-7
  Preseason games, 1984-1, 1994-1, 1998-6, 1998-8, 2010-1
  Radio, 1994-1, 2010-5, 2015-19, 2015-20
  Schedule, see GAME SCHEDULE
  Sirius XM Radio Contract, see SIRIUS XM SATELLITE RADIO
    CONTRACT
  Stadium signage, 2002-8
  Telecommunications, 2013-3, 2014-4
  Wireless distribution, 2008-7, 2010-4

— C —

CATASTROPHIC LOSS PROGRAM, 2002-10, 2005-10, 2008-9, 2011-25,
    2012-14, 2015-22

CLAIMS AGAINST LEAGUE, 1997-3

CLUB CONTRACTS
    Preseason games, 1994-1
    Preseason television, 1984-3, 1994-1
    Radio, 1994-1

CLUB DEBT
    Debt limit, see DEBT LIMIT
    Definition, 1988-2

CLUB DELINQUENT ACCOUNTS, 1982-1, 1984-2

CLUB MARKS, see TRADEMARKS

CLUB REPORTING
    Audit report, 1985-1, 2004-14
    Debt limit, 1996-1
    Financial statements/budget, 1990-1, 2004-14
    Ownership, 1983-2
    Super Bowl game ticket distribution, 1989-1

CLUB SEAT PREMIUMS
    Inclusion in gross receipts, 1987-1, 1995-1, 2008-1
    Pooling, 1995-1, 1995-4
    Stadium financing, 1999-2, 2003-7, 2011-16, 2012-4, 2012-7,
        2014-13
    Waiver criteria, 1994-3

COACHES' PENSION PLAN, 1983-1

COLLECTIVE BARGAINING AGREEMENT, 2008-10, 2011-26

COMMISSIONER
    Approval of uniform changes, 2002-3
    Authority over affiliate operations, 1990-3
    Authority to appoint Management Council Executive Committee Chairman
        (2007-12)
    Authority to assess club for legal fees and expenses, 1997-3
    Authority over Exempt List, 2014-10
    Preseason Scheduling Authority, 1991-1, 2001-7

CONTROLLING OWNER REQUIREMENTS, see OWNERSHIP POLICIES

CORPORATE OWNERSHIP, 1996-3

CREDIT FACILITY, 2002-2

CROSS-OWNERSHIP, 1997-1, 2004-13

CROWD NOISE, 2002-6

— D —

DEBT LIMIT, 1988-2, 1996-1, 1998-9, 1998-11, 2001-1, 2012-3, 2015-14
    Waiver, 1999-1, 2005-6, 2013-6

DEFERRED COMPENSATION, 1988-1, 1993-3

DIGITAL MEDIA CONTENT, 2015-2, 2015-19, 2016-15
    NFL Now, 2014-7

DIRECTV CONTRACT, 2003-1, 2004-1, 2009-1

DRAFT
    Draft choice asset value policy, 2005-11, 2011-24, 2012-13, 2015-21

DRAFT ELIGIBILITY, 1990-4

— E —

E-COMMERCE, 2016-4

ELIGIBILITY, 1990-4

EMPLOYEE BENEFITS
    Accidental Death Policy, 2014-16
    Medical insurance, 1997-4
    Retirement Plans, 2009-7, 2010-2
    Workers' Compensation, 2013-8

EXECUTIVE SESSION MEETINGS, 1984-4

EXPANSION, 1995-1, 1996-5, 1996-6, 1999-1, 2016-8

— F —

FANTASY FOOTBALL, 2012-2

FINANCIAL REPORTING, 1990-1, 2004-14

FINANCING
Stadium, 1999-2, 2003-7, 2011-16, 2012-4, 2012-7, 2014-13

FUND INVESTMENT COMMITTEE, 2011-14, 2013-5

— G —

G-3 STADIUM FINANCING PROGRAM, 1999-2, 2003-7, 2014-11

G-4 STADIUM FINANCING PROGRAM, 2011-16, 2012-4, 2012-7

GAMBLING
Lottery advertising, 1993-1, 2009-3

GAME SCHEDULE
General, 1998-5, 2000-4, 2006-1, 2009-10, 2016-1
International games, 1990-2, 2006-6, 2011-22, 2014-11, 2015-16, 2016-12
Preseason games, 1991-1, 1998-6, 2001-2, 2001-7, 2006-5

GROSS GATE RECEIPTS
Calculation, 1987-1, 1987-3, 1995-1, 2001-2, 2012-11, 2014-8, 2015-18, 2016-14
Postseason, 1987-2

— H —

HALL OF FAME GAME, 1998-7

HEADSETS, 2014-4

— I —

IN-STADIUM GIVEAWAYS, 1985-3

INSURANCE
    Accidental Death Policy, 2014-16
    Draft choice asset value policy, 2005-11, 2011-24, 2012-13, 2015-21
    Workers' Compensation, 2013-8

INTEREST ON CLUB DELINQUENT ACCOUNTS, 1984-2

INTERNATIONAL
    American Bowl, 1991-2
    Business objectives, 1993-7
    Funding, 1998-10
    Game scheduling and administration, 1990-2, 2006-6, 2008-6, 2011-22,
        2012-10, 2014-11, 2015-16, 2016-12
    NFL Europe, 2003-6
    Television revenue, 1998-10, 2007-4
    United Kingdom, 2011-22, 2014-11, 2015-2, 2015-16, 2016-12


INTERNET NETWORK, 2001-8, 2004-3, 2006-8, 2007-3, 2010-1, 2011-4,
    2014-7
    Wireless distribution, 2005-4, 2008-7, 2010-4

— L —

LEAGUE MARKS, see TRADEMARKS

LEAGUE TAX STATUS, 2015-4

LEAGUE-WIDE CREDIT FACILITY, 2002-2

LEASES, see STADIUM LEASES

LEGAL FEES, 1997-3

LICENSING OF TRADEMARKS, see TRADEMARKS

LIMITED LIABILITY COMPANIES
    Ownership requirements, 1998-12

LIMITED PARTNERSHIPS
    Ownership requirements, 1985-2, 1996-2

LITIGATION EXPENSES, 1997-3

LOCATION-BASED ENTERTAINMENT VENTURE, 1997-5

LOS ANGELES FRANCHISE, 1995-1, 2016-1, 2016-6, 2016-7


— M —

MANAGEMENT COUNCIL, 1990-3, 2007-12, 2015-4

MEETINGS
   Executive Session, 1984-4

MONDAY NIGHT FOOTBALL, 1998-5


— N —

NETWORK TELEVISION CONTRACTS, 1998-1, 2004-2, 2005-2, 2005-3,
   2009-2, 2010-6, 2011-1, 2011-2, 2011-3, 2014-1,
   2014-3, 2015-1, 2016-15

NFL ATTRACTIONS, 1997-5

NFL ENTERPRISES, see NFL VENTURES

NFL EUROPE, 2003-6

NFL FILMS, 1990-3, 2013-1

NFL INTERNET NETWORK, see INTERNET NETWORK

NFL NETWORK, 2010-6, 2011-3, 2014-1, 2014-3, 2015-1, 2016-15

NFL NOW, 2014-7

NFLSHOP.COM, 2016-4

NFL TICKET EXCHANGE, 2012-1

NFL PROPERTIES, 1990-3
   Reebok Joint Venture, 2000-5, 2001-14
   Fanatics, 2016-4

NFL VENTURES (FORMERLY KNOWN AS NFL ENTERPRISES), 1994-2,
   1998-10, 2012-4, 2013-3, 2014-4

NON-PLAYER EMPLOYEES, 2010-2

— O —

OFF-TRACK BETTING ORGANIZATIONS
    Advertising, 1993-1

OWNERSHIP POLICIES, 1985-2
    Acquisition debt, 1998-11, 2001-1, 2012-3, 2015-14
    Aggregation of Principal Owner's interests with those of immediate family
        members, 2004-11, 2009-9, 2011-12, 2015-7
    Corporations, 1996-3
    Cross ownership, 1997-1, 2004-13
    Family companies/trusts, 1996-2, 1996-3, 1998-12, 2004-11
    Limited liability companies, 1998-12
    Limited partnerships, 1996-2
    Primary purpose requirement, 1993-6, 2005-1
    Relocated Franchise, 2016-7, 2016-12
    Reporting requirements, 1983-2
    Succession Planning, 2011-12

OWNERSHIP REPORT, 1983-2

— P —

PERMANENT SEAT LICENSES (PSLs), 1995-1, 1996-5, 1996-6, 1999-1,
    1999-2, 2003-7, 2011-16, 2012-4, 2012-7, 2014-13

PERSONAL CONDUCT POLICY, 2014-10

PLAYER BENEFITS, 1977-1, 1978-1, 2002-10, 2007-11, 2011-25,
    2012-14, 2014-16, 2015-22

PLAYER CONDUCT
    Personal Conduct Policy, 2014-10
    Unsportsmanlike conduct, 2000-3

PLAYER STOCKING PLAN, 1999-1

POOLED REVENUE, see REVENUE SHARING

POSTSEASON
    Calculation of gross gate receipts, 1987-2
    Game revenue distribution, 1977-1, 1978-1, 1983-1
    Season Ticket Holders, 2014-9, 2015-3
    Super Bowl game, see SUPER BOWL GAME

PRACTICE SQUAD, 2004-18, 2005-7, 2006-15

PRESEASON
   American Bowl, 1990-2, 1991-2
   Game contracts, 1994-1, 2001-2
   Nationally televised games, 1998-1
   Payments for nationally televised games, 1998-8
   Scheduling, 1991-1, 1998-6, 2001-2, 2001-7, 2006-5
   Telecast consent, 1984-1
   Television rights contracts, 1984-3, 1994-1, 2003-1, 2010-1

PRIMARY PURPOSE REQUIREMENT, 1993-6
   Club-dedicated networks, 2005-1

PROMOTIONS
   In-stadium giveaways, 1985-3


— R —

RADIO
   Club contracts, 1994-1

REALIGNMENT, 1995-1, 1996-6, 1999-1, 2001-7

REEBOK JOINT VENTURE, 2000-5, 2001-14

RELOCATION,
   Browns/Ravens, 1996-5
   Chargers, 2016-9
   Los Angeles, 2016-7, 2016-9
   Oilers/Titans, 1996-6
   Raiders, 2016-9
   Rams, 1995-1, 2016-9

RELOCATION FEES, 1995-1, 1996-5, 1996-6

REVENUE SHARING, 1995-4, 2001-2, 2006-9, 2007-5, 2011-26


— S —

SATELLITE
   Radio, see SIRIUS XM SATELLITE RADIO CONTRACT
   Television, see DIRECTV CONTRACT

SCHEDULING, see GAME SCHEDULE

SIDELINES, LEAGUE CONTROL, 2002-8, 2013-3
    Headsets, 2014-4

SIRIUS XM SATELLITE RADIO CONTRACT, 2003-4, 2010-5, 2015-20

STADIUM FINANCING, see G-3 STADIUM FINANCING PROGRAM and
    G-4 STADIUM FINANCING PROGRAM

STADIUM LEASES, 1988-3

STRATEGIC INVESTMENT FUND, 2011-14, 2013-5

STRIKE FUND, 1993-2

SUPER BOWL GAME
    Site selection, 1991-3, 1999-1
    Team ticket report, 1989-1
    Ticket distribution, 1989-1, 1998-14, 2016-6


                                    — T —

TELECOMMUNICATIONS, 2013-3, 2014-4

TELEVISION CONTRACTS, see BROADCASTING

TELEVISION REVENUE
    Distribution, 1977-1, 1983-1
    International, 1998-10, 2007-4, 2011-22, 2015-16
    Preseason, 1998-1, 1998-8
    Relocated franchise, 1995-1

THANKSGIVING GAMES, 1998-5

THURSDAY NIGHT FOOTBALL, 2014-1, 2015-1, 2016-15
    Uniforms, 2014-11

TICKETMASTER AGREEMENT, 2012-1

TICKETS
    Base ticket manifest, 2012-11, 2014-8, 2015-18, 2016-14
    NFL Online Ticket Exchange, 2007-1, 2007-2, 2012-1
    Season Ticket Holders, 2014-9, 2015-3
    Super Bowl game, 1989-1, 1998-14, 2016-6

TRADEMARKS, 2004-3, 2011-4, 2013-3, 2016-4

TRADES FOR CASH, 1982-2, 2001-15

— U —

UNIFORM DESIGN, 2002-3, 2003-5, 2014-11

UNSPORTSMANLIKE CONDUCT, 2000-3, 2014-10

— V —

VISITING TEAM SHARE
    Calculation of gross gate receipts, 1987-1, 1987-3, 1995-4, 2001-2, 2008-3
        2012-11, 2014-8, 2015-18, 2016-14
    International, 2011-22, 2015-16
    Pooling, 1995-4, 2001-2
    Postseason, 1987-2
    Relocated franchise, 1996-6
    Waiver, 1987-1, 1994-3, 1999-1, 1999-2, 2003-4, 2011-16, 2012-4,
        2012-7, 2014-13