**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ X

BRIAN FLORES, STEVE WILKS and RAY　　　　：
HORTON, as Class Representatives, on behalf of　：
themselves and all others similarly situated,　　　：
　　　　　　　　　　　　　　　　　　　　　　：
　　　　　　　　　　　　　Plaintiffs,　　　　：
　　　　　　　　　　　　　　　　　　　　　　：
　　　　　v.　　　　　　　　　　　　　　　　：
　　　　　　　　　　　　　　　　　　　　　　：
THE NATIONAL FOOTBALL LEAGUE; NEW　：　　Civil Action No.: 22-cv-00871 (VEC)
YORK FOOTBALL GIANTS, INC. d/b/a NEW　：
YORK GIANTS; MIAMI DOLPHINS, LTD.　　：
d/b/a MIAMI DOLPHINS; DENVER BRONCOS ：
FOOTBALL CLUB d/b/a DENVER BRONCOS; ：　**ORAL ARGUMENT REQUESTED**
HOUSTON NFL HOLDINGS, L.P. d/b/a　　　：
HOUSTON TEXANS; ARIZONA CARDINALS　：
FOOTBALL CLUB LLC d/b/a ARIZONA　　　：
CARDINALS; TENNESSEE TITANS　　　　　：
ENTERTAINMENT, INC. d/b/a TENNESSEE　：
TITANS and JOHN DOE TEAMS 1 through 26,　：
　　　　　　　　　　　　　　　　　　　　　　：
　　　　　　　　　　　　　Defendants.　　　：
------------------------------------------------------------ X

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO**
**COMPEL ARBITRATION AND STAY FURTHER PROCEEDINGS**

**WIGDOR LLP**　　　　　　　　**ELEFTERAKIS, ELEFTERAKIS & PANEK**

Douglas H. Wigdor　　　　　　　John Elefterakis
Michael J. Willemin　　　　　　　Nicholas Elefterakis
David E. Gottlieb　　　　　　　　Raymond Panek
　　　　　　　　　　　　　　　　Johnson Atkinson

85 Fifth Avenue
New York, NY 10003　　　　　　　80 Pine Street, 38th Floor
Telephone: (212) 257-6800　　　　New York, New York 10005
Facsimile: (212) 257-6845　　　　　Telephone: (212) 532-1116
dwigdor@wigdorlaw.com　　　　　Facsimile: (212) 532-1176
mwillemin@wigdorlaw.com
dgottlieb@wigdorlaw.com　　　　　*Counsel for Plaintiffs*

*Counsel for Plaintiffs*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND ...................................................................................................................2

ARGUMENT .........................................................................................................................5

I.      Arbitration Agreements Are Not Entitled to "Special" Treatment .......................5

II.     The Arbitration Agreements Are Wholly Unconscionable ...................................5

        A.      The Commissioner is Obviously Biased ..................................................6

        B.      The Arbitration Agreements are Unconscionable .....................................8

        C.      The Arbitration Agreements Preclude Effective Vindication of Statutory
                Rights and Undermine Congressional Intent ..........................................15

III.    Even if Defendants Argue that the Commissioner Can Delegate His Role as
        Arbitrator to JAMS, the DRPG Fails to Provide an Available Forum ...............17

IV.     The NFL is Not a Party to or Beneficiary of the Arbitration Agreements .........19

        A.      The NFL Is Not a Party to Any Contract or Arbitration Agreement ....19

        B.      The NFL Is Not Covered Under the Relevant Arbitration Provisions as a
                Third-Party Beneficiary .........................................................................20

V.      Mr. Flores' Claims Against the Broncos, Giants and Texans, and Post-Termination
        Claims Against the Dolphins Are Not Covered Under Any Arbitration Agreement ........24

        A.      Mr. Flores' Claims Against the Broncos, Giants and Texans...............24

        B.      Mr. Flores' Post-Employment Claims Against the Dolphins ...............25

CONCLUSION....................................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                   <u>Page(s)</u>

<u>Am. Exp. Co. v. Italian Colors Rest.</u>,
    570 U.S. 228 (2013)................................................................................. 5, 15, 17

<u>Armendariz v. Found. Health Psychcare Servs., Inc.</u>,
    24 Cal. 4th 83 (Cal. 2000)................................................................................ 6

<u>Bogen Comm., Inc. v. Tri-Signal Integration, Inc.</u>,
    227 F. App'x 159 (3d Cir. 2007) ...................................................................... 25

<u>Brower v. Gateway 2000, Inc.</u>,
    676 N.Y.S.2d 569 (1st Dep't 1998) ................................................................... 8

<u>Choctaw Generation Ltd. P'ship v. Am. Home Assur. Co.</u>,
    271 F.3d 403 (2d Cir. 2001)............................................................................. 22

<u>Cole v. Burns Intern. Sec. Services</u>,
    105 F. 3d 1465 (D.C. Cir. 1997)................................................................... 15, 16

<u>CPR (USA) Inc. v. Spray</u>,
    187 F.3d 245 (2d Cir. 1999)........................................................................ 24, 25

<u>De Jesus v. Gregorys Coffee Mgmt., LLC</u>,
    No. 20 Civ. 6305 (MKB), 2021 WL 5591026 (E.D.N.Y. Nov. 29, 2021) ................................. 8

<u>De Malmanche v. Glenrock Asset Mgmt. Assocs., L.P.</u>,
    No. 07 Civ. 10940 (KNF), 2010 WL 2541495 (S.D.N.Y. June 22, 2010) .............................. 19

<u>Doctor's Assocs., Inc. v. Casarotto</u>,
    517 U.S. 681 (1996)....................................................................................... 5

<u>Doe v. Trump Corp.</u>,
    6 F.4th 400 (2d Cir. 2021) ..................................................................... 20, 21, 22, 23

<u>Dreyfuss v. Etelecare Global Solutions–U.S. Inc.</u>,
    349 F. App'x. 551 (2d Cir. 2009) ...................................................................... 9

<u>Floss v. Ryan's Family Steak Houses</u>,
    211 F. 3d 306 (6th Cir. 2000) .......................................................................... 12

<u>Gillman v. Chase Manhattan Bank N.A.</u>,
    73 N.Y.2d 1 (1988)........................................................................................ 8

Gilmer v. Interstate/Johnson Lane Corp.,
  500 U.S. 20 (1991) ............................................................................................ 5, 6

Graham v. Scissor-Tail, Inc.,
  28 Cal. 3d 807 (Cal. 1981) ...................................................................................... 15

Green Tree Fin. Corp.-Alabama v. Randolph,
  531 U.S. 79 (2000) ...................................................................................................... 16

Hooters of America Inc. v. Phillips,
  173 F. 3d 933 (4th Cir. 1999) .................................................................................. 11

In re Currency Conversion Fee Antitrust Litig.,
  361 F. Supp.2d 237 (S.D.N.Y. 2005) ........................................................................ 20

In re Salomon Inc. Shareholders' Derivative Litig. 91 Civ. 5500 (RRP),
  68 F.3d 554 (2d Cir. 1995) ................................................................................ 17, 19

Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.,
  462 F.2d 673 (2d Cir. 1972) ...................................................................................... 9

Korody Marine Corp. v. Mins. & Chem. Philipp Corp.,
  300 F.2d 124 (2d Cir. 1962) .................................................................................... 25

Kosson v. Algaze,
  610 N.Y.S.2d 227 (1st Dep't 1994) ........................................................................ 5

Litton Fin. Printing Div. v. NLRB,
  501 U.S. 190 (1991) .................................................................................................. 24

McMullen v. Meijer, Inc.,
  355 F.3d 485 (6th Cir. 2004) ............................................................................ 13, 14

Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,
  473 U.S. 614 (1985) .................................................................................................. 15

Neely v. Bechtel Corp.,
  No. 1:07-CV-0907-WKWWO, 2008 WL 2120085 (M.D. Ala. May 20, 2008) ...................... 25

New York Gaslight Club, Inc. v. Carey,
  447 U.S. 54 (1980) .................................................................................................... 16

Opals on Ice Lingerie v. Body Lines Inc.,
  320 F.3d 362 (2d Cir. 2003) ...................................................................................... 5

Pokorny v. Quixtar, Inc.,
  601 F. 3d 987 (9th Cir. 2010) .................................................................................... 14

Ragone v. Atl. Video at Manhattan Ctr.,
  595 F.3d 115 (2d Cir. 2010) ........................................................................... 8, 15, 22

Relevent Sports, LLC v. United States Soccer Fed'n, Inc.,
  No. 19 Civ. 8359 (VEC), 2020 WL 4194962 (S.D.N.Y. July 20, 2020) ................................ 18

Rent–A–Center, West, Inc. v. Jackson,
  561 U.S. 63 (2010) ................................................................................................. 5

Ross v. Am. Exp. Co.,
  547 F.3d 137 (2d Cir. 2008) ..................................................................................... 23

Saizhang Guan v. Uber Techs., Inc.,
  236 F. Supp. 3d 711 (E.D.N.Y. 2017) ........................................................................... 5

Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.,
  198 F.3d 88 (2d Cir. 1999) ...................................................................................... 20

State v. Wolowitz,
  468 N.Y.S.2d 131 (1983) ........................................................................................... 8

TradeComet.com LLC v. Google, Inc.,
  435 F. App'x 31 (2d Cir. 2011) ................................................................................. 20

Walker v. Ryan's Family Steak Houses,
  400 F.3d 370 (6th Cir. 2005) .......................................................................... 12, 13, 16

Weinstein v. Jenny Craig Op., Inc.,
  No. 105520/11, 2014 WL 10680367 (N.Y. Cty. Sup. Ct. Sep. 08, 2014) .............................. 20

Williams v. Cigna Fin. Advisors Inc.,
  197 F.3d 752 (5th Cir. 1999) .................................................................................... 16

Other Authorities

9 U.S.C.A. §2 ....................................................................................................... 5

Plaintiffs Brian Flores, Steve Wilks and Ray Horton, by and through their counsel, respectfully submit this Memorandum of Law in Opposition to Defendants' Motion to Compel Arbitration and Stay Further Proceedings (the "Motion").  Defendants' Motion should be denied.

## PRELIMINARY STATEMENT

While the Supreme Court has approved arbitration for resolution of statutory disputes, it has not licensed employers to create unconscionably biased one-sided "kangaroo courts" that bear no resemblance to a neutral judicial forum and fail to comport with basic principles of fairness.  But that is exactly what the National Football League ("NFL") and the other Defendants are asking the Court to approve.  Defendants have selected the NFL's Commissioner as the person to oversee and rule on a dispute as to whether the NFL and teams have engaged in systemic discrimination.  Nobody could credibly argue that the Commissioner could somehow act objectively when he (amongst other things): (i) has earned hundreds of millions of dollars from the teams (and presumably will continue to do so); (ii) will be a witness in this matter; and (iii) has already issued a public statement that Plaintiffs' allegations are "without merit." Equally vexing is the NFL's request that the claims against it should be arbitrated.  The NFL is not a party to any arbitration agreement, and, in fact, made the conscious decision to exclude itself from the list of parties against whom Plaintiffs would have to arbitrate claims.  This is, of course, because the NFL understands that it cannot require parties to arbitrate disputes against it while simultaneously serving as the arbiter of those disputes.

In short, Defendants ask the Court to deviate from established authority and societal norms to create a new and unprecedented rule that arbitration should be approved no matter how biased and unfair the process—a rule that will embolden employers to create manifestly unfair arbitrations with assurance that they will be approved by the courts; a rule that will lead to untold

numbers of people who will lose the ability to effectively vindicate their statutory rights; a rule that will undermine Congressional intent underlying the anti-discrimination laws and the Civil Rights Era that led to their momentous passage.  If the Court compels arbitration, scores of employers following this case, and those who learn of it, will undoubtedly change their arbitration clauses to permit the appointment of an obviously biased decisionmaker.

## **BACKGROUND**

The NFL has a long history of systemic discrimination in the hiring and retention of NFL coaches and executives.  Even the NFL's most senior executives have acknowledged that the NFL has a problem with racism in the coaching ranks.  See Ex. A at ¶ 7.[1]  This problem has manifested itself in the lack of meaningful opportunities for Black coaches despite a majority of Black players.  By the end of the 2002 season, the NFL had three Black head coaches out of 32 teams.  Id. at ¶ 116.  Following a deluge of public pressure, the NFL instituted what has become known as the "Rooney Rule," literally *forcing* teams to interview minority candidates.  Id. at ¶¶ 116-119.  Even this has failed, as when this action was filed 20 years later there was only one Black head coach.  Id. at ¶ 127.  Black candidates who overcome these odds and obtain head coaching jobs are given limited opportunities to succeed.  Id. at ¶¶ 138-141.

Plaintiffs are three representatives of the Black community who have been marginalized by the NFL's institutional racism.  Coach Flores was subjected to a sham interview by the Denver Broncos (id. at ¶¶ 200-206), unlawfully terminated by the Miami Dolphins after a winning season (id. at ¶¶ 174-177), subjected to a sham interview and not hired by the New York Giants (id. at ¶¶ 178-199), retaliated against by the Dolphins after filing this action (id. at ¶¶ 219-226), and then further retaliated against by the Houston Texans (id. at ¶¶ 207-218).  Coach Wilks

---

[1]      References herein to "Ex. __" refer to Exhibits attached to the Decl. of Douglas H. Wigdor in Opposition to Defendants' Motion.  All references to "Defs.' Br." and "Defs.' Ex. __" refer to Dkt. Nos. 48 and 50, respectively.

was unlawfully terminated by the Arizona Cardinals after just one season.  Id. at ¶¶ 231-258.

Coach Horton was subjected to a sham interview and unlawfully denied a position as head coach

of the Tennessee Titans.  Id. at ¶¶ 268-284.  Many other Black coaches and executives have been

subjected to an array of similar conduct, examples of which are set forth in detail in the

Complaint.  Id. at ¶¶285-336.  Despite this, after this action was filed the NFL immediately

issued a public statement stating that the allegations are "without merit."  Id. at ¶355; Ex. B.

        The NFL's lack of transparency and unwillingness to accept accountability is evidenced

by their contention that Plaintiffs' claims should not be litigated with the inherent fairness of a

judicial proceeding, heard in a public forum or decided by a jury of peers.  Instead, Defendants

argue, Plaintiffs' claims should be forced into a closed-door proceeding where Roger Goodell,

the Commissioner of the NFL who has been paid hundreds of millions of dollars by the NFL,

will preside over the case.  If Defendants have their way, Mr. Goodell will decide all matters

related to this dispute, including the way in which claims will proceed, the discovery that will be

exchanged, the confidentiality of the proceedings and ultimately a determination on the merits.

        Plaintiffs entered into employment contracts with the teams they each coached and each

of those contracts contained purported arbitration agreements.  Relevant here, Mr. Flores entered

into an employment contract with the Miami Dolphins, Mr. Wilks with the Arizona Cardinals,

and Mr. Horton with the Tennessee Titans (together, the "Relevant Employment Contracts").

The arbitration agreement in contract expressly limits arbitration to disputes between the coach

and the respective team.  See Defs.' Ex. 2 at §12.2; Defs.' Ex. 5 at §10(a); Defs.' Ex. 7.

        The Flores-Dolphins and the Wilks-Cardinals contracts attach and incorporate NFL

Dispute Resolution Procedural Guidelines ("DRPG"); the Horton-Titans contract makes no

mention of the DRPG.  Id.[2]  The DRPG (not applicable to Coach Horton) provides that all applicable disputes are subject to an initial arbitral ruling by the NFL Commissioner as to whether the dispute is "football-oriented" or "not football-oriented."  A dispute is "football-oriented" if it arises out of the Constitution or any NFL or Club policies, rules or regulations.  If the Commissioner rules that the dispute is "football-oriented," the dispute will be resolved pursuant to the rules of the DRPG and the Commissioner will continue to serve as arbitrator.  If the Commissioner rules that the dispute is "not football-oriented," the arbitration *may*, in his discretion, proceed to JAMS, pursuant to its Comprehensive Arbitration Rules and Procedures. The Commissioner makes the football-oriented ruling "in his sole discretion" following submissions from the parties.  See e.g. Defs.' Ex. 2 at p. 12, §§1.5-1.8.[3]

The NFL is neither a party to the Relevant Employment Contracts nor listed as a beneficiary in any of the dispute resolution provisions.  Id.  The Relevant Employment Contracts do, however, incorporate by reference the NFL Constitution and Bylaws ("NFL Constitution"), which has its own dispute resolution provision and vests the Commissioner—and only the Commissioner—with the power to resolve certain categories of disputes, including disputes between coaches and teams.  See Defs.' Ex. 1 at §8.3(B) ("Section 8.3").  Nothing in Section 8.3 gives the Commissioner jurisdiction over disputes between coaches and the NFL.  Id.  In fact, Section 8.3 carefully details the parties that must arbitrate claims against each other, and not only are claims by coaches against the NFL not covered, no claims against the NFL are covered.

---

[2]     The only purported Horton-Titans arbitration agreement is one sentence stating, "You and the Titans agree that all matters in dispute between You and the Titans shall be referred to the Commissioner and his decisions shall be accepted as final, complete, conclusive, binding and unappealable by You and the Titans."  Defs.' Ex. 7 at §6(a). This fails for all the reasons set forth below, including lack of definiteness of essential terms.  See infra at n. 7.

[3]     In the Wilks-Cardinals contract, the "football-oriented" determination provision is contained in the contract itself (see Defs.' Ex. 5 at §10), not in the attached DRPG.

**ARGUMENT**

**I.       Arbitration Agreements Are Not Entitled to "Special" Treatment**

It is a "fundamental principle that arbitration is a matter of contract."  Rent–A–Center,
West, Inc. v. Jackson, 561 U.S. 63, 67 (2010); see also Am. Exp. Co. v. Italian Colors Rest., 570
U.S. 228, 233 (2013) (The Federal Arbitration Act ("FAA") "reflects the overarching principle
that arbitration is a matter of contract.").  The FAA *does not* put arbitration agreements on a
"pedestal" or give them any "special footing."  See Gilmer v. Interstate/Johnson Lane Corp., 500
U.S. 20, 33 (1991) (the FAA "place[d] arbitration agreements on the same footing as other
contracts."); Opals on Ice Lingerie v. Body Lines Inc., 320 F.3d 362, 369 (2d Cir. 2003)
(observing that arbitration agreements are "as enforceable as other contracts, but not more so.").

The FAA expressly states that arbitration agreements are not enforceable "upon such
grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C.A. §2; see also
Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996) (agreements "may be invalidated
by generally applicable contract defenses, such as . . . unconscionability.").  Whether a valid and
enforceable arbitration agreement exists is a question of state contract law.  See e.g. Saizhang
Guan v. Uber Techs., Inc., 236 F. Supp. 3d 711, 729 (E.D.N.Y. 2017).  The burden rests on the
party seeking to compel arbitration.  See e.g. Kosson v. Algaze, 610 N.Y.S.2d 227, 228 (1st
Dep't 1994) ("[i]t is black letter law that the burden of proving the existence, terms and validity
of a contract rests on the party seeking to enforce it").

**II.      The Arbitration Agreements Are Wholly Unconscionable**

The agreements at issue are wholly unconscionable by virtue of delegating unfettered
decision-making power in the hands of the NFL's Commissioner and is otherwise so lacking in
basic fairness that Plaintiffs are unable to effectively vindicate their statutory rights.

A.      <u>**The Commissioner is Obviously Biased**</u>

The Arbitration Agreements[4] are so grossly and manifestly unfair in creating a dispute resolution process bearing no resemblance whatsoever to a neutral judicial proceeding. Specifically, the Arbitration Agreements completely fail to provide for a neutral or impartial decisionmaker—which should be the most basic and minimal requirement of a substitute for a judicial forum where statutory rights are at issue.  <u>See</u> <u>Gilmer</u>, 500 U.S. at 30 (approving arbitration for discrimination cases in part on the fact that arbitration rules "provide protections against biased panels"); <u>see</u> <u>also</u> <u>Armendariz v. Found. Health Psychcare Servs., Inc.</u>, 24 Cal. 4th 83, 102 (Cal. 2000) (arbitration agreements unenforceable absent, *inter alia*, neutral arbitrators and reasonable discovery) (citing <u>Gilmer</u>, 500 U.S. at 30).  Absent an impartial decisionmaker, arbitration becomes nothing more than "kangaroo court" that is lopsided and an absolute sham.

To say that Mr. Goodell is biased in favor of the NFL and its teams is so obvious it hardly needs to be debated—Mr. Goodell, as the Commissioner, *is the NFL* in all regards.  The proposition that *a party to a dispute* can be the decisionmaker is directly at odds with every possible conception of fundamental fairness.  He is fully professionally and financially beholden to the NFL and its teams.  The financial and professional incentives for Mr. Goodell to act in the NFL's interest are so overwhelming that no reasonable person could consider him impartial.

First, Mr. Goodell is a direct employee of the NFL.  As Commissioner, it is Mr. Goodell's job to act in the NFL's interest; he is the NFL's chief executive and fiduciary.  It would be completely *contrary* to the NFL's best interest—both financially, reputationally and otherwise—for there to be any finding whatsoever that the NFL or its teams engage in systemic discrimination against Black coaches.  It would also be contrary to the NFL's best interest for

---

[4]      For ease, where applicable, the dispute resolution provisions of the Relevant Employment Contracts, DRPG and Section 8.3, are referred to collectively as the "Arbitration Agreements."

Plaintiffs to be afforded the necessary pre-hearing discovery to support their case.  And there are scores of other pre-hearing decisions Mr. Goodell would be obligated to make which would directly pit Mr. Goodell's fiduciary obligations in conflict with the role of an impartial arbitrator.

Second, as the NFL's chief executive, Mr. Goodell is employed by and reports directly to the member teams and serves as Commissioner at their leisure.  See Defs.' Ex. 1 at §8.1 (the Commissioner is determined by affirmative vote of not less than two-thirds of the member teams).  Those teams can terminate his position at any time and for any reason.  Mr. Goodell cannot possibly be impartial in the numerous decisions and findings he will be asked to make *against* the same teams who are responsible for his position as Commissioner.

Third, Mr. Goodell has substantial financial and professional incentive to please the NFL and its member teams.  As Commissioner, Mr. Goodell has reportedly been paid $127.8 million over just the last two years and it has been reported this year that he is negotiating a new contract.  See e.g. Exs. C-F.  Mr. Goodell therefore has a massive ongoing financial motivation to remain in the NFL's "good graces."

Fourth, this is not a situation where there is mere "risk" or "potential" for bias.  The NFL over which Mr. Goodell presides has already publicly released its position on this entire case, stating that the allegations are "without merit."  See Ex. A at ¶ 355; Ex. B.  Even if the NFL claims that Mr. Goodell never personally contributed to these remarks (something for which we have sought discovery), the NFL's Public Relations Department is established and employed by Mr. Goodell, and reports to him.  See Defs.' Ex. 1 at §8.8.  Mr. Goodell cannot possibly claim to be unbiased or impartial when the NFL and his office have already stated that the allegations are "without merit" mere hours after the Complaint in this action was filed.

Fifth, Mr. Goodell will be a witness in this matter, and asked to turn over documents from his corporate and personal files.  Plaintiffs will also call him to testify at depositions and/or at a hearing on the merits.  Mr. Goodell cannot objectively preside over these issues, let alone assess the credibility of his own testimony or rule on the appropriateness of his own conduct.

Put together, the level of blatant conflict, bias and partiality here is both overwhelming and astounding.  Defendants' contention otherwise is self-serving and unreasonable.

## B.    The Arbitration Agreements are Unconscionable[5]

Under New York law, a contract is unconscionable when it is "so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable."  See e.g. De Jesus v. Gregorys Coffee Mgmt., LLC, No. 20 Civ. 6305 (MKB), 2021 WL 5591026, at *4 (E.D.N.Y. Nov. 29, 2021) (quoting Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 121 (2d Cir. 2010)).[6]  Respectfully, it would be hard to imagine a societal convention more critical to fundamental fairness than the requirement that legal disputes— particularly those regarding violations of important statutory rights like the anti-discrimination laws—be resolved in a fair and impartial forum and by a neutral, unbiased decisionmaker.

---

[5]    Defendants do not commit to either the DRPG or Section 8.3 as being operative, but it is of no moment as both dictate the Commissioner to be the arbitrator.  Under the DRPG, while arguably Mr. Goodell could use his "sole discretion" to determine that the dispute is not "football-oriented" and delegate the matter to JAMS, such a process still ensures that Mr. Goodell act as arbitrator in the first instance.  Given Mr. Goodell's blatant bias, it would be unconscionable for him to have discretion and decision-making authority over any aspect of this litigation.
[6]    For the reasons described herein, the Arbitration Agreements are procedurally and substantively unconscionable.  However, the Second Circuit and New York courts have held that while "determinations of unconscionability are ordinarily based on [a] conclusion that both the procedural and substantive components are present . . . there have been exceptional cases where a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone."  Ragone, 595 F.3d at 122 (quoting Gillman v. Chase Manhattan Bank N.A., 73 N.Y.2d 1, 12 (1988)); Brower v. Gateway 2000, Inc., 676 N.Y.S.2d 569, 574 (1st Dep't 1998) ("substantive element alone may be sufficient to render the terms of the provision at issue unenforceable."); State v. Wolowitz, 468 N.Y.S.2d 131, 145 (1983) ("it can be said that procedural and substantive unconscionability operate on a 'sliding scale' . . . a contractual term [may be] so outrageous and oppressive as to warrant a finding of unconscionability irrespective of the contract formation process").

Under either the DRPG or Section 8.3, Mr. Goodell is the delegated arbitrator—that alone renders the entirety of the Arbitration Agreements unconscionable as it vests in a biased decisionmaker numerous decisions related to discovery, confidentiality, procedure and ultimate determination on the merits.  In addition, Section 8.3 provides no safeguards.  It does not provide for *any* entitlement to discovery or *any* rules of procedure whatsoever.[7]  Section 8.3 does not even require that the Commissioner preside over an arbitral proceeding in an impartial manner.  Moreover, nothing in the Constitution prevents the teams from retaliating against or punishing the Commissioner based on his arbitral decisions.

The Relevant Employment Contracts' references to the Constitution suffers from the same unconscionability.  As an initial matter, the Constitution was not attached to the contracts nor were instructions on where to access the document provided.  Defendants do not contend that Plaintiffs were ever provided a copy of the Constitution or told how it could be accessed.  Moreover, the Relevant Employment Contracts state only that the coaches are required to comply with and be bound by the Constitution, but not the teams.  See Defs.' Ex. 2 at §12.1 ("Employee agrees to comply . . . and to be bound by, the Constitution…"); Defs.' Ex. 5 at §9(a) (same); Defs.' Ex. 7 at §6(a) (same).  The Relevant Employment Contracts also require Plaintiffs to comply with the Constitution as it may be amended, but neither the teams nor the NFL have any obligation to provide notice of changes.  See id.

---

[7]      In fact, courts have held that agreements of this type also fail for lack of definiteness.  An arbitration agreement fails for indefiniteness if it does not establish a "range of matters relevant to the conduct of arbitration proceedings" including "'the [arbitral] forum, the identity and method of selecting arbitrators, apportionment of fees, arbitration procedures, choice of law, and the like.'"  Dreyfuss v. Etelecare Global Solutions–U.S. Inc., 349 F. App'x. 551, 553 (2d Cir. 2009); see also e.g. Interocean Shipping Co. v. Nat'l Shipping & Trading Corp., 462 F.2d 673, 676 (2d Cir. 1972) ("Under the general principles of contract law, there is no contract if the parties fail to agree on all the essential terms or if some of the terms are too indefinite to be enforceable").

Plaintiffs' rights fare no better under the Relevant Employment Contracts or DRPG.  A DRPG-governed proceeding is left in the discretionary hands of the Commissioner.  There is no entitlement to *any* discovery.  See Defs.' Exs. 2 and 5 at §6.1 ("the Commissioner may in his discretion or at the request of a party, permit, limit or disallow discovery. . .").  Furthermore, there is no procedural fairness of the arbitration hearing, which is also left to the complete discretion of the Commissioner.  See Defs.' Ex. 2 and 5 at §9.1 ("The Commissioner shall determine the manner in which the parties shall present their cases.").  The DRPG also permits the Commissioner to delegate any aspect of his role to a person on his "staff," without requiring that the designee is fair, impartial or unbiased.  See Defs.' Ex. 2 and 5 at §3.2.  And, the Commissioner may, in his sole discretion, hire any employee to be on his "staff" that he deems necessary.  See Defs.' Ex. 1 at §8.4(A).  These are mere examples, as the Commissioner's full and complete discretion—riddled with obvious bias—permeates every aspect of the DRPG.

The case law addressing this precise issue is understandably limited—few organizations have the gall to appoint their own chief executive to be an arbitrator in claims asserted against them.  Courts that have addressed this arrangement have found unconscionability.  See e.g. Gruden v. NFL, No. A-21-844043-B, Dkt. No. 52 at p. 30 (Nev. Dist. Ct., Clark Cty., May 25, 2022), (based on Section 8.3, "the enforcement of the arbitration would be unconscionable both procedurally, as well as substative[ly]."), see Ex. G; Nostalgic Partners, LLC v. New York Yankees Partnership, et al., No. 656724/2020 (BO), Dkt. No. 108 at p. 2, Dkt. No. 110 at p. 26 (N.Y. Cty. Sup. Ct. Dec. 17, 2021) ("Based on the appearance of impropriety, the Commissioner of Major League Baseball should not arbitrate a dispute of claims that are asserted against Major League Baseball"), see Exs. H and I.

However, the case law is rife with courts invalidating arbitration agreements as unconscionable when the arbitration proceedings lack appropriate fairness.  Even in the cases cited below, the unfairness is "tame" compared to the rigged system proposed by here in which the Commissioner wields despotic control over all aspects of the proceedings.

In <u>Hooters of America Inc. v. Phillips</u>, 173 F. 3d 933 (4th Cir. 1999) the court invalidated an arbitration agreement that did not provide a "system whereby disputes are fairly resolved by an impartial third party."  <u>Id.</u> at 940 ("We hold that the promulgation of so many biased rules— *especially the scheme whereby one party to the proceeding so controls the arbitral panel—* breaches the contract entered into by the parties") (emphasis added).  Specifically, under the arbitration agreement, "[t]he employee and Hooters each select an arbitrator, and the two arbitrators in turn select a third" with the arbitrators all "selected from a list of arbitrators created exclusively by Hooters." <u>Id.</u> at 938-939.  The court appropriately found this unacceptable:

> Under the rules, Hooters is free to devise lists of partial arbitrators who have *existing relationships, financial* or familial, with Hooters and its management. In fact, the rules do not even prohibit Hooters from placing *its managers themselves* on the list. Further, *nothing in the rules restricts Hooters from punishing* arbitrators who rule against the company by removing them from the list. Given the *unrestricted control that one party (Hooters) has over the panel*, the selection of an impartial decision maker would be surprising.

<u>Id.</u> at 939 (emphasis added).  The <u>Phillips</u> court was appropriately concerned over this procedure undermining the ability of the plaintiff to obtain a fair hearing and refused to compel arbitration.

The arbitrator delegation here is far *more* concerning than the selection process at issue in <u>Phillips</u>.  Here, there is no panel of arbitrators at all for Plaintiffs to choose from, whether initially selected by the employer or not.  Rather, both the DRPG and Section 8.3 dictate one biased arbitrator selected in advance by Defendants.  In <u>Phillips</u>, the court took issue with the one-sidedness of the panel because, *in theory*, Hooters could place its own managers on the

11

panel.  But here, Defendants have already appointed not just "a manager," but the NFL's own

chief executive.  Furthermore, just as in <u>Phillips</u>, nothing in the DRPG or Section 8.3 prevents

teams from punishing Mr. Goodell for ruling against the NFL or its teams.  Finally, the <u>Phillips</u>

court opined that it would be "surprising" if the selection process led to an impartial

decisionmaker—an acknowledgment that while perhaps unlikely, the appointment of a neutral

arbiter was at least possible.  In contrast, here it is impossible.  Put simply, the absence of an

arbitrator selection process and the pre-determined appointment of Mr. Goodell is far more

lacking in basic fairness and good faith than the facts of <u>Phillips</u>.[8]

The Sixth Circuit's decision in <u>Walker v. Ryan's Family Steak Houses</u>, 400 F.3d 370,

385 (6th Cir. 2005) requires the same result.[9]  The <u>Walker</u> court refused to compel arbitration

almost entirely on the basis that the arbitrator selection process lacked neutrality.[10]  There, the

employer ("Ryan's") contracted with an organization called Employment Dispute Services, Inc.

("EDSI") to administer employee disputes.  The arbitrator selection process, while unusual, at

least created the possibility of a neutral panel: three arbitrators would be selected, one from each

of three selection pools; the three selection pools were (i) managers from other employers who

contracted with EDSI, (ii) hourly employees from other employers who contracted with EDSI

and (iii) attorneys and former judges associated with neither party; any arbitrator could be struck

for cause by either party and replaced by EDSI; the parties would take turns striking names from

---

[8]        Plaintiffs respectfully disagree with this Court's summary of the <u>Phillips</u> holding in Dkt. No. 58 at p. 5.
While the <u>Phillips</u> court did find a variety of deficiencies in the arbitration agreement, chief among them, for good
reason, was the arbitrator selection process.  Here, with an arbitrator selection process *far more fraught* with bias
than in <u>Phillips</u>, Plaintiffs are completely stuck with an arbitrator with no plausible claim to impartiality.  Moreover,
as set forth above, the DRPG and Section 8.3 have numerous other unconscionable deficiencies.

[9]        In <u>Floss v. Ryan's Family Steak Houses</u>, 211 F. 3d 306, 314 (6th Cir. 2000), the Sixth Circuit also declined
to compel arbitration based on the same arbitration agreement at issue in <u>Walker</u>.  While the <u>Floss</u> court stated in
*dicta* that the arbitrator selection process gave the court "serious reservations," the <u>Walker</u> court stated that "the
record in this case removes any uncertainties" previously noted in <u>Floss</u>.

[10]       The <u>Walker</u> court also found that limited guaranteed discovery—only one deposition was permitted as of
right—prejudiced employees.  As stated <u>supra</u> at p. 10, the DRPG and Section 8.3 do not provide for any discovery.

the list until one person remained in each pool.  Id. at 375-76, 385-386.  The Walker court found this process lacked impartiality because EDSI is "clearly a for-profit business" and "Ryan's annual fee covered 42% of EDSI's gross income."  As a result, the "symbiotic relationship" meant that "Ryan's effectively determines the three pools of arbitrators."  Id. at 386.

The matter at bar presents a far more compelling case of bias in the form of financial entanglements plaguing the arbitration process.  In Walker, the court was forced to *infer* that EDSI's business relationship with Ryan's would lead to an unfair *application* of an arbitrator selection process arguably neutral on its face.  Here, Mr. Goodell is not merely part of a selection list administered by a third party with arguably a "symbiotic" relationship.  Rather, the DRPG and Section 8.3 dictate that a clearly biased person will act as the arbitrator or, at a minimum, oversee the process.  If the "symbiotic" relationship between EDSI and Ryan in the Walker matter was sufficiently nefarious to render the arbitrator selection process unenforceable, there can be no question the same result should follow here.[11]

Similarly, in McMullen v. Meijer, Inc., 355 F.3d 485 (6th Cir. 2004), the Sixth Circuit invalidated an arbitration agreement far less problematic than the DRPG or Section 8.3.  In McMullen, the employer would first select a pool of five potential arbitrators in the first instance but it was subject to certain guidelines intended to safeguard against bias—each potential arbitrator selection had to be "(1) an attorney, (2) unemployed by and unaffiliated with the company, (3) generally recognized as a neutral and experienced labor and employment arbitrator,

---

[11]    We respectfully disagree with the Court's analysis of the Sixth Circuit decisions in Dkt. No. 58 at p. 5-6. The Court found that both Walker and Floss invalidated arbitration agreements because "the employer had complete control over the arbitration rules, to the point that it could unilaterally alter the arbitration rules and appoint its own employees to arbitrate the claim."  But in the dense "Analysis" section of the Walker court's decision, the court stated that "[t]he Arbitration Agreements and related rules and procedures at issue in this case demonstrate that EDSI's arbitral forum is not neutral and, therefore, the agreements are unenforceable," continuing to describe *only* the unfairness and lack of neutrality in the arbitrator selection process.  Walker, 400 F.3d at 385–86.  Regardless, the same exact rationale could apply here given the arbitration terms described supra at pp. 9-10.

and (4) listed on the rosters of the Federal Mediation and Conciliation Services (FMCS) or the AAA, as well as other arbitration rosters." Id. at 488. Thus, although the company was entitled to select the pool, these standards helped ensure every potential candidate was bound by the legal professional ethical rules, had no connection with the employer, had a level of recognition within the legal profession to be impartial and had been independently approved as impartial by recognized dispute resolution providers. Even with these protections, the McMullen court held that the arbitration agreement did not provide "an effective substitute for a judicial forum" due to the "risk of bias inherent in [the arbitrator selection] procedure." Id. at 494.

The DRPG and Section 8.3 are far more lacking in fairness than McMullen—they literally contain *no protections* to ensure the fairness and neutrality. Both dictate that Mr. Goodell will be the arbitrator—Plaintiffs have no say in the matter. Moreover, Mr. Goodell is not an attorney, is directly affiliated with and financially dependent on all Defendants, has never been recognized as a neutral with experience in labor and employment law and has never been approved as an arbitrator for an independent arbitral organization.[12]

Numerous decisions by other courts lead to the same conclusion. See e.g. Pokorny v. Quixtar, Inc., 601 F. 3d 987, 1002-3 (9th Cir. 2010) (denying motion to compel in arbitration in RICO action; arbitrator selection substantively unconscionable where plaintiff had a choice and could either (i) select from a list of neutral JAMS arbitrators who had attended a defendant-led orientation who would be paid at a fixed rate, or (ii) select from a list of neutral JAMS arbitrators who had not attended a defendant-led orientation and who would be paid at the arbitrator's

---

[12] Even a cursory review of the McMullen arbitration agreement demonstrates its superiority in fairness to the DRPG or Section 8.3. See Ex. J. In addition to a far more reasonable arbitrator selection process, it also requires that proceedings "shall be conducted in accordance with the applicable provisions of the Employment Dispute Resolution Rules of the [AAA]" and guides the arbitrator to "authorize discovery consistent with . . . the need to provide full and fair consideration of the relevant and material facts of the case." Id. at I-J. Neither the DRPG or Section 8.3 provide that level of procedural fairness.

presumably higher published rate); <u>Graham v. Scissor-Tail, Inc.,</u> 28 Cal. 3d 807, 827 (Cal. 1981) ("a contract which purports to designate one of the parties as the arbitrator of all disputes arising thereunder is to this extent illusory … [as] the party so designated will have an interest in the outcome which, in the view of the law, will render fair and reasoned decision, based on the evidence presented, a virtual impossibility . . . a contractual party may not act in the capacity of arbitrator and a contractual provision which designates him to serve in that capacity is to be denied enforcement on grounds of unconscionability"); <u>see</u> <u>also</u> <u>Cole v. Burns Intern. Sec.</u> <u>Services,</u> 105 F. 3d 1465, 1482 (D.C. Cir. 1997) ("an employee cannot be required . . . to waive access to a neutral forum in which statutory employment discrimination claims may be heard).

Mr. Goodell's bias is precisely the reason Defendants want him to retain exclusive control.  Respectfully, a judicial endorsement of this approach will upend the longstanding, guiding principle that arbitration must be a fair, neutral and unbiased replacement for a judicial forum—not a one-sided effort by the employer to evade accountability and side-step compliance with the law.  Providing such judicial cover would certainly be "grossly unreasonable or unconscionable in the light of the mores and business practices."  <u>Ragone,</u> 595 F.3d at 121.

### C.  The Arbitration Agreements Preclude Effective Vindication of Statutory <u>Rights and Undermine Congressional Intent</u>

The United States Supreme Court has held and repeatedly reinforced that an arbitration agreement will be invalid if it fails to provide a forum in which statutory rights can be effectively vindicated.  <u>See</u> <u>e.g.</u> <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,</u> 473 U.S. 614, 637 (1985) ("so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function"); <u>Italian Colors Rest.,</u> 570 U.S. at 235 ("in <u>Mitsubishi Motors,</u>  . . . we expressed a

willingness to invalidate, on 'public policy' grounds, arbitration agreements that 'operate . . . as a prospective waiver of a party's *right to pursue* statutory remedies.'").

The rationale for the "effective vindication" doctrine is straightforward—it would undermine Congressional intent underlying the federal statutes if private parties, such as employers, could force people to waive those rights in an arbitration agreement.  Green Tree Fin. Corp.-Alabama v. Randolph, 531 U.S. 79, 90 (2000) (only "'so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum,' [will] the statute serve[] its functions").  The anti-discrimination laws are intended to correct societal problems of racism, sexism and other forms of insidious discrimination by individuals acting as "private attorney generals" and seeking redress.  See e.g. New York Gaslight Club, Inc. v. Carey, 447 U.S. 54, 63 (1980) ("Congress has cast the Title VII plaintiff in the role of 'a private attorney general,' vindicating a policy 'of the highest priority.'").  Thus, if an arbitration agreement were to undermine the enforcement mechanism of these statutes it would be contravening the intent, import and enforcement of the law.

Where an arbitration agreement fails to provide a neutral decision maker, a plaintiff lacks any legitimate ability to vindicate their statutory rights.  See e.g. Cole, 105 F. 3d at 1482 ("statutory rights include both a substantive protection and access to a neutral forum in which to enforce those protections.");  Walker, 400 F.3d at 388 ("a structural bias in the make-up of the arbitration panel, which would stymie a party's attempt to marshal the evidence to prove or defend a claim, can be just as prejudicial as arbitral bias in the final decision on the merits.  Such is the case here, providing an additional basis to conclude that [the] arbitration scheme does not allow for the effective vindication" of rights);  Williams v. Cigna Fin. Advisors Inc., 197 F.3d 752, 763 (5th Cir. 1999) ("whether a federal statutory claim can be subjected to compulsory

arbitration depends upon whether the particular arbitral forum involved provides an

adequate substitute for a judicial forum in protecting the particular statutory right at issue.").

In fact, the Supreme Court has even held that excessive costs that could act as a barrier to

entry into *neutral* forum could invalidate an arbitration agreement based on the effective

vindication doctrine.  See e.g. Italian Colors Rest., 570 U.S. at 236 ("the [effective vindication]

exception finds its origin in the desire to prevent 'prospective waiver of a party's right to

pursue statutory remedies.'  That would . . . perhaps cover filing and administrative fees attached

to arbitration that are so high as to make access to the forum impracticable.").

Here, respectfully, no reasonable person could find that having Mr. Goodell act as the

arbitrator is a "reasonable substitute" for a judicial forum.  For the reasons described above, Mr.

Goodell is inherently conflicted and biased in his role as Commissioner.  Permitting Mr. Goodell

to preside over this dispute would be the same as stripping Plaintiffs and all other NFL

employees of their statutory rights under the anti-discrimination laws.

## III.    Even if Defendants Argue that the Commissioner Can Delegate His Role as Arbitrator to JAMS, the DRPG Fails to Provide an Available Forum

Defendants may argue that any bias determination is premature as Mr. Goodell may

delegate the matter to JAMS under the DRPG (though not Section 8.3).  For reasons set forth

supra at § II(D), Defendants would be incorrect.  However, even assuming *arguendo* that were

correct, JAMS' own rules prohibit administration of this matter under its own rules.

An arbitration agreement will be invalidated if it fails to provide for a viable arbitral

forum or arbitrator.  See e.g. In re Salomon Inc. Shareholders' Derivative Litig. 91 Civ. 5500

(RRP), 68 F.3d 554, 560 (2d Cir. 1995) (where a specific arbitral forum in an arbitration

agreement fails, a court will not sever the failed term from the rest of the agreement and the

entire arbitration provision will fail.); <u>Relevent Sports, LLC v. United States Soccer Fed'n, Inc.</u>, No. 19 Civ. 8359 (VEC), 2020 WL 4194962, at *4 (S.D.N.Y. July 20, 2020) (same).

The JAMS Comprehensive Arbitration Rules and Procedures ("Comprehensive Rules") requires that "[e]ach party shall pay its *pro rata* share of JAMS fees and expenses as set forth in the JAMS fee schedule in effect at the time of the commencement of the Arbitration, unless the Parties agree on a different allocation of fees and expenses." <u>See</u> Ex. K at §31(a).[13]  This renders JAMS an unavailable forum as JAMS' Policy on Employment Arbitration Minimum Standards of Procedural Fairness ("Minimum Standards") makes clear that JAMS *will not administer* employment disputes where the employee is required to pay such *pro rata* arbitration fees.

JAMS Minimum Standards confirms that "JAMS will administer mandatory arbitrations in employment cases only if the arbitration provision complies with" those terms (<u>see</u> Ex. M at p. 1), among them, "[t]he only fee that an employee may be required to pay is the JAMS' initial Case Management Fee.  All other costs must be borne by the company, including any additional JAMS Case Management Fee and all professional fees for the arbitrator's services." <u>Id.</u> at §6. Given the DRPG's cost-sharing, which is inconsistent with the Minimum Standards, JAMS is precluded from administering the case pursuant to its own terms.[14]

Numerous courts have agreed, including this Court, that a plaintiff may pursue their claims in federal court if the designated arbitral forum is unavailable.  <u>See</u> <u>e.g.</u> <u>Relevent Sports,</u> 2020 WL 4194962, at *4 (denying motion to compel arbitration of plaintiff's antitrust claims as

---

[13]     This is different than JAMS Employment Arbitration Rules and Procedures ("Employment Rules") §31(c)—inapplicable here—which provide that in compulsory arbitration agreements "the only fee that an Employee may be required to pay is the initial JAMS Case Management Fee." <u>See</u> Ex. L.

[14]     The JAMS Minimum Standards provides that the terms do not apply if the "agreement to arbitrate was individually negotiated by the employee and employer, or if the employee was represented or advised by counsel during the negotiations." <u>See</u> Ex. M at p. 3.  But there was no "negotiation" over the "agreement to arbitrate."  The Constitution and the DRPG are, as Defendants argue, part of the rules and procedures of the NFL and are not subject to any negotiation.  Plaintiffs did not negotiate any aspect of their respective arbitration agreements.

the set forum, FIFA, had previously stated that it "will not entertain the antitrust [and RICO] issues") (J. Caproni); <u>In re Salomon</u>, 68 F.3d 554 at 558 ("we cannot compel a party to arbitrate a dispute . . . [when the arbitral provider] has refused the use of its facilities to arbitrate the dispute in question"); <u>De Malmanche v. Glenrock Asset Mgmt. Assocs., L.P.</u>, No. 07 Civ. 10940 (KNF), 2010 WL 2541495, at *4 (S.D.N.Y. June 22, 2010).

JAMS, as a dispute resolution provider with an interest in ensuring fairness, has clearly stated that it will not administer employment disputes like the matter at bar if the employer requires the employee to pay any more than the Case Management Fee.  As the DRPG requires application of the JAMS Comprehensive Rules, which require *pro rata* payment of fees, JAMS cannot administer this dispute by its own express policies.   Accordingly, any attempt by Defendants to use the potential for Mr. Goodell to delegate this matter to JAMS will not "save" the Arbitration Agreements—it only further renders them invalid.

## IV.    <u>The NFL is Not a Party to Nor Beneficiary of the Arbitration Agreements</u>

The NFL cannot compel arbitration when it is not (i) a party to any contract, (ii) a third-party beneficiary under an estoppel theory, and (iii) a covered defendant under Section 8.3.

### A.    <u>The NFL Is Not a Party to Any Contract or Arbitration Agreement</u>

There NFL is <u>not</u> a party to any of the Relevant Employment Contracts.  Each contract states very specifically that it is between strictly the coach and the team.  <u>See</u> Defs.' Exs. 2-7. The fact that the Commissioner approved the contracts does not turn the NFL into a party. Similarly, none of the employment contracts even purports to include the NFL as a party to which arbitration would apply.  <u>See</u> <u>id.</u>; <u>supra</u> at p. 4.

Moreover, to the extent Defendants argue the arbitration provisions of the Flores-Steelers or Wilks-Panthers contracts somehow apply—though they are subject to all the same

deficiencies set forth above—arbitration agreements signed after a class action is commenced are unenforceable.  See e.g. Weinstein v. Jenny Craig Op., Inc., No. 105520/11, 2014 WL 10680367, at *2 (N.Y. Cty. Sup. Ct. Sep. 08, 2014) ("Arbitration agreements signed after litigation is commenced are deemed unconscionable and thus unenforceable"); In re Currency Conversion Fee Antitrust Litig., 361 F. Supp.2d 237, 254 (S.D.N.Y. 2005) (same).[15]

The NFL also cannot claim that Section 8.3 covers claims between coaches and the NFL. Indeed, the NFL took great care to outline the five categories of disputes the Commissioner is vested with the authority to resolve through arbitration.  See Defs.' Ex. 1 at §8.3(A)-(E).  None of those categories cover claims brought against the NFL.

**B.      The NFL Is Not Covered Under the Relevant Arbitration Provisions as a Third-Party Beneficiary**

It is axiomatic that a party "cannot be required to submit to arbitration any dispute which it has not agreed to submit."  Doe v. Trump Corp., 6 F.4th 400, 412 (2d Cir. 2021).  While the doctrine of equitable estoppel has been recognized in the arbitration context, "'[t]his does not mean [] that whenever a relationship of any kind may be found among the parties to a dispute and their dispute deals with the subject matter of an arbitration contract made by one of them, that party will be estopped from refusing to arbitrate.'"  Id.  Indeed, where a "nonsignatory is alleged to be a third-party wrongdoer as it is here, we [the Second Circuit] have made clear that the arbitration contract "'in no way' extends to the non-signatory."  Id. at 413-14.

---

[15]      Defendants' reliance on Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 99 (2d Cir. 1999) is misplaced.  While retroactivity of an arbitration agreement was found to apply, the litigants were parties to, or assignees of, arbitration agreements.  Here, there is no mention of the NFL or the teams listed as Defendants in the Flores-Steelers or Wilks-Panthers contract.  There was also no pending class action litigation involving the parties in Smith/Enron when the arbitration agreements were entered into.  TradeComet.com LLC v. Google, Inc., 435 F. App'x 31, 34 (2d Cir. 2011), and the cited cases, leads to no different conclusion.

In short, for the equitable estoppel doctrine to apply, the dispositive issue is not whether the claims are intertwined, but rather whether the "signatories had knowledge of, and consented to, the extension of their agreement to arbitrate to the non-signatories." Id. at 414; see also id. (denying motion to compel where there was "no evidence to suggest that the plaintiffs treated the defendants as if they were effectively parties to the IBO agreement"). Here, there is no basis to determine that Plaintiffs treated the NFL as if it was effectively a party to any arbitration agreement. In fact, the evidence establishes that Plaintiffs reasonably thought the exact opposite.

First, as noted above, the NFL put great care into developing its Constitution, including Section 8.3. It outlined five specific categories of claims subject to arbitration, including claims made by coaches against teams, team employees or other coaches. The NFL plainly made a conscious decision not to include itself among the parties against whom claims by coaches would be arbitrated. In fact, the NFL did not include itself as a party against which *any* claims, made by anyone, would be subject to arbitration. The NFL obviously did not see itself as an entity against whom claims would be arbitrated before the Commissioner.

Second, while the NFL is not a signatory to the employment agreements, it was required to approve them. This means that the NFL reviewed the language and had the opportunity to require that the NFL be included within the list of parties against whom claims would be arbitrated. But chose not to do so. Accordingly, Plaintiffs certainly could not have believed that the NFL was effectively a party to the arbitration agreements contained in those contracts.

Third, the reason the NFL did not include itself among the parties against whom claims would be arbitrated is obvious—because the NFL, in the form of the Commissioner, is the designated arbitrator under the arbitration agreements. The NFL is sophisticated enough to understand that a company cannot reasonably require claims to be arbitrated against it, and then

serve as the arbitrator of those claims.  Put simply, despite the relationship between the NFL and

the teams, there is no circumstance in which Plaintiffs or anyone else would believe that they had

signed up to arbitrate claims against the NFL, with the arbitration being decided by the NFL.

The foregoing establishes that the cases relied upon by the NFL are inapposite.  The NFL

relies most heavily on Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115 (2d Cir. 2010).  To

begin, the Ragone arbitration agreement did not expressly and in great detail delineate the sets of

parties against whom arbitration would be required, and deliberately *exclude* the non-signatory in

that list, such as Section 8.3 does.  Moreover, the non-signatory in Ragone was not also the

arbitrator that would be overseeing the arbitration of the plaintiff's claims.  Thus, the facts that

compel a finding that Plaintiffs did not believe that they were entering into an agreement to

arbitrate against the NFL are not present in Ragone.[16]

Furthermore, in Ragone, an employee of the non-signatory was actually the plaintiff's

"on-site supervisor," and the plaintiff was hired specifically to provide services to the non-

signatory.  The same is not true here, where Plaintiffs' "on-site" supervisors are the teams, which

are the only entities referenced in the contractual arbitration provisions.  In addition, while

Plaintiffs' work may have benefited the NFL, the services were intended to, and did, most

directly benefit the teams.  Cf. Doe, 6 F.4th at 414 (describing Ragone, finding that "[a]lthough

the plaintiff's initial employment records and arbitration agreement did not mention ESPN, the

plaintiff understood that she was hired by AVI specifically to work for ESPN").

At least one case relied on by the NFL directly supports Plaintiffs' position.  The NFL

cites to Doe, 6 F.4th at 412, for the proposition that "under the doctrine of equitable estoppel, a

---

[16]     Choctaw Generation Ltd. P'ship v. Am. Home Assur. Co., 271 F.3d 403 (2d Cir. 2001) is inapposite for
similar reasons.  There, the plaintiff had entered into a separate agreement with the non-signatory that was directly
related to the agreement that contained the arbitration clause.  There is no such separate agreement in this case.

signatory to an arbitration agreement cannot avoid arbitration with a third party where there is a 'close relationship' among the parties and the issues in dispute are 'intertwined' with the contract containing the arbitration agreement."  See Defs.' Br. at pp. 21-22.  In Doe, however, the Second Circuit actually *affirmed* the District Court's refusal to apply the doctrine of equitable estoppel in connection with a motion to compel arbitration made by the Trump Corporation, Donald J. Trump and members of his family (the "Trump Defendants").

In short, the Doe plaintiffs alleged that the Trump Defendants induced them into forming business relationships with another defendant ("ANC"), with whom the plaintiffs had entered into arbitration agreements.  Doe, 6 F.4th at 403.  According to the plaintiffs, the Trump Defendants were promoting that the relationships with ANC had a reasonable chance of success, knowing this to be false, while secretly receiving large payments from ANC.  Id.  Despite the financial arrangements and coordinated fraudulent scheme, the Second Circuit held that the equitable estoppel doctrine did not apply, and that the Trump Defendants could not take advantage of the plaintiffs' arbitration agreements with ANC.  Id. at 414.  In doing so, the Second Circuit held that "[t]here is no unfairness in denying estoppel to a third-party wrongdoer aligned with a signatory in effectuating allegedly wrongful business practices."  Id.

Nor can the NFL rely on Ross v. Am. Exp. Co., 547 F.3d 137 (2d Cir. 2008), which *reversed* the District Court's decision to compel arbitration despite: (i) allegations that the non-signatory conspired with the other defendants to carry out a fee-fixing scheme in violation of the Sherman Act; and (ii) a determination that the claims against all defendants were intertwined. The basis for this holding was that, as in this case, there was insufficient evidence to suggest that plaintiffs intended to arbitrate the dispute with the non-signatory.

23

In sum, the evidence establishes that no reasonable person entering into the Arbitration Agreements would assume they were agreeing to arbitrate claims against the NFL, with the Commissioner overseeing the arbitration.  As such, equitable estoppel does not apply.

**V.      Mr. Flores' Claims Against the Broncos, Giants and Texans, and Post-Termination Claims Against the Dolphins Are Not Covered Under Any Arbitration Agreement**

**A.      Mr. Flores' Claims Against the Broncos, Giants and Texans**

Mr. Flores was never, at any time, under contract with the Broncos, Giants or Texans. Moreover, at the time the Giants and Texans unlawfully failed to hire Mr. Flores, he was not under contract with any team.  While Mr. Flores was under contract with the Patriots when he interviewed for the Broncos, the dispute resolution provision in the Flores-Patriots contract is strictly limited to disputes with the Patriots.  See Defs.' Ex. 3 at §17.

Defendants make a remarkably disingenuous and frivolous argument that Mr. Flores' claims against the Giants and Texans are subject to arbitration because they "involve[ ] facts and occurrences that arose" before his termination.  See Defs.' Br. at p. 18.  Defendants cite to the Complaint's allegations regarding the NFL's and Giants' history of discrimination, much of which took place while Mr. Flores was under contract with the Patriots or Dolphins.

Defendants rely upon a single case, CPR (USA) Inc. v. Spray, 187 F.3d 245 (2d Cir. 1999).  However, CPR only stands for the proposition that when one party breaches the very contract that contains an arbitration provision, the other party to that contract can enforce the arbitration provision even if the underlying contract has expired.  To wit, CPR held that "post-expiration grievances **arise under the contract**, and are therefore arbitrable [ ] when the dispute 'involves facts and occurrences that arose before expiration.'"  Id. (citing Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 206 (1991) (emphasis added).  The CPR court also said, in describing Litton, that the Supreme Court "ultimately ruled that [a] layoff dispute **did not arise**

24

**under, and consequently was not covered by, the expired agreement**," and therefore the dispute was not arbitrable under the clause in that expired agreement.  Id. (emphasis added).

Thus, Defendants' argument is fatally flawed for two independent reasons.  First, Mr. Flores' claims against the Giants and Texans do not in any way even relate to his employment contract with the Dolphins, much less arise under it.  Second, the facts concerning the NFL's and Giants' history of discrimination is irrelevant to this analysis.  Mr. Flores' claim is based on the Giants' and Texans' failure to hire him.  Those claims began to accrue and finished accruing in the moment that the decision not to hire him was made, at a time during which Mr. Flores was not under contract or subject to the Constitution.  The NFL's history of discrimination is relevant to proving unlawful bias, but it does not constitute an element of those claims.

### B.     Mr. Flores' Post-Employment Claims Against the Dolphins

Mr. Flores' post-employment claims against the Dolphins also are not subject to arbitration, as the Dolphins terminated his contract.  Once the contract was terminated, the arbitration agreement no longer covered Mr. Flores.  Indeed, neither the Constitution nor the arbitration clauses contain language suggesting that they survive the end of Plaintiffs' employment, in contrast to other provisions (such as the confidentiality provisions) that expressly survive contract termination.  See Korody Marine Corp. v. Mins. & Chem. Philipp Corp., 300 F.2d 124, 125 (2d Cir. 1962) (arbitration agreement does not survive expiration of contract); Bogen Comm., Inc. v. Tri-Signal Integration, Inc., 227 F. App'x 159, 161 (3d Cir. 2007) (same); Neely v. Bechtel Corp., No. 1:07-CV-0907-WKWWO, 2008 WL 2120085, at *3 (M.D. Ala. May 20, 2008) (post-employment claims not covered by arbitration agreement); Gruden, No. A-21-844043-B ("the employment contract was terminated before this Complaint was filed . . . the arbitration provision does not cover former employees"), see Ex. G.

25

## CONCLUSION

For the reasons set forth herein, Defendants' motion should be denied.

Dated: August 31, 2022
       New York, New York            Respectfully submitted,

                                         **WIGDOR LLP**

By: _____
                   Douglas H. Wigdor
                   Michael J. Willemin
                   David E. Gottlieb

                   85 Fifth Avenue
                   New York, NY 10003
                   Telephone: (212) 257-6800
                   Facsimile: (212) 257-6845
                   dwigdor@wigdorlaw.com
                   mwillemin@wigdorlaw.com
                   dgottlieb@wigdorlaw.com

                   *Counsel for Plaintiffs*
                   *Proposed Counsel for the Proposed Class*

                         - and -

                   **ELEFTERAKIS, ELEFTERAKIS & PANEK**

By: _____
                   John Elefterakis
                   Nicholas Elefterakis
                   Raymond Panek
                   Johnson Atkinson

                   80 Pine Street, 38th Floor
                   New York, New York 10005
                   Telephone: 212-532-1116
                   Facsimile: 212 532-1176

                   *Counsel for Plaintiffs*
                   *Proposed Counsel for the Proposed Class*