UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 03/01/2023
```

-------------------------------------------------------------X
BRIAN FLORES, STEVE WILKS, and RAY            :
HORTON, as Class Representatives, on          :
behalf of themselves and all others similarly :
situated,                                     :
                                              :
                              Plaintiffs,     :
                                              :
            -against-                         :
                                              :
THE NATIONAL FOOTBALL LEAGUE; NEW   :
YORK FOOTBALL GIANTS, INC. d/b/a NEW :
YORK GIANTS; MIAMI DOLPHINS, LTD. d/b/a :    22-CV-0871 (VEC)
MIAMI DOLPHINS; DENVER BRONCOS      :
FOOTBALL CLUB d/b/a DENVER BRONCOS; :         OPINION AND ORDER
HOUSTON NFL HOLDINGS, L.P. d/b/a    :
HOUSTON TEXANS; ARIZONA CARDINALS   :
FOOTBALL CLUB LLC d/b/a ARIZONA     :
CARDINALS; TENNESSEE TITANS         :
ENTERTAINMENT, INC. d/b/a TENNESSEE,:
TITANS and JOHN DOE TEAMS 1 through 26,:
                                              :
                              Defendants.     :
-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

This case shines an unflattering spotlight on the employment practices of National

Football League ("NFL") teams.  Although the clear majority of professional football players are

Black, only a tiny percentage of coaches are Black.  In 2002, to much hoopla, the NFL

announced that it was going to do something about the paucity of Black coaches.[1]  Its solution

was to adopt the so-called "Rooney Rule."  The Rooney Rule as originally adopted required any

NFL team looking to hire a head coach to interview at least one minority candidate.  The

---

[1] *See* Gus Garcia-Roberts, *The Failed NFL Diversity 'Rule' Corporate America Loves*, Wash. Post (Oct. 4, 2022), https://www.washingtonpost.com/sports/interactive/2022/rooney-rule-nfl-black-coaches/; Dave Anderson, *Sports of The Times; Minority Candidates Should Get Fairer Shake*, N.Y. Times (Dec. 16, 2003), https://www.nytimes.com/2003/12/16/sports/sports-of-the-times-minority-candidates-should-get-fairer-shake.html?searchResultPosition=7.

Amended Complaint in this case alleges that, however laudable the intent, the Rooney Rule has

devolved into a cruel sham, with Black candidates being interviewed for positions that the team

has already decided will be filled by a white candidate and with Black coaches being treated

more harshly vis-à-vis employment decisions than similarly-situated white coaches.  *See* Am.

Compl., Dkt. 22.

Three Black men who are current or former NFL coaches have sued the NFL and several

member teams for racial discrimination in violation of 42 U.S.C. § 1981, the New York State

Human Rights Law, the New York City Human Rights Law, and the New Jersey Law Against

Discrimination.  *See* Am. Compl.  Defendants moved to compel arbitration and to stay the

current proceedings, Mot. to Compel Arbitration, Dkt. 47, and Plaintiffs opposed the motion, Pls.

Opp., Dkt. 62.  For the reasons discussed below, the motion to compel arbitration is GRANTED

except as to the Brian Flores's claims against the New York Giants, the Houston Texans, the

Denver Broncos, and his related claims against the NFL, as to which the motion is DENIED.

## BACKGROUND[2]

The NFL is an unincorporated association of thirty-two professional football clubs.  Defs.

Mem., Dkt. 48 at 4.  Although each club is a separate legal entity, the clubs are governed by a

shared set of NFL rules and policies, including the NFL Constitution.  *See generally* Second

DiBella Decl. Ex. 1 ("NFL Const. & Bylaws"), Dkt. 73.  The NFL is overseen by a

Commissioner, currently Roger Goodell, who is appointed by member teams.  *See* NFL Const. &

Bylaws Art. VIII; Pls. Opp. at 3.

---

[2]    Although not raised by the parties, recent case law seems to suggest that there is some disagreement among courts in this circuit concerning the appropriate standard to apply on a pre-discovery motion to compel arbitration. *Compare Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (applying a summary judgment standard) *with Aleksanian v. Uber Techs. Inc.*, 524 F. Supp. 3d 251, 258 (S.D.N.Y. 2021) (applying a motion to dismiss standard). Because the parties do not dispute the material facts relevant to the motion to compel arbitration, the Court need not resolve this apparent conflict for the purposes of this motion.

## A.  Plaintiffs' Allegations of Discrimination in the NFL

Brian Flores, Steve Wilks, and Ray Horton are Black men who allege that they have each been discriminated against when employed or when seeking to be employed as coaches for NFL teams.  Am. Compl. ¶ 1.  Messrs. Flores and Horton allege that several NFL teams interviewed them for head coaching positions solely to fulfill the so-called "Rooney Rule" without any intent of hiring them.[3]  *See id.* at ¶¶ 185, 200–05, 271–73.

### 1.  Brian Flores

Mr. Flores alleges that he was a victim of racial discrimination on four distinct occasions.

Mr. Flores first alleges that the Denver Broncos interviewed him in 2019 solely to satisfy the Rooney Rule without actually considering him for its head coach position.  *Id.* ¶¶ 200–05.

Mr. Flores next alleges that when he was head coach of the Miami Dolphins, Dolphins owner Stephen Ross attempted to bribe him (i) to lose games so the Dolphins would get the first pick in the next year's draft and (ii) to recruit "a prominent quarterback in violation of League tampering rules."  *Id*. ¶ 168; *see also id*. ¶¶ 161–63.  When Mr. Flores refused both requests, he was stigmatized as an "angry black man" and ultimately fired.  *Id*. ¶¶ 175, 177.  Mr. Flores further alleges that the Dolphins provided him with an improper separation agreement, failed to pay him contractually-required severance pay in violation of his employment contract, and instituted arbitration proceedings against him to claw back his wages as retaliation for filing this lawsuit.  *Id*. ¶¶ 220–26.

---

[3]     Of course, non-compliance with the Rooney Rule is not, itself, actionable.  Nevertheless, Plaintiffs' allegations that teams conducted sham interviews, if proven, could undercut any defense predicated on the teams showing that Black candidates were "considered" for all open positions.

Mr. Flores further alleges that, in January 2022, the New York Giants invited him to interview for the position of head coach, but the Giants had already selected Brian Daboll.[4]  *Id.* ¶¶ 182–88.

Finally, Mr. Flores claims that the Houston Texans removed him from consideration for their head coach position solely as retaliation for filing the instant lawsuit.  *Id.* ¶¶ 207–13.

### 2.  Steve Wilks

Steve Wilks alleges that the Arizona Cardinals hired him as a "bridge coach," meaning a coach "who is not given a meaningful opportunity to succeed and is simply 'keeping the seat warm' until . . . a new coach is brought in."  *Id.* ¶ 233; *see also id.* ¶ 232.  Mr. Wilks alleges that, despite a strong coaching performance "under extremely difficult circumstances" — including the arrest of Cardinals' General Manager Steve Keim, a weak roster featuring a rookie quarterback who had been drafted over Mr. Wilks's objection, and pressure to lose games to improve the Cardinals' position in the NFL draft — he was wrongfully terminated.  *Id.* ¶ 247; *see also id.* ¶¶ 19, 240, 250.  Mr. Wilks alleges that the Cardinals fired him as the "fall guy" for failures that were attributable in significant part to Mr. Keim, before hiring Kliff Kingsbury, a white man, as head coach.  *See id.* ¶¶ 258–60.

### 3.  Ray Horton

In January 2016, while he was the Tennessee Titans' defensive coordinator, Mr. Horton interviewed to be the Titans' head coach.  *Id.* ¶¶ 266, 271–73.  Mr. Horton alleges that the Titans only offered him the interview to comply with the Rooney Rule, as the Titans had already decided to hire Mike Mularkey, a white man, when they interviewed Mr. Horton.  *Id.* ¶¶ 273–78.

---

[4]     Before Mr. Flores interviewed for the position he received a text from Bill Belichik, the New England Patriots' head coach, congratulating him for getting the job.  Am. Compl., Dkt. 22 ¶¶ 186–87.  Mr. Belichik appears to have confused Brian Daboll, who was hired as the Giants' head coach, with Brian Flores, who was not.  *Id.*

In a 2020 interview, Mr. Mularkey stated that Amy Adams Strunk, the Titans' controlling owner, told him that he was going to be the head coach before they "went through the Rooney rule."  *Id*. ¶ 280; *see also id*. ¶ 272.  Mr. Horton further alleges that his unsuccessful interview with the Titans branded him as a "stale" candidate and interfered with him receiving additional interviews for head coach positions.  *Id*. ¶ 284.

### B.  Plaintiffs' Employment Contracts

Messrs. Flores, Wilks, and Horton each had an employment contract with each team he coached.  *See* Pls. Opp. at 3; Defs. Mem. at 6.  The NFL was not a party to those contracts.  The NFL Commissioner was, however, required to approve each contract.  *See* Defs. Mem. at 3, 21; *see also, e.g.*, Second DiBella Decl. Ex. 4 ("Flores-Steelers Agreement"), Dkt. 73 § 12.  In each contract, each Plaintiff acknowledged that he had read the NFL Constitution and Bylaws and agreed to be bound by them.  *See* Pls. Opp. at 9; *see also, e.g.*, Second DiBella Decl. Ex. 2 ("Flores-Dolphins Agreement"), Dkt. 73 § 7.1; Second DiBella Decl. Ex. 7 ("Horton-Titans Agreement"), Dkt. 73 § 6(a)–(c); Second DiBella Decl. Ex. 5 ("Wilks-Cardinals Agreement"), Dkt. 73 § 9(a).

While the exact text of those contracts varies, in relevant part each agreement provides that the NFL Commissioner will oversee an alternative dispute resolution process for all disputes arising between the parties.  *See, e.g.*, Flores-Dolphins Agreement § 12.2; Horton-Titans Agreement § 6(a); Wilks-Cardinals Agreement § 10(a).  Mr. Wilks's contract with the Cardinals also included a clause delegating any disputes regarding whether the contracts were "void or voidable" to the arbitrator.  *See* Wilks-Cardinals Agreement § 10(e).

**LEGAL STANDARD**

Pursuant to Section 2 of the Federal Arbitration Act ("FAA"), "agreements to arbitrate [are] 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'"[5]  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336 (2011) (quoting 9 U.S.C. § 2).  "[B]efore an agreement to arbitrate can be enforced, the district court must first determine whether such agreement exists between the parties.  This question is determined by state contract law."  *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (citing *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)) (internal citation omitted).

If an arbitration agreement exists, the Court must also determine "whether the dispute falls within the scope of the arbitration agreement."  *Meyer*, 868 F.3d at 74 (internal quotation omitted).  Because of the "emphatic federal policy in favor of arbitral dispute resolution," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985), "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).  *See also Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002) (Sotomayor, J.) ("[A]rbitration is indicated unless it can be said with positive assurance that an arbitration clause is not susceptible to an interpretation that covers the asserted dispute."  *Id.* (internal quotation omitted).).  In light of the "liberal federal policy favoring arbitration agreements . . . arbitration agreements should be enforced according to their terms unless the FAA's mandate has been

---

[5]     Plaintiffs do not dispute that the Federal Arbitration Act ("FAA") applies to the parties' agreement to arbitrate.  Pls. Opp., Dkt. 62 at 5 (citing the FAA).

overridden by a contrary congressional command." *Sutherland v. Ernst & Young LLP*, 726 F.3d 290, 295 (2d Cir. 2013) (cleaned up).[6]

An agreement to arbitrate arbitrability is "an additional, antecedent agreement" that is also covered by the FAA. *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70 (2010)). Unlike other agreements to arbitrate, for which there is a presumption in favor of finding the parties agreed to arbitration, "the law reverses the presumption" for agreements to arbitrate arbitrability. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945 (1955). Accordingly, "the issue of arbitrability may only be referred to the arbitrator if there is *clear and unmistakable evidence* from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." *Contec Corp. v. Remote Sol., Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) (quoting *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002)).

## DISCUSSION

Plaintiffs acknowledge that they entered into employment agreements with several of the Defendant teams and that those agreements provide an alternative dispute resolution process. Plaintiffs argue, however, that the alternative dispute resolution agreements are invalid or do not encompass their claims, or, if they are valid and do encompass their claims, they are unenforceable. *See, e.g.*, Pls. Opp. at 4 n.2, 8–9, 15–16, 24. For the reasons discussed below, the Court finds that Mr. Flores's claims against the Dolphins, Mr. Wilks's claims against the

---

[6]     Section 1981 of the Civil Rights Act of 1866 does not indicate a Congressional intent to override the FAA's policy toward the enforcement of arbitration agreements. *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 65, 67–68 (2010) (applying the FAA to plaintiff's section 1981 claim).

Cardinals, and Mr. Horton's claims against the Titans must be submitted to arbitration; Mr.

Flores may, however, litigate his claims against the Broncos, Giants, and Texans in federal court.

I.    **Plaintiffs' Claims, Except Those Against the Giants and Texans, Are Covered by the Parties' Arbitration Agreements**

Each employment agreement selected the law of the state in which the team was based as

the governing law.[7]  *See* Defs. Mem. at 3 n.2.  Pursuant to the applicable state laws, the Court

finds that Plaintiffs' claims, except for Mr. Flores's claims against the Giants and Texans, fall

within the scope of the parties' arbitration agreements.[8]

**A.  Brian Flores**

Mr. Flores has sued four different football teams: the Denver Broncos, Miami Dolphins,

New York Giants, and Houston Texans.  From 2008 until February 3, 2019, Mr. Flores was a

coach for the New England Patriots.  Am. Compl. ¶ 157; Defs. Mem. at 5.  While under contract

to the Patriots, he interviewed for the Broncos' head coach position, but he was not hired.  Am.

Compl. ¶¶ 200–04.  From 2019 until January 10, 2022, Mr. Flores was the Dolphins' head coach.

*Id*. ¶¶ 158, 177.  After being fired by the Dolphins, Mr. Flores interviewed for the Giants' and

Texans' head coach position but was not hired by either team.  *Id*. ¶¶ 179, 184, 191, 207, 216.

This lawsuit was filed on February 1, 2022, Compl., Dkt. 1, and on February 18, 2022, the

---

[7]    The Court applies the law of the state selected by the applicable choice of law provisions in each contract. The choice of law clauses are enforceable because each employment contract selects the law of the state in which the Defendant team is based and in which each coach was employed; consequently, "the chosen law bears a reasonable relationship to the parties or the transaction."  *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 822 F.3d 620, 641 (2d Cir. 2016) (quoting *Welsbach Elec. Corp v. MasTec N. Am., Inc.*, 859 N.E.2d 498, 500 (2006)).

[8]    Mr. Flores's claims against the Broncos fall within the scope of the applicable arbitration agreement, but the agreement is not enforceable for reasons discussed *infra*, section III(A).

Pittsburgh Steelers hired Mr. Flores as "the senior defensive assistant and linebackers coach," Defs. Mem. at 18; *see also* Flores-Steelers Agreement at 1.[9]

Defendants argue that, even though Mr. Flores never contracted with the Giants, Broncos, or Texans, his claims against those teams are nevertheless subject to arbitration pursuant to the NFL Constitution as incorporated into his contracts with the Patriots, Dolphins, and Steelers. *See* Defs. Mem. 18, 20 n.3.  For the reasons explained below, the Court finds that only Mr. Flores's contract with the Dolphins and Patriots contain valid arbitration agreements relevant to his claims, and there is no binding arbitration agreement in Mr. Flores's contract with the Steelers.

### 1.  Mr. Flores's Claims Against the Broncos

Mr. Flores alleges that the Denver Broncos discriminated against him because of his race when they failed to hire him.  Mr. Flores argues that he is not required to arbitrate his claims against the Broncos because he never specifically agreed to arbitrate claims against the Broncos. *See* Pls. Opp. at 24.  At the time Mr. Flores interviewed with the Broncos, he was under contract with the New England Patriots; in his contract with the Patriots, he expressly agreed to abide by the NFL Constitution, which was "made a part of th[e] Agreement."  Second DiBella Decl. Ex. 3 ("Flores-Patriots Agreement"), Dkt. 73 § 15; *see also NSTAR Elec. Co. v. Dep't of Pub. Utilities*, 968 N.E.2d 895, 905–06 (Mass. 2012) (holding that a contract incorporates a document by reference where it "clearly communicate[s] that the purpose of the reference is to incorporate the referenced material into the contract," *id*. at 905 (internal quotation omitted)).

---

[9]     Mr. Flores now appears to be the Minnesota Vikings' defensive coordinator.  *See* Craig Peters, *Vikings Hire Brian Flores as Defensive Coordinator*, Vikings.com (Feb. 6, 2023, 5:25 P.M.), https://www.vikings.com/news/brian-flores-defensive-coordinator-hired-2023.

Section 8.3 of the NFL Constitution contains an arbitration provision that is broader than the one contained in the employment contracts; it grants the NFL Commissioner "full, complete and final jurisdiction and authority to arbitrate" several types of disputes.  As is relevant here, the NFL Commissioner has jurisdiction to arbitrate "[a]ny dispute between any . . . coach . . . and any member club or clubs."  NFL Const. & Bylaws § 8.3(B).

Mr. Flores's claims against the Broncos plainly constitute a "dispute between any . . . coach . . . and any member club."  *Id*.  Mr. Flores's contract with the Patriots bound him to follow the NFL Constitution while he was employed by the Patriots, including its provision giving the Commissioner sole authority to arbitrate any dispute with an NFL team.  *See* Flores-Patriots Agreement § 15; Pls. Opp. at 24 (acknowledging that Mr. Flores was under contract with the Patriots when he interviewed with the Broncos).

Defendants also argue that the arbitration agreement in the NFL Constitution, as incorporated into Mr. Flores's 2019 contract with the Miami Dolphins, retroactively applies to Mr. Flores's claims against the Broncos, which arose before he became the Dolphins' head coach.  *See* Defs. Mem. at 18.  Courts, however, have "refused to compel arbitration of claims arising from disputes which arose outside of the effective dates of arbitration agreements," unless the agreement expressly includes claims preceding the contract.  *Klay v. All Defendants*, 389 F.3d 1191, 1203 (11th Cir. 2004); *see also Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1271 n.1 (11th Cir. 2017) (arbitration agreement that explicitly encompassed past claims could be interpreted to include disputes over plaintiff's "previous attempts at employment."); *Baptist Hosp. of Miami, Inc. v. Media Healthcare Plans, Inc.*, 376 F. Supp. 3d 1298, 1308–10 (S.D. Fla. 2019) (applying Florida law and collecting cases).[10]

---

[10]      Even if the NFL Constitution, as incorporated into Flores-Dolphins contract, could be interpreted to retroactively apply to claims against teams that arose before the contract's effective date, the arbitration agreement

Defendants finally argue that Mr. Flores must arbitrate his claims against the Broncos because the NFL's alleged systemic racism was already in full force while Mr. Flores was under contract to the Patriots.[11]  Defs. Mem. at 18–20.  The Court disagrees.

Despite the long historic narrative in the Amended Complaint reciting historical racism in the NFL, the gravamen of Mr. Flores's claim is not that the NFL is generally racist.  Rather, Mr. Flores claims that specific adverse employment decisions were driven by discriminatory animus harbored by the NFL and member teams.  Defendants' argument, taken to its logical extreme, would bind a coach forever to arbitration, even if he were never again employed by a team in the NFL, so long as the NFL had a practice of inflicting similar harm on other coaches while that coach was under contract.  Defendants cite no cases, and research has revealed none, that endorse the idea of an endless agreement to arbitrate future disputes with legally distinct entities.

## 2.  Mr. Flores's Claims Against the Miami Dolphins

Mr. Flores alleges that the Dolphins discriminated against him while he was employed by the Dolphins and shortly thereafter.  The employment contract between Mr. Flores and the Dolphins provides that "all matters in dispute" between Mr. Flores and the Dolphins "including, without limitation, any dispute arising from the terms of this Agreement, Employee's employment with the Club, or otherwise, shall be referred to the Commissioner of the NFL for

---

would be unenforceable for unconscionability under Florida law.  *See* Second DiBella Decl. Ex. 2 ("Flores-Dolphins Agreement"), Dkt. 73 § 19 (selecting Florida law).  Mr. Flores had no power to modify the NFL Constitution, and Defendants did not commit to providing Mr. Flores notice of any changes to the NFL Constitution.  *See* Flores-Dolphins Agreement § 7.1 ("Employee . . . agrees . . . to be bound by[] the Constitution, Bylaws, and the Rules and Regulations of the NFL (as they now exist or as they may be amended) . . . ."); Second DiBella Decl. Ex. 1 ("NFL Const. & Bylaws"), Dkt. 73 Art. 25 (setting forth the procedures for amendment of the NFL Constitution).  Courts applying Florida law have held that a contract is illusory, and thus, unenforceable, where one party can modify the terms of that contract without notifying the other party.  *See Diverse Elements, Inc. v. Ecommerce, Inc.*, 5 F. Supp. 3d 1378, 1382 (S.D. Fla. 2014) (collecting cases); *Centennial Bank v. ServisFirst Bank, Inc.*, 2022 WL 10219893, at *31 (M.D. Fla., Oct. 10, 2022) ("[A] contract once entered into may not thereafter be unilaterally modified as subsequent modifications require consent . . . ." *Id*. at *31 (citations omitted)).

[11]    Defendants make a similar argument with respect to Mr. Flores's claims against the Giants and the Texans, *see* Defs. Mem., Dkt. 48 at 18–20, which the Court rejects for the same reasons.

binding arbitration . . . ."  Flores-Dolphins Agreement § 12.2.  Mr. Flores does not dispute that this agreement was binding or that his claims alleging discrimination while he was a coach and when he was fired fall within the scope of his arbitration agreement with the Dolphins.  He argues, however, that his claims regarding the Dolphins' retaliatory conduct after he was fired do not fall within the scope of the contract's arbitration agreement.  Pls. Opp. at 25.

There is a "presumption in favor of postexpiration arbitration of matters . . . arising out of the relation governed by the contract."  *Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. N.L.R.B.*, 501 U.S. 190, 204 (1991) (internal citation omitted); *see also Doctors Assocs., Inc. v. Thomas*, 898 So.2d 159, 162 (Fla. Dist. Ct. App. 2005) (arbitration agreements govern disputes arising after the termination of a contract that does not explicitly exclude post-termination disputes).

Mr. Flores's retaliation claim against the Dolphins is subject to arbitration because it clearly arises from his employment with the club.  Florida courts have interpreted the "arising from" requirement to require arbitration of an employee's claims where the "breach in question was an immediate, foreseeable result of the performance of contractual duties."  *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218 (11th Cir. 2011) (internal quotation omitted); *see also Maglana v. Celebrity Cruises, Inc.*, No. 20-14206, 2022 WL 3134373, at *4–5 (11th Cir. Aug. 5, 2022); *Phillips v. NCL Corp. Ltd.*, 824 F. App'x 675, 679 (11th Cir. 2020).

Disputes regarding the payment of wages or the terms of separation are "a fairly direct result of the performance of contractual duties" in an employment relationship.  *Telecom Italia, SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1116 (11th Cir. 2001) (noting that an "intentional failure to perform the contract" is subject to arbitration).  Upon embarking on an employment relationship, both employee and employer can anticipate that the employee may be

fired and that disputes may arise regarding an employee's wages or the employer's retaliatory conduct.

In *Milestone v. Citrus Specialty Grp., Inc.*, No. 19-CV-2341, 2019 WL 5887179, at *2 (M.D. Fla. Nov. 12, 2019), the court found that an employee's claims of discrimination and retaliation were arbitrable under Florida law because "the claims were dependent upon the plaintiffs' employment's status and could not be brought in the absence of the employment relationship governed by the agreements." *Id.* (quoting *McAdoo v. New Line Transp., LLC*, No. 16-CV-1917, 2017 WL 942114, at *4 (M.D. Fla. Mar. 9, 2017) (cleaned up); *see also Ravelo v. Shutts & Bowen, LLP*, No. 09-CV-865, 2009 WL 1587272, at *1–2 (M.D. Fla. July 11, 2009) (holding that plaintiffs' racial discrimination and retaliation claims were subject to arbitration).

### 3.   Mr. Flores's Claims Against the Giants and Texans

Defendants argue that the arbitration clause in Mr. Flores's contract with the Steelers applies retroactively to any claims accrued against the NFL or member teams before he was hired by the Steelers.  Defs. Mem. at 20 n.3.  Even if the Defendants are correct on that point, Defendants have failed to establish that Mr. Flores entered into a valid arbitration agreement when he was hired by the Steelers.

The Flores-Steelers Agreement required the approval of the NFL Commissioner before it became effective.  *See* Flores-Steelers Agreement § 12 ("This Agreement shall become valid and binding upon each party only when and if it shall be approved by the Commissioner of the NFL.").  The version of the Flores-Steelers Agreement submitted to the Court never became binding upon Mr. Flores or the Steelers because the Commissioner never signed it.  *See* Flores-Steelers Agreement at 7.

In their June 21, 2022, brief, Defendants noted that the contract was still awaiting the Commissioner's approval; more than a year after the contract's purported effective date, Defendants have failed to provide the Court with any evidence that the contract has been approved by Commissioner Goodell. *See* Defs. Mem. at 9.  On February 1, 2023, the Court ordered Defendants to re-submit Plaintiffs' contracts due to omissions in the original submissions, *see* Order, Dkt. 70; Defendants once again submitted a version of the Flores-Steelers Agreement that lacked Commissioner Goodell's signature and attested that it was "a true and correct copy" of the Agreement, *see* Second DiBella Decl., Dkt. 73 ¶ 5; Flores-Steelers Agreement at 7.

"The party seeking to stay the case in favor of arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (collecting cases).  Even where the party opposing arbitration admits that he is subject to an arbitration agreement, the moving party bears the burden of demonstrating that a valid arbitration agreement exists.  *See Dreyfuss v. Etelecare Glob. Sols.-U.S. Inc.*, 349 F. App'x 551, 552–53 (2d Cir. 2009).  Defendants have failed to carry that burden with respect to Mr. Flores's claims against the Giants and Texans because they have failed to prove that an arbitration agreement was in effect when or after Mr. Flores was being considered for hire by those teams.  *See id*.  Accordingly, Mr. Flores may litigate his claims against the Giants and Texans, and his related claims against the NFL, in federal court.[12]

---

[12]     Because the Court finds that at least some claims may proceed in federal court, it need not address whether the arbitration agreement requires arbitration on an individual basis, as Mr. Flores retains the ability to pursue a class action in federal court.

### B.  Steve Wilks

Mr. Wilks signed an employment agreement with the Cardinals in which both the Cardinals and Mr. Wilks agreed to arbitrate "all disputes, claims or controversies that exist or that may arise between them."  Wilks-Cardinals Agreement § 10(a).  Mr. Wilks also agreed to arbitrate "any claim that all or any part of this Agreement is void or voidable."  *Id*. § 10(e).

Where, as here, the parties have agreed that the arbitrator will decide issues regarding whether the arbitration agreement is "void or voidable," they have "clearly and unmistakably" delegated to the arbitrator the power to determine whether their dispute is subject to arbitration. *See Rent-A-Center, West, Inc.*, 561 U.S. at 66, 69–70 (delegating arbitrability dispute where the delegation clause encompassed claims regarding whether the arbitration agreement was "void or voidable"); *see also Ward v. Ernst & Young U.S. LLP*, 468 F. Supp. 3d 596, 603 (S.D.N.Y. 2020) (same).  This includes the power to decide whether the arbitration agreement as a whole is unenforceable for unconscionability or any other applicable contract defense.  *See Rent-A-Center, West, Inc.*, 561 U.S. at 73–75.

Because neither party discussed the delegation clause in their original submissions, on February 1, 2023, the Court ordered supplemental briefing regarding the enforceability of the delegation provision.  *See* Order, Dkt. 70 at 2.  In response, Mr. Wilks argued that Defendants had waived their right to seek arbitration of the threshold question of arbitrability by failing to raise the issue in their moving papers or reply and that allowing the Commissioner to decide the threshold issue of arbitrability would be operationally problematic and unconscionable.  Pls. Supp. Br., Dkt. 75 at 1.  Defendants' failure to raise the issue does not constitute a waiver of their right to enforce the delegation clause, and neither of Plaintiffs' other arguments is persuasive.

15

The Supreme Court has recently made clear that federal courts should not condition waiver of the right to compel arbitration on a showing of prejudice; instead, the Court held that the focus must be on the defendants' conduct. *See Morgan v. Sundance*, 142 S. Ct. 1708, 1712–13 (2022). Following *Morgan*, the Second Circuit has held that delay alone — even a delay of nearly three years — is insufficient to constitute waiver when the parties had not engaged in substantive litigation before the defendant belatedly sought arbitration. *Nicosia v. Amazon.com, Inc.*, No. 21-2624, 2023 WL 309545, at *4 n.2 (2d Cir. Jan. 19, 2023).[13]

Consequently, the fact that Defendants failed to raise the issue of the delegation clause for nearly eight months after their opening brief was filed (and then only when prompted by the Court) does not waive their right to enforce the delegation clause when no other substantive litigation has occurred. "Mere silence, oversight or thoughtlessness . . . is insufficient to support an inference of waiver." *Herrera v. Manna 2nd Ave. LLC*, No. 20-CV-11026, 2022 WL 2819072, at *8 (S.D.N.Y. July 18, 2022); *see also Powell v. Vroom, Inc.*, No. 22-CV-302, 2022 WL 4096872, at *7 (N.D. Ala. Sept. 7, 2022) (holding that defendant did not waive its right to enforce the delegation clause in the parties' contract by initially submitting the threshold question of delegation to the court). Furthermore, "any doubt concerning the scope of arbitrable issues should be resolved in favor of arbitration," including "allegation of waiver . . . ." *Moses H. Cone Mem. Hosp.*, 460 U.S. at 24–25.

Plaintiffs finally argue that allowing Commissioner Goodell to arbitrate any threshold questions of arbitrability would be unconscionable because he will inevitably be biased. Pls.

---

[13]     Plaintiffs contend that because the Wilks-Cardinals agreement selects Arizona law, Arizona law governs the question of waiver. *See* Second DiBella Decl. Ex. 5 ("Wilks-Cardinals Agreement"), Dkt. 73 § 23; Pls. Supp. Br., Dkt 75 at 1, 1 n.1. Plaintiffs are incorrect. Whether Defendants waived their right to compel arbitration is governed by federal waiver law, and, thus, the issue is controlled by the law of this circuit. *See Morgan v. Sundance*, 142 S. Ct. 1708, 1712–13 (2022).

Supp. Br. at 4.  Plaintiffs have not pointed to a single case, and research has revealed none, that applied Arizona law to find that an arbitration agreement was unenforceable because there was a risk that the arbitrator the parties jointly selected may be biased.[14]  Rather, Arizona courts have focused on whether the arbitration provision is "fundamentally unfair" because it "grants one party to the arbitration unilateral control over the pool of arbitrators."  *Arnold v. Standard Pac. of Ariz. Inc.*, No. 16-CV-452, 2016 WL 4259762, at *3 (D. Ariz. Aug. 12, 2016) (citing *McMullen v. Meijer, Inc.*, 355 F.3d 485, 494 (6th Cir. 2004)) (cleaned up); *see also Gullet on behalf of Estate of Gullet v. Kindred Nursing Ctrs. W., L.L.C.*, 390 P.3d 378, 359 (Ariz. Ct. App. 2017) (holding that arbitration was not substantively unconscionable for lack of neutrality where, *inter alia*, the employer did not have unilateral control over the arbitration selection process).

Because arbitration is a matter of contract, Plaintiffs cannot ask the Court to provide them with an arbitrator who is more neutral than the one to whom they agreed.  *See Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 548 (2d Cir. 2016).  Indeed, the Arizona legislature has only precluded individuals with "a known, direct and material interest in the outcome of the arbitration proceeding" from serving as an arbitrator where the agreement itself requires the arbitrator to be neutral.  Ariz. Rev. Stat. § 12-3011(B).

### C.  Ray Horton

Mr. Horton's employment contract with the Tennessee Titans, which was in effect when he interviewed for the Titans' head coach position, states: "all matters in dispute between [Mr.

---

[14]     Because the Court finds that it would not be unconscionable for Commissioner Goodell to serve as the arbitrator, it follows that it is not "operationally problematic" to allow Commissioner Goodell to make the threshold determination of whether arbitration of the dispute should be delegated to JAMS.  Pls. Supp. Br., Dkt. 75 at 4–5.

Horton] and Titans shall be referred to the Commissioner . . . . "  Horton-Titans Agreement

§ 6(a).[15]

Mr. Horton argues that clause is insufficient to constitute an arbitration agreement.  Pls.

Opp. at 4 n.2.  It is, of course, black letter law that a contract does not have to use the word

"arbitration" in order to be an arbitration agreement.  *See McDonnell Douglas Fin. Corp v. Penn.*

*Power & Light Co.*, 858 F.2d 825, 830 (2d Cir. 1988).  The Second Circuit has held that an

agreement that "manifests an intention by the parties to submit certain disputes to a specified

third party for binding resolution" is an arbitration agreement."[16]  *Id.*; *see also Bakoss v. Certain*

*Underwriters at Lloyds of London Issuing Certificate No. 0510135*, 707 F.3d 140, 143 (2d Cir.

2013).  Mr. Horton's contract with the Titans, bare bones though it may be, satisfies those

requirements: the parties agreed to submit any disputes to the NFL Commissioner and that his

decision would be binding.  *See* Horton-Titans Agreement § 6(a).

Mr. Horton's claims against the Titans clearly fall within the scope of the arbitration

agreement, which broadly encompasses "all matters in dispute" between Mr. Horton and the

Titans.  Horton-Titans Agreement § 6(a).  Plaintiffs do not argue otherwise.  Accordingly, there

is a valid arbitration agreement applicable to Mr. Horton's claims against the Titans.

---

[15]     While Defendants assert that Mr. Horton is also subject to arbitration pursuant to the NFL Constitution as incorporated into the Horton-Titans Agreement, the only version of the NFL Constitution that is in the record did not go into effect until September 2016, after Mr. Horton was no longer employed by the Titans.  *See* Second DiBella Decl., Dkt. 73 ¶ 2; Am. Compl. ¶ 266.  Thus, there is no record evidence of an arbitration provision in the NFL Constitution would encompass Mr. Horton's claim against the Titans.

[16]     Although the applicable state law governs questions of contract formation, the Second Circuit has held that courts should apply federal common law in determining whether the form of alternative dispute resolution to which the parties have agreed is arbitration as contemplated by the FAA.  *See Bakoss v. Certain Underwriters at Lloyds of London Issuing Certificate No. 0510135*, 707 F.3d 140, 143 (2d Cir. 2013) ("[F]ederal common law provides the definition of 'arbitration' under the FAA.");  *but see Portland Gen. Elec. Co. v. U.S. Bank Trust Nat. Ass'n as Tr. for Trust No. 1*, 218 F.3d 1085, 1086 (9th Cir. 2000) (courts should look to state law in defining arbitration).

## II.     The Arbitration Agreements Apply to Plaintiffs' Claims Against the NFL

Plaintiffs argue that their arbitration agreements with the hiring teams do not apply to their disputes with the NFL because the arbitration agreements in the parties' contracts and the NFL Constitution do not explicitly include claims against the NFL.  Pls. Opp. at 19.  The applicable state laws, however, estop Plaintiffs from avoiding arbitration of their claims against the NFL in light of their allegations that the NFL and the Defendant teams were jointly engaged in the alleged discrimination and retaliation.  *See Doe v. Trump Corp.*, 6 F.4th 400, 412 n.8 (2d Cir. 2021) ("[S]tate law governs whether a non-signatory may enforce an arbitration clause." *Id*. (citation omitted)).[17]

The Amended Complaint not only alleges that the NFL is a joint employer with the Defendant teams but that the discrimination experienced by Black players and coaches was a product of collusion among NFL teams and the NFL.  *See* Am. Compl. ¶¶ 337–53; *cf. State ex rel. Hewitt v. Kerr*, 461 S.W.3d 798, 814 (Mo. 2015) (en banc) (enforcing plaintiff's arbitration agreement with the St. Louis Rams Partnership against non-signatories, including the St. Louis Rams, L.L.C., when plaintiffs brought allegations against defendants collectively).  Throughout the Amended Complaint, Plaintiffs treat the NFL and its member teams "as a single unit;" they cannot now claim that the two entities are distinct in order to avoid arbitration.  *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 98 (2d Cir. 1999)

---

[17]     Plaintiffs' reliance on *Doe v. Trump Corp.*, 6 F.4th 400 (2d Cir. 2021), is misplaced.  As an initial matter, in refusing to grant the defendants' motion to compel arbitration, the *Doe* court relied heavily on the fact that the third-party Trump defendants had not signed the relevant contracts; here, the NFL Commissioner signed the contracts that will be enforced.  *See id*. at 412–13; *see also, e.g.*, Flores-Dolphins Agreement at 11.  Furthermore, the Second Circuit explained that arbitration was generally appropriate against third parties that "had some sort of *corporate* relationship to a signatory party," contrasting that situation to cases in which one signatory is unaware of the relationship between the other signatory and the third party that is seeking to enforce the arbitration agreement. *Doe*, 6 F.4th at 413; *see also id*. at 414.  The coaches were undoubtedly aware of the relationship between the NFL and the teams.

(plaintiffs could not avoid arbitration with non-signatories where the complaint treated signatories and non-signatories alike).

"[C]ourts around the country have almost uniformly concluded" that a party to the contract is estopped from avoiding arbitration where a plaintiff brings claims against the other party and a nonparty who jointly controlled his employment and engaged in the alleged misconduct.[18] *Green v. Mission Health Cmtys., LLC*, 20-CV-439, 2020 WL 6702866, at *8 (M.D. Tenn. Nov. 13, 2020) (internal quotation omitted) (applying Tennessee law to find that an employee was equitably estopped from avoiding arbitration when she alleged that her joint employers engaged in misconduct); *see also Gunson v. BMO Harris Bank, N.A.*, 43 F. Supp. 3d 1396, 1401, 1403 (S.D. Fla. 2014) (applying Florida law to compel arbitration of claims against non-signatories where plaintiff's claims arose from the joint misconduct of contractual party and non-signatory); *Kolsky v. Jackson Square, LLC*, 28 So.3d 965, 969 (Fla. Dist. Ct. App. 2010) (same); *Machado v. System4 LLC*, 28 N.E.3d 401, 409 (Mass. 2013) (plaintiffs were equitably estopped from avoiding arbitration when plaintiffs "lumped the two defendants together, asserting each claim in their complaint against [them] collectively," *id*. at 412).

### III.   The Arbitration Agreements Are Enforceable Except as to Mr. Flores's Claims Against the Broncos

Plaintiffs argue that, even if they agreed to arbitrate their claims against the Defendant teams and the NFL, the agreements are unconscionable, particularly because Commissioner

---

[18]     Section 11(d) of the Horton-Titans Agreement selects Tennessee law.  Although Tennessee state courts have yet to apply the doctrine of equitable estoppel to cases in which the plaintiff alleges that a non-party engaged in misconduct with a party to the contract, at least one Tennessee appeals court has recognized the prevalence of this doctrine in other courts.  *See Blue Water Bay at Ctr. Hill, LLC v. Hasty*, 2017 WL 5665410, at *14 n.12 (Tenn. App. Ct. Nov. 27, 2017) (noting that "many courts" apply the doctrine of estoppel when the plaintiff alleges "concerted misconduct by a nonsignatory and one or more signatories to the contract").

Goodell would serve as the arbitrator and has the discretion to alter the arbitration rules.[19]  *See*
Pls. Opp. at 5.  For the reasons discussed below, the Court finds that all the applicable arbitration
agreements are enforceable except the arbitration agreement in the NFL Constitution as
incorporated in Mr. Flores's contract with the New England Patriots to the extent that it applies
to his claim that the Broncos' failure to hire him was discriminatory.

### A.  Defendants Cannot Compel Mr. Flores to Arbitrate His Claims Against the Broncos

Mr. Flores's contract with the Patriots required him to comply with the NFL Constitution,
including its arbitration provision, in its "present form and as amended from time to time
hereafter."  *See* Flores-Patriot Agreement § 15.  Plaintiffs argue that the arbitration agreement in
the NFL Constitution is unenforceable because the NFL is not required to provide Plaintiffs
notice of any changes that it may make to the NFL Constitution.[20]  *See* Pls. Opp. at 9.  The Court
agrees.

The NFL and its member clubs have the unilateral ability to modify the terms of the NFL
Constitution.  *See* NFL Const. & Bylaws Art. 25 (setting forth the procedures for amendment of
the NFL Constitution).  Under Massachusetts law, which applies to Mr. Flores's contract with
the Patriots, *see* Flores-Patriots Agreement § 21, if "the party seeking to enforce the arbitration
provision retain[s] the unilateral discretion to alter its terms, without notice, the agreement to

---

[19]     Defendants suggest that, pursuant to the NFL's arbitration rules, at least some of Plaintiffs' claims may be
arbitrated by JAMS.  Defs. Mem. at 8.  Plaintiffs argue that the instant disputes are not eligible to be referred to
JAMS under JAMS's rules.  Pls. Opp. at 17.  The Court need not address this argument because delegation to JAMS
appears to be discretionary, and thus, whether it is available is of no moment.  *See* Flores-Dolphins Agreement Ex.
A ("NFL Dispute Resolution Procedural Guidelines"), Dkt. 73 ¶ 1.7.

[20]     The Court does not address this argument for Plaintiffs' other claims.  Defendants need to rely on the NFL
Constitution only for Mr. Flores's claims against the Broncos, as all other claims for which there is a valid
arbitration agreement are also subject to arbitration pursuant to the arbitration agreements contained in the Plaintiffs'
contracts with the Defendant teams.  *See supra*, section I–II.

arbitrate is illusory and unenforceable," *Fawcett v. Citizens Bank, N.A.*, 297 F. Supp. 3d 213, 221 (D. Mass. 2018) (internal quotation omitted) (collecting cases).  *See also Jackson v. Action for Boston Cmty. Dev., Inc.*, 525 N.E.2d 411, 415 (Mass. 1988) (the unilateral right to amend arbitration rules without notice renders any "'offer' made by the defendant . . . illusory"); *Bekele v. Lyft, Inc.*, 918 F.3d 181, 189–90 (1st Cir. 2019) (enforcing contract modifiable by Lyft because Lyft was required to provide users notice and an opportunity to reject the contract).

Because there is no enforceable arbitration agreement governing Mr. Flores's claims against the Denver Broncos and his related claims against the NFL, Mr. Flores may litigate those claims in federal court.

### B.  Possible Arbitrator Bias Does Not Invalidate the Arbitration Agreements

Plaintiffs argue that Mr. Goodell could not possibly serve as a neutral arbitrator because "Mr. Goodell, as the Commissioner, *is the NFL* in all regards."  Pls. Opp. at 6.  As evidence of Mr. Goodell's bias, Plaintiffs rely heavily on a statement released by the NFL on the day that Mr. Flores filed his complaint, in which the NFL stated that Mr. Flores's claims were "without merit."  *See* Am. Compl. ¶ 3; Wigdor Decl. Ex. 2, Dkt. 63.

"[A]rbitration is a matter of contract, and consequently, the parties to an arbitration can ask for no more impartiality than inheres in the method they have chosen."  *Nat'l Football League Mgmt. Council*, 820 F.3d at 548.  In the context of litigation arising out of allegations that the Patriots underinflated the balls used they used in the American Football Conference Championship Game against the Indianapolis Colts in 2015, the Second Circuit rejected the argument that, as a matter of law, the NFL Commissioner cannot fairly arbitrate claims regarding the NFL's conduct.  *See id*. at 532–33, 548.  As the Court noted, the parties contracted to arbitrate claims before the NFL Commissioner "knowing full well . . . that the Commissioner would have a stake both in the underlying discipline and in every arbitration brought."  *Id*. at

548.  Accordingly, the Second Circuit declined to indulge allegations that the NFL

Commissioner could not "adjudicate the propriety of his own conduct."  *Id.*

The Court acknowledges that this structure creates a risk of biased adjudication and that

the NFL statement on the day the case was filed is worrisome.  Plaintiffs' descriptions of their

experiences of racial discrimination — which allegedly are only the most recent chapter in the

NFL's long history of systematic discrimination toward Black players, coaches, and managers —

are incredibly troubling.  Am. Compl. ¶ 4.  Given the number of Black men who play and coach

football, it is difficult to understand how it could be that, at the time Plaintiffs initiated this

lawsuit, "the NFL had only one Black Head Coach." [21]  *Id.* ¶ 6.

Nevertheless, the FAA cautions against judicial intervention at this early stage when

Plaintiffs have, as here, agreed to a particular arbitration structure, including a specific arbitrator.

Courts must avoid presupposing that the selected arbitrator will not serve as a conscientious and

impartial arbitrator.  *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30 (1991) ("We

decline to indulge the presumption that the parties and arbitrable body conducting a proceeding

will be unable or unwilling to retain . . . impartial arbitrators."  *Id.* (cleaned up));  *Nat'l Football*

*League Mgmt. Council*, 820 F.3d at 548.  If the NFL Commissioner is, indeed, improperly

biased, and that bias prevents him from fairly adjudicating Plaintiffs' claims, Plaintiffs have a

recourse: this Court retains the authority to review the Commissioner's decision and to vacate the

Commissioner's award.  *See* 9 U.S.C. § 10(a)(2) (permitting courts to overturn arbitration

decisions where there is "evident partiality or corruption").

---

[21]     In both the NFL and the National Basketball Association ("NBA"), "about 70% of the players are Black."
Scott Neuman, *Why a 20-Year Effort by the NFL Hasn't Led to More Minorities in Top Coaching Jobs*, NPR (Feb.
3, 2022), https://www.npr.org/2022/02/03/1075520411/rooney-rule-nfl.  When Mr. Flores filed the Complaint,
thirteen of the thirty head coaches in the NBA were Black; at that same time, only one of the thirty-two head
coaches in the NFL was Black.  *See id.*  Thus, at the time this lawsuit was filed, the percentage of NBA Black head
coaches (43%) was more than thirteen times than the percentage of NFL Black head coaches (3.1%).

Plaintiffs also argue that Commissioner Goodell's alleged bias would prevent them from effectively vindicating their claim in a forum in which he is the arbitrator.  *See* Pls. Opp. at 15–17.  The effective vindication doctrine is "a judge-made exception to the FAA" that "finds its origins in the desire to prevent prospective waiver of a party's *right to pursue* statutory remedies."  *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235–236 (2013) (internal quotation omitted).

The Supreme Court has recognized two types of arbitration agreements to which this doctrine may apply: an agreement "forbidding the assertion of certain statutory rights" and an agreement imposing arbitration fees "so high as to make access to the forum impracticable."  *Id*. at 236; *see also Reyes v. Gracefully, Inc.*, 2018 WL 2209486, at *7 (S.D.N.Y. May 11, 2018) (holding that an arbitration agreement could not shorten the statute of limitations for FLSA claims).  Alleged structural bias falls into neither category.[22]  Moreover, the Supreme Court has noted that while several Supreme Court "cases have . . . asserted the existence of an 'effective vindication' exception," these cases have simultaneously "declined to apply it to invalidate the arbitration agreement at issue."  *Am. Express Co.*, 570 U.S. at 235.[23]

Plaintiffs also argue that the risk that Commissioner Goodell will be biased renders the arbitration agreements unconscionable as a matter of state contract law.  To support this

---

[22]     *Cole v. Burns International Security Services, et al.*, 105 F.3d 1465 (D.C. Cir. 1997), is not to the contrary.  Although the court noted that access to neutral arbitrators was one of several factors relevant to assessing whether plaintiffs could effectively vindicate their claims, *see id*. at 1482, the parties had agreed to use a neutral arbitrator, *see id*. at 1480.  The *Cole* court gave no indication that lack of access to a neutral arbitrator was dispositive when the parties had agreed to a specific arbitrator.  And although the Sixth Circuit in *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306 (6th Cir. 2000), expressed concern that bias in the makeup of the arbitral panel would preclude the effective vindication of plaintiffs' claims, it expressly did not resolve that question because it found that the arbitration agreement was illusory.  *See id*. at 314–15.

[23]     *See Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 242 (2013) (Kagan, J. dissenting) (warning that the Supreme Court's limited application of the effective vindication doctrine to arbitration agreements that "operate to" bar federal claims enables companies to "appoint as an arbitrator an obviously biased person — say, the CEO. . . .").

argument, Plaintiffs rely heavily on *Hooters of America v. Phillips*, 173 F.3d 933 (4th Cir. 1999),

and related cases in the Sixth Circuit.  Pls. Opp. at 11–14.  Those cases are, however, inapposite

as they all concerned arbitration agreements with unfair selection procedures that, *inter alia*,

granted the employer improper control over the pool of arbitrators.

The *Hooters* court refused to enforce an arbitration agreement that required all arbitrators

to be selected from a list prepared by Hooters and thereby granted it "unrestricted control" over

the selection of arbitrators.  *See id.* at 939.  And in *McMullen v. Meijier, Inc.*, 355 F.3d 485 (6th

Cir. 2004), the court refused to enforce the parties' arbitration agreement based on "procedural

unfairness inherent in an arbitration agreement," while noting that the "preferred method of

challenging allegations of bias is to pursue the underlying claims through the arbitration process

and then seek review . . . ."  *Id.* at 494 n.7; *see also id.* at 488 (noting that the employer had "the

right to unilaterally select a pool of . . . potential arbitrators").  By contrast, Plaintiffs' arbitration

agreements grant Defendants no discretion over the choice of the arbitrator: it must be the NFL

Commissioner.[24]

The applicable state contract laws of Florida and Tennessee do not compel a different

conclusion.[25]  In *Garcia v. Church of Scientology Flag Service Organization, Inc.*, No. 18-

13452, 2021 WL 5074465, at *12 (11th Cir. Nov. 2, 2021), the Eleventh Circuit held that an

---

[24]     Similarly, in *Pokorny v. Quixtar, Inc.*, 601 F.3d 987 (9th Cir. 2010), the Ninth Circuit found that an arbitration agreement requiring plaintiffs to pay a fee if they selected an arbitrator who had not gone through defendants' "training," which was "designed to produce a very favorable view of [defendants]," unconscionably used the threat of financial hardship to give defendants control over the arbitrator selection process.  *Id.* at 1003 (internal quotation omitted).

[25]     Several cases, on state law grounds, have declined to enforce an arbitration agreement appointing the commissioner of a sports league as the arbitrator due to concerns of impropriety or bias.  *See* Order, *Nostalgic Partners LLC v. New York Yankees P'ship*, No. 656724/2020, at 2 (N.Y. Sup. Ct. Dec. 17, 2021); *State ex rel. Hewitt v. Kerr*, 461 S.W.3d 798, 813–14 (Mo. 2015) (en banc); *Gruden v. The Nat'l Football League, et al.*, No. A-21-844043-B, at 13–14 (Nev. Dist. Ct. Clark Cty. Oct. 12, 2022).  Because none of the applicable contracts selects Missouri, New York, or Nevada law, those cases are interesting but not controlling.

arbitration clause that required plaintiffs to arbitrate their claims against the Church of

Scientology before individuals "in good standing" with the church was not unconscionable under

Florida law — even in the face of the lead arbitrator making "various comments . . . reflecting

bias in favor of the church." *Id*. at *12 (citing *Nat'l Football League Mgmt. Council*, 820 F.3d at

548); *see also id*. at *8–9 (applying Florida law).

In *Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370 (6th Cir. 2005), the Sixth

Circuit, applying Tennessee law, declined to enforce the arbitration agreement because the

"arbitrator-selection process itself [was] fundamentally unfair," while making clear the general

rule that pre-arbitration challenges to an allegedly biased arbitration panel will not stand. *Id.* at

385 ("[A] party cannot avoid the arbitration process simply by alleging that the arbitration panel

will be biased."); *see also Iysheh v. Cellular Sales of Tenn., LLC*, No. 17-CV-542, 2018 WL

2207122, at *8 (E.D. Tenn. May 14, 2018) (arbitration agreement was not unconscionable

where, *inter alia*, both parties had an opportunity to participate in arbitrator selection).

In short, Plaintiffs' concern about the Commissioner's ability to decide fairly their claims

is insufficient reason not to enforce the arbitration agreements.

### C.  Possible Discovery Limitations Do Not Render the Agreements Unconscionable

Plaintiffs also complain that they will not be able to take robust discovery if they are

compelled to arbitrate their disputes.  The fact that the NFL Commissioner may limit the amount

of discovery Plaintiffs can take, however, is also not grounds for refusing to enforce the various

arbitration agreements.  *See Gilmer*, 500 U.S. at 31 (limited discovery did not bar arbitration of

plaintiff's age discrimination claims).  While the Second Circuit has "recognized that a provision

that deprived a claimant of a meaningful opportunity to present her claim might well be

unenforceable," plaintiffs bear the burden of demonstrating that the arbitration rules will in fact

deprive them of a chance to prove their claims. *Lohnn v. Int'l Bus. Machs. Corp.*, No. 21-CV-6379, 2022 WL 36420, at *11 (S.D.N.Y. Jan. 4, 2022) (cleaned up) (quoting *Guyden v. Aetna, Inc.*, 544 F.3d 376, 386–87 (2d Cir. 2008)).

Plaintiffs have not carried that burden because they rely solely on speculation that Commissioner Goodell may interpret the arbitration rules in a manner that will improperly and unfairly limit the scope of discovery. *See* Pls. Opp. at 6–7; *see also PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 406–07 (2003) (holding that courts should not decline to enforce arbitration agreements "on the basis of mere speculation" that the arbitrator may interpret the arbitration agreement in a manner that will render it unenforceable, *id.* (internal quotation omitted)); *AT&T Mobility LLC*, 563 U.S. at 342 (cautioning that limitations on discovery should not be considered substantively unconscionable because that "rule would have a disproportionate impact on arbitration agreements").[26]  If Plaintiffs are "unable to vindicate [their] rights in the arbitral forum, [they] will have recourse to the Court." *Howard v. Anderson*, 36 F. Supp. 2d 183, 187 (S.D.N.Y. 1999) (collecting cases); *see also* 9 U.S.C. § 10(a)(3) (permitting courts to vacate arbitration awards where the arbitrator "refus[es] to hear evidence pertinent and material to the controversy").

### D.  The Horton-Titans Agreement Is Sufficiently Definite To Enforce

Plaintiffs argue that the arbitration agreement between Mr. Horton and the Titans is unenforceable because it fails to set forth the essential terms of the arbitration process.  Pls. Opp. at 4 n.2.  Mr. Horton's arbitration agreement with the Titans provides, in its entirety: "You and the Titans agree that all matters in dispute between You and Titans shall be referred to the

---

[26]     Discovery in arbitration is not typically as extensive as federal court discovery; that reality is, of course, one reason many prefer arbitration over litigation.  Nevertheless, the Court takes the NFL at its word that it is committed to combating racism, Defs. Reply, Dkt. 64 at 5, and is confident that the Defendants recognize that the Plaintiffs have raised serious claims that may require more than minimal discovery to adjudicate fairly.

Commissioner and his decision shall be accepted as final, complete, conclusive, binding and unappealable by You and Titans."  Horton-Titans Agreement § 6(a).

Tennessee courts have held that "for a contract to be enforceable, it must be of sufficient explicitness so that a court can perceive what are the respective obligations of the parties," and "any agreement which leaves unanswered . . . critical questions" is not enforceable.  *Higgins v. Oil, Chemical and Atomic Workers Int'l Union, Local No. 3-677*, 811 S.W.2d 875, 880 (Tenn. 1991) (quoting *Soar v. Nat'l Football League Players' Ass'n*, 550 F.2d 1287, 1290 (1st Cir. 1977) (holding that the NFL Commissioner's oral promise retroactively to provide pension benefits to retired NFL players was insufficiently definite)) (alterations omitted).

Although Mr. Horton's arbitration agreement with the Titans is admittedly quite succinct, it is sufficiently definite to enforce.  Courts applying Tennessee law have found that a reference to "binding arbitration to resolve all disputes that may arise out of the employment context" is adequate to state the essential terms of the agreement.  *Hayward v. Trinity Christian Ctr. of Santa Ana*, No. 14-CV-2282, 2015 WL 1924552, at *3 (M.D. Tenn. Apr. 28, 2015).[27]  Although the NFL Commissioner retains substantial discretion to set the arbitration procedures, the doctrines of good faith and fair dealing preclude the NFL from unilaterally adopting arbitration procedures that are "improper or oppressive."  *Howell v. Rivergate Toyota, Inc.*, 144 F. App'x 475, 479 (6th Cir. 2005) (applying Tennessee law); *see also Brubaker v. Barrett*, 801 F. Supp. 2d

---

[27]     Although Tennessee courts have been skeptical of contracts that provide "little notice as to the procedure" for arbitration, those contracts appear to have either been even more succinct than the one at issue here or contracts of adhesion.  For example, in *Wofford v. M.J. Edwards & Sons Funeral Home Inc.*, 490 S.W.3d 800 (Tenn. Ct. App. Nov. 23, 2015), the contract did not indicate who the arbitrator would be or the "effect" of the arbitrator's decision, i.e., that it would be binding and final, *see id.* at 822–23.  And while the court in *Howell v. NHC Healthcare-Fort Sanders, Inc.*, 109 S.W.3d 731, 734 (Tenn. Ct. App. 2003), invalidated the parties' arbitration agreement in part because it did "not adequately explain how the arbitration procedure would work, except as who would administer it," *id.* at 734, Tennessee courts have subsequently limited *Howell*'s holding to contracts of adhesion, *see Wofford*, 490 S.W.3d at 817 n.13.

743, 753–55 (E.D. Tenn. 2011) (same).[28]  To the extent Commissioner Goodell adopts

procedures that are improper or oppressive, Plaintiffs will have recourse to this Court.

## CONCLUSION

For the foregoing reasons, Defendants' motion to compel arbitration is GRANTED

except that it is DENIED as to Brian Flores's claims against the Denver Broncos, New York

Giants, and the Houston Texans, and his related claims against the NFL.  Defendants' request to

stay the case is DENIED as to Flores's claims that may proceed to litigation and is GRANTED

as to all of the claims that must be arbitrated.  The Clerk of Court is respectfully directed to

terminate the open motion at docket entry 47.

The parties are ordered to appear for a pretrial conference on **Friday, March 24, 2023, at

10:00 A.M.** in Courtroom 443 of the Thurgood Marshall Courthouse, 40 Foley Square, New

York, New York, 10007.  By **March 16, 2023**, the parties must submit a joint letter regarding the

status of the case, including:

    a.  a statement of all existing deadlines, due dates, and/or cut-off dates;

    b.  a statement describing the status of any settlement discussions and whether the parties

        would like a settlement conference;

    c.  a statement of the anticipated length of trial and whether the case is to be tried to a

        jury;

    d.  a statement regarding the anticipated schedule of arbitration;

    e.  any contemplated motions;

---

[28]  *Floss v. Ryan's Family Steakhouse*, 211 F.3d 306 (6th Cir. 2000), is not to the contrary.  "In *Floss*, the arbitration agreement was between employees and a third-party arbitration service, not the employer . . . . In other words, the promise of the third party was too indefinite for legal enforcement." *Vision Healthcare Sys. (Int'l) Pty, Ltd. v. Vision Software Techs. Inc.*, No. 15-CV-175, 2015 WL 2404089, at *3 (M.D. Tenn. May 20, 2015) (citing *Floss*, 211 F.3d at 315–16) (upholding arbitration agreement that stated, in relevant part, "arbitration shall take place in Nashville . . . before one arbitrator" without detailing further procedures, *id.* at *1).

f.  a proposed schedule for discovery, which must comply with the guidance set forth in the Court's model Civil Case Management Plan and Scheduling Order, available on the Court's website;

g.  any other issue that the parties would like to address at the pretrial conference; and

h.  any other information that the parties believe may assist the Court in advancing the case to settlement or trial.

**SO ORDERED.**

**Date:  March 1, 2023**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**