UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
BRIAN FLORES, STEVE WILKS, and RAY        :
HORTON, as Class Representatives, on behalf of   :
themselves and all others similarly situated,     :
                                                  :
                                    Plaintiffs,   :
                                                  :
                         v.                       :
                                                  :
THE NATIONAL FOOTBAL LEAGUE; NEW     :
YORK FOOTBALL GIANTS, INC. d/b/a NEW    :   Civil Action No.: 22-CV-00871 (VEC)
YORK GIANTS; MIAMI DOLPHINS, LTD.       :
d/b/a MIAMI DOLPHINS; DENVER BRONCOS    :
FOOTBALL CLUB d/b/a DENVER BRONCOS;     :
HOUSTON NFL HOLDINGS, L.P. d/b/a         :
HOUSTON TEXANS; ARIZONA CARDINALS       :
FOOTBALL CLUB LLC d/b/a ARIZONA          :
CARDINALS; TENNESSEE TITANS              :
ENTERTAINMENT, INC. d/b/a TENNESSEE      :
TITANS; and JOHN DOE TEAMS 1 through 26,  :
                                                  :
                                    Defendants.   :
-------------------------------------------------------------X

## *AMICI CURIAE* BRIEF OF LAW PROFESSORS
## IN SUPPORT OF PLAINTIFFS' MOTION FOR RECONSIDERATION

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES....................................................................................................ii

INTEREST OF *AMICI CURIAE* ..........................................................................................1

SUMMARY OF ARGUMENT...............................................................................................1

ARGUMENT...........................................................................................................................2

I.    Employment Arbitration's Legal History and Evolution, Which Include the
      Development of Norms or Protocols of Procedural Fairness, Help Demonstrate the
      Unconscionable Nature of the NFL's Contracts.............................................................2

      A.    The FAA, As Originally Enacted, Did Not Cover Statutory Claims .....................3

      B.    The FAA, As Originally Enacted, Did Not Cover Take-It-Or-Leave-It,
            Adhesion Contracts...............................................................................................4

      C.    The FAA, As Originally Enacted, Did Not Cover Employment Contracts ...........5

      D.    The Arbitration Community's Development of Procedural Fairness Standards
            in the Wake of *Gilmer* .........................................................................................6

II.   The NFL's Designation of Commissioner Goodell As Arbitrator Is Unconscionable
      and Contrary to the Procedural Fairness Standards Developed by the Arbitration
      Community ...................................................................................................................8

      A.    The Failure of the NFL's Agreements To Provide for the Joint, Meaningful
            Selection of An Arbitrator From a Diverse Roster..................................................8

      B.    The NFL's Designation of Commissioner Goodell As Arbitrator Is
            Unconscionable and Violates Norms of Procedural Fairness ...............................10

III.  The Court's Ruling Could Undermine the Legitimacy and Fairness of Arbitration for
      Millions of Workers and Consumers............................................................................12

CONCLUSION .....................................................................................................................14

APPENDIX  .................................................................................................................A1-A4

# **TABLE OF AUTHORITIES**

<u>CASES</u>                                                                                              Page(s)

*Am. Safety Equipment Corp. v. J.P. Maguire & Co.*,
    391 F.2d 821 (2d Cir. 1968) ..................................................................................4

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011) ...........................................................................................14

*Badgerow v. Walters*,
    142 S. Ct. 1310 (2022)...........................................................................................6

*Circuit City Stores, Inc. v. Adams*,
    532 U.S. 105 (2001) .............................................................................................6

*The Employers' Liability Cases*,
    207 U.S. 463 (1908) .............................................................................................5

*Gilmer v. Interstate/Johnson Lane Corp.*,
    500 U.S. 20 (1991) .......................................................................................*passim*

*New Prime Inc. v. Oliveira*,
    139 S. Ct. 532 (2019)...........................................................................................6

*Wellness Int'l Network v. Sharif*,
    575 U.S. 665 (2015) .............................................................................................5

*Wilko v. Swan*,
    346 U.S. 427 (1953) .............................................................................................4

<span style="font-variant: small-caps">Statutes</span>

Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021, Pub. L. No.
    117-90, 136 Stat. 2.............................................................................................13

Federal Arbitration Act, 9 U.S.C. §§ 1-16.............................................................*passim*

<span style="font-variant: small-caps">Legislative Materials</span>

*Bill Relating to Sales and Contracts to Sell in Interstate and Foreign Commerce; and a Bill to*
    *Make Valid and Enforceable Written Provisions or Agreements for Arbitration of Disputes*
    *Arising out of Contracts, Maritime Transactions, or Commerce Among the States or*
    *Territories or With Foreign Nations, Hearings on S. 4213 and S. 4214 Before a Subcommittee*
    *of the Senate Committee on the Judiciary,* 67th Cong. (1923) ....................................4

O<small>THER</small> A<small>UTHORITIES</small>

Richard A. Bales, *The Employment Due Process Protocol at Ten: Twenty Unresolved Issues, and A Focus on Conflicts of Interest*, 21 O<small>HIO</small> S<small>T</small>. J. <small>ON</small> D<small>ISP</small>. R<small>ESOL</small>. 165 (2005) .......................7, 8

Alexander J.S. Colvin, Economic Policy Institute, *The Growing Use of Mandatory Arbitration* (2018) ...........................................................................................................................7, 12

Alexander J.S. Colvin, *The Relationship Between Employment Arbitration and Workplace Dispute Resolution Procedures*, 16 O<small>HIO</small> S<small>T</small>. J. <small>ON</small> D<small>ISP</small>. R<small>ESOL</small>. 643 (2001) ........................6, 7

M<small>ARTIN</small> D<small>OMKE ET AL</small>., D<small>OMKE ON</small> C<small>OMMERCIAL</small> A<small>RBITRATION</small> (Dec. 2022 update)  .................8

Due Process Protocol for Mediation and Arbitration of Statutory Disputes Arising Out of the Employment Relationship (1995) ................................................................7, 8, 9, 11

Dunlop Commission on the Future of Worker-Management Relations, Fact Finding Report (May 1994) .......................................................................................................7, 10

Dunlop Commission on the Future of Worker-Management Relations, Final Report (Dec. 1994) ...........................................................................................................7, 10

Margaret M. Harding, *The Limits of the Due Process Protocols*, 19 O<small>HIO</small> S<small>T</small>. J. <small>ON</small> D<small>ISP</small>. R<small>ESOL</small>. 369 (2004) .............................................................................................7, 8

International Institute for Conflict Prevention and Resolution Due Process Protections..............10

JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness (2009) ...................................................................................................................10, 11

I<small>AN</small> R. M<small>ACNEIL ET AL</small>., F<small>EDERAL</small> A<small>RBITRATION</small> L<small>AW</small> (1995)  ........................................................8

James Madison, Federalist No. 10.................................................................................11

National Academy of Arbitrators, Policy Statement on Employment Arbitration (2009) .....10, 11

Imre S. Szalai, *A New Legal Framework for Employee and Consumer Arbitration Agreements*, 19 C<small>ARDOZO</small> J. C<small>ONFLICT</small> R<small>ESOL</small>. 653 (2018)  ...................................................... 14

I<small>MRE</small> S. S<small>ZALAI</small>, O<small>UTSOURCING</small> J<small>USTICE</small>: T<small>HE</small> R<small>ISE OF</small> M<small>ODERN</small> A<small>RBITRATION</small> L<small>AWS IN</small> A<small>MERICA</small> (2013) ....................................................................................................................3

Imre S. Szalai, *The Prevalence of Consumer Arbitration Agreements by America's Top Companies*, 52 U.C. D<small>AVIS</small> L. R<small>EV</small>. O<small>NLINE</small> 233 (2019) ...........................................12

iii

Imre S. Szalai, The Emp. Rts. Advoc. Inst., *The Widespread Use of Workplace Arbitration Among America's Top 100 Companies* (Mar. 2018) (80% of America's largest companies have used arbitration agreements for employment disputes) ....................................................12

## INTEREST OF *AMICI CURIAE*

*Amici* are law professors and scholars who focus on dispute resolution.[1] *Amici* are concerned that the Court's ruling in this case may undermine the equitable administration of arbitration and erode public confidence in arbitration. *Amici* file this brief to provide additional context regarding the unconscionable designation of NFL Commissioner Roger Goodell as arbitrator for these civil rights disputes.

## SUMMARY OF ARGUMENT

The Supreme Court's watershed decision in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991), opened the door for employers to implement mandatory arbitration for statutory claims brought by individual, non-union workers. In the wake of *Gilmer*, concerns arose that employers were unilaterally imposing one-sided, unconscionable arbitration agreements on their workers. As a result, leaders in the arbitration community during the 1990s developed norms or protocols of procedural fairness to help govern the new, emerging field of employment arbitration.

As explained in more detail below, the NFL's unilateral designation of Commissioner Goodell as arbitrator is unconscionable and contrary to the norms of fundamental fairness developed by the arbitration community. Furthermore, if the Court's current ruling stands, other corporate parties may rewrite their arbitration clauses to imitate the NFL's provisions whereby a company representative serves as the sole, designated arbitrator for employment disputes or consumer disputes against the company. The Court's ruling could undermine the legitimacy and fairness of arbitration for hundreds of millions of workers and consumers governed by arbitration

---

[1] *Amici* file this brief in their individual capacities, not as representatives of any organizations with which they are affiliated, and no one, other than *amici*, authored this brief in whole or in part. Also, no person or entity made a monetary contribution to the preparation or submission of the brief. The names, titles, and short biographies of *amici* appear in the appendix. Affiliation and membership with certain institutional organizations are set forth in the appendix for identification purposes only, and listing those organizations does not represent their support for this brief.

agreements.  Upholding such arbitration clauses designating a company representative as the sole arbitrator could transform arbitration as it has been practiced for decades and damage the credibility of arbitration as a viable form of dispute resolution.  *Amici* respectfully ask the Court to reconsider its ruling and hold that it is unconscionable for NFL Commissioner Roger Goodell to serve as the arbitrator for these civil rights claims.

## **ARGUMENT**

I. **Employment Arbitration's Legal History and Evolution, Which Include the Development of Norms or Protocols of Procedural Fairness, Help Demonstrate the Unconscionable Nature of the NFL's Contracts**

To better understand the unconscionability surrounding the NFL's designation of the NFL Commissioner as an arbitrator, this section provides some legal history and background regarding the development of employment arbitration in the United States.  In particular, this section explores how the Supreme Court's watershed decision in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991), transformed the arbitration landscape.  *Gilmer* opened the door for employers to implement mandatory arbitration for statutory claims brought by individual, non-union workers. This sudden rise of employment arbitration in turn prompted leaders in the arbitration community to develop certain norms or protocols of procedural fairness for the arbitration of statutory employment disputes.  As explained in this brief, the relevant NFL contracts at issue violate these norms of fundamental fairness.

Prior to the 1920s and the enactment of the Federal Arbitration Act ("FAA"), pre-dispute arbitration agreements were generally not enforceable in the United States.  However, with a growing, interconnected, national economy driven in part by advances in technology and transportation, and with the expansion of commerce beyond the narrow confines of small communities and trade associations, merchants began lobbying for modern arbitration laws around

1910.[2]  Such laws would reverse an old judicial tradition of hostility against arbitration and make pre-dispute arbitration agreements fully binding and enforceable in connection with interstate business deals.  During the early 1900s, before the adoption of uniform and simplified federal judicial rules of civil procedure in 1938, merchants were also frustrated with delays in court proceedings and the complex variations of court procedures from state to state.[3]  Because of the growing national economy during the early 1900s and the challenges of the existing court system, merchants heavily desired and lobbied for stronger arbitration laws at both the state and federal levels.  As a result of their lobbying efforts, Congress enacted the FAA in 1925.

Pursuant to the groundbreaking language of this statute, written provisions in a contract "to settle by arbitration a controversy thereafter arising out of such contract" became generally "valid, irrevocable, and enforceable." 9 U.S.C. § 2. The 1925 FAA reversed the former judicial hostility against arbitration and rendered pre-dispute arbitration agreements fully binding.  However, at the time of the FAA's enactment, the FAA was originally understood to be narrow in scope and not applicable to (A) statutory claims; (B) take-it-or-leave-it, adhesion contracts; or (C) employment contracts.  It was not until several decades later that the Supreme Court in cases like *Gilmer* began to transform and expand the original scope of the FAA.

### A.    The FAA, As Originally Enacted, Did Not Cover Statutory Claims

The FAA was originally understood to apply to a limited scope of disputes: contractual disputes, such as disputes regarding damaged goods, delivery dates, or the quality of goods shipped across state lines.  Upon a close, textual reading of the statute, the FAA's coverage is limited to written provisions in a contract "to settle by arbitration a controversy thereafter arising out of such

---

[2] For a deeper exploration of this history, please see IMRE S. SZALAI, OUTSOURCING JUSTICE: THE RISE OF MODERN ARBITRATION LAWS IN AMERICA (2013) (exploring the multiple factors, institutions, and events contributing to the transformation of arbitration laws during the 1920s).

[3] *Id.* at 166-73.

contract."  9 U.S.C. § 2.  Claims like personal injury claims, civil rights claims, or other statutory claims were not intended to be covered by the FAA because such claims do not depend on or arise from a contract.  Instead, the right to sue in these situations arises from duties imposed by tort law or by statute.  For example, Plaintiffs' right to sue here for unlawful discrimination, similar to one's right to sue to be free from bodily harm, does not depend on or arise from a contract.  Therefore, the right to sue in this instance is not covered by the FAA's text, which only applies to disputes arising out of a contract.  Thus, when the FAA was enacted and for several decades prior to landmark decisions like *Gilmer* in 1991, courts did not apply the FAA to statutory claims.  *See, e.g.*, *Wilko v. Swan*, 346 U.S. 427, 438 (1953) (holding federal statutory claim not arbitrable under the FAA); *Am. Safety Equipment Corp. v. J.P. Maguire & Co.*, 391 F.2d 821, 828 (2d Cir. 1968) (holding statutory antitrust claims not arbitrable under the FAA).

> ### B. The FAA, As Originally Enacted, Did Not Cover Take-It-Or-Leave-It, Adhesion Contracts

The FAA was originally intended to apply to contracts where there was meaningful choice and voluntary consent to arbitrate.  The FAA was not intended to apply to non-negotiable contracts of adhesion.  During Congressional hearings regarding the FAA's enactment, a Senator raised concerns about the enforcement of arbitration agreements drafted by a stronger party and presented on a take-it-or-leave-it basis.  The Senator gave examples of non-negotiable, standard form contracts, such as contracts drafted by the corporate juggernauts of the day: railroad and insurance companies.[4]  The Senator pointed out that such contracts are "not really voluntary" contracts.[5]  One

---

[4] *Bill Relating to Sales and Contracts to Sell in Interstate and Foreign Commerce; and a Bill to Make Valid and Enforceable Written Provisions or Agreements for Arbitration of Disputes Arising out of Contracts, Maritime Transactions, or Commerce Among the States or Territories or With Foreign Nations, Hearings on S. 4213 and S. 4214 Before a Subcommittee of the Senate Committee on the Judiciary*, 67th Cong. 9-11 (1923) [hereinafter *1923 Congressional Hearings*].
[5] *Id.* at 9, 10.

4

of the FAA's drafters testified in favor of the FAA and agreed with the Senator, explaining that the FAA was not intended to apply to such take-it-or-leave-it, non-negotiable contracts.[6]  Rather, the FAA was designed to facilitate the resolution of contract disputes between parties who knowingly and voluntarily agreed to arbitrate.  Voluntary, negotiated agreements to arbitrate are fully consistent with the waiver of Constitutional rights, such as the right to a jury trial.  *Cf. Wellness Int'l Network v. Sharif*, 575 U.S. 665, 685 (2015) (waiver of the right to Article III adjudication must be "knowing and voluntary").

### C.      The FAA, As Originally Enacted, Did Not Cover Employment Contracts

For the first several decades of the FAA's existence, it was widely understood that the FAA did not apply to employment contracts.  The FAA, by its terms, exclusively applies to contracts involving interstate commerce.  9 U.S.C. §§ 1, 2.  At the time of the FAA's enactment during the 1920s, the Commerce Clause of the U.S. Constitution was narrowly construed, and most employment relationships were generally viewed as local in nature, not involving interstate commerce at all.  *The Employers' Liability Cases*, 207 U.S. 463 (1908).  At the time of the FAA's enactment, there was one exception or category of employees who were viewed as involved in interstate commerce: transportation workers.  Transportation workers who crossed state lines, such as railroad employees, were considered to be involved in interstate commerce and were, therefore, subject to Congressional regulation.  To clarify that the FAA was never intended to cover any employment disputes at all, the FAA's drafters added precautionary language to the statute providing that the FAA does not apply to "contracts of employment" of any "class of workers engaged in interstate commerce."  9 U.S.C. § 1.  Moreover, during Congressional hearings regarding the FAA, one of its drafters stated that "[i]t was not the intention of this bill to make an

---

[6] *Id.* at 10.

industrial arbitration in any sense. . . .  It is not intended that this shall be an act referring to labor disputes, at all."[7]  Also, letters from the FAA's drafters, found in archival materials, stressed that "all industrial questions have been eliminated" from the FAA's coverage through section 1's exclusion of workers involved in interstate commerce, and according to the FAA's drafters, this exclusionary language was intended to ensure that no labor or employment disputes would fall under the coverage of this commercial arbitration statute.[8]

Thus, at the time of the FAA's enactment, and for several decades thereafter until the Supreme Court's watershed decision in *Gilmer* in 1991, the FAA did not cover an agreement to arbitrate employment disputes.

### D.   The Arbitration Community's Development of Procedural Fairness Standards in the Wake of *Gilmer*

The Supreme Court's 1991 decision in *Gilmer* was like a devastating, blindside hit from an All-Pro NFL linebacker.  *Gilmer* transformed the FAA and "set in motion one of the most dramatic shifts in the governance of employment relations of recent times."[9]  In *Gilmer*, the Supreme Court upheld the enforcement of an arbitration agreement under the FAA with respect to a statutory civil rights dispute in the employment setting.[10]  *Gilmer* was a revolutionary moment in the development of arbitration because the FAA, as originally understood for decades, did not at first cover these types of statutory disputes or employment disputes.  *Gilmer* represents the governing law today.[11]

---

[7] *1923 Congressional Hearings* at 9.

[8] SZALAI, *supra* note 2, at 135, 153.

[9] Alexander J.S. Colvin, *The Relationship Between Employment Arbitration and Workplace Dispute Resolution Procedures*, 16 OHIO ST. J. ON DISP. RESOL. 643, 643 (2001).

[10] *Gilmer*, 500 U.S. 20 (1991).  Following *Gilmer*, the Supreme Court in 2001 confirmed the applicability of the FAA to employment disputes by holding that only transportation workers are exempt under § 1 of the FAA.  *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001).

[11] However, the Supreme Court's current Justices have been using a more textual or literal approach when interpreting the FAA since 2019.  *See, e.g.*, *New Prime Inc. v. Oliveira*, 139 S. Ct. 532 (2019); *Badgerow v. Walters*, 142 S. Ct. 1310 (2022).  If the Supreme Court were to write on a clean slate and decide *Gilmer* today, it is possible there could

In the wake of this monumental change ushered in by *Gilmer* during the 1990s, complaints arose that employers in non-union workplaces were unilaterally implementing arbitration systems that failed to satisfy basic norms of fairness.[12]   Because of the unequal bargaining power often found in employment relationships, there was a growing concern that employers could dilute fundamental rights through one-sided or harsh arbitration procedures drafted by employers and presented to workers on a take-it-or-leave-it basis.[13]

In this new frontier where employers began unilaterally imposing mandatory arbitration in the workplace during the 1990s, procedural safeguards became necessary to protect workers. Leaders in the arbitration community responded by developing some minimal standards of procedural fairness for employment arbitration.   A task force was created in 1994 to address these concerns, and members of this task force included leaders from the National Academy of Arbitrators, American Arbitration Association, American Bar Association, Federal Mediation and Conciliation Service, and other organizations.[14]

In 1995, the task force produced the Due Process Protocol for Mediation and Arbitration of Statutory Disputes Arising Out of the Employment Relationship (hereinafter Due Process Protocol).[15]   In drafting the Due Process Protocol, the members of the task force were cognizant

---

be a different result, with perhaps the Court holding that statutory civil rights claims are not disputes that arise out of a contract or with perhaps the Court recognizing that the FAA exempts all workers engaged in interstate commerce, broadly defined.

[12] Dunlop Commission on the Future of Worker-Management Relations, Final Report 51, 52, 54-55, 73  (Dec. 1994); *see also* Colvin, *supra* note 9, at 643 (observing the growth of employment arbitration, from just a "handful of workplaces" at the beginning of the 1990s, to ten percent of companies in 1995, to sixteen percent in 1998); *see also* Alexander J.S. Colvin, Economic Policy Institute, *The Growing Use of Mandatory Arbitration* (2018) ("the share of workers subject to mandatory arbitration had risen from just over 2 percent (in 1992) to almost a quarter of the workforce [by the early 2000s]" and by 2018, "now exceeds 55%").

[13] Dunlop Commission on the Future of Worker-Management Relations, Fact Finding Report 118 (May 1994).

[14] Margaret M. Harding, *The Limits of the Due Process Protocols*, 19 Ohio St. J. on Disp. Resol. 369, 390 (2004).

[15] Due Process Protocol for Mediation and Arbitration of Statutory Disputes Arising Out of the Employment Relationship                                                                                                                          (1995), https://www.adr.org/sites/default/files/document_repository/Employment%20Due%20Process%20Protocol_0.pdf.
For more history regarding the development of the protocol, see generally Harding, *supra* note 14 (describing a confluence of factors, including the *Gilmer* decision, leading to the creation of the employment protocol); *see also*

of employers who had unilaterally implemented dispute resolution plans that "constituted inequitable and oppressive efforts to tilt the result of such [arbitration] to the employer, while depriving employees of many rights usually associated with due process and fairness."[16]  The Due Process Protocol, which was specifically confined to statutory claims under employment contracts, addressed a range of issues, such as the right of representation, adequate pre-hearing discovery, and most relevant to Plaintiffs' motion for reconsideration, the qualifications and selection process of arbitrators.[17]

## II.   The NFL's Designation of Commissioner Goodell As Arbitrator Is Unconscionable and Contrary to the Procedural Fairness Standards Developed by the Arbitration Community

### A.   The Failure of the NFL's Agreements To Provide for the Joint, Meaningful Selection of An Arbitrator From A Diverse Roster

It is well established that the most important decision in connection with arbitration is the parties' choice of an arbitrator.  3 IAN R. MACNEIL ET AL., FEDERAL ARBITRATION LAW § 27.1 (1995) (selecting the arbitrator is "the most important decision arbitrating parties can make," and "[i]n arbitration, to a great degree, the arbitrator *is* the process.") (emphasis in original); 2 MARTIN DOMKE ET AL., DOMKE ON COMMERCIAL ARBITRATION § 24:1 (Dec. 2022 update) ("The arbitrator is the decisive element in any arbitration.").

Because of the fundamental significance of selecting a neutral arbitrator, the landmark Due Process Protocol contains several provisions about arbitrator selection.  For example, the Due Process Protocol provides for the development of a roster of independent, impartial arbitrators to hear statutory employment disputes.[18]  Furthermore, arbitrators selected for membership on this

---

Richard A. Bales, *The Employment Due Process Protocol at Ten: Twenty Unresolved Issues, and A Focus on Conflicts of Interest*, 21 OHIO ST. J. ON DISP. RESOL. 165 (2005).
[16] Harding, *supra* note 14, at 391 (citation omitted).
[17] Due Process Protocol, *supra* note 15.
[18] *Id.* § C.1.

roster "should have skill in the conduct of hearings, knowledge of the statutory issues at stake in the dispute, and familiarity with the workplace and employment environment."[19]  Importantly, this roster of arbitrators for statutory disputes in the employment setting "should be established on a non-discriminatory basis, diverse by gender, ethnicity, background, experience, etc. to satisfy the parties that their interest and objectives will be respected and fully considered."[20]  Additionally, the Due Process Protocol recognizes that arbitrators on this roster should go through mandatory training, including training regarding the substantive employment laws at issue.[21]

The Due Process Protocol also recognizes as a critical component of procedural fairness the right of both the employee and employer to participate in the joint selection of an arbitrator from a roster or list of arbitrators.  For binding arbitration of employment disputes involving statutory rights, such as the very rights at issue in this case, the Due Process Protocol emphasizes the following:

> We recognize the right of employers and employees to *jointly select* as mediator and/or arbitrator one in whom *both parties have requisite trust*. . . .[22]

Furthermore, to promote fairness during this joint selection process, the Due Process Protocol provides for the use of a list procedure whereby the parties engage in alternate striking of names of potential arbitrators from the list, taken from the roster of diverse, qualified, trained arbitrators.[23]

In addition to the landmark Due Process Protocol, leading arbitration organizations have similarly recognized the key fairness principle that workers must have the right to participate meaningfully in the selection of an arbitrator:

---

[19] *Id.*
[20] *Id.*
[21] *Id.* § C.2.
[22] *Id.* § C.1 (emphasis added).
[23] *Id.* § C.3.

- The National Academy of Arbitrators captured this fairness principle with the following analysis for employment disputes: "Did both parties have a meaningful [arbitrator] selection opportunity? A negative answer to this question should cause you to decline the case . . . ."[24]

- JAMS, another leading arbitration organization, recognized the following as a minimum standard of procedural fairness for employment disputes: "an employee must have the right to participate in the selection of the arbitrator(s)."[25]

- The International Institute for Conflict Prevention and Resolution, another leading arbitration organization, developed the following as part of its Due Process Protections for employment disputes: employees "shall have the right to nominate any person(s) for consideration as an arbitrator."[26]

Putting aside for the moment the identity of the chosen arbitrator in this case, the NFL's unilateral designation of *any arbitrator* on a take-it-or-leave-it basis, without Plaintiffs' meaningful participation, is, by itself, deeply troubling considering the norms and protocols of procedural fairness developed by the arbitration community.

### B.     The NFL's Designation of Commissioner Goodell As Arbitrator Is Unconscionable and Violates Norms of Procedural Fairness

To add insult to injury, the NFL not only stripped away Plaintiffs' meaningful participation in the selection of an arbitrator, *which by itself contravenes procedural fairness*, but also

---

[24] National Academy of Arbitrators, Policy Statement on Employment Arbitration (2009), https://naarb.org/employment-arbitration-policy-and-guidelines.

[25] JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness (2009), Standard No. 2, https://www.jamsadr.com/employment-minimum-standards.

[26] International Institute for Conflict Prevention and Resolution Due Process Protections, https://static.cpradr.org/docs/Due%20Process%20Protections%205.9.22.pdf; *see also* Dunlop Final Report, *supra* note 12, at 57 (for fairness in employment arbitration in the wake of *Gilmer*, the Dunlop Commission recommends a selection process where both the employer and employee jointly participate in the selection of an arbitrator from a roster of qualified, trained, experienced arbitrators, and "[n]either party should be able to limit the roster unilaterally so as to risk the possibility that the arbitrator finally selected will be biased in favor of that side").

unilaterally and specifically designated a highly problematic arbitrator: Commissioner Roger

Goodell.  The Due Process Protocol and norms of fairness developed by the arbitration community

require a neutral, impartial arbitrator,[27] and the designation of Commissioner Goodell violates

these norms of fundamental fairness in several ways:

- First, Commissioner Goodell is the chief executive officer of the NFL, and the team owners

  employ him and set his compensation.  His interests are inextricably tied to Defendants.

  Because he is inseparable from Defendants in this case, he cannot be viewed as a neutral

  and impartial arbitrator.[28]

- Second, within hours of the filing of Plaintiffs' lawsuit, the NFL, which Commissioner

  Goodell oversees, immediately issued a public announcement emphatically declaring that

  Plaintiffs' claims are "without merit."  It is unthinkable for an arbitrator to prejudge a case

  or make such public statements about the case.  Arbitration becomes a sham under such

  circumstances.

- Third, Commissioner Goodell could be called as a witness in this case.  As such, he is

  ineligible to receive this case and cannot serve as a neutral and impartial arbitrator to hear

  these claims.

- Fourth, Commissioner Goodell is not an attorney; he is not legally trained to hear these

  civil rights disputes.

It cannot be overemphasized that the NFL's unilateral designation of Commissioner Goodell to

serve as the arbitrator for these civil rights disputes, without the meaningful opportunity of

---

[27] *See supra* notes 18-26 and accompanying text; *see also* National Academy of Arbitrators, Policy Statement on Employment Arbitration (2009) (arbitrators "should scrupulously maintain both the reality and the appearance of impartiality"); JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness (2009), Standard No. 2 ("The arbitrator(s) must be neutral.").

[28] "No man is allowed to be a judge in his own cause; because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity." James Madison, Federalist No. 10.

employees to choose the arbitrator, is unconscionable and an egregious violation of fundamental fairness, like a flagrant horse-collar tackle, a hit on a defenseless player, or allowing a referee to officiate a professional football game where the referee owns one of the teams.

### III.  The Court's Ruling Could Undermine the Legitimacy and Fairness of Arbitration for Millions of Workers and Consumers

With the expansion of arbitration law, arbitration agreements have blitzed throughout American society, and today, there are hundreds of millions of arbitration agreements governing workers and consumers.  In the workplace, more than 60 million American workers are bound by arbitration agreements, and about 80% of America's largest companies have used arbitration agreements for employment disputes.[29]  In the consumer setting, a 2018 study found that conservatively, there were more than 826 million consumer arbitration agreements in the United States.[30]  These figures are gargantuan when one considers that the entire population of the United States is about 330 million.[31]

In light of these astronomical numbers of employment and consumer arbitration agreements, the impact of this Court's ruling on the future of arbitration cannot be understated. Imagine that in the wake of the Court's ruling allowing Commissioner Goodell to serve as the arbitrator in this civil rights employment matter, major companies like Uber update their arbitration agreements for both customers and workers.  For example, Uber could rewrite its arbitration clause to state that the arbitrator for all consumer or driver disputes must be a senior

---

[29] Alexander J.S. Colvin, Economic Policy Institute, *The Growing Use of Mandatory Arbitration* (2018) (more than 60 million American workers are bound by arbitration agreements); Imre S. Szalai, The Emp. Rts. Advoc. Inst., *The Widespread Use of Workplace Arbitration Among America's Top 100 Companies* (Mar. 2018) (80% of America's largest companies have used arbitration agreements for employment disputes).

[30] Imre S. Szalai, *The Prevalence of Consumer Arbitration Agreements by America's Top Companies*, 52 U.C. DAVIS L. REV. ONLINE 233 (2019) (81% of America's largest companies have used arbitration agreements for consumer transactions, and by conservative estimates, there are more than 826 million consumer arbitration agreements in America).

[31] *Id.*

employee of Uber, such as an executive or senior level management working at Uber's headquarters.  Or perhaps Uber modifies its arbitration clause so that all disputes must now be resolved through arbitration with Uber's CEO serving as the arbitrator.

Based on the Court's reasoning in the current case, Uber will likely argue that courts must avoid presupposing that a designated arbitrator, such as an Uber executive or manager, is biased, and furthermore, Uber's customers and drivers consented to this arrangement.  Under the Court's reasoning, such arbitration agreements where company executives are designated as arbitrators would be fully enforceable.  And the only apparent recourse for consumers and workers would be post-award: if the Uber executive or manager eventually displays actual bias during the course of such an arbitration proceeding, a customer or driver could subsequently petition to vacate an arbitral award after an award has been issued.  Following this Court's reasoning, other courts could easily order Uber customers and drivers to arbitrate race discrimination claims, or virtually any other type of claim,[32] before Uber management.   As explained above, this situation is unconscionable and violates fundamental fairness norms.

If this Court's ruling stands, other corporate parties may rewrite their arbitration clauses to imitate the relevant contract provisions at issue in this case, whereby a company representative serves as the sole, designated arbitrator for employment disputes or consumer disputes against the company.  The Court's ruling could undermine the legitimacy and fairness of arbitration for hundreds of millions of workers and consumers.  Upholding arbitration clauses whereby a company representative serves as the sole arbitrator in a worker's or consumer's case against the company could transform arbitration as it has been practiced for decades and damage the

---

[32] Congress recently adopted a notable exception involving sexual harassment or sexual assault claims arising after March 3, 2022.  Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021, Pub. L. No. 117-90, 136 Stat. 2.

credibility of arbitration as a viable form of dispute resolution.  To preserve any public confidence in arbitration, the Court should ensure procedural fairness and protect the traditional ability of parties to engage in a meaningful, joint selection of a competent, neutral arbitrator from a list or roster of qualified, diverse arbitrators.

## **CONCLUSION**

For the reasons set forth in Plaintiffs' motion for reconsideration, the Court should overturn the call on the field and find that it is unconscionable and a violation of procedural norms of fundamental fairness for NFL Commissioner Roger Goodell to hear Plaintiffs' civil rights claims against the NFL and its teams.[33]

---

[33] When an arbitration agreement contains seriously-flawed provisions, such as the designation of Commissioner Goodell in this case as the arbitrator, the correct solution is to invalidate the entire obligation to arbitrate.  Textually, the heart of the FAA provides that agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Under section 2, the FAA's most important provision, there are only two options: either the agreement to arbitrate is fully enforceable, or the agreement is not enforceable in its entirety if there is a basis at law or in equity to challenge the contract. *Cf. AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 355 (2011) (Thomas, J., concurring) (FAA permits general contract defenses concerning the *formation* of an agreement to arbitrate).  Section 2 does not provide for severance of problematic terms, such as a fundamentally-flawed provision regarding the designation of an arbitrator.  Similarly, section 3 of the FAA does not permit severance of unconscionable terms.  Section 3, which builds on the foundation of section 2, provides for a stay of litigation "until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3 (emphasis added).  Pursuant to this text, either a court grants a stay so that the arbitration takes place "in accordance with the terms of the agreement," or the court does not grant a stay at all.  Section 4 of the FAA, which also carries out the core directive of section 2, likewise does not permit severance of problematic terms in an arbitration agreement.  If one party refuses to honor an agreement to arbitrate, section 4 of the FAA states that "the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."  9 U.S.C. § 4 (emphasis added).  Section 4 also does not provide a court with the power to reshape the parties' agreement by ordering severance of unconscionable terms.  Also, merely severing unconscionable terms incentivizes and actually rewards stronger parties who wish to game the system and continue drafting harsh terms. For additional explanations why the text, history, and policy behind the FAA require invalidation of an entire obligation to arbitrate if an arbitration agreement contains unconscionable terms, see Imre S. Szalai, *A New Legal Framework for Employee and Consumer Arbitration Agreements*, 19 Cardozo J. Conflict Resol. 653 (2018). *Amicus curiae* Professor Imre S. Szalai, if asked by the Court, could submit further briefing and additional background why invalidation of the entire obligation to arbitrate is the proper remedy under the FAA when a clause contains unconscionable terms.

Dated:  March 21, 2023
        New York, New York

                                        By:   /s/Kevin Mintzer_____
                                              LAW OFFICE OF
                                              KEVIN MINTZER, P.C.
                                              Kevin Mintzer
                                              1350 Broadway, Suite 1410
                                              New York, New York 10018
                                              *Attorneys for Amici Curiae*
                                              646-843-8180
                                              km@mintzerfirm.com

## Appendix

**Biographies of *Amici***

**Gilat Juli Bachar** is an Assistant Professor of Law at Temple University Beasley School of Law, where she teaches Torts, Professional Responsibility, and a seminar in Dispute Resolution. She was previously a Visiting Assistant Professor at Villanova University School of Law, teaching Contracts and Dispute Resolution. Prior to Villanova, Gilat was a research fellow with the Stanford Center on the Legal Profession, and a Stanford Law School Public Interest Fellow at the Center for Justice & Accountability in San Francisco where she worked on social justice tort litigation in federal courts. Gilat graduated with a JSD from Stanford Law School in 2018, where her research won one national and two school-wide awards, as well as numerous research grants. Prior to coming to Stanford, she clerked for the Israeli Chief Justice, worked as an associate in one of Israel's leading litigation firms, and earned an LL.B. in Law and an M.B.A. in Business Administration, both summa cum laude, from the Hebrew University of Jerusalem. Her work, which has been published or is forthcoming in journals such as the Arizona State Law Journal, Cardozo Law Review, Hastings Law Journal, and Chicago Journal of International Law, investigates both theoretically and empirically how lay people, disputants and lawyers perceive and apply legal concepts like accountability, confidentiality and deterrence and how their perceptions inhibit or help produce social change.

**Rick Bales** is a faculty member at Ohio Northern University Law School. He teaches a wide variety of labor/employment and ADR courses, Torts, and Civil Procedure. He has published more than 100 scholarly articles and authored or co-authored 10 books on a variety of topics related to labor/employment/ADR. Rick also is a labor arbitrator. He is a member of the National Academy of Arbitrators and the College of Labor and Employment Lawyers, and he serves on FMCS, AAA, SERB (Ohio), MERC (Michigan), and Houston Police panels. In 2010, Rick served as a Fulbright Specialist providing dispute resolution training to labor judges in Malaysia. Three years later, he again served as a Fulbright Specialist, this time in Indonesia. His time in Malaysia led to his becoming familiar with the Cambodian Arbitration Council – a model for labor-arbitration design throughout Southeast Asia. That, in turn, led to several opportunities to work with the Solidarity Center to provide dispute-resolution training to garment workers in Myanmar. The goal – since disrupted by the 2021 military coup – was to provide tripartite (labor, management, neutrals) training there in labor dispute resolution.

**George A. Bermann** is a Professor of Law and director of Center for International Commercial and Investment Arbitration (CICIA), Columbia Law School; international commercial and investment arbitrator since 1980; founding member, Governing Board, ICC International Court of Arbitration; director of global board, New York International Arbitration Center (NYIAC); editor-in-chief, "American Review of International Arbitration;" patron, Chartered Institute of Arbitrators; president of board of Thai International Arbitration Center (Bangkok, Thailand); president of board of Center for International Investment and Commercial Arbitration (Lahore, Pakistan); professor, MIDS program in international dispute resolution (Geneva); Professor, Sciences Po LL.M. (Paris); Chief Reporter of ALI Restatement of the U.S . Law of International Commercial and Investment Arbitration; author of "Twilight Issues in International Arbitration," "International   Arbitration and Private International Law" (Hague General Course in Private

International Law); "Mandatory Law in International Arbitration," "Nutshell on International Commercial Arbitration," "Nutshell on Transnational Litigation;" Lifetime Achievement Award, American Society of Comparative Law; past president, International Academy of Comparative Law; past president, American Society of Comparative Law; honorary degrees, University of Fribourg (Switzerland), University of Versailles-St. Quentin (France); Nova University of Lisbon (Portugal); University Cesar Vallejo (Lima, Peru); founder and past editor-in-chief, "Columbia Journal of European Law;" founder and former director, European Legal Studies Center, Columbia Law School.

**Benjamin Davis** is Emeritus Professor of Law of the University of Toledo College of Law and a Visiting Professor of Law at Washington and Lee School of Law with 23 years experience in academia.  He is a former Chair of the American Bar Association Section of Dispute Resolution. Some of the subjects he teaches are Alternative Dispute Resolution, International and Domestic Arbitration, and Contracts.  Prior to entering academia, for ten years he was the American Legal Counsel at the Secretariat of the International Court of Arbitration of the International Chamber of Commerce in Paris, France, where he directly supervised around 1000 international commercial arbitrations and mediations.

**Ylli Dautaj** is an Adjunct Professor at Penn State Law, U.S.; Lecturer, Brunel University London, U.K.; visiting lecturer Uppsala University, Sweden; and Managing Partner at DER Legal, Sweden. Ylli focuses his practice and scholarship on international arbitration, commercial law, and international economic law.  He has published numerous academic articles and books on commercial law, international arbitration, and public international law, including e.g., with Manchester Journal of International Economic Law, Brill Research Perspectives, American Review of International Arbitration, The International Lawyer, Fordham International Law Journal, Cornell International Law Journal, and Dispute Resolution Journal.

**Michael Z. Green** has served as a full professor at Texas A&M University School of Law since its beginning in August 2013 and as the Director of its Workplace Law Program since 2015.  He has published several law review articles and book chapters in support of his scholarly agenda focused on workplace law issues and their intersection with dispute resolution and race.  He has also discussed his scholarly endeavors at many national and international venues.  As a member of the Labor Law Group, a collection of scholars engaged in producing quality casebooks for instruction in labor and employment law, he is a co-author of the Fourth Edition of <u>ADR in the Workplace</u> by West, published in 2020.  In September 2019, he was selected as a member of the National Academy of Arbitrators in recognition of his scholarly achievements and service as a labor arbitrator.

**Deborah Hensler** is the Judge John W. Ford Professor of Dispute Resolution at Stanford Law School, where she teaches courses on domestic, international and investor state arbitration and global litigation. She has written extensively on court-connected ADR and arbitration and conducted empirical research on the uses of arbitration.

**Ariana R. Levinson** is a Professor of Law and the Associate Dean for Intellectual Life at the University of Louisville Louis D. Brandeis School of Law where she teaches Employment Law, Dispute Resolution, and Arbitration Practice.  Professor Levinson is also a fellow in the Rutgers

School of Management & Labor Relations Institute for the Study of Employee Ownership & Profit Sharing.  Professor Levinson has published six law review articles about arbitration and is a co-author of the West Concise Hornbook Principles of Arbitration Law.  She is the faculty advisor for the Brandeis School of Law ABA Student Division Mock Arbitration Team and for the Wagner Moot Court Team. Professor Levinson is admitted to practice in Indiana and California.  She graduated magna cum laude from the University of Michigan Law School.  During law school, she served as a contributing editor on the Michigan Law Review and was awarded the Robert S. Feldman Labor Law Award for the most outstanding work in that field.

**Mnotho Ngcobo** is an esteemed legal scholar with expertise in alternative dispute resolution (ADR) and a passion for sports arbitration and access to justice. He is a fellow of the American Bar Association, Section on Dispute Resolution, and serves as a distinguished lecturer of law at Jindal Global Law School, where he also serves as a fellow of the Centre for Alternative Dispute Resolution. Mnotho has extensive experience as an ADR specialist in the United States, South Africa, and India, and is highly regarded for his exceptional research and publications in this field. Mnotho has successfully handled arbitration cases involving sports law and has a profound understanding of the unique challenges and intricacies involved in these cases.  He holds a Master of Laws in Dispute Resolution from the University of Missouri and is an admitted attorney of the high court of South Africa.

**Alexi Pfeffer-Gillett** is a Visiting Assistant Professor at the University of Maryland Carey School of Law and an incoming Assistant Professor at the Washington & Lee University School of Law. He previously clerked for Judge Mary M. Schroeder on the United States Court of Appeals for the Ninth Circuit and has experience in class-action securities litigation.  His scholarship has appeared or is forthcoming in the University of Pennsylvania Law Review, the Minnesota Law Review, the Duke Law & Technology Review, and the California Law Review.  Professor Pfeffer-Gillett earned his J.D. from the University of California, Berkeley, School of Law.

**Andrea Kupfer Schneider** is a Professor of Law and Director of the Kukin Program for Conflict Resolution at Cardozo School of Law.  Professor Schneider was the previous director of the nationally ranked ADR program at Marquette University Law School in Wisconsin, where she taught ADR, Negotiation, Ethics and International Conflict Resolution for over two decades. In addition to overseeing the ADR program, Professor Schneider was the inaugural director of the university's Institute for Women's Leadership. Professor Schneider has published numerous articles on negotiation, plea bargaining, negotiation pedagogy, ethics, gender and international conflict.  Her books include Discussions in Dispute Resolution: The Foundational Articles, edited with Art Hinshaw and Sarah Cole (Oxford University Press 2021) (winner of the 2022 CPR Book Award); and multiple textbooks in the field.  She is a founding editor of Indisputably, the blog for ADR law faculty, and started the Dispute Resolution Works-in-Progress annual conferences in 2007.  In 2016, she gave her first TEDx talk titled Women Don't Negotiate and Other Similar Nonsense.  She was named the 2017 recipient of the ABA Section of Dispute Resolution Award for Outstanding Scholarly Work, the highest scholarly award given by the ABA in the field of dispute resolution.

**<u>Imre Stephen Szalai</u>** is the Judge John D. Wessel Distinguished Professor of Social Justice at Loyola University New Orleans College of Law.  He is a graduate of Yale University, and he received his law degree from Columbia University, where he was named a Harlan Fiske Stone Scholar.   His teaching and scholarly passion focus on dispute resolution, arbitration, and arbitration law.   For two decades, he has extensively studied the uses of arbitration and the development of arbitration law in the United States from the colonial period to the present, and he has written books, book chapters, and articles about the history and development of the FAA.  His scholarship has appeared in top journals of dispute resolution, and he maintains a blog focusing on arbitration law, www.arbitrationusa.com.  He also serves as a commercial arbitrator.