# Exhibit K



## NATIONAL FOOTBALL LEAGUE

**ROGER GOODELL**
*Commissioner*

September 17, 2024

David Gottlieb, Esq.
Douglas Wigdor, Esq.
WIGDOR LLP
85 Fifth Avenue
New York, NY 10003

William Burck, Esq.
QUINN EMANUEL
1300 I Street, N.W.
Suite 900
Washington, D.C. 20005-3314

Adolpho Birch, Esq.
Senior Vice President
TENNESSEE TITANS
460 Great Circle Road
Nashville, TN 37228

Dan Nash, Esq.
AKIN GUMP
Robert S. Strauss Tower
2001 K Street, N.W.
Washington, D.C. 20006

### Re: Requests for Arbitration of Disputes Between Brian Flores and Miami Dolphins, Ltd., Ray Horton and Tennessee Titans, and Steve Wilks and Arizona Cardinals LLC

Gentlemen:

This will set forth my decision regarding various issues presented in the above-referenced arbitrations. Briefly summarized, I have determined (a) that the proceedings are sufficiently "football-oriented" to warrant being addressed through binding arbitration under the NFL Constitution and Bylaws and the League's Dispute Resolution Guidelines; and (b) that the three disputes will be consolidated and addressed in a single proceeding by the same arbitrator. Finally, I have appointed the Hon. Peter Harvey to serve as the arbitrator of these disputes.

### Background

Brian Flores served as Head Coach of the Miami Dolphins during the 2019-2021 NFL seasons. His employment was terminated by Miami following the 2021 season. (Statement of Claim ("Claim") at 163.) Ray Horton was interviewed, but not hired, for the position of Head

Messrs. Gottlieb, Birch, Burck, and Nash
September 17, 2024
Page two

Coach of the Tennessee Titans prior to the 2016 season. (Claim at 262, 266.) Steve Wilks served as head coach of the Arizona Cardinals during the 2018 season, after which he was terminated. (Claim at 218, 240.)

Coach Flores filed suit in February of 2022 alleging claims of discrimination and retaliation against the Dolphins, Denver Broncos, and New York Giants. A subsequent amendment added claims by Coach Flores against the Houston Texans. Coach Horton and Coach Wilks also joined the lawsuit, filing claims of discrimination against the Titans and Cardinals, respectively. Each coach also asserted various claims against the NFL.

The District Court heard motions to compel arbitration filed by all clubs and the NFL, and ordered all claims of Coaches Horton and Wilks, and Coach Flores's claims against Dolphins, and their related claims against the NFL, to be addressed in arbitration proceedings under the NFL Constitution and Bylaws. The District Court did not compel arbitration of the claims asserted by Coach Flores against the Broncos, Giants, and Texans, and his related claims against the NFL, and the arbitrability of those claims is currently before the Court of Appeals. Accordingly, this decision is limited to the claims that have been ordered to arbitration and I express no opinion on the claims currently pending in the Court of Appeals. Similarly, because I have appointed a third party to serve as arbitrator of these claims, I express no opinion on the merits of the matters committed to arbitration, which will be for the arbitrator to determine.

### The Claims Asserted by Each Coach are Sufficiently Football-Oriented to Require that they be Resolved in Arbitration Under the NFL Constitution and Bylaws

In assessing whether the claims are "football-oriented," and therefore properly addressed in a league arbitration, I have relied on the factual allegations made by each coach, as set forth in the Statement of Claim. There is a dispute between the Dolphins and Coach Flores as to which party initiated, or was entitled to initiate, an arbitration proceeding. The Dolphins contend that the club did so in letters dated February 17 and 18, 2022. Coach Flores argues that, having filed his lawsuit in federal court, the Dolphins could not initiate arbitration proceedings. For present purposes, I do not need to resolve this matter, since the District Court has directed that the entire dispute between Coach Flores and the Dolphins, and any related claims against the NFL, be resolved through arbitration. This includes both Coach Flores's claims against the Dolphins and any counterclaims that the Dolphins have asserted against Coach Flores.

ROGER GOODELL
*Commissioner*

**Coach Flores** — Coach Flores's allegations against the Dolphins address several issues, all of which directly relate to his tenure as the club's head coach. The allegations address his performance as Miami's head coach ("Mr. Flores did a fantastic job [as Miami's head coach] in three seasons from 2019-2021." Claim at 145.); his dispute with owner Stephen Ross over allegations that Mr. Ross wanted the Dolphins deliberately to lose games ("Mr. Ross had wanted Mr. Flores to 'tank' the season to put the team in position to secure the first pick in the draft." Claim at 147.) and the allegation that Mr. Ross offered Coach Flores "$100,000 for each game lost that year." Claim at 148; see also Claim at 150-153 (alleging that Coach Flores "made clear . . . that he would try his very best to win every game the Dolphins played" and that Coach Flores complained in writing about "the unreasonable position he was being place in by the team and upper management.").

The Statement of Claim also details allegations relating to violations of the NFL's Anti-Tampering Rules with respect to recruiting "a prominent quarterback" and Coach Flores's refusal "to comply with . . . improper directives" from Mr. Ross in that respect, as well as his refusal to participate in a meeting with the quarterback. (Claim at 154-158.). Coach Flores alleges that his termination as Miami's head coach was the direct result of his refusal to engage in this prohibited conduct. (Claim at 162-163.)

The allegations of "tanking" to improve a team's draft position, and of tampering with another club's players or coaches (Claim at 164), address core football issues of fair competition and integrity of the game, and reflect conduct long prohibited within the NFL. When these issues first surfaced, they were investigated at my direction by independent counsel, and based on the findings of that investigation, I imposed significant discipline on the Dolphins and two owners, including Mr. Ross, in August of 2022. Insofar as these matters allegedly led to Coach Flores being dismissed as Miami's head coach, they reflect a dispute that concerns NFL rules and policies that are central to the operations of a sports league.

The Statement of Claim also alleges that the Dolphins retaliated against Coach Flores following his termination and the filing of his federal lawsuit by conditioning his severance payments on his signing a "Separation Agreement" that included both a release "that was far broader in its scope than what was set forth" in the employment contract and included several additional terms that "far exceeded a general release of claims." (Claim at 165-170.) Coach Flores contends that Miami's refusal to pay severance absent his agreement to these objectionable provisions "constitutes a breach of the Flores-Dolphins Contract." (Claim at 171.)

**ROGER GOODELL**
*Commissioner*

Messrs. Gottlieb, Birch, Burck, and Nash
September 17, 2024
Page four

This is the same contract that governed Coach Flores's service as Miami's head coach and includes the arbitration provisions relied upon by the District Court in directing that this dispute be resolved in a league arbitration. There is no reason to treat this breach of contract claim as outside the scope of the arbitration provision or something other than a traditional, football-oriented dispute.

Accordingly, I find that Coach Flores's claims against the Miami Dolphins, and his related claims against the NFL, are sufficiently football-oriented that they are properly resolved in an arbitration proceeding under the NFL Constitution and Bylaws.

**Coach Horton** – Coach Horton's claim is focused on a brief period in mid-January of 2016, when he was under consideration to be the head coach of the Tennessee Titans. In particular, Coach Horton alleges that he was invited to interview with the Titans but was asked to "immediately get on a flight to Tennessee to interview . . . the next day." As a result, Coach Horton "took a red-eye flight on little notice" and met with Titans ownership and executives on January 16, 2016. (Claim at 257-260.). Coach Horton further alleges that this rushed interview "was an orchestrated attempt to make it appear that the Titans had complied with the Rooney Rule" and that the interview was a sham because the team had already decided to retain its interim head coach, Mike Mularkey. (Claim at 261.)

Coach Horton's claim alleges that he had an excellent interview, during which he received positive feedback from Titans ownership and executives (Claim at 262-264). Nonetheless he was told later that same day that the club had decided to retain Mr. Mularkey, whom Coach Horton had seen in the facility on the day of his interview. (Claim at 265-266.) Coach Horton became convinced that his job interview was a sham based on comments that Mr. Mularkey made to the media in October of 2020, in which he stated that he had been told that he would "be the head coach in 2016, before they went through the Rooney Rule" and that the Titans engaged in "this fake hiring process" in which the other coaches being interviewed "had no chance to get that job." (Claim at 267-269.)

In short, Coach Horton alleges that Tennessee engaged in a sham hiring process in violation of the Rooney Rule and other league policies for clubs. This is a claim that Tennessee violated a policy governing clubs' recruitment and hiring of the most important football-related positions, among others. This policy was adopted by all clubs with the recognition that a violation of the policy would be considered conduct detrimental and would subject the club and individuals to discipline. (See, e.g., Claim at 273-276.). A dispute concerning an alleged

**ROGER GOODELL**
*Commissioner*

Messrs. Gottlieb, Birch, Burck, and Nash
September 17, 2024
Page five

violation of such NFL rules and policies is sufficiently football-oriented to be addressed in a league arbitration proceeding.

Accordingly, I find that Coach Horton's claims against the Tennessee Titans, and his related claims against the NFL, are sufficiently football-oriented that they are properly resolved in an arbitration proceeding under the NFL Constitution and Bylaws.

**Coach Wilks** – Coach Wilks's claim relates to his service as head coach of the Arizona Cardinals during the 2018 season, when he alleges that he was hired as a "bridge coach," meaning a coach "who is not given a meaningful opportunity to succeed and is simply 'keeping the seat warm' until the team is better positioned to succeed, at which point a new coach is brought in." (Claim at 219-220.) Coach Wilks alleges that he was not given sufficient time or authority to develop the team; as one example, the Cardinals lacked a starting quarterback and that he and then-General Manager Steve Keim disagreed on which quarterback should be selected in the 2018 draft. Ultimately, the player who Mr. Keim selected was unsuccessful and is no longer employed in the NFL, while the player who Coach Wilks preferred has thrived after being selected by another club. (Claim at 221-225.) As another example, Coach Wilks alleges that he was "micromanaged" and not allowed to select his own offensive coordinator. (Claim at 234.)

Coach Wilks also made detailed allegations relating to a DUI offense committed by Mr. Keim, how the Cardinals responded to the DUI, the difficulties that Mr. Keim's suspension created for Coach Wilks, and the use – allegedly at owner Michael Bidwill's direction – of "burner phones" to communicate with Mr. Keim during his suspension. (Claim at 227-233.)

Coach Wilks alleges that he "did a tremendous job under extremely difficult circumstances" that included suggestions that ownership was annoyed that the team's success on the playing field "might . . . compromise[] the Cardinals' ability to obtain the first pick in the NFL draft." (Claim at 235, 241; 237-238.)

Coach Wilks alleges that his termination, after only one season, was "unjust" and that he should have been given an opportunity for a second year, especially since the Cardinals were able to draft quarterback Kyler Murray with the first pick in the draft. (Claim at 242-244.) He alleges that the Cardinals should have fired the General Manager instead. (Claim at 245-246.)

**ROGER GOODELL**
*Commissioner*

Messrs. Gottlieb, Birch, Burck, and Nash
September 17, 2024
Page six

    The allegations made by Coach Wilks, which address the scope of his authority as head coach, disputes between himself and the club's GM over player selection, the club's discipline of the General Manager for his DUI (and whether that discipline was adhered to or circumvented at the owner's direction), and whether his termination was appropriate given his job performance go to football issues and are football-oriented.

    Accordingly, I find that Coach Wilks's claims against the Cardinals, and his related claims against the NFL, are sufficiently football-oriented that they are properly resolved in an arbitration proceeding under the NFL Constitution and Bylaws.

### The Claims of the Three Coaches Should be Consolidated in a Single Proceeding

    The next issue that the parties have presented to me for resolution is whether the claims should be consolidated and addressed in a single proceeding or should be addressed separately. I believe that the better course is for the claims to be considered in a single proceeding and am confident that a schedule for pre-hearing matters (discovery, motions practice, etc.), and hearings can be crafted that will promote a fair and efficient resolution of these disputes.

    Similarly, the arbitrator will have the authority to consider the extent to which the claims of Coach Horton and Coach Wilks, all of which have been committed to arbitration, may be heard on behalf of a class, and if so, the definition of that class, or only on an individual basis. Insofar as Coach Flores asserts claims against Miami that are distinct from his claims against Denver, Houston, and the New York Giants that are currently pending in federal court, the arbitrator will also have the authority to consider the extent to which those claims may be heard on behalf of a class, and if so, the definition of that class, or only on an individual basis. Having determined that the claims are "football-oriented" and therefore properly resolved in an arbitration proceeding under the Constitution and Bylaws, the treatment of particular issues raised by either the coaches or the clubs is a matter for the arbitrator.

    The arbitrator will, of course, have the customary authority regarding scheduling and the parties may make applications as appropriate to address issues or to seek accommodations in the schedule, as well as to establish appropriate procedures for determining the scope of the proceedings and how (if at all) any class action claims will be addressed. These matters are committed to the sound discretion of the arbitrator.

**ROGER GOODELL**
*Commissioner*

Messrs. Gottlieb, Birch, Burck, and Nash
September 17, 2024
Page seven

### Appointment of Arbitrator

The coaches have strenuously objected to my serving as arbitrator and deciding these disputes. While the District Court rejected this position – as other courts have done – and even though I regard the position as unfounded, I have the discretion in all cases to appoint an arbitrator, and it is my normal practice to appoint someone to serve as arbitrator rather than hear the matter myself. Consistent with that practice, as noted, I have appointed the Hon. Peter C. Harvey to serve as arbitrator in this dispute, and I do so without precedent for future decisions concerning the appointment of arbitrators or my capacity to serve in that role. Mr. Harvey has agreed to accept this assignment and will have the same scope of authority to resolve these disputes as I would were I sitting as the arbitrator. Mr. Harvey will be in contact with the parties shortly to schedule a status conference and further proceedings. I have also retained Bill Polian, who served as the General Manager of several NFL clubs, to serve as a consulting expert to assist Mr. Harvey as needed. I expect all parties to give both Mr. Harvey and Mr. Polian the same cooperation that they would give me.

Each club will be responsible for one-fourth of the fees and expenses related to Mr. Harvey's and Mr. Polian's services, with the balance being treated as a league expense.

Other than as addressed in this letter, I express no views on any other claim or defense asserted by any party in these disputes.

Sincerely,

*Roger Goodell*

ROGER GOODELL

cc: Lynn Bayard, Esq.
John Elefterakis, Esq.
Brad Karp, Esq.
JP Kernisan Esq.
Hon. Peter C. Harvey