UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- X

BRIAN FLORES, STEVE WILKS and RAY  :
HORTON, as Class Representatives, on behalf of  :  Civil Action No.: 22-cv-00871 (VEC)
themselves and all others similarly situated,  :

                                         :

                     Plaintiffs,  :  **SECOND AMENDED**
                                         :  **CLASS ACTION COMPLAINT[1]**

        v.  :

                                         :

THE NATIONAL FOOTBALL LEAGUE; NEW  :
YORK FOOTBALL GIANTS, INC. d/b/a NEW  :  **Jury Trial Demanded**
YORK GIANTS; MIAMI DOLPHINS, LTD.  :
d/b/a MIAMI DOLPHINS; DENVER BRONCOS  :
FOOTBALL CLUB d/b/a DENVER BRONCOS;  :
HOUSTON NFL HOLDINGS, L.P. d/b/a  :
HOUSTON TEXANS; ARIZONA CARDINALS  :
FOOTBALL CLUB LLC d/b/a ARIZONA  :
CARDINALS; TENNESSEE TITANS  :
ENTERTAINMENT, INC. d/b/a TENNESSEE  :
TITANS and JOHN DOE TEAMS 1 through 26,  :

                                         :

                     Defendants.  :

--------------------------------------------------------------- X

> **"Morals cannot be legislated, but behavior can be regulated. The law cannot make an employer love me, but it can keep him from refusing to hire me because of the color of my skin."**
>
> ▪     Dr. Martin Luther King, Jr.

## PRELIMINARY STATEMENT

1.      On February 1, 2022, Coach Brian Flores—who is now joined by Coach Steve Wilks and Coach Ray Horton—filed this class action lawsuit against the National Football League ("NFL" or the "League") and its member teams. The suit alleged, and continues to

---

[1]      This Second Amended Complaint adds claims under Title VII of the Civil Rights Act of 1964 ("Title VII") pursuant to Dkt. No. 202 and updates associated non-substantive allegations. All substantive allegations, including dates and tense, remain as set forth in the First Amended Complaint filed on April 7, 2022. Dkt. No. 22.

allege, systemic racial discrimination in the hiring, retention and termination of NFL coaches and executives.

2.      Mr. Flores' courage to step forward and speak out about this long-standing, undeniable issue—visible and obvious to everyone—was widely applauded by players, coaches, journalists, public figures and the general population.

3.      In contrast to this outpouring of support, however, the NFL fell back on its tried-and-true playbook and reflexively, within mere hours of the lawsuit being filed and without initiating any investigation whatsoever, issued a statement declaring that the allegations were "without merit."[2]

4.      This class action lawsuit was and remains long overdue.  The NFL—left to its own devices to police itself—has continually failed to address the massive imbalance and underrepresentation of Black coaches and executives.

5.      The reality is, that contrary to its contention that this lawsuit is "without merit," even the NFL, in unguarded moments or in response to public pressure, has begrudgingly acknowledged the decades-long problem of systemic discrimination.

6.      The Rooney Rule—which, among other terms, requires NFL teams to interview minority candidates—was implemented in 2002 and is itself an acknowledgement of the NFL's institutional failure to embrace racial diversity on its own.  When the Rooney Rule went into effect, the NFL had only three Black Head Coaches.  Approximately 20 years later when this lawsuit was filed, and after several amendments to purportedly "strengthen" the Rooney Rule,

---

[2]      See e.g. Selbe, *Nick, NFL Calls Brian Flores's Lawsuit Alleging Racist Hiring "Without Merit" in Statement*, SPORTS ILLUSTRATED, (Feb. 1, 2022), https://www.si.com/nfl/2022/02/01/nfl-releases-statement-brian-flores-lawsuit-racist-hiring-practices.

the NFL had only one Black Head Coach.  The Rooney Rule may have been well intentioned, but it is not working.

7.      To that end, Troy Vincent, the NFL's own Executive Vice President of Football Operations, publicly admitted just weeks before this lawsuit was filed, that for Black candidates, "there is a double standard.  I don't think that that is something that we should shy away from. But that is all part of some of the things that we need to fix in the system."[3]

8.      Now is time for the NFL to show a genuine understanding of these issues and allow for the system to be fixed without standing in the way.  This cannot be fixed through a series of platitudes or empty promises, or with a variety of "committees" that have no legitimate power or authority.

9.      Critical to effectuating that systemic change is outside oversight and accountability.  Unfortunately, however, the NFL continues to refuse to acknowledge the need for oversight and accountability to create change.  Indeed, the NFL remains determined to continue its failed efforts self-regulation.  Notably, over the last two years, during a time when Black Head Coaches fell to only one at the start of this off-season, Commissioner Goodell was reportedly paid $128 million for his services to the League.[4]

10.     Mr. Goodell is obviously completely beholden to the team owners who pay him this enormous compensation.  Mr. Goodell is not independent, unbiased or impartial—qualities essential for someone meant to ensure that Black candidates have equal opportunities and that

---

[3]      See e.g. Maske, Mark, *Senior NFL official: "Double standard" for Black coaches when it comes to keeping jobs*, WASHINGTON POST, (Jan. 11, 2022), https://www.washingtonpost.com/sports/2022/01/11/black-nfl-coaches-firings-troy-vincent/.

[4]      See e.g. Bailey, Analis, *Report: Roger Goodell received staggering salary package over past two years: $128 million*, USA TODAY, (Oct. 29, 2021), https://www.usatoday.com/story/sports/nfl/2021/10/29/roger-goodell-received-128-million-salary-over-two-years/6191205001/.

team owners do not engage in employment decisions that have an obviously discriminatory impact.  Mr. Goodell has the power to take real action, but his inaction and mere lip-service to these issues shows that he is unwilling to exercise that judgment and responsibility appropriately.

11.     Case in point, since the filing of this action, Mr. Flores and his legal team has publicly and privately invited the NFL to engage with him in a dialogue, together with the aid of a neutral third-party mediator, to discuss a path forward in which the NFL can make meaningful and lasting change—with oversight and accountability—to ensure that Black and other minority candidates for coaching and executive positions are given an equal opportunity for success and advancement.  The League responded by only agreeing to speak to Mr. Flores on its own terms – likely a public relations stunt just so the NFL could say the League sat down and spoke to him – and without any independent third-party.

12.     This should not have been a controversial request.  In fact, in a press conference before the Super Bowl, NFL Commissioner Roger Goodell specifically said, "To me, it's more important for us to sort of listen to Coach [Flores], understand the points he and other coaches are going through, what our clubs are going through, what feedback they have, and also again, re-evaluate everything we're doing."[5]

13.     However, contrary to these well-sounding platitudes, the NFL and Mr. Goodell have rejected Mr. Flores' request to engage in a structured and meaningful dialogue to ensure that any resolution to the problem of systemic discrimination comes with actual change and outside oversight and accountability.  Instead, the NFL has only offered to meet with Mr. Flores

---

[5]     See Sullivan, Tyler *Super Bowl 2022: NFL Commissioner Roger Goodell addresses Washington Investigation, Brian Flores Lawsuit, more*, CBS SPORTS, (Feb. 11, 2022), https://www.cbssports.com/nfl/news/super-bowl-2022-nfl-commissioner-roger-goodell-addresses-washington-investigation-brian-flores-lawsuit-more/.

without any structure in place to ensure it will be a meaningful use of everyone's time rather than a public relations move for the NFL.

14.    Instead, the NFL, in an obvious public relations stunt, created its own "diversity advisory committee." This committee, which has only six members, has on it two practicing lawyers, both of whom make a living defending employers against claims of discrimination. One of those lawyers even defended McDonalds against race discrimination claims as co-counsel to Loretta Lynch, Esq., the attorney that the NFL has hired to defend itself in this action. There is not one person on the committee that has spent their career representing victims of discrimination. Moreover, this committee has absolutely no power or authority—it is simply going to make private recommendations to the NFL. Clearly, the "diversity advisory committee" does not in any way demonstrate a true commitment to change, oversight and accountability.

15.    In addition, the Miami Dolphins ("Miami" or the "Dolphins") has sought to silence Mr. Flores by attempting to push his claims against that team into arbitration—a secretive, closed-door proceeding outside the public view. Mr. Flores and the legal team have publicly and in written correspondence called on Commissioner Goodell to voluntarily agree not to invoke arbitration and to confirm that all of Mr. Flores' claims will be allowed to proceed in open court. Neither Mr. Goodell nor his legal team have even responded to this request, despite the fact that Congress just recently acknowledged the ills of forced arbitration when it passed the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, which prohibits the use of mandatory arbitration in sexual harassment and sexual assault cases.

16.    What is worse, since the filing of this action Mr. Flores has been the subject of blatant retaliation by the NFL, the Houston Texans ("Houston" or the "Texans") and the Dolphins.

5

17.    Specifically, as described in more detail below, the Texans retaliated against Mr. Flores by removing him for consideration for its Head Coach vacancy due to his decision to file this action and speak publicly about systemic discrimination in the NFL.

18.    Moreover, the Dolphins have retaliated against Mr. Flores by refusing to comply with its obligations under his employment contract with the team (the "Flores Employment Agreement") and asserting baseless claims against him, including that he should be obligated to return to the Dolphins wages paid to him—wages it claims were conditioned on him not suing the Dolphins even though no such condition was ever expressed to Mr. Flores let alone agreed upon.

19.    Mr. Wilks has also taken the courageous step forward to oppose the NFL's systemic discrimination.  As described in more detail below, in 2018, Mr. Wilks was discriminated against by the Arizona Cardinals ("Arizona" or the "Cardinals") in a manner consistent with the experiences of many Black coaches.  Mr. Wilks was hired as a "bridge coach" and was not given any meaningful chance to succeed.  He was unfairly and discriminatorily fired after just one season—a season in which he was: (i) without a General Manager ("GM"), Steve Keim, during the critical time of the pre-season (Mr. Keim had been suspended for a DUI conviction); and (ii) stuck with an unready rookie quarterback drafted by the GM contrary to Mr. Wilks' suggestion.

20.    Mr. Wilks coached the team and acted with integrity even though dealt a difficult hand with the Cardinals that year.  But he was fired after one year.  Mr. Keim, in contrast, who clearly had personal responsibility for the team's performance, and who had engaged in fireable conduct, remained.  What is more, when Mr. Wilks was fired, he had three years and a club option remaining on his contract—a substantial amount of compensation remained owed.  Yet

the Cardinals still chose to move on from him even though they still had to pay those amounts. Mr. Keim, at the time, had one year remaining on his contract, and it would have been a logical time to let him go rather than have him continue as a "lame duck" GM for the following year. Incredibly, the Cardinals gave Mr. Keim a four-year extension when Mr. Wilks was fired.[6]

21.    Mr. Wilks was replaced by a white coach, Kliff Kingsbury, who had no prior NFL coaching experience and was coming off of multiple losing seasons as a Head Coach at Texas Tech University.  Mr. Kingsbury, armed with quarterback Kyler Murray, has been given a much longer leash than Mr. Wilks and, to his credit, has succeeded.  That said, Mr. Wilks, given the same opportunity afforded to Mr. Kingsbury, surely would have succeeded as well.

22.    Mr. Flores and Mr. Wilks are joined by Mr. Horton.  Mr. Horton was a long time NFL coach and Defensive Coordinator when he was interviewed for the Tennessee Titans ("Tennessee" or the "Titans") Head Coach position in January 2016.

23.    This turned out to be a completely sham interview done only to comply with the Rooney Rule and to demonstrate an appearance of equal opportunity and a false willingness to consider a minority candidate for the position.

24.    The Titans' all-white ownership and management ultimately hired Mike Mularkey, a white candidate, for the Head Coach position.  Years later, in 2020, Mr. Mularkey admitted in a podcast interview that the Titans,

> [T]old me I was going to be the head coach in 2016, before they went through the Rooney rule.  And so I sat there knowing I was the head coach in 2016, as they went through this fake hiring process knowing, knowing a lot of the coaches that they were interviewing, knowing how much they prepared to go through those interviews, knowing that everything they could do and they had no chance to get that job. And actually, the GM Jon Robinson, he was in an

---

[6]    During the course of this litigation, additional and telling evidence will come forward demonstrating disparate treatment of Mr. Keim compared to Mr. Wilks.

interview with me.  He had no idea why he is interviewing me, that I have a job already.  I regret it, cause I pride myself and my kids first to do the right thing, and I always said that to the players. And here I am the head guy not doing it, and I regretted it since then.  It was the wrong thing to do. I am sorry I did that, but it was not the way to do that.  Should have been interviewed like everybody else and got hired cause of the interview not early on.[7]

25.    Upon information and belief, given that Mr. Mularkey's remarks and admissions have been publicly available since 2020, the NFL has been aware of them but has not done any investigation into the Titans' discriminatory conduct and/or failure to comply with the Rooney Rule.  This shows, yet again, that the NFL is either incapable or unwilling to address the issue of racial discrimination on its own.

26.    Defendants' conduct has violated Plaintiffs' rights under Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), the New Jersey Law Against Discrimination, ("NJLAD"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL") and the Florida Private Whistleblower Statute § 448-102 ("FPWBS").  The Dolphins conduct described herein also constitutes a breach of the Flores Employment Agreement.

## PROPOSALS FOR CHANGE

27.    Plaintiffs propose the following actions be taken to make meaningful and lasting change within the NFL and to create a future with equal opportunity for Black candidates:

1.    **Appointment of an Independent Monitor**.  An independent monitor should be appointed who will have oversight and authority to enforce and ensure compliance with all the mechanisms set forth below.

---

[7]    See Stealers Realm, *28 Mike Mularkey Enters the Realm/Steelers Realm S2-E28-55*, YOUTUBE, (Oct. 21, 2020), https://www.youtube.com/watch?v=whsIgoNKxEE at 25:02.

2.      **Promote Black Ownership**.  Increase the influence of Black individuals in hiring and termination decisions by taking steps to promote Black ownership of NFL teams.  Steps that can be taken include: (i) creating and funding a committee dedicated to sourcing Black investors to take majority ownership stakes in NFL teams; (ii) revise requirements related to financing the purchase of NFL teams to the extent that such requirements act as an impediment (issue to be studied) to the sale of NFL teams to a majority Black investor or ownership group; (iii) ensure diversity of decision-making by permitting select Black players and coaches to participate in the interviewing process for applicable positions.

3.      **Increased Transparency in Hiring and Terminations**.  The League should be committed to increased transparency in hiring and termination decisions.  Measures that would further this transparency include: (i) appointment of a special hiring committee, and require teams to have a committee member present at all applicable interviews, (ii) require teams to document the criteria for the applicable open positions, (iii) for both hiring and termination decisions, require teams to document the rationale for each person considered in the process, including a full explanation of the basis for any subjective influences (*e.g.*, trust, personality, interview performance, *etc.*), (iv) require teams to consider side-by-side comparisons of objective criteria (such as past performance, experience, *etc.*); (v) require semi-annual written performance reviews for all applicable positions, and (vi) all communications regarding the hiring and termination of applicable positions shall be considered public records.

4.      **Meaningful Incentives**:  Incentivize the hiring and retention of Black candidates through monetary, compensation and/or further draft picks, including but not limited to, additional salary cap space for making diverse hires.

5.   **<u>Increased Visibility for Black Assistant Coaches</u>**.  Increase the level of visibility and interaction between, on the one hand, Black assistant coaches and executives, and, on the other hand, NFL team owners.  Hold multiple coach/executive/owner conferences each year, similar to the annual Owners' Meetings, during which the NFL team owners will meaningfully interact with Black assistant coaches and executives.

6.   **<u>Increased Pipeline for Black Coaches</u>**.  Teams should be required to have either a Black QB Coach or Assistant QB Coach to ensure a pipeline of experienced candidates for Offensive Coordinator and Head Coach positions.

7.   **<u>Uniform Contracts</u>**.  Ensure language and non-monetary term uniformity with respect to coaching contracts (*e.g.*, all Head Coach contracts are the same, all Offensive Coordinator contracts are the same, *etc.*).  The independent monitor will confer with employee-side lawyers, management-side lawyers and special coaches committee with respect to the uniformity of the terms.

8.   **<u>Ban Forced Arbitration.</u>**  Ban forced arbitration for claims of discrimination or retaliation brought against the NFL or its teams by coaches or executives, and provisions that would require a coach or executive to waive any claims of discrimination or retaliation in order to receive his or her severance.

### <u>ADMINISTRATIVE PROCEDURES</u>

28.   Mr. Flores filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and received a Notice of Right to Sue with respect to his claims under Title VII.

29.   Pursuant to NYCHRL § 8-502, Plaintiffs previously served a copy of this lawsuit upon the New York City Commission on Human Rights and the New York City Law

Department, Office of the Corporation Counsel within 10 days of its filing, thereby satisfying the notice requirements of this action.

30.     Plaintiffs have complied with any and all other prerequisites to filing this action.

## JURISDICTION AND VENUE

31.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiffs' rights under § 1981.  The Court has supplemental jurisdiction over Plaintiffs' related state and local law claims pursuant to 28 U.S.C. § 1367(a).

32.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including certain of the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

33.     Plaintiff Brian Flores is a Black man and a resident of the State of Minnesota.

34.     Plaintiff Steve Wilks is a Black man and a resident of the State of North Carolina.

35.     Plaintiff Ray Horton is a Black man and resident of the State of Arizona.

36.     Defendant the National Football League is a trade association made up of 32 professional football teams and with a principal place of business located at 345 Park Avenue, New York, NY 10154.  At all relevant times, the National Football League was an employer and/or prospective employer of Plaintiffs and the members of the Proposed Class.

37.     Defendant New York Football Giants, Inc. is a corporation that owns and operates the New York Giants professional football team.  New York Football Giants, Inc. is headquartered at 1925 Giants Drive, East Rutherford, NJ 07073.  At all relevant times, the New York Giants was an employer and/or prospective employer of Plaintiffs and the members of the Proposed Class.

11

38.     Defendant Miami Dolphins, Ltd. is a corporation that owns and operates the Miami Dolphins professional football team.  Miami Dolphins, Ltd. is headquartered at 346 Don Shula Drive, Miami Gardens, FL 33056.  At all relevant times, the National Football League was an employer and/or prospective employer of Plaintiffs and the members of the Proposed Class.

39.     Defendant Denver Broncos, former corporate name PDB Sports, Ltd., is a corporation that owns and operates the Denver Broncos professional football team.  The Denver Broncos are headquartered at 13655 Broncos Parkway, Englewood, Colorado 80112.  At all relevant times, the Denver Broncos was an employer and/or prospective employer of Plaintiffs and the members of the Proposed Class.

40.     Defendant Houston NFL Holdings, L.P. is a corporation that owns and operates the Houston Texans professional football team.  The Houston Texans is headquartered at Two NRG Park, Houston, Texas 77054.  At all relevant times, the Houston Texans was an employer and/or prospective employer of Plaintiffs and the members of the Proposed Class.

41.     Defendant Arizona Cardinals Football Club LLC is a corporation that owns and operates the Arizona Cardinals professional football team.  The Arizona Cardinals is headquartered at 8701 South Hardy Drive, Tempe, Arizona, 85284.  At all relevant times, the Arizona Cardinals was an employer and/or prospective employer of Plaintiffs and the members of the Proposed Class.

42.     Defendant Tennessee Titans Entertainment, Inc. is a corporation that owns and operates the Tennessee Titans professional football team.  The Tennessee Titans is headquartered at 460 Great Circle Road, Nashville, Tennessee 37228.  At all relevant times, the Tennessee Titans was an employer and/or prospective employer of Plaintiffs and the members of the Proposed Class.

43.     Defendants John Doe Teams 1 through 26 are intended to identify NFL teams who have engaged in discriminatory conduct towards the Members of the Proposed Class, including potentially the Atlanta Falcons, Baltimore Ravens, Buffalo Bills, Carolina Panthers, Chicago Bears, Cincinnati Bengals, Cleveland Browns, Dallas Cowboys, Detroit Lions, Green Bay Packers, Indianapolis Colts, Jacksonville Jaguars, Kansas City Chiefs, Las Vegas Raiders, Los Angeles Chargers, Los Angeles Rams, Minnesota Vikings, New England Patriots, New Orleans Saints, New York Jets, Philadelphia Eagles, Pittsburgh Steelers, San Francisco 49ers, Seattle Seahawks, Tampa Bay Buccaneers, and/or the Washington Commanders.  At all relevant times, John Doe Teams 1 through 26 were an employer and/or prospective employer of Plaintiffs and the members of the Proposed Class.

## FACTUAL ALLEGATIONS

## I.     HISTORY OF RACE DISCRIMINATION IN THE NFL

44.     The NFL has a tortured and unacceptable history with race relations that requires immediate focus in the first instance.  The League remains mired in a culture that lacks inclusivity and where a barrier to entry still exists today for Black professionals in leadership.

45.     The first iteration of the NFL[8] began in 1920, and it was rife with racism.

46.     From 1920 through 1926, a total of only nine Black players were permitted into the League.  At that time, the only reason Black players were permitted at all was because the then-existing teams had difficulty filling out their rosters in the League's early days.

47.     Heading into the 1927 season, all five of the remaining Black players at the time left the League and, from 1927 to 1933, only a handful of Black players were permitted to

---

[8]     The NFL was originally known as the American Professional Football Conference, then the American Professional Football Association, before being renamed to the NFL in 1922.

participate.  Indeed, during that time frame there was no more than one Black player in the League per year.

48.     In 1933, the League had only two Black players, but they left at the end of the year, leaving the NFL with none.  At this point, the NFL was reportedly financially viable and no longer needed Black players to fill vacant positions.

49.     This led to one of the most despicable moments in the history of professional sports in the United States:  it is widely accepted that the NFL used the absence of Black players as an opportunity to impose a "gentleman's agreement" to ban Black players entirely.

50.     This initiative was led by the Washington Commander's ("Washington" or the "Commanders") owner George Preston Marshall.[9]  The League's other founding owners—including, but not limited to, Tim Mara of the New York Giants (the "Giants")—appear to have colluded and cooperated in this widespread racial ban.

51.     It was not until 1946 that Black players re-entered professional football.

52.     However, the reentry of Black players into the League was not the result of introspection and a commitment to equality.  Rather, when the Cleveland Rams moved to Los Angeles, the publicly funded playing venue, the Los Angeles Coliseum, forced the Rams to integrate at least one Black player because the alternative—the creation of a segregated, "separate but equal" venue for Black players—was too costly.

---

[9]     See Moore, Louis, *The NFL and a History of Black Protest*, AFRICAN AMERICAN INTELLECTUAL HISTORY SOCIETY, (Sept. 12, 2018) (citing *Kenny to get Tryout with National League*, LOS ANGELES TRIBUNE, (Jan. 19, 1946)), https://www.aaihs.org/the-nfl-and-a-history-of-black-protest/#fn-42670-3.

53.     In fact, it was reported that during a meeting between local officials, community activists and the Rams' General Manager Charles F. Walsh, Mr. Walsh admitted to the unwritten racist "gentlemen's agreement" of barring Black players.

54.     As it would happen, the Rams ultimately signed two Black players for the 1946 season, but two more years would go by before any other team would sign a Black player.

55.     As of 1950, fewer than half of the NFL's ten teams had signed a Black player, and it was not until more than a decade later that the Commanders signed its first Black player.

56.     In 1959, 13 years later after the start of integration, only 12% of the League's players were Black.

57.     Even as integration slowly progressed, the stain of racism persisted.  Teams reportedly put unwritten quotas on how many Black players could be signed, and often teams would stack Black players at the same position so that they would be eliminated as a matter of competition and roster cuts.  It was also reported that Black players received less compensation than their white counterparts.

58.      The NFL only engaged in genuine full-scale racial integration when it became economically necessary due to outrage and protests from writers and fans, the emergence of the rival and more racially progressive leagues (such as the All-America Football Conference ("AAFC") and American Football League ("AFL")) and the success of numerous minority athletes in college football.[10]

59.     Of course, integration was hardly the end of Black struggle in the NFL—untold forms of discrimination still followed Black players from team-to-team, city-to-city, stadium-to-

---

[10]     See *The Reintegration of the NFL*, NFL FOOTBALL OPERATIONS, https://operations.nfl.com/inside-football-ops/players-legends/evolution-of-the-nfl-player/the-reintegration-of-the-nfl/ (last visited April 5, 2022).

stadium and hotel-to-hotel.  In fact, though the NFL had integrated 23 years earlier, when the

Commander's owner, Mr. Marshall, died in 1969, he abhorrently stipulated that his estate be

used to establish the Redskins Foundation, on the condition that it was barred from spending

money for "any purpose which supports or employs the principle of racial integration in any

form."[11]

60.    The NFL has profited immensely from the racial integration of its players.

Initially considered a second-tier sport, the NFL has thrived as an integrated League over the last

75 years.  While the NFL was forced to racially integrate its players to generate these immense

profits, it was not forced to do so in other areas—so it did not:

- It took approximately **20 years** for the League to hire its first black official (Burl Toler).

- It is widely known by even casual NFL fans that it took until at least the 1980s—approximately **40 years** after integration—for teams to genuinely accept Black players at the quarterback position (*i.e.*, Warren Moon and Randall Cunningham).[12]

- It took **43 years** for the first Black Head Coach to be hired (Art Shell).

---

[11]    See Coates, Ta-Nehisi, *A History of Segregation in the NFL*, THE ATLANTIC, (Nov. 17, 2011), https://www.theatlantic.com/entertainment/archive/2011/11/a-history-of-segregation-in-the-nfl/248625/.

[12]    The blatant racial stereotyping of Black quarterbacks in terms of the way they have been treated and described must be noted.  Empirical studies show that "Black quarterbacks tend to be praised for their athleticism and criticized for a lack of intelligence. Meanwhile, white quarterbacks are often praised for their intelligence and criticized for a lack of athleticism."  See Mercurio, Eugenio, and Filak, Vincent, *Roughing the Passer: The Framing of Black and White Quarterbacks Prior to the NFL Draft.*, HOWARD JOURNAL OF COMMUNICATIONS, 21, no. 1 (Jan. 26, 2010), https://doi.org/10.1080/10646170903501328.  The Wonderlic test, used by NFL teams to gauge intelligence of pre-draft players has been harshly criticized for being discriminatory.  See e.g. Hazell, Ricardo A., *NFL Draft Wonderlic leaks Reek of Racism and Classism*, THE SHADOW LEAGUE, (April 25, 2017), https://theshadowleague.com/nfl-draft-wonderlic-leaks-reek-of-racism-and-classism/; Stromberg, Joseph, *Reminder: The NFL's Wonderlic Aptitude Test is Totally Worthless*, VOX, (May 8, 2014), https://www.vox.com/2014/5/8/5694518/why-the-nfls-wonderlic-aptitude-test-is-totally-worthless.

- It took **54 years** for an NFL team to hire a Black General Manager (Ozzie Newsome).

- Now, **76 years** following integration, there has never been a Black Commissioner and there has never been a Black majority owner of an NFL team.

61.     For a League and its team owners who have profited immensely off the talent of Black players, the NFL has never fully acknowledged its history of racism or taken appropriate steps to address its racial disparities.  As a Black sportswriter once wrote:

> [P]ersons, corporations or business almost always forget the people or incidents that made them big . . . [the NFL] took all the aid the colored American could give and then as soon as it became 'big league,' promptly put a bar up against the very backbone of its existence."[13]

62.     Case in point:  Mr. Marshall, in many ways the personification of the NFL's deep-seeded institutional racism, is enshrined in the NFL Hall of Fame, and his contributions are lauded by the Hall of Fame's website, with only a passing reference to the fact that he "endured his share of criticism for not integrating his team until being forced to do so in 1962."[14]  That is, the NFL does not even acknowledge, much less condemn, Mr. Marshall's role in the League's history with racism.  Rather, it only notes that he received criticism from others.

## II.     THE NFL'S ONGOING PROBLEMS WITH RACE

63.     History shows that the NFL is synonymous with ownership resistance to anti-racist protest—and that continues to the present day.

---

[13]     See Halley Harding, *So What?*, LOS ANGELES TRIBUNE, (Feb. 7, 1941), (as cited in Moore, *The NFL and a History of Black Protest*).
[14]     See *George Preston Marshall: Pro Football Hall of Fame Official Site*, PFHOF, https://www.profootballhof.com/players/george-preston-marshall/ (last visited April 5, 2022).

A.      **Discrimination Against Colin Kaepernick**

64.     As has been well documented, during the 2016 NFL season, Colin Kaepernick protested societal racial injustice by kneeling during the national anthem.

65.     Following the 2016-17 season—a season in which, over the course of the 11 games he started, he had 16 touchdowns against only four interceptions, 468 rushing yards and a passer rating of 90.7—no NFL team would offer him a job, even as a backup.

66.     To even a casual observer it was clear that Mr. Kaepernick was more than qualified for a roster spot in the NFL.

67.     Seattle Seahawks ("Seattle" or the "Seahawks") Head Coach Pete Carroll explained the Seahawks' rationale for not bringing him in: "**He's a *starter* in this league**. And we have a starter. But **he's a *starter* in this league,** and I can't imagine that someone won't give him a chance to play."[15]

68.     The Giants gave Mr. Kaepernick no consideration and suggested that it was because the team feared backlash from the fans if it signed Mr. Kaepernick—a statement that journalists understandably labeled "dangerous." [16]

69.     In an August 2017 article titled, "Colin Kaepernick is Not Supposed to Be Unemployed," the statistics website FiveThirtyEight stated, "It's obvious Kaepernick is being

---

[15]     See Kapadia, Sheil, *Pete Carroll on Colin Kaepernick: Not doing anything yet, but "he's a starter in this league"*, ESPN.COM, (Jun. 2, 2017), https://www.espn.com/nfl/story/_/id/19523162/pete-carroll-says-seattle-seahawks-not-signing-colin-kaepernick.

[16]     See Biderman, Chris, *Why Giants Owner John Mara's Statement on Colin Kaepernick is dangerous*, USA TODAY, (May 29, 2017), https://ninerswire.usatoday.com/2017/05/29/why-giants-owner-john-maras-statement-on-colin-kaepernick-is-dangerous/.  This was a particularly outrageous position to take given that the Giants had just signed a white Kicker, Josh Brown, after he was arrested for domestic violence and kept him off the team after he was suspended for the same misconduct.  It took the murder of George Floyd and the related nationwide protests for Mr. Goodell to publicly convey his support for players who choose to kneel during the Anthem.

frozen out for his political opinions," that "[n]o above-average quarterback has been unemployed nearly as long as Kaepernick" and "[i]t's easy to lose sight of the reality that good quarterbacks often never even reach free agency, let alone remain unsigned for so long."[17]

70.     Mr. Kaepernick's protests received a variety of reactions—both positive and negative—with then-President Donald J. Trump siding against him and calling on the nearly all-white NFL owners to "fire" players who protest during the national anthem.  President Trump referred to a player who protested (clearly Mr. Kaepernick) as "that Son of a Bitch."

71.     In an October 2017 meeting among owners, players and League executives to address racial injustice protests by players, NFL owners effectively endorsed President Trump's opinion that a player who protests racial injustice is a "Son of a Bitch" and a stated an unwillingness to act contrary to Trump's directives.[18]

72.     As time went on, still no team would sign Mr. Kaepernick for any role, starter or backup, despite the fact that he clearly deserved such a role based on merit, skill and experience. While some owners gave lip service to solidarity with Black players, NFL owners still collectively refused to employ Mr. Kaepernick following his racial justice protests.

73.     During these years, many teams—including the Giants—could have used his services as a clear roster upgrade.  But he remained blackballed.

74.     Against the backdrop of the League's history, this conduct remains an appalling example of the League's continued problems with race.

---

[17]     See Wagner, Kyle, *Colin Kaepernick is Not Supposed To Be Unemployed*, FIVETHIRTYEIGHT, (Aug. 9, 2017), available at: https://fivethirtyeight.com/features/colin-kaepernick-is-not-supposed-to-be-unemployed/.

[18]     See McCann, Michael, *The Leaked October Tapes and the Kaepernick Collusion Case*, SPORTS ILLUSTRATED, (Apr. 25, 2018), https://www.si.com/nfl/2018/04/25/leaked-tapes-nfl-owners-players-october-meeting-kaepernick-collusion-case-donald-trump.

### B.    Acquiescence to Discrimination by Head Coach John Gruden

75.    John Gruden, the 30-year NFL insider and three-time Head Coach, is the embodiment of the NFL's acquiescence to racism.

76.    In October 2021, it was disclosed that between 2011 and 2018, Mr. Gruden exchanged a slew of emails containing racist, misogynistic and homophobic slurs to the Commanders' then-General Manager Bruce Allen.

77.    Mr. Gruden remarked that DeMaurice Smith, the NFL Players' Association Executive Director, had "lips the size of Michelin tires."

78.    Mr. Gruden also stated that players who protested the national anthem to protest racial inequality should be "fired."

79.    Mr. Smith responded to reports of these emails saying, "Racism like this comes from the fact that I'm at the same table as they are and they don't think someone who looks like me belongs."[19]

80.    As stated, Mr. Gruden's emails also contained a slew of additional offensive conduct.  The emails referred to Mr. Goodell as a "faggot" and a "clueless anti football pussy," and said Mr. Goodell should not have pressured the Rams to draft "queers" (referring to the drafting of Michael Sam, the first openly gay player drafted by an NFL team in 2014), something

---

[19]    See *Raiders, NFL condemn Jon Gruden for using racial trope in 2011 email to describe NFLPA Executive Director DeMaurice Smith*, NFL.COM, (Oct. 8, 2021), https://www.nfl.com/news/raiders-nfl-condemn-jon-gruden-for-using-racial-trope-in-2011-email-to-describe-#:~:text=%22Racism%20like%20this%20comes%20from,not%20let%20it%20define%20me.%22.

which the Rams coach has denied.  Mr. Gruden also called then United States Vice President Joe Biden a "nervous clueless pussy."[20]

81.  Mr. Gruden and Mr. Allen also exchanged emails with other members of the Commanders staff with photos of topless women, including two team cheerleaders.

82.  In one email from 2015 that includes several football insiders including Mr. Allen, Gruden asked Mr. Allen to tell Bryan Glazer (part of the family which owns the Tampa Bay Buccaneers ("Tampa Bay" or the "Buccaneers") to perform oral sex on him.

83.  Mr. Gruden also mocked Caitlyn Jenner, a transgender former Olympic athlete.

84.  It simply cannot be a surprise to NFL executives, insiders and team owners—who have collectively spent the last three decades in the proximity of Mr. Gruden—that this is who Mr. Gruden is and that these are the beliefs he harbors.

85.  Nonetheless, Mr. Gruden remained an inner-circle candidate for virtually every Head Coach position over the 10-year period that followed his departure from Tampa Bay in 2008.

86.  Ultimately, in 2018, Mr. Gruden received the largest contract in history for an NFL Head Coach, when the Las Vegas Raiders signed him to a 10-year, $100 million deal.

87.  The Raiders' hiring of Mr. Gruden occurred in close succession with the Raiders' firing of General Manager Reggie McKenzie, one of the few Black General Managers in the League.

---

[20]  See Belson, Ken and Rosman, Katherine, *Raiders Coach Resigns After Homophobic and Misogynistic Emails*, NEW YORK TIMES, (Oct. 11, 2021), https://www.nytimes.com/2021/10/11/sports/football/what-did-jon-gruden-say.html.

88.     Under Mr. McKenzie, the Raiders had the highest percentage of Black players at 82.3%, and he won the NFL Executive of the Year Award in 2016 after compiling a 12-4 record.

89.     Only two years later, Mr. McKenzie was fired and replaced by Mike Mayock, a white candidate.  Under all-white leadership (Owner, General Manager and Head Coach), the percentage of Black players on the Raiders decreased every year that followed.  By 2021, the percentage of Black players on the Raiders roster dropped to 67.2%.

90.     Though Mr. Gruden is no longer employed by the Raiders, it has been reported that the NFL was well aware of Mr. Gruden's offensive emails for several months and took no action.[21]

91.     When the news of Mr. Gruden's racist emails finally surfaced, rather than an unequivocal rebuke and a for-cause termination, the Raiders allowed him to graciously resign and claim that it was due to his desire not to be a distraction.

92.     Mr. Gruden even had the gall to blame the NFL and Mr. Goodell, claiming that they were responsible—not him for his own actions—for his termination.[22]

C.      **The NFL's Concussion Settlement Discriminated Against Black Players**

93.     In 2011, retired NFL players began filing personal injury actions in courts around the country seeking damages or relief in the form of medical monitoring.  Some of these actions

---

[21]    See Beaton, Andrew, *How the NFL Learned Months Ago of the Offensive Emails that Cost Jon Gruden His Job*, THE WALL STREET JOURNAL, (Oct. 12, 2021), https://www.wsj.com/articles/jon-gruden-emails-investigation-washington-football-team-11634079234.

[22]    See Whelan, Catherine, *Jon Gruden Sues NFL for Allegedly Leaking Emails that Led to his Resignation*, NPR, (Nov. 13, 2021), https://www.npr.org/2021/11/13/1055574569/jon-gruden-sues-nfl-for-allegedly-leaking-emails-that-led-to-his-resignation.

were filed on behalf of a class, some for small groups of former players and others for individuals (collectively, the "Concussion Lawsuits").

94.    As alleged in the Concussion Lawsuits, the NFL for decades was aware of the evidence and the risks associated with repetitive traumatic brain injuries, but nevertheless "ignored, minimized, disputed, and actively suppressed broader awareness of the link between subconcussive and concussive injuries in football and the chronic neuro-cognitive damage, illnesses, and decline suffered by former players."

95.    The NFL was also alleged to have "failed to warn [players] and/or impose safety regulations governing this health and safety problem" and "produced industry-funded, biased, and falsified research that claimed that concussive and sub-concussive head impacts in football do not present serious, life-altering risks."

96.    The Concussion Lawsuits identified a number of retired NFL players who were diagnosed with traumatic brain injury ("TBI") following their playing career, and sought money damages for injury and death, as well as medical treatment for retired players diagnosed with TBI.

97.    Ultimately, the claims were consolidated and settled in 2014.  Under the settlement agreement, a former player who has a "Qualifying Diagnosis" is eligible for monetary benefits.  A diagnosis is "Qualifying" primarily—but not exclusively—if rendered by physicians approved by the NFL or in conjunction with the NFL's Baseline Assessment Program ("BAP"). The BAP is intended both to identify symptoms of eligible conditions and to collect data for comparison to later testing, to establish any subsequent decline in a retired player's cognitive functioning.

98.     Claims for monetary awards are first reviewed by a Claims Administrator.  In the first instance, any appeals of the Claims Administrator's determinations are heard by an Appeals Advisory Panel.  Any appeals from the Appeals Advisory Panel are brought to the court that entered the settlement agreement.

99.     According to a lawsuit filed by former Black NFL players Kevin Henry and Najeh Davenport, as well as media reports, the NFL began regularly insisting that physicians use "race-norms" in determining whether a retiree had suffered cognitive impairment (the "Race-Norming Lawsuit").  When Black retirees were deemed to be cognitively impaired, the NFL regularly appealed such determinations if race-norming was not used.

100.    As alleged in the Race-Norming Lawsuit, "the National Football League . . . [has] been avoiding paying head-injury claims under the Settlement Agreement based on a formula for identifying qualifying diagnoses that explicitly and deliberately discriminates on the basis of race.  When being evaluated for the Qualifying Diagnoses of Neurocognitive Impairment, Black former players are automatically assumed (through a statistical manipulation called 'race-norming') to have started with worse cognitive functioning than white former players.  As a result, if a Black former player and a white former player receive the exact same raw scores on a battery of tests designed to measure their current cognitive functioning, the Black player is presumed to have suffered less impairment, and he is therefore less likely to qualify for compensation."

101.    Put another way, the NFL insisted that white people simply have better cognitive function than Black people.  Thus, if a Black person was found to be cognitively impaired, the NFL would often not accept that diagnosis unless the physician gave adequate consideration to the possibility that Black people simply do not function cognitively as well as white people.

24

This is the very definition of racism—the assumption that someone is not as smart as another person because of the color of his or her skin.

### D.    The NFL's Attempt to Pander During Widespread, Societal Racial Protests

102.    In June 2020, following protests over George Floyd's murder and other instances of racially charged violence, Roger Goodell publicly apologized for the League's previous response to player protests saying, "we were wrong for not listening to NFL players earlier."[23]

103.    Goodell further "encourage[d] all to speak out and peacefully protest" and said, "[w]ithout black players, there would be no National Football League and the protests around the country are emblematic of the centuries of silence, inequality and oppression of black players, coaches, fans and staff."  Id.

104.    Despite the blatant collusion against Mr. Kaepernick, Mr. Goodell declared in a publicly released video that "Black Lives Matter" and announced that the NFL desired to work with Mr. Kaepernick in the creation and distribution of a $250 million foundation for social justice initiative.[24]

105.    These remarks and actions—emblematic of the phrase "too little too late"—were largely ridiculed by the public as hypocritical and an obvious attempt to pander to growing public sentiment against racial injustice.  Racial discrimination requires real and meaningful attention—not mere soundbites when it is in the League's financial interest.

---

[23]    See Roger Goodell: *NFL "wrong" for not listening to protesting players earlier*, NFL.COM, (Jun. 5, 2020), https://www.nfl.com/news/roger-goodell-nfl-wrong-for-not-listening-to-protesting-players-earlier.

[24]    See Battista, Judy, *NFL commits $250M over 10-year period to combat systemic racism*, NFL.COM, (Jun. 11, 2020), https://www.nfl.com/news/nfl-commits-250m-over-10-year-period-to-combat-systemic-racism.

E.        **The NFL's Attempt to Pander Following the Filing of this Lawsuit**

106.    The filing of this lawsuit on February 1, 2022, provided yet another moment of public outcry for the League to step up—but it has not.

107.    After Mr. Flores filed this action, the League quickly rejected his claims as being "without merit" without having conducted any investigation whatsoever.  After its response was roundly criticized as being tone deaf and blind to the obvious racial injustice that exists in the NFL, the League took a step back and promised to hire "outside experts" to evaluate the NFL's diversity, equity and inclusion policies.

108.    It took almost two full months for the NFL to roll out its "diversity advisory committee."  This committee, which has only six members, has on it two practicing lawyers, both of whom make a living defending employers against claims of discrimination.  One of those lawyers even defended McDonalds against race discrimination claims as co-counsel to Loretta Lynch, Esq., the attorney that the NFL has hired to defend itself in this action.  There is not one person on the committee that has spent their career representing victims of discrimination.

109.    Clearly, the "diversity advisory committee" does not in any way demonstrate a true commitment to change, oversight and accountability.  Instead, it is an obvious public relations stunt designed to insulate the NFL from further criticism.

110.    The fact that the "diversity advisory committee" is nothing more than a public relations ploy is illustrated by the NFL's response to Mr. Flores' public and private invitations to the NFL to engage with him in a dialogue, together with the aid of a neutral third-party mediator, to discuss a path forward in which the NFL can make meaningful and lasting change—with oversight and accountability—to ensure that Black and other minority candidates for coaching and executive positions are given an equal opportunity for success and advancement.

26

111.    This should not have been a controversial request.  In fact, in a press conference before the Super Bowl, NFL Commissioner Roger Goodell specifically said, "To me, it's more important for us to sort of listen to Coach [Flores], understand the points he and other coaches are going through, what our clubs are going through, what feedback they have, and also again, re-evaluate everything we're doing."

112.    However, contrary to these well-sounding platitudes, the NFL and Mr. Goodell have rejected Mr. Flores' request to engage in a structured and meaningful dialogue to ensure that any resolution to the problem of systemic discrimination comes with actual change and outside oversight and accountability.

## III.    DISPARATE AND ADVERSE IMPACT OF NFL'S PRACTICES

113.    Troy Vincent, a Black, Hall of Fame former cornerback, and current NFL Executive Vice President of Football Operations, recently stated with regard to the treatment of Black Head Coaches in the NFL:

> There is a double standard, and we've seen that . . . And you talk about the appetite for what's acceptable.  Let's just go back to . . . Coach Dungy was let go in Tampa Bay after a winning season. . . Coach Wilks, just a few years prior, was let go after one year . . . Coach Caldwell was fired after a winning season in Detroit . . . It is part of the larger challenges that we have.  But when you just look over time, it's over-indexing for men of color.  These men have been fired after a winning season.  How do you explain that?  There is a double standard.  I don't think that that is something that we should shy away from.  But that is all part of some of the things that we need to fix in the system. We want to hold everyone to why does one, let's say, get the benefit of the doubt to be able to build or take bumps and bruises in this process of getting a franchise turned around when others are not afforded that latitude? . . . [W]e've seen that in history at the [professional] level.[25]

---

[25]    See Maske, Mark, *Senior NFL Official: "Double Standard for Black coaches when it comes to keeping jobs"*, THE WASHINGTON POST, (Jan. 11, 2022), https://www.washingtonpost.com/sports/2022/01/11/black-nfl-coaches-firings-troy-vincent/.

114.     Mr. Vincent's common-sense analysis of the NFL's predicament with respect to the lack of Black Head Coaches hits the nail on the head: "There is a double standard."  This double standard has led to a consistent dearth of Black Head Coaches despite an abundance of highly qualified candidates.  For Black Head Coaches who are hired, retention of the job is routinely more difficult than for white counterparts.

115.     However, the issue is not limited to direct disparate treatment of Black coaches and candidates.  Rather, the NFL's policies, practices and process also have disparate impact even when neutral on their face.  To that end, while Commissioner Goodell has not admitted that the League engages in intentional discrimination, he has acknowledged that even though NFL has "adopted numerous policies and programs" to combat discrimination, that the NFL "must acknowledge that particularly with respect to head coaches, the results have been unacceptable."  Mr. Goodell has also admitted the NFL has problems with "results" in regard to the racial composition of Head Coaches and needs to make changes to policies and practices so "real and tangible results will be achieved." [26]

116.     Historically, Head Coach positions were closed to Black candidates until Art Shell broke this color barrier in 1989.  Still, Coach Shell was only one of five Black Head coaches between then and the passage of the Rooney Rule.  At the end of the 2002 season, the NFL had only 3 Black Head Coaches out of 32 teams.  As one sportswriter noted, "NFL franchise owners had to be prodded to seriously consider Black candidates to coach their teams.  They were willing to sign Black players [to] make them money while risking their health.  They

---

[26]     See Goodell, Roger, *Memorandum: Our Commitment to Diversity, Equity and Inclusion*, TWITTER, (Feb. 5, 2022), https://twitter.com/adamschefter/status/1489985648853405703?lang=en.

28

were reluctant to let them lead their teams after they were done playing."[27]  This was a reference to what is commonly known as the "Rooney Rule."

117.   In 2002, Johnnie L. Cochran Jr., civil rights attorney Cyrus Mehri and labor economist Dr. Janice Madden together produced a detailed report on the NFL's Head Coaching hiring practices titled "Black Coaches in the National Football League: Superior Performance, Inferior Opportunities."  The report analyzed the NFL's hiring and firing practices over the previous 15 seasons, and the findings showed statistically significant evidence that Black Head Coach candidates were less likely to be hired and more likely to be fired than white coaches.

118.   Due to the public sentiment gathering to address this problem, on October 31, 2002, the NFL appointed a "Committee on Workplace Diversity," headed by Pittsburgh Steelers' President Dan Rooney, to study the issue further.  On December 20, 2002, this committee issued its recommendations, including that NFL teams make a commitment to interview minority candidates for every Head Coach job opening (with limited exceptions).  In December 2002, the owners approved this recommendation.

119.   Since its passage, the Rooney Rule has been amended several times in an effort to strengthen its impact on diversity and inclusion, or to at least appear to do that.  It now applies to General Manager and other front office positions, as well as Assistant Head Coach and Coordinator positions.  Moreover, teams are now required to interview two minority Head Coach candidates, and at least one in-person.  However, the Rooney Rule has failed to yield any meaningful change to an NFL institution so fully steeped in discriminatory practices.

---

[27]   See Cunningham, Michael, *Here we go again: NFL still has "double standard" with Black coaches*, THE ATLANTA JOURNAL CONSTITUTION, (Jan. 14, 2022), https://www.ajc.com/sports/mike-check-blog/here-we-go-again-nfl-still-has-double-standard-with-black-coaches/2L7DTCGPCFBIHBUVRGHDGPX2UA/.

120.    NFL teams use a discretionary, subjective hiring practice when selecting Head Coaches, which has led to the disparate and discriminatory outcomes Commissioner Goodell has admitted are unacceptable.  While teams may apply various objective metrics in the decision-making process (such as years of experience in coaching, success in coaching positions as measured by various statistics, previous experience in Head Coach or Coordinator positions, whether a family member was previously a Head Coach, *etc.*), and must comply with NFL rules in connection with the practices (such as the Rooney Rule), the overall process is by its very nature subjective and discretionary and cannot be separated into independent or isolated parts.  It was this unfettered, unchecked and discretionary process that led to the Rooney Rule in the first place—but the discriminatory impact of these policies, practices and processes remains.

121.    As of the filing of the original Complaint, in the 20 years since the Rooney Rule was passed, only 15 Head Coaching positions had been filled by Black Candidates.  During that time, there had been approximately 129 Head Coaching vacancies.  Thus only 11% of Head Coach positions had been filled by Black candidates—in a league where 70% of players are Black.  With few exceptions, the Black candidates who have obtained Head Coach positions have been on a "short leash" and lasted for extremely short periods, while white candidates have had much lengthier opportunities to prove their worth.  In addition, upon information and belief, in general Black coaches at all levels are paid less than similarly qualified white coaches.

122.    Indeed, not a single one of the 10 Black Head Coaches hired since 2012 still holds his Head Coach job today.  In contrast, approximately 25% of white Head Coaches hired during the same time frame remain employed as a Head Coach.  Moreover, since 2012, Black Head Coaches have been fired in an average of 2.5 years, whereas (accounting for Head Coaches that are expected to return next year) white Head Coaches have averaged nearly 3.5 years on the job.

30

123.     Put another way, white Head Coaches are afforded an entire additional year to establish themselves relative to Black Head Coaches.  Thus, not only does the NFL employ policies, practices and process that have a discriminatory impact in the hiring of Black Head Coaches, but the same unfettered, unchecked and discretionary decision-making results in a disparate impact with respect to Head Coach retention.

124.     Moreover, since 1978, only 16 winning teams have fired their head coach (3%).  Even though Black coaches only held a small fraction of the Head Coach positions during that time, an astounding 25% (four of the 16) of the Head Coaches fired after a winning season were Black.  This statistic is even more remarkable given that there have only ever been 17 Black Head Coaches who have coached a full season, and four of them (23.5%) were fired after a winning season.  In contrast, only 6.9% of white coaches were fired after a winning season (12 out of 174).  Thus, Black Head Coaches are 3.5 times more likely to be fired even when successful.

125.     White Head Coaches routinely get second and third chances in critical positions, including as a Head Coach or Offensive or Defensive Coordinator.  Indeed, according to a 2021 NFL Diversity and Inclusion report, since 1963, 116 white individuals were hired as a Head Coach or Coordinator after an initial Head Coach opportunity, whereas only 21 individuals of color have received the same second chances.[28]  The same report noted that only one person of color has received three Head Coaching opportunities, whereas 15 white men have received three Head Coaching opportunities (two of the 15 received four opportunities).  Id.

---

[28]     See Harrison, C.K. and Bukstein, S., *Occupational Mobility Patterns in the National Football League, Vol. X*, NATIONAL FOOTBALL LEAGUE, (Feb. 2021), https://operations.nfl.com/media/4989/nfl-occupational-mobility-report-volume-x-february-2021.pdf.

126.    Thus, while the Rooney Rule was and remains well-intentioned, its effectiveness requires NFL teams to take it seriously, and not treat it as a formality that must be endured simply to formalize the pre-determined hiring of a white coach.  It requires that teams provide Black Head Coaches a fair and legitimate chance—a chance commensurate with the circumstances and comparable to the chances given to white Head Coaches—to thrive.  This can only be achieved with oversight in the hiring and firing process and other meaningful change.

127.    But that has not happened.  Following the recent terminations of Mr. Flores and David Culley, former Head Coach of the Texans, at the time the lawsuit was filed there was only one Black Head Coach out of 32 NFL teams.

128.    The following photo array speaks for itself.



129.    As mentioned above, at the time the Rooney Rule was instituted, almost 20 years ago, there were 3 Black Head Coaches.  That marks a complete lack of improvement, and in fact, a move backwards in the wrong direction.  The fact that NFL teams may have taken notice of this issue and hired a few minority Head Coaches *after* Mr. Flores filed this lawsuit only demonstrates the NFL's completely *reactive* approach to this issue when it negatively impacts the public relations efforts of the League.

130.    As was recently well-put by sportswriter Jemele Hill,

[M]ost NFL owners have been white men, and they have seldom been willing to let African Americans or Latinos call plays—either on the field or from the sidelines. This is no different from when franchises presumed that black players weren't smart enough to play quarterback and lacked leadership skills to command men. The league's paltry record of hiring minority head coaches comes from the same mind-set. And its primary effort to address the problem has been a failure, because a policy can't compensate for ignorance . . . If the NFL wants to create an equitable system for minority head coaches, the owners can't rely on a rule to create institutional change.[29]

131.    Ms. Hill continued, "NFL owners must recognize that their lazy stereotypes of black male leadership have created this embarrassing problem.  In time, we'll see whether they have the courage to fix it."  As has been evidenced by The New York Giants' Head Coach search and treatment of Mr. Flores—the NFL and its teams clearly do not.

132.    To avoid any doubt, the lack of Black Head Coaches in the NFL is not a mere "anecdotal" problem.  Statistically, it is extremely improbably that a fair and legitimately neutral hiring processes would have led to the admittedly "unacceptable" and disparate results across the NFL.  The Miami Herald recently published data regarding the Head Coach interviewees and hires between 2015 and February 1, 2022, when this lawsuit was filed.[30]  The results: 51 Head Coaches hired, 7 identify as Black (13.7%), and 111 Head Coaches interviewed, 29 of which identify as Black (26.1%).

---

[29]    See Hill, Jemele, *NFL Owners Have a Problem With Coaches of Color*, THE ATLANTIC, (Jan. 11, 2020), https://www.theatlantic.com/ideas/archive/2020/01/nfl-owners-have-problem-coaches-color/604771/.  Unfortunately, NFL owners have, by and large, failed to recognize even the existence of these stereotypes, much less found the courage to eradicate them.
[30]    See Blaskey, Sarah and Rosmery Izaguirre, *White Interviewees had 3x better odds of being hired as NFL head coaches, new data show*, MIAMI HERALD, (Mar. 4, 2022), https://www.miamiherald.com/sports/nfl/article258302943.html.

34

133.    Thus, based on the interview pool and the percentage of Black candidates in that pool, a completely neutral process would predict an outcome of 13 Black candidates being hired. A race-neutral process would have yielded 6 additional Black Head Coach hires.  Statistically, the probability of 7 or fewer candidates being hired (which is what happened) during these hiring cycles is 0.5%, or 2.58 standard deviations.[31]

134.    However, the above analysis considers solely the open jobs and the entire pool of unique individuals who interviewed for those jobs.  Another, method of analysis would be to look at the unique candidates by year.  That is, re-counting the same person who is interviewed for each year in which the person interviews.  Under this approach, 7 candidates were hires out of 60 Black candidates; a race-neutral process would expect 16.  The probability is 0.1%, or 3.09 standard deviations, that 7 or fewer Black candidates would have been selected by mere chance.

135.    Finally, one can look at each specific job opening and the candidates who interviewed for each (thus counting candidates multiple times even in the same year if they interviewed for multiple positions).  In total, for the 51 Head Coach positions, there were 327 interview appearances, and 106 interviews were granted to Black candidates (32.4%).  A race neutral process would have led to an expected result of 18 Black Head Coach hires when

---

[31]    The Second Circuit has recognized that standard deviations of more than two units can be used as evidence of discrimination because of the low likelihood that such disparities have resulted from chance.  See Malave v. Potter, 320 F.3d 321, 327 (2d Cir. 2003) ("[a statistical significance of two standard errors or more is] sufficient to warrant an inference of discrimination.") (quotation omitted); Waisome v. Port Auth. of New York & New Jersey, 948 F.2d 1370, 1376 (2d Cir. 1991)  ("finding of two or three standard deviations …[is] highly probative of discriminatory treatment"); Guardians Assoc. of New York City Police Dep't, Inc. v. Civil Serv. Comm., 630 F.2d 79, 86 (2d Cir. 1980) ("[I]n cases involving large samples, 'if the difference between the expected value … and the observed number is greater than two or three standard deviations,' a prima facie case is established.") (citation omitted).

analyzed in this manner. Under this analysis, the probability of 7 or fewer candidates being hired is 0.03%, or 3.42 standard deviations. The following table reflects these three analyses.

| Table 1 | | | |
|---|---|---|---|
| Mulpools Analysis of NFL Head Coach Selections, 2015-2022 | | | |
| Black Candidates | | | |
| | Per Candidate | Per Candidate/Year | Per Interview |
| | (1) | (2) | (3) |
| Expected Number of Selections | 13.3 | 16 | 18 |
| Actual Number of Selections | 7 | 7 | 7 |
| Expected Additional Selections | 6.3 | 9 | 11 |
| Probability (converted to 2 tail) | 0.005 | 0.001 | 0.0003 |
| Standard Deviation Equivalents | 2.58 | 3.09 | 3.42 |
| Total Black Candidates | 29 | 60 | 106 |

136.    Even when looking at a variety of variables that could have impacted the Head Coach selections that are independent of race—including age (a proxy for experience), years in the NFL as a Head Coach or Coordinator, the Win-Loss record of the team the candidate was most recently affiliated with, the Elo score[32] of the team the candidate was most recently affiliated with, and the Simple Rating System ("SRS")[33] score of the team the candidate was most recently affiliated with—none of these non-racial factors has had any statistically

---

[32]    Elo is a statistical formula which grades team skill level using the final scores and locations of each game. An explanation of Elo ratings can be found at: Paine, Neil, *NFL Elo Ratings Are Back!*, FIVETHIRTYEIGHT, (Sept. 10, 2015), https://fivethirtyeight.com/features/nfl-elo-ratings-are-back/.

[33]    For a primer on SRS, see *A very simple ranking system*, PROFOOTBALLREFERENCE.COM, (May 8, 2006), https://www.pro-football-reference.com/blog/index4837.html?p=37&__hstc=213859787.73125663f23707173cd55249a723585f.1648760587980.1648760587980.1648760587980.1&__hssc=213859787.1.1648760587980&__hsfp=748233975.

significant impact on the selection of Head Coaches according to this data.  This only further confirms that the disparate impact is the result of the candidate's race.

137.    A statistical analysis was also performed by FiveThirtyEight.com ("FiveThirtyEight") looking only at the 2021-22 hiring cycle which reached the same conclusion.[34]  FiveThirtyEight looked at the reported "finalists" for each of nine open Head Coach positions (25 total candidates, of which 9 were selected) and collected information on their race, age, coaching background, experience and statistical measures of team performance. FiveThirtyEight opined that, "If hiring NFL coaches were truly an objective process, we might expect the head-coaching candidates who were hired to have superior resumes to those who were not selected, in at least some quantifiable sense."  However, FiveThirtyEight found that when looking at all the factors, "the most statistically significant difference between the groups [hired versus not hired] *by far* was race." (emphasis in original).  During this coaching cycle, 53.8% of white candidates were hired whereas only 16.7% of non-white candidates were hired— "a difference that is very unlikely to have happened solely due to chance."

138.    The same FiveThirtyEight article also found that Mr. Flores and other Black Head Coaches already hired into a position are held to an unreasonably high bar and have to be "miracle workers" to hold on to their jobs.  FiveThirtyEight found Mr. Flores' termination from the Dolphins to be extremely suspect given that the team achieved a higher Elo score at the end of the year than at the beginning of the year (*i.e.*, the team improved) despite the fact that the team got negative performance play at the quarterback position.

---

[34]    See Pain, Neil, *NFL Teams Are Making Brian Flores's Case For Him*, FIVETHIRTYEIGHT, (Feb. 17, 2022), https://fivethirtyeight.com/features/nfl-teams-are-making-brian-floress-case-for-him/.

139.    In the last 30 years, only four Head Coaches have been fired under such circumstances, and three of them are Black (75%).

| YEAR | TEAM | COACH | WIN % | STARTING QB | QB ELO | TEAM ELO | | DEPARTURE |
| | | | | | | PRE | FINAL | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **2021** | **MIA** | **Flores** | .529 | **Tagovailoa** | -11.3 | 1532 | 1557 | **Fired** |
| 2017 | TEN | Mularkey | .556 | Mariota | -3.2 | 1460 | 1491 | Mutual |
| 2014 | BUF | Marrone | .563 | Orton | -14.5 | 1456 | 1549 | Resigned |
| **2012** | **CHI** | **Smith** | .625 | **Cutler** | -57.1 | 1505 | 1546 | **Fired** |
| **2008** | **NYJ** | **Mangini** | .563 | **Favre** | -10.4 | 1442 | 1472 | **Fired** |
| 2000 | DET | Ross | .563 | Batch | -72.5 | 1466 | 1512 | Resigned |
| **1994** | **OAK** | **Shell** | .563 | **Hostetler** | -18.5 | 1516 | 1530 | **Fired** |

140.    The same discriminatory pattern holds when looking at Head Coaches fired after just one season—*i.e.*, not even given a legitimate chance to succeed.  From 2003 through the end of the 2021 season, the NFL has had 127 different new Head Coach jobs/tenures (one coach can count for multiple tenures).  Of these 127 positions, 22 Black candidates have been hired (17.3%).  However, of the 14 Head Coaches during this time frame who have been fired after one season, 5 have been Black (35.7%).  Looked at another way, of the 22 Black Head Coaches hired since 2003, 22.7% have been fired after only one year.  In contrast, of the 103 white Head Coaches hired, 11 have been fired after one year (10.6%).

141.    That is, the same non-minority decision makers engaging in the same form unfettered, unchecked and discretionary decision-making with result to Head Coach firing and retention also leads to a disparate impact.

142.    Even further to the same point, the same unfettered, unchecked and discretionary processes are used to hire Coordinators, Quarterback Coaches and General Managers.  And

accordingly, nearly identical racial disparities exist there as well, notwithstanding that the Rooney Rule has been expanded to apply to those roles.

143. Offensive and Defensive Coordinators are significantly over-represented by white candidates and under-represented by Black candidates. These positions are very often filled by a pool of former players, approximately 70% of whom are Black.

144. As of the filing of this action, there were only four Black Offensive Coordinators in the 32-team League (12.5%), and 11 Black Defensive Coordinators (34%).[35]

145. This is significant given that, according to the NFL's Diversity & Inclusion Report covering 2012 through 2021 (published in February 2021),[36] teams focus on Coordinators, and in particular Offensive Coordinators, when it comes to considering candidates for Head Coach positions. During the period studied, approximately 80% of Head Coach hires were previously Coordinators.

146. According to the study, 31 out of 62 Head Coach positions were filled by Offensive Coordinators (where Black professionals are the most under-represented) while 18 Head Coach positions were filled by Defensive Coordinators. Moreover, only three out of 32 teams had a Black Quarterbacks Coach, which is the position that most often leads to an Offensive Coordinator opportunity.

147. This shows that not only are the NFL's Head Coaches predominantly white, but that the pipeline feeding this racial disparity is fraught with discrimination. This is indicative of the structural discrimination that pervades NFL teams and likely ensures that this problem will

---

[35]   In addition, only eight of 32 Special Teams Coordinators are Black (25%).
[36]   See Harrison, C.K. and Bukstein, S., *supra* fn. 27.

remain.  In sum, NFL teams are more willing to hire Black professionals into positions they deem to be less important and less likely to lead to Head Coach positions.

148.    The same discriminatory practices are apparent when it comes to the hiring of General Managers.  When this lawsuit was filed, out of 32 teams, there were only 7 Black General Managers (18.75%) against 26 white General Managers.[37]

---

[37]    These are as follows: Chris Grier, Dolphins; Andrew Berry, Cleveland Browns; Martin Mayhew, Washington Commanders; Brad Holmes, Detroit Lions; Terry Fontenot, Atlanta Falcons; Kwesi Adofo Mensah, Minnesota Vikings; Ryan Poles, Chicago Bears.

149.    See below:



150.    According to the NFL's Diversity & Inclusion Report, from 2012 through 2021 there were 37 General Managers vacancies and only six were filled by Black candidates (16%). 20 NFL teams have never had a Black General Manager.

151.    The NFL's inability to achieve racial diversity at the Head Coach positions stems from both the pipeline flowing up as well as the decision makers at the top.  The lack of representation of Black General Managers doubtlessly leads to the lack of Black Head Coaches.

152.    It stands to reason that, whether explicit or implicit, white decisionmakers tend to favor white candidates for significant positions, as numerous studies suggest there is same-race bias and impact in decision-making.

153.    Organizational studies have shown that people are most likely to hire others of the same race and that bias among decision makers can affect the diversity of the entire organization. This helps explain the structural problems that lead to a lack of Black professionals in both Head Coaching and in the pipeline at Coordinator positions.[38]

---

[38]    See e.g. Goldberg, Caren B, Relational Demography and Similarity-Attraction in Interview Assessments and Subsequent Offer Decisions: Are we Missing Something," *George Washington University* (Dec. 1, 2005); Bertrand, M., & Mullainathan, S., "Are Emily and Greg more employable than Lakisha and Jamal? A field experiment on labor market discrimination.", *The American Economic Review*, 94(4), 991-1013, (2004), Retrieved February 1, 2022 from https://proxy.library.upenn.edu/login?url=https://www.proquest.com/scholarly-journals/are-emily-greg-more-employable-than-lakisha-jamal/docview/233023724/se-2; Johnson, S. K., Hekman, D. R., & Chan, E. T., "If there's only one woman in your candidate pool, there's statistically no chance she'll be hired", *Harvard Business Review*, (Apr. 26, 2016), Retrieved February 1, 2022, from https://hbr.org/2016/04/if-theres-only-one-woman-in-your-candidate-pool-theres-statistically-no-chance-shell-be-hired.

154. To that end, the NFL has no Black owners:





155.    Owners are ultimately responsible for leading the entire organization, establishing an inclusive culture and deciding who to hire and retain in front office leadership positions such General Managers.  The lack of any Black voices in ownership clearly has led to a dearth of opportunities for Black General Managers, which has—in turn—has undermined racial inclusion in the NFL for more than 100 years.

## IV.   FACTUAL ALLEGATIONS OF THE NAMED PLAINTIFFS

### A.   Claims By Brian Flores

#### i.   Background on Brian Flores

156.   Mr. Flores, the son of Honduran immigrants, grew up in the housing projects in Brownsville, Brooklyn, New York.  Mr. Flores managed to navigate and avoid the perils of drugs, gangs and violence in one of the city's toughest neighborhoods and grew to love his home neighborhood and city.  As it was put by a childhood friend, "Brownsville is the trenches . . . and Brian was like a rose growing out of the concrete."[39]

157.   Mr. Flores excelled academically and began playing football.  After a successful high school and college playing career, Mr. Flores was hired as a scout by the New England Patriots and, in 2008, transitioned to a coaching position.  Mr. Flores received multiple promotions, and, during his tenure, the Patriots appeared in five Super Bowls, winning three of them.  In the last of these Super Bowls, when Mr. Flores called the Patriots' defensive plays, the Patriots held the Los Angeles Rams to three points, tied for the fewest ever in a Super Bowl.

#### ii.   Discrimination by the Dolphins

158.   In 2019, on the heels of his outstanding performance with the Patriots, Mr. Flores was offered the Dolphins Head Coach position.

159.   By all accounts, Mr. Flores did a fantastic job in three seasons from 2019-2021.

160.   In his first year, Miami's gutted roster won five games despite many experts predicting an 0-16 season and one of the worst teams in NFL history.

---

[39]   See O'Connor, Ian, *The Patriots' next coaching star? His odds were incredibly long*, ESPN.COM, (Mar. 7, 2018), https://www.espn.com/nfl/story/_/id/22262842/brian-flores-new-england-patriots-next-coaching-star-emerge-bill-belichick-tree.

161. The Dolphins owner, Stephen Ross, was unhappy with this performance—but not because it was under-performing. To the contrary, Mr. Ross had wanted Mr. Flores to "tank" the season to put the team in position to secure the first pick in the draft.

162. Indeed, during the 2019 season, Mr. Ross told Mr. Flores that he would pay him $100,000 for each game lost that year.

163. This request constitutes a violation of the Sports Bribery Act, and, had Mr. Flores acceded to the request, that too would have constituted a violation of the Sports Bribery Act.

164. Mr. Flores made it clear in no uncertain terms that he would not agree to lose games on purpose, and that he would try his very best to win every game the Dolphins played.

165. Nevertheless, when the Dolphins started winning games, due in no small part to Mr. Flores' coaching, Mr. Flores was told by Mr. Grier, that "Steve" was "mad" that Mr. Flores' success in winning games that year was "compromising [the team's] draft position."

166. Given these reactions and alarming demands to lose games, Mr. Flores memorialized Mr. Ross' desire to have Miami lose games in a December 4, 2019 memorandum that was provided to General Manager, Chris Grier; Chief Executive Officer, Tom Garfinkel; and Senior Vice President of Football and Business Administration, Brandon Shore. In this letter, Mr. Flores detailed the toxicity that existed within the organization and explained the unreasonable position he was being placed in by the team ownership and upper management.

167. Over the remainder of Mr. Flores' tenure at the helm of the Dolphins, he was routinely made to feel uncomfortable based upon his decision not to tank in order to secure the top pick in the 2020 draft. Upon information and belief, no white Head Coach has ever been subjected to such ridicule over winning and holding the spirit of the game in such high regard.

168. Separately, after the end of the 2019 season, Mr. Ross began to pressure Mr. Flores to recruit a prominent quarterback in violation of League tampering rules.

169. Mr. Flores repeatedly refused to comply with these improper directives.

170. Undeterred, in the winter of 2020, Mr. Ross invited Mr. Flores onto a yacht for lunch. Shortly after he arrived, Mr. Ross told Mr. Flores that the prominent quarterback was "conveniently" arriving at the marina.

171. Obviously, Mr. Ross had attempted to "set up" a purportedly impromptu meeting between Mr. Flores and the prominent quarterback.

172. Mr. Flores refused the meeting and left the yacht immediately.

173. After the incident, Mr. Flores was treated with disdain and held out as someone who was noncompliant and difficult to work with—typical discriminatory stereotypes that are regularly applied to Black people, and not white people.

174. The following year, in 2020, despite this discriminatory treatment, the Dolphins improbably won 10 games, narrowly missing the playoffs, and Mr. Flores was mentioned as a potential coach of the year candidate. In 2021, Miami again finished with a winning record, and fans, pundits and experts all agree the team played extraordinarily hard for Mr. Flores.

175. Nonetheless, Mr. Flores was terminated and subsequently defamed throughout the media and the League, as he was labeled by the Dolphins brass as someone who was difficult to work with. This is reflective of an all too familiar "angry black man" stigma that is often cast upon Black men who are strong in their morals and convictions while white men are coined as passionate.

176. Mr. Flores' only failure to collaborate was his refusal to tank the 2019 season and tamper in violation of league rules. When he refused, and then over-performed and led the team

to winning records in two consecutive seasons with a roster few experts predicted could do so—he was fired.

177.    Mr. Flores was discharged from his duties as the Dolphins Head Coach on January 10, 2022.  Countless current and former players, executives and media analysts expressed their dismay at Mr. Flores' termination,[40] and he immediately became one of the top Head Coach candidates on the market.

### iii.    Giants Discriminatory and Sham Interview

178.    It is against this backdrop that the Giants should have considered Mr. Flores as a highly regarded candidate for the Head Coach position, and, for nearly two weeks, it at least publicly appeared that the Giants viewed Mr. Flores as a desirable option.

179.    Indeed, on January 11, 2022, the day that the Giants terminated Head Coach Joe Judge, Mr. Flores received a text message from Tim McDonnell, the Giants' Co-Director of Player Personnel.  The two spoke *via* telephone and, according to Mr. McDonnell, the Giants, and its owner John Mara, were extremely interested in hiring him for the team's vacant Head Coach position.

180.    Later that day, after the two texted about potential General Manager and Assistant Coach/Coordinator candidates, Mr. McDonnell let Mr. Flores know that Mr. Mara would be reaching out directly to him to express his interest.  Mr. Flores let Mr. McDonnell know that the Giants Head Coach position would be his "dream job."[41]

---

[40]    See Cwik, Chris, *Dolphins players, rest of NFL react to Brian Flores getting fired: "I'm sick"*, YAHOO! SPORTS, (Jan. 10, 2022), https://sports.yahoo.com/dolphins-players-rest-of-nfl-react-to-brian-flores-getting-fired-im-sick-170451689.html.

[41]    Ironically, during their January 11, 2022 text exchange, Mr. McDonnell also suggested that if Mr. Flores were hired as the Giants Head Coach, Brian Daboll might be interested in leaving Buffalo to serve as his Offensive Coordinator ("Heard Daboll isn't happy with Sean [McDermott] in Buffalo . . . might be able to get out if he doesn't get a head job… thoughts?").

181.    The following day, on January 12, 2022, Mr. Mara and Mr. Flores had a positive conversation about his candidacy for the Head Coach position.  This was followed up with a Zoom meeting on Tuesday, January 18, 2022.

182.    On the morning of Sunday, January 23, 2022, Mr. Schoen, who had recently been announced as the Giants' new General Manager (beating out multiple Black candidates for the job), began the process of scheduling an interview with Mr. Flores.

183.    The same day in the mid-afternoon, Mr. McDonnell told Mr. Flores that he hoped that Mr. Flores would "come in and win the fng job."

184.    On Monday, January 24, 2022, Mr. Schoen finalized Mr. Flores' interview date for January 27, 2022.

185.    Unfortunately, just hours later Mr. Flores learned that the Giants' continued courtship was nothing more than a discriminatory façade designed to show false compliance with the Rooney Rule.

186.    Indeed, on January 24, 2022, at 2:30 p.m., Mr. Flores received a text message from New England Patriots Head Coach, Bill Belichick—clearly an insider and privy to non-public information from direct sources.

187.    The ensuing text messages from Mr. Belichick to Mr. Flores speak for themselves:

 

188.    Clearly, by midday Monday, January 24, 2022, the Giants had already decided to hire Mr. Daboll and communicated the decision to third-parties, including to Mr. Belichick.

189.    But for Mr. Belichick's error, Mr. Flores never would have known of this fact.[42] This revelation not only impugns and viciously exposes the sham process to which Mr. Flores was subjected but also stands to indict the Giants' organizational hiring practices in general.

---

[42]    Other third parties have also confirmed that the interview of Mr. Flores was a sham. See e.g. Jimmy Randazzo (@JimmyRandazzo), TWITTER, (Jan. 28, 2022), https://twitter.com/JimmyRandazzo/status/1487168987725185025 ("I Was Told on Monday Brian Daboll Will Get the Job. I Don't Care Who Was Right or Who Was First I Just Want Him

190.    It is impossible to put into words the emotions Mr. Flores felt upon learning that not only would he not be getting the Giants Head Coach job—the job of his dreams—but, more importantly, that he was not even being given serious consideration for the position but being treated as a box to "check off" due to his race.

191.    Mr. Flores spent Monday evening, Tuesday and Wednesday (including a dinner with Mr. Schoen) knowing that he was walking into Thursday's interview with no chance to become the Giants Head Coach.  While he would spend countless hours preparing to put his best step forward, the white men across the table from him saw and heard only one thing: a formality that had to be observed in order to name Mr. Daboll the Head Coach.

192.    It bears noting that the Giants in particular have an ominous history when it comes to race relations, and, in particular, when it comes to hiring Black Head Coaches.

193.    The Giants have never hired a Black Head Coach; Mr. Flores would have been the team's first.  This is a near unbelievable fact given that the Giants have been in existence for nearly 100 years and have now hired 22 Head Coaches.  It is made even worse given that approximately 70% of the players in the NFL are Black, and the Organization sits in the nexus of the New York/New Jersey community, which prides itself on diversity and inclusion.

194.    Year after year, the Giants have interviewed Black candidates for open Head Coach positions—likely due only to the requirements of the Rooney Rule—without ever hiring one.

195.    In 2004, the Giants hired Tom Coughlin after interviewing: (i) Romeo Crennel (who would go on to receive Head Coach positions with the Cleveland Browns (the "Browns"),

---

to Be the next Head Coach"); Esiason, Boomer, *[Brian Daboll] was offered the job earlier in the week but had to wait for the Giants to complete the formal interviewing process*, CBS SPORTS MINUTE, (Jan. 31, 2022), https://www.audacy.com/podcasts/cbs-sports-minute-818.

Kansas City Chiefs (the "Chiefs") and the Texans); and (ii) Lovie Smith (who would go on to receive a Head Coach position with the Chicago Bears (the "Bears"), who he took to the Super Bowl in 2006, and the Tampa Bay Buccaneers (the "Buccaneers")).

196.    After Tom Coughlin left the organization in 2016, the Giants hired Ben McAdoo after interviewing Teryl Austin, the highly qualified Black Defensive Coordinator of the Detroit Lions ("Detroit" or the "Lions").

197.    When Mr. McAdoo was terminated after just two years, the Giants hired Pat Shurmur after interviewing Steve Wilks and Eric Studesville, two highly qualified Black candidates.

198.    After Mr. Shurmur was fired just two years later, the Giants passed over Eric Bieniemy, who many considered to be the best Head Coach prospect on the market, as well as Kris Richard, and instead hired Joe Judge,[43] who himself was fired after just two years.

199.    More to the point, only once since the passage of the Rooney Rule have the Giants even interviewed more than the minimum number of Black candidates for Head Coach, and it is not for a lack of qualified candidates.  This demonstrates that the Giants interview Black candidates because of the NFL's mandate and for no other reason.

### iv.    Prior Sham Interview with the Denver Broncos

200.    Incredibly, this was not Mr. Flores' first sham interview that was held only in an effort to comply with the Rooney Rule.

---

[43]    The Giants' willingness to hire Mr. Judge, but not Mr. Flores, is a particular affront to racial equality when comparing their relative qualifications.  See Hill, Jemele, *supra* (explaining that Mr. Flores had to have far greater qualifications than Mr. Judge before finally receiving a Head Coach position with the Dolphins).

201. Indeed, in 2019 Mr. Flores was scheduled to interview with the Denver Broncos (the "Broncos").

202. However, the Broncos' then-General Manager, John Elway, President and Chief Executive Officer, Mr. Ellis, and others, showed up an hour late to the interview.

203. They looked completely disheveled, and it was obvious that they had been drinking heavily the night before.

204. It was clear from the substance of the interview that Mr. Flores was interviewed only because of the Rooney Rule, and that the Bronco's never had any intention to consider him as a legitimate candidate for the job.

205. Shortly thereafter, Vic Fangio, a white man, was hired to be the Head Coach of the Broncos.

206. Sadly, while the Rooney Rule was meant to lift the NFL from its history of insidious "gentlemen's agreements," segregation and racism, the Giants and Broncos' actions towards Mr. Flores fit that history all too well.

### v. Retaliation Against Mr. Flores Following the Filing of the Lawsuit

#### a. The Texan's Fail to Hire Mr. Flores as the Team's Head Coach Because He Filed this Lawsuit

207. On January 31, 2022, Mr. Flores interviewed for the Texans job in-person with Cal McNair (Chairman and Chief Executive Officer), Hannah McNair (Mr. McNair's wife), Nick Caserio (General Manager) and Jack Easterby (executive Vice President of Football Operations).

208. Prior to Mr. Flores filing this lawsuit, in addition to Mr. Flores, the Texans had interviewed Hines Ward, Jonathan Gannon, Kevin O'Connell and Josh McCown, none of whom have any head coaching experience.

209.    On February 1, 2022, Mr. Flores filed this lawsuit.  As a courtesy, he gave the Texans advance notice that it would be filed.

210.    In the days following the filing of this suit, two candidates received second interviews by the Texans—Mr. Gannon and Mr. McCown.

211.    On February 4, 2022, it was widely reported that the Texans had narrowed the position to three candidates—Mr. Flores, Mr. Gannon and Mr. McCown.  Mr. Gannon and Mr. McCown are both white and less experienced than Mr. Flores.  Mr. McCown, in particular, has never coached in any capacity in the NFL.

212.    On February 6, 2022, it was announced that Mr. Gannon would no longer be considered for the Texans Head Coach position.[44]  Thus, the Head Coach vacancy was down to Mr. McCown and Mr. Flores.

213.    It is clear that the Texans did not want to hire Mr. Flores to be the team's Head Coach because he had opposed discriminatory conduct within the NFL by the filing of this lawsuit and speaking publicly about the systemic racism in the NFL.

214.    It is also clear that the Texans were rightfully concerned that if it hired Mr. McCown over Mr. Flores, it would bolster Mr. Flores' allegations of systemic discrimination against Black candidates, particularly given that the team had just fired Black Head Coach David Culley after only one season.

---

[44]    See e.g. Thompson, Cole, *Sources: Jonathan Gannon Out of Houston Texans Coach Search; Josh McCown vs. Brian Flores*, SPORTS ILLUSTRATED, (Feb. 6, 2022), https://www.si.com/nfl/texans/news/houston-head-coach-jonathan-gannon-eagles-josh-mccown-brian-flores-nick-caserio#:~:text=The%20Texans%20will%20no%20longer,first%2Dyear%20coach%20David%20Culley.

215.    As such, later on the very same day that it was announced that the Texans had narrowed its search down to only two candidates, it also was announced that the team had decided to give an initial interview to its own Coach Culley's Defensive Coordinator, Lovie Smith, for the Head Coach position.

216.    On February 8, 2022, the Texans hired Lovie Smith to be the team's Head Coach. Mr. Smith is a two-time previous Head Coach with a career winning record, multiple trips to the playoffs and a Super Bowl appearance with the Bears in 2006. Mr. Flores applauded the Texans for hiring a Black Head Coach when the announcement was made. To be clear, Mr. Smith is more than qualified for the role, and it is a positive thing that another Black Head Coach has been hired by an NFL football team.

217.    That said, it is equally problematic that the reason that the Texans did not hire Mr. Flores in the first place was because he filed this lawsuit and opposed systemic racism in the NFL.

218.    Upon information and belief, either the Texans made this retaliatory decision on its own or the NFL—through the Commissioner's office and/or other member teams and/or surrogates from the NFL or its member teams—pressured the Texans not to hire Mr. Flores to be its Head Coach after he filed this lawsuit, or some combination thereof.

> b.    The Dolphins Breach Mr. Flores' Contract and Retaliatorily Attempt to Claw Back Compensation Paid to Him

219.    Pursuant to the Flores Employment Agreement with the Dolphins, upon a termination without cause, he would be entitled to a payout of the remaining two years of his five-year contract (an eight-figure sum), provided that he signed a "general release of claims in favor of the [Dolphins] and [Dolphins' affiliates]."

55

220.    After the Dolphins terminated Mr. Flores, and in breach of the Flores Employment Agreement, the team never provided him with a "general release of claims in favor of the [Dolphins] and [Dolphins' affiliates]."  Instead, the team provided him with a separation agreement (the "Separation Agreement") that included terms that went far beyond a general release.

221.    First, the Separation Agreement contained a release of claims against not only the Dolphins, but also the Dolphins' "affiliates, *and their respective parents, predecessors, related entities, and their respective officers, directors, insurers, shareholders, agents, attorneys, employees, successors, assigns, and past, current and future subsidiaries*." (Emphasis added). The Dolphins were not entitled to demand that Mr. Flores sign a release that was far broader than what was set forth in the Flores Employment Agreement.

222.    Second, the Separation Agreement contained confidentiality, non-disparagement, cooperation, non-solicitation, tax indemnification and arbitration provisions, among many others. Again, these provisions far exceed a general release of claims, and the Dolphins were not entitled to present them to Mr. Flores, much less refuse to pay his severance because he refused to agree to them.

223.    Third, the non-disparagement provision in the Separation Agreement constitutes an impermissible restraint on Mr. Flores' ability to obtain alternative comparable employment of his choice, as he would undoubtably need to speak negatively regarding the Dolphins in explaining his departure from the team, particularly given that the Dolphins had, at the point when they presented him with the Separation Agreement, already spoken negatively about Mr. Flores.

224.    Fourth, the Separation Agreement failed to make clear that it does not prevent Mr. Flores from filing a complaint or charge with the Equal Employment Opportunity Commission ("EEOC") or any other governmental agency, including the Department of Justice and/or the Federal Bureau of Investigation.  See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 28 (1991) (confirming that a private agreement cannot interfere with a person's right to file a charge with the EEOC); see also https://www.eeoc.gov/policy/docs/waiver.html (stating inter alia that, "An employer may not interfere with the protected right of an employee to file a charge"). While the Separation Agreement did state that "nothing in this Agreement prohibits Employee from participating in an investigation or proceeding before any federal, state or local governmental agency," that provision was limited to "participating in an investigation" and does not appear to permit Mr. Flores to file a complaint.  Additionally, as mentioned, the Separation Agreement contains an impermissible non-disparagement provision that would effectively preclude Mr. Flores from being fully forthcoming with the aforementioned agencies or others.

225.    Under these circumstances, the Dolphins failure to pay Mr. Flores the severance to which he was contractually entitled constitutes a breach of the Flores Employment Agreement.

226.    To make matters worse, after this lawsuit was filed, the Dolphins filed a letter with Commissioner Goodell seeking an arbitration over claims that Mr. Flores should be required to return hundreds of thousands of dollars of earned income.  The only reason that the Dolphins filed this request is because Mr. Flores filed this suit and opposed the team's discriminatory conduct.

**B.    Discrimination Against Steve Wilks**

**i.    Background**

227.    Mr. Wilks has been a college and professional football coach for almost 30 years.

228.    Between 1995 and 2005, Mr. Wilks worked for several Division I colleges, including Notre Dame and Washington.

229.    Starting in 2006, Mr. Wilks started his NFL tenure as a Defensive Backs Coach with the Bears, and the Bears went to the Super Bowl.

230.    Thereafter, between 2009 and 2017, Mr. Wilks was the Defensive Backs Coach for the San Diego Chargers, the Defensive Backs Coach for the Carolina Panthers and the Assistant Head Coach and Defensive Coordinator for the Carolina Panthers.

### ii.    Discrimination by the Cardinals

231.    In 2018, the Cardinals hired Mr. Wilks to be its Head Coach pursuant to an employment contract (the "Wilks Employment Agreement").

232.    Like many situations when Black Head Coaches are hired in the NFL, in retrospect it is clear Mr. Wilks was hired as a "bridge coach."

233.    A "bridge coach" is understood to be a coach who is not given a meaningful opportunity to succeed and is simply "keeping the seat warm" until the team is better positioned to succeed, at which point a new coach is brought in.

234.    True to form, Mr. Wilks was not given nearly the time nor authority to develop the team or culture for the Cardinals—certainly nothing at all commensurate with the time and opportunities afforded to white Head Coaches throughout the League.

235.    Before the 2018 NFL draft, Mr. Wilks inherited a team with no starting quarterback as veteran Carson Palmer had retired.

236.    Heading into the draft, Mr. Wilks urged General Manager Steve Keim to trade up in the draft to select quarterback Josh Allen.  Josh Allen was selected 7th overall and is now a professional bowl player with a 39-21 record as a starting quarterback.

58

237.    Instead, at Mr. Keim's decision and in contrast to Mr. Wilks' suggestion, the Cardinals traded up to the 10th spot, to draft quarterback Josh Rosen.

238.    Unfortunately, history would reveal this move to be one of the great draft gaffes of all time.  Mr. Rosen was not ready to be a starting quarterback in the NFL and ultimately had an unsuccessful career.  He was cut mid-season by the Atlanta Falcons (the "Falcons") this past year after hardly playing.

239.    After organized team practice activities ("OTAs") in the offseason, before training camp, Mr. Wilks spoke to the team about how to comport themselves heading into the season.  He implored them all to use good judgment, stay out of trouble and to "not be that guy."

240.    Before training camp, on July 4, 2018, Mr. Keim was arrested and later pleaded guilty to driving under the influence of alcohol—a fireable offense showing poor judgment from a team leader.  Michael Bidwell, owner of the Cardinals, spoke to Mr. Wilks and said, in sum and substance, "I guess Steve [Keim] is that guy."

241.    On July 17, 2018, the Cardinals publicly stated that,

> Those who work within the National Football League – particularly those in leadership positions – bear a greater responsibility and are held to a higher standard than simply a legal one and we feel that these measures are reflective of that . . . this behavior is indefensible and completely unacceptable.  While Steve has accepted full accountability and responsibility for his actions, that does not diminish their gravity nor the severity of the consequences that result from them.[45]

---

[45]    See e.g. Urban, Darren, *Steve Keim Suspended Five Weeks, Fined After DUI*, AZCARDINALS.COM, (Jul 17, 2018), https://www.azcardinals.com/news/steve-keim-suspended-five-weeks-fined-after-dui.

242.    But Mr. Keim kept his job.  The Cardinals fined him $200,000 and he was suspended for five weeks, which had little if any ramification on Mr. Keim's career or tenure with the Cardinals.

243.    Mr. Keim's arrest and suspension made an already challenging position for Mr. Wilks even more difficult.  Specifically, Mr. Wilks was without a GM to weigh in on personnel decisions and make roster moves during a critical time in the preseason.

244.    During these weeks, NFL teams have daily meetings among front office personnel, coaches and scouts to narrow a group of 90 players down to 53.  The GM is expected to be a leader in that process.  Without a GM, the Cardinals—and consequently Mr. Wilks heading into his first season as Head Coach—were at a severe disadvantage.

245.    In August 2018, while Mr. Keim was supposedly suspended and not engaged in his job, star running back David Johnson stated that he was "encouraged" a deal would get done.  On September 8, 2019, just after Mr. Keim's suspension was over, the Cardinals announced that Mr. Johnson signed a 3-year, $39 million contract.  Clearly the negotiation was ongoing, and there is evidence of Mr. Keim's input and participation during his so-called suspension.

246.    On top of everything else, Mr. Wilks was micromanaged and was unable to make personnel decisions related to his staff with the appropriate level of discretion and autonomy.

247.    Notwithstanding all of the foregoing, Mr. Wilks did a tremendous job under extremely difficult circumstances.

248.    According to the aforementioned executive,

> You never had a shot for success in Arizona.  Even though we had minimal talent, the players had a lot of respect and admiration for how you handled the chaos that year.  There isn't a human being alive that would ever be able to overcome the pressure and lack of respect that you had to deal with every day from Bidwill . . . To say your season was filled with dysfunction, would come up short.  The

60

truth is that you earned the right to coach an NFL team, you just showed up at a place that was in complete disarray. I apologize on behalf of the organization and the league for how you were scapegoated by the owner that year.

249. As the season progressed, it was clear that the Cardinals would be in the running for the first pick in the NFL draft.

250. In week 13, Mr. Wilks helped lead the team to an upset victory playing on the road against the Green Bay Packers. After the game, a colleague told Mr. Wilks that he shared an elevator ride with Mr. Bidwill and Mr. Keim and that they were "pissed" that the Cardinals won the game; *i.e.*, they were upset because the win might have compromised the Cardinals' ability to obtain the first pick in the NFL draft.

251. A few weeks later, in week 15, when the Cardinals were on the road against the Falcons, a colleague told Mr. Wilks that Mr. Keim was openly discussing replacements for Mr. Wilks—a humiliating lack of support for a Head Coach mid-season. Mr. Keim did this on several other occasions, which was completely disrespectful to Mr. Wilks.

252. On or about December 31, 2018, the Cardinals terminated Mr. Wilks after just one season.

253. Though the Cardinals ended up with a 3-13 record in Mr. Wilks' first season, the team lost four games on walk-off field goals, including in the final game of the season against the Seahawks. This goes to demonstrate how hard the team's players continued to work and play hard for Mr. Wilks, many of whom spoke out publicly in support of him.

254. Notably, the Cardinals ended the season with the top pick in the NFL draft and had a pathway towards a successful future—the team was set to draft quarterback Mr. Murray with the first pick. History tells us that, particularly given the circumstances, a white Head

Coach would have been given a second year to build upon the first. But, just like Coach Culley this past year, Mr. Wilks was never given the opportunity for a second year.

255. The Cardinals' treatment of Mr. Wilks stands in stark contrast to its treatment of Mr. Keim. Mr. Keim, who had personally chosen Mr. Rosen as the team's quarterback and had been arrested for a DUI, did not lose his job. To the contrary, he was given bogus discipline for his egregious infractions and then given a contract extension at the end of the year.

256. At the time, many felt Mr. Wilks' termination was unjust.

257. Mr. Wilks had three years and a club option remaining on his contract, and he was terminated notwithstanding the financial commitment still owed to him. In contrast, Mr. Keim's contract was one year away from expiring and it would have been a logical time to move on from an underperforming GM. However, Mr. Keim was given a four-year extension at the same time Mr. Wilks was fired.

258. ESPN published an article titled "When the Cardinals fired Steve Wilks, they fired the wrong guy" which explained all the reasons Mr. Wilks was the wrong "fall guy" even beyond those described above:

> Bidwill need not look further than Keim to figure out why the team struggled in 2018. Keim should've been the one to pack up his office on Monday, not Wilks . . . Keim has largely been the reason the Cardinals started to fall back to earth in 2016 and 2017, and why they crashed in 2018 . . . Before his DUI in July that led to a five-week suspension during training camp, there were a series of bad and head-scratching moves: From trying to underpay Calais Campbell and Tyrann Mathieu to signing veteran offensive lineman after veteran offensive lineman who either got hurt or didn't live up to their expectations, hoping for a quick fix that never came . . . Then there were the draft mistakes. Four of his first-round picks – Josh Rosen, Deone Bucannon, Haason Reddick and Nkemdiche – hardly produced this year. His 2013 first-round pick, Jonathan Cooper, was traded in 2016. Keim's only first-round pick to begin living up to expectations was tackle D.J. Humphries, who's been hampered by injuries for most of his career . . . Keim's absence during training

62

camp left Wilks on an island. Even though Wilks was able to rely on his former coach in Carolina, Ron Rivera, and other head coaches for advice, he didn't have access to his GM during the most important time for any coach, much less a first-time coach.[46]

### iii.    The Cardinals Give a White Head Coach Opportunity to Succeed

259.    Next, the Cardinals hired Mr. Kingsbury, who is white, to be the next Head Coach.  Mr. Kingsbury had no NFL coaching experience whatsoever and had just been fired by Texas Tech after amassing a losing record over six seasons.

260.    Mr. Kingsbury inherited a position where the team had the first pick in a draft with a clear consensus top quarterback to select—Mr. Murray (thus quickly abandoning Mr. Rosen who had been drafted just the year before).  Mr. Kingsbury, with the top pick at quarterback, led the team to a record of 5-10-1 in his first season, only two wins better than Mr. Wilks.

261.    But Mr. Kingsbury was not fired.  He kept his job and was given time to develop the team.  In year two, 2020, Mr. Kingsbury improved the team to 8-8, and to 11-6 and a playoff berth in 2021.  Mr. Wilks was never given close to the same opportunity.

262.    Like many other Black Head Coaches, Mr. Wilks has never been given a second opportunity to become the Head Coach of any other NFL team.

263.    Mr. Wilks is unfortunately not an anomaly or an exception to the rule.  To the contrary, the discriminatory treatment towards Mr. Wilks is just part and parcel to the ongoing pattern and practice of discrimination in the NFL when it comes to the NFL's Head Coach, Coordinator and Executive hiring and employment decisions.

---

[46]    See Weinfuss, Josh, *When the Cardinals fired Steve Wilks, they fired the wrong guy*, ESPN.COM, (Dec. 31, 2018), https://www.espn.com/blog/arizona-cardinals/post/_/id/31247/when-the-cardinals-fired-steve-wilks-they-fired-the-wrong-guy?platform=amp.

### C.    Admitted Discrimination Against Ray Horton

#### i.    Background

264.    Mr. Horton has been a professional football coach for almost 30 years since his NFL playing career ended and has an impeccable reputation around the League.

265.    Mr. Horton was a Defensive Backs Coach or Secondary Coach from 1994 through 2010 for the Washington Redskins (1994-1996), Cincinnati Bengals (1997-2001), Detroit Lions (2002-2003) and Pittsburgh Steelers (2004-2010).

266.    In 2011, the Cardinals hired Mr. Horton to be the team's Defensive Coordinator, and he remained in that role through the end of the 2012 season when the Head Coach was terminated.  In 2013, Mr. Horton was the Defensive Coordinator for the Cleveland Browns.  In 2014, Mr. Horton was hired to be the Defensive Coordinator of the Titans, pursuant to an employment contract (the "Horton Employment Agreement") where he remained employed through the end of the 2015 season.

267.    During these years, Mr. Horton was interviewed for several Head Coach vacancies, including the Cardinals, the Browns and Buffalo Bills.  Mr. Horton did not get any of these jobs.

#### ii.    Discrimination and Sham Interview by the Titans

268.    During 2015 season, the Titans started the year with a 1-6 record and fired the Head Coach midway through the season.  Mike Mularkey, who had been the Titans Tight Ends Coach at the time, was named the Interim Head Coach for the remainder of the season.  The team went 2-7 over the final nine games.

269.    Following the conclusion of the season, the Titans did a series of purported interviews for the Head Coach position.  The Titans interviewed Doug Marrone (then

64

Jacksonville Jaguars Assistant Head Coach), Mr. Mularkey, Teryl Austin (then the Lions Defensive Coordinator) and Mr. Horton.

270. Mr. Marrone had been the first interview candidate earlier in the week starting Monday, January 11, 2016. It was reported that Mr. Mularkey was interviewed by the Titans on Friday, January 15, 2016. Following Mr. Mularkey's interview, the Titans interviewed Mr. Austin later that same day.

271. Also, that same day, Friday, January 15, 2016, Mr. Underwood called Mr. Horton—who was home in Phoenix at the time—and asked him to immediately get on a flight to Tennessee to interview for the Head Coach job the next day.

272. The urgency of the request was, so Mr. Horton was told, due to the fact that Titans owner Amy Adams Strunk's (the controlling owner of the Titans) granddaughter was competing in an equestrian event for which she had to get to Tampa, Florida on Saturday. Thus, Mr. Horton took a red-eye flight on little notice to interview for the Titans Head Coach position the next day, January 16, 2016.

273. As Mr. Horton now understands, the rush to interview him was an orchestrated attempt to make it appear that the Titans had complied with the Rooney Rule and otherwise appear to have given an equal opportunity to Black candidates so the team could announce the pre-made decision to hire Mr. Mularkey as Head Coach.

274. On Saturday, January 16, 2016, Mr. Horton met with Ms. Adams, Kenneth Adams (another Owner), Jon Robinson (General Manager), Steve Underwood (President) and Vin Marino (Vice President of Football Administration). Every member of this group is white.

275. The interview was at the Titans practice facility. Mr. Horton was very familiar with it having been the Defensive Coordinator for two years. Mr. Horton described numerous

65

ideas he had which would all help reinforce a positive and hard-working culture—from the football field to the locker room to the parking lot. Mr. Horton described the way he would motivate players and be personally accessible and accountable to the team.

276. At one point during the interview, Mr. Adams said to Mr. Horton, "We've gotta have you." Others in the meeting nodded their heads in agreement, though not Ms. Adams.

277. When Mr. Horton was leaving the facility after the conclusion of the interview, he ran into Mr. Mularkey walking into the office. Mr. Horton, of course, knew Mr. Mularkey well having coached with him over the previous two years. However, Mr. Horton thought Mr. Mularkey's presence was odd given that he had been interviewed just the day before and because Mr. Horton had been told that Ms. Adams had to leave in order to fly to Florida.

278. Later that day, Mr. Underwood called Mr. Horton to let him know that the Titans decided to hire Mr. Mularkey. Mr. Underwood told him that the interview was "outstanding," and everyone was "very impressed."

279. Years later, on or about October 21, 2020, after Mr. Mularkey was no longer coaching in the NFL, Mr. Mularkey was interviewed for a podcast called Steelers Realm. Mr. Mularkey was asked, "Well Mike if you could turn back the clock where would you—you probably hate these questions—but would there be anything during your coaching career that you might have done differently or changed?"

280. Mr. Mularkey responded *verbatim*:

> That's a good question. I will tell you guys this, I've always prided myself on doing the right thing in this business and I can't say that's true about everyone in this business. It's a very cutthroat business, and a lot of guys will tell you that. But I allowed myself at one point when I was in Tennessee to get caught up in something I regret, and I still regret it, but the ownership there Amy Adams Strunk and her family came in and told me I was going to be the head coach in 2016, before they went through the Rooney rule. And so I sat there

66

knowing I was the head coach in 2016, as they went through this fake hiring process knowing, knowing a lot of the coaches that they were interviewing, knowing how much they prepared to go through those interviews, knowing that everything they could do and they had no chance to get that job. And actually, the GM Jon Robinson, he was in an interview with me. He had no idea why he is interviewing me, that I have a job already. I regret it, cause I pride myself and my kids first to do the right thing, and I always said that to the players. And here I am the head guy not doing it, and I regretted it since then. It was the wrong thing to do. I am sorry I did that, but it was not the way to do that. Should have been interviewed like everybody else and got hired cause of the interview not early on. So that is probably my biggest regret.

281. Mr. Mularkey admitted that he knew the job was his before he was interviewed and that the minority candidates interviewed as part of the process were subjected to sham interviews for the Head Coach position in order to comply with the Rooney Rule and/or create an appearance of a non-discriminatory process.

282. The Titans affirmatively misrepresented to Mr. Horton that he had a legitimate chance at the Head Coach position. The Titans also withheld from Mr. Horton and omitted material information: namely, that the interview was illegitimate and a decision to hire Mr. Mularkey had already been made before Mr. Horton's interview.

283. The Titans, and Ms. Adams in particular, humiliated and disrespected Mr. Horton by subjecting him to a blatantly sham interview due to his race.

284. Mr. Horton's interview with the Titans was his last interview for a Head Coach position. Upon information and belief, after having gone through several Head Coach interviews and not getting any position and being close to 60 years old at the time, after the Titan's interview process, Mr. Horton was viewed as a "stale" candidate and was not offered any further Head Coach interviews.

**V.      OTHER NOTABLE RECENT EXAMPLES OF DISCRIMINATORY CONDUCT**

**A.      The Hiring of Steve Mariucci**

285.    In 2003, soon after the Rooney Rule was adopted, the Lions were looking for a Head Coach, and team president Matt Millen made it clear that the team expected to hire Steve Mariucci.

286.    Likely because the Lions' intention to hire Mr. Mariucci was made so well known, five minority coaching candidates, including Dennis Green (who had a 97-62 record as the Head Coach of the Minnesota Vikings for 10 seasons), understandably turned down interviews.

287.    Similar to the Giants with Mr. Flores, the Lions were looking to interview Black candidates not because of any genuine intent to give any of them a fair shot at the job.  It was only an attempt to engage in false compliance with the Rooney Rule.

288.    The NFL determined that the Rooney Rule had been violated and fined the team a paltry $200,000.

**B.      Jim Caldwell Fired After Winning Seasons and Replaced by White Coaches**

289.    In 2009, Jim Caldwell was hired as the Indianapolis Colts (the "Colts") Head Coach.

290.    The team went 14-2 in his first year and made it to the Super Bowl, followed by a 10-6 record and the AFC South division title for a second year in a row—a total record of 27-8 over his first two seasons.

291.    The following year Colts lost starting quarterback Peyton Manning, around whom the entire team had been built, and the team fell to 2-14.

292.    Despite his past success and the justifiable reasons for this poor record in one season out of three, Mr. Caldwell was fired.

293.    In 2014, the Lions hired Mr. Caldwell.

294.    In his first year the team went 11-5, a four-game improvement from the previous year.  The Lions fell to 7-9 in 2015 but rebounded to 9-7 in 2016 and made it to the playoffs. The Lions were 9-7 again in 2017 but missed the playoffs.  Thus, Mr. Caldwell had three winning seasons in four years—for one of the historically worst franchises in the NFL.

295.    He had an aggregate record of 36-28, a winning percentage of .563—the best winning percentage of any Lions Head Coach since the 1950s.  The Lions also had two playoff berths in four seasons, as compared to one playoff appearance in the previous 14 seasons.

296.    Nonetheless, Mr. Caldwell was fired the day after his fourth season.

297.    The Lions have gone 17-46 since his departure with only white Head Coaches, including no playoff appearances and no season with any greater than six wins.

298.    In the more than three years since losing the Lions job, Mr. Caldwell has not received any further opportunities as a Head Coach, despite numerous openings and interviewing no fewer than five times for different positions.

299.    In fact, in 2019, Coach Caldwell interviewed for the New York Jets opening and lost out on the job to Adam Gase, who had two losing seasons in Miami.  He also interviewed that year for the Cardinals opening after Mr. Wilks was fired and lost out on the job to the far less experienced Mr. Kingsbury, who had just been fired in the college ranks.  Both teams clearly hired a Head Coach with an offensive-minded background, just like Mr. Caldwell, though with significantly less experience including at the Head Coach level.  This begs the question why Mr. Caldwell lost out on both these jobs in favor of less experienced white candidates.

69

### C.    Discriminatory Treatment of Mr. Culley

300.    David Culley has been a collegiate and NFL coach for more than 45 years, including 27 years in the NFL.

301.    Despite his reputation and success, Mr. Culley was never hired into an Offensive or Defensive Coordinator position.

302.    However, in January 2021, the Texans hired Mr. Culley to be Head Coach, though it was widely considered to be one of the most difficult situations for a first-year Head Coach in memory.

303.    The previous season, the Texans went 4-12 despite having Pro Bowl quarterback Deshaun Watson start every game, throw 33 touchdowns against only seven interceptions and end with a passer rating of 112.4.

304.    However, Mr. Watson was unavailable to play due to allegations of sexual misconduct, and Mr. Culley was forced to start Davis Mills, a rookie third-round draft pick, at quarterback.  The team had also lost its top two players in recent years, J.J. Watt and DeAndre Hopkins.

305.    Mr. Culley's prospects for success were nearly impossible, but Mr. Culley managed to coach the team to the same record as the team had its previous season.

306.    Immediately after the season ended, the Texans fired Mr. Culley without explanation other than vague "philosophical differences"—which begs the question why he was hired just one year earlier in the first place.

307.    Even the Texans GM acknowledged that, "a change after one season is unusual."

### D.    No Opportunities Provided to Kris Richard

308.    Kris Richard has been a collegiate and NFL coach for more than 10 years.

70

309.    He boasts an impressive resume, including being instrumental in the formation of the Seahawks "Legion of Boom," as both a Secondary Coach and Defensive Coordinator, in the mid-2010s.

310.    He was also very successful as a Defensive Assistant for the Dallas Cowboys and New Orleans Saints.

311.    Mr. Richard had five Head Coach interviews during the 2018 and 2019 hiring cycles and received no offers.

312.    Meanwhile, six white Head Coaches were hired in 2018 and another six were hired in 2019.

313.    Mr. Richard was reportedly not interviewed at all during the 2020 cycle, and it seems now that he is being considered only for Defensive Coordinator positions.

### E.    Teryl Austin Never Given a Chance

314.    Teryl Austin has been a collegiate and NFL coach for more 30 years.

315.    After success with the Seahawks, Baltimore Ravens and Lions, Mr. Austin was interviewed for no fewer than 10 open Head Coach positions.  He was rejected for each one.

316.    Following the 2016 hiring cycle, Mr. Austin stated that only two of the four interviews he engaged in that year felt like "legitimate interviews" where he had a "legitimate shot at the job."  He was asked in a follow-up question whether his saying two of the job interviews were "legitimate," meant he believed the other two were "Rooney Rule interviews." Mr. Austin said: "Take it however you want."

317.    As noted above, Mr. Austin was interviewed by the Titans for a Head Coach position that had already been promised to Mr. Mularkey.

71

**F.**      **Eric Bieniemy Cannot Get a Head Coach Job**

318.    Eric Bieniemy has been a highly successful NFL coach for almost 12 years and has yet to be offered a Head Coach position despite more than 70 vacancies during that time.

319.    In high school, Mr. Bieniemy was a second team All-American and went on to play at the University of Colorado.  In 1990, his senior year, he was the nation's second leading rusher with 1,628 years and 17 touchdowns, and he finished third in Heisman Award voting.

320.    Mr. Bieniemy was drafted in the second round of the NFL draft and played in the League for nine seasons, until 1999.

321.    After going back to college to complete his degree, Mr. Bieniemy then took jobs as the Running Back Coach at Colorado for two years and at UCLA for three years.

322.    In 2005, following a 9-2 season concluding with a win in the Sun Bowl, Mr. Bieniemy accepted a position as Running Back Coach for the Minnesota Vikings (the "Vikings").

323.    During his tenure, the team's lead running back, Adrian Peterson, led the National Football Conference ("NFC") in rushing in 2007 and 2008.

324.    In 2010, Mr. Bieniemy was named the Vikings' Assistant Head Coach for the offense.

325.    In 2011, Mr. Bieniemy returned to Colorado as Offensive Coordinator, only to return to the NFL two years later as the Running Back Coach for the Chiefs.

326.    In 2018, Mr. Bieniemy was promoted to Offensive Coordinator.  In Mr. Bieniemy's first season as Offensive Coordinator, the Chiefs were first in the NFL in yards per game and scored the third-most points in a season in NFL history.  Chiefs quarterback Patrick

Mahomes became only the second quarterback in NFL history, along with Peyton Manning, to throw for 5,000 yards and 50 touchdowns in a season.

327.    In 2018, the Chiefs advanced to the American Football Conference ("AFC") Championship Game where they lost to the Tom Brady-led New England Patriots.

328.    In 2019, Mr. Bieniemy won his first Super Bowl with the Chiefs.  In 2020 and 2021, Mr. Bieniemy again helped lead the Chiefs to the AFC Championship Game and, in 2020, the Super Bowl.

329.    Without question, Mr. Bieniemy has the pedigree, track record and reputation to make him a sought-after Head Coach.  However, despite being interviewed for approximately 20 vacant positions over the last five years, no team has extended Mr. Bieniemy an offer.

330.    During this time, numerous white candidates who are clearly less qualified have taken over the Head Coach duties for numerous NFL teams.

331.    Mr. Bieniemy's inability to land a Head Coach job stands in stark contrast to his immediate predecessor Offensive Coordinators serving under Chiefs Head Coach Andy Reid—Doug Pederson and Matt Nagy.  Mr. Pederson served as Offensive Coordinator for four years until he obtained the Eagles Head Coach job, and was recently hired by the Jacksonville Jaguars for his second job as a Head Coach.  Mr. Nagy served as Mr. Reid's Offensive Coordinator for two years before landing the Chicago Bears Head Coach position.  Mr. Bieniemy has been Offensive Coordinator for the Chiefs for four years during which time the team has enjoyed incredible success, going 50-15 and making it to at least the AFC Conference Game each year.  However, in contrast to Mr. Pederson and Mr. Nagy, no NFL team has been willing to offer Mr. Bieniemy a Head Coach job.

G.    **GM McKenzie Pushed Out by the Raiders**

332.    As mentioned *supra*, the Raiders' 2018 hiring of Mr. Gruden—who is documented to harbor discriminatory animus—occurred in close succession with the Raiders' firing of General Manager, Mr. McKenzie.

333.    Mr. McKenzie was one of the few Black General Managers in the League.  Although Mr. McKenzie was hired into an extraordinarily difficult GM situation in 2012—the Raiders were over the salary cap, without substantial player talent and had traded away numerous top draft picks—within a few years Mr. McKenzie had drafted a franchise quarterback (Derek Carr) and helped lead the team to a 12-4 record and playoff berth by 2016. After the 2016 season, Mr. McKenzie was named the NFL Executive of the Year by the Pro Football Writers of America.

334.    Only two years later, Raiders ownership made the decision to pay $100 million dollars to John Gruden to bring him in as Head Coach.  This decision was clearly made by ownership, not by Mr. McKenzie.  Within months, in December 2018, Mr. McKenzie was pushed out and fired.

335.    Mr. Gruden quickly replaced Mr. McKenzie with a white candidate, Mike Mayock.  Though Mr. McKenzie was an experienced and award-winning executive, Mr. Maycock had never worked in the front office of any NFL team or any professional or college football team in his career.  Mr. Maycock previously had an approximate 18-year career working in commercial real estate, followed by a tenure working in football broadcasting.

336.    In addition to Mr. Gruden's stated animus towards Black people and his replacement of Mr. McKenzie with a less qualified white candidate, the racial composition of the Raiders' players changed during this time as well.  Under Mr. McKenzie, the Raiders had the

highest percentage of Black players at 82.3%.  However, under all-white leadership (Owner, General Manager and Head Coach), the percentage of Black players decreased year-over-year.  By 2021, the percentage of Black players on the Raiders roster dropped to 67.2%.

## VI.    THE NFL IS AN EMPLOYER AND/OR JOINT EMPLOYER AND/OR OSTENSIBLE EMPLOYER

337.    The NFL is an employer, constructive employer, joint employer and/or ostensible employer of all members of the Proposed Class including, without limitation, the Named Plaintiffs.

338.    The NFL directly asserts and exerts control over the terms and conditions of employment of the members of the Proposed Class including the Named Plaintiffs through, *inter alia*, the express terms of their employment contracts; the NFL's Constitution and Bylaws; additional NFL rules, policies, practices and decisions; and the NFL's governing relationship over all the member teams.  In effect, the NFL is the consolidated and centralized control of the labor relations over the Proposed Class.

339.    The NFL and the NFL teams have complete interrelation of ownership, management, operations and financial control.  Under the NFL Constitution and Bylaws, the NFL exists at the behest of and is completely controlled by the NFL teams.  The stated purpose of the NFL is to "promote and foster the business of the League members [teams]."[47]

340.    The NFL Constitution and Bylaws provide that the League has an Executive Committee made up of a representative from each member team.  The NFL Executive

---

[47]    See *Constitution and Bylaws of the National Football League*, NATIONAL FOOTBALL LEAGUE, (Feb. 1, 1970 (2006 Rev.), https://www.onlabor.org/wp-content/uploads/2017/04/co_.pdf.

Committee has an array of powers, including, but not limited to, imposing fines on any employee of any NFL team, such as the members of the Proposed Class.

341.   The Commissioner of the NFL serves at the behest and direction of the NFL's member teams.  The NFL member teams determine the appointment and retention of the Commissioner at all times.  The NFL Constitution and Bylaws provide for the Commissioner to assert financial control over the interests of the NFL and enter into contracts on behalf of the member organizations.

342.   Among the Commissioner's powers with respect to the Proposed Class are to resolve disputes between members of the Proposed Class and teams, discipline members of the Proposed Class up to and including fines and termination of employment, cancel the contracts of the Proposed Class members and ban members of the Proposed Class from the NFL.  The Commissioner also has the power to approve or disapprove contracts between teams and members of the Proposed Class.

343.   The NFL through, *inter alia*, its Constitution and Bylaws, dictates numerous aspects of the terms and conditions of employment for the Proposed Class, including eight pages of "Prohibited Conduct" and numerous other obligations contained throughout the Constitution and Bylaws.

344.   The NFL's status as an employer is further clear from the express terms of the employment contracts of the members of the Proposed Class.  The following are representative examples—from Mr. Flores' contract with the Dolphins, Mr. Wilks' contract with the Cardinals and Mr. Horton's contract with the Titans—demonstrating control by the NFL.

345.   Mr. Flores' contract with the Dolphins demonstrates the NFL's control over the terms and conditions of his employment and the NFL's status as an employer:

- The Flores Employment Agreement includes a signature line specifically for the NFL Commissioner;

- The Flores Employment Agreement had to be approved by the NFL Commissioner;

- The NFL Commissioner did approve and execute the Flores Employment Agreement;

- The Flores Employment Agreement references the team's membership in the NFL throughout;

- Nothing in the Flores Employment Agreement disclaims that the NFL is an employer;

- The Flores Employment Agreement expressly required Mr. Flores to be bound by NFL "policies, rules and procedures;"

- The Flores Employment Agreement expressly required Mr. Flores to be bound by NFL "hiring practices;"

- The Flores Employment Agreement expressly required Mr. Flores to be bound by NFL "employment practices;"

- The Flores Employment Agreement expressly required Mr. Flores to affirm that he "reviewed, understands and agrees at all times with, and to be bound by, the Constitution, Bylaws and the Rules and Regulations of the NFL;"

- The Flores Employment Agreement expressly states that the NFL Constitution, Bylaws and the Rules and Regulations are expressly made a "part of" the Employment Agreement;

- The Flores Employment Agreement expressly states that "the decisions of the Commissioner of the NFL" are made a "part of" the Flores Employment Agreement;

- The Flores Employment Agreement expressly states that Mr. Flores was contractually obligated to wear clothing on game day as provided and approved by NFL and which typically contain an NFL logo;

- The Flores Employment Agreement expressly states that the team could terminate Mr. Flores' employment for cause if they violate any NFL "rule, regulation, constitutional

77

provision or by-law" which "impugns the image of the . . . NFL;"

- The Flores Employment Agreement expressly states that the NFL Commissioner has the authority as arbitrator to determine all disputes involving Mr. Flores' employment;

- The Flores Employment Agreement expressly states that the Flores Employment Agreement was governed by NFL rules and the Commissioner of the NFL.

346.   Mr. Wilks' contract with the Cardinals demonstrates the NFL's control over the terms and conditions of his employment and the NFL's status as an employer:

- The Wilks Employment Agreement includes a signature line specifically for the NFL Commissioner;

- The Wilks Employment Agreement was subject to approval by the NFL Commissioner;

- The NFL Commissioner did approve and execute the Wilks Employment Agreement;

- The Wilks Employment Agreement specifically states in the opening preamble that it is an agreement between Mr. Wilks and the Cardinals as "a member of the National Football League" and thereafter references the team's membership in the NFL throughout;

- Nothing in the Wilks Employment Agreement disclaims that the NFL is an employer;

- The Wilks Employment Agreement expressly required Mr. Wilks to "perform duties and responsibilities relating to the Club's business as a member of the NFL;"

- The Wilks Employment Agreement expressly permitted Mr. Wilks to engage in speaking and promotional activities for the NFL without any prior notice or consent of the Cardinals;

- The Wilks Employment Agreement required Mr. Wilks not to disparage or defame the NFL or any of the member teams or their owners;

- The Wilks Employment Agreement required Mr. Wilks to comport himself on and off the field in a manner that would not reflect adversely upon the NFL;

- The Wilks Employment Agreement expressly states that Mr. Wilks was contractually obligated to wear clothing on game day as provided and approved by NFL and which typically contain an NFL logo;

- The Wilks Employment Agreement required Mr. Wilks to "comply with the policies, standards and/or regulations of the . . . NFL , or the Commissioner of the NFL;"

- The Wilks Employment Agreement required Mr. Wilks to "comply with the directions by the . . . NFL, or the Commissioner of the NFL;"

- The Wilks Employment Agreement required Mr. Wilks to be "comply at all times with, and be bound by, the Constitution and Bylaws and rules and regulations of the NFL;"

- The Wilks Employment Agreement states that Mr. Wilks would be bound by "the decisions of the Commissioner [of the NFL], which decisions shall be final, conclusive and unappealable;"

- The Wilks Employment Agreement states that Mr. Wilks would "not engage in or perform any acts or omissions that are prohibited by the Constitution and Bylaws of the NFL, by the policies, rules and regulations of the NFL . . . or by any decisions of the Commissioner;"

- The Wilks Employment Agreement expressly states that the NFL Commissioner had the authority as arbitrator to determine all disputes involving Mr. Wilks' employment.

347. Mr. Horton's contract with the Titans demonstrates the NFL's control over the terms and conditions of his employment and the NFL's status as an employer:

- The Horton Employment Agreement includes a signature line specifically for the NFL Commissioner;

- The Horton Employment Agreement was subject to approval by the NFL Commissioner;

79

- The NFL Commissioner did approve and execute the Horton Employment Agreement;

- The Horton Employment Agreement specifically states that part of Mr. Horton's job duties was to abide by all "NFL Rules, including without limitation, the Constitution and By-Laws of the NFL; the rules, regulations and policies of the NFL; and the pronouncements, rulings arbitration decisions and directives of the Commissioner of the NFL;"

- The Horton Employment Agreement permitted Mr. Horton to do outside instructional clinics and seminars only so long as such did not violate any NFL rules;

- The Horton Employment Agreement expressly stated that Mr. Horton was contractually obligated to wear clothing on game day as provided and approved by NFL and which typically contain an NFL logo;

- The Horton Employment Agreement required Mr. Horton to "strictly adhere" to all NFL rules;

- The Horton Employment Agreement required Mr. Horton to "conduct [him]self . . . in a manner that reflects positively upon . . . the NFL;"

- The Horton Employment Agreement required Mr. Horton to "acknowledge that public acceptance of . . . the NFL . . . depends in part on perception Titans' employees and their conduct at all times;"

- The Horton Employment Agreement required Mr. Horton to "acknowledge that . . . conformity to NFL [rules] . . . are of great importance to . . . the NFL;"

- The Horton Employment Agreement was subject to termination for violation of NFL rules;

- The Horton Employment Agreement required Mr. Horton to "agree at all times to comply and be bound by all of the provisions of the constitution and By-Laws and Rules and Regulations of the NFL . . . and by the decisions of the Commissioner of the NFL;"

80

- The Horton Employment Agreement states that under the NFL Constitution and Bylaws, Mr. Horton had an "obligation to communicate openly and candidly with the [Titans CEO];"

- The Horton Employment Agreement states that Mr. Horton could be subject to discipline for violation of the NFL rules;

- The Horton Employment Agreement provided that the NFL could control whether Mr. Horton could seek or entertain alternate employment during the period of his employment with the Titans.

348. Upon information and belief, all contracts for members of the Proposed Class contain substantially similar provisions to those in the Named Plaintiffs' contracts referenced above demonstrating the NFL's status as employer and control over the terms and conditions of employment.

349. In fact, pursuant to the NFL's Constitution and Bylaws, the NFL member teams do not even have discretion to deviate or opt-out from the NFL's level of control. The NFL's Constitution and Bylaws require that such employment contracts be subject to Commissioner approval and that such employees agree to comply with NFL policies, rules and regulations.

350. As set forth above, the NFL and the Commissioner also exert control over the hiring processes of the individual teams, and the individual teams agree to such control by the NFL, including, but not limited to, the implementation, review and enforcement of the Rooney Rule.

351. The control that the NFL and the Commissioner exert over the hiring, retention and termination, as well as the ongoing terms and conditions of employment, of Plaintiffs and the members of the Proposed Class is exerted in and from New York City, New York. The NFL's conduct in that regard has an impact across New York state and city. As such, Plaintiffs and the members of the Proposed Class were, at all relevant times, employees or prospective

81

employees within the state and city of New York. Moreover, Plaintiffs and the members of the Proposed Class regularly worked within the state of New York, including, *inter alia*, in connection with interactions with the NFL, as well as football games played in Buffalo, New York.

352. Pursuant to the Rooney Rule, the NFL asserts control over the manner and method with which NFL teams interview for and hire, *inter alia*, Head Coach, Defensive and Offensive Coordinators, Quarterbacks Coaches and General Managers. In addition to the Rooney Rule, the NFL has promulgated additional requirements in connection with the hiring of coaches. By way of example only, the NFL just implemented a requirement that teams must hire at least one minority assistant coach on the offensive side of the football team for the upcoming 2022 NFL season.

353. The NFL teams clearly collude and act in concert with one another as a single enterprise to maintain the status quo. Not only have NFL teams collectively engaged in conduct which has resulted in massive under-representation of Black coaches and executives, but the NFL clearly colluded to ensure that Mr. Kaepernick did not obtain further NFL employment after he protested racial injustice.

354. Furthermore, amid numerous accusations that the NFL engages in systemic discrimination in its hiring, retention and firing practices with respect to coaches and executives, the NFL has not stated to the public or members of the Proposed Class that it is not an employer or that it is not responsible for the hiring, retention and firing decisions of the teams.

355. To the contrary, the NFL has stated that the allegations in this action are "without merit," implying that the NFL is directly aware of team hiring, retention and firing decisions such that it can make such an affirmative and informed statement.

356.    The Named Plaintiffs all reasonably believed that the NFL was their employer together with their respective member team employer.  To the extent the NFL claims that it is not an employer to the members of the Proposed Class, the NFL was and remains negligent in allowing the Proposed Class to maintain such reasonable belief and failing to take appropriate actions to dispel the Proposed Class of that belief.

357.    The NFL knows or should know that the members of the Proposed Class believe themselves to be employed by the NFL and/or jointly employed by the NFL and their respective teams due to, *inter alia*, the reasons set forth above.

## RULE 23 CLASS ACTION ALLEGATIONS

## I.    CLASS DEFINITION

358.    This is a class action pursuant to Federal Rule of Civil Procedure ("FRCP") 23, brought by Plaintiffs on behalf of a Proposed Class of similarly situated employees.  The Proposed Class (subject to future revision as may be necessary), is defined as follows:

> **All Black Head Coach, Offensive and Defensive Coordinators and Quarterbacks Coaches, as well as General Managers, and Black candidates for those positions during the applicable statute of limitations period**

359.    The unlawful conduct suffered by Plaintiffs and the members of the Proposed Class includes, but is not limited to, commonly experienced acts of discriminatory disparate treatment and disparate impact:

- Members of the Proposed Class have been discriminatorily denied positions as Head Coaches, Offensive and Defensive Coordinators and Quarterbacks Coaches, as well as General Managers;

- Members of the Proposed Class have been discriminatorily subjected to sham and illegitimate interviews;

- Members of the Proposed Class have been subjected to discriminatory retention practices and/or termination decisions;

- Members of the Proposed Class have been subjected to disparate terms and conditions of employment, including but not limited to, lack of opportunity and harm to professional reputation; and

- Members of the Proposed Class have been subjected to unequal compensation relative to their white peers.

360. Upon information and belief, the Proposed Class contains more than 40 members during the applicable limitations period.

361. Plaintiffs and the Proposed Class have standing to seek such relief because of the adverse effects that Defendants' unlawful patterns, practices and/or policies have had on them individually and generally.

362. The patterns, practices and/or policies described in this Complaint demonstrate that discrimination is not unusual at the NFL; rather, it is part and parcel to the League's standard operating patterns, practices and/or policies.

## II.   NUMEROSITY AND IMPRACTICALITY OF JOINDER

363. The members of the Proposed Class are sufficiently numerous to make joinder of their claims impracticable.

364. The exact number of Proposed Class members is unknown because such information is in the exclusive control of Defendants and requires discovery.

365. Upon information and belief, there are more than 40 current, former and prospective members of the Proposed Class who have been subjected to the discriminatory conduct described herein.

366.    Although precise determination of the number of Proposed Class members is immeasurable at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

### III.    <u>COMMON QUESTIONS OF LAW AND FACT</u>

367.    The claims alleged on behalf of Plaintiffs and the Proposed Class raise questions of law and fact common to all Plaintiffs and Proposed Class members.  Among these questions are:

a.    Whether members of the Proposed Class have been denied positions as Head Coaches, Offensive and Defensive Coordinators and Quarterbacks Coaches, as well as General Managers, and whether race and/or color played motivating factor in those decisions;

b.    Whether members of the Proposed Class have been discriminatorily subjected to sham and illegitimate interviews due in whole or part to their race and/or color;

c.    Whether members of the Proposed Class have been subjected to discriminatory retention practices and/or termination decisions in whole or part due to race and/or color;

d.    Whether members of the Proposed Class have been subjected to disparate terms and conditions of employment, including but not limited to, lack of opportunity and harm to professional reputation, due in whole or part to race and/or color;

e.    Whether members of the Proposed Class have been subjected to unequal compensation relative to their white peers, and whether this is due in whole or part to race and/or color;

f.    Whether members of the Proposed Class have been victimized by policies and practices of the NFL and its teams that have created a disparate impact with respect to hiring members of the Proposed Class;

g.    Whether members of the Proposed Class have been victimized by policies and practices of the NFL and its teams that have created a disparate impact with respect to the retention of members of the Proposed Class;

h.    Whether members of the Proposed Class have been victimized by policies and practices of the NFL and its teams that have created a disparate impact with respect to the termination of members of the Proposed Class;

i.    Whether the NFL is complicit, has participated in, and/or has aided and abetted the NFL teams in the discriminatory treatment of the members of the Proposed Class;

j.    Whether the NFL and/or the NFL teams collectively engage in discriminatory practices towards the members of the Proposed Class; and

k.    Whether the NFL and/or the NFL teams engage in conduct that has a discriminatory impact on the members of the Proposed Class.

368.    Thus, the common question requirement of FRCP 23(a) is satisfied.

## IV.    TYPICALITY OF CLAIMS AND RELIEF SOUGHT

369.    Plaintiffs are members of the Proposed Class they seek to represent.

370.    The claims of Plaintiffs are typical of the claims of the Proposed Class in that they all arise from the same unlawful patterns, practices and/or policies of Defendants, and are based on the legal theories, including disparate treatment and impact theories, that these patterns, practices and/or policies violate legal rights.

371.    Plaintiffs and the members of the Proposed Class all allege that they each are the victims of unlawful adverse employment decisions and/or treatment based on race and/or color.

372.    The relief that Plaintiffs seek as a result Defendants' unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Proposed Class.

373.    Thus, the typicality requirement of FRCP 23(a) is satisfied.

## V.    ADEQUACY OF REPRESENTATION

374.    The interests of Plaintiffs are co-extensive with those of the Proposed Class they seek to represent in the instant case.

375.    Plaintiffs are willing and able to represent the Proposed Class fairly and vigorously as they pursue their similar individual claims.

376.    Plaintiffs have retained counsel who are qualified and experienced in employment class action litigation and who are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

377.    The combined interests, experience and resources of Plaintiffs and their counsel to competently litigate the individual and class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

## VI.    REQUIREMENTS OF RULE 23(b)(1)

378.    Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

379.    Specifically, all evidence of Defendants' patterns, practices and/or policies and the issue of whether they are in violation of the law would be exchanged and litigated repeatedly.

380.    Accordingly, certification of the Proposed Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the Proposed Class and Defendants.

381.    By filing this Complaint, Plaintiffs are preserving the rights of Proposed Class members with respect to the statute of limitations on their claims.  Therefore, not certifying a

class would substantially impair and/or impede the other members' ability to protect their interests.

## VII.    REQUIREMENTS OF RULE 23(b)(2)

382.    Defendants have acted on grounds, described herein, generally applicable to Plaintiffs and the members of the Proposed Class, by adopting and following systemic patterns, practices and/or policies that are discriminatory toward the Proposed Class.

383.    These discriminatory acts are fostered by Defendants' standard patterns, practices and/or policies, are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiffs and the Proposed Class as a whole, including the declaratory and injunctive relief outlined in Section A of the Prayer for Relief.

384.    Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic discrimination based on race and/or color committed against the Proposed Class.

385.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs and the Class Members' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic discrimination.

386.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

## VIII.    REQUIREMENTS OF RULE 23(b)(3)

387.    The common issues of fact and law affecting Plaintiffs' claims and those of the Proposed Class, including, but not limited to, the common issues identified in the paragraphs above, predominate over issues affecting only individual claims.

388.   A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims and the claims of the Proposed Class.

389.   The cost of proving Defendants' pattern and practice of discrimination makes it impracticable for the members of the Proposed Class to pursue their claims individually.

390.   The class action will not be difficult to manage for reasons, including, but not limited to, the discrete organizational nature of the Proposed Class, as well as the common questions of law and fact described above.

**FIRST CAUSE OF ACTION**
**(Disparate Treatment Discrimination under Section 1981)**
***On Behalf of Plaintiffs and the Proposed Class***
*As to all Defendants*

391.   Plaintiffs, on behalf of themselves and the Proposed Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

392.   As described above, Defendants have discriminated against Plaintiffs and the Proposed Class on the basis of race and/or color in violation of Section 1981 by (i) discriminatorily denying Proposed Class members positions as Head Coaches, Offensive and Defensive Coordinators and Quarterbacks Coaches, as well as General Managers, (ii) discriminatorily subjecting them to sham and illegitimate interviews, (iii) subjecting Proposed Class members to discriminatory retention practices and/or termination decisions, (iv) subjecting Proposed Class members to disparate terms and conditions of employment, including, but not limited to, lack of opportunity and harm to professional reputation and (v) subjecting Proposed Class members to unequal compensation relative to their white peers.

393.   Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to prevent or remedy discriminatory conduct due to race and/or color.  Each Defendant has actually participated in and aided and abetted the discriminatory conduct of the other Defendants.

89

394.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981, Plaintiffs and the Proposed Class have suffered, and continue to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which they are entitled to an award of damages.

395.    Defendants' unlawful discriminatory actions constitute reckless, malicious, willful and wanton violations of Section 1981 for which Plaintiffs and the Proposed Class are entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Disparate Treatment Discrimination under NYSHRL)
*On Behalf of Plaintiffs and the Proposed Class*
*As to all Defendants*

396.    Plaintiffs, on behalf of themselves and the Proposed Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

397.    As described above, Defendants have discriminated against Plaintiffs and the Proposed Class on the basis of race and/or color in violation of the NYSHRL by (i) discriminatorily denying Proposed Class members positions as Head Coaches, Offensive and Defensive Coordinators and Quarterbacks Coaches, as well as General Managers, (ii) discriminatorily subjecting them to sham and illegitimate interviews, (iii) subjecting Proposed Class members to discriminatory retention practices and/or termination decisions, (iv) subjecting Proposed Class members to disparate terms and conditions of employment, including, but not limited to, lack of opportunity and harm to professional reputation and (v) subjecting Proposed Class members to unequal compensation relative to their white peers.

398.    Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to prevent or remedy discriminatory conduct due to race and/or color.  Each Defendant has actually participated in and aided and abetted the discriminatory conduct of the other Defendants.

90

399.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of NYSHRL, Plaintiffs and the Proposed Class have suffered, and continue to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which they are entitled to an award of damages.

400.    Defendants' unlawful discriminatory actions constitute reckless, malicious, willful and wanton violations of NYSHRL for which Plaintiffs and the Proposed Class are entitled to an award of punitive damages.

<strong><u>THIRD CAUSE OF ACTION</u></strong><br>
<strong>(Disparate Impact Discrimination under NYSHRL)</strong><br>
<em><strong>On Behalf of Plaintiffs and the Proposed Class</strong></em><br>
<em>As to all Defendants</em>

401.    Plaintiffs, on behalf of themselves and the Proposed Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

402.    As described above, Defendants have engaged in hiring and retention policies, practices and/or processes which have had a discriminatory impact against Plaintiffs and the Proposed Class on the basis of race and/or color in violation of the NYSHRL.  Defendants' conduct which has a discriminatory impact is not a business necessity and other methods exist which will not have a discriminatory effect.

403.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of NYSHRL, Plaintiffs and the Proposed Class have suffered, and continue to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which they are entitled to an award of damages.

404.    Defendants' unlawful discriminatory actions constitute reckless, malicious, willful and wanton violations of NYSHRL for which Plaintiffs and the Proposed Class are entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**(Disparate Treatment Discrimination under NYCHRL)**
*On Behalf of Plaintiffs and the Proposed Class*
*As to all Defendants*

405.    Plaintiffs, on behalf of themselves and the Proposed Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

406.    As described above, Defendants have discriminated against Plaintiffs and the Proposed Class on the basis of race and/or color in violation of the NYCHRL by (i) discriminatorily denying Proposed Class members positions as Head Coaches, Offensive and Defensive Coordinators and Quarterbacks Coaches, as well as General Managers, (ii) discriminatorily subjecting them to sham and illegitimate interviews, (iii) subjecting Proposed Class members to discriminatory retention practices and/or termination decisions, (iv) subjecting Proposed Class members to disparate terms and conditions of employment, including, but not limited to, lack of opportunity and harm to professional reputation and (v) subjecting Proposed Class members to unequal compensation relative to their white peers.

407.    Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to prevent or remedy discriminatory conduct due to race and/or color.  Each Defendant has actually participated in and aided and abetted the discriminatory conduct of the other Defendants.

408.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of NYCHRL, Plaintiffs and the Proposed Class have suffered, and continue to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which they are entitled to an award of damages.

409.    Defendants' unlawful discriminatory actions constitute reckless, malicious, willful and wanton violations of NYCHRL for which Plaintiffs and the Proposed Class are entitled to an award of punitive damages.

92

**FIFTH CAUSE OF ACTION**
**(Disparate Impact Discrimination under NYCHRL)**
*On Behalf of Plaintiffs and the Proposed Class*
*As to all Defendants*

410.    Plaintiffs, on behalf of themselves and the Proposed Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

411.    As described above, Defendants have engaged in hiring and retention policies, practices and/or processes which have had a discriminatory impact against Plaintiffs and the Proposed Class on the basis of race and/or color in violation of the NYCHRL.  Defendants' conduct which has a discriminatory impact is not a business necessity and other methods exist which will not have a discriminatory effect.

412.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of NYCHRL, Plaintiffs and the Proposed Class have suffered, and continue to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which they are entitled to an award of damages.

413.    Defendants' unlawful discriminatory actions constitute reckless, malicious, willful and wanton violations of NYCHRL for which Plaintiffs and the Proposed Class are entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Disparate Treatment Discrimination under NJLAD)**
*On Behalf of Plaintiff Brian Flores*
*As to Defendant the Giants*

414.    Mr. Flores hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

415.    As described above, the Giants have discriminated against Mr. Flores by failing to hire him because of his race and subjecting him to a sham interview process.

93

416. As a direct and proximate result of the Giants' unlawful discriminatory conduct in violation of NJLAD, Mr. Flores suffered, and continue to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which he is entitled to an award of damages.

417. The Giants' unlawful discriminatory actions constitute reckless, malicious, willful and wanton violations of NJLAD for which Mr. Flores is entitled to an award of punitive damages.

**SEVENTH CAUSE OF ACTION**
**(Disparate Impact Discrimination under NJLAD)**
***On Behalf of Plaintiff Brian Flores***
*As to Defendant the Giants*

418. Mr. Flores hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

419. As described above, Defendant NFL and the Giants have engaged in hiring and retention policies, practices and/or processes which have had a discriminatory impact against Mr. Flores on the basis of race and/or color in violation of the NJLAD. Defendant NFL and the Giants' conduct which has a discriminatory impact is not a business necessity and other methods exist which will not have a discriminatory effect.

420. As a direct and proximate result of Defendant NFL and the Giants' unlawful discriminatory conduct in violation of NJLAD, Mr. Flores has suffered, and continue to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which he is entitled to an award of damages.

421. Defendant NFL and the Giants' unlawful discriminatory actions constitute reckless, malicious, willful and wanton violations of NJLAD for which Mr. Flores is entitled to an award of punitive damages.

**EIGHTH CAUSE OF ACTION**
**(Retaliation under Section 1981)**
*On Behalf of Plaintiff Brian Flores*
*As to Defendants the Texans and Dolphins*

422.    Mr. Flores hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

423.    As described above, the Texans has retaliated against Mr. Flores in violation of Section 1981 by failing to hire him to be the team's Head Coach because he filed this lawsuit and opposed discrimination prohibited under Section 1981.

424.    As described above, the Dolphins has retaliated against Mr. Flores in violation of Section 1981 by filing a demand for arbitration against him in connection with a purported obligation that he repay hundreds of thousands of dollars of earned compensation because he filed this lawsuit and opposed discrimination prohibited under Section 1981.

425.    As a direct and proximate result of the unlawful retaliatory conduct taken by the Texans and Dolphins in violation of Section 1981, Mr. Flores has suffered, and continues to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which he is entitled to an award of damages.

426.    The unlawful retaliatory conduct taken by the Texans and Dolphins constitutes reckless, malicious, willful and wanton violations of Section 1981 for which Mr. Flores is entitled to an award of punitive damages.

**NINTH CAUSE OF ACTION**
**(Retaliation under the Florida Private Whistleblower Statute)**
*On Behalf of Plaintiff Brian Flores*
*As to Defendant the Dolphins*

427.    Mr. Flores hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

95

428.    As described above, the Dolphins has retaliated against Mr. Flores in violation of the FPWBS by terminating his employment because he objected to, or refused to participate in, any activity, policy or practice of the employer which is in violation of a law, rule or regulation. In this case, the unlawful activity in which Mr. Flores refused to engage—*i.e.*, by refusing to intentionally lose football games—would have constituted a violation of the Sports Bribery Act, among other laws.

429.    As a direct and proximate result of the unlawful retaliatory conduct taken by the Dolphins in violation of the FPWBS, Mr. Flores has suffered, and continues to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which he is entitled to an award of damages.

430.    The unlawful retaliatory conduct taken by the Dolphins constitutes reckless, malicious, willful and wanton violations of the FPWBS for which Mr. Flores is entitled to an award of punitive damages.

**TENTH CAUSE OF ACTION**
**(Breach of Contract)**
***On Behalf of Plaintiff Brian Flores***
*As to Defendant the Dolphins*

431.    Mr. Flores hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

432.    As described above, the Dolphins breached the Flores Employment Agreement by, *inter alia*, failing to pay Mr. Flores the severance to which he is entitled upon a termination without cause and seeking to recoup hundreds of thousands of dollars appropriately paid to Mr. Flores.

433. As a direct and proximate result of the unlawful conduct taken by the Dolphins in breach of the Flores Employment Agreement, Mr. Flores has suffered, and continues to suffer, economic damages for which he is entitled to an award of damages.

434. The unlawful breach of the Flores Employment Agreement constitutes reckless, malicious, willful and wanton violations of the law for which Mr. Flores is entitled to an award of punitive damages.

<u>**ELEVENTH CAUSE OF ACTION**</u>
**(Disparate Treatment Discrimination under Title VII)**
***On Behalf of Plaintiff Brian Flores Individually and the Proposed Class***
*As to Defendants NFL, Giants, Texans and Dolphins*

435. Plaintiff Brian Flores, on behalf of himself and the Proposed Class, hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

436. As described above, Defendants NFL, Giants, Texans and Dolphins have discriminated against Mr. Flores and the Proposed Class on the basis of race and/or color in violation of Title VII by (i) discriminatorily denying Plaintiffs and the Proposed Class members Head Coach, Offensive and Defensive Coordinator, Quarterbacks Coach and General Manager positions, (ii) discriminatorily subjecting them to sham and illegitimate promotion interviews, (iii) subjecting them to discriminatory retention and/or termination decisions, (iv) subjecting them to disparate terms and conditions of employment, including, but not limited to, lack of opportunity and harm to professional reputation and (v) subjecting them to unequal compensation relative to their white peers.

437. As described above, Defendants NFL, Giants, Texans and Dolphins have discriminated against Mr. Flores and the Proposed Class in violation of Title VII by engaging in a pattern and/or practice of discrimination against Plaintiffs and the Proposed class motivated in whole or part on the basis their race and/or color.

438. Defendants NFL, Giants, Texans and Dolphins have fostered, condoned, accepted, ratified and/or otherwise failed to prevent or remedy discriminatory conduct due to race and/or color.

439. As a direct and proximate result of Defendants NFL, Giants, Texans and Dolphins' unlawful discriminatory conduct in violation of Title VII, Plaintiffs and the Proposed Class have suffered, and continue to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which they are entitled to an award of damages.

440. Defendants NFL, Giants, Texans and Dolphins' unlawful discriminatory actions constitute reckless, malicious, willful and wanton violations of Title VII for which Plaintiffs and the Proposed Class are entitled to an award of punitive damages.

## TWELFTH CAUSE OF ACTION
### (Disparate Impact Discrimination under Title VII)
### *On Behalf of Plaintiff Brian Flores Individually and the Proposed Class*
### *As to Defendants NFL, Giants, Texans and Dolphins*

441. Plaintiff Brian Flores, on behalf of himself and the Proposed Class, hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

442. As described above, Defendants NFL, Giants, Texans and Dolphins have engaged in selection and retention policies, practices and/or processes which have had a discriminatory impact against Plaintiffs and the Proposed Class on the basis of race and/or color in violation of Title VII. Defendants NFL, Giants, Texans and Dolphins' conduct which has a discriminatory impact is not a business necessity and other methods exist which will not have a discriminatory effect.

443. As a direct and proximate result of Defendants NFL, Giants, Texans and Dolphins' unlawful discriminatory conduct in violation of Title VII, Plaintiffs and the Proposed

98

Class have suffered, and continue to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which they are entitled to an award of damages.

444. Defendants NFL, Giants, Texans and Dolphins' unlawful discriminatory actions constitute reckless, malicious, willful and wanton violations of Title VII for which Plaintiffs and the Proposed Class are entitled to an award of punitive damages.

### THIRTEENTH CAUSE OF ACTION
**(Retaliation under Title VII)**
***On Behalf of Plaintiff Brian Flores***
*As to Defendants NFL, Dolphins and Texans*

445. Mr. Flores hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

446. As described above, the NFL and Dolphins have retaliated against Mr. Flores in violation of Title VII by, *inter alia*, filing a demand for arbitration against him in connection with a purported obligation that he repays hundreds of thousands of dollars of earned compensation because he filed this lawsuit and opposed discrimination prohibited under Title VII.

447. As described above, the NFL and Texans retaliated against Mr. Flores in violation of Title VII by failing to hire him to be the team's Head Coach because he filed this lawsuit and opposed discrimination prohibited under Title VII.

448. As a direct and proximate result of the unlawful retaliatory conduct by the NFL, Dolphins and Texans in violation of Title VII, Mr. Flores has suffered, and continues to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which he is entitled to an award of damages.

449.    The unlawful retaliatory conduct by the NFL, Dolphins and Texans constitutes reckless, malicious, willful and wanton violations of Title VII for which Mr. Flores is entitled to an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court issue a declaratory judgment that the actions, conduct and practices of the Defendants complained of herein violates the federal, state and local laws asserted herein, and issue the following additional relief:

A.    **Injunctive Relief**

i.    **Appointment of an Independent Monitor**.  An independent monitor should be appointed who will have oversight and authority to enforce and ensure compliance with all the mechanisms set forth below.

ii.    **Promote Black Ownership**.  Increase the influence of Black individuals in hiring and termination decisions by taking steps to promote Black ownership of NFL teams.  Steps that can be taken include: (i) creating and funding a committee dedicated to sourcing Black investors to take majority ownership stakes in NFL teams; (ii) revise requirements related to financing the purchase of NFL teams to the extent that such requirements act as an impediment (issue to be studied) to the sale of NFL teams to a majority Black investor or ownership group; (iii) ensure diversity of decision-making by permitting select Black players and coaches to participate in the interviewing process for applicable positions.

iii.    **Increased Transparency in Hiring and Terminations**.  The League should be committed to increased transparency in hiring and termination decisions.  Measures that would further this transparency include: (i) appointment of a special hiring committee, and require teams to have a committee member present at all applicable interviews, (ii) require teams to document the criteria for the applicable open positions, (iii) for both hiring and termination decisions, require teams to document the rationale for each person considered in the process, including a full explanation of the basis for any subjective influences (*e.g.*, trust, personality, interview

100

performance, *etc.*), (iv) require teams to consider side-by-side comparisons of objective criteria (such as past performance, experience, *etc.*); (v) require semi-annual written performance reviews for all applicable positions, and (vi) all communications regarding the hiring and termination of applicable positions shall be considered public records.

iv.  **Meaningful Incentives**:  Incentivize the hiring and retention of Black candidates through monetary, compensation and/or further draft picks, including but not limited to, additional salary cap space for making diverse hires.

v.  **Increased Visibility for Black Assistant Coaches**.  Increase the level of visibility and interaction between, on the one hand, Black assistant coaches and executives, and, on the other hand, NFL team owners.  Hold multiple coach/executive/owner conferences each year, similar to the annual Owners' Meetings, during which the NFL team owners will meaningfully interact with Black assistant coaches and executives.

vi.  **Increased Pipeline for Black Coaches**.  Teams should be required to have either a Black QB Coach or Assistant QB Coach to ensure a pipeline of experienced candidates for Offensive Coordinator and Head Coach positions.

vii.  **Uniform Contracts**.  Ensure language and non-monetary term uniformity with respect to coaching contracts (*e.g.*, all Head Coach contracts are the same, all Offensive Coordinator contracts are the same, *etc.*).  The independent monitor will confer with employee-side lawyers, management-side lawyers and special coaches committee with respect to the uniformity of the terms.

viii.  **Ban Forced Arbitration.**  Ban forced arbitration for claims of discrimination or retaliation brought against the NFL or its teams by coaches or executives, and provisions that would require a coach or executive to waive any claims of discrimination or retaliation in order to receive his or her severance.

B.  **Monetary Relief**

i.  An award of damages to Plaintiffs and the Proposed Class and against the Defendants, in an amount to be determined at trial,

to compensate them for all monetary and/or economic damages;

ii.    An award of damages to Plaintiffs and the Proposed Class and against the Defendants, in an amount to be determined at trial, to compensate them for all non-monetary and/or compensatory damages, including, but not limited to, loss of reputation, loss of opportunity and mental anguish;

iii.    An award of punitive and/or liquidated damages to Plaintiffs and the Proposed Class and against the Defendants in an amount to be determined at trial;

iv.    Pre- and post-judgment interest on all amounts due;

v.    An award of Plaintiffs and the Proposed Class's reasonable attorneys' fees and costs; and

C.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs and the Proposed Class hereby demand a trial by jury.

Dated: March 4, 2026
　　　　New York, New York                Respectfully submitted,

                                        **WIGDOR LLP**

                                        By: _____
                                        　　　Douglas H. Wigdor
                                        　　　Michael J. Willemin
                                        　　　David E. Gottlieb

                                        85 Fifth Avenue
                                        New York, NY 10003
                                        Telephone: (212) 257-6800
                                        Facsimile: (212) 257-6845
                                        dwigdor@wigdorlaw.com
                                        mwillemin@wigdorlaw.com
                                        dgottlieb@wigdorlaw.com

                                        *Counsel for Plaintiffs*
                                        *Proposed Counsel for the Proposed Class*

- and -

**ELEFTERAKIS, ELEFTERAKIS & PANEK**


By: _____
   John Elefterakis
   Nicholas Elefterakis
   Raymond Panek
   Johnson Atkinson

80 Pine Street, 38th Floor
New York, New York 10005
Telephone: 212-532-1116
Facsimile: 212 532-1176

*Counsel for Plaintiffs*
*Proposed Counsel for the Proposed Class*