**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| BRIAN FLORES, STEVE WILKS and RAY HORTON, as Class Representatives, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE NATIONAL FOOTBALL LEAGUE; NEW YORK FOOTBALL GIANTS, INC. d/b/a NEW YORK GIANTS; MIAMI DOLPHINS, LTD. d/b/a MIAMI DOLPHINS; DENVER BRONCOS FOOTBALL CLUB d/b/a DENVER BRONCOS; HOUSTON NFL HOLDINGS, L.P. d/b/a HOUSTON TEXANS; ARIZONA CARDINALS FOOTBALL CLUB LLC d/b/a ARIZONA CARDINALS; TENNESSEE TITANS ENTERTAINMENT, INC. d/b/a TENNESSEE TITANS and JOHN DOE TEAMS 1 through 26,<br><br>Defendants. | : | Civil Action No.: 22-cv-00871 (VEC) |

**PLAINTIFF BRIAN FLORES' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS NFL, GIANTS, TEXANS AND BRONCOS' MOTIONS TO DISMISS <u>THE THIRD AMENDED COMPLAINT</u>**

**WIGDOR LLP**

Douglas H. Wigdor
David E. Gottlieb
Michael J. Willemin
Russell L. Kornblith
Daniel Altaras
Noah Jacobs

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845

**ELEFTERAKIS, ELEFTERAKIS & PANEK**

John Elefterakis
Nicholas Elefterakis
Raymond Panek
Johnson Atkinson

80 Pine Street, 38th Floor
New York, NY 10005
Telephone: (212) 532-1116
Facsimile: (212) 532-1176

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

PRELIMINARY STATEMENT ........ 1

STATEMENT OF FACTS ........ 2

I. The NFL's History of Racism Leads to the Rooney Rule ........ 2

II. Brian Flores Experienced Race Discrimination in the NFL ........ 4

A. The Broncos Subject Flores to a Sham, Discriminatory Interview ........ 4

B. The NFL's Double Standard Forces Flores from the Dolphins ........ 4

C. The Giants Subject Flores to a Sham, Discriminatory Interview ........ 5

D. The Texans Retaliate Against Flores for Filing this Lawsuit ........ 5

E. The NFL Retaliates Through its own Arbitral Process ........ 6

ARGUMENT ........ 6

I. The NFL is an Integrated Employer with the Teams ........ 6

A. The NFL and Teams Operate as a Single Integrated Enterprise ........ 6

B. The NFL and Member Teams Operate as a Joint Employer ........ 13

C. Other Sports-League Cases Favor a Finding of Single Employer and Joint Employer Here ........ 17

II. Flores Properly Pleaded Disparate Treatment Claims ........ 19

A. Flores Properly Pleaded Disparate Treatment Claims Against the Giants ........ 20

i. Flores Pleaded Failure to Hire Claims ........ 20

ii. Flores Pleaded Actionable Discriminatory Treatment Under All Antidiscrimination Laws ........ 24

B. Flores Properly Pleaded Disparate Treatment Claims Against the Broncos ........ 28

C. Flores Properly Pleaded Application of NYSHRL and NYCHRL ........ 32

D. Flores Properly Pleaded Disparate Treatment Claims Against the NFL ....35

E. Flores Properly Pleaded Pattern-or-Practice Theory of Disparate Treatment ....38

III. Flores Properly Pleaded Disparate Impact Claims ....41

A. Flores Has Identified a Specific Employment Practice ....41

B. Flores Has Alleged That a Racial Disparity Exists....45

IV. Flores Properly Pleaded Retaliation Claims Against the Texans and NFL ....48

A. Applicable Standards ....48

B. Flores Pleaded Retaliation Against the Texans for Post-Filing Conduct ....48

C. The NFL Is Also Liable for the Decision Not to Hire Flores ....50

D. Flores Pleaded Retaliation Against the NFL for Interfering with and Preventing Him from Pursuing His Claims ....51

V. This Court Has Jurisdiction Over the Broncos and Texans, and Venue is Proper ....56

A. The Broncos and Texans Are Subject to Personal Jurisdiction in This Court Because They Are Part of an Integrated Enterprise With the NFL and they are Joint Employers or Plaintiffs ....56

i. Broncos and Texans Are Subject to General Jurisdiction in New York....57

ii. Broncos and Texans Are Subject to Specific Jurisdiction in New York ....60

iii. Defendants' Declarations Do Not Defeat Jurisdiction and, at a Minimum, Flores Is Entitled to Jurisdictional Discovery....62

B. Venue is Proper ....63

i. Venue Is Proper Here Under Title VII's Venue Provision ....63

ii. Venue Is Proper Under 27 U.S.C. §1391(b)(2)....65

CONCLUSION....66

# TABLE OF AUTHORITIES


**Cases** **Page(s)**

Adams v. Indianapolis,
742 F.3d 720 (7th Cir. 2014) ........ 45

Alameda v. Ass'n of Soc. Work Boards,
2024 WL 4302389 (S.D.N.Y. Sept. 25, 2024) ........ 37

Alfandary v. Nikko Asset Mgmt. Co.,
2022 WL 20833775 (S.D.N.Y. Mar. 30, 2022) ........ 60

Allied Dynamics Corp. v. Kennametal, Inc.,
965 F. Supp. 2d 276 (E.D.N.Y. 2013) ........ 56

Alvarez v. City of N.Y.,
31 F. Supp. 2d 334 (S.D.N.Y. 1998) ........ 48

American Needle, Inc. v. National Football League,
560 U.S. 183 (2010) ........ 19

Anderson v. City of N.Y., Health & Hosp. Corp.,
2017 WL 9538862 (S.D.N.Y. Jan. 19, 2017) ........ 50

Andrade v. Cultural Care, Inc.,
706 F. Supp. 3d 348 (E.D.N.Y. 2023) ........ 17

Arculeo v. On-Site Sales & Mktg., LLC,
425 F.3d 193 (2d Cir. 2005) ........ 13, 36

Austen v. Catterton Partners V, LP,
709 F. Supp. 2d 168 (D. Conn. 2010) ........ 12

Aviall, Inc. v. Ryder Sys., Inc.,
110 F.3d 892 (2d Cir. 1997) ........ 56

Bamba v. United States Dep't of Homeland Sec.,
2024 WL 3924810 (S.D.N.Y. Aug. 23, 2024) ........ 50

Banks-Holliday v. Am. Axle & Mfg., Inc.,
2005 WL 189724 n.2 (W.D.N.Y. Jan. 24, 2005) ........ 28

Barfield v. New York City Health & Hosps. Corp.,
537 F.3d 132 (2d Cir. 2008) ........ 16, 17

Barrett v. Forest Lab'ys, Inc.,
39 F. Supp. 3d 407 (S.D.N.Y. 2014) ........ 36, 38, 46

Baylor v. Powell,
459 F. Supp. 3d 47 (D.D.C. 2020) .......... 28

Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,
751 F.2d 117 .......... 59

Benedict v. Manfred,
2026 WL 836679 (S.D.N.Y. Mar. 26, 2026) .......... 18

Bledsoe v. Delta Air Lines, Inc.,
2024 WL 1142321 (E.D.N.Y. Mar. 15, 2024) .......... 55

Bolar v. Frank,
938 F.2d 377 (2d Cir. 1991) .......... 63

Britton v. Bronx Parent Hous. Network, Inc.,
2022 WL 4332735 (S.D.N.Y. Sept. 19, 2022) .......... 18

Broich v. Inc. Vill. of Southampton,
462 F. App'x 39 (2d Cir. 2012) .......... 50

Brown v. City of Syracuse,
2008 WL 5451020 (N.D.N.Y. Dec. 31, 2008) .......... 54

Brown v. Daikin Am. Inc.,
756 F.3d 219 (2d Cir. 2014) .......... 7, 13

Burgis v. N.Y.C. Dep't of Sanitation,
798 F. 3d 63 (2d Cir. 2015) .......... 29, 37

Burlington N. & Santa Fe Ry. Co. v. White,
548 U.S. 53 (2006) .......... 48, 53

Butts v. New York City Dep't Of Hous. Pres. And Dev.,
2007 WL 259937 (S.D.N.Y. Jan. 29, 2007) .......... 21

Byrnie v. Town of Cromwell,
243 F.3d 93 (2d Cir. 2001) .......... 44

Caldwell v. ServiceMaster Corp.,
966 F. Supp. 33 (D.D.C. 1997) .......... 50

Camillo v. Khim's Millennium Market, Inc.,
2025 WL 951265 (E.D.N.Y. 2025) .......... 12

Carr v. New Jersey,
534 F. App'x 149 (3d Cir. 2013) ........................................................................ 24, 28

Cassard v. Omnicom Media Grp. Holdings, Inc.,
2025 WL 3227617 (S.D.N.Y. Nov. 19, 2025) ......................................................... 19

Catlett v. Missouri Highway & Transp. Comm'n,
589 F. Supp. 929 (W.D. Mo. 1983) ........................................................................ 25

Chavannes v. Bronx Parent Hous. Network, Inc.,
2022 WL 4124762 (S.D.N.Y. Sept. 9, 2022) ........................................................... 18

Chin v. Port Authority of N.Y. & N.J.,
685 F.3d 135 (2012) ........................................................................................ 41, 42

Clark Cnty. Sch. Dist. v. Breeden,
532 U.S. 268 (2001) ............................................................................................. 50

Concession Consultants, Inc. v. Mirisch,
355 F.2d 369 (2d Cir. 1966) .................................................................................. 63

Cook v. Arrowsmith Shelburne, Inc.,
69 F.3d 1235 (2d Cir. 1995) .................................................................................. 36

Cortec Indus., Inc. v. Sum Holding L.P.,
949 F.2d 42 (2d Cir.1991) ..................................................................................... 10

Craig v. Yale Univ. Sch. of Med.,
2013 WL 789718 (D. Conn. Mar. 4, 2013) ............................................................. 40

Daimler AG v. Bauman,
571 U.S. 117 (2014) ........................................................................................ 57, 61

Daniel v. Am. Bd. of Emergency Medicine,
428 F.3d 408 (2d Cir. 2005) .................................................................................. 65

Davis v. Billick,
2002 WL 1398560 (N.D. Tex. June 26, 2002) ........................................................ 61

Davis v. Cintas Corp.,
717 F.3d 476 (6th Cir. 2013) ................................................................................. 45

Davis v. District of Columbia,
925 F. 3d 1240 (D.D.C. 2019) ............................................................................... 43

DeCintio v. Westchester Cnty. Med. Ctr.,
821 F.2d 111 (2d Cir. 1987) ..... 50

Dent v. National Football League,
902 F.3d 1109 (9th Cir. 2018) ..... 19

Doheny v. Int'l Bus. Machines, Corp.,
714 F. Supp. 3d 342 (S.D.N.Y. 2024) ..... 45

Donahue v. Asia TV USA Ltd.,
208 F. Supp. 3d 505 (S.D.N.Y. 2016) ..... 11

Duplan v. City of N.Y.,
888 F.3d 612 (2d Cir. 2018) ..... 55

During v. City Univ. of New York,
2005 WL 2276875 (S.D.N.Y. Sept. 19, 2005) ..... 24, 28

E.E.O.C. v. Bloomberg L.P.,
967 F. Supp. 2d 816 (S.D.N.Y. 2013) ..... 35

E.E.O.C. v. United Galaxy, Inc.,
2013 WL 3223626 (D.N.J. June 25, 2013) ..... 20

Eades v. Kennedy, PC L.,
Offs., 799 F.3d 161 (2d Cir. 2015) ..... 56

Echevarria v. Insight Med. P.C.,
72 F. Supp. 3d 442 (S.D.N.Y. 2014) ..... 6

Farber v. Walt Disney Co.,
2024 WL 3874131 (S.D.N.Y. Aug. 20, 2024) ..... 7, 14

Farmer v. Shake Shack Enterprises, LLC,
473 F. Supp. 3d 309 (S.D.N.Y. 2020) ..... 31, 36

Felder v. United States Tennis Ass'n,
27 F.4th 834 (2d Cir. 2022) ..... 13, 14

Flores v. Nat'l Football League,
2026 WL 407884 (S.D.N.Y. Feb. 13, 2026) ..... 52, 54

Flores v. New York Football Giants, Inc.,
150 F.4th 172 (2d Cir. 2025) ..... 6, 52, 54, 56

Flores v. Nat'l Football League,
658 F. Supp. 3d 198 (S.D.N.Y. 2023) .......... 9

Fowler v. Scores Holding Co.,
677 F. Supp. 2d 673 (S.D.N.Y. 2010) .......... 14

Francis v. Kings Park Manor, Inc.,
992 F.3d 67 (2d Cir. 2021) .......... 36

Franklin v. City of Buffalo, N.Y.,
2026 WL 1506125 (W.D.N.Y. May 29, 2026) .......... 22

Frazier v. Morgan Stanley,
2018 WL 11585450 (S.D.N.Y. Nov. 29, 2018) .......... 38, 39, 40

Fried v. LVI Servs., Inc.,
2011 WL 4633985 (S.D.N.Y. Oct. 4, 2011) .......... 35

Gaffney v. Dep't of Info. Tech. & Telecommunications,
536 F. Supp. 2d 445 (S.D.N.Y. 2008) .......... 29

Gaines v. New York City Transit Auth.,
528 F. Supp. 2d 135 (E.D.N.Y. 2007) .......... 54

Gamble v. Kaiser Found. Health Plan, Inc.,
348 F. Supp. 3d 1003 (N.D. Cal. 2018) .......... 43

Gesualdi v. Advanced Ready Mix Corp,
768 F. Supp. 3d 451 (E.D.N.Y. 2025) .......... 12

Gonzalez v. NYU Langone Hospitals,
2022 WL 4372199 (2d Cir. Sept. 22, 2022) .......... 34, 66

Gulf Ins. Co. v. Glasbrenner,
417 F.3d 353 (2d Cir. 2005) .......... 65

Henao v. Parts Auth., LLC,
557 F. Supp. 3d 490 (S.D.N.Y. 2021) .......... 60, 61

Hill v. Major League Soccer,
2024 WL 3361216 (S.D.N.Y. 2024) .......... 18, 44

Hillware v. New Orleans Saints,
2015 WL 2250178 (E.D. La. May 13, 2015) .......... 19

Hines v. Hillside Children's Ctr.,
73 F. Supp. 2d 308 (W.D.N.Y. 1999) .................................................................. 24, 28

Hoffman v. Parade Publications,
15 N.Y.3d 285 (2010)................................................................................................ 32

Hoffman v. United Telecomms., Inc.,
575 F. Supp. 1463 (D. Kan. 1983) ........................................................................... 64

Hollander v. Am. Cyanamid Co.,
895 F.2d 80 (2d Cir. 1990) ....................................................................................... 30

Hughes v. Twenty-First Century Fox, Inc.,
304 F. Supp. 3d 429 (S.D.N.Y. 2018) ..................................................................... 20

Idrees v. City of N.Y. Dep't of Parks & Recreation,
2005 WL 1026027 (S.D.N.Y. May 3, 2005) ............................................................ 40

In re Magnetic Audiotape Antitrust Litig.,
334 F.3d 204 (2d Cir. 2003) ..................................................................................... 63

Int'l Diamond Importers, Inc. v. Med Art, Inc.,
2017 WL 2839640 (S.D.N.Y. June 29, 2017) ......................................................... 57

Irizarry v. Catsimatidis,
722 F.3d 99 (2d Cir. 2013) ....................................................................................... 15

Jackson v. Nat'l Football League,
1994 WL 282105 (S.D.N.Y. June 21, 1994) ............................................................ 18

Jazini v. Nissan Motor Co.,
148 F.3d 181 (2d Cir. 1998) ............................................................................... 57, 58

Jenkins v. New York City Transit Authority,
646 F. Supp. 2d 464 (S.D.N.Y. 2009) ..................................................................... 46

John v. Dep't of Info. Tech. & Telecomm.,
2008 WL 4694596 (S.D.N.Y. Oct. 23, 2008)................................................... 23, 28

John v. Whole Foods Mkt. Gr., Inc.,
858 F.3d 732 (2d Cir. 2017) ..................................................................................... 45

Jones v. R.R. Donnelley & Sons Co.,
541 U.S. 369 (2004)................................................................................................... 28

Juhua Han v. Kuni's Corp.,
2020 WL 2614726 (S.D.N.Y. May 22, 2020) ........ 19

Kassman v. KPMG LLP,
925 F. Supp. 2d 453 (S.D.N.Y. 2013) ........ 64

Knight v. MTA - New York City,
2026 WL 875339 (E.D.N.Y. Mar. 31, 2026) ........ 27

Kucher v. Domino's Pizza, Inc.,
2017 WL 2987214 (S.D.N.Y. Feb. 13, 2017) ........ 57

LaFontant v. Citigroup Glob. Markets Inc.,
2005 WL 2978944 (S.D.N.Y. Nov. 4, 2005) ........ 53

Lawson v. Sessions,
271 F. Supp. 3d 119 (D.D.C. 2017) ........ 53

Legnani v. Alitalia Linee Aeree Italiane, S.P.A,
274 F.3d 683 (2d Cir. 2001) ........ 55

Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,
732 F.3d 161 (2d Cir. 2013) ........ 56

Lima v. Addeco,
634 F. Supp. 2d 394 (S.D.N.Y. 2009) ........ 13, 51

Littlejohn v. City of New York,
795 F.3d 297 (2d Cir. 2015) ........ 48

Lugo v. City Winery, LLC,
2026 WL 751225 (S.D.N.Y. Mar. 17, 2026) ........ 59

Malave v. Potter,
320 F.3d 321 (2d Cir. 2003) ........ 47

Mandala v. NTT Data, Inc.,
975 F.3d 202 (2d Cir. 2020) ........ 41, 45, 46

Mangahas v. Eight Oranges Inc.,
754 F. Supp. 3d 468 (S.D.N.Y. 2024) ........ 7, 11

Marcus v. Leviton Mfg. Co.,
661 F. App’x 29 (2d Cir. 2016) ........ 32

Martin v. Coinmach Corp.,
2016 WL 6996182 (S.D.N.Y. Nov. 29, 2016) ........ 43

McClain v. Lufkin Indust., Inc.,
519 F. 3d 264 (5th Cir. 2008) ........ 43

McGuinness v. Lincoln Hall,
263 F.3d 49 (2d Cir. 2001) ........ 48

McHenry v. Fox News Network, LLC,
510 F. Supp. 3d 51 (S.D.N.Y. 2020) ........ 7

McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
672 F.3d 482 (7th Cir. 2012) ........ 43

McReynolds v. Sodexho Marriot Services, Inc.,
349 F. Supp. 2d 1 (D.D.C. 2004) ........ 43

Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,
715 F.3d 102 (2d Cir. 2013) ........ 27, 32

Minnette v. Time Warner,
997 F.2d 1023 (2d Cir. 1993) ........ 65

Muldrow v. City of St. Louis, Missouri,
601 U.S. 346 (2024) ........ 24

Mullinix v. Mount Sinai Sch. of Med.,
2014 WL 3687217 (S.D.N.Y. July 24, 2014) ........ 23, 28

Musiello v. CBS Corp.,
518 F. Supp. 3d 782 (S.D.N.Y. 2021) ........ 19

N. Am. Soccer League v. N.L.R.B.,
613 F.2d 1379 (5th Cir. 1980) ........ 17

Nagle v. Marron,
663 F.3d 100 (2d Cir. 2011) ........ 49

National Football League,
309 NLRB 78 (1992) ........ 18

Ndremizara v. Swiss Re Am. Holding Corp.,
93 F. Supp. 3d 301 ........ 30

Norman-Bloodsaw v. Lawrence Berkeley Lab'y,
135 F.3d 1260 (9th Cir. 1998) .......... 25

Olvera v. Bareburger Grp. LLC,
73 F. Supp. 3d 201 (S.D.N.Y. 2014) .......... 15, 16

Ortiz v. Consol. Edison Co. of New York, Inc.,
801 F. Supp. 3d 260 .......... 16

Palmieri v. Estefan,
793 F. Supp. 1182 (S.D.N.Y 1992) .......... 62

Pani v. Empire Blue Cross Blue Shield,
152 F.3d 67 (2d Cir. 1998) .......... 10

Parker v. Columbia Pictures Indus.,
204 F.3d 326 (2d Cir. 2000) .......... 7

Raymond v. City of New York,
317 F. Supp. 3d 746 (S.D.N.Y. 2018) .......... 37

Reynolds v. Barrett,
685 F.3d 193 (2d Cir. 2012) .......... 23, 38, 41

Robinson v. Metro-North Commuter R.R. Co.,
267 F.3d 147 (2d Cir. 2001) .......... 39

Rodriguez v. Beechmont Bus Serv. Inc.,
173 F. Supp. 2d 139 (S.D.N.Y. 2024) .......... 45

Rodriguez v. Town of Ramapo,
412 F. Supp. 3d 412 (S.D.N.Y. 2019) .......... 43

Rosario v. Town of Mount Kisco,
2020 WL 764280 (S.D.N.Y. Feb. 14, 2020) .......... 37

Rubert v. King,
2020 WL 5751513 (S.D.N.Y. Sept. 25, 2020) .......... 31, 36

Sauveur v. Federation of Org.,
2019 WL 2994449 (E.D.N.Y. July 9, 2019) .......... 29

Senne v. Kansas City Royals Baseball Corp.,
105 F. Supp. 3d 981 (N.D. Cal. 2015) .......... 61

Senne v. Kansas City Royals Baseball Corp.,
591 F.Supp.3d 453 (N.D. Cal. 2022) .......... 17

Shiflett v. Scores Holding Co.,
601 F. App'x 28 (2d Cir. 2015) .......... 19

Shipley v. Dugan,
874 F. Supp. 933 (S.D. Ind. 1995) .......... 25

Slattery v. Swiss Reinsurance Am. Corp.,
248 F.3d 87 (2d Cir. 2001) .......... 50

Smith v. Xerox Corp.,
196 F.3d 358 (2d Cir. 1999) .......... 23

Sosa v. Medstaff, Inc.,
2013 WL 6569913 (S.D.N.Y. Dec. 13, 2013) .......... 17

Spindel v. Kroll, LLC,
2026 WL 555653 (S.D.N.Y. Feb. 27, 2026) .......... 27

Sprint/United Management Co. v. Mendelsohn,
552 U.S. 379 (2008) .......... 31

SPV OSUS Ltd. v. AIA LLC,
2016 WL 3039192 (S.D.N.Y. May 26, 2016) .......... 57

SPV OSUS Ltd. v. UBS AG,
114 F. Supp. 3d 161 (S.D.N.Y. 2015) .......... 57

St. Jean v. Orient-Express Hotels Inc.,
963 F. Supp 2d 301 (S.D.N.Y. 2013) .......... 11

Staves v. Prince George's Cnty. Bd. of Educ.,
2023 WL 2648794 (D. Md. Mar. 27, 2023) .......... 28

Stefanoni v. Darien Little League, Inc.,
101 F. Supp. 3d 160 (D. Conn. 2015) .......... 36

Steinberg v. Cushman & Wakefield, Inc.,
2025 WL 1084646 (S.D.N.Y. Mar. 11, 2025) .......... 7, 14

Stratton v. Dep't for the Aging for City of New York,
132 F.3d 869 (2d Cir. 1997) .......... 23

Sullivan v. Tagliabue,
785 F. Supp 1076 (D.R.I. 1992) ... 61

Syeed v. Bloomberg, L.P.,
41 N.Y.3d 446 (2024) ... 32, 35

Tabor v. Hilti, Inc.,
703 F. 3d 1206 (10th Cir. 2013) ... 43

Taylor v. Bronx Parent Hous. Network,
2023 WL 3996620 (S.D.N.Y. June 14, 2023) ... 19

Terry v. Ashcroft,
336 F.3d 128 (2d Cir. 2003) ... 21

Tolton v. Day,
2020 WL 2542129 (D.D.C. May 19, 2020) ... 42

Torres v. Brend Restoration Servs., Inc.,
2024 WL 4355030 (S.D.N.Y. Sept. 30, 2024) ... 14

Torres v. Gristede's Operating Corp.,
628 F. Supp. 2d 447 (S.D.N.Y. 2008) ... 53

Townsend v. Cnty. of Mercer,
2024 WL 866719 (D.N.J. Feb. 29, 2024) ... 26

Troma Entm't, Inc. v. Centennial Pictures Inc.,
729 F.3d 215 (2d Cir. 2013) ... 56

Trotter v. National Football League,
737 F. Supp. 2d 172 (S.D.N.Y. 2024) ... 35

Turbon Int'l, Inc. v. Hewlett-Packard Co.,
769 F. Supp. 2d 259 (S.D.N.Y. 2011) ... 57, 58, 61, 63

Turley v. ISG Lackawanna, Inc.,
774 F.3d 140 (2d Cir. 2014) ... 8

U.S. Football League Players Ass'n, AFL-CIO v. U.S. Football League,
650 F. Supp. 12 (D. Or. 1986) ... 18

United States ex rel. Aharon v. Nuvance Health, Inc.,
2025 WL 968583 (S.D.N.Y. Mar. 31, 2025) ... 51

United States v. City of N.Y.,
717 F.3d 72 (2d Cir. 2013) ........................................ 38, 39

Vangas v. Montefiore Med. Ctr.,
823 F.3d 174 (2d Cir. 2016) ........................................ 35

Vega v. Hempstead Union Free Sch. Dist.,
801 F.3d 72 (2d Cir. 2015) ........................................ 19

Vivenzio v. City of Syracuse,
611 F.3d 98 (2d Cir. 2010) ........................................ 20

Walsh v. United Cable Tech SVCS Corp.,
201 F.3d 434 (2d Cir. 1999) ........................................ 29

Watson v. Fort Worth Bank & Tr.,
487 U.S. 977 (1988) ........................................ 42

Williams v. PMA Cos., Inc.,
419 F. Supp. 3d 471 (N.D.N.Y. 2019) ........................................ 58

Woodell v. United Way of Dutchess Cnty.,
357 F. Supp. 2d 761 (S.D.N.Y. 2005) ........................................ 19

Xiaoyan Liu v. Canteen 82 Inc.,
2018 WL 6067228 (S.D.N.Y. Nov. 20, 2018) ........................................ 60

Zann Kwan v. Andalex Grp. LLC,
737 F.3d 834 (2d Cir. 2013) ........................................ 32

Zurich Am. Life Ins. Co. v. Nagel,
571 F. Supp. 3d 168 (S.D.N.Y. 2021) ........................................ 60, 61

**Statutes**

28 U.S.C. §1391(b)(2) ........................................ 63, 65

42 U.S.C. §1981 ........................................ 28, 32

42 U.S.C. §2000e-5(f)(3) ........................................ 63, 65

42 U.S.C. §2000e-2(k)(1)(A)(i) ........................................ 41

42 USCA §2000e-2(a)(1) ........................................ 24

42 USCA §2000e-2(a)(2) ........................................ 25

N.J. Stat. Ann. §10:5-12 (a) .......... 26

N.Y.C. Admin. Code §8-107(23) .......... 40

N.Y. Exec. Law §296(d) .......... 27

**Other Authorities**

EEOC Enforcement Guidance on National Origin Discrimination,
2016 WL 11963756 .......... 38, 39

## PRELIMINARY STATEMENT

This matter alleges a pattern of race discrimination in the National Football League ("NFL" or "League") that extends far beyond "individual employment grievances," as Defendants attempt to frame the case. The Complaint[1] alleges that, despite repeated public commitments to nondiscrimination, diversity and equal opportunity, Defendants have maintained a League-wide pattern or practice in which Black Head Coaches are routinely denied the same opportunities afforded to their white counterparts. Flores' experiences with Defendants are emblematic of a systemic, institutional discrimination that pervades the NFL.

The Complaint alleges that this discrimination manifests itself in numerous ways, including failure-to-hire Black candidates, sham interviews based on race conducted solely to satisfy League requirements, disparate treatment in hiring processes and retention decisions, retaliation against those who challenge discriminatory practices, and the NFL's knowing failure to investigate or remedy recurring violations of its own hiring policies. These allegations are supported by extensive statistical evidence using numerous methodologies, detailed accounts involving a variety of coaches across multiple hiring cycles and teams, and public admissions by senior NFL officials acknowledging persistent racial disparities and a "double standard" for Black candidates.

Defendants collectively ignore the gravamen of the Complaint, instead attempting to isolate individual allegations and characterize them as insufficient when viewed in isolation. But ignoring the factual allegations does not make the allegations disappear. Rather than simply declare the allegations "without merit," as the NFL did the moment this case was filed, Defendants must confront that the Complaint alleges an interconnected League-wide Head

[1] All references to the Complaint are to Dkt. No. 274.

Coach hiring process governed by common rules, policies, reporting obligations, and NFL oversight, together with repeated factual examples demonstrating how that system has operated to the detriment of Black coaching candidates. These allegations easily clear the pleading threshold for all the claims asserted. Whether Plaintiff ultimately proves those allegations is a matter for discovery, summary judgment and trial. At this stage, the detailed factual allegations—considered collectively—more than plausibly state claims under Title VII, Section 1981, and the analogous state and local antidiscrimination statutes.

Finally, the NFL's uncited statement in both its moving papers and throughout this litigation that it has a "deep commitment" to combating racism and having the clubs consider a diverse pool of candidates, see Dkt. No. 285 ("NFL Br.") at 1; see also Dkt. No. 48 at 4, Flores v. New York Football Giants et al., No. 23-1185 at Dkt. No. 153 at 8, cannot be permitted to stand without response given the information obtained in discovery. To this point, no Defendant has produced any documents; the only documents that have been produced are from a third-party consulting firm which has aided some teams in Head Coach candidate searches. Even this very limited document production to date reveals extremely troubling material. Common sense dictates that the consulting firm had conversations with the NFL team about what it was looking for in a candidate; and, we have seen no indication that the team for which this was prepared objected to the racist and retaliatory statements contained therein. See Ex. A.

## STATEMENT OF FACTS

### I. The NFL's History of Racism Leads to the Rooney Rule

The Complaint describes the NFL's systemic problems with discrimination towards Head Coaches in the context of the League's history with discrimination. ¶¶45-106.[2] Even after long

[2] All citations to ¶__ are references to the operative Complaint.

overdue racial integration, it took 43 years for a team to hire a Black Head Coach and 54 years to hire a Black General Manager. ¶61. There has never been a Black majority owner. Id. This has all occurred in the context of a League made up of a vast majority of Black players. ¶125. During this period, the NFL has been the subject of numerous allegations of race discrimination and retaliation by employees—including by Flores, his co-Plaintiffs Steve Wilks and Ray Horton, and many others—some of which are described in the Complaint. ¶¶158; 364.

In 2002, out of 32 NFL teams, only three Head Coaches were Black and public pressure created an impetus for the NFL to finally take some action. ¶¶117-19. Known as the "Rooney Rule," the policy required teams to interview minority candidates for Head Coach vacancies. ¶119. Over the ensuing two decades, the NFL repeatedly attempted to strengthen the Rooney Rule and adopted additional related measures. ¶120. The Rooney Rule and its subsequent revisions reflect the NFL's recognition that promoting racial diversity of team employees is a League-wide obligation and that such hiring decisions are part of a League-wide hiring process in a closed-ecosystem governed by common rules, policies, and oversight and over which the NFL bears ultimate responsibility. ¶¶121-124. However, the Rooney Rule is only one of many policies that impose League oversight and control over teams.

Notwithstanding these League-wide measures, 20 years after the Rooney Rule was implemented, when this lawsuit was filed, only one Head Coach was Black and today there are only three. ¶131. Moreover, the Rooney Rule has too often become a formality that has highlighted discrimination rather than safeguard against it. The NFL has overseen a hiring ecosystem in which clubs compete for the same pool of coaching candidates under uniform rules and reporting requirements, yet repeatedly tolerate sham interviews, circumvention of League hiring requirements, and other discriminatory hiring practices without meaningful investigation

or enforcement. ¶¶26, 122-123. The NFL has observed that the same discriminatory practices and results that led to the Rooney Rule remain today. ¶¶114-57. NFL senior officials have admitted these problems, including Commissioner Roger Goodell and Executive Vice President of Football Operations, Troy Vincent. ¶¶114-16. These admissions are hardly momentous given that an array of statistical evidence only further demonstrates the race discrimination and diversity problems that pervade the NFL. ¶¶135-52. Yet, as a demonstration of the NFL's lack of care, after this lawsuit was filed, the NFL issued a knee-jerk statement that the claims were "without merit." ¶108.

## II. Brian Flores Experienced Race Discrimination in the NFL

Brian Flores is the son of Honduran immigrants and grew up in the housing projects of Brooklyn. ¶158. After a successful playing career, he was hired as an NFL scout and, in 2008, transitioned to coaching. ¶159. During his tenure, as a scout and coach, his team, the Patriots appeared in five Super Bowls and won three. Id.

### A. The Broncos Subject Flores to a Sham, Discriminatory Interview

In 2019, Flores was scheduled to interview with the Denver Broncos. ¶207. The substance of the interview revealed that they were interviewing Flores as a sham and only because of his race, and that the Broncos never had any intention of considering him as a legitimate candidate for the job. ¶210.

### B. The NFL's Double Standard Forces Flores from the Dolphins

In 2019, Flores landed as the Dolphins Head Coach and he performed admirably despite inheriting a troubled team. ¶160-62. But this performance was insufficient to overcome the NFL's built-in headwinds for Black Head Coaches. Flores was discharged after three seasons. ¶179. FiveThirtyEight.com found Flores's termination to be "extremely suspect" given that the

team achieved a higher Elo score at the end of his final year than at the beginning—meaning the team improved—despite negative quarterback performance. ¶141. In the 30 years preceding this case, only four Head Coaches had been fired under such circumstances, and three of them are Black. ¶142. Flores' experience with the Dolphins was emblematic of the broader practice of discrimination in the NFL. ¶180.

### C. The Giants Subject Flores to a Sham, Discriminatory Interview

In 2002, Flores was subjected to another sham interview with the Giants; he was not given the same opportunity to win the job as a white candidate, Brian Daboll, due to the color of his skin. ¶¶181-94, 204. The Giants have never had a Black Head Coach and only once since the passage of the Rooney Rule have the Giants even interviewed more than the minimum number of Black candidates, demonstrating that the Giants interview Black candidates solely because of the NFL's mandate. ¶¶196–202.

### D. The Texans Retaliate Against Flores for Filing this Lawsuit

On January 31, 2022, Flores interviewed for the Texans Head Coach position. ¶216. He filed this lawsuit the following day. ¶218. Prior to the lawsuit being filed, the Texans interviewed Flores, Hines Ward, Jonathan Gannon, Kevin O'Connell and Josh McCown, none of whom had any experience as a Head Coach other than Flores. ¶217. The Texans narrowed the search to Flores, McCown and Gannon. ¶220. After the lawsuit was filed, the Texans re-opened the process and interviewed Lovie Smith, a Black former Head Coach who had not previously been considered. ¶224. The Texans proceeded to hire Smith. ¶225. The decision to hire Smith was part of a broader decision not to hire Flores in retaliation for his lawsuit against the NFL. ¶¶221-26. It was also part of an effort to avoid hiring a less qualified white candidate in McCown, thereby providing additional fodder to Flores' claims of discrimination. Id.

**E. The NFL Retaliates Through its Own Arbitral Process**

The NFL also engaged in fraudulent conduct in connection with sham arbitration proceedings, intended to interfere with Flores' claims. Although the NFL's own guidelines expressly provide that a dispute is "not football oriented" if it is a dispute "which could arise between any employer and employee, such as a dispute relating to or arising out of discrimination," Goodell found the opposite in a sham decision to keep the case in the NFL's own control rather than referring it to JAMS. ¶299–301. The Second Circuit called this decision "facially inconsistent with these procedures." Flores v. New York Football Giants, Inc., 150 F.4th 172, 185 n.61 (2d Cir. 2025); ¶301.

Goodell then delegated arbitral authority to Peter C. Harvey, Esq.—an attorney who had extensive conflicts with the NFL. ¶302. Harvey refused to make any arbitral conflict disclosures despite repeated demands and such disclosures being required by numerous laws and purposely stymied the case from advancement. ¶¶303-08. Only due to the Second Circuit's intervention and this Court's subsequent decision was the NFL forced to end this retaliatory charade.

## ARGUMENT

## I. The NFL is an Integrated Employer with the Teams

### A. The NFL and Teams Operate as a Single Integrated Enterprise

"[T]wo nominally separate entities [that] are part of a single integrated enterprise" are both responsible for violations of Title VII and Section 1981. Echevarria v. Insight Med. P.C., 72 F. Supp. 3d 442, 458 (S.D.N.Y. 2014). Courts apply a four-factor test to determine whether two nominally separate entities constitute a single employer: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or

financial control." Brown v. Daikin Am. Inc., 756 F.3d 219, 226 (2d Cir. 2014). "Although no one factor is determinative . . . control of labor relations is the central concern." Id., at 227.

At the pleading stage, a plaintiff need only plead sufficient facts to raise a reasonable inference of "an amount of participation by the [indirect employer] that is sufficient and necessary to the total employment process." McHenry v. Fox News Network, LLC, 510 F. Supp. 3d 51, 81 (S.D.N.Y. 2020). Whether two related entities are sufficiently integrated to be treated as a single employer "is generally a question of fact not suitable for resolution on a motion to dismiss." Steinberg v. Cushman & Wakefield, Inc., 2025 WL 1084646, at *4 (S.D.N.Y. Mar. 11, 2025).

Accordingly, courts applying this standard since Brown have repeatedly denied motions to dismiss on this issue, even where a complaint alleges nothing more than that an indirect employer signed employment agreements, enforced its own rules as a job obligation, and exercised authority over termination. See Farber v. Walt Disney Co., 2024 WL 3874131, at *3 (S.D.N.Y. Aug. 20, 2024) (denying motion to dismiss and holding that "at this early stage in the litigation, the control that [Farber] alleged [WDC] to have exercised over [the Theatrical Group's] employment actions—lying at the core of [Farber's] charges of discrimination—is adequate to sustain the action"). Flores easily clears this modest bar.

**Centralized Control of Labor Relations (Most Significant).** "The second factor, centralized control of labor relations, looks to whether there has been centralization of 'tasks such as handling job applications, approving personnel status reports, and exercising veto power over major employment decisions.'" Mangahas v. Eight Oranges Inc., 754 F. Supp. 3d 468, 486-87 (S.D.N.Y. 2024) (quoting Parker v. Columbia Pictures Indus., 204 F.3d 326, 341 (2d Cir. 2000)). "[P]laintiff need not demonstrate that the parent company exercises 'day-to-day control'

over labor relations. . . . The plaintiff must show only that the corporate parent's involvement 'is sufficient and necessary to the total employment process, even absent total control or ultimate authority over hiring decisions.'" Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 156–57 (2d Cir. 2014).

The pleadings go far beyond this low bar—and publicly available documents confirm this only further. Plaintiff has alleged the NFL's near-total control and authority over Head Coach hiring decisions and the terms of coaching contracts, and substantial control over the interview process. Specifically, the NFL has detailed rules and guidelines that cover the entire Head Coach hiring process, and the commissioner must pre-approve hiring of all coaches, all coaching contracts, and the terms of such contracts. ¶¶121-23, 374-80, 382; Ex C; Ex. D at §9.3(A)(1). And, under the NFL Constitution (the "Constitution"), every team contract with *any team employee* (i.e. not merely coaches) must bind such employee to all NFL rules and dispute resolution before the commissioner. Id. at §9.3(A)(2).

These rules were not merely precatory. Flores' employment agreement with the Dolphins "includes a signature line specifically for the NFL Commissioner"; "had to be approved by the NFL Commissioner"; required Flores "to be bound by NFL 'policies, rules and procedures'"; and required him to "affirm that he 'reviewed, understands and agrees at all times with, and to be bound by, the Constitution, Bylaws and the Rules and Regulations of the NFL.'" ¶375. And identical provisions appear in the Wilks and Horton agreements. ¶¶376-77. These provisions are certain to be in virtually all team contracts with employees—they are obligatory under the Constitution.

The NFL's centralized control further extends to the redress of grievances: The Commissioner has the power "to resolve disputes between members of the Proposed Class and

teams, discipline members of the Proposed Class up to and including fines and termination of employment, cancel the contracts of the Proposed Class members and ban members of the Proposed Class from the NFL." ¶ 372. Nor does this control stop at this Complaint's core allegations: The NFL further retains for itself the right to (1) regulate financial dealings between itself, clubs, and coaches; (2) limit the speech of coaches, including any criticism they may have of the League; (3) prohibit leisure time activities of coaches, including their prognostication on so-called fantasy teams; (4) regulate to whom they may give gifts; (5) limit the communications equipment they may use during games; (6) prohibit coaches from dealings with players under contract by other clubs; and (7) prohibits coaches from removing their teams from the field, among other restrictions. Ex. D at §§9.1(B)-(F).

Moreover, the Constitution may be modified or amended without notice to any employee. Id. at §25.2. In effect, the NFL retains the authority and discretion to add, change, remove or modify any rules, standards or terms of employment as to any team employee. See Flores v. Nat'l Football League, 658 F. Supp. 3d 198, 208 n.10 (S.D.N.Y. 2023). Further demonstrating the NFL's central control of labor relations, all contracts between teams and players must be in the form determined by the NFL, must be approved by the NFL, and must be filed and recorded by the NFL League office. Ex. D at §§15.1, 15.3, 15.4. In fact, a player cannot even practice with a team until and unless that employee's contract has been approved by the NFL. Id. at §15.6. Under Article XVII, the Constitution contains an extensive array of rules and regulations governing NFL players—team employees—including comprehensive rules governing roster composition, player eligibility, reserve and injured-list status, waivers, suspensions, military leave, practice squads, compensation, reporting obligations, and League enforcement. In fact,

the Constitution dictates that if a team were to withdraw or be removed from the League, all player contracts would become the property of the NFL to administer. Id. at §§3.6-3.8

The NFL's Anti-Tampering Policy contains more of the same and demonstrates that labor relations affecting coaches and other football personnel are centrally regulated by the NFL rather than left to the discretion of the teams. See Ex. B.[3] The Anti-Tampering Policy establishes an NFL-governed framework governing the recruitment, hiring, interviewing, promotion, transfer, and movement of coaches and other football employees, including but not limited to restrictions on when clubs may solicit another club's employees, mandatory interview and permission procedures, hiring timelines, reporting requirements, organizational reporting structures, contract requirements, and League-administered enforcement and discipline for violations. Id.

Indeed, the Anti-Tampering Policy repeatedly reserves supervisory authority to the League and the Commissioner. The League office verifies employees' contractual status, determines the classification of key football executives based on organizational charts and employment responsibilities, requires clubs to submit organizational reporting structures, reviews disputes arising under the Policy, and authorizes the Commissioner to investigate violations and impose discipline. Id. at §§3(A)-8(I). In short, the Anti-Tampering Policy reflects a centralized system in which the NFL—not merely the individual clubs—establishes, administers, and enforces the rules governing the recruitment, movement, and employment of coaches and other football personnel.

The NFL Hiring Policy demonstrates the same; that the NFL centrally administers and oversees the hiring process for Head Coach and other positions. See Ex. C. The policy requires

---

[3] The Court may consider and take judicial notice of documents and matters that are public record on a motion to dismiss. Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 75 (2d Cir. 1998) ("It is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6)"); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir.1991) (same).

clubs to follow League-prescribed hiring procedures, use League-controlled hiring platforms and reporting systems, obtain and submit League-required permissions and documentation, complete mandatory training, and upload employment agreements for League review, all of which is consistent with the NFL exercising substantial control over the hiring process across its teams. Id.

The NFL is, undeniably, central to the labor relations of coaches, players and other team and League personnel. Any discretion delegated to the teams exists because the NFL opts not to intervene and not to exercise its full measure of authority; not because it cannot. This level of centralized control more than suffices at the motion to dismiss stage. See, e.g., Donahue v. Asia TV USA Ltd., 208 F. Supp. 3d 505, 518 (S.D.N.Y. 2016) (citing meeting with employees, approving budgets, and reviewing personnel information, among other pleadings, sufficient at the motion to dismiss stage); St. Jean v. Orient-Express Hotels Inc., 963 F. Supp 2d 301, 309-10 (S.D.N.Y. 2013) (identifying parent's involvement in subsidiary's hiring and termination decisions as paramount in finding single employer).

**Interrelation of Operations.** "The interrelation-of-operations factor concerns in large part whether the entities share employees, services, records, and equipment." Mangahas, 754 F. Supp. 3d at 486. The NFL and teams are completely intertwined in virtually all regards. The NFL provides centralized administrative and operational services that are integral to the day-to-day functioning of every team and the entire League. The NFL schedules games, negotiates and distributes national media rights, administers the draft, administers the waiver system, governs the salary cap, and reviews all player transaction systems, oversees officiating and game operations, conducts investigations, administers discipline, provides security, licensing, marketing, legal, technology, and football operations services, and maintains centralized player,

employment, and organizational records. Ex. D at §§4.3-4.4, 6.5, 7.5, 8.4-8.14, 16.4-16.6, 18.8-18.12, 21.5, 2003 Resolution IC-1, 2006 Resolution BV-1. The teams rely on the NFL to provide these operational services on a League-wide basis. Id. at §§10.3, 4.4, 2006 Resolution G-1, 1977 Finance Resolution, 1978 Finance Resolution.

These facts suffice to show interrelation at the pleadings stage. Cf. Gesualdi v. Advanced Ready Mix Corp, 768 F. Supp. 3d 451, 467-68 (E.D.N.Y. 2025) (finding interrelation where two companies shared facilities and employes); Camillo v. Khim's Millennium Market, Inc., 2025 WL 951265, at *5 (E.D.N.Y. 2025) (finding interrelation where employees transferred across locations).

**Common Management.** "[A] finding of common directors and/or officers favors parental liability but is of limited importance." Austen v. Catterton Partners V, LP, 709 F. Supp. 2d 168, 175 (D. Conn. 2010). The Complaint alleges that "[u]nder the NFL Constitution and Bylaws, the NFL exists at the behest of and is completely controlled by the NFL teams." ¶369. The NFL has an Executive Committee "made up of a representative from each member team" and "[t]he Commissioner of the NFL serves at the behest and direction of the NFL's member teams." ¶¶370-71. This overlapping governance structure—where team representatives exercise authority through the League office and the Commissioner exercises authority over the teams' employees but serves at the pleasure of the teams—supports a finding of common management. See Austen, 709 F. Supp. 2d at 175 (finding common management prong satisfied because plaintiff alleged parent's board was composed of individuals from subsidiaries).

**Common Ownership or Financial Control.** The Complaint alleges that "[t]he NFL and the NFL teams have complete interrelation of ownership, management, operations and financial

control." ¶369.[4] Its Executive Committee is composed of representatives from each team. ¶370. The Constitution governs a set of complex financial dealings between the League and the teams. These include, as set forth above, highly lucrative television contracts, post-season games, digital media, and partnerships, from which the NFL distributes revenue to member teams. See Ex. D at §§10.3, 4.4, 2006 Resolution G-1, 1977 Finance Resolution, 1978 Finance Resolution. These revenue distributions are significant: Over $13 billion annually, amounting to $432.6 million for each of the NFL's 32 teams.[5]

Read together, the four factors plausibly allege more than a formal association between a League and its member teams. Indeed, in Brown, the Second Circuit held that three allegations of centralized control sufficed at the pleadings stage to hold a Japanese parent responsible for its American subsidiary's actions, even though the plaintiff had not alleged that the parent participated in the decision to him or fire him, and the plaintiff also had not alleged common management. 756 F.3d at 228. Plaintiff here alleges far more.

### B. The NFL and Member Teams Operate as a Joint Employer

The same facts establish that the NFL is a joint employer of coaches with its member teams. Under the joint-employer doctrine, an entity that is not a plaintiff's direct employer may nonetheless be liable under Title VII and Section 1981 where it is a "'constructive employer'—an entity that shares in controlling the terms and conditions of a plaintiff's employment." Felder v. United States Tennis Ass'n, 27 F.4th 834, 838 (2d Cir. 2022); see also Lima v. Addeco, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009) ("Where two entities are deemed part of a single integrated

---

4 The NFL egregiously misquotes Arcuelo to argue that "[t]wo entities typically cannot be considered a 'single employer' unless they are a 'parent and wholly-owned subsidiary corporations, or separate corporations under common ownership and management.'" Arculeo v. On-Site Sales & Mktg., LLC, 425 F.3d 193, 198 (2d Cir. 2005). But Arcuelo actually said that "examples may be parent and wholly-owned subsidiary corporations, or separate corporations under common ownership and management." Id.

5 Rob Demovsky, "Packers say they received record $432.6M in revenue sharing," ESPN (Jul. 23, 2025), available at: https://www.espn.com/nfl/story/_/id/45807728/packers-say-received-record-4326m-revenue-sharing.

enterprise, then both entities are 'subject to joint liability for employment-related acts'"). Relevant factors include "control over an employee's hiring, firing, training, promotion, discipline, supervision, and handling of records, insurance, and payroll," along with "all of the incidents of the relationship . . . assessed and weighed with no one factor being decisive." Torres v. Brend Restoration Servs., Inc., 2024 WL 4355030, at *3 (S.D.N.Y. Sept. 30, 2024).

Critically, joint-employer status is "essentially a factual issue" that, like single-employer status, is "not suitable for resolution on a motion to dismiss." Steinberg, 2025 WL 1084646, at *4. To survive dismissal, a plaintiff "need only allege facts sufficient to put [the defendant] on notice of the theory of employer liability upon which [the] claims are based." Steinberg, 2025 WL 1084646, at *4 (quoting Fowler v. Scores Holding Co., 677 F. Supp. 2d 673, 681 (S.D.N.Y. 2010)); see Farber, 2024 WL 3874131, at *3 (denying motion to dismiss retaliation claim where parent-company involvement plausibly connected it to challenged employment action). Here, the NFL exercises considerable control over the employment practices at issue in this lawsuit: the recruiting, interviewing, and hiring of coaches. The Complaint addresses virtually every Felder factor in this regard:

The NFL's control over the hiring process is not merely supervisory—it is structural and mandatory.[6] "[T]he NFL and the Commissioner also exert control over the hiring processes of the individual teams, and the individual teams agree to such control by the NFL, including, but not limited to, the implementation, review and enforcement of the Rooney Rule." ¶380. The Commissioner holds the power to "approve or disapprove contracts between teams and members of the Proposed Class," and "pursuant to the NFL's Constitution and Bylaws, the NFL member

[6] These facts distinguish this case from Felder itself, in which the court found that the USTA exercised no meaningful control over an employee of a subcontractor who provided security to the USTA through yet another intermediate contractor, because the USTA did not have any authority to set the terms and conditions of employment. 27 F.4th at 846.

teams do not even have discretion to deviate or opt-out from the NFL's level of control." ¶¶372, 379. The entire Head Coach hiring process is governed by "uniform league rules and reporting requirements, including the Rooney Rule and related interview and documentation obligations, all of which are monitored by the NFL League office and subject to potential league discipline for noncompliance." ¶123. The Anti-Tampering Policy, cited above, provides an array of additional League-governed rules related to the movement and hiring of coaches. Thus, this factor favors joint employer status. Cf. Olvera v. Bareburger Grp. LLC, 73 F. Supp. 3d 201, 207 (S.D.N.Y. 2014) (finding parent's guidance to franchisees on "how to hire" indicative of joint employer relationship).

Furthermore, the Commissioner's authority over termination is express and sweeping. "Among the Commissioner's powers with respect to the Proposed Class are to resolve disputes between members of the Proposed Class and teams, discipline members of the Proposed Class up to and including fines and termination of employment, cancel the contracts of the Proposed Class members and ban members of the Proposed Class from the NFL." ¶372. The Horton and Wilks contracts contain similar specifications. ¶¶376-77. Even if not exercised, this power favors joint employer status. See Irizarry v. Catsimatidis, 722 F.3d 99, 114 (2d Cir. 2013) (finding evidence "that Catsimatidis possesses, but rarely exercises, the power to hire or fire anyone he chooses" satisfied this favor).

The NFL also exerts control and supervision over the day-to-day terms of employment. Each of the three agreements cited in the Complaint required ongoing, affirmative compliance with NFL rules as an express job duty. ¶¶ 375-77. And the NFL retained the right to alter its requirements at any time. Ex. D at §25.2. The NFL even mandated the clothing worn by each coach on game day. ¶¶ 375–77. As set forth in the preceding factor, the NFL exercises

disciplinary authority over coaches. "[A]llegations suggest that the [NFL and teams] jointly controlled many aspects of Plaintiffs schedules and employment conditions, which is sufficient at the pleading stage." Ortiz v. Consol. Edison Co. of New York, Inc., 801 F. Supp. 3d 260, 304 (S.D.N.Y. 2025); see further Olvera, 73 F. Supp. 3d at 207 (finding parent's indirect control indicative of joint employer status).

The NFL maintains records of the hiring process to ensure compliance with its rules, including the Rooney Rule. ¶123. And interviews are conducted from "lists compiled by the league office."[7] This factor, too, favors joint employer status. See Barfield v. New York City Health & Hosps. Corp., 537 F.3d 132, 144 (2d Cir. 2008) ("[T]here is no question that Bellevue maintained employment records on the matter most.").

The NFL also sets out methods for internal dispute resolution with its coaches. Each agreement putatively designated the Commissioner as the exclusive arbitrator of all employment disputes—placing the NFL at the center of the record of, and forum for, any employment claim. ¶¶375-77. This control was not merely theoretical: "After this lawsuit was filed, the Dolphins filed a letter with Goodell seeking an arbitration over claims that Mr. Flores should be required to return hundreds of thousands of dollars of earned income." ¶236. This control, too, suggests that the NFL controlled the coaches' employment where it mattered most.

The NFL does not dispute that it exercises the foregoing authority. ¶ 384. It instead stated publicly—within hours of the filing of this action—that the [discrimination] allegations in this action are 'without merit' implying that the NFL is directly aware of team hiring, retention and firing decisions such that it can make such an affirmative and informed statement." ¶ 385.

---

[7] Adam Kilgore and Nicole Dungca, "Thirteen NFL teams have never had a Black head coach. Here's one franchise's story," Washington Post (Nov. 21, 2022), available at: https://wapo.st/4oNUkZV.

Courts have found defendants to be joint employers under similar circumstances. See, e.g., Andrade v. Cultural Care, Inc., 706 F. Supp. 3d 348, 362-63 (E.D.N.Y. 2023) (finding factual question as to au pair agency's status as joint employer because agency maintained "the power to hire and terminate au pairs, as well as to transfer au pairs between host families," and because "the ability to significantly control an employee's employment—even if that control is not constantly exercised—can create an employment relationship"); Barfield, 537 F.3d at 144 (holding hospital joint employer of nurses employed through agency because hospital had power to hire, fire, and supervise nurses, alter their conditions of employment, and maintain relevant records, even though agency paid nurses). Certainly, at the pleadings stage, the Court cannot say conclusively that the NFL is not a joint employer of coaches.[8]

### C. Other Sports-League Cases Favor a Finding of Single Employer and Joint Employer Here

The foundational precedent on the status of sports leagues is N. Am. Soccer League v. N.L.R.B., 613 F.2d 1379 (5th Cir. 1980). There, the Court held the NASL a joint employer with local clubs, because of the degree of control over essential aspects of labor relations, the league's constitution, regulations, and commissioner, rules around interclub hiring and trades, the commissioner's power to approve or disapprove contracts and resolve disputes, and the disciplinary authority vested in the league. Id. at 1382.

Similarly, in Senne v. Kansas City Royals Baseball Corp., 591 F.Supp.3d 453, 594 (N.D. Cal. 2022), the court held the MLB as a joint employer with minor league clubs because of the oversight and discipline exercised by the MLB through the organization of recruiting processes,

[8] To be sure, in joint-employer relationships, conduct of one employer cannot necessarily be imputed to the other, but, here, there is good reason to hold the NFL responsible for the conduct of its teams—precisely because its own executives have said that it is up to the NFL to fix the system. ¶7; *cf.* Sosa v. Medstaff, Inc., 2013 WL 6569913, at *4 (S.D.N.Y. Dec. 13, 2013) ("Sosa has not pled any facts indicating that the Cross Country Defendants should be held liable for the allegedly discriminatory and hostile conduct by Vargas.").

approval of contracts, recordkeeping, disciplinary authority, and supervision of employment conditions, even though it did not exercise day-to-day control and did not set pay beyond minimums. And, in National Football League, 309 NLRB 78, 105 (1992), the NLRB found the NFL liable for clubs' unfair labor practices based on a joint venture committee, citing the NFL's management committee.

The cases to the contrary on which Defendants rely shed little light on NFL coaches. Hill v. Major League Soccer and Benedict v. Manfred offer comparatively cursory analysis and involved other leagues whose relationship to member clubs was structurally and legally distinct from the NFL's. The Hill complaint alleged only conclusory allegations that MLS "controlled the clubs' hiring and firing practices." 2024 WL 3361216, at *2, 4 (S.D.N.Y. 2024). Similarly, in Benedict, 2026 WL 836679, at *5 (S.D.N.Y. Mar. 26, 2026), MLB's standardized universal employment contracts were insufficient to establish joint employer status over scouts because MLB did not exercise any level of control over the clubs' actual hiring decisions.[9] In neither case did the court consider the level of control exhibited by the NFL and the candid acknowledgments of control by the League, such as the statement of Vincent about "fix[ing]" the League's problems and the specific factual denial issued by Goodell immediately upon this case's filing. ¶¶7, 114, 116.[10]

[9] U.S. Football League Players Ass'n, AFL-CIO v. U.S. Football League, 650 F. Supp. 12 (D. Or. 1986), too, involved a different league with a less centralized governance structure and different contractual provisions. And Jackson v. Nat'l Football League,1994 WL 282105 (S.D.N.Y. June 21, 1994), hardly undermines this case.. The court concluded that "[w]hether or not the NFL and its member teams are a single employer, however, is not germane to this case. Plaintiff does not allege any discrimination by an NFL team." Id. at *5. It further explained, "the Second Circuit stated that unincorporated associations may be held liable under a theory of authorization in the absence of membership ratification." Id.

[10] The NFL similarly relies on a series of non-controlling cases with inapposite facts to argue that conclusory allegations, shared HR policies, dual roles, or general rules do not establish centralized labor control. But these cases all involved markedly different facts. See Chavannes v. Bronx Parent Hous. Network, Inc., 2022 WL 4124762, at *4 (S.D.N.Y. Sept. 9, 2022) (Plaintiff did "not allege any facts indicating that the City and BPHN have interrelated operations, centralized control of labor, common management, or common ownership or financial control."); Britton v. Bronx Parent Hous. Network, Inc., 2022 WL 4332735, at *3 (S.D.N.Y. Sept. 19, 2022) (holding "[c]onclusory, *ipse dixit* assertions about the degree of control" insufficient to find joint employer and no ownership

Likewise, many of the NFL's authorities address contexts outside of employment. American Needle, Inc. v. National Football League, 560 U.S. 183, 196-97 (2010) addressed antitrust single-entity analysis under the Sherman Act, and the word "employ" appears nowhere in the decision. Dent v. National Football League, 902 F.3d 1109, 1114 (9th Cir. 2018) concerned the league's responsibility for safety-related torts under a collective bargaining agreement. The lone employment case Defendant does cite, Hillware v. New Orleans Saints, 2015 WL 2250178, at *3 (E.D. La. May 13, 2015), concerned a *pro se* ticket-office supervisor, not a Head Coach with specific constraints spelled out in the Constitution.

## II. Flores Properly Pleaded Disparate Treatment Claims

In an employment discrimination action, a plaintiff need not plead a prima facie case to survive a motion to dismiss. Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 83-84 (2d Cir. 2015). Rather, the plaintiff must only plausibly allege that (1) the employer discriminated against him (2) because of his race, by asserting "facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." Id. at 87. At the "initial stage of a litigation," the plaintiff's burden is "'minimal,'" requiring only the plausible allegation of facts providing "at least minimal support for the proposition that the employer was motivated by discriminatory intent." Id. at 86-87.

---

relationship between New York City and Bronx Parent Housing Authority); Taylor v. Bronx Parent Hous. Network, 2023 WL 3996620, at *5 (S.D.N.Y. June 14, 2023) (same); Shiflett v. Scores Holding Co., 601 F. App'x 28, 30 (2d Cir. 2015) (holding, on summary judgment, that "none of the evidence indicates that [one entity] controlled labor relations at [the other]"); Cassard v. Omnicom Media Grp. Holdings, Inc., 2025 WL 3227617, at *5 (S.D.N.Y. Nov. 19, 2025) ("Shared HR policies and an organization-wide code of conduct as alleged here, without more, are insufficient to support a plausible claim of centralized control of labor relations."); Woodell v. United Way of Dutchess Cnty., 357 F. Supp. 2d 761, 768 (S.D.N.Y. 2005) ("[P]laintiff has failed to allege any evidence of common management between the UWA and the UWDC" and there was "no overlap at all between the board[s]."); Musiello v. CBS Corp., 518 F. Supp. 3d 782, 791 (S.D.N.Y. 2021) (finding conclusory allegations of control insufficient); Juhua Han v. Kuni's Corp., 2020 WL 2614726, at *9 (S.D.N.Y. May 22, 2020) (overlap of corporate directors insufficient to show centralized control of labor relations).

### A. Flores Properly Pleaded Disparate Treatment Claims Against the Giants

i. Flores Pleaded Failure to Hire Claims

To establish a prima facie case of discriminatory failure to hire under Title VII, or Section 1981, a plaintiff must demonstrate: "(1) he is a member of a protected class, (2) he was qualified for the job for which he applied, (3) he was denied the job, and (4) the denial occurred under circumstances that give rise to an inference of invidious discrimination." Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010). "Title VII and the NJLAD employ the same standard to establish a prima facie failure to hire claim." E.E.O.C. v. United Galaxy, Inc., 2013 WL 3223626, at *9 (D.N.J. June 25, 2013). "To make out a failure-to-hire claim under…the more liberal NYCHRL, a plaintiff must merely 'plead facts sufficient to support an inference that [she has] been treated less well at least in part because of a protected trait.'" Hughes v. Twenty-First Century Fox, Inc., 304 F. Supp. 3d 429, 445 (S.D.N.Y. 2018). The only element the Giants contest is whether Plaintiff alleged circumstances giving rise to an inference of discrimination.

Plaintiff clearly alleged he was discriminated against the Giants when he was denied the Head Coach position in favor of a white candidate, Brian Daboll. ¶¶181-205. Flores alleged that in the interview process, he was subjected to a sham process in which he was not even given a legitimate opportunity to earn the job; whereas, in contrast, the white candidate who was offered the job was given a legitimate chance. ¶¶192, 194, 204-05. Flores alleged that during the interview process, the Giants directly disregarded and flouted a rule—the Rooney Rule—which is in place to combat systemic racist and discriminatory conduct in the NFL; namely, the historic practice of discriminatory failure to hire Black Head Coaches. ¶¶ 203-205.

And, the candidate who was selected had objectively less experience than Flores. By 2022, Flores had been a successful NFL Head Coach for three seasons. ¶161-62. Daboll, on the other hand, had never been an NFL Head Coach.[11]

The Giants' decision to discount Flores' stronger overall Head Coaching résumé and proven experience as the lead coach of an NFL team further supports the requisite inference of discrimination. See, e.g., Butts v. New York City Dep't Of Hous. Pres. And Dev., 2007 WL 259937, at *9 (S.D.N.Y. Jan. 29, 2007) ("An employer's choice of a less qualified employee not from Plaintiff's protected class raises an inference of discrimination sufficient to establish a prima facie case of discrimination"); Terry v. Ashcroft, 336 F.3d 128, 139 (2d Cir. 2003) (denying summary judgment in failure to hire claim, finding inference of discrimination where "position was offered to an allegedly significantly less qualified African–American man").

These facts alone are sufficient at the pleading stage. However, the circumstances surrounding the Giants' decision cannot be viewed in isolation from the team's broader hiring history. As alleged, "[t]he Giants have never hired a Black Head Coach; Mr. Flores would have been the team's first. This is a near unbelievable fact given the Giants have been in existence for nearly 100 years and have now hired 22 Head Coaches." ¶196. Moreover, the Complaint reflects other examples of the Giants' historical discrimination towards Black players. ¶¶ 51, 69, 196-202.

But even this does not address the broader League-wide context in which the Giants failed to hire Flores. Plaintiff alleges his experience with the Giants was part of a broader practice of NFL teams discriminating against Black Head Coaches, which led to the Rooney Rule in an attempt to address "the NFL's institutional failure to embrace racial diversity." ¶6.

---

[11] See Pro Football Reference, https://www.pro-football-reference.com/coaches/DaboBr0.htm.

However, “the Rooney Rule has failed to yield any meaningful change to an NFL institution so fully steeped in discriminatory practices.” ¶120. Instead, the Rooney Rule has had the perverse effect of incentivizing sham interviews to facially ensure compliance without meaningfully considering minority candidates. ¶¶24, 181-215, 278-297.

The difference in treatment between minority candidates and white candidates is readily acknowledged by NFL executives. Vincent publicly admitted just weeks before this lawsuit was filed that for Black candidates, “[T]here is a double standard. I don’t think that that is something that we should shy away from. But that is all part of some of the things that we need to fix in the system.” ¶114. As alleged in the Complaint, “this double standard has led to a consistent dearth of Black Head Coaches despite an abundance of highly qualified candidates. For Black Head Coaches who are hired, retention of the job is routinely more difficult than for white counterparts.” ¶115. Goodell also “acknowledged that even though NFL has ‘adopted numerous policies and programs’ to combat discrimination, that the NFL ‘must acknowledge that particularly with respect to head coaches, the results have been unacceptable.’ Mr. Goodell has also admitted the NFL has problems with ‘results’ in regard to the racial composition of Head Coaches and needs to make changes to policies and practices so ‘real and tangible results will be achieved.’” ¶116.

The NFL’s problems with racism are demonstrated through both specific anecdotal and broad statistical evidence. The Second Circuit has recognized that statistics may be combined with anecdotal evidence “to bring the cold numbers convincingly to life.” Franklin v. City of Buffalo, N.Y., 2026 WL 1506125, at *3 (W.D.N.Y. May 29, 2026). The Complaint sets forth numerous examples of Black candidates who were denied Head Coach jobs, denied

opportunities, subjected to sham interviews, or subjected to discriminatory treatment after obtaining a Head Coach job. See ¶¶158-215; 237-297; 313-364.

And, as to statistics, the Second Circuit has repeatedly held statistical data may be used to support disparate treatment claims.[12] See, e.g., Reynolds v. Barrett, 685 F.3d 193, 203 n.11 (2d Cir. 2012) ("Statistics may . . . be used to support an individual disparate treatment claim"); Smith v. Xerox Corp., 196 F.3d 358, 370 (2d Cir. 1999) (at summary judgment "[a] plaintiff may also present statistical findings as circumstantial evidence of intentional discrimination"); Stratton v. Dep't for the Aging for City of New York, 132 F.3d 869, 877 (2d Cir. 1997) (post-trial appeal; "Although statistics play a much more substantial role in disparate impact cases, they are admissible to support a claim of discrimination even in a disparate treatment case involving a single plaintiff"). Here, Plaintiff provided an array of statistics more than sufficient and mathematically viable at the pleading stage. See infra at III(B); ¶¶135-52.

The Giants argue Flores' allegations are insufficient because they amount only to allegations of a discriminatory sham interview—which the Giants incredulously claim is permitted under the law. Not only is that an incorrect description of the allegations (for reasons just described), but the case law cited is distinguishable on the facts, law and stage of proceedings. See John v. Dep't of Info. Tech. & Telecomm., 2008 WL 4694596, at *5 (S.D.N.Y. Oct. 23, 2008) (evidentiary standard at summary judgment; dismissing failure to hire claim where plaintiff claimed preselection before interview and offered no evidence of discriminatory intent); Mullinix v. Mount Sinai Sch. of Med., 2014 WL 3687217, at *15 (S.D.N.Y. July 24, 2014), on reconsideration in part, 2015 WL 328050 (S.D.N.Y. Jan. 23, 2015) (denying summary judgement on failure to hire claim where illegitimate interview process was a component of the

---

12 The Giants do not address Plaintiff's statistics in connection with Flores' disparate treatment claim.

evidence); During v. City Univ. of New York, 2005 WL 2276875, at *7 (S.D.N.Y. Sept. 19, 2005) (granting summary judgment and finding plaintiff's "speculative" allegations that another individual was pre-selected do "not give rise to an inference of discrimination without some evidence that pre-selection was somehow discriminatory"); Hines v. Hillside Children's Ctr., 73 F. Supp. 2d 308, 325 (W.D.N.Y. 1999) (granting summary judgment because plaintiff's only made "vague, conclusory allegations that the team interview process was nothing but a sham"); Carr v. New Jersey, 534 F. App'x 149, 153 (3d Cir. 2013) (affirming summary judgment because plaintiff "adduced no evidence suggesting that the selection criteria and interview questions (which were the same for all candidates) were inherently unfair or discriminatory").

Ultimately, Flores has plausibly alleged the Giants' treatment of Flores, and ultimate decision not to hire him as a Head Coach, stemmed from the policies and practices within the NFL that have led to disparate treatment of and disparate impact towards Black coaches for decades. ¶205. These allegations are sufficient.

**ii. Flores Pleaded Actionable Discriminatory Treatment Under All Antidiscrimination Laws**

In addition to tangible actions such as failure-to-hire, Title VII makes it unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment." 42 USCA § 2000e-2(a)(1). The Supreme Court recently clarified that under such provision, a plaintiff need only "show some harm" with respect to the terms and conditions of employment rather than "significant harm." Muldrow v. City of St. Louis, Missouri, 601 U.S. 346, 355-58 (2024). Further, Title VII provides it is an unlawful employment practice for an employer "to limit, segregate, or classify . . . applicants for employment in any

way which would deprive or tend to deprive any individual of employment opportunities" for a discriminatory reason. 42 USCA § 2000e-2(a)(2).

Consistent with this statutory framework, federal courts have recognized Title VII provides protection against discriminatory terms and conditions in which people obtain employment, separate and apart from claims for failure-to-hire. See Norman-Bloodsaw v. Lawrence Berkeley Lab'y, 135 F.3d 1260, 1272 (9th Cir. 1998) (denying summary judgment on pre-employment discrimination claims arising from the interview process separate and apart from failure-to-hire claims; stating, "Title VII bars discrimination not only in the 'terms' and 'conditions' of ongoing employment, but also in the 'terms' and 'conditions' under which individuals may *obtain* employment") (emphasis in original);[13] Catlett v. Missouri Highway & Transp. Comm'n, 589 F. Supp. 929, 944 (W.D. Mo. 1983) (entering judgment in favor of plaintiffs under Title VII on claims of discrimination in the job application process separate and apart from a failure-to-hire claim; stating "Title VII requires that females must have equal employment opportunities, not merely that their applications, if any, be processed fairly"); Shipley v. Dugan, 874 F. Supp. 933, 942 (S.D. Ind. 1995) (denying summary judgment on claim of discrimination claim in the selection process; stating, "Title VII, and sections 1981 and 1983 provide Plaintiff a right to be free from discrimination throughout the selection process. If the process is discriminatory at any stage, Plaintiff is entitled to relief regardless of her qualifications relative to those ultimately hired.").

The application of Title VII's prohibition on discrimination in the pre-employment context is further reinforced by the EEOC's enforcement guidance, which specifically recognizes

[13] The Norman-Bloodsaw court did not find a claim of discrimination in the terms and conditions of the pre-employment process to be at all novel, stating "[d]espite defendants' assertions to the contrary, plaintiffs' Title VII claims fall neatly into a Title VII framework." Id.

that Title VII extends to all employment decisions, separately listing "recruitment" and "hiring" alongside "other terms and conditions of employment." EEOC Enforcement Guidance on National Origin Discrimination, 2016 WL 11963756, at *6. Further, the enforcement guidance provides "Title VII prohibits employers from engaging in recruitment practices that have the purpose of discriminating" based on a protected class. Id.

Section 1981 is also not limited to failure-to-hire claims in the pre-employment context. While the original coverage of §1981 prohibited discrimination in the right "to make and enforce contracts," the Civil Rights Act of 1991 expanded the prohibition to the "performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id. Therefore, because §1981's protections attach to the contract formation stage, a discriminatory sham interview—which is part of the process of making a contract—falls well within the statute's textual framework.

The NJLAD, similar to Title VII, prohibits discrimination "in terms, conditions or privileges of employment." N.J. Stat. Ann. §10:5-12 (a). For the same reasons discriminatory treatment in the interview process can be considered a viable claim under Title VII, it is also legally cognizable claim under the NJLAD. Townsend v. Cnty. of Mercer, 2024 WL 866719, at *7 (D.N.J. Feb. 29, 2024), aff'd, 2025 WL 1540356 (3d Cir. May 30, 2025) (noting courts employ the same standard of review under Title VII and the NJLAD). However, even more support is provided by the New Jersey Division on Civil Rights, the administrative agency tasked with enforcing the NJLAD, which explicitly states the law "prohibits discrimination in all aspects of employment, including but not limited to: recruitment, job postings, *interviews*, and hiring decisions" (emphasis added). "Discrimination in Employment," N.J. Div. on C.R.,

https://www.njoag.gov/about/divisions-and-offices/division-on-civil-rights-home/know-the-law/njlad/discrimination-in-employment/.

Finally, the NYSHRL and the NYCHRL are interpreted more broadly than their federal counterpart. See Knight v. MTA - New York City, 2026 WL 875339, at *3 (E.D.N.Y. Mar. 31, 2026) ("As the amended NYSHRL adopts the same standard as the NYCHRL, the plaintiff's NYSHRL claims rise and fall with the NYCHRL claims."). To prevail on a disparate-treatment discrimination claim under the NYCHRL, "the plaintiff need only show differential treatment—that she is treated 'less well'—because of a discriminatory intent." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 110 (2d Cir. 2013). Critically, the NYSHRL and the NYCHRL were amended to extend coverage beyond current employees. N.Y. Exec. Law § 296(d); N.Y.C. Admin. Code § 8-107(23). Therefore, in Spindel v. Kroll, LLC, 2026 WL 555653, at *8 n.4 (S.D.N.Y. Feb. 27, 2026), the court rejected the proposition "that the NYSHRL and the NYCHRL do not apply to applicants during the interview process because the statutes only protect current employees."

Under all these applicable laws, Flores clearly alleged he was subjected to race discrimination in the job application process when he was subjected to a sham interview—a massive waste of his time, effort and resources—because of the color of his skin. ¶¶192-194. Flores was interviewed, but contrary to his white colleagues, he was not given any fair or legitimate opportunity to win the job. ¶204. He was interviewed as a token. ¶193. This was an embarrassing and humiliating process for Flores to be subjected to and endure. The reason Flores was forced to suffer this indignity and discrimination was due to his race.

The cases cited by the Giants, already addressed above, are strictly limited to analysis of failure-to-hire claims and do not address or discuss the independent actionability of

discrimination in the pre-employment job application and selection context. See John, 2008 WL 4694596, at *5 (limited to failure-to-hire analysis); Mullinix, 2014 WL 3687217, at *15 (same); During, 2005 WL 2276875, at *7 (same); Hines, 73 F. Supp. 2d at 325 (same); Carr, 534 F. App'x at 153 (same); Staves v. Prince George's Cnty. Bd. of Educ., 2023 WL 2648794, at *8 (D. Md. Mar. 27, 2023) (same); Baylor v. Powell, 459 F. Supp. 3d 47, 59 (D.D.C. 2020), aff'd, 847 F. App'x 7 (D.C. Cir. 2021) (same).

Defendants' apparent position—that discrimination in the pre-employment process is categorically beyond the reach of the antidiscrimination laws—cannot be reconciled with statutory text, statutory intent or basic morality underpinning these laws. It would create an unwarranted gap in protection—a lawless zone—where employers could discriminate freely at the very point where hiring decisions are made. The anti-discrimination laws protect individuals from discrimination at all points in connection with employment and should be interpreted as such; they do not carve out a safe harbor for discrimination before employment formally begins.

**B. Flores Properly Pleaded Disparate Treatment Claims Against the Broncos**

Flores' claims against the Broncos are properly pleaded and are not time-barred. Claims under §1981 are subject to a four-year statute of limitations where such claims were made actionable by the Civil Rights Act of 1991 ("1991 Act"). See Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382 (2004). Prior to the 1991 Act, §1981 covered contract formation claims which were governed by statutes of limitation borrowed from state law. However, the 1991 Act expanded §1981's coverage to include post-contract formation discrimination claims—which carry a four-year limitations period. See Banks-Holliday v. Am. Axle & Mfg., Inc., 2005 WL 189724, at *1 n.2 (W.D.N.Y. Jan. 24, 2005) ("racial discrimination relating to the conditions of employment were not actionable under 42 U.S.C. §1981 . . . Because the petitioners' claims were

cognizable only under a statute enacted after December 1, 1990-*i.e.,* the Civil Rights Act of 1991-they are governed by § 1658's four-year statute of limitations.").

Flores does not allege a mere failure-to-hire claim against the Broncos, which would been a contract formation claim. Rather, Flores alleges in 2019, while employed by the NFL (at that time, as a subordinate coach on the Patriots) he sought advancement to from an assistant coach to a Head Coach position—and in that process was subjected to discriminatory terms and conditions; namely, a discriminatory sham job interview due to his race. ¶¶206-215. While the Patriots and Broncos are different nominal entities, as set forth above, they are both part of a single consolidated employer: the NFL. Flores already had an existing contractual employment relationship with that employer. The Broncos interview concerned advancement within that relationship, not entry into a new one. See supra at §I. Therefore, the alleged discrimination concerned the conditions, privileges, and opportunities of an existing employment relationship with the NFL, making the claim one subject to the four-year limitations period.

For this reason, and others, the Broncos' reliance—like the Giants—almost entirely on failure-to-hire case law (largely at the summary judgment stage) is inapplicable here. See Walsh v. United Cable Tech SVCS Corp., 201 F.3d 434, 434 (2d Cir. 1999) (affirming summary judgment because allegations that plaintiff's "interview 'lacked substance and professionalism' raise[d] no issue of fact that is material to alleged discrimination based on age"); Gaffney v. Dep't of Info. Tech. & Telecommunications, 536 F. Supp. 2d 445, 466 (S.D.N.Y. 2008) (granting summary judgment, in part, because "preselection alone does not sufficiently establish by a preponderance of the evidence that unlawful discrimination was Defendants' real reason"); Burgis v. N.Y.C. Dep't of Sanitation, 798 F. 3d 63, 68 (2d Cir. 2015) (no allegations of discrimination); Sauveur v. Federation of Org., 2019 WL 2994449, at *4-6 (E.D.N.Y. July 9,

2019) (failure to hire context; pro se plaintiff asserted minimal and insufficient allegations); Ndremizara v. Swiss Re Am. Holding Corp., 93 F. Supp. 3d 301 (same).

The Broncos' argument that Flores has failed to allege discriminatory intent fails. He alleged he was subjected to a bogus interview—one that required substantial preparation, use of professional and personal time, interstate travel and an audience in front of senior Broncos personnel—which turned out to be a humiliating, offensive and discriminatory ordeal. The Broncos did not give Mr. Flores a legitimate opportunity to obtain the job and used him as a token due to his skin color. ¶¶206, 211-215. Put another way, the reason Flores was put through such offensive treatment was because he is Black. While the Broncos claim this does not create an inference of discrimination in the hiring *decision*, that ignores the fact that the interview itself was a discriminatory act based on Flores' race. Simply put, no inferences need to drawn—Flores directly alleged that the discriminatory act occurred because of his race. At the pleading stage, this is more than sufficient.

Moreover, as set forth above, the Broncos' discriminatory treatment occurred within the context of the NFL and its teams mistreating Black coaches in innumerable ways with respect to the terms and conditions of employment over the course of decades, as established both through specific incidents and statistical evidence. Contrary to the Broncos' preference that all these allegations be ignored, other employees' experiences with discrimination is often discoverable in employment discrimination actions—even where those employees work in different locations, under different supervisors and different circumstances. See Hollander v. Am. Cyanamid Co., 895 F.2d 80, 84 (2d Cir. 1990) ("It is well-settled that an individual disparate treatment plaintiff may use statistical evidence regarding an employer's general practices at the pretext stage to help rebut the employer's purported nondiscriminatory explanation. . . . Evidence relating to

company-wide practices may reveal patterns of discrimination against a group of employees, increasing the likelihood that an employer's offered explanation for an employment decision regarding a particular individual masks a discriminatory motive."). Whether and to what extent other acts of discrimination are *admissible at trial* is a fact-based determination following an evidentiary review. See Sprint/United Management Co. v. Mendelsohn, 552 U.S. 379, 381-82 (2008) (on motion in limine, whether "evidence of discrimination by other supervisors is relevant in an individual [discrimination] case is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case. "). At the pleading stage, Flores' allegations are appropriately considered.

Moreover, Flores alleges far more than a "generalized" history of discrimination. As detailed above, the public admissions confirming the double standards for Black candidates, Defendants' clear practice of conducting sham interviews for minority candidates, Defendants' failure to hire minority candidates on a level that is statistically improbable to not be motivated by discrimination—are more than sufficient circumstantial evidence to support a plausible inference of discrimination. ¶¶24, 114, 135-52, 181-215, 278-297. Thus, this case is readily distinguishable from those relied upon by Defendants to support the assertion that Plaintiff has merely anchored his claims to the discriminatory treatment of others. See Farmer v. Shake Shack Enterprises, LLC, 473 F. Supp. 3d 309, 328 (S.D.N.Y. 2020) (plaintiff's "subjective belief that her firing was motivated by her race" and the termination of other African American employees "based on circumstances unconnected to [plaintiff] d[id] not, without more, suggest that her termination was racially animated."); Rubert v. King, 2020 WL 5751513, at *7 (S.D.N.Y. Sept. 25, 2020) (plaintiff's conclusory allegations "that he was 'fired because defendants saw

him as another expendable Hispanic,' and that 'Walmart has a history of discrimination and illegal conduct,'" were considered "'boilerplate assertion[s]' unsupported by specific facts.").

Finally, while §1981 has a "but for" standard, that does not require proof that race was the "only" cause of the employer's action. Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846, n.5 (2d Cir. 2013) ("a plaintiff's injury can have multiple 'but—for' causes, each one of which may be sufficient to support liability. "). Thus, at the pleading stage, a plaintiff need only plausibly allege facts from which it can be inferred that retaliation would not have occurred absent protected activity. See e.g. Marcus v. Leviton Mfg. Co., 661 F. App'x 29, 32 (2d Cir. 2016) (summary order). However, and regardless, Plaintiff has specifically alleged that the "but for" reason he was subjected to a discriminatory interview was because of his race.

**C. Flores Properly Pleaded Application of NYSHRL and NYCHRL**

To state a claim under the NYSHRL and NYCHRL, a non-resident plaintiff need only "plead and prove that the alleged discriminatory conduct had an impact in New York State (as to the NYSHRL) or New York City (as to the NYCHRL)." Hoffman v. Parade Publications, 15 N.Y.3d 285, 289 (2010). Courts have a "mandate" to construe the NYSHRL and NYCHRL "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." Syeed v. Bloomberg, L.P., 41 N.Y.3d 446, 451 (2024). The term "impact" was not further defined by Hoffman. However, its plain meaning is broad and should be read as such to carry out the remedial intent of the law. See Mihalik, 715 F.3d at 109 (NYCHRL should be "construed liberally for the accomplishment of the uniquely broad and remedial purposes").

Here, Flores' claims against the NFL, Giants, Texans and Broncos have numerous impacts in New York State and New York City. The NFL's global headquarters is in New York City, which is where all business operations of all 32 teams are centralized. ¶¶37, 367. The

NFL's League office in New York is responsible for collecting, reviewing and overseeing team conduct and compliance with League rules, including but not limited to the Rooney Rule and Anti-Tampering Rules. ¶¶366-367, 379-382. All 32 teams, including the Giants, Texans and Broncos report to the NFL League office in New York City and are subject to the NFL's broad supervisory powers and inextricably intertwined with New York. ¶368. All 32 teams travel to and through New York to play in NFL football games—including the Broncos and Texans. ¶367. Due to the NFL's interconnectivity with New York, the DRPG presumes that any arbitrated dispute will occur either at the NFL's office in New York or the team's local office—and the arbitration of this matter had been administered in New York. Ex. E at §4.1.

The NFL also has significant presence in New York by virtue of three teams that reside and/or are intertwined with New York State and/or City; namely, the Buffalo Bills, New York Jets and New York Giants. The Giants in particular, while physically located in New Jersey, have deep-seated and longstanding ties to New York, as reflected in the franchise's marketing, civic and charitable involvement and the very name it carries. The team is involved in New York based charitable efforts, such as the Gridiron Gala, an annual gala that has raised more than $36 million to New York City programs.[14] The team frequently partners with various nonprofit organizations located in and benefiting New York City residents.[15] The organization's players are deeply embedded in the New York City community—participating in youth programs across Harlem, Far Rockaway and the Bronx, serving holiday meals at the Good Bank's Harlem

---

[14] "About the Gridiron Gala," United Way NYC, available at: https://unitedwaynyc.org/gridirongala/about.

[15] See e.g., Dan Salomone, "Giants partner with NYC Police Foundation to help build a safe city together," Giants.com (Dec. 31, 2020), available at: https://www.giants.com/news/giants-partner-with-nyc-police-foundation-to-help-build-a-safe-city-together; Matt Cltak, "Giants continue support of New York Gay Flag Football League," Giants.com (Jun. 25, 2025), available at: https://www.giants.com/news/giants-continue-support-of-new-york-gay-flag-football-league-2025-hall-of-fame-induction.

kitchen, and headlining events in Madison Square Garden.[16] The ticker-tape parades after the Giants won the Super Bowl in 2008 and 2012 were in Manhattan.[17] The team is legally titled as the "New York" Giants, originally established in New York City, playing its first three decades in Manhattan and the Bronx.[18] Notably, after John Harbaugh was hired as Head Coach of the Giants in 2026, he said in a press conference it was "a new chapter *in New York*" and that his "one mission" as coach was "to become, to earn the right, to be called the world champions in New York."[19] He pledged "a relentless commitment to this organization, this city [New York City] and the fans to do things the right way." Id.

Finally, the protected activity (the filing of this action) that serves as the predicate for Flores' retaliation claims against the Texans and NFL occurred in New York. Protected activity is, of course, "essential" to any retaliation claim. See Gonzalez v. NYU Langone Hospitals, 2022 WL 4372199, at *2 (2d Cir. Sept. 22, 2022). Had Flores not engaged in protected activity in New York, material aspects of this action would not even exist.

For these reasons, the alleged discrimination and retaliation against Flores by all Defendants, has and will have an impact in New York. Flores, had he obtained any of the Head

[16] See "Giants Inspire Change," Giants.com, available at: https://www.giants.com/community/inspirechange (Harlem and Far Rockaway youth programs, Food Bank Harlem meal service, and MSG boxing event); "Introducing the Bronx Giants," N.Y.C. Police Found., https://www.nycpolicefoundation.org/nycpf-news/introducing-the-bronx-giants/ (2025 Bronx program expansion); Dean Moses, "NYPD Sets Up Playdate with New York Giants and Harlem Youth," amNewYork (Sept. 21, 2022), available at: https://www.amny.com/news/nypd-sets-up-playdate-with-new-york-giants-and-harlem-youth/ (players leading Harlem youth drills); "NYPD Community Affairs Bureau Second Annual. . . Football Awards Banquet," NYC Police Found. (Aug. 29, 2023), available at: https://www.nycpolicefoundation.org/nycpf-news/nypd-community-affairs-bureau-second-annual-far-rockaway-harlem-giants-football-awards-banquet/.

[17] Jaunted, "The Giants' Ticker-Tape Parade Will Be Held Tomorrow In Lower Manhatten," Business Insider (Feb. 6, 2021), available at: https://www.businessinsider.com/the-giants-ticker-tape-parade-will-be-held-tomorrow-in-lower-manhattan-2012-2.

[18] "New York Football Giants: The Early Years," giants.com, available at: https://www.giants.com/photos/new-york-football-giants-the-early-years#132d69a1-09d5-4473-8528-1d7042fc723a (last visited Jul. 20, 2026).

[19] Jesse Zanger & Allen Devlin, "New York Giants Introduce John Harbaugh as Head Coach," CBS N.Y. (Jan. 20, 2026), available at: https://www.cbsnews.com/newyork/news/new-york-giants-john-harbaugh-head-coach-first-press-conference/.

Coach jobs in question, would have been traveling to New York for business and would have been working for entities controlled and governed out of New York City. If he had obtained the job with the Giants, he would have been working for a *bona fide* New York entity, even if its legal headquarters are based in New Jersey. See Syed, 41 N.Y.3d at 454 (holding that a nonresident who is discriminatorily denied a job opportunity that would have an impact in New York satisfies the Hoffman impact requirement).

In isolation, any one of the facts set forth above might be insufficient, but taken as a whole, should be satisfactory at the pleading stage. In fact, whether a particular set of circumstances has a sufficient New York impact is typically decided at summary judgment not on the pleadings. See E.E.O.C. v. Bloomberg L.P., 967 F. Supp. 2d 816 (S.D.N.Y. 2013) (summary judgment stage); Fried v. LVI Servs., Inc., 2011 WL 4633985, at *14 (S.D.N.Y. Oct. 4, 2011), aff'd, 500 F. App'x 39 (2d Cir. 2012) (summary judgment stage); Vangas v. Montefiore Med. Ctr., 823 F.3d 174, 177 (2d Cir. 2016) (post-trial motion).[20]

**D. Flores Properly Pleaded Disparate Treatment Claims Against the NFL**

Flores alleges that intentional discrimination is embedded in the NFL's league-wide hiring system that the NFL designs, oversees, regulates, and administers. The NFL's liability does not depend on Flores identifying one centralized decisionmaker who personally engaged in the discriminatory conduct with respect to each employment decision. Rather, Flores alleges that the NFL maintains and perpetuates an integrated hiring system in which intentional race discrimination is the regular operating practice.

[20] The NFL's reliance on Trotter v. National Football League, 737 F. Supp. 2d 172, 192 (S.D.N.Y. 2024) is misplaced as the plaintiff was an employee (or potential employee) of the NFL's media arm and not an NFL team, let alone a New York-based franchise like the New York Giants as is the case here.

For the same reasons that Flores properly asserted claims against the Giants and Broncos, and due to the well-pleaded allegations that the NFL is a single and/or joint employer with those teams, claims have been properly asserted against the NFL. Arculeo, 425 F.3d at 198 ("an employee, who is technically employed on the books of one entity, which is deemed to be part of a larger 'single-employer' entity, may impose liability for certain violations of employment law not only on the nominal employer but also on another entity comprising part of the single integrated employer") (citing Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1240–41 (2d Cir. 1995)).

The NFL's cited cases for its lack of direct participation in the Giants, Broncos or Texans' conduct as precluding the viable of claims against the NFL simply ignores the allegations of single and/or joint employer liability and assumes those allegations do not exist. See NFL Br. at 18 (citing Stefanoni v. Darien Little League, Inc., 101 F. Supp. 3d 160, 182-83 (D. Conn. 2015) (no allegations of joint or single employer); Francis v. Kings Park Manor, Inc., 992 F.3d 67, 80 (2d Cir. 2021) (same)). That is, where intentional discrimination is established by any of the teams, the NFL is liable for that conduct if it is found to be a single or joint employer.

The NFL's argument that Plaintiff's allegations regarding systemic discrimination towards Black coaches (and players) is irrelevant is also misplaced and based on faulty, misstated authority. See NFL Br. at 18-19 (citing Farmer, 473 F. Supp. 3d at 328; Rubert, 2020 WL 5751513, at *7, distinguished above). As discussed above, discrimination towards others within the same organization may be admissible at trial and is certainly plausible for consideration at the pleading stage. See supra at §II(B); see also Barrett v. Forest Lab'ys, Inc., 39 F. Supp. 3d 407, 430 (S.D.N.Y. 2014) ("It follows that allegations of a sufficient number of

instances of discrimination may permit a plausible inference that discrimination was the defendant's standard operating procedure, even if the defendant is a multinational company.").

The NFL is also wrong that Plaintiff's pleaded statistics are insufficient because they rely on "raw percentages" without details about the size and qualifications of the relevant applicant pool. NFL Br. at 21–22. Not only is it an incorrect description (the statistics at hand involve numerous methodologies, variables and controls and rely on standard deviations), but the NFL cites a line of cases where cases were dismissed based on allegations of "statistics alone" and where such statistics were nothing more than raw percentages. See Burgis, 798 F.3d at 69 (dismissing discrimination claim where complaint included no allegations of discriminatory intent and relied exclusively on raw statistics alone, without any controls); Raymond v. City of New York, 317 F. Supp. 3d 746, 762 (S.D.N.Y. 2018) (same; dismissing claims based on raw statistics alone); Alameda v. Ass'n of Soc. Work Boards, 2024 WL 4302389, at *5 (S.D.N.Y. Sept. 25, 2024) (same); Rosario v. Town of Mount Kisco, 2020 WL 764280, at *8 (S.D.N.Y. Feb. 14, 2020) (same).

Here, statistical evidence is coupled with numerous allegations of intentional discrimination directed not only at Flores, but also at co-Plaintiffs Wilks and Horton, as well as several other Black coaches. ¶¶237-97, 317-59. Plaintiff further alleges that this discrimination has pervaded the NFL for decades, prompting the NFL to adopt the Rooney Rule and other initiatives expressly intended to address longstanding racial disparities. ¶¶117-120. Indeed, even NFL officials have publicly acknowledged the existence of racial discrimination within the League. ¶¶114, 116. Accordingly, for this reason alone, the line of cases addressing "statistics alone" is inapplicable. Moreover, Plaintiff's statistical allegations do not consist of mere "raw percentages" discussed in the cited line of cases. Rather, they include multiple statistical

analyses employing a variety of controls and variables, including regression analyses yielding statistically significant standard deviations. ¶¶135-40.

### E. Flores Properly Pleaded Pattern-or-Practice Theory of Disparate Treatment

Disparate treatment may be established through an individual claim of intentional discrimination or through a pattern-or-practice theory. Reynolds, 685 F.3d at 202. A pattern-or-practice claim "is not a separate and free-standing cause of action[], but is really merely another method by which disparate treatment can be shown." United States v. City of N.Y., 717 F.3d 72, 83 (2d Cir. 2013).

To survive a motion to dismiss where disparate treatment claims are predicated on a pattern-or-practice theory, a plaintiff need only plausibly allege facts showing that "racial discrimination was the company's standard operating procedure." Id. The pleading "burden in a class-wide pattern or practice case is heavier in one respect and lighter in another respect than the burden in an individual case." Frazier v. Morgan Stanley, 2018 WL 11585450, at *10 (S.D.N.Y. Nov. 29, 2018). "On one hand, the burden is heavier because the plaintiff must make a showing of a pervasive policy of intentional discrimination, rather than demonstrating a single instance of discriminatory treatment." However, "[o]n the other hand, the burden [] is lighter in that the plaintiff need not initially show discrimination against any particular present or prospective employee—although instances of discrimination against particular employees are relevant to show a policy of intentional discrimination, they are not required, and a statistical showing of disparate impact might suffice." Id. (cleaned up; citing cases).

Courts have stated that "while statistical evidence need not be pled in order to survive a motion to dismiss, allegations of statistical disparities go a long way toward making such a claim plausible." Frazier, 2018 WL 11585450, at *11 (citing Barrett, 39 F. Supp. 3d at 429). And,

when a plaintiff is "proceeding against an employer without statistical evidence, courts have found, 'at least when there is a small number of employees, anecdotal evidence alone can suffice' to survive summary judgment." Id.

Here, Plaintiff has provided an array of allegations of intentional discrimination consistent with a pattern or practice and statistical evidence demonstrating the same. The Complaint plausibly alleges that the NFL's standard operating procedure has been to administer and oversee a League-wide hiring ecosystem in which all 32 clubs compete for the same coaching candidates under a common framework of rules, policies, reporting obligations, and oversight mechanisms (including, but not limited to, the Rooney Rule), while knowingly permitting discriminatory hiring practices to persist throughout that ecosystem. ¶¶121–24. Plaintiff has plausibly alleged that discrimination was the NFL's regular practice because the Complaint alleges: (i) a League-wide hiring ecosystem governed by common rules and oversight; (ii) repeated instances of alleged discrimination affecting multiple Black coaches across multiple clubs and hiring cycles; (iii) detailed statistical disparities; (iv) admissions by NFL officials acknowledging systemic discrimination and a "double standard"; (v) evidence of sham interviews and circumvention of League hiring requirements; and (vi) the NFL's repeated failure to investigate or remedy known discriminatory practices.

Taken together, those allegations are sufficient at the pleading stage. See e.g. City of N.Y, 717 F.3d at 87–88 (at summary judgment, recognizing that a pattern-or-practice claim may be established through statistical disparities, evidence of longstanding minority underrepresentation, and other evidence supporting an inference that intentional discrimination was the employer's regular practice); Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 158–60 (2d Cir. 2001) (at the class-certification stage, explaining that plaintiffs may

establish a prima facie pattern-or-practice case through gross statistical disparities and testimony detailing specific instances of discrimination, where plaintiffs alleged that discretionary employment decisions were exercised in a racially discriminatory manner).

The NFL argues that the Complaint's specific instances of race discrimination "stem from the decisions and actions of individual" clubs and not from any "intentionally discriminatory policy or practice" by the NFL more broadly. NFL Br. at 20. However, the cases relied upon by the NFL are completely disanalogous to the present case. See Frazier, 2018 WL 11585450, at *11 (dismissing claims based on pattern or practice method of proof where plaintiffs alleged no statistics and recited "near-verbatim, boilerplate accounts" of seven experiences from a pool of 16,000 employees); Idrees v. City of N.Y. Dep't of Parks & Recreation, 2005 WL 1026027, at *7 (S.D.N.Y. May 3, 2005) (single plaintiff "made only conclusory allegations that his treatment was the result of a systematic discriminatory policy" based on the fact that the defendant was "known to discriminate" and named in several "pending discrimination lawsuits."); Craig v. Yale Univ. Sch. of Med., 2013 WL 789718, at *10 (D. Conn. Mar. 4, 2013) (on summary judgment; "the probative evidence of discrimination [was] confined . . . [to] individual incidents"). Together, the NFL's cited authority stands for the unremarkable proposition that pattern or practice method of proof requires more than isolated accounts at the pleading stage. By the NFL's own cited standards, the matter at bar is sufficiently pleaded.

Finally, the NFL incorrectly argues that the Complaint's acknowledgment that "numerous Black coaches were and continue to be hired into coaching and front office positions" undermines any inference that intentional discrimination is the NFL's standard operating procedure. See NFL. Br. at 21. However, the occasional incident of non-discrimination in the hiring of Black coaches does not change that Plaintiff has alleged a practice within the NFL that

has demonstrably disparate results, is frequently corrupted by sham compliance and where the NFL's own executives have publicly described a "double standard" requiring systemic reform is precisely the issue. ¶¶114, 116. The Second Circuit has not required that a policy result in complete exclusion of all members of a protected group to constitute a pattern or practice of discrimination and the NFL has cited no such authority. See Reynolds, 685 F.3d at 203 ("the plaintiffs are 'not required to offer evidence that each person [who] will ultimately seek [individualized] relief was a victim of the employer's discriminatory policy' in order to prevail in the liability phase."). Accordingly, the existence of some successful Black candidates does not defeat a plausible inference that disparate treatment within the NFL is the result of a pattern or practice of discrimination.

## III. Flores Properly Pleaded Disparate Impact Claims

Title VII's disparate impact provision, codified at 42 U.S.C. § 2000e-2(k)(1)(A)(i), makes it unlawful for an employer to use a particular employment practice that causes a disparate impact on a protected group, unless the employer demonstrates that the challenged practice is job related and consistent with business necessity. Mandala v. NTT Data, Inc., 975 F.3d 202, 208 (2d Cir. 2020). At the pleading stage, to set forth a sustainable disparate impact claim, a plaintiff need only plausibly "(1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." Id. at 207; Chin v. Port Authority of N.Y. & N.J., 685 F.3d 135 (2012).

### A. Flores Has Identified a Specific Employment Practice

The NFL's standardized Head Coach hiring process constitutes a specific employment practice for purposes of Title VII disparate-impact analysis. That process consists of the NFL's League-wide rules governing Head Coach recruitment, interviews and hiring—including the

Rooney Rule, the Hiring Policy, the Anti-Tampering Policy and related reporting requirements and pipeline initiatives—which operate in conjunction with the discretionary authority exercised by team decisionmakers. These are not isolated features but operate together as an integrated practice. See Chin, 685 F.3d at 154 ("Whether a particular decisionmaking process is capable of separation for analysis largely turns on the details of the specific process and its implementation in a given case."). And "[n]othing in Title VII suggests that a plaintiff must make that showing at the pleading stage, without the benefit of discovery." Tolton v. Day, 2020 WL 2542129, at *23 (D.D.C. May 19, 2020); Chin, 685 F.3d at 155 (finding inseparability using trial record).

It is widely known and acknowledged that the NFL's Head Coach hiring practices have had a disparate impact. In fact, the Rooney Rule was implemented—and over time modified to strengthen it—specifically to address the disparate impact that has been ongoing for decades and that the League needed to address. ¶¶114-124. As alleged, the NFL's own senior executives have acknowledged the "double standard" for white and Black coaches in the NFL. ¶¶114, 116. Goodell himself has even conceded that the NFL "must acknowledge that particularly with respect to head coaches, the results have been unacceptable." Id. at ¶116. It is not surprising that this hiring process has led to disparate impact when virtually all NFL owners are white and there is a dearth of Black senior executives in NFL teams or the League office. ¶¶133, 153-157.

Numerous cases in the Second Circuit and other circuits hold that an unchecked, subjective decision-making process—leading to disparate results for protected classes—can be actionable as a specific employment practice. See e.g. Watson v. Fort Worth Bank & Tr., 487 U.S. 977, 977 (1988) (under evidentiary standard, finding a facially neutral policy where plaintiffs alleged that the employer "had not developed precise and formal selection criteria for the positions, but instead relied on the subjective judgment of white supervisors who were

acquainted with the candidates and with the nature of the jobs"); Rodriguez v. Town of Ramapo, 412 F. Supp. 3d 412, 439 (S.D.N.Y. 2019) (holding that allegations "that there is no objective performance rating system in the Highway Department, that this allows for subjective assessments by Caucasian managers, and that these assessments are disproportionately unfavorable to minorities" were sufficient to state a disparate impact claim); Martin v. Coinmach Corp., 2016 WL 6996182, at *6 (S.D.N.Y. Nov. 29, 2016) (holding that a "company's policy of making all merit increases dependent entirely on the discretion of a white supervisor, in the absence of any objective criteria to cabin or direct that individual's judgment is a 'specific employment practice'" for purposes of a disparate impact claim); Gamble v. Kaiser Found. Health Plan, Inc., 348 F. Supp. 3d 1003, 1023 (N.D. Cal. 2018) ("[P]laintiffs' allegations of a completely arbitrary and subjective system for making employment decisions including promotions are sufficient to state a claim."); see also; McClain v. Lufkin Indust., Inc., 519 F. 3d 264 (5th Cir. 2008); Tabor v. Hilti, Inc., 703 F. 3d 1206 (10th Cir. 2013); Davis v. District of Columbia, 925 F. 3d 1240 (D.D.C. 2019); McReynolds v. Sodexho Marriot Services, Inc., 349 F. Supp. 2d 1 (D.D.C. 2004); cf. McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 672 F.3d 482, 489 (7th Cir. 2012) ("If the teaming policy causes racial discrimination and is not justified by business necessity, then it violates Title VII as "disparate impact" employment discrimination—and whether it causes racial discrimination and whether it nonetheless is justified by business necessity are issues common to the entire class and therefore appropriate for class-wide determination.").

It is perplexing that Defendants argue no specific employment practice was identified when it is explicitly described in the Complaint and even recognized by Defendants in their respective moving papers. See e.g. NFL Br. at 23. Despite acknowledging the allegations, the

NFL opted not to even engage with Plaintiff's theory of the case at all, attempting to dispatch with a misarticulated version of the practice alleged in a single conclusory sentence. See id. ("Moreover, the allegation that each club employs its own 'discretionary, subjective hiring practice when selecting Head Coaches' undermines any conclusory claim that an NFL-wide hiring policy has had a disparate impact on Black candidates."). Incredibly, despite a voluminous body of case law confirming that discretionary employment practices may be actionable under a disparate impact theory—literally *none* of the cases cited above were referenced, distinguished or otherwise addressed by *any* of the Defendants.

Defendants collectively attempt to argue that the facially neutral policy at issue is the Rooney Rule. See NFL Br. at 24; Dkt. No. 282 ("Broncos Br.") at 20 (same); Dkt. No. 290 ("Giants Br.") at 18 (same). But this is a misread of the Complaint as Plaintiff never alleged the Rooney Rule as the predicate for the disparate impact claims; rather, the Rooney Rule is cited as evidence that the NFL and its teams recognized the discriminatory effects of its discretionary hiring system—and yet failed to cure them. It is also just one piece of evidence that League-wide rules govern the hiring process across all 32 NFL teams. The Rooney Rule cannot be simply pulled out and analyzed separately.

Finally, the few cases collectively cited by Defendants for the proposition that the articulated facially neutral practice is insufficient at the pleading stage are all off the mark. See Byrnie v. Town of Cromwell, 243 F.3d 93, 111 (2d Cir. 2001) (summary judgment decision; dismissing plaintiff's disparate impact claims where the plaintiff "fail[ed] to suggest what specific employment practice accounts for" alleged age discrimination beyond an outdated guide); Hill, 2024 WL 3361216, at *6 (dismissing disparate impact claim where sole policy alleged was "delegation of anti-discrimination compliance to managers at the Club level");

Doheny v. Int'l Bus. Machines, Corp., 714 F. Supp. 3d 342, 364-65 (S.D.N.Y. 2024) (dismissing disparate impact claim where alleged policy was that the employer "target[ed] older employees for layoff"); Rodriguez v. Beechmont Bus Serv. Inc., 173 F. Supp. 2d 139, 148 (S.D.N.Y. 2024) (dismissing disparate impact clam where plaintiff "argue[d] not that he fell victim to a neutral policy but that he was subjected to deliberate discriminatory conduct" and failed to allege any supportive statistics); Davis v. Cintas Corp., 717 F.3d 476 (6th Cir. 2013) (class certification stage).

Here, the Complaint provides extensive factual support for the specific practice challenged: the League-wide system of unfettered, discretionary hiring, overlaid with NFL-mandated rules and reporting requirements, administered through a closed ecosystem of teams and candidates. And it describes in detail how Black coaches, including Plaintiff, have been disproportionately affected by the NFL's system for decades, and that the NFL itself has admitted that its system has produced "unacceptable" results in this regard.

### B. Flores Has Alleged That a Racial Disparity Exists

A disparate impact plaintiff typically relies on statistics to show the requisite disparity. Mandala, 975 F.3d at 209. As the Second Circuit has confirmed, the "standard is relaxed at the pleading stage." Id. "For one thing, we do not require a plaintiff to prove in detail the methodological soundness of her statistical assessment to survive a motion to dismiss." Id. (citing John v. Whole Foods Mkt. Gr., Inc., 858 F.3d 732, 737 (2d Cir. 2017)). Moreover, "we do not expect a complaint to supplement its statistical analysis with corroborating evidence. Id. Rather, the statistics need only plausibly "suggest that the challenged practice *actually* has a disparate impact." Id. (citing Adams v. Indianapolis, 742 F.3d 720, 733 (7th Cir. 2014)).

Several courts even hold that at pleading stage, before the benefit of discovery, a disparate impact plaintiff need not even present such statistical evidence. Jenkins v. New York City Transit Authority, 646 F. Supp. 2d 464, 469 (S.D.N.Y. 2009) ("To the extent the defendants' argument is that a plaintiff must provide statistical support for a disparate impact claim in order to survive a motion to dismiss, that argument is incorrect. It would be inappropriate to require a plaintiff to produce statistics to support her disparate impact claim before the plaintiff has had the benefit of discovery"); Barrett, 39 F. Supp. 3d at 436 ("the Court rejects th[e] argument . . . that Plaintiffs cannot state a plausible [disparate impact] claim without alleging statistics.").

Nonetheless, Plaintiff has provided a wealth of statistical data. The Complaint's proffered statistics are more than adequate at the pleading stage because they provide the type of "relevant comparison" that courts routinely hold to be sufficient. "In a typical case concerning racially discriminatory hiring policies, the relevant comparison is between 'the racial composition of the at-issue jobs and the racial composition of the qualified population in the relevant labor market.'" Mandala, 975 F.3d at 210. The Complaint provides exactly that:

- The Complaint provides statistical allegations setting forth that between 2015 and 2022, 111 Head Coaches were interviewed, 29 of whom were Black. During that time, 51 Head Coaches were hired. A race neutral process would have led to an expected outcome of 13 Black Head Coaches being hired. However, the outcome was only seven. ¶¶135-36.

- Other analyses, set forth in the Complaint, confirm the same. When controlling for unique candidates by year—that is, re-counting the same person who interviewed for each year the person interviews—seven candidates were hired out of 60 Black candidates. Under this form of analysis, a race-neutral process would be expected to yield 16 Black hires. The probably of seven or fewer Black candidates being hired using this analysis would be 0.1% or 3.09 standard deviations. Thus, a second analysis creates an even stronger statistical case of disparity. ¶137.

- The Complaint presents further analyses, which accounted for counting each candidate for each job for which they interviewed. In total, there were 327 unique candidate interviews, of which 106 were Black candidates. Under this approach, a race-neutral process would have expected to 18 Black Head Coaches hired. And, the

probability of seven or fewer being hired, would be 0.03%, or 3.42 standard deviations. ¶138.

- Another statistical analysis—conducted by a media organization—was intended to isolate the factors that drove hiring decisions. The data set was limited to the Head Coach finalists during the 2021-22 hiring cycle, and controlled for an array of variables including race, age, years as a Head Coach or coordinator, win-loss record of recent team, Elo score of recent team, and SRS score of recent team. During that hiring cycle, 53.8% of white candidates were offered jobs whereas only 16.7% of non-white candidates were hired. The study showed that "the most statistically significant difference between the groups *by far* was race." ¶140.

As a matter of law, each of these statistical disparities would alone be more than sufficient. See e.g. Malave v. Potter, 320 F.3d 321, 327 (2d Cir. 2003) (in context of disparate impact claims in an employment discrimination action, "[a statistical significance of two standard errors or more is] sufficient to warrant an inference of discrimination.").

While those allegations would be more than enough, Plaintiff also set forth additional allegations that hiring processes result in disparate outcomes for other coaches and executives. Offensive and Defensive Coordinator positions—the highest-level coach below Head Coach and the primary pipeline for new Head Coaching candidates—have racially disparate rates as well. As of the Complaint, only 12.5% and 34% of Offensive and Defensive Coordinators, respectively, were Black. Moreover, from 2012 through 2021, approximately 80% of Head Coach hires were previously in Offensive or Defensive Coordinator roles. And, the same is happening at the General Manager level, where only 18.75% of those positions were filled by Black individuals. ¶¶147-152. This data only further bolsters Plaintiff's allegations at this stage.

Defendants do not even attempt to address any of these statistics or the case law analyzing this prong of a disparate impact claim against the NFL. See NFL Br. at 22-24 (no discussion of sufficiency of the pleaded statistics); Broncos Br. at 19-21 (same); Giants Br. At 19-21 (same) at Dkt. No. 287 ("Texans Br.") at 22-23 (same). In fact, the NFL effectively concedes that the statistics are sufficient so long as a facially neutral policy has been alleged.

See NFL Br. at 23-24 ("Nor can the Complaint's statistical allegations substitute for the required identification of a facially neutral policy that results in the alleged disparate impact.").[21]

## IV. Flores Properly Pleaded Retaliation Claims Against the Texans and NFL

### A. Applicable Standards

To plead a retaliation claim under Title VII or §1981, a plaintiff need only plausibly allege "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." Littlejohn v. City of New York, 795 F.3d 297, 315-16 (2d Cir. 2015). The pleading burden has been repeatedly described as "minimal." McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001). As to the adverse action prong, a plaintiff need only show that the challenged action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

Here, the protected activity at issue is the filing of this lawsuit, which neither the NFL nor the Texans argue is not protected, nor could they. See Alvarez v. City of N.Y., 31 F. Supp. 2d 334, 343–44 (S.D.N.Y. 1998) ("Title VII (and the analogous state and city anti-discrimination laws) protect against retaliation for filing a discrimination claim or otherwise opposing a discriminatory practice."). Rather, their defenses focus on adverse action and causation. For the reasons set forth below, these arguments fail.

### B. Flores Pleaded Retaliation Against the Texans for Post-Filing Conduct

Flores alleged that prior to filing this lawsuit he was a finalist for the Texans' Head Coach position. There was no suggestion that Lovie Smith was in contention for the Texans' position.

---

[21] Neither the NFL nor any of the teams argue that Plaintiff failed to sufficiently plead the causal relation prong of a disparate impact claim. See e.g. NFL Br. at 22-25 (no discussion of causal relation prong).

After her filed this lawsuit, the Texans removed Flores from consideration for the position. And, although the Texans had already been through an entire slate of interviews and had narrowed down the list to three finalists, they abruptly interviewed Smith and ultimately hired him. ¶¶220-25.

The temporal proximity between Flores' protected activity (the filing of this case on February 1, 2022) and the adverse action (his exclusion from consideration and ultimately not being hired on February 8, 2022) is one week. ¶¶218, 225. This one-week temporal relationship alone easily suffices to demonstrate causation at the pleadings stage. Nagle v. Marron, 663 F.3d 100, 111 (2d Cir. 2011) ("While we have not 'drawn a bright line' defining the maximum time period that can give rise to an inference of causation, six weeks fits comfortably within any line we might draw").

The Texans argue that the temporal proximity is insufficient to establish "but for" causation where the adverse action was a natural result of a process previously in progress. This argument requires disregard of the Complaint's allegations. As alleged, there was no "natural progression" that led to Smith's hiring; rather, it was specifically alleged that an abrupt change was made to the process—removing Flores from consideration and adding Smith to consideration—due to Flores filing this lawsuit. Moreover, adding only further interference of retaliatory intent, the Texans were already under scrutiny for having just terminated David Culley (a Black Head Coach) after just one season, ¶¶ 328-335,[22] and the NFL has a record of retaliation against others who raise complaints of race discrimination. ¶298-312.

---

[22] There was broad public scrutiny of the Texans' decision to fire Mr. Culley after one season as a continuation of the NFL's longstanding discrimination towards Black coaches. See, e.g., Nancy Armour, "Opinion: Another Black coach is fired, and the NFL goes on acting like it's inclusive," USA Today (Jan. 13, 2022); Mark Maske, Texans fire David Culley after one season, leaving NFL with one Black head coach," Washington Post (Jan. 13, 2022).

Of course, the Texans also misunderstand "but for" causation. At the pleading stage, "but for" does not require more than a plausible allegation setting forth the elements of the claim. See Anderson v. City of N.Y., Health & Hosp. Corp., 2017 WL 9538862, at *10 (S.D.N.Y. Jan. 19, 2017) (stating on motion to dismiss, "[t]o the extent Defendants argue that Plaintiff has failed to plead a but-for connection between the alleged adverse acts and Plaintiff's protected activity, their argument is premature."). And, the cases cited by Defendants applied a summary judgment standard (to distinguishable facts). See Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001) (summary judgment); Bamba v. United States Dep't of Homeland Sec., 2024 WL 3924810, at *1 (S.D.N.Y. Aug. 23, 2024) (same); Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001) (same).

The Texans' argument that Smith was qualified for the coaching position hardly undermines the inference that Smith (who had not engaged in protected activity) was hired over Flores (who had) because of retaliatory animus. See, e.g., DeCintio v. Westchester Cnty. Med. Ctr., 821 F.2d 111, 116 n.8 (2d Cir. 1987) ("In the event, however, that appellees were motivated by retaliatory animus in instituting the [] proceeding, Title VII would be violated even though there were objectively valid grounds for the proceeding . . ."); Broich v. Inc. Vill. of Southampton, 462 F. App'x 39, 46 n.4 (2d Cir. 2012) ("That the [defendant] had sufficient justification to [engage in adverse action at issue against plaintiff] does not resolve the question of whether they would in fact [have done so] in the absence of retaliatory animus.").

### C. The NFL Is Also Liable for the Decision Not to Hire Flores

A defendant is liable for the retaliation of a joint employer where "the defendant knew or should have known of the discriminatory [or retaliatory] conduct and … it failed to take those corrective measures within its control." Caldwell v. ServiceMaster Corp., 966 F. Supp. 33, 46

(D.D.C. 1997); see also Lima, 634 F. Supp. 2d at 400 ("[C]ourts have found that even when a plaintiff establishes an entity's status as part of a joint employer, the plaintiff must still show that the joint employer knew or should have known of the [discriminatory] conduct and failed to take corrective measures within its control."). Here, the NFL was on direct notice that Flores alleged discrimination and retaliation against the League and its teams only to sit back and watch as Flores was retaliated against by the Texans. Likewise, "lower court decisions within the Second Circuit hold[] that, in employment retaliation cases, separate entities may be held liable as a plaintiff's employer where . . . [they are] part of a single integrated enterprise." United States ex rel. Aharon v. Nuvance Health, Inc., 2025 WL 968583, at *17 (S.D.N.Y. Mar. 31, 2025).

### D. Flores Pleaded Retaliation Against the NFL for Interfering with and Preventing Him from Pursuing His Claims

The NFL's post-filing conduct also constitutes unlawful retaliation. Here, for the portion of Flores' claims initially compelled to arbitration, the NFL was in the position of simultaneously being Flores' former employer and, ostensibly, arbitrator and arbitral forum. However, the Second Circuit fully rejected the proposition that the proceedings the NFL purported to control constituted arbitration at all.

As alleged, the NFL—Flores' employer—acted through Goodell as bogus a "arbitrator" to interfere with Flores' pursuit of his claims. ¶¶298-309. The conduct of the NFL in connection with this sham arbitration demonstrated that it was "determined to ensure that Plaintiffs [did] not receive a fair process for adjudication of their claims." ¶298.

As one example alleged, although the arbitration agreement at issue dictated that discrimination claims should be transferred into a legitimate arbitration forum (JAMS), Goodell unilaterally determined, contrary to legitimate reason, that the dispute should remain under the control of the NFL where he could retain ultimate control and ferry the case to as biased

arbitrator, Harvey. ¶¶299-302. In fact, the Second Circuit agreed that not only was Goodell not a legitimate arbitrator but that this decision was bogus. Flores, 150 F.4th at 185; see also Flores v. Nat'l Football League, 2026 WL 407884, at *7 n.11 (S.D.N.Y. Feb. 13, 2026) ("As observed by the Second Circuit, appointing Mr. Harvey as the arbitrator was 'facially inconsistent' with the DRPG.").

Harvey, in turn, was plainly conflicted and deployed his authority to grind this case to a halt to benefit the NFL and its teams—and harm Plaintiff's' ability to vindicate their statutory rights. ¶¶302-309. Plaintiffs' own investigation revealed that Harvey held multiple NFL appointments and used his work for the NFL to market himself and his law firm. ¶303. This conflict manifested itself immediately—Harvey refused to provide arbitral disclosures in contravention of statutory law and every established principle of arbitration. ¶¶304-308. By refusing to do so, Harvey also refused to advance the arbitration for almost a year after the initial conference. ¶¶307-09. It was only after Plaintiffs raised Harvey's conduct with the Court that Harvey took any action at all—but he still refused to address the obligatory conflict disclosures. See Dkt. No. 154 at 5-8 (Plaintiffs' counsel describing Harvey's misconduct); Dkt. No. 156; Dkt. No. 160.

In short, the so-called "arbitration" proceedings were nothing more than a sham as was predicted from the start. These sham proceedings were not only intended to deter Flores' pursuit of his claims under the anti-discrimination laws—they actually *did* deter his pursuit of his claims. By virtue of Goodell's initial arbitral determination, Flores was denied a legitimate forum in which his claims could proceed; and then, through Harvey, he was effectively denied *any forum* as Harvey fully refused to advance the claims or comply with the law and provide legally required arbitral conflict disclosures. ¶¶304-307; see also Dkt. No. 154 at 5-8.

Under Burlington, a plaintiff need only plead that an employer's conduct "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S at 77. These maneuvers, cloaked in laughably contorted legalese, sought to completely strip Flores' right to a legitimate means of vindicating his rights. This directly contravenes the Supreme Court's explanation that the purpose of the anti-retaliation provisions is "[m]aintaining unfettered access to statutory remedial mechanisms." Id. at 64. Plainly, the allegations demonstrate that the NFL refused to provide Flores with such unfettered access.

Moreover, we respectfully submit that common sense dictates that an employee would be "dissuaded" from pursuing claims if the only available process were a sham. See Lawson v. Sessions, 271 F. Supp. 3d 119, 140–41 (D.D.C. 2017) (J. K. Jackson) ("This Court has no doubt that, . . . a reasonable employee[might] refrain from engaging the EEO-complaint process out of a concern that a supervisor's interference with the EEO process would render her efforts futile."). Even where employers engage in defensive litigation measures—such as filing sham counterclaims within a legitimate judicial forum—courts have held such conduct can be actionable. See Torres v. Gristede's Operating Corp., 628 F. Supp. 2d 447, 473 (S.D.N.Y. 2008) ("[b]ad faith or groundless . . . legal proceedings against employees who assert statutory rights are actionable retaliation precisely because of their *in terrorem* effect."). Here, of course, the NFL's conduct was not merely intimidating but fully stripped Flores of a legitimate forum to pursue his claims.

The NFL attempts to mischaracterize these retaliation claims as a dispute regarding being forced into one arbitral forum as opposed to another or that the proceedings were delayed. Clearly, that is not the basis for Flores' retaliation claims; as such, the NFL's cited cases are easily distinguishable. See NFL Br. at 29-30; LaFontant v. Citigroup Glob. Markets Inc., 2005

WL 2978944, at *7 (S.D.N.Y. Nov. 4, 2005) (retaliation claims predicated on arbitration being held in NASD as opposed to AAA found insufficient); Gaines v. New York City Transit Auth., 528 F. Supp. 2d 135, 149–50 (E.D.N.Y. 2007), aff'd, 353 F. App'x 509 (2d Cir. 2009) (finding no claim of breach of fair representation by union due to delay in proceedings); Brown v. City of Syracuse, 2008 WL 5451020, at *4 (N.D.N.Y. Dec. 31, 2008) (refusal to settle an arbitration case not actionable conduct).

Nor does arbitral immunity (argued by the NFL in a footnote at p. 28) save the NFL. First, the Second Circuit has already held that what the NFL sought to impose here is "arbitration in name only" that "fails to bear even a passing resemblance to 'traditional arbitral practice.'" Flores, 150 F.4th at 183. It therefore held that the NFL's actions here "lack[] the protection of the Federal Arbitration Act[("FAA")]." Id. at 176. This Court agreed. Flores, 2026 WL 407884, at *7 ("The Second Circuit provided an example of an alternative dispute resolution method: a coin flip. This Court would add the always-exciting dispute resolution method known on playgrounds all over as 'rock-paper-scissors.' Both have procedures, but neither is arbitration. Nor is the process here, even with the addition of the DRPG . . . Paraphrasing Abraham Lincoln: even if you call a tail a leg, a dog has only four legs because calling a tail a leg does not make it a leg."). Even more to the point, Flores has credibly alleged that the NFL (through Goodell and later Harvey), was not acting as an arbitrator but as a former employer engaging in retaliation. At the very least, this creates fact issues that preclude judgment on the pleadings. ¶309 ("Mr. Goodell, in making his initial determination and in delegating the matter to Mr. Harvey, was not acting as a legitimate or bona fide arbitrator but as an actor on behalf of the NFL and its teams to retaliate against Plaintiffs."). To be sure, arbitrators legitimate *arbitration* proceedings are entitled to immunity—but the NFL's process is not arbitration.

The NFL argues that there is no allegation of retaliatory intent with respect to this conduct; but the Complaint clearly alleges that the NFL specifically took these actions to intimidate Flores and interfere with his rights. ¶298 ("NFL and Mr. Goodell have been determined to ensure that Plaintiffs do not receive a fair process for adjudication of their claims"), ¶309 ("The entire process was intended to interfere with and stymie Plaintiffs' statutory rights . . . [and] retaliate against Plaintiffs").[23]

The NFL's remaining three arguments are easily dispatched. First, the NFL argues that it cannot be held liable because it is not Flores' former employer. For the reasons set forth above, Flores has adequately pleaded that the NFL was his employer. See supra at §I. That is sufficient at this stage. Second, Plaintiff had no obligation to file a new EEOC charge with respect to this claim. Under the reasonably related doctrine, "claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are 'reasonably related' to those that were filed with the agency. . . . A claim alleging retaliation by an employer against an employee for filing a discrimination charge is one type of claim we have recognized as 'reasonably related' to the underlying discrimination charge." Legnani v. Alitalia Linee Aeree Italiane, S.P.A, 274 F.3d 683, 686 (2d Cir. 2001) (cleaned up); see also Duplan v. City of N.Y., 888 F.3d 612, 624 (2d Cir. 2018) ("Although we have not previously had occasion to make clear that 'reasonably related' retaliation claims are excused from the exhaustion requirement *only* if they arise during the pendency of an EEOC investigation ***or* a timely filed federal case**, that outcome is consistent with Title VII's statutory scheme and our existing case law. There is no indication in the text or legislative history of Title VII that Congress intended to sanction a broad category of unexhausted retaliation claims") (emphasis added). Finally, the NFL's suggestion that the FAA

[23] Defendant relies on Bledsoe v. Delta Air Lines, Inc., 2024 WL 1142321, at *6 (E.D.N.Y. Mar. 15, 2024), a pro se case, but the NFL's conduct here is plainly distinguishable.

requires a challenge to the impartiality of the arbitrator after the conclusion of this case ignores that Plaintiff's allegations are not merely that the process was simply biased and that the Second Circuit's held this case does not involve FAA arbitration. Flores, 150 F.4th at 183; cf. Aviall, Inc. v. Ryder Sys., Inc., 110 F.3d 892, 895 (2d Cir. 1997) (holding impartiality challenges must be decided according to the FAA in a "dispute is governed by the FAA").

## V. This Court Has Jurisdiction Over the Broncos and Texans, and Venue is Proper

### A. The Broncos and Texans Are Subject to Personal Jurisdiction in This Court Because They Are Part of an Integrated Enterprise With the NFL and They are Joint Employers of Plaintiff

"[A] complaint will survive a motion to dismiss for want of personal jurisdiction so long as its allegations, taken as true, are legally sufficient allegations of jurisdiction." Troma Entm't, Inc. v. Centennial Pictures Inc., 729 F.3d 215, 217 (2d Cir. 2013). Courts look first to the forum state's long-arm statute, and "[i]f the long-arm statute permits personal jurisdiction, we analyze whether personal jurisdiction comports with due process protections established under the Constitution." Eades v. Kennedy, PC L. Offs., 799 F.3d 161, 168 (2d Cir. 2015)

"Under New York law, there are two bases for personal jurisdiction over out-of-state defendants: (1) general jurisdiction pursuant to N.Y. C.P.L.R. § 301, and (2) long-arm jurisdiction pursuant to N.Y. C.P.L.R. § 302." Allied Dynamics Corp. v. Kennametal, Inc., 965 F. Supp. 2d 276, 289 (E.D.N.Y. 2013). "[D]ue process requires a plaintiff to allege (1) that a defendant has certain minimum contacts with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances." Eades, 799 F.3d at 168–69. "If minimum contacts exist, the defendant has to present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Id. at 169; see also Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 170 (2d Cir. 2013) (Although "section 302(a)(1)

of New York's long-arm statute and constitutional due process are not coextensive, and . . . personal jurisdiction permitted under the long-arm statute may theoretically be prohibited under due process analysis, . . . such cases [are] rare.").[24]

**i. Broncos and Texans Are Subject to General Jurisdiction in New York**

"Under section 301 . . . of New York's Civil Practice Law and Rules . . . a corporation is subject to general jurisdiction in New York if it is 'doing business' in the State." Turbon Int'l, Inc. v. Hewlett-Packard Co., 769 F. Supp. 2d 259, 260–61 (S.D.N.Y. 2011). "For New York courts to have personal jurisdiction in that situation, the subsidiary must be either an 'agent' or a 'mere department' of the foreign parent." Jazini v. Nissan Motor Co., 148 F.3d 181, 184 (2d Cir. 1998); SPV OSUS Ltd. v. UBS AG, 114 F. Supp. 3d 161, 169 (S.D.N.Y. 2015), aff'd, 882 F.3d 333 (2d Cir. 2018) ("[T]he 'mere department' analysis applies only if the parent company is subject to general jurisdiction in the forum.").[25] "[C]ourts have found that, where general jurisdiction is established over a parent, it would not offend due process to exert personal jurisdiction over a subsidiary found to be a mere department-—even where the foreign entity exists not in a neighboring state, but in a foreign country." Kucher v. Domino's Pizza, Inc., 2017 WL 2987214, at *13 (S.D.N.Y. Feb. 13, 2017); see also Int'l Diamond Importers, Inc. v. Med Art, Inc., 2017 WL 2839640, at *2 (S.D.N.Y. June 29, 2017) ("[I]f a foreign corporation has a subsidiary in New York, and that subsidiary functions as a "mere department" of the foreign parent, the court may have general jurisdiction over that foreign corporation."); SPV OSUS Ltd. v. AIA LLC, 2016 WL 3039192, at *3 (S.D.N.Y. May 26, 2016) ("[W]here a Court has general

[24] The Texans concede that the statutory inquiry is functionally coextensive with the constitutional inquiry of fair play and substantial justice. (Texans Br. at 6).

[25] Although the Second Circuit previously considered the agency theory of personal jurisdiction as a theory of general personal jurisdiction, Daimler AG v. Bauman, 571 U.S. 117, 135 n.13 (2014) noted that "[a]gency relationships, . . . may be relevant to the existence of specific jurisdiction."

jurisdiction over an entity, foreign subsidiaries or affiliates that are 'mere departments' of that entity are subject to the Court's jurisdiction as well."); cf. Turbon Int'l, Inc. , 769 F. Supp. 2d at 261; ("[T]he typical case involves a foreign subsidiary and a local parent . . .") (collecting cases).

The NFL and Giants do not dispute that they are subject to jurisdiction in New York. And the Broncos and Texans are here subject to general jurisdiction because they are "mere departments" of the NFL and have significant contacts with the state. "A foreign entity is a mere department of a local entity where there is common ownership of the two and where there is the requisite degree of financial dependency, interference in the selection and assignment of personnel, failure to observe corporate formalities, and/or control over marketing and operational policies." Id. at 261; see also Jazini, 148 F.3d at 185 (identifying the foregoing factors); Williams v. PMA Cos., Inc., 419 F. Supp. 3d 471, 484-85 (N.D.N.Y. 2019) (suggesting that the "single, integrated enterprise" inquiry and "mere department" inquiry are coextensive). The "mere department" test is satisfied here.

First, there is common ownership and control between the NFL and the teams: The teams own the entirety of the NFL, name its commissioner, and have the power to remove him. ¶¶367, 371. The NFL has an Executive Committee "made up of a representative from each member team" and "[t]he Commissioner of the NFL serves at the behest and direction of the NFL's member teams." ¶¶370-71.

Second, there is also significant financial connection between the NFL and the teams, including through the highly lucrative television contracts that the NFL negotiates on behalf of the teams, and that in turn distributes in excess of $400 million to each team each year. Ex. D at §§10.3, 4.4, 2006 Resolution G-1, 1977 Finance Resolution, 1978 Finance Resolution. See also supra §I(A). At the pleadings stage, this financial interrelation is sufficient to infer that "that

[each team] is wholly dependent upon [the NFL's] financial support to stay in business," and this factor therefore tilts in favor of jurisdiction. Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp., 751 F.2d 117, 121 (2d Cir. 1984).

Third, the Commissioner and the NFL exert important operational powers over the teams, including setting and enforcing the coaching, hiring, and firing policies central to this lawsuit. ¶¶ 378-385; see also supra §I(A). The NFL's control over coaching contracts and the interview process is total: The NFL commissioner must pre-approve hiring of all coaches, all coaching contracts, and the terms of such contracts. Ex. D at §9.3(A)(1). Even after approval, the NFL retains final authority to alter the terms and conditions of employment. Id. at §9.3(A)(2). Teams have no discretion to opt out of or deviate from this control. ¶379. The Anti-Tampering Policy extends that control after hiring. It governs not only whether a coach may be employed, but when, where, and under what conditions another club may even approach that coach about future employment. Section 9.1(C)(11) of the Constitution prohibits any member from tampering "with a player or coaches or other employee under contract to or the property of another member club." 2000 Resolution G-1B bars clubs from seeking permission to discuss a head coaching position with an assistant coach until that coach's employer club has completed its season, and it prohibits "all in-season discussions, requests for permission, or contacts of any kind concerning the future employment of an assistant coach with a club other than his employer club." And, particularly relevant to jurisdiction, the NFL sets owners' meetings in New York and compels teams to play games in New York. ¶¶367, 381. The NFL even controls the appearances of coaches during NFL games, requiring them to wear apparel provided and approved by the NFL, including an NFL logo—a key piece of the NFL's marketing agenda. ¶¶375-77.

On a motion to dismiss, these facts satisfy a *prima facie* showing of the requisite control for purposes of personal jurisdiction. Cf., e.g., Lugo v. City Winery, LLC, 2026 WL 751225, at *5 (S.D.N.Y. Mar. 17, 2026) (finding four-factor test satisfied); Alfandary v. Nikko Asset Mgmt. Co., 2022 WL 20833775, at *5 (S.D.N.Y. Mar. 30, 2022) (same).

**ii. Broncos and Texans Are Subject to Specific Jurisdiction in New York**

The Broncos and Texans are also subject to specific jurisdiction in New York as to the recruiting and hiring practices at issue in this lawsuit. New York allows the exercise of specific justification over any defendant who, *inter alia*, "transacts any business within the state." N.Y.C.P.L.R. § 302(a)(1).

"[C]ourts in this District have found that adequately alleging a joint employment relationship is 'sufficient to render defendants amenable to [specific] jurisdiction in New York.'" Xiaoyan Liu v. Canteen 82 Inc., 2018 WL 6067228, at *5 (S.D.N.Y. Nov. 20, 2018). Accordingly, the same analysis supporting the NFL and teams' role as joint employers supports the exercise of personal jurisdiction over the Broncos and Texans.

As set forth above, and here incorporated by reference, the teams and the NFL are joint employers of Flores and the proposed class. See supra §I(B). The NFL controls key functions of the coaching relationship, including, critically, the policies at issue this class action: The NFL's hiring policies and the Rooney Rule. See supra §I(B). These facts support a finding of specific jurisdiction here.

Defendants' contrary authority does not withstand scrutiny. Both the Broncos and the Texans rely on cases such as Henao v. Parts Auth., LLC, 557 F. Supp. 3d 490 (S.D.N.Y. 2021), and Zurich Am. Life Ins. Co. v. Nagel, 571 F. Supp. 3d 168 (S.D.N.Y. 2021), for the proposition that single-enterprise and joint-employer theories are theories of liability rather than jurisdiction.

But those courts dismissed the plaintiffs' cases, because the plaintiffs failed to tie the New York contacts to the out-of-state defendants: In Henao, the plaintiffs did "not allege . . . that any actions of Defendants subject to this Court's jurisdiction can be imputed to" the non-domiciliary defendants. 557 F. Supp. 3d at 497. And in Nagel, the New York-based policies were never applied to the plaintiff and were no longer in effect. Here, by contrast, the New York contacts run directly to the challenged conduct: Flores alleges that the NFL, from its New York headquarters, exercises centralized control over the hiring, retention, and termination of coaches, including as to the Broncos and Texans. ¶¶366-78. It also imposes the Rooney Rule and monitors compliance—a policy central to the disparate treatment class claims at issue in this case. ¶380. Here, the challenged conduct originates in New York, militating in favor of jurisdiction here.

For the same reasons, Defendants' reliance on Senne v. Kansas City Royals Baseball Corp., 105 F. Supp. 3d 981 (N.D. Cal. 2015), Davis v. Billick, 2002 WL 1398560 (N.D. Tex. June 26, 2002), and Sullivan v. Tagliabue, 785 F. Supp 1076 (D.R.I. 1992) is misplaced. None of these cases considered a case filed in the headquarters location of the respective league. Nor did any of the cases consider policies set in that league-office headquarters, as this case here challenges.

The Complaint likewise pleads facts sufficient to show an agency relationship between the NFL and the teams sufficient to confer jurisdiction for purposes of the practices at issue. "Agency relationships, . . . may be relevant to the existence of specific jurisdiction." Daimler, 571 U.S. at 135 n.13. "An agency relationship between two entities exists where one does all the business which [the other] could do were it here by its own officials." Turbon Int'l, Inc., 769 F. Supp. 2d at 261.

The NFL is the teams' trade association. ¶37. It conducts business on behalf of the teams from its New York office, and exists completely at the behest of the teams. ¶¶367, 369, 371. It also sets, administers, and monitors compliance with the employment practices at issue in this lawsuit from its New York headquarters—functions it undertakes as an agent of the competing teams. ¶¶123, 380-81. In addition, the NFL negotiates the aforementioned highly lucrative national TV contract through its New York headquarters with New York headquartered networks. Ex. D at §§10.3, 4.4, 2006 Resolution G-1, 1977 Finance Resolution, 1978 Finance Resolution. See also supra § I(A). Cf. Palmieri v. Estefan, 793 F. Supp. 1182, 1191 (S.D.N.Y 1992) (emphasizing that "defendants derive hundreds of millions of dollars in profits from sales due to acts signed by [parent]" and that this fact supported finding an agency relationship between New York parent and geographically diverse subsidiaries). Finally, the NFL schedules games for the teams in Buffalo, from which they derive meaningful revenue. ¶381. If the teams do not conduct business in New York, it is because the NFL conducts it as their agent and on their behalf.

#### iii. Defendants' Declarations Do Not Defeat Jurisdiction and, at a Minimum, Flores Is Entitled to Jurisdictional Discovery

Defendants' self-serving declarations are thus beside the point. See Smyth Decl. ¶¶2-5 (Broncos); Logan Decl. ¶¶4-11 (Texans). Flores does not contend that the Broncos and Texans are independently "at home" in New York based on their own real estate or payroll. Rather, New York contacts exist through the integrated enterprise and joint-employment relationship with the NFL, whose central hub is New York City. The declarations do not address, let alone refute, the NFL's centralized control of coaching labor relations from New York, or the interrelation of operations, management, and financial control among the NFL and its member clubs. And they certainly cannot be credited in the absence of discovery.

At the very least, if the Court harbors any doubt about the sufficiency of the jurisdictional allegations, the proper course is to permit jurisdictional discovery rather than to dismiss. Courts regularly allow jurisdictional discovery, because such discovery may shed light on the fact-specific nature of the inquiry and the relationship between parent and subsidiaries. See In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 208 (2d Cir. 2003) (remanding for jurisdictional discovery where the analysis was fact-specific); Turbon Int'l, Inc., 769 F. Supp. 2d at 261 (ordering "some additional discovery to determine whether the relationship between [parent] and [subsidiary] supports § 301 jurisdiction"). Where, as here, the jurisdictional question turns on fact-intensive, multi-factor inquiries discovery is warranted before dismissal.

**B. Venue Is Proper**

The NFL, Broncos, and Giants do not dispute venue, and any objections as to these defendants are therefore waived. See Concession Consultants, Inc. v. Mirisch, 355 F.2d 369, 371 (2d Cir. 1966) (noting venue subject to waiver). Venue is also proper as to the Texans under both Title VII's venue provision and 28 U.S.C. §1391(b)(2), because the discriminatory policies at issue originate in this district and the protected activity underlying the retaliation claims took place in this district.

**i. Venue Is Proper Here Under Title VII's Venue Provision**

Title VII specifies that "an action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed [or] in the judicial district in which the employment records relevant to such practice are maintained and administered . . . ." 42 U.S.C. §2000e-5(f)(3). "Almost uniformly, courts . . . have applied

section 2000e–5(f)(3) to determine venue in employment discrimination actions premised on Title VII." Bolar v. Frank, 938 F.2d 377, 379 (2d Cir. 1991).

The Complaint alleges two categories of Title VII claim against the Texans. First, Plaintiff advances employment discrimination claims: The Texans were part of the NFL's closed and centralized hiring-and-termination system that systematically disfavored Black coaches and coaching applicants—a system governed by uniform League rules and subject to the NFL's "direction, control, rules and contracts." ¶¶122-23, 368. Second, Flores alleges retaliation claims: that after he filed the original complaint in this matter, the Texans and NFL removed him from consideration for the Texans head coaching position in 2022. ¶¶216-228, 453, 477.

As to the discrimination claim, Plaintiffs bring this claim in this district because it is the centralized location where the unlawful hiring and retention practices at issue have been committed. "[C]ourts have held that where a plaintiff alleges that a corporate policy developed in the company's headquarters has a disparate impact throughout the company, the relevant employment practice 'is 'committed' where ... [it] is initiated,' namely, in the district where the company's headquarters is located." Kassman v. KPMG LLP, 925 F. Supp. 2d 453, 474 (S.D.N.Y. 2013) (finding venue proper in Massachusetts because "core discriminatory practice alleged" was promulgated in Massachusetts)); Hoffman v. United Telecomms., Inc., 575 F. Supp. 1463, 1484 (D. Kan. 1983) (finding venue proper in Kansas because "practices and procedures relating to personnel and management of employees are established and implemented by UTI and USSI in the District of Kansas for all of the defendant subsidiaries"). Here, the NFL promulgates, monitors, and enforces the challenged employment policies and practices that bind the teams through its New York headquarters. ¶¶380-81. This fact alone suffices to confer venue here.

But the records linked to this decision provide a second basis for venue in this district: The NFL, headquartered in New York, maintains records of the coaching selection process for all of the teams. ¶¶121-23. These records will include information relevant to both the discrimination and retaliation claims. Id. This case therefore qualifies for venue here based on the records provision of 42 U.S.C. § 2000e-5(f)(3) as well. See Minnette v. Time Warner, 997 F.2d 1023, 1026 (2d Cir. 1993) (finding venue proper where "personnel and other employment records relevant to the alleged discriminatory practice were maintained").

**ii. Venue Is Proper Under 28 U.S.C. §1391(b)(2)**

Likewise, events meaningful to the discrimination and retaliation claims arising under other statutes took place in this district. Under 28 U.S.C. §1391(b)(2), venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." Venue may thus be proper in a district "even if other material events occurred elsewhere." Gulf Ins. Co. v. Glasbrenner, 417 F.3d 353, 357 (2d Cir. 2005). In other words, §1391(b)(2) "does not restrict venue to the district in which the 'most substantial' events or omissions giving rise to a claim occurred." Daniel v. Am. Bd. of Emergency Medicine, 428 F.3d 408, 432 (2d Cir. 2005). Rather, venue may be proper in multiple districts so long as the chosen district has a substantial connection to the litigation. Id.

This case has substantial ties to this district. First, as set forth above, the coaching, hiring, and firing policies and practices that form the basis of the class claims are promulgated, enforced, monitored, and revised from the NFL's New York headquarters. ¶381. These include the review and approval of the policies and coaching contracts at issue. Such contractual ties suffice to confer venue here. See Gulf Ins. Co., 417 F.3d at 357 ("We believe that the

submission, approval, and issuance of the policy constituted a 'substantial part of the events' underlying Gulf's claims. . . .").

Second, moreover, the retaliation claims that are specific to the Texans stem from protected activity in this district. Flores filed the original complaint in this matter in this Court. The Texans and the NFL then removed Flores from consideration for the Texans head coaching position, because of the lawsuit. ¶¶226-27. See Gonzalez, 2022 WL 4372199, at *2 (protected activity is "essential" to retaliation claim). And, Flores' participation in protected activity in this district thus satisfies the requirement that a "substantial part of the vents or omissions giving rise to the claim" have taken place here.

## CONCLUSION

Plaintiff respectfully submits that the motions to dismiss be denied in their entireties.

Dated: July 20, 2026
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: ______________________
Douglas H. Wigdor
Michael J. Willemin
David E. Gottlieb
Russell L. Kornblith
Daniel J. Altaras
Noah Jacobs

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
mwillemin@wigdorlaw.com
dgottlieb@wigdorlaw.com
rkornblith@wigdorlaw.com
daltaras@wigdorlaw.com

njacobs@wigdorlaw.com

*Counsel for Plaintiffs*
*Proposed Counsel for the Proposed Class*

- and -

**ELEFTERAKIS, ELEFTERAKIS & PANEK**

By: __________/s/______________
John Elefterakis
Nicholas Elefterakis
Raymond Panek
Johnson Atkinson

80 Pine Street, 38th Floor
New York, New York 10005
Telephone: 212-532-1116
Facsimile: 212 532-1176

*Counsel for Plaintiffs*
*Proposed Counsel for the Proposed Class*

**Certificate of Compliance**

The undersigned counsel hereby certifies, pursuant to Dkt. No. 297, Judge Caproni's July 1, 2026 Order, that the foregoing Memorandum of Law in Opposition of Defendants' Motions to Dismiss complies with the Order's word-count limitations. This memorandum contains 20,999 words, exclusive of the caption, table of contents, table of authorities, signature block, and this certificate.

Dated: July 20. 2026

**WIGDOR LLP**

____________________________

Douglas H. Wigdor