**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BRIAN FLORES, STEVE WILKS and RAY HORTON, as Class Representatives, on behalf of themselves and all others similarly situated,

Plaintiffs,

- against -

THE NATIONAL FOOTBALL LEAGUE; NEW YORK FOOTBALL GIANTS, INC. d/b/a NEW YORK GIANTS; MIAMI DOLPHINS, LTD. d/b/a MIAMI DOLPHINS; DENVER BRONCOS FOOTBALL CLUB d/b/a DENVER BRONCOS; HOUSTON NFL HOLDINGS, L.P. d/b/a HOUSTON TEXANS; ARIZONA CARDINALS FOOTBALL CLUB LLC d/b/a ARIZONA CARDINALS; TENNESSEE TITANS ENTERTAINMENT, INC. d/b/a TENNESSEE TITANS and JOHN DOE TEAMS 1 through 26,

Defendants.

Case No. 22-cv-00871 (VEC)(SLC)

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT NEW YORK FOOTBALL GIANTS, INC., N/K/A NEW YORK FOOTBALL GIANTS LLC'S MOTION TO DISMISS

**McCARTER & ENGLISH, LLP**
250 W. 55th Street, 13th Floor
New York, New York 10019
(212) 609-6800

*Counsel for Defendant*
*New York Football Giants, Inc.,*
*n/k/a New York Football Giants LLC*

Dated: August 19, 2026

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT .......... 1

ARGUMENT .......... 3

I. THE OPPOSITION CONFIRMS THE LACK OF WELL-PLEADED FACTS PLAUSIBLY CONNECTING THE GIANTS' HIRING DECISION TO FLORES' RACE .......... 3

II. THE OPPOSITION DOES NOT DISPUTE THAT THE TAC DOES NOT IDENTIFY A SPECIFIC GIANTS PRACTICE THAT CAUSED A RACIAL DISPARITY .......... 8

A. Labeling the Entire NFL Hiring System a Single Practice Is Insufficient .......... 9

B. League-Wide Aggregate Statistics Do Not Plausibly Show That a Giants Practice Caused a Disparity .......... 10

III. THE OPPOSITION CANNOT RECONCILE ITS CLAIMS UNDER THE NEW YORK HUMAN RIGHTS LAWS WITH THE FACT THAT THE GIANTS' HEAD-COACH POSITION IS A NEW JERSEY JOB .......... 11

CONCLUSION .......... 12

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Brown v. Daikin America Inc.*,
756 F.3d 219 (2d Cir. 2014)....6

*Burgis v. N.Y.C. Dep't of Sanitation*,
798 F.3d 63 (2d Cir. 2015)....5

*Catlett v. Missouri Highway & Transp. Comm'n*,
589 F. Supp. 929 (W.D. Mo. 1983)....7

*Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*,
589 U.S. 327 (2020)....3

*Francis v. Kings Park Manor, Inc.*,
992 F.3d 67 (2d Cir. 2021)....4

*Harty v. W. Point Realty, Inc.*,
477 F. Supp. 3d 163 (S.D.N.Y. 2020)....5

*Mandala v. NTT Data, Inc.*,
975 F.3d 202 (2d Cir. 2020)....8, 10, 11

*Moss v. Bd. of Educ. of Sachem Central Sch. Dist.*,
2024 WL 3328637 (E.D.N.Y. July 8, 2024)....4, 8

*Nnebe v. City of New York*,
2023 WL 2393920 (S.D.N.Y. Jan. 30, 2023)....6

*Norman-Bloodsaw v. Lawrence Berkeley Lab.*,
135 F.3d 1260 (9th Cir. 1998)....7

*Riddle v. Citigroup*,
2014 WL 2767180 (S.D.N.Y. May 29, 2014)....4

*Trotter v. Nat'l Football League*,
737 F. Supp. 3d 172 (S.D.N.Y. 2024)....11

*Shipley v. Dugan*,
874 F. Supp. 933 (S.D. Ind. 1995)....7

*Vega v. Hempstead Union Free Sch. Dist.*,
801 F.3d 72 (2d Cir. 2015)....3

**TABLE OF AUTHORITIES**
**(*Continued*)**

**Page(s)**

*Vidal v. Galaxy 2439 Enters., LLC*,
2023 WL 8455255 (D.N.J. Dec. 6, 2023) ........ 3

*Watson v. Fort Worth Bank & Trust*,
487 U.S. 977 (1988) ........ 9

**State Cases**

*Hoffman v. Parade Publ'ns*,
15 N.Y.3d 285 (2010) ........ 11

*Kingston v. Int'l Bus. Machs. Corp.*,
187 A.D.3d 578 (1st Dep't 2020) ........ 11

*Syeed v. Bloomberg LP*,
41 N.Y.3d 446 (2024) ........ 11

**Statutes**

42 U.S.C. § 2000e-2(k)(1)(A)(i) ........ 8

42 U.S.C. § 2000e-2(k)(1)(B)(i) ........ 9



ME1\62330915.v2

## PRELIMINARY STATEMENT

The Opposition confirms the dispositive defect in the Third Amended Complaint ("TAC"): it pleads no nonconclusory fact connecting the Giants' January 2022 head-coach decision to Brian Flores' race. The pleaded facts demonstrate the opposite. The Giants contacted Flores the day the position opened, told him that ownership was "extremely interested," held two discussions with him, and then scheduled a final interview after hiring a new general manager. TAC ¶¶ 181–87. Flores himself believed that he had a legitimate "shot" at the job. *Id.* ¶ 190. The TAC's only basis for calling Flores' interview a "sham" is a text from Bill Belichick—an outsider to the Giants' organization—stating, "I ***think*** they are naming Daboll." *Id.* Even if that text suggests preselection, it does not suggest racial discrimination.

The Opposition tries several ways to supply the missing racial nexus, but none salvages Flores' disparate-treatment claims. It equates alleged preselection with discrimination without facts supporting an inference that race motivated the Giants' decision. It also now suggests that Flores was substantially more qualified than Daboll, although the TAC says nothing about Daboll's qualifications. And it recasts the interview itself as a discriminatory condition, although the TAC alleges no race-based difference in the criteria, requirements, or other conditions imposed on Flores.

The Opposition's reliance on historical Giants hiring, League-wide statistics, statements by NFL executives, or hiring decisions by other clubs similarly does not explain why the Giants selected Daboll in January 2022. Flores' single-enterprise and joint-employer theories also do not eliminate the need to connect the Giants' decision to race, and the TAC alleges no such connection.

Flores' disparate-impact claims fare no better. The Opposition now labels the challenged practice as the entire League-wide hiring "system"—a combination of club discretion, the Rooney

Rule, anti-tampering rules, reporting requirements, and pipeline initiatives—while simultaneously disclaiming the Rooney Rule as the challenged practice. Title VII, however, requires identification of a particular employment practice unless the elements of a decisionmaking process cannot be separated for analysis. The TAC neither identifies which elements of the League-wide hiring "system" caused the alleged disparity nor explains why they cannot be analyzed separately. As to the Giants, it identifies no Giants practice that caused a racial disparity and does not plausibly connect any of the pleaded League-wide aggregate statistics to any Giants practice or qualified applicant pool.

Flores' theory also suffers from a fundamental inconsistency. He attributes the alleged disparity to unconstrained club discretion, while characterizing club hiring decisions as the product of a standardized League-wide process. He cannot have it both ways. If unconstrained club discretion caused the asserted disparity, aggregate outcomes do not establish that a common NFL practice caused it. If a common League-wide practice caused it, Flores must identify that practice and plausibly allege that the Giants used it to produce the disparity. He does neither.

Finally, the New York State and City Human Rights Laws do not apply to the New Jersey-based head-coach position Flores sought. Neither the TAC nor the Opposition alleges that the Giants' head coach was required to work in New York. The team's name, charitable activities, occasional travel, and the NFL's Manhattan headquarters do not transform a New Jersey job into a New York one.

For these reasons, all claims against the Giants should be dismissed with prejudice.

## ARGUMENT

### I. THE OPPOSITION CONFIRMS THE LACK OF WELL-PLEADED FACTS PLAUSIBLY CONNECTING THE GIANTS' HIRING DECISION TO FLORES' RACE.

In an employment discrimination action, a complaint must set forth "well-pleaded factual allegations plausibly giving rise to an inference of unlawful discrimination[.]" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015). That means Flores must show that "the [Giants] discriminated against him" "***because of*** his race, color, religion, sex, or national origin." *Id.* at 85. NJLAD standards generally track Title VII. *Vidal v. Galaxy 2439 Enters., LLC*, 2023 WL 8455255, at *9 (D.N.J. Dec. 6, 2023). Section 1981 requires still more: facts plausibly supporting that race was "a but-for cause" of the Giants' decision to hire Daboll over Flores. *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 589 U.S. 327, 341 (2020).

The TAC does not satisfy these standards. To the contrary, its factual allegations describe substantial interest by the Giants in Flores. The TAC alleges that the Giants began pursuing Flores when the head-coach position opened on January 11, 2022; that a senior Giants executive said the Giants and their owner, John Mara, were "extremely interested"; that Mara spoke positively with Flores the next day and again on January 18, 2022; and that the Giants scheduled Flores' final interview after hiring a new general manager. TAC ¶¶ 181–87. Those allegations describe genuine interest, not racial animus. Indeed, according to the TAC, Flores believed that he had a legitimate "shot" at the Giants' head-coach position. *Id.* ¶ 190. The allegation that the process later became a "sham" rests solely on Belichick's January 24 text to Flores saying: "I ***think*** they are naming Daboll." *Id.* But the TAC does not allege that Belichick participated in the Giants' hiring process, identify his supposed source, or plead any race-related statement or conduct by any Giants decisionmaker. And the only allegations connecting the Giants' decision to race are conclusory

statements added for the first time in the TAC—namely that the Giants treated Daboll and Flores "differently due to their race; namely, [Daboll] was given a fair chance at the job whereas [Flores] was subjected to a sham and illegitimate interview." TAC ¶ 204. Those statements "are not entitled to the assumption of truth" and cannot support disparate-treatment liability. *See Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021); *Moss v. Bd. of Educ. of Sachem Central Sch. Dist.*, 2024 WL 3328637, at *8 (E.D.N.Y. July 8, 2024) ("Plaintiff's allegations are missing the connective tissue that links h[is] protected status to the alleged failure to hire. [He] offers no allegations, save for h[is] own speculation …, that [defendants] used that information in its hiring decisions -- much less that it was a *motivating factor* in their decisionmaking.").

In response, the Opposition raises several arguments. None salvages Flores' disparate-treatment claims.

*First*, the Opposition misstates the Giants' position as contending that "a discriminatory sham interview . . . is permitted under the law." Op. 23. But the TAC does not plausibly allege that the purported "sham" interview was discriminatory. Even if Flores has alleged, at most, an irregularity in the Giants' hiring process, he has not pleaded facts plausibly suggesting that the irregularity was motivated by race. In other words, even accepting that Daboll was selected before Flores' final interview, that allegation speaks only to when the decision was made, not why. That Daboll is white and Flores is Black does not automatically support an inference of racial discrimination. *Riddle v. Citigroup*, 2014 WL 2767180, at *3 (S.D.N.Y. May 29, 2014), *aff'd*, 640 F. App'x 77 (2d Cir. 2016) ("[T]he mere fact that the Citibank Defendants have hired people who are of a different race … from Riddle does not suggest that the Citibank Defendants failed to hire her on account of her race[.]"). Otherwise, every qualified minority applicant rejected in favor of

a nonminority candidate could state a claim without any additional facts suggesting discrimination. That is not the law.

*Second*, the Opposition argues for the first time that Flores' qualifications were so superior to Daboll's that the disparity supports an inference of discrimination. Op. 21. But the TAC says nothing about Daboll's qualifications and alleges no facts suggesting that the Giants selected a materially less-qualified candidate.[1] Indeed, the Opposition cites none of the TAC's 483 paragraphs or 106 pages to support that proposition. The Court should not consider new factual theories raised only in opposition. *Harty v. W. Point Realty, Inc.*, 477 F. Supp. 3d 163, 169 (S.D.N.Y. 2020), *aff'd*, 28 F.4th 435 (2d Cir. 2022) ("declin[ing] to consider plaintiff's new, improper allegations raised for the first time in opposition to the motion").

*Third*, the Giants' historical hiring record does not plausibly connect the 2022 decision to race. (Op. 21.) Although the Opposition suggests that there must be something nefarious about the Giants not previously hiring a Black head coach, the Giants have only one head-coach position, and the sample on which Flores relies—22 head coaches over 100 years—is far too small to support an inference of discrimination. As the Second Circuit held in *Burgis v. N.Y.C. Department of Sanitation*, statistics offered to establish discriminatory intent "must not only be statistically significant in the mathematical sense, but they must also be of a level that makes other plausible non-discriminatory explanations very unlikely." 798 F.3d 63, 69 (2d Cir. 2015). Consistent with that principle, courts in this Circuit have repeatedly rejected discrimination claims based on raw hiring numbers unaccompanied by the contextual information necessary to make them meaningful.

[1] Flores' statements after initiating this lawsuit that Daboll is a "great coach" who will do a "great job" also undermine this argument. ESPN, *Brian Flores' Full Interview on Suing the NFL, Dolphins, Giants & Broncos*, YOUTUBE, at 2:50–3:03 (Feb. 2, 2022), https://www.youtube.com/watch?v=zS5f_YH3Y2A.

*See*, e.g., *Nnebe v. City of New York*, 2023 WL 2393920, at *4, *13 (S.D.N.Y. Jan. 30, 2023) (finding allegations that plaintiff's supervisors had not hired any Black teachers among their sixteen hires insufficient where plaintiff provided "no detail as to the number or qualifications of the applicants and the individuals hired").

The same is true here. The TAC does not allege the composition of the relevant qualified applicant pools, candidates' qualifications, hiring criteria, or even continuity among decisionmakers. Instead, the TAC simply lists four Giants searches over nearly two decades and alleges that none of the franchise's 22 head coaches were Black. TAC ¶¶ 196–202. Without the context to make those numbers probative, they do not plausibly support an inference that the Giants' 2022 decision was racially motivated, particularly because the TAC acknowledges that the 2022 search was conducted under a newly hired general manager. *Id.* ¶¶ 185–87, 194.

*Fourth*, the Opposition's single- and joint-employer theories do not convert League-wide allegations into evidence of the Giants' intent. Even if Flores adequately alleged that the NFL and its clubs could qualify as a single employer (which he did not), Flores must still plausibly allege facts supporting an inference that the Giants' challenged hiring decision was motivated by race. *Brown v. Daikin America Inc.*, 756 F.3d 219 (2d Cir. 2014), a case on which Flores relies (Op. 6–7), illustrates the missing link. There, the plaintiff alleged that the corporate parent controlled the subsidiary's termination decisions and directed the subsidiary to discharge non-Japanese employees while protecting Japanese employees from discharge. *Id.* at 228. Thus, the parent's alleged discriminatory conduct was directly tied to the challenged decisions. The TAC contains no comparable allegation that the NFL directed the Giants' hiring decision, much less that any allegedly discriminatory NFL view or practice caused the Giants to select Daboll over Flores

because of race. Nor does it explain how hiring decisions made by other clubs, which involve different candidates, circumstances, and decisionmakers, bear on the Giants' intent.

For the same reason, generalized statements by NFL executives about League-wide hiring outcomes and aggregate statistics concerning other clubs suffer from the same defect. Without facts connecting those alleged statements to the Giants' 2022 process, they do not supply the missing racial nexus.

*Finally*, the Opposition argues that the alleged "sham" interview is independently actionable as a discriminatory condition of access to employment, and portrays the Giants as contending that pre-employment discrimination is "beyond the reach of the antidiscrimination laws." (Op. 28.) That is not the Giants' position. The TAC simply does not plausibly allege any such race-based treatment.

The Opposition's cases illustrate the distinction. *Norman-Bloodsaw v. Lawrence Berkeley Laboratory* involved an actual differential condition of employment: Black employees were singled out for nonconsensual sickle-cell testing and female employees for pregnancy testing as part of mandatory employment entrance examinations. 135 F.3d 1260, 1271–72 (9th Cir. 1998). *Catlett v. Missouri Highway & Transportation Commission* involved different hiring processes for male and female applicants where "female applicants were forced to take part in interviews conducted in open areas with numerous highway employees present, a practice which was designed to inhibit and intimidate the female applicants." 589 F. Supp. 929, 944 (W.D. Mo. 1983). And *Shipley v. Dugan* involved factual allegations that the defendant employer "passed [plaintiff] over in the screening process" in favor of "less qualified candidates" *because* of race, national origin, and protected activity. 874 F. Supp. 933, 942 (S.D. Ind. 1995). In each case, the plaintiff

alleged facts connecting the challenged intermediate employment practice itself to a protected characteristic.

Here, the TAC alleges no comparable facts. Instead, the TAC's alleged harm and its alleged discriminatory motive collapse into the same conclusion. Paragraph 204 states that Daboll received a fair chance, Flores received a "sham" interview, and the difference was "due to their race." But the TAC supplies no supporting facts for that conclusion. It does not allege that the Giants asked Flores different questions, imposed additional requirements, limited his presentation, shortened his interview, insulted him, or otherwise subjected him to any conditions not imposed on white candidates. Nor does the TAC allege that Daboll was selected over Flores despite having inferior qualifications. At most, it alleges preselection. Preselection is not itself racial discrimination, and the TAC pleads no facts connecting the alleged preselection to race.

In short, because the TAC has already been amended repeatedly and still does not supply the "connective tissue that links [Flores'] protected status to the alleged failure to hire," *Moss*, 2024 WL 3328637, at *8, Counts I, II, IV, VI, and XI should be dismissed as to the Giants.

## II. THE OPPOSITION DOES NOT DISPUTE THAT THE TAC DOES NOT IDENTIFY A SPECIFIC GIANTS PRACTICE THAT CAUSED A RACIAL DISPARITY.

A disparate-impact claim requires a plaintiff to identify a specific employment practice and plausibly connect that practice to a significant statistical disparity. *See* 42 U.S.C. § 2000e-2(k)(1)(A)(i); *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 209 (2d Cir. 2020) ("[A] plaintiff's statistical analysis 'must [demonstrate] that the disparity is substantial or significant,' and must be of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity."). The TAC does neither as to the Giants.

### A. Labeling the Entire NFL Hiring System a Single Practice Is Insufficient.

The Opposition now defines the challenged practice as the "NFL's standardized Head Coach hiring process," encompassing "League-wide rules governing Head Coach recruitment, interviews and hiring . . . and related reporting requirements and pipeline initiatives[,] which operate in conjunction with" discretionary decisions by 32 clubs. Opp. 41–42. That formulation is not only broader than the TAC's, but Flores also never identifies which component allegedly causes fewer Black coaches to be hired. Indeed, the Opposition disclaims the Rooney Rule as the challenged practice. Opp. 44. The remaining components serve different functions: the Anti-Tampering Policy regulates when clubs may contact candidates under contract; reporting requirements document compliance; pipeline initiatives seek to expand opportunities; and club discretion consists of individualized hiring judgments by different owners and executives. Calling those distinct features a "system" does not identify the particular practice causing the alleged disparity.

Title VII requires a plaintiff to show that "each particular challenged employment practice" causes a disparate impact unless the decisionmaking elements "are not capable of separation for analysis." 42 U.S.C. § 2000e-2(k)(1)(B)(i). The TAC invokes that exception (TAC ¶ 121), but pleads no facts explaining why recruitment rules, interview requirements, candidate-pipeline initiatives, reporting requirements, and club-level hiring decisions cannot be analyzed separately.

The Opposition's cases reinforce the point. *Watson v. Fort Worth Bank & Trust* required a plaintiff challenging subjective decisionmaking to isolate the "specific employment practices" responsible for observed disparities. 487 U.S. 977, 994 (1988). *Martin v. Coinmach Corporation* likewise rejected aggregation where independently operating policies could be analyzed separately. 2016 WL 6996182, at *4 (S.D.N.Y. Nov. 29, 2016). The remaining out-of-Circuit

cases relied upon by Flores also do not support treating separately identifiable rules and programs operating at different levels, together with independent decisions by multiple employers, as one employment practice merely because all relate to hiring. Nothing in those cases permits Flores to bundle distinct practices and declare, without supporting facts, that they "operate together as an integrated practice." Opp. 42.

### B. League-Wide Aggregate Statistics Do Not Plausibly Show That a Giants Practice Caused a Disparity.

The League-wide statistics suffer from a separate defect: they are not tied to any Giants practice. *See* Opp. 46–47. A statistic fails to establish disparate impact if it compares inappropriate populations or is untethered to the challenged employment practice. *Mandala*, 975 F.3d at 210. The TAC aggregates hiring decisions by different clubs, for different vacancies, with different candidate pools, criteria, and decisionmakers. TAC ¶¶ 135–52. It does not identify the qualified applicant pool for a Giants vacancy or allege that a particular Giants practice produced a racial disparity within that pool.

That omission exposes the inconsistency in Flores' theory. If the asserted disparity results from individualized discretion exercised by 32 clubs, aggregate League-wide outcomes do not show that a common NFL practice caused it. If, on the other hand, a common practice caused the disparity, Flores must identify that practice and allege that the Giants used it in a way that caused the asserted disparity. The TAC does not identify the effect of any League rule on hiring outcomes, compare outcomes based on whether or how clubs applied a particular rule, or allege a common substantive hiring criterion used by the Giants and the other clubs included in the TAC's statistics. It identifies an aggregate outcome and a collection of procedures, but no causal link between them.

The prospect of additional statistical detail in discovery also does not relieve Flores of his threshold pleading burden. Although granular data may be unavailable before discovery, the

pleaded statistics must still "plausibly suggest that the challenged practice actually has a disparate impact." *Mandala*, 975 F.3d at 210.

Because the TAC identifies neither a particular Giants practice nor facts plausibly connecting a League-wide practice to a Giants hiring disparity, Counts III, V, VII, and XII should be dismissed with prejudice.

## III. THE OPPOSITION CANNOT RECONCILE ITS CLAIMS UNDER THE NEW YORK HUMAN RIGHTS LAWS WITH THE FACT THAT THE GIANTS' HEAD-COACH POSITION IS A NEW JERSEY JOB.

In addition to being flawed for the same reasons discussed above, Flores' claims under NYSHRL and NYCHRL also fail because those statutes do not provide a claim to a non-New York resident denied a job outside New York.

Under *Hoffman v. Parade Publications*, a nonresident must plead that the challenged conduct had an impact on the plaintiff in New York State or New York City. 15 N.Y.3d 285, 291–92 (2010). In *Syeed v. Bloomberg LP*, the court explained that, in the failure-to-hire context, this requirement is satisfied when the plaintiff sought an actual New York City- or State-based job—meaning a position "that requires the employee to be physically present in New York." 41 N.Y.3d 446, 452–53 & n.2 (2024). The TAC does not allege that the Giants' head-coach position is such a job. It alleges that the Giants are headquartered in New Jersey. TAC ¶ 38. Neither the TAC nor the Opposition alleges that the head coach's regular workplace would have been in New York, much less that the position required physical presence within the State.

The Opposition's cases confirm that tangential New York contacts are insufficient where the plaintiff works elsewhere. *See Trotter v. Nat'l Football League*, 737 F. Supp. 3d 172, 192–95 (S.D.N.Y. 2024) (NFL's New York headquarters and allegations that employment decisions were made in New York insufficient where plaintiff lived and worked in California); *Kingston v. Int'l*



ME1\62330915.v2

*Bus. Machs. Corp.*, 187 A.D.3d 578, 579 (1st Dep't 2020) (New York-based managers and clients and occasional New York travel insufficient where plaintiff lived and worked elsewhere).

Flores' asserted New York contacts are even more attenuated. The Giants' "New York" name, historic stadiums, Super Bowl parades, charitable partnerships, and coach's press-conference rhetoric—which are absent from the TAC—say nothing about where Flores would have worked as the Giants' head coach. Nor does speculation that he might have occasionally traveled to New York for a game against the Buffalo Bills or other unspecified business transform a New Jersey-based position into a New York-based one. The NFL's Manhattan headquarters and alleged oversight likewise do not change the location of the job Flores sought. Even if the NFL exercised some control from New York, Flores sought the Giants' head-coach position, not employment at the League office. Treating every NFL club job as New York-based because the League is headquartered there would effectively erase the territorial limitation of NYSHRL and NYCHRL.

Counts II, III, IV, and V should be dismissed on this additional and independent ground.

## **CONCLUSION**

For the foregoing reasons, all claims against the Giants should be dismissed with prejudice.

Dated: August 19, 2026

Respectfully submitted,

By: /s/ Brian W. Carroll
Brian W. Carroll
Hugh F. Murray, III (*pro hac vice*)
Mark A. Makar
Scott Weingart (*pro hac vice* forthcoming)
**McCARTER & ENGLISH, LLP**
250 W 55th Street, 13th Floor
New York, New York 10019
(212) 609-6800
bcarroll@mccarter.com
hmurray@mccarter.com
mmakar@mccarter.com
sweingart@mccarter.com

*Counsel for Defendant*
*New York Football Giants, Inc.,*
*n/k/a New York Football Giants LLC*

**CERTIFICATE OF COMPLIANCE**

In accordance with Rule 7.1(c) of the Local Civil Rules of the United States District Court for the Southern District of New York, I hereby certify that this document contains 3,500 words, excluding the parts of the document that are exempted by Rule 7.1(c).

*/s/ Brian W. Carroll*
Brian W. Carroll

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Reply was served by CM/ECF on all counsel of record in this matter, on August 19, 2026.

*/s/ Brian W. Carroll*
Brian W. Carroll